AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |
|---|---|---|

INDEPENDENT ASSET MANAGEMENT LLC
and OLA HOLMSTROM

V.

DANIEL ZANGER

AMENDED
**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:    1:07-CV-06431-JSR

TO: (Name and address of Defendant)

Daniel Zanger
21814 Sam Miguel Street
Woodland Hills, CA 91364

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

CRAIG STUART LANZA, ESQ.
BALESTRIERE, PLLC
Attorney for Plaintiff
Office and Post Office Address, Telephone
225 Broadway - Suite 2700
New York, New York 10007
(212) 374-5401

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

OCT 2 3 2007

DATE

(By) DEPUTY CLERK



John Balestriere
Craig Stuart Lanza
**BALESTRIERE PLLC**
225 Broadway, Suite 2700
New York, NY 10007
Telephone: 212-374-5404
Email: clanza@balestriere.net
*Attorneys for Plaintiffs*

OCT 2 3 2007
U.S.D.C. S.D.N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| INDEPENDENT ASSET MANAGEMENT LLC and OLA HOLMSTROM, | : |
| | : |
| Plaintiffs, | :     1:07-CV-06431-JSR |
| | : |
| | :     ECF |
| -against- | : |
| | :     **AMENDED COMPLAINT** |
| | : |
| DANIEL ZANGER, | :     **JURY TRIAL DEMANDED** |
| | : |
| Defendant, | : |

-------------------------------------------------------------x

Plaintiffs Independent Asset Management ("IAM") and Ola Holmstrom ("Holmstrom") (collectively, "Plaintiffs"), by their attorneys, John Balestriere PLLC, respectfully allege as follows:

### NATURE OF THE CASE

1.     Defendant Daniel Zanger ("Defendant" or "Zanger") accepted the responsibility to act as a fiduciary when he became involved in a joint venture with IAM and agreed to manage Holmstrom's money. During the course of his partnership with IAM, Zanger breached his contract with IAM over 125 times, acting so recklessly that he greatly damaged IAM's reputation and finances, and squandered Holmstrom's

money.  Plaintiffs have been unsuccessful in receiving any compensation for these damages in the negotiations they have had with Zanger, through his attorney, and are thus forced to bring this lawsuit.

## PARTIES

2.    Plaintiff IAM is the trading manager and marketer for The Independent Fund Limited ("IFL"), a Bermuda-based hedge fund. IAM is a Delaware LLC and a citizen of the United States and the State of Delaware.

3.    Plaintiff Ola Holmstrom is a minor equity holder of IAM and former investor in IFL and is a citizen of Sweden.

4.    Defendant Daniel Zanger is a multi-millionaire and former trader for IAM and IFL and is a citizen of the United States and the State of California.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1332(a)(1)-(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties are diverse because Plaintiff IAM is a citizen of Connecticut and Delaware, Plaintiff Holmstrom is a citizen of Sweden, and Defendant is a citizen of California. This Court may properly exercise personal jurisdiction over the parties, because Plaintiffs submit to the jurisdiction of this Court and Defendant has purposefully availed himself of the benefits and protections of the laws of the State of New York.

6.    Specifically, Defendant has submitted himself to jurisdiction in this district by signing in New York City a contract between himself and IAM (the

2

"Agreement"), the contract out of which this dispute arises. Additionally, Defendant has systematic and continuous contact with the State of New York because he spends substantial periods of time in the State for both business and personal activities.

7.    Venue is properly laid in the Southern District of New York, under 28 U.S.C. §1391(a)(2), because the claims arose in this District.

## FACTS

8.    IFL is a hedge fund incorporated under the laws of Bermuda and registered with the Bermuda Monetary Authority.

9.    IAM, established on February 16, 2001, is an experienced marketer and trading manager of hedge funds. A trading manager, also known as an investment manager, manages the assets of a hedge fund.

10.    IAM is the trading manager for IFL.

11.    On or about October 19, 2004, Defendant entered into an agreement (the "Agreement") with IAM whereby Defendant agreed to manage a class of share issued by IFL, in this case, Class Z shares.

12.    IAM and Defendant entered into the Agreement because Defendant was in need of an existing offshore investing vehicle as well as someone to market him as a trader, and IAM was an experienced hedge fund marketer and manager that could provide to Defendant what he needed.

13.    Accordingly, IAM and Defendant agreed to a joint venture whereby Defendant would invest his own money in IFL and manage that money. IAM and

3

Defendant would then use Defendant's performance in IFL to market Defendant to outside investors.

14.     Under the Agreement, Defendant agreed to invest between $5 million and $50 million of his own money in IFL for a term of five (5) years. Defendant further agreed that he would keep at least $5 million in IFL for the entire five year period.

15.     Under the Agreement, as compensation for its marketing and management efforts, IAM was entitled to fifty percent (50%) of the management fees (the "Management Fee") from IFL and twenty-five percent (25%) of the performance fees (the "Performance Fee"). Defendant was to receive the remaining fifty percent (50%) and seventy-five percent (75%) of the Management Fee and Performance Fee, respectively.

16.     A management fee is the amount that a hedge fund manager receives annually as compensation for managing a fund. In this case, the Management Fee was two percent (2%) of the value of assets under management ("AUM"). IAM was therefore entitled to a Management Fee equal to one percent (1%) of IFL's AUM.

17.     A performance fee is the amount that a hedge fund manager receives based on the performance of the fund. In this case, the Performance Fee was twenty percent (20%) of all returns of the fund. IAM was therefore entitled to a Performance Fee equal to five percent (5%) of IFL's returns.

18.     Prior to the execution of the Agreement between IAM and Defendant, Defendant had established a reputation as a volatile trader. IAM thus required several

4

assurances that Defendant would safeguard the fund's assets and trade responsibly, and Defendant agreed to give IAM such assurances.

19.    Among other things, under the Agreement, Defendant expressly agreed to (a) stay within risk confines as indicated by the offering memorandum; (b) limit leverage; (c) emphasize liquidity in maintaining positions; (d) disclose to IAM the fund's positions at all times; (e) comply with all Goldman Sachs Execution and Clearing, L.P.'s limits, rules, or guidelines; (f) be transparent and compliant to IAM and IFL; (g) keep drawdowns below twenty percent (20%); (h) comply with all applicable laws, rules, regulations, and rules of exchanges on which Defendant traded; and (i) comply with any and all of IAM's reasonable requests of Defendant (See Exhibit 1 ¶¶ 1, 7, 14.)

20.    Pursuant to the Prime Brokerage Agreement signed by IAM, Defendant, and Goldman Sachs Execution and Clearing, L.P. ("Prime Broker") on or about September 9, 2005, Defendant was, among other things, obligated to (a) refrain from inducing margin calls by maintaining adequate margins in the account so as to continually meet the original and maintenance margin requirements established by Prime Broker; (b) pay immediately any margin deficiencies that might arise; and (c) refrain from making any trade that would exceed any limitations imposed. (See Exhibit 2 at 7 ¶ 2.)

21.    Pursuant to the Power of Attorney agreement Defendant signed in connection with the Prime Brokerage Agreement, Defendant was also prohibited from

making personal withdrawals directly from IFL without first obtaining written authorization from IFL. (See Exhibit 2 at 3 ¶ 3.)

22.    A drawdown is an unrealized or realized loss which is calculated as a fund's decline from its historical peak. It is commonly used in the world of trading as an indicator of risk.

23.    A margin call occurs when an investor has borrowed money to purchase securities and the value of the securities falls below a preset amount. This preset amount may be established by government agencies, self-regulatory organizations, securities exchanges, and agreements executed between private parties. If the value of the securities falls below that preset amount, a margin violation has occurred, a margin call will subsequently issue, and the investor will be required to deposit additional funds to restore the account value to or above the preset level. A margin call usually occurs because of over-aggressive investing.

24.    Soon after the Agreement between IAM and Defendant was executed, it became abundantly clear that Defendant was unwilling to uphold his contractual obligations. Defendant deposited only the minimum required amount of $5 million into the account and then began to manage the account in a very aggressive and very volatile manner, leading to significant trading losses and impeding IAM's ability to assemble new investors to IFL.

25.    Notwithstanding IAM's experience in marketing funds and its unrelenting efforts to find additional investors for IFL, due to Defendant's poor

performance, IAM was able to find only one additional investor. On March 1, 2006, Holmstrom invested $500,000 in IFL as a result of the marketing efforts of IAM.

26.    In addition to managing the fund in an excessively aggressive and risky manner, early on in the relationship between IAM and Defendant, Defendant began to complain of the terms of the Agreement, accusing IAM of "making money" off of Defendant.

27.    These complaints are well documented in transcripts of instant messenger communications. Apparently, Defendant disregarded portions of the Agreement outlining IAM's contributions to the joint-venture and believed that IAM deserved no remuneration for its constant efforts of finding investors and managing the fund.

28.    In the course of serving as a fund manager for IFL, Defendant continually violated the Agreement between IAM and Defendant, the Prime Brokerage Agreement, and numerous exchange rules.

29.    In the course of serving as fund manager for IFL, Defendant induced at least 115 margin calls, each of which was a direct violation of his Agreement with IAM to comply with the Prime Brokerage Agreement and also with applicable statutes, rules, and regulations.

30.    Of these 115 margin calls, 66 represented violations of the Prime Broker's house margin rules; 46 represented violations of Regulation T, promulgated by the Securities and Exchange Commission in an effort to reduce market volatility; and the remaining 3 represented violations of Rule 431 of the New York Stock Exchange ("NYSE").

7

| | | | |
|---|---|---|---|
| 9 | 5/6/05 | 5/11/05 | $ 439,411.00 |
| 10 | 5/6/05 | 5/11/05 | $439,411.00 |
| 11 | 5/11/05 | 5/16/05 | $1,106,102.00 |
| 12 | 5/11/05 | 5/16/05 | $1,106,102.00 |
| 13 | 5/12/05 | 5/17/05 | $913,233.00 |
| 14 | 5/12/05 | 5/17/05 | $913,233.00 |
| 15 | 5/17/05 | 5/20/05 | $219,483.00 |
| 16 | 5/17/05 | 5/20/05 | $219,483.00 |
| 17 | 5/18/05 | 5/23/05 | $448,978.00 |
| 18 | 5/18/05 | 5/23/05 | $448,978.00 |
| 19 | 5/27/05 | 6/2/05 | $266,361.00 |
| 20 | 5/27/05 | 6/2/05 | $266,361.00 |
| 21 | 5/31/05 | 6/3/05 | $3,080.00 |
| 22 | 5/31/05 | 6/3/05 | $3,080.00 |
| 23 | 6/1/05 | 6/6/05 | $951,131.00 |
| 24 | 6/1/05 | 6/6/05 | $951,131.00 |
| 25 | 6/9/05 | 6/14/05 | $1,712,375.00 |
| 26 | 6/9/05 | 6/14/05 | $1,712,375.00 |
| 27 | 7/8/05 | 7/13/05 | $789,827.00 |
| 28 | 7/8/05 | 7/13/05 | $789,827.00 |
| 29 | 7/12/05 | 7/15/05 | $234,013.00 |
| 30 | 7/12/05 | 7/15/05 | $234,013.00 |
| 31 | 7/13/05 | 7/18/05 | $424,644.00 |
| 32 | 7/13/05 | 7/18/05 | $424,644.00 |
| 33 | 7/20/05 | 7/25/05 | $1,445,219.00 |
| 34 | 7/20/05 | 7/25/05 | $1,445,219.00 |
| 35 | 8/1/05 | 8/4/05 | $638,152.00 |
| 36 | 8/1/05 | 8/4/05 | $638,152.00 |
| 37 | 8/2/05 | 8/5/05 | $3,624.00 |

| 38 | 8/2/05 | 8/5/05 | $3,624.00 |
|----|--------|--------|-----------|
| 39 | 8/8/05 | 8/11/05 | $262,474.00 |
| 40 | 8/8/05 | 8/11/05 | $262,474.00 |
| 41 | 8/12/05 | 8/17/05 | $808,939.00 |
| 42 | 8/12/05 | 8/17/05 | $808,939.00 |
| 43 | 8/16/05 | 8/19/05 | $105,855.00 |
| 44 | 8/16/05 | 8/19/05 | $105,855.00 |
| 45 | 8/22/05 | 8/25/05 | $315,398.00 |
| 46 | 8/22/05 | 8/25/05 | $315,398.00 |

Source: Goldman Sachs Execution & Clearing, L.P.

## VIOLATIONS OF NYSE RULE 431

NYSE Rule 431 is the primary rule governing margin trading in securities listed on the New York Stock Exchange and was promulgated by the New York Stock Exchange pursuant to its rulemaking power vested in it as a national securities exchange. Before going into effect, each rule of the New York Stock exchange must be approved by the Securities and Exchange Commission.

Rule 431(b) specifies that the initial margin requirement must be the greater of (1) the amount specified in Regulation T of the Board of Governors of the Federal Reserve System, or Rules 400 through 406 of the Exchange Act or Rules 41.42 through 41.48 of the Commodity Exchange Act; (2) the amount specified in section (c) of this Rule; (3) such greater amount as the Exchange may from time to time require for specific securities; or (4) equity of at least $2,000 except that cash need not be deposited in excess of the cost of any security purchased (this equity and cost of purchase provision shall not apply to "when distributed" securities in a cash account). The

minimum equity requirement for a "pattern day trader" is $25,000 pursuant to paragraph (f)(8)(B)(iv)(1) of this Rule. (See NYSE Rule 431(b).)

Rule 431(c) states that the minimum maintenance margin requirements is (1) 25% of the current market value of all securities except for securities futures contracts "long" in the account; plus (2) $2.50 per share or 100% of the current market value, whichever amount is greater, of each stock "short" in the account selling at less than $5.00 per share; plus (3) $5.00 per share or 30% of the current market value, whichever amount is greater, of each stock "short" in the account selling at $5.00 per share or above; plus (4) 5% of the principal amount or 30% of the current market value, whichever amount is greater, of each bond "short" in the account. The minimum maintenance margin levels for security futures contracts , long and short, shall be 20% of the current market value of such contract.

In the instant case, Defendant violated NYSE Rule 431 on the following days and in the following amounts by failing to maintain the requisite level of margin:

| SUMMARY OF NYSE RULE 431 MARGIN VIOLATIONS | | | |
|---|---|---|---|
| # | Trade Date | Due Date | Margin Call Amount |
| 1 | 10/12/06 | 10/17/06 | $391,367.00 |
| 2 | 10/13/06 | 10/18/06 | $25,528.00 |
| 3 | 11/6/06 | 11/9/06 | $161,922.00 |

Source: Goldman Sachs Execution & Clearing, L.P.

VIOLATIONS OF PRIME BROKER HOUSE MARGIN RULES

Defendant, Plaintiff IAM, and the Prime Broker signed the Prime Brokerage agreement on or about September 9, 2005, which governed the relationship between the parties with respect to the management of IFL. Among other things, the agreement governed the manner in which Defendant was permitted to trade on margin and is stated in relevant part below:

> Customer agrees at all times to maintain adequate margins in the account so as continually to meet the original and maintenance margin requirements established by GSEC in its sole discretion from time to time. GSEC's margin requirements may exceed the margin requirements set by any exchange or other regulatory authority and need not be in uniform as among other customers or commodities. Customer agrees to pay to GSEC the amount of the premium for every option purchased for the account. Customer agrees to deposit margins and pay premiums immediately upon GSEC's request. Payments shall be made in immediately available U.S. dollars to GSEC at the address shown at Section 8 herein or as GSEC shall notify customer. GSEC shall have the right to retain any interest with respect to any cash margins deposited in the account. (See Ex. 2 at 7 ¶ 2).

In addition to the aforementioned violations of Regulation T and NYSE Rule 431, Defendant breached the Prime Brokerage Agreement by failing to maintain margin requirements as rightfully established by the Prime Broker. In direct contravention of the Prime Brokerage Agreement, Defendant induced sixty-six (66) house margin calls, each of which is illustrated below.

| SUMMARY OF PRIME BROKER MARGIN VIOLATIONS | | | |
|---|---|---|---|
| # | Trade Date | Due Date | Margin Call Amount |
| 1 | 8/30/05 | 9/2/05 | $108,295.00 |
| 2 | 8/30/05 | 9/2/05 | $108,295.00 |
| 3 | 8/31/05 | 9/6/05 | $714,294.00 |

13

| | | | |
|---|---|---|---|
| 4 | 8/31/05 | 9/9/05 | $74,294.00 |
| 5 | 9/7/05 | 9/12/05 | $54,074.00 |
| 6 | 9/7/05 | 9/12/05 | $54,074.00 |
| 7 | 9/9/05 | 9/14/05 | $454,513.00 |
| 8 | 9/9/05 | 9/14/05 | $454,513.00 |
| 9 | 9/13/05 | 9/16/05 | $576,206.00 |
| 10 | 9/13/05 | 9/16/05 | $576,206.00 |
| 11 | 9/29/05 | 10/4/05 | $238,082.00 |
| 12 | 9/29/05 | 10/4/05 | $238,082.00 |
| 13 | 9/30/05 | 10/5/05 | $147,267.00 |
| 14 | 9/30/05 | 10/5/05 | $147,267.00 |
| 15 | 10/26/05 | 10/31/05 | $631,813.00 |
| 16 | 10/27/05 | 11/1/05 | $60,216.00 |
| 17 | 11/4/05 | 11/9/05 | $96,975.00 |
| 18 | 11/7/05 | 11/10/05 | $147,263.00 |
| 19 | 11/10/05 | 11/15/05 | $58,170.00 |
| 20 | 11/11/05 | 11/16/05 | $1,285,236.00 |
| 21 | 11/14/05 | 11/17/05 | $7,311.00 |
| 22 | 11/18/05 | 11/23/05 | $162,986.00 |
| 23 | 12/9/05 | 12/14/05 | $38,254.00 |
| 24 | 12/14/05 | 12/19/05 | $102,753.00 |
| 25 | 1/6/06 | 1/11/06 | $391,412.00 |
| 26 | 1/9/06 | 1/12/06 | $1,508,385.00 |
| 27 | 1/10/06 | 1/13/06 | $187,451.00 |
| 28 | 1/11/06 | 1/17/06 | $3,689.00 |
| 29 | 1/17/06 | 1/20/06 | $593,979.00 |
| 30 | 1/24/06 | 1/27/06 | $2,119,659.00 |
| 31 | 1/31/06 | 2/3/06 | $250,464.00 |
| 32 | 3/3/06 | 3/8/06 | $11,787.00 |

14

| | | | |
|---|---|---|---|
| 33 | 3/16/06 | 3/21/06 | $958,781.00 |
| 34 | 4/3/06 | 4/6/06 | $1,215,918.00 |
| 35 | 4/4/06 | 4/7/06 | $1,945,404.00 |
| 36 | 4/7/06 | 4/12/06 | $164,198.00 |
| 37 | 4/17/06 | 4/20/06 | $1,582,397.00 |
| 38 | 4/19/06 | 4/24/06 | $3,285.00 |
| 39 | 4/21/06 | 4/26/06 | $891,440.00 |
| 40 | 4/24/06 | 4/27/06 | $20,397.00 |
| 41 | 5/2/06 | 5/5/06 | $833,932.00 |
| 42 | 5/8/06 | 5/11/06 | $797,676.00 |
| 43 | 5/9/06 | 5/12/06 | $201,101.00 |
| 44 | 5/11/06 | 5/16/06 | $1,729,991.00 |
| 45 | 6/29/06 | 7/5/06 | $1,209,585.00 |
| 46 | 6/30/06 | 7/6/06 | $354,300.00 |
| 47 | 7/5/06 | 7/10/06 | $951,767.00 |
| 48 | 7/6/06 | 7/11/06 | $149,277.00 |
| 49 | 7/7/06 | 7/12/06 | $459,367.00 |
| 50 | 8/16/06 | 8/21/06 | $934,740.00 |
| 51 | 8/17/06 | 8/22/06 | $86,593.00 |
| 52 | 8/18/06 | 8/23/06 | $154,072.00 |
| 53 | 8/21/06 | 8/24/06 | $87,519.00 |
| 54 | 9/14/06 | 9/19/06 | $244,540.00 |
| 55 | 9/18/06 | 9/21/06 | $409,128.00 |
| 56 | 10/3/06 | 10/6/06 | $411,221.00 |
| 57 | 10/4/06 | 10/10/06 | $756,195.00 |
| 58 | 10/5/06 | 10/11/06 | $19,068.00 |
| 59 | 10/6/06 | 10/12/06 | $352,405.00 |
| 60 | 10/12/06 | 10/17/06 | $1,480,866.00 |
| 61 | 10/13/06 | 10/18/06 | $33,052.00 |

| 62 | 10/23/06 | 10/26/06 | $4,006.00 |
| 63 | 11/6/06 | 11/9/06 | $1,417,661.00 |
| 64 | 11/8/06 | 11/13/06 | $647,160.00 |
| 65 | 11/16/06 | 11/21/06 | $350,629.00 |
| 66 | 11/22/06 | 11/28/06 | $446,956.00 |

Source: Goldman Sachs Execution & Clearing, L.P.

31.    Because the Agreement with IAM required Defendant to comply with all applicable laws, rules, and regulations (See Exhibit 1 ¶ 13), each one of these margin calls represents a breach of the Agreement between IAM and Defendant.

32.    Moreover, because the Prime Brokerage Agreement required Defendant to maintain sufficient margin levels at all times (See Exhibit 2 at 7 ¶ 2), any margin call represents a deficiency in the required level of margin and, thus, constitutes a violation of the Prime Brokerage Agreement, which, in turn, amounts to a violation of the Agreement between IAM and Defendant.

33.    In an attempt to cover some, but not all, of the violative margin calls that Defendant himself induced, Defendant again breached the Prime Brokerage and, as a consequence, the Agreement, by violating the provision of the Power of Attorney agreement prohibiting personal withdrawals from IFL's account without written authorization from IFL. (See Exhibit 2 at 3 ¶ 3.)

34.    Defendant initially covered his prohibited margin deficiencies by electronically transferring or "wiring" Defendant's own money from Defendant's own personal account into IFL's account to cover the call. After the margin deficiency had been fully satisfied, Defendant would then, in direct contravention of the Power of

15

Attorney agreement (See Exhibit 2 at 3 ¶ 3.), attempt to withdraw the funds that he had previously personally deposited directly with IFL.

35.    The manner in which Defendant wired the money was inconsistent with the rules of the Prime Broker (See Exhibit 2 at 3 ¶ 3.), which amounted to yet another violation of the Agreement. As such, Defendant's wires were treated as additional subscriptions of IFL and when Defendant attempted to take the additional money out of the fund, his withdrawals were treated as redemptions and Defendant was required to wait three to four weeks before he could receive the money.

36.    In the course of attempting to wire money into and out of IFL, which Defendant attempted to conceal from IAM, Defendant failed to notify IAM about what he was doing or why he was doing it, forcing IAM to learn of Defendant's activities through other parties, even though the Agreement  between Defendant and IAM expressly required Defendant to keep IAM informed of IFL's positions at all time (See Exhibit 1 ¶ 1(d).)

37.    In addition to the aforementioned margin calls triggered by Defendant's flagrantly aggressive and excessively leveraged trading, Defendant induced multiple day trading violations in contravention of NYSE Rule 431(f)(8)(B).

38.    Rule 431(f)(8)(B) provides in pertinent part that the special maintenance margin requirement for the day trades in equity accounts shall be 25%, that the minimum equity required for pattern day traders shall be $25,000, and that pattern day traders cannot trade in excessive of their day trading buying power.

16

39.    On November 9, 2006, Defendant violated Rule 431(f)(8)(B) by inducing a day trading call in the amount of $134,372. In accordance with NYSE Rule 431(f)(8)(B)(iv), the Prime Broker imposed day trading limits by which Defendant's buying power would be limited two times the available equity in a customer's account, a 2:1 buying power ratio.

40.    Defendant ignored the Prime Broker's repeated attempts to ascertain whether and how Defendant was going to cover the day trading call.

41.    Moreover, Defendant told IAM that he refused to cover any more margin calls. In Defendant's own words, "I'm not sending in any more money . . . no more 3-4 week waits." (See Exhibit 3.) After further inquiry by IAM, Defendant said that he was going to do "nothing" about the day trading margin call.

42.    Ultimately, Defendant failed to meet the day trading call by the due date of November 16, 2006, a violation of NYSE Rule 431(f)(8)(C).

43.    After the November 9, 2006, call was not met, the Prime Broker imposed further day trading limits pursuant to NYSE Rule 431(f)(8)(B)(iv) by which Defendant's buying power would be limited to 1:1.

44.    On November 30, 2006, Defendant violated Rule 431(f)(8)(B) and induced a second day trade call, this time in the amount of $2,850,461. Defendant again refused to meet the day trading call and ultimately failed to meet the call by the due date of December 7, 2006, another violation of NYSE Rule 431(f)(8)(C).

45.    Because Defendant refused to cover the November 9, 2006 and November 30, 2006, margin calls, pursuant to NYSE Rule 431(f)(8)(B)(iv)(3), the Prime Broker

17

restricted IFL's account to trading on a cash available basis for ninety (90) days or until Defendant's day trading margin calls were met. Because IFL was highly leveraged and was required by the Prime Broker to trade on a cash available basis, IFL was effectively forced to shut down its operations and cease functioning as a hedge fund.

46.    Shortly thereafter, on December 11, 2006, the Prime Broker effectively terminated the account with IFL as a result of Defendant's repeated failure to comply with the Prime Brokerage Agreement and patent refusal to satisfy the day trading margin calls.

47.    On December 11, 2006, the Prime Broker restricted the account to liquidating or closing transactions, further shutting down the IFL's operations.

48.    Because IFL had effectively ceased operations, Defendant was permitted to redeem his shares. Thus, by engaging in further misconduct by refusing to cover the large margin call, Defendant was able to avoid full performance and escape a five (5) year contract in only two (2) years.

49.    As a direct result of Defendant's misconduct, Butterfield Fund Services, IFL's fund administrator, was also forced to close its account with IFL and withdraw from its position as fund administrator, after having threatened to do so on account of Defendant's inability to trade within the confines of the law.

50.    As a result of Defendant's actions, Ola Holmstrom lost about 34% of his investment, approximately $170,000. IAM is estimating conservatively $6 million to $8 million dollars in revenue lost and lost opportunities, and in conjunction with debt and

other obligations which now cannot be handled for lack of revenues from the five (5) year deal.

## COUNT I – BREACH OF CONTRACT
## (BROUGH BY IAM AGAINST DEFENDANT)

51.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 50 of this Complaint as if fully set forth herein.

52.    A valid contract (the "Agreement") existed between IAM and Defendant.

53.    IAM fully performed its obligations under the Agreement by exercising its best efforts to manage and market the fund and by otherwise acting within the confines of the Agreement.

54.    Defendant breached the Agreement by, *inter alia*, refusing to disclose to IAM the fund's positions at all times. As explained above and as indicated by various communications, Defendant frequently failed to inform IAM as to the fund's positions and also failed to inform IAM as to the amount of money that was being transferred into and out of IFL.

55.    As explained above, Defendant breached the Agreement by refusing to keep drawdowns below 20%.

56.    As explained above, Defendant breached the Agreement by refusing to comply with all applicable laws, rules, regulations, and rules of exchanges on which Defendant traded.

57.    As explained above, Defendant breached the Agreement by refusing to comply with Prime Broker limits, rules, or guidelines. Pursuant to the Prime Brokerage

Agreement, which Defendant was obligated to comply with under Section 1(e) of the Agreement, Defendant was required to refrain from inducing margin calls by maintaining adequate margins in the account so as to continually meet the original and maintenance margin requirements established by Prime Broker, yet he induced at least 115 margin calls and at least 2 day trading violations in direct breach of the Prime Brokerage Agreement.

58.    Pursuant to the Prime Brokerage Agreement, which Defendant was obligated to comply with under Section 1(e) of the Agreement, Defendant was required to pay immediately any margin deficiencies that might arise. However, Defendant consistently failed to respond to inquiries made by the Prime Broker, frequently let several days pass before ever taking any corrective action, and flatly refused to cover a margin call of $2,850,461, therefore constituting a breach of the Prime Brokerage Agreement and, consequently, of the Agreement between Defendant and IAM as well.

59.    Pursuant to the Prime Brokerage Agreement, which Defendant was obligated to comply with under Section 1(e) of the Agreement, Defendant was required to refrain from making any trade that would exceed any limitations imposed upon IFL. As explained above, Defendant plainly violated this provision on more than one occasion — November 9, 2006, and November 30, 2006 — thereby constituting a breach of the Prime Brokerage Agreement and, consequently, of the Agreement between Defendant and IAM.

60.    Pursuant to the Power of Attorney agreement signed in connection with Prime Brokerage Agreement, which Defendant was obligated to comply with under

20

Section 1(e) of the Agreement, Defendant was prohibited from making personal withdrawals directly from IFL without first obtaining written authorization from IFL. As explained above, however, Defendant made personal withdrawals from IFL, which was a direct violation of the terms of the Power of Attorney agreement and, thus, a breach of the Agreement between Defendant and IAM.

61.    Given the incessant nature of Defendant's malfeasance as well as his unwillingness to accept responsibility for any trading losses or any violations that he caused, it is clear that Defendant's actions rose to the level of gross negligence and/or willful malfeasance.

62.    As a result of Defendant's multiple breaches, IAM was damaged in that it was forced to shut down its operations and was denied the opportunity to receive the benefit of five (5) years' worth of Management Fees and Performance Fees of the fund, based on a minimum AUM of $5 million.

## COUNT II – BREACH OF FIDUCIARY DUTY
## (BROUGHT BY IAM AGAINST DEFENDANT)

63.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62 of this Complaint as if fully set forth herein.

64.    IAM and Defendant were engaged in a joint venture and owed to each other a fiduciary duty.

65.    Defendant wanted to get out of joint venture because Defendant felt that IAM was "making money" off of him.

21

66.    Defendant knew that his refusal to cover the margin calls would ultimately compel the premature termination of the fund and of Defendant's obligations under the Agreement.

67.    Accordingly, Defendant recklessly caused excessive margin calls and then intentionally refused to cover such calls in order to shut IFL down and redeem his money.

68.    Defendant breached his fiduciary duty to IAM by placing his own interests first in order to get out of the Agreement.

## COUNT III – BREACH OF FIDUCIARY DUTY
## (BROUGHT BY HOLMSTROM AGAINST DEFENDANT)

69.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.    As manager of Holmstrom's money, Defendant owed a fiduciary duty to Holmstrom.

71.    Defendant breached this duty and placed his own interests first above those of Holmstrom's by, among other things, recklessly causing excessive margin calls and intentionally refusing to cover the final margin call as a means of shutting IFL down and, thus, getting out of the Agreement.

## COUNT IV – TORTIOUS INTERFERENCE
## (BROUGHT BY HOLMSTROM AGAINST DEFENDANT)

72.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 71 of this Complaint as if fully set forth herein.

73.    A valid contract existed between IAM and Holmstrom.

22