Name of Offeree: _____
Memorandum No. _____

# THE INDEPENDENT FUND LIMITED

**(a Bermuda Company registered under The Companies Act 1981)**

CONFIDENTIAL OFFERING MEMORANDUM

An offering up to $200,000,000

The date of this Confidential Offering Memorandum is November 1, 2004

PURSUANT TO AN EXEMPTION FROM THE COMMODITY FUTURES TRADING COMMISSION IN CONNECTION WITH POOLS WHOSE PARTICIPANTS ARE LIMITED TO QUALIFIED ELIGIBLE PERSONS, AN OFFERING MEMORANDUM FOR THIS POOL IS NOT REQUIRED TO BE, AND HAS NOT BEEN, FILED WITH THE COMMISSION.  THE COMMODITY FUTURES TRADING COMMISSION DOES NOT PASS UPON THE MERITS OF PARTICIPATING IN A POOL OR UPON THE ADEQUACY OR ACCURACY OF AN OFFERING MEMORANDUM.  CONSEQUENTLY, THE COMMODITY FUTURES TRADING COMMISSION HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY OFFERING MEMORANDUM FOR THIS POOL.

THE CIRCULATION AND DISTRIBUTION OF THIS OFFERING MEMORANDUM IN CERTAIN JURISDICTIONS IS RESTRICTED BY LAW. THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT LAWFUL, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO. PERSONS WHO COME INTO POSSESSION OF THIS OFFERING MEMORANDUM ARE REQUIRED TO INFORM THEMSELVES OF, AND TO OBSERVE, ANY SUCH RESTRICTIONS.

THE DIRECT OR INDIRECT SALE OF SHARES OF THE FUND IN THE UNITED STATES OR THE DIRECT OR INDIRECT SALE, TRANSFER OR ASSIGNMENT OF, THE GRANT OF AN OPTION WITH RESPECT TO, OR THE GRANT OF ANY SIMILAR RIGHT WITH RESPECT TO, SHARES OF THE FUND TO UNITED STATES PERSONS IS EXPRESSLY PROHIBITED, EXCEPT THAT THE BOARD OF DIRECTORS HAS THE DISCRETION TO ACCEPT SUBSCRIPTIONS FROM A LIMITED NUMBER OF U.S. INVESTORS THAT ARE QUALIFIED ELIGIBLE PERSONS AND PENSION OR PROFIT SHARING TRUSTS, OR OTHER TAX EXEMPT ENTITIES.

THE CONTENTS OF THIS CONFIDENTIAL OFFERING MEMORANDUM DO NOT CONSTITUTE LEGAL OR TAX ADVICE. EACH PROSPECTIVE PURCHASER SHOULD CONSULT HIS OWN PROFESSIONAL ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

SHARES WILL BE ISSUED ONLY ON THE BASIS OF THE INFORMATION AND REPRESENTATIONS IN THIS OFFERING MEMORANDUM, AND NO OTHER INFORMATION OR REPRESENTATION HAS BEEN AUTHORIZED. ANY PURCHASE MADE BY ANY PERSON ON THE BASIS OF STATEMENTS OR REPRESENTATIONS NOT CONTAINED HEREIN OR INCONSISTENT WITH INFORMATION CONTAINED HEREIN SHALL BE SOLELY AT THE RISK OF THE PURCHASER. NEITHER DELIVERY OF THIS CONFIDENTIAL OFFERING MEMORANDUM NOR ANYTHING STATED HEREIN SHOULD BE TAKEN TO IMPLY THAT ANY INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. THIS CONFIDENTIAL OFFERING MEMORANDUM MAY NOT IN ANY EVENT BE USED FOR AN OFFER OR SOLICITATION IN ANY JURISDICTION OR IN ANY CIRCUMSTANCE IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED OR LAWFUL.

SHARES OF THE FUND OFFERED HEREBY ARE SUITABLE ONLY FOR SOPHISTICATED INVESTORS WHO ARE ABLE TO BEAR THE POSSIBLE LOSS OF THEIR ENTIRE INVESTMENT AND WHO ARE WILLING TO ACCEPT THE RISKS INVOLVED IN AN INVESTMENT IN SHARES OF THE FUND. *(SEE "CERTAIN RISK FACTORS")*

SHARES OF THE FUND OFFERED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY PURSUANT TO THE PROVISIONS OF THE BYE-LAWS OF THE COMPANY, HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATES, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS AND MAY NOT BE RESOLD WITHOUT REGISTRATION OR AN APPROPRIATE EXEMPTION FROM SUCH LAWS. IN ADDITION, NO PUBLIC OR OTHER MARKET CURRENTLY EXISTS FOR SHARES OF THE FUND AND IT IS UNLIKELY THAT ANY SUCH MARKET WILL EXIST IN THE FUTURE.

THIS OFFERING MEMORANDUM HAS NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, STATE SECURITIES COMMISSIONS OR ANY OTHER REGULATORY AUTHORITIES, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER OF THE SHARES OF THE FUND TO ANY MEMBERS OF THE PUBLIC OF BERMUDA, OR ANY OTHER JURISDICTION.

THE DIRECTORS OF THE FUND WHOSE NAMES APPEAR IN THIS MEMORANDUM ACCEPT RESPONSIBILITY FOR THE INFORMATION CONTAINED IN THIS DOCUMENT. TO THE BEST OF THE KNOWLEDGE AND BELIEF OF THE DIRECTORS (WHO HAVE TAKEN ALL REASONABLE CARE TO ENSURE THAT SUCH IS THE CASE), THE INFORMATION CONTAINED IN THIS DOCUMENT IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION.  THE DIRECTORS ACCEPT RESPONSIBILITY ACCORDINGLY.

# THE INDEPENDENT FUND LIMITED

The Independent Fund Limited (the "Fund") is a limited liability, mutual fund company incorporated under the laws of Bermuda on May 31, 2001 with unlimited duration. The Fund may engage in, among other things, the speculative trading of (i) futures and options contracts and other commodity interests including futures, options and forward contracts on stock, financial and economic indices, financial instruments, metals, currencies, and agricultural products; (ii) securities; and (iii) other financial instruments and assets. The investment decisions of the Fund have been delegated to Independent Asset Management, LLC (the "Trading Manager").

This Offering Memorandum relates to the offering from time to time (as described herein) to qualified investors of redeemable Class A, B, C, D, P, Z and other common shares (the "Shares") of the Fund. Shares may be offered, sold and delivered only to qualified investors who are not United States Persons (except that the Board of Directors has the discretion to accept subscriptions from limited numbers of U.S. investors that are qualified eligible persons and pension or profit sharing trusts, or other tax exempt entities) or citizens or residents of Bermuda on the terms set forth in this Offering Memorandum. The minimum initial investment is $250,000, subject to the discretion of the Fund to raise or lower the minimum at any time, provided that such minimum shall not be less than $100,000.

The Fund's Initial Offering Period commenced prior to the date of filing of this Offering Memorandum with the Registrar of Companies in Bermuda. Thereafter, the Fund continued and intends to continue its offering, from time to time, at the Subscription Price (as defined below) and will issue a separate Series of Shares within each Class on each date that Shares of that Class are purchased. The period following the Initial Offering Period during which subscriptions may be offered shall be referred to as the "Subscription Period."

During the Subscription Period, the Shares will be offered for subscription in separate Series within each Class on the first business day of each month at a price of $1,000 per Share (the "Subscription Price"). The Trading Manager may act as placement agent for the Fund, but without specific compensation for such activity. The Fund reserves the right to retain additional placement agents should it determine that it is in the best interest of the Fund. The Fund reserves the right to reject any application in whole or in part for any reason.

The Shares may be redeemed on the last business day of each month at the option of the holder thereof, at a redemption price equal to the Net Asset Value per Share for each Series of Shares within each Class of Shares of the Fund as at the end of the last business day of the month. Any redemptions are subject to certain restrictions and conditions described herein, including a redemption charge of 2% if an investor redeems Shares within 12 months of the date on which the investor first made the investment that is the subject of the redemption. All Shares redeemed will be canceled but may be reissued.

**The Fund has been classified as a Bermuda Institutional Scheme. As such, the Fund is exempted from the need to appoint a Bermuda custodian and may not be supervised to the same degree as other schemes which are regulated and supervised by the Bermuda Monetary Authority.**

No public market for the Shares is likely to develop and it is not expected that the Shares will be listed on any stock or securities exchange.

No representation or warranty of any kind is being given and no opinion is being rendered in connection with the tax consequences to any investor in the Shares. Each investor should consult with its own tax advisor with regard to all tax implications relating to the Shares.

The Shares are available only to sophisticated persons who are willing and able to bear the economic risks of this investment and who are able to bear a substantial or complete loss of their investment in the

Shares of the Fund. The Shares are speculative and involve a high degree of risk. Trading losses can sharply reduce the Net Asset Value of the Fund and consequently the value of the investor's Shares of the Fund.

The Shares offered hereby have not been registered with or approved by the U.S. Securities and Exchange Commission (the "SEC"), the U.S. Commodity Futures Trading Commission (the "CFTC") or any regulatory authority of any state, country or other jurisdiction, nor has any such commission or regulatory authority passed upon the accuracy or adequacy of this Offering Memorandum. Any representation to the contrary is unlawful. There are restrictions on the offer and sale of the Shares and the circulation of documents relating thereto.

Since Purchasers of Shares in the Fund are limited to certain qualified investors, the Fund is eligible for exemption from certain of the CFTC disclosure, reporting and record keeping rules, and thus investors will not have the benefit of such rules.

The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended (the "1940 Act").

No person is authorized to give any information or to make any representation not contained in this Offering Memorandum in connection with the matters described herein and, if given or made, such information or representation may not be relied upon as having been authorized. This Offering Memorandum does not constitute an offer by any person within any jurisdiction in which such offer is not authorized or permitted, or in which the person making such offer is not qualified to do so, or to any person to whom such offer would be unlawful. The delivery of the Offering Memorandum at any time does not imply that information contained herein is correct as of any time subsequent to the date hereof.

The contents of this Offering Memorandum should not be construed as investment or legal advice. Each prospective investor is urged to seek independent investment and legal advice concerning the consequences of investing in the Fund.

Permission under the Exchange Control Act of 1972 (and Regulations made thereunder) has been obtained from the Bermuda Monetary Authority for the offering of up to 1,000,000 common shares of a par value of $0.01 each in the Fund, although initially only 200,000 Shares will be offered to investors. A copy of this Offering Memorandum has been delivered to the Registrar of Companies in Bermuda for filing pursuant to The Companies Act 1981 of Bermuda, as amended.

In granting such permission, and in accepting this Memorandum for filing, the Bermuda Monetary Authority and the Registrar of Companies in Bermuda accept no responsibility for the financial soundness of any proposals or for the correctness of any statements made or opinions expressed with regard to them.

Approvals or permissions received from the Bermuda Monetary Authority do not constitute a guarantee by the Authority as to the performance or creditworthiness of the Fund. Furthermore, in giving such approvals or permissions, the Authority shall not be liable for the performance or default of the Fund or for the correctness of any opinions or statements expressed.

All references herein to "dollars" or "$" are to U.S. dollars. Wherever used herein, "business day" means any day on which banks are open for business in New York and Bermuda.

The date of this Offering Memorandum is November 1, 2004.

# TABLE OF CONTENTS

Page No.

SYNOPSIS.................................................................................................................................. 7

THE FUND............................................................................................................................... 14

INVESTMENT POLICY....................................................................................................... 14

THE OFFERING ..................................................................................................................... 18

REDEMPTION OF SHARES .............................................................................................. 19

MANAGEMENT OF THE FUND ....................................................................................... 21

THE TRADING MANAGER................................................................................................. 22

ADMINISTRATION, BANKING AND CLEARING ....................................................... 23

BROKERAGE .......................................................................................................................... 24

ADVISORY FEES................................................................................................................... 25

EXPENSES OF THE FUND ................................................................................................. 26

CERTAIN DEFINITIONS .................................................................................................... 27

DESCRIPTION OF THE SHARES..................................................................................... 29

CERTAIN RISK FACTORS ................................................................................................. 30

CONFLICTS OF INTEREST ............................................................................................... 35

EXCHANGE CONTROL AND TAX .................................................................................. 36

REGULATION UNDER ERISA.......................................................................................... 37

GENERAL INFORMATION ................................................................................................ 38

FUND DIRECTORY .............................................................................................................. 40

SUBSCRIPTION AGREEMENT AND APPLICATION FORMS................................. 42

THE INDEPENDENT FUND LIMITED

## SYNOPSIS

| | |
|---|---|
| **Incorporation** | A limited liability mutual fund company incorporated under the laws of Bermuda. |
| **Business and Investment Objective** | The Fund's investment goal is to achieve capital appreciation through the speculative trading of currencies, commodities, futures, options and forward contracts, securities and other financial instruments and assets. The Fund intends to utilize a proprietary quantitative probabilistic model called the Global Pattern Recognition Model ("GPRM" or the "Model") developed in 1991 by George B. Szele, a principal and the founder of Independent Asset Management, LLC ("IAM" or the "Trading Manager"). The Fund has developed trading strategies utilizing the Model and discretionary analysis to trade a variety of assets and asset classes in the effort to achieve short, medium and long-term trading profits. In addition, the Fund may invest up to 100% of the capital from its Class A Shares, Class D Shares, Class P Shares (strategy to be managed by Mr. Paul Berman), and Class Z Shares (strategy to be managed by Mr. Daniel Zanger) in other investment funds, under other trading managers or under trading strategies other than the Global Pattern Recognition Model, without limitation, as determined by the Trading Manager. There can be no assurance that the Fund will achieve its investment objective. |
| **The Trading Manager** | The Fund is managed by the Trading Manager, which is owned and operated by George B. Szele and Joseph J. Porco. The Trading Manager has the responsibility, among other functions, for all trading and investment decisions for the Fund. The duties of the Trading Manager include developing the overall strategy for the Fund and overseeing the Fund's trading activities on a day-to-day basis. If the services of George B. Szele become unavailable to the Fund at any time, the trading and investment activity of the Fund may cease immediately and the Fund may be liquidated and dissolved. |
| **Fund Share Capital** | There are Seven classes of shares authorized to be issued by the Fund: Class A, B, C, D, P and Z shares (the "Shares") and the management shares (the "Management Shares"). Class A, B, C, D, P and Z Shares will be non-voting. Class B and C will be identical in every way except there will be different target leverage limits applicable to investments attributable to Classes B and C so that each of such Classes will attract a different allocation of profit and loss and represent a different risk/return profile for an investor. Class B will represent approximately two times the risk profile and anticipated return of Class C. Class A and Class C will allow up to maximum leverage of 2:1. The Fund shall be permitted to invest up to 100% of the capital from |

Class A Shares, Class D Shares, Class P Shares (strategy to be managed by Mr. Paul Berman), and Class Z Shares (strategy to be managed by Mr. Daniel Zanger) in other investment funds, to allocate such capital to other trading managers and/or to invest such capital under trading strategies other than the Global Pattern Recognition Model, without limitation, as determined by the Trading Manager. In addition, the Fund has established Class H Shares and may establish additional classes of non-voting shares designed to hedge against currency risks. (See "Description of the Shares"). Items of profit and loss on investments identifiable to a particular class will be allocated 100% to that class. Items of profit and loss for non class specific investments of Class B & Class C only will be allocated pro rata based upon the proportion of the Class Leveraged Account Value compared to the Total Leverage Account Value *(See "Certain Definitions.")* To facilitate the assessment of the Performance Fee, a separate Series of Shares will be issued on each occasion that a Shareholder subscribes for Shares. The Net Asset Value per Share of Class A, B, C, D, P and Z Shares will differ accordingly, as may Net Asset Values for each Series within each Share Class. Different Series of Shares within a Class may be consolidated into a single Series of that Class provided that such consolidation shall have no impact upon each Shareholder's percentage ownership of the Fund or the Performance Fee payable by each Shareholder. The Management Shares will be the only voting securities issued by the Fund. All of the Management Shares have been issued to the Trading Manager prior to the Offering at a price of $1.00 per share. Management Shares will not be subject to dividends or distributions, except for the repayment upon a winding up of the Fund of amounts paid in with respect to the Management Shares.

| | |
|---|---|
| **Bankers** | Bermuda Commercial Bank Limited will act as banker to and maintain accounts for the Fund, or such other bank as may be appointed from time to time. |
| **Clearing Broker** | Citigroup/Smith Barney, Inc., Cargill Investor Services and Interactive Brokers LLC will serve as Clearing Brokers to the Fund. |
| **Administrator, Registrar and Transfer Agent** | The Fund has retained Forum Fund Services Ltd. ("Forum"), a division of Citigroup Global Transaction Services to assist it in administering the Fund on a day-to-day basis and to perform certain accounting services for the Fund. Forum serves as the Fund's administrator, registrar and transfer agent. |
| **Shares Offered** | 200,000 Shares (U.S. $200,000,000). The Offering may be expanded at the discretion of the Board of Directors of the Fund. |
| **Price Per Share** | U.S. $1,000. |
| **Minimum Initial Purchase per Subscriber** | The minimum purchase per subscriber is U.S. $250,000, subject to the discretion of the Fund to raise or lower such minimum at any time, provided that such minimum shall not be less than |

$100,000.

**Minimum Initial Subscriptions**

Subscriptions for at least $3,000,000 have been received by the Fund (the "Minimum Initial Subscriptions") and the initial closing of the Fund has occurred.

**Continuous Offering**

Unless rescinded, the Offering will be continuous for the life of the Fund. After the Initial Offering Period, new Shares may be issued by the Fund on the first business day of each month (each, a "Subscription Date") at a price of $1,000 per Share. The Fund, at its discretion, reserves the right to reject any subscription, in whole or in part, for any reason.

**Redemption of Shares**

Any Shareholder may submit Shares for redemption by the Fund on any Redemption Date, which shall be the last business day of each month; provided that the redemption will be subject to a 2% redemption charge if the Shares have been held by the Shareholder for a period of less than 12 months. A Shareholder must give notice in writing to the Fund at least fifteen (15) business days prior to the Redemption Date. Unless involuntarily redeemed because the Shareholder is an unqualified U.S. or a Bermuda Person, the Redemption Price shall be equal to the Net Asset Value per Share of the Shares of each Series within a Class to be redeemed as at the end of the last business day of the month (adjusted for accrued Performance Fees, if any), less any wire transfer fees and other transaction costs. The Net Asset Value per Share of each Series within a Class will be that Series' pro rata share of the Classes assets and liabilities divided by the number of outstanding Shares of the Series. Redemptions will be accounted for on a first in, first out basis with respect to each of the investments by a particular Shareholder.

**Share Transfers**

The Bye-Laws of the Company impose certain restrictions on the transferability of Shares.

**Finders' Fees**

The Fund will not pay any finders' fees in connection with the offer and sale of the Shares. The Trading Manager, in its discretion, may decide to pay such fees at its own expense. A prospective investor will receive written notification prior to acceptance of such investor's subscription by the Fund if a finder's fee is to be paid in connection therewith.

**Sales Charges**

The Fund will have the discretion to impose a 2% front end charge to new investments in the Fund for the purpose of compensating third parties that introduce such new investments in the Fund. When applicable, the 2% charge will be deducted prior to the investor being issued Shares in the Fund. No sales charges other than the 2% front end charge will be incurred by investors.

**Placement Agent**

The Trading Manager may act as a placement agent for the Fund, but without specific compensation for such activity. The Fund has authorized utilizing other placement agents and reserves the right to retain such additional placement agents should it

determine that it would be in the best interest of the Fund.

**Tax Status**

The Fund has been advised that under current law in Bermuda, neither the Fund nor its Shareholders who are not residents of Bermuda will be subject to any form of income tax, withholding tax, capital gains tax, estate duty or inheritance tax resulting from the Fund's activities. The Fund should not be subject to any United States income taxes (other than United States withholding taxes on dividends and certain interest income derived from United States sources). Shareholders of the Fund who are not otherwise subject to United States taxation by reason of their residence, nationality or other particular circumstances should not become subject to any such taxation by reason of the ownership, transfer or redemption of Shares. Shareholders should consult their own advisors as to the tax consequences to them of an investment in the Fund.

**Brokerage**

The Trading Manager will allocate transactions for the Fund (or in case of Class A Shares, Class D Shares, Class P Shares, and Class Z Shares, the Trading Manager may permit the individual managers for such classes to allocate transactions) to various brokers and dealers on the basis of best execution and such broker or dealer's reliability and financial condition. The Fund will also consider other factors, such as applicable margin levels and financing rates, transaction size and liquidity. *(See "Brokerage".)*

**Soft Dollar Arrangements**

The Trading Manager may enter into "soft dollar" arrangements with certain brokers pursuant to which such brokers may provide research or brokerage services to the Trading Manager and/or the Fund in return for executing transactions on behalf of the Fund. Services obtained in connection with transactions for the Fund will fall within the safe harbor provided under Section 28(e) of the U.S. Securities Exchange Act of 1934, as amended. Under Section 28(e), research or brokerage services obtained with "soft dollars" generated by the execution of Fund transactions may be used by the Trading Manager to service accounts other than the Fund. The selection of brokers to execute Fund transactions may depend in part on their willingness to enter into soft dollar arrangements with the Trading Manager.

**Eligible Investors**

This Offering is limited to non-U.S. and non-Bermuda Persons with the financial capacity to speculate in high-risk investments. Shares in the Fund may be sold, at the discretion of the Board of Directors, to a limited number of U.S. investors that are qualified eligible persons and pension or profit sharing trusts or other tax exempt entities.

**Expenses**

The Fund will bear its own costs and expenses. Except as described herein the Trading Manager will bear its own normal operating expenses incurred in connection with the provision by it of investment management and advisory services to the Fund, including overhead expenses. In the event that any services are performed or paid on behalf of the Fund by the Trading Manager,

the Fund will reimburse the Trading Manager therefor.

**Organization and Offering Expenses**

The Fund will reimburse the Trading Manager for all organizational expenses for the formation of the Fund and expenses associated with the sale of the Shares.

**Management Fee**

The Fund will pay to the Trading Manager a fee of one-sixth of one percent (1/6%) per month (approximately 2% per annum) of the net assets of the Fund as at the end of each calendar month, payable in arrears. The Trading Manager may elect to waive a portion of the Management Fee with respect to any Shareholder.

**Performance Fee**

The Fund will pay to the Trading Manager a quarterly performance fee equal to 20% of the Net New Profits (as defined herein) with respect to each Shareholder's Shares accrued monthly, but determined at the end of each calendar quarter, payable in arrears (the "Performance Fee").

"Net New Profits" means, with respect to each Shareholder investment, the Shareholder's share of (a) the net realized profits and losses for the period, plus (b) the net unrealized profits and losses for the period, minus (c) the net unrealized profits and losses at the end of the previous period, minus (d) any net losses carried forward from previous periods that have not been recouped. Net profits and losses with respect to each Shareholder investment for a period are calculated taking into consideration all cash and cash equivalents (valued at cost), accrued interest and the market value of all open trading positions and all other assets, less the brokerage and floor commissions and fees and other transaction costs that would be payable with respect to closing of each open trading position and all other liabilities of the investment, including the Shareholder's pro rata share of accrued legal, accounting and auditing fees, accrued organizational expenses, accrued management fees, expenses of the continuous offering and any extraordinary expenses (e.g. non-recurring legal expense) determined in accordance with U.S. generally accepted accounting principles consistently applied under the accrual basis of accounting. Accrued and paid Performance Fees are specifically not deducted in determining Net New Profits. The carry-forward loss is proportionally reduced if and to the extent a Shareholder's Shares are redeemed during a period that a carry-forward loss exists.

In the event a Shareholder subscribes for additional Shares after making its initial investment, the Fund will issue a new Series of Shares and the subsequent subscription will be treated as a separate investment for purposes of calculating Performance Fees. The Performance Fee will only be paid on a Shareholder's Net New Profits for the period when the Net Asset Value of the Series of Shares exceeds the highest closing Net Asset Value of the same Shares in any previous accounting period in which a Performance Fee was paid. In addition, if a Shareholder redeems Shares when the Net Asset Value with respect to those Shares is

11

below its highest previous value, such highest previous value shall be reduced (solely for purposes of calculating Net New Profits) by the percentage obtained by dividing the redemption amount by the Share's Net Asset Value immediately before the redemption. Redemptions will be accounted for on a first in, first out basis with respect to each individual Shareholder's investments, in the event that a Shareholder has more than one investment.

The Trading Manager may elect to defer payment of all or part of the Performance Fee (or the Management Fee). Any such deferred amounts shall be treated, and the amounts payable at the end of any deferral period shall be determined, as if such deferred fees had been invested in the Fund without any charge for Performance (or Management) Fees. The deferred fees, including any appreciation or depreciation, shall be paid promptly at the end of the deferral period. The Trading Manager may reduce the Performance Fee with respect to any Shareholder.

**Other Ongoing Expenses**

The Fund will pay operating expenses incurred in its operations, including legal and accounting expenses, auditing expenses, reporting expenses, company registration, administration and secretarial expenses, interest expenses, extraordinary expenses such as litigation, and expenses associated with annual and other meetings of the Fund. In the event the Fund invests capital in other funds and/or under other trading advisors other than the Trading Manager, the Fund may be required to pay additional management fees and/or performance fees to such other funds or trading advisors. However, the Fund reserves the right to cap any management fee or performance fee in respect to any investor in the Fund, to be determined on a case by case basis.

**Limited Liability**

Shareholders will invest in the Fund with limited liability, with the result that a Shareholder's liability with respect to its investment shall not exceed the amount of that Shareholder's investment in the Shares.

**Dividends and Distributions**

The Fund does not anticipate paying dividends to Shareholders. All net profits on investments (whether ordinary or capital gains or losses) are expected to be reinvested in accordance with the Fund's trading objectives.

**Transfer of Shares**

There is no secondary trading market for the Shares, nor is one expected to develop. The transferability or assignment, or the grant of an option or similar right with respect to the Shares (directly or indirectly), is restricted.

**Optional Redemption of Shares**

The Fund shall have the right to redeem any or all Shares of a holder if (i) it is discovered that such person is an unqualified U.S. or a Bermuda Person, (ii) the holder's continued ownership in the Fund would result in adverse tax consequences to the Fund or its other holders, (iii) such holder has violated the provisions of any agreements, certificates or other documents

|  | with, or presented to, the Fund, (iv) the services of George B. Szele become unavailable to the Fund, or (v) the Fund otherwise believes that such redemption is necessary or advisable to correct or prevent violations of law. |
|---|---|
| **Risks** | The purchase of the Shares involves a high degree of risk and is speculative. (See "*Certain Risk Factors*" below.) |
| **Securities Law Matters** | The Fund will not be a registered investment company under the Investment Company Act of 1940.  The Shares offered to investors will not be registered under the Securities Act or any applicable state securities laws. |
| **Termination** | The Fund has been structured so that the Fund's Board of Directors will have the right at any time to dissolve and liquidate the Fund. |
| **Accounting and Reporting** | The accounting firm of KPMG has been selected to act on behalf of the Fund and will audit and report upon the financial statements of the Fund each year.  The Fund's financial year shall end on December 31st each year.  Copies of their reports will be distributed to all Shareholders.  As of the date of this Offering Memorandum, the Fund has neither paid nor declared any dividend. |

The foregoing is a synopsis only, does not attempt to be complete and is in all respects qualified by the more detailed information appearing elsewhere herein.

———————————————

## THE FUND

The Fund is a limited liability mutual fund company incorporated in Bermuda under the provisions of the Companies Act 1981.

The authorized share capital of the Fund is $10,100 consisting of (i) 1,000,000 redeemable, non-voting common shares of $0.01 par value each (the "Shares"); and (ii) 100 voting, non-redeemable, non-participating shares with a par value of U.S. $1.00 each (the "Management Shares"). The Shares will be initially divided into Classes A, B, C, D, P and Z, each of which may be divided into Series of Shares. Class A, B, C, D, P and Z Shares will be non-voting. Class B and C will be identical in every way except there will be different target leverage limits applicable to investments attributable to Classes B and C so that each of such Classes will attract a different allocation of profit and loss and represent a different risk/return profile for an investor. Class B will represent approximately two times the risk profile and anticipated return of Class C. Class A and Class C will allow up to maximum leverage of 2:1. The Fund shall be permitted to invest up to 100% of the capital from Class A Shares, Class D Shares, Class P Shares (strategy to be managed by Mr. Paul Berman), and Class Z Shares (strategy to be managed by Mr. Daniel Zanger) in other investment funds, to allocate such capital to other trading managers and/or to invest such capital under trading strategies other than the Global Pattern Recognition Model, without limitation, as determined by the Trading Manager. In addition, the Fund has established Class H Shares and may establish additional classes of non-voting shares designed to hedge against currency risks (See "Description of the Shares"). Items of profit and loss on investments identifiable to a particular class will be allocated 100% to that class. Items of profit and loss for non-class specific investments of Class B & Class C only will be allocated pro rata based upon the proportion of the Class Leveraged Account Value compared to the Total Leveraged Account Value (*See "Certain Definitions."*) To facilitate the assessment of the Performance Fee, a separate Series of Shares will be issued for each occasion that a Shareholder subscribes for Shares. The Net Asset Value per Share of Class A, B, C, D, P and Z Shares will differ accordingly, as may Net Asset Values for each Series within each Share Class. Different Series of Shares within a Class may be consolidated into a single Series of that Class provided that such consolidation shall have no impact upon each Shareholder's percentage ownership of the Fund or the Performance Fee payable by each Shareholder. The Management Shares will be the only voting securities issued by the Fund. All of the Management Shares have been issued to the Trading Manager prior to the Offering at a price of $1.00 per share. Management Shares will not be subject to dividends or distributions, except for the repayment upon a winding up of the Fund of amounts paid in with respect to the Management Shares.

Persons acquiring Shares ("Shareholders") will be subject to limited liability by virtue of their ownership of the Shares with the result that a Shareholder's liability with respect to its investment shall not exceed the amount of that Shareholder's investment in the shares.

## INVESTMENT POLICY

The Fund's investment goal is to achieve capital appreciation through the speculative trading of currencies, commodities, futures, options and forward contracts, securities and other financial instruments and assets. The Fund intends to utilize a proprietary quantitative probabilistic model called the Global Pattern Recognition Model ("GPRM" or the "Model") developed in 1991 by George B. Szele, a principal and the founder of the Trading Manager. The Fund has developed trading strategies utilizing the Model and discretionary analysis to trade a variety of assets and asset classes in the effort to achieve short, medium and long-term trading profits. Assets intended to be traded include, but are not limited to: (i) futures contracts, options, options on futures contracts and spot and forward contracts on currencies, commodities, stock, financial and economic indices, financial instruments, metals and agricultural products; (ii) securities; and (iii) other financial instruments and assets. In addition, the Fund may invest up to 100% of the capital from its Class A Shares, Class D Shares, Class P Shares (strategy to be managed by Mr. Paul Berman), and Class Z Shares (strategy to be managed by Mr. Daniel Zanger) in other investment funds, under other trading managers or under trading strategies other than the Global Pattern Recognition Model, without limitation, as determined by the Trading Manager. There

can be no assurance that the Fund will achieve its investment objective, and its investment results may vary substantially from period to period. The Fund will employ significant leverage, but will seek to limit leverage to no more than two times its assets for Class A and C Shares and four times its assets for Class B Shares. In the case of Class A Shares, Class D Shares, Class P Shares, and Class Z Shares, the Trading Manager may permit the individual managers for such classes to make trading allocations, select brokers and make other investment decisions for capital invested in their specific classes.

**Investment Philosophy.** The Trading Manager's investment philosophy has emerged from the belief that most markets have a degree of inefficiency and tend to be mean-reverting. It is assumed prices can deviate from levels consistent with full, correct discounting of all available information. Investors must spend time and resources to acquire and properly interpret new data and patterns. New information is incorporated gradually rather than instantaneously into the market price. This can cause the actual price of an asset to deviate substantially from its true equilibrium or "fair value" level in which all available information is correctly and fully discounted. The goal of the Trading Manager's strategy is to more accurately identify short, medium and long-term trends in fair value and to take advantage of those times when prices deviate substantially from their true fair value price. The Fund will seek to achieve profitable returns by capturing a portion of the many mean-reverting moves (or short-term moves) and taking at least some profits while remaining partially in the market to capture a potential trending environment (or a medium to long-term move) (may not pertain to all Classes of Shares).

The Trading Manager's strategy (may not pertain to all Classes of Shares) utilizes three major components including but not limited to: a proprietary adaptive MACD (Moving Average Convergence Divergence); Exponential Moving Averages; and proprietary adaptive high return to low risk Pattern Recognition. These attributes, along with Price Divergences and/or Support/Resistance levels, are key to the Trading Manager's trading philosophy and proprietary strategy. The Model uses such probabilistic indicators and proprietary statistical deviation analyses to recommend trades. Unusual circumstances or events warrant additional analyses as part of the trading decision, and therefore the Trading Manager may take into account certain fundamentals in its decision-making process.

Founder George Szele has developed this proprietary trading methodology based upon his thirteen years' experience and improved upon it while trading at Goldman Sachs, Société Génerale and State Street Global Advisors. At each firm, and independently prior thereto, Mr. Szele spent considerable time observing, analyzing, trading and managing significant positions ($10 million to $2.3 billion), incorporating the system in many functions.

The Fund's trading methodology (may not pertain to all Classes of Shares) is applicable to many time frames and asset classes including stock indexes, currencies, fixed income, and commodities. It can show positive results on a five-minute, hourly, daily or weekly basis, and anywhere in between. There can be no guarantee, and neither the Fund nor the Trading Manager represents, that the methodology will show positive results.

**Traditional Forecasting Approaches.** Many quantitative forecasting models consist of technical and fundamental approaches. Technical analysis attempts to predict market returns by looking for trends and patterns in historical prices. Fundamental approaches may use micro-and macro-economic indicators of supply and demand to predict expected returns. Both are useful for identifying long-term price trends, but the Trading Manager believes that price action analysis is generally more capable of consistently predicting reversals and trends in most time frames. It is the Trading Manager's view that fundamental models are often too simplistic or too complex to accurately capture the dynamics of financial markets, and that the accuracy of fundamental approaches is limited by the quality and frequency of the input data. Many traditional fundamental models use government-reported monthly or quarterly indicators such as inflation, unemployment, and money supply. Such economic data can be subject to sizeable collection errors and revisions. The low frequency of data availability also limits how quickly a fundamental model can respond to changing market conditions.

15

**Global Pattern Recognition Model (GPRM).**  GPRM assumes prices, in the short, medium and long term, may diverge from their "fair value" equilibrium or mean levels.  This is based on the premise that not all investors have the same information or the same ability to correctly or profitably interpret the information at any point in time.  GPRM primarily uses hourly and daily observable data as inputs.  Such data essentially include stock index (cash and futures) prices, currency exchange rates, commodity prices and other prices generated directly by the market.  Unlike traditional government-reported monthly and quarterly economic information, daily, hourly and shorter-term data allow faster response to changing market conditions.  Such data are also not subject to the collection, processing, and seasonal adjustment errors and revisions that may characterize fundamental economic inputs.  Market-generated data usually have investors' expectations of traditional economic inputs already imbedded in them.  These expectations play a strong role in forecasting the major reversal points and trends in the different markets and time frames.

Characteristics and advantages of GPRM include:

*Distinctive:* Long and short positions are taken in a diversified portfolio; the Model is constructed on the basis that markets will either trend or mean-revert; the Model is simplified utilizing a unique formula based on a primary technical tool; the Model is based on pattern recognition of previous price patterns; and correlated weightings across asset classes helps diversification.

*Flexible:* The system attempts to capture positive returns in trending or mean-reverting environments; higher turnover allows the possibility to capture profits in either environment; the Model can be used in similar form across various asset classes and time frames; the Model can be used as a strong diversifier or timing tool for longer-term models and portfolios; and the Model is customizable from short term private individual needs to long-term institutional hedging.

*Reliable:* Consistent parameters and similar weightings across asset classes disallow room for curve fitting or data mining and the Model has a low correlation with traditional and alternative investments.  Model parameters were first optimized and tested in 1991.

**Portfolio Construction.**  The Fund (may not pertain to all Classes of Shares) is not subject to any policies regarding diversification and may sometimes concentrate its holdings in assets or investment strategies, which, in light of investment considerations, market risks and other factors, the Trading Manager believes are appropriate.  However, the Trading Manager intends to diversify the investment portfolio of the Fund to reduce expected risk to the level consistent with the Fund's targeted net annual return objective.  Portfolio construction will take into account the historical volatility of asset returns, their correlations, and their stability over time in determining the relative weights of asset classes and individual assets.  It is contemplated that a typical Fund portfolio will generally have a 25-50% exposure to equity indexes, 25-50% to currencies, 0-25% to bonds, and 0-10% to commodities, though these allocations can and will change over time, and may change even from 0 to 100% in certain asset classes.  Total capital committed to any market may also be constrained by the level of liquidity in each market.

**Long and short positions.**  The Fund (may not pertain to all Classes of Shares) is designed to minimize risk by using hedging techniques.  This generally means that the portfolio will from time to time contain both long positions and short positions, although this may not always be the case.

**Leverage.**  The Trading Manager may leverage the Fund's assets up to the level permitted under applicable law and regulation.  Leverage limits will differ for each Class of Shares and will result in different amounts of profit or loss from transactions effected on behalf of the Fund.  The Trading Manager intends to maintain a maximum leverage (defined as the gross value of long and short positions divided by actual equity) of 2:1 for Class A Shares; 4: 1 for Class B Shares; 2:1 for Class C Shares.  Class D Shares, Class P Shares and Class Z Shares will have flexible leverage limits.  It is intended that the portfolio (may not pertain to all Classes of Shares) typically will be 50-100% invested, but may at times have no speculative positions.

Margin-to-equity may range between 10-50% but these figures are expected to change over time, and may change to 0% or more than 50% in certain situations.

**Turnover.** Total portfolio turnover (may not pertain to all Classes of Shares) is difficult to pinpoint but will mostly be consistent with market volatility; the higher the volatility, the greater likelihood of frequent trading. The average holding period may be one day (or less) to one month (or longer) for any one asset depending on the market environment and strength of signals. These characteristics should be used only as an indication as the Model and market activity may cause any or all of these holding periods to deviate up or down from the levels presented here.

**Cash Management.** The Fund may invest its excess cash in short term, high quality investments, including government and agency securities, commercial paper, banker's acceptances, certificates of deposit and other money market instruments.

**Risk Control.** The Trading Manager will attempt to control risk within the Fund's portfolio at four levels. First, typically, the amount of leverage intended to be used will be limited as described herein (may not pertain to all Classes of Shares). Second, the volatility of the market and signals will be monitored; changes in market volatility may dictate slight changes in operating parameters. Third, the performance will be monitored at the individual asset, asset class, portfolio levels and Class Share levels to ensure the program is working within its expected risk and return envelope. Fourth, proper exit points or stop-loss levels are continuously identified, imposed and monitored. Depending on conditions and trends in areas such as the currency, commodities and securities markets, and the economy generally, the Trading Manager may employ other techniques it considers appropriate and in the best interest of the Fund.

Risk control management is designed to reduce, but may not eliminate, the chance of a loss. There is no guarantee that a cumulative loss will be limited to any particular amount in any Class of Shares.

**Markets and Instruments Traded.** Futures contracts intended to be traded by the Fund include, but are not limited to currencies, commodities, securities, financial and economic indices, financial instruments, metals, and agricultural products. Exchanges on which these transactions will take place will include, but are not limited to, all exchanges in the United States, as well as non-U.S. exchanges.. In addition, the Fund may initiate trades in other markets at any time that the Trading Manager determines that a market is sufficiently liquid and tradable, given its methods. In the case of Class A Shares, Class D Shares, Class P Shares, and Class Z Shares, the Trading Manager may permit the individual managers for such classes to allocate transactions, select certain brokers as described herein, and generally manage their strategies as they see fit, under the guidelines of this Memorandum.

The Fund may engage in transactions in physical commodities, including exchange of futures for physicals transactions ("EFPs"). An EFP is a transaction permitted under the rules of many futures exchanges in which two parties exchange a futures market position for a cash position (or vice versa) without making an open, competitive trade on the exchange. The prices at which such transactions are executed are negotiated between the parties.

The Fund's focus (may not pertain to all Classes of Shares) will be on futures contracts traded on the Chicago Mercantile Exchange (CME) and the Chicago Board of Trade (CBOT). Cash markets for currencies (interbank) and equity indexes will also be traded. These are among the most liquid exchanges and markets in the world, allowing quick execution of orders. The Fund may expand into certain commodities and/or other asset classes as the Trading Manager deems appropriate.

Contracts and cash positions to be traded include but are not limited to:

S&P 500 and/or E-Mini S&P 500 (CME)
Nasdaq 100 and/or E-Mini Nasdaq 100 (CME)

30Y TBOND, 1OY USNOTE (CBOT)
Japanese Yen (CME)
Euro (CME)
British Pound (CME)
Swiss Franc (CME)
Australian Dollar (CME)
Canadian Dollar (CME)
Currency crosses on the above such as Euro versus Yen (CME)
Options on the above (CME, CBOT)
Options on OEX
Cash currencies and options on cash currencies
QQQ (Nasdaq 100)
SPY (SP500)

**Other Trading Methodologies**. In addition to the trading activity described above, the Fund may invest up to 100% of the capital from its Class A Shares, Class D Shares, Class P Shares (strategy to be managed by Mr. Paul Berman), and Class Z Shares (strategy to be managed by Mr. Daniel Zanger) in other investment funds, under other trading managers or under trading strategies other than the Global Pattern Recognition Model, without limitation, as determined by the Trading Manager.

## THE OFFERING

The Fund is initially offering up to 200,000 Shares at an initial price per Share of U.S. $1,000. The Fund will initially issue Series 1 Shares for each Class. Subscriptions for at least $3,000,000 have been received by the Fund (the "Minimum Initial Subscriptions") and the initial closing of the Fund has occurred.

Unless rescinded, the Offering will be continuous for the life of the Fund. New Shares may be issued by the Fund in separate Series within each Class on monthly Subscription Dates (the first business day of each month) at a price of $1,000 per Share. The Fund, at its discretion, reserves the right to reject any subscription, in whole or in part, for any reason.

Application may be made for the purchase of Shares on the accompanying Subscription Agreement and Application Forms, which should be sent to the Administrator to be received not later than 5:00 P.M. (local time) on the fifth business day preceding the relevant Subscription Date.

The minimum initial subscription is $250,000, subject to the discretion of the Fund to raise or lower such minimum at any time, provided that such minimum shall not be less than $100,000. Subsequent subscriptions by existing investors may be in lesser amounts, as determined from time to time and on a negotiated basis by the Fund, but, in any event, not less than $100,000.

Subscriptions should be paid by wire transfer to the bank account set forth on the Subscription Agreement and Application Forms. All subscriptions must be in U.S. dollars.

Sales confirmations will normally be sent to Shareholders by the Fund within five business days of the relevant Subscription Date, or as soon thereafter as practicable. Unless specifically requested, no Share certificates will be issued. The Fund reserves the right to reject, in whole or in part, any application for any reason in which event the subscription amount or the balance thereof will be mailed to the applicant at its own risk.

The Shares have not been and will not be registered under the Securities Act and, subject to the Board of Directors' discretion to accept subscriptions from a limited number of U.S. investors that are qualified eligible persons and pension or profit sharing trusts, or other tax exempt entities, may not at any time be

offered, sold or delivered, directly or indirectly, in the U.S. or to a U.S. Person as defined in the Subscription Agreement and Application Forms. Nor may Shares be offered or sold to a citizen or resident of Bermuda. Except where the Board of Directors has exercised the afore-mentioned discretion, each purchaser of Shares will be required to represent in the Subscription Agreement and Application Forms that it is not a U.S. Person or citizen or resident of Bermuda (a "Bermuda Person"), or if it is a dealer, that it is not purchasing such Shares for the account of any U.S. or Bermuda Person and that a similar representation will be obtained from each person who purchases from it.

**Investment Representation.** The Offering is being made in reliance, among other things, upon an exemption from registration for a sale of securities which does not involve a public offering. Each investor purchasing Shares will be required to represent and warrant, among other things, that such investor is acquiring the Shares for investment purposes only and not with a view to the resale or distribution thereof within the meaning of the Securities Act.

**Restrictions on Transferability.** The Bye-Laws of the Company prohibit Shareholders from offering, selling, transferring or pledging their Shares, in whole or in part, without the prior written consent of the Board of Directors of the Fund. The Board of Directors of the Fund may require as a condition of any such disposition of Shares that the Shareholders furnish the Fund with an opinion of counsel (which counsel and opinion is acceptable to counsel for the Fund) that the proposed disposition complies with all applicable provisions of federal and state securities laws.

**Suitability Requirements.** An investment in the Shares offered hereby is speculative and involves a high degree of risk. It is suitable only for investors with substantial financial resources who can afford to lose the full amount of their investment. The Shares will be sold only to those persons as to whom the Fund, immediately prior to such sale, after making reasonable inquiry, has reasonable grounds to believe have such knowledge and experience in financial and business matters (either personally or with their "purchaser representatives", if any, as such term is defined in Regulation D under the Securities Act) that they are capable of evaluating the merits and risks of an investment in the Fund.

Each investor purchasing Shares will be required to execute and deliver to the Fund a Subscription Agreement and Application Form in the form set forth in Exhibit A hereto in which such investor will represent and warrant, among other things, that (i) such investor (either personally or with a purchaser representative) understands the business in which the Fund proposes to engage and has such knowledge in financial and business matters that such investor is capable of evaluating the merits and risks of an investment in the Fund; (ii) such investor is an "qualified eligible persons", as such term is defined in 17 C.F.R. Section 4.7, or that such investor is an "accredited investor," as such term is defined in Regulation D under the Securities Act; and (iii) that such investor either (a) has a personal net worth in excess of five (5) times his proposed aggregate investment (exclusive of home, furnishings, and automobiles), (b) has a personal net worth in excess of $1,500,000 (exclusive of home, furnishings, and automobiles), or (c) will have at least $750,000 in assets under management with the Fund. The Fund, in its sole discretion, may modify the requirements described in (iii) above.

Each prospective investor is urged to consult with its own advisors to determine the suitability of an investment in the Fund, and the relationship of such an investment to the purchaser's overall investment program and financial and tax position.

Purchasers of Shares may be required to pay all stamp taxes and other charges of purchasers in accordance with the laws and practices of the country of purchase.

## REDEMPTION OF SHARES

Any Shareholder, on no less than 15 business days' written notice, may submit Shares for redemption by the Fund as of the last business day of each month occurring after the Initial Offering Period (each a

"Redemption Date"). Redemptions shall be at the Net Asset Value for the Shares of each Series within a Class to be redeemed, calculated as at the end of the last business day of such month (the "Redemption Price"); provided that the redemption will be subject to a 2% redemption charge if the Shares have been held by the Shareholder for a period of less than 12 months. The Net Asset Value per Share of each Series will be that Series' pro rata share of the Fund's assets and liabilities divided by the number of outstanding Shares of the Series.

Redemptions of Shares may be for any number of Shares, provided that the redeeming Shareholder maintains a residual holding of Shares representing an aggregate Net Asset Value of at least $250,000 or, if the Board of Directors accepted a subscription of less than $250,000, an aggregate Net Asset Value of such lesser amount. A redemption request resulting in a residual holding below this amount may be treated as constituting a redemption request for the full number of Shares held by such Shareholder.

The notice of redemption (in form substantially identical to that attached) must be timely received by the Administrator and shall be irrevocable unless, in its sole discretion, the Board of Directors agrees to a shorter notice period or allows revocation of such notice. Payment of the Redemption Price on the redemption of Shares will be made within thirty (30) business days after the relevant Redemption Date in U.S. dollars in accordance with the instructions provided by the Shareholder, by a bank check or, at the option of the Shareholder, by wire transfer to a U.S. dollar account maintained at a commercial bank. The Redemption Price paid by the Fund for any Shares may be higher or lower than the price paid at the time of purchase of such Shares.

Under special circumstances, including but not limited to the inability of the Fund to reasonably determine the Net Asset Value of the Fund as of any Redemption Date, or by reason of the suspension of trading on any established market or markets where commodity or other interests of the Fund are traded, or default or delay in payments due to the Fund from banks or other persons (for example, if the Fund invests in other funds or managers which have redemption periods which are longer than thirty days), the Fund may in turn suspend redemptions of Shares as of the applicable Redemption Date or delay payment to persons requesting redemption of Shares. In such cases, the Fund shall as soon as practicable thereafter cause such Shares to be redeemed or such redemption payments to be made. Furthermore, in the case that an investor elects to have a third party provide principal protection on the investor's assets in the Fund, the Fund may allow for weekly or daily liquidity/redemption on such investor's shares.

The Fund shall have the right to redeem any or all Shares of a holder if (i) it is discovered that such person is an unqualified U.S. or a Bermuda Person, (ii) the holder's continued ownership in the Fund would result in adverse tax consequences to the Fund or its other holders, (iii) such holder has violated the provisions of any agreements, certificates or other documents with, or presented to, the Fund, (iv) the services of George B. Szele become unavailable to the Fund, or (v) the Fund otherwise believes that such redemption is necessary or advisable to correct or prevent violations of law.

At the discretion of the Board of Directors, the Fund for any reason may cause all Shares then outstanding to be redeemed on the next Redemption Date at a price equal to the Net Asset Value per Share for each Class of Share of the Fund (adjusted for accrued Management and Performance Fees, if any) determined as at the end of such Redemption Date. The Fund shall notify the Shareholders of such redemption no later than 10 business days prior to such Redemption Date. In addition, the Fund reserves the right to require the redemption, from time to time and on a case by case basis, of less than all the Shares, as it deems appropriate.

All Shares redeemed will be canceled but may be subsequently reissued at not less than the then current Net Asset Value per Share for the relevant Class of Shares of the Fund.

## MANAGEMENT OF THE FUND

The Board of Directors of the Fund, each of whom shall act in a non-executive capacity, is initially constituted as follows:

**George B. Szele:**  Mr. Szele has 13 years of experience in proprietary trading and investment management.  Mr. Szele is Founder and Managing Director of Independent Asset Management, LLC.  From 1999 to 2000 Mr. Szele served as a Vice President of Proprietary Trading in the Fixed Income, Currencies, Commodities division at Goldman Sachs.  Mr. Szele was selected as one of five people in New York and of fifteen globally to join this group of discretionary proprietary traders.  From 1997 to 1999, Mr. Szele was a Vice President of Proprietary Trading at Société Generale in New York.  From 1994 to 1997, Mr. Szele served as an Investment Officer at State Street Global Advisors in Boston where he was instrumental in forming and marketing their first hedge fund, and developed models for equity and foreign exchange trading.  He also served as the head trader for currencies, the passive hedging Portfolio Manager of $2.3 billion, and as a discretionary currency trader.  Mr. Szele has assisted the development of American-Hungarian joint ventures and import/export companies throughout Eastern Europe and South America.  Fluent in French and Hungarian, Mr. Szele has also advised on private equity deals in Europe while residing in Budapest.  Mr. Szele gained a Bachelor of Architecture at Virginia Polytechnic Institute and studied at Harvard, as well as studying Architecture and Business at various institutions throughout Europe.

**Joseph J. Porco:**  Mr. Porco has served as Managing Member for Independent Asset Management, LLC since the company's inception.  Mr. Porco has 17 years experience in the financial services industry, beginning his career with Phoenix Mutual Life Insurance Company.  He previously founded the Financial Security Group LLC, where he concentrated his practice in retirement, insurance and financial planning for high net-worth individuals and small businesses.  During this time, Mr. Porco received many accolades from financial institutions including Government Personnel Mutual, Phoenix Mutual, Allianz Life Insurance Company and Personalized Brokerage Services, Inc.  Mr. Porco was a Registered Investment Advisor from 1995 to 2000 and has been a licensed Insurance Agent with the State of Connecticut Department of Insurance since 1986.  He is a member of the Society of Certified Senior Advisors (SOCSA); an organization committed to helping senior citizens handle the complexity of serious issues that arise from health, legal, financial and social problems.  Mr. Porco majored in Psychology at Southern Connecticut State University.

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing its investment policies.  All voting securities of the Fund will be held by the Trading Manager and accordingly the Trading Manager will possess the right to elect all members of the Fund's Board of Directors.

The Trading Manager has been appointed to manage the Fund's trading and investment affairs on a day-to-day basis pursuant to the Trading Manager Agreement between the Fund and the Trading Manager (the "Trading Manager Agreement").  The Trading Manager Agreement is attached as Exhibit B.

The Trading Manager is a Delaware limited liability company.  Management responsibility for the Trading Manager is vested in its Board of Directors.  George B. Szele and Joseph J. Porco own the equity interests in the Trading Manager and therefore will possess the right to elect all members of the Trading Manager Board of Directors.

The Trading Manager will oversee the investment and trading activities of the Fund.  This will include developing the overall trading strategies of the Fund, making individual trading decisions and overseeing the execution of such trading decisions.  George B. Szele, a principal and founder of the Trading Manager, will be mainly involved in directing the investment and trading activities of the Fund.

The Fund's Bye-Laws provide that, subject to certain exceptions, directors and officers of the Fund will be indemnified against all losses, expenses (including legal fees) and judgments arising out of their service to the Fund or to another entity at the Fund's request, provided that such losses, expenses or judgments were

21

not the result of gross negligence or willful misconduct and such person did not act contrary to the best interests of the Fund. The Trading Manager, Custodian, and Administrator will be indemnified by the Fund on the same basis. Any such indemnification payments would reduce the value of Shares of the Fund. The foregoing persons will also be exculpated from any liability to the Fund or any Shareholder provided that their actions conform to the same standards.

## THE TRADING MANAGER

The Fund has appointed Independent Asset Management, LLC ("IAM" or the "Trading Manager") to undertake the day to day investment of the Fund's assets. The Trading Manager has primary responsibility for all investment and trading activities of the Fund and is authorized by the Fund to designate the clearing broker(s), floor or executing broker(s) and introducing broker(s) to be used in executing and clearing trades for the Fund. The Trading Manager, on behalf of the Fund, may replace or add introducing brokers at its discretion. Neither the Fund, the Trading Manager, nor any of their affiliates will be liable for any losses suffered as a result of investments made consistent with the Fund's investment objectives, except by reason of acts or omissions due to willful misconduct or gross negligence.

A majority of the voting and ownership interests in the Trading Manager are held by George B. Szele and Joseph J. Porco.

*George B. Szele:* George Szele has 13 years of experience in proprietary trading and investment management. From 1999 to 2000 Mr. Szele served as a Vice President of Proprietary Trading in the Fixed Income, Currencies, Commodities division at Goldman Sachs. Mr. Szele was selected as one of five people in New York and of fifteen globally to join this group of discretionary proprietary traders. From 1997 to 1999, Mr. Szele was a Vice President of Proprietary Trading at Société Generale in New York. From 1994 to 1997, Mr. Szele served as an Investment Officer at State Street Global Advisors in Boston where he was instrumental in forming and marketing their first hedge fund, and developed models for equity and foreign exchange trading. He also served as the head trader for currencies, the passive hedging Portfolio Manager of $2.3 billion, and as a discretionary currency trader. Mr. Szele has assisted the development of American-Hungarian joint ventures and import/export companies throughout Eastern Europe and South America. Fluent in French and Hungarian, Mr. Szele has also advised on private equity deals in Europe while residing in Budapest. Mr. Szele gained a Bachelor of Architecture at Virginia Polytechnic Institute and studied at Harvard, as well as studying Architecture and Business at various institutions throughout Europe.

*Joseph J. Porco:* Mr. Porco has served as Managing Member for Independent Asset Management, LLC since the company's inception. Mr. Porco has 17 years experience in the financial services industry, beginning his career with Phoenix Mutual Life Insurance Company. He previously founded the Financial Security Group LLC, where he concentrated his practice in retirement, insurance and financial planning for high net-worth individuals and small businesses. During this time, Mr. Porco received many accolades from financial institutions including Government Personnel Mutual, Phoenix Mutual, Allianz Life Insurance Company and Personalized Brokerage Services, Inc. Mr. Porco was a Registered Investment Advisor from 1995 to 2000 and has been a licensed Insurance Agent with the State of Connecticut Department of Insurance since 1986. He is a member of the Society of Certified Senior Advisors (SOCSA); an organization committed to helping senior citizens handle the complexity of serious issues that arise from health, legal, financial and social problems. Mr. Porco majored in Psychology at Southern Connecticut State University.

**Conflicts of Interest; Indemnification.** The Trading Manager, its affiliates and their respective members, partners, officers and employees will devote as much of their time to the activities of the Fund, as they deem necessary and appropriate. By the terms of the Trading Manager Agreement, the Trading Manager and its affiliates are not restricted from forming additional investment funds, from entering into other investment advisory relationships, from following similar investment strategies for other funds, from trading for their own account or the accounts of others in assets that are also purchased, sold or held for the account of the Fund, or from engaging in other business activities, even though such activities may be in competition with

the Fund and/or may involve substantial time and resources of the Trading Manager. These activities could be viewed as creating a conflict of interest in that the time and effort of the members, partners, officers and employees of the Trading Manager and its affiliates will not be devoted exclusively to the business of the Fund but will be allocated between the business of the Fund and the management of the monies of other clients of the Trading Manager.

While the Trading Manager intends to employ a consistent investment program, the portfolio strategies of the Trading Manager used for other investment funds or accounts could conflict with the transactions and strategies employed by the Trading Manager in managing the Fund and affect the prices and availability of the instruments in which the Fund invests.

The Trading Manager or its affiliates may give advice or take action with respect to any of their other clients which may differ from the advice given or the timing or nature of any action taken with respect to investments in the Fund. It is the policy of the Trading Manager, to the extent possible, to allocate investment opportunities to the Fund over a period of time on a fair and equitable basis relative to other funds and accounts under its management. The Trading Manager has no obligation to purchase, sell or exchange any asset for the Fund which it may purchase, sell or exchange for the account of other clients.

## ADMINISTRATION, BANKING AND CLEARING

The Fund has engaged the services of the Bermuda Commercial Bank Limited ("BCB") to provide banking services to the Fund.

The Fund has engaged the services of Citigroup/Smith Barney, Inc. ("SSB") which will act as one of the Fund's primary clearing broker and will clear the Fund's transactions pursuant to the terms and conditions of SSB's standard account agreements, copies of which may be obtained from the Administrator. The Fund is not committed to its relationship with either BCB or SSB for any minimum period and the Fund may select other or additional banks, custodians or clearing brokers to act for the Fund with the prior written consent of the Bermuda Monetary Authority.

The Fund has contracted with Forum Fund Services Ltd., a division of Citigroup Global Transaction Services, to act as the Administrator, Registrar and Transfer Agent (the "Administrator") to the Fund pursuant to an Administration, Registrar and Transfer Agency Agreement (the "Administration Agreement"). Pursuant to the Administration Agreement, the Fund has delegated responsibility for administrative activities of the Fund to the Administrator. The Administration Agreement may be terminated by either party for any reason on three months' prior written notice. The Administrator is responsible for the general administrative functions of the Fund, including those required by the laws of Bermuda.  Such functions will include company secretarial services, communications with Shareholders and liaison with the clearing brokers and Trading Manager.  As Administrator, such duties include calculation of Net Asset Values and Management and Performance Fees, the preparation of periodic financial reports and maintaining in good order the Fund's accounting and bookkeeping records.  As Registrar and Transfer Agent, the Administrator maintains the share register for the Shares and accounts for any Share transfers.  The Fund may retain other entities to carry out certain other functions.  The Administrator will also perform certain accounting services on behalf of the Fund.  Such services include daily trade input, daily reconciliation, and daily estimated Net Asset Values and liaising with the clearing brokers, pursuant to the Administration Agreement.

The Administrator will calculate an estimated Net Asset Value of the Fund (Class of Shares) and an estimated Net Asset Value per Share of the Fund on a daily basis, which information will be available to Shareholders from the Administrator or Trading Manager on request. An internet web address and password will be provided to each Shareholder so that Shareholders may access the prior day's estimated Net Asset Value for each funded series of Shares. The estimated Net Asset Values will be posted each day between 9:00 a.m. and 12:00 p.m. U.S. Eastern Standard Time. The Administrator will calculate the Net Asset Values of the Fund and the Net Asset Value per Share of the Funds Classes and applicable Series on a monthly basis,

23

which information will be available to Shareholders from the Administrator or Trading Manager on request. The fees payable to the Administrator are based on the standard schedules of fees charged for similar services. In addition to the reports provided by the Administrator, the Trading Manager may provide quarterly performance reports to the Shareholders and may provide other periodic performance reports as it deems necessary in its sole discretion.

## BROKERAGE

The Trading Manager will allocate transactions for the Fund (or in case of Class A Shares, Class D Shares, Class P Shares, and Class Z Shares, the Trading Manager may permit the individual managers for such classes to allocate transactions) to various brokers and dealers on the basis of best execution, such broker or dealer's reliability and financial condition and, with respect to brokers only, the provision of or payment for the costs of research and brokerage services which are of benefit to the Fund, the Trading Manager and related funds and accounts. The Fund will also consider other factors, such as applicable margin levels and financing rates, transaction size and liquidity. Accordingly, if the Trading Manager determines in good faith that the commissions charged by a broker are reasonable in relation to the value of the research or brokerage services provided by such broker, the Fund may pay commissions to such broker which are greater than those another might charge. The Trading Manager has the discretion to select brokers on behalf of the Fund, subject to consideration of the factors described above. In the case of Class A Shares, Class D Shares, Class P Shares, and Class Z Shares, the Trading Manager may permit the individual managers for such classes to make trading allocations, select brokers and make other investment decisions for capital invested in their specific classes.

Brokers through which transactions for the Fund are executed may provide research or brokerage services to the Fund, including, among other things, research reports on particular industries or companies, economic surveys and analyses, recommendations as to specific securities, on-line quotations, news and research services, and other services (e.g., computer and telecommunications equipment) providing lawful and appropriate assistance to the Trading Manager in the performance of its investment decision-making responsibilities on behalf of the Fund and other accounts which the Trading Manager or its affiliates may manage.

Such services may be provided directly by brokers, by third parties at the direction of brokers or purchased on behalf of the Fund with credits or rebates provided by brokers. Brokers sometimes suggest a level of business they would like to receive in return for the various services they provide. Actual business received by any broker may be less than the suggested allocations.

Research obtained with soft dollars generated by the Fund may be used by the Trading Manager to service accounts other than the Fund. Where a product or service obtained with commission dollars provides both research and non-research assistance to the Trading Manager, the Trading Manager will make a reasonable allocation of the cost which may be paid for with commission dollars.

Section 28(e) of the U.S. Securities Exchange Act of 1934, as amended, permits the use of such services, provided that the Fund does not pay a rate of commission in excess of what is competitively available from comparable brokerage firms for comparable services, taking into account various factors, including commission rates, financial responsibility and strength and ability of the broker to execute transactions efficiently. Services obtained in connection with transactions for the Fund generally will be within the safe harbor established under Section 28(e).

# ADVISORY FEES

Pursuant to the Trading Manager Agreement, the Trading Manager will be paid the following fees for services that it performs for the Fund.

**Management Fee.**  The Trading Manager will receive compensation for its performance of management services to the Fund at a rate of one-sixth of one percent (1/6%) per month (approximately 2% per annum) of the Net Asset Value of the Fund, calculated and paid on a monthly basis (the "Management Fee"). Such fee shall be calculated as of the last business day of each month and paid in arrears as soon as practicable.

If the Fund, in its discretion, permits subscriptions to be made by new or existing Shareholders on any date that does not fall on the first day of a calendar month, the Management Fee shall be pro rated to take into account the actual number of calendar days remaining in such partial calendar month. If the Fund, in its discretion, permits a withdrawal by a Shareholder other than as of the last day of a calendar month a pro rata portion of the Management Fee shall be paid by the withdrawing Shareholder to the Trading Manager based on the actual number of calendar days remaining in such partial calendar month. The Trading Manager may elect to waive a portion of the Management Fee with respect to any Shareholder.

**Performance Fee.** The Trading Manager will receive additional compensation for its services to the Fund in the form of a performance fee which shall be twenty percent (20%) of the Net New Profits (as defined below) with respect to each Shareholder's Shares for each quarter (including net realized and unrealized gain and net investment income) (the "Performance Fee").

"Net New Profits" means, with respect to each Shareholder investment, the Shareholder's share of (a) the net realized profits and losses for the period, plus (b) the net unrealized profits and losses for the period, minus (c) the net unrealized profits and losses at the end of the previous period, minus (d) any net losses carried forward from previous periods that have not been recouped. Net profits and losses with respect to each Shareholder investment for a period are calculated taking into consideration all cash and cash equivalents (valued at cost), accrued interest and the market value of all open trading positions and all other assets less the brokerage and floor commissions and fees and other transaction costs that would be payable with respect to closing each open trading position and all other liabilities of the investment, including the Shareholder's pro rata share of accrued legal, accounting and auditing fees, accrued organizational expenses, accrued management fees, expenses of the continuous offering and any extraordinary expenses (e.g. non-recurring legal expense) determined in accordance with U.S. generally accepted accounting principles consistently applied under the accrual basis of accounting.  Accrued and paid Performance Fees are specifically not deducted in determining Net New Profits. The carry-forward loss is proportionally reduced if and to the extent a Shareholder's Shares are redeemed during a period that a carry-forward loss exists.

In the event a Shareholder subscribes for additional Shares after making its initial investment, the Fund will issue a new Series of Shares and the subsequent subscription will be treated as a separate investment for purposes of calculating Performance Fees. The Performance Fee will only be paid on a Shareholder's Net New Profits for the period when the Net Asset Value of the Series of Shares exceeds the highest closing Net Asset Value of the same Shares in any previous accounting period in which a Performance Fee was paid. In addition, if a Shareholder redeems Shares when the Net Asset Value with respect to those Shares is below its highest previous value, such highest previous value shall be reduced (solely for purposes of calculating Net New Profits) by the percentage obtained by dividing the redemption amount by the Share's Net Asset Value immediately before the redemption.  Redemptions will be accounted for on a first in, first out basis with respect to each individual Shareholder's investments, in the event that a Shareholder has more than one investment.

The Trading Manager may elect to defer payment of all or part of the Performance Fee (or the Management Fee).  Any such deferred amounts shall be treated, and the amounts payable at the end of any deferral period shall be determined, as if such deferred fees had been invested in the Fund without any charge

for Performance (or Management) Fees. The deferred fees, including any appreciation or depreciation, shall be paid promptly at the end of the deferral period. The Trading Manager may reduce the Performance Fee with respect to any Shareholder. Such fee shall be accrued monthly and paid quarterly in arrears. Net New Profits shall be determined before any deduction for Management or Performance Fees. The Performance Fee is also paid when Shares are redeemed. The Trading Manager has no obligation to restore to the Fund any fees previously earned and paid, notwithstanding a loss in a subsequent period.

In the event the Fund invests capital in other funds and/or under other trading advisors other than the Trading Manager, the Fund may be required to pay additional management fees and/or performance fees to such other funds or trading advisors.

## EXPENSES OF THE FUND

The Fund will incur a number of types of expenses in conducting its operations, including:

**Organizational and Offering Expenses.** Expenses of organization of the Fund (such as incorporation expenses, filing fees and legal and accounting fees), as well as expenses of the offering of Shares by the Fund (including without limitation, legal and other costs of preparation and printing of this Offering Memorandum) and the marketing and selling of Shares pursuant to this Offering, have been paid by the Fund from the proceeds of subscriptions for Shares. Initial expenses totaled $91,000. Some of these expenses were incurred prior to the organization of the Fund by officers or directors of the Fund or others. Those advancing amounts for these expenses will be reimbursed by the Fund. These expenses have been capitalized by the Fund and are being amortized over a five-year period. The Fund will also incur expenses in connection with the continuing offering of Shares.

The Fund will bear its own expenses related to the Fund's operations, including, without limitation, investment related expenses such as brokerage commissions, research expenses, interest on margin accounts and other indebtedness, borrowing charges, custodial fees, bank service fees, withholding and transfer fees, taxes, clearing and settlement charges, professional fees (including, without limitation, expenses of consultants and experts) relating to investments, fees for data and software providers and other expenses related to the purchase, sale or transmittal of Fund investments; travel expenses related to investments; marketing, legal, internal and external accounting, audit and tax preparation expenses; corporate licensing fees; Trading Manager and managing member liability insurance premiums; organization expenses; expenses incurred in connection with the offer and sale of Shares; and other similar expenses related to the operation or organization of the Fund and any extraordinary expenses, as shall be determined by the Board of Directors of the Fund in its sole discretion.

**Brokerage Commissions.** Commissions will be paid to various brokers through which the Fund conducts its trading activities. The Trading Manager will negotiate with such brokers and seek to secure the most favorable commission rates available to the Fund. Similar charges will be incurred on trades executed on foreign exchanges and for non-exchange traded instruments. Such fees may change and, in addition, may include applicable floor brokerage, exchange, clearinghouse and NFA fees, "give up" or transfer fees and any costs associated with taking delivery of commodity or securities interests and the execution of the Fund's forward contract or other over-the-counter transactions.

**Administration Fees.** The Administrator has the responsibility of furnishing all necessary administrative services to the Fund. The Administrator's services include, without limitation, accounting, maintaining the Fund's books and records, and preparation of the Net Asset Value and Management/Performance Fee figures at the end of each month for each series of each Class of Shares of the Fund. The Administrator's services include, without limitation, certain accounting services on behalf of the Fund. Such services include daily trade input, daily reconciliation, and daily preparation of the estimated Net Asset Value and Performance Fee figures for each series of Shares of the Fund. The Administrator will be

responsible for distributing monthly and annual reports to Shareholders (including annual reports which will have been audited by the Fund's independent auditors), communicating with Shareholders and with governmental agencies and instrumentalities, maintaining the register of Shareholders, and recording the purchase, transfer and redemption of Shares.  For the services and facilities provided and for the responsibilities undertaken, the Administrator is entitled to an annual fee and to reimbursement for costs incurred in discharging its responsibilities. The Fund will negotiate the most favorable fee for such services as is in the best interest of the Fund.  The terms of the Administration Agreement with the Fund provide for indemnification of the Administrator from and against any and all losses, claims, costs and liabilities that the Administrator may incur or suffer by reason of having acted or relied upon instructions of the Fund.

**Other Periodic Expenses**.  The Fund will be required to pay additional periodic operating expenses including, but not limited to, filing and recording charges, legal, printing, accounting, auditing fees and other ongoing operating expenses plus non-recurring expenses such as expenses associated with significant litigation.  Such expenses shall be paid out of the assets of the Fund.  In the event the Fund invests capital in other funds and/or under other trading advisors other than the Trading Manager, the Fund may be required to pay additional management fees and/or performance fees to such other funds or trading advisors.

## CERTAIN DEFINITIONS

**Net Asset Value.**  Net Asset Value with respect to the Fund means the Fund's total assets less total liabilities; Net Asset Value of a Class means the total assets less total liabilities applicable to a particular Class. Net Asset Value of a Series within a Class means the Net Asset Value of the Class multiplied by the percentage that the Series bears to all Series of the Class; and Net Asset Value per Share means a Series' pro rata share of the Classes assets and liabilities divided by the number of outstanding Shares of the Series.  Net Asset Value shall be determined according to the following principles, and where no such principle is governing, then on the basis of generally accepted accounting principles, consistently applied.

(a)    Net Asset Value includes any realized or unrealized profit or loss on open currency, commodities, securities or other positions.

(b)    All open currency, commodities, securities or other positions are valued at their then market value, which means, the settlement price as determined by the exchange on which the transaction is effected, or the most recent appropriate quotation as supplied by the clearing broker, dealer or banks through which the transaction is effected, except that U.S. Treasury bills (not futures contracts thereon) shall be carried at their cost plus accrued interest.  If there are no trades on the date of the calculation due to the operation of daily price fluctuation limits or due to a closing of the exchange on which the transaction is executed, the contract is valued at the nominal settlement price as determined by the exchange.  Interest, if any, shall be accrued monthly.

(c)    Management and Performance Fees paid to the Trading Manager shall be accrued monthly for purposes of calculating Net Asset Value only, even if not paid until the end of the quarter.

**Determination of Net Asset Value.**  Net Asset Valuations are determined by the Administrator, with the assistance of the Board of Directors, as of the close of business on the last business day of each month with respect to each Series of Shares.  Due to fluctuations in the Net Asset Value per Share, investments of different investors or multiple investments of one investor may be subject to differing fees per investment (e.g. one investor or investor's investment may be subject to payment of a Performance Fee during a period, while another investor or investor's investment may not) resulting in varying Net Asset Values per Share for each Series of Shares and for each individual Shareholder's investments.

**Calculation of Net Asset Value of Shareholders' Shares.**  The Net Asset Value of Shareholder's Shares shall be expressed in U.S. dollars and shall be determined by calculating the value of the assets and liabilities of each such Shareholder's investments on the relevant valuation day.  The Net Asset Value of

Shareholders' Shares shall include all cash and cash equivalents (valued at cost), accrued interest and the market value of all open trading positions and all other assets less the brokerage and floor commissions and fees and other transaction costs that would be payable with respect to closing of each open trading position and all other liabilities of the investment, including the Shareholder's pro rata share of accrued legal, accounting and auditing fees, accrued organizational expenses, accrued Management Fees, accrued Performance Fees, expenses of the continuous offering and any extraordinary expenses (e.g. non-recurring legal expense) determined in accordance with U.S. generally accepted accounting principles consistently applied under the accrual basis of accounting.

**Net New Profits.**  Net New Profits means, with respect to each Shareholder investment, the Shareholder's share of (a) the net realized profits and losses for the period, plus (b) the net unrealized profits and losses for the period, minus (c) the net unrealized profits and losses at the end of the previous period, minus (d) any net losses carried forward from previous periods that have not been recouped.  Net profits and losses with respect to each Shareholder investment for a period are calculated taking into consideration all cash and cash equivalents (valued at cost), accrued interest and the market value of all open trading positions and all other assets less the brokerage and floor commissions and fees and other transaction costs that would be payable with respect to closing of each open trading position and all other liabilities of the investment, including the Shareholder's pro rata share of accrued legal, accounting and auditing fees, accrued organizational expenses, accrued Management Fees, expenses of the continuous offering and any extraordinary expenses, (e.g. non-recurring legal expense) determined in accordance with U.S. generally accepted accounting principles consistently applied under the accrual basis of accounting.  Accrued and paid Performance Fees are specifically not deducted in determining Net New Profits.  The carry-forward loss is proportionally reduced if and to the extent a Shareholder's Shares are redeemed during a period that a carry-forward loss exists.

In the event a Shareholder subscribes for additional Shares after making its initial investment, the Fund will issue a new Series of Shares and the subsequent subscription will be treated as a separate investment for purposes of calculating Performance Fees.  The Performance Fee will only be paid on a Shareholder's Net New Profits for the period when the Net Asset Value of the Series of Shares exceeds the highest closing Net Asset Value of the same Shares in any previous accounting period in which a Performance Fee was paid.  In addition, if a Shareholder redeems Shares when the Net Asset Value with respect to those Shares is below its highest previous value, such highest previous value shall be reduced (solely for purposes of calculating Net New Profits) by the percentage obtained by dividing the redemption amount by the Share's Net Asset Value immediately before the redemption.  Redemptions will be accounted for on a first in, first out basis with respect to each individual Shareholder's investments, in the event that a Shareholder has more than one investment.

**Allocation of Net New Profits.**  Items of Net New Profits are allocated to shareholders using the following principles.

a.  All Fund specific income & expense items (not identifiable to a particular Class) will be allocated pro rata based upon the proportion of the shareholder capital value compared to the Fund's capital value.

b.  All class specific income & expense items inclusive of all Profit and Loss applicable to Class specific investments will be allocated 100% to the shareholders of the Class pro rata based upon the proportion of the shareholders capital value within a Class compared to the Classes capital value.

c.  All Profit and Loss applicable to Class B and Class C investments in the Class Leveraged Trading Strategy (as defined below) will be allocated to each Class pro rata based upon the proportion of the Class Leveraged Account Value (as defined below) compared to the Total Leveraged Account value (as defined below).  The shareholders of each class will receive their pro rata share of this profit and loss based upon the allocation methods identified in "b." above.

**Leveraged Factor.** The Leverage Factor is only applicable to Class B and Class C. The Leverage Factor for Class B and Class C will be 4:1 and 2:1 respectively.

**Class Leveraged Trading Strategy.** The Class Leveraged Trading Strategy is only applicable to Class B & Class C. The Class Leveraged Trading Strategy refers to pooled investments of Class B and Class C in the Global Pattern Recognition Model or such other trading strategy that may be developed by the Trading Manager.

**Class Leveraged Account Value.** Class Leveraged Account Value is only applicable to investments in the Class Leveraged Trading Strategy. Class Leveraged Account Value means the actual beginning of period capital account value specific to investments in the Class Leveraged Trading Strategy multiplied by the Leveraged Factor applicable to Class B or Class C.

**Total Leveraged Account Value.** Total Leveraged Account Value is only applicable to investments in the Class Leveraged Trading Strategy. Total Leveraged Account Value means the sum of all Class Leveraged Account Values.

## DESCRIPTION OF THE SHARES

The Fund has an authorized capital of U.S. $10,100 and is authorized to issue an aggregate of 1,000,100 shares, consisting of (i) 1,000,000 shares of redeemable, non-voting, participating, common shares with a par value of $0.01 each ("Shares"); and (ii) 100 voting, non-redeemable, non-participating shares with a par value of U.S. $1.00 each (" Management Shares").

The Shares are divided into Classes A, B, C, D, P and Z each of which may be divided into Series of Shares. Class A, B, C, D, P and Z Shares will be non-voting. Class B and C will be identical in every way except there will be different target leverage limits applicable to investments attributable to Classes B and C so that each of such Classes will attract a different allocation of profit and loss and represent a different risk/return profile for an investor. Class B will represent approximately two times the risk profile and anticipated return of Class C. Class A and Class C will allow up to a maximum leverage of 2:1. The Fund shall be permitted to invest up to 100% of the capital from Class A Shares, Class D Shares, Class P Shares and Class Z Shares in other investment funds, to allocate such capital to other trading managers and/or to invest such capital under trading strategies other than the Global Pattern Recognition Model, without limitation, as determined by the Trading Manager. In addition, the Fund has established Class H Shares and may establish additional classes of non-voting shares designed to hedge against currency risks. In such classes, the major portion of capital invested in shares in such classes will be invested in a trading strategy utilized in one of the other classes of the Fund, and a small portion of such capital will be utilized to purchase hedge against the currency risk of a particular currency. Items of profit and loss on investments identifiable to a particular class will be allocated 100% to that class. Items of profit and loss for non class specific investments of Class B & Class C only will be allocated pro rata based upon the proportion of the Class Leveraged Account Value compared to the Total Leveraged Account Value. (*See "Certain Definitions."*) To facilitate the assessment of the Performance Fee, a separate Series of Shares will be issued on each occasion that a Shareholder subscribes for Shares. The Net Asset Value per Share of Class A, B, C, D, P and Z Shares will differ accordingly, as may Net Asset Values for each Series within each Share Class. Different Series of Shares within a Class may be consolidated into a single Series of that Class provided that such consolidation shall have no impact upon each Shareholder's percentage ownership of the Fund or the Performance Fee payable by each Shareholder. The Management Shares will be the only voting securities issued by the Fund. All of the Management Shares have been issued to the Trading Manager prior to the Offering at a price of $1.00 per share. Management Shares will not be subject to dividends or distributions, except for the repayment upon a winding up of the Fund of amounts paid in with respect to the Management Shares.

The powers and rights of all of the Shares are controlled by Bermuda law and are subject to the provisions of the Fund's Memorandum of Association and Bye-Laws, which are available from the Fund Administrator.

Shares are not transferable without the approval of the Board of Directors of the Fund. In no event will transfers be permitted if, in the opinion of counsel to the Fund, such transfers pose a risk of subjecting the Fund or any of its officers, directors or affiliates to additional regulatory requirements or would appear even remotely likely, in the sole judgment of the Board of Directors of the Fund, to result in any violation of any applicable law.

Shareholders will not be entitled to any voting rights in the administration of the Fund.

It is anticipated that the Fund will not pay dividends on its Shares. Investors should contemplate that any return they will realize on their investments in the Fund will be in the form of increases in the Net Asset Value of the Shares held by the investor.

## CERTAIN RISK FACTORS

An investment in the Shares of the Fund is speculative and involves a high degree of risk. Investment in the Shares is designed only for sophisticated investors who are able to bear a substantial loss of their investment or the loss of their entire investment. Set forth below are some, though not all, of the factors and considerations which should be taken into account prior to making an investment decision.

**Fund's Investment Activities.** The Fund is a relatively new and evolving entity and there is limited operating and financial history to evaluate its likely performance in that there are only approximately 2 years of financial returns for the Fund. The Fund's performance is dependent upon, among other things, the success of the trading and investment decisions of the Trading Manager and, in certain cases, the managers of certain Classes of Shares. There is no guarantee or representation that the Fund's investment program(s) will succeed or yield profits. The Fund will invest in and actively trade currencies, commodities, securities and other instruments and assets using a variety of investment techniques with significant risk characteristics, including risks arising from the volatility of the currency, commodities and securities markets, and the risk of loss from counterparty and broker defaults. The Performance Fee payable to the Trading Manager may create an incentive for the Trading Manager to cause the Fund to make investments that are riskier than it would otherwise make.

**Limited Transferability.** The Shares have not been registered under the Securities Act and, therefore, are subject to restrictions on transfer under that Act. Shares may not be transferred without the consent of the Board of Directors of the Fund. Consequently, a Shareholder should expect to liquidate his investment only by withdrawing from the Fund.

**Reliance on GPRM.** The success of the Fund will depend in part on the performance of GPRM, which will be used to generate some of the Fund's trading signals. There is no assurance that GPRM will be effective in producing positive investment returns. The Trading Manager is dependent on several third parties (for example, data providers) to maintain GPRM and to generate signals and maintain the Model. The unavailability of any such third party, or its data feeds, services or products would have a material adverse impact on the ability of the Trading Manager to maintain GPRM and to generate signals and maintain the Fund's trading strategy. Such an event is likely to have a material adverse impact on the operation of the Fund.

**Importance of Relationship with Trading Manager.** The Fund's success will depend, not only upon the successful operation and functioning of GPRM but also, to a great extent, upon the Trading Manager's discretion, ability and experience. If the Trading Manager were to withdraw from its relationship with the Fund, there can be no expectation that the Fund would otherwise have access to GPRM. The loss to

the Fund of the services of the Trading Manager could have a substantial adverse effect on the performance of the Fund.

**Reliance on Key Personnel.** All decisions with respect to the investment of the Fund's capital will be made by the Trading Manager, which, with respect to the Fund's assets, relies on the services of George B. Szele and Joseph J. Porco. As a result, the success of the Fund for the foreseeable future will depend largely upon the ability of George B. Szele and Joseph J. Porco and, should they terminate their relationship with the Trading Manager, die or become otherwise incapacitated for any period of time, and should the replacement (if any) for such principal decision maker(s) of the Trading Manager not equal the predecessor's performance, the value of the Fund's investments may suffer. If the services of George B. Szele become unavailable to the Fund at any time, the trading and investment activity of the Fund may cease immediately and the Fund may be liquidated and dissolved.

**Non-Diversification of Investments.** There are no restrictions on the amount of Fund assets that the Fund may commit to any one investment. While it would be unusual, it is not inconceivable that the Fund may maintain at any given time a small number of relatively large positions. Consequently, a loss resulting from any one such position could have a material adverse effect on the overall financial performance of the Fund and its capital position.

**Margin and Leverage.** While leverage presents opportunities for increasing the total return on investments, it has the effect of potentially increasing losses as well. Accordingly, any event which adversely affects the value of an investment would be magnified to the extent leverage is utilized. The cumulative effect of the use of leverage with respect to any investment in a market that moves adversely to such investment could result in a substantial loss which would be greater than if the investments were not leveraged. The Trading Manager will not effect transactions for the Fund by reference to the Class of Shares held by a Shareholder, but will place orders and effect transactions for the Fund as a whole (except for certain cases and for Class A, Class D Shares, Class P Shares and Class Z Shares). The different amounts of leverage applicable to each Class of Shares held by a Shareholder will yield different amounts of profit or loss from each transaction. A holder of a Class of Shares carrying a lower leverage limit may be exposed to additonal risk and, potentially, losses due to the fact that transactions or positions of the Fund may, in fact, be effected or held with higher amounts of leverage.

**Withdrawals.** The Board of Directors of the Fund may require a Shareholder to withdraw all or any portion of its capital under such circumstances as the Board of Directors of the Fund, in its sole discretion, deems appropriate. If the Fund has experienced losses, a withdrawing Shareholder may receive an amount of capital that is less than the amount originally contributed by such Shareholder.

**Futures Trading Is Speculative and Volatile.** Futures prices are highly volatile and often fluctuate rapidly in a short period of time. Price movements of futures contracts are influenced by, among other things: changing supply and demand relationships; climate; government agricultural, trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; crop diseases; the purchasing and marketing programs of different nations; and changes in interest rates. In addition, governments from time to time intervene, directly and by regulation, in certain markets, particularly those in currencies and gold. Such intervention is often intended to influence prices directly. None of these factors can be controlled by the Fund or the Trading Manager and no assurances can be given that the Fund will not incur substantial losses as the result of any such activity.

**Securities Can Be Volatile in Price and Potentially Illiquid.** The prices of securities can be highly volatile. Prices can be influenced among other things by such factors as changing supply and demand, government programs and policies, political and economic events, and also by the effects of speculation within the marketplace itself. Daily price limits in some circumstances prevent securities trades from being executed during a given trading day at a price above or below the daily limit. Daily limits could prevent the Fund from

promptly liquidating unfavorable positions and may subject it to substantial losses that could exceed the margin initially committed to the trades involved.

**Futures Markets May Be Illiquid.** United States and other futures exchanges impose "daily limits" on the amount by which the price of most futures contracts traded on such exchanges may vary during a single day. Daily limits prevent trades from being executed during a given trading day at a price above or below the daily limit. Once the price of a futures contract has moved to the limit price, it may be difficult, costly or impossible to liquidate a position. Such limits could prevent the Fund from promptly liquidating unfavorable positions and restrict its ability to exercise or offset futures or options which it holds. In addition, even if prices have not moved the daily limit, the Fund may be unable to execute trades at favorable prices if the liquidity of the market is not adequate. It is also possible for an exchange or the CFTC to suspend trading in a particular contract, order immediate settlement of a particular contract or order that trading in a particular contract be conducted for liquidation only. In addition, the Fund may trade on certain non-U.S. markets, which may be substantially more prone to periods of illiquidity than the United States markets due to a variety of factors.

**Futures Trading Is Highly Leveraged.** The low margin deposits normally required in futures contract trading (typically between 2% and 15% of the value of the contract purchased or sold) permit an extremely high degree of leverage. For example, if at the time of purchase 10% of the price of a contract is deposited as margin, a 10% decrease in the price of the contract would, if the contract is then closed out, result in a total loss of the margin deposit before any deduction for brokerage commissions. A decrease of more than 10% would result in a loss of more than the total margin deposit. Accordingly, a relatively small price movement in a contract may result in immediate and substantial losses to the investor. Like other leveraged investments, any trade may result in losses in excess of the amount invested.

**Possible Effects of Speculative Position Limits.** The CFTC and the United States commodities exchanges have established limits referred to as "speculative position limits" on the maximum net long or net short speculative positions that any person may hold or control in any particular futures or options contracts traded on United States commodities exchanges. The Fund could be required to liquidate positions held, or may be precluded from taking on additional positions in order to comply with such limits. Any such liquidation or inability to take on new positions could result in substantial losses to the Fund.

**Trading in Options on Futures.** Options on futures contracts, currencies and physical commodities may be traded by the Fund. Each such option is a right, purchased for a certain price, to either buy or sell the underlying futures contract, currency or physical commodity during a certain period of time for a fixed price. Such trading involves risks substantially similar to those involved in trading futures contracts in that options are speculative and highly leveraged. Specific market movements of the futures contracts, currency or commodities underlying an option cannot accurately be predicted. The purchaser of an option is subject to the risk of losing the entire purchase price of the option. The writer of an option is subject to the risk of loss resulting from the difference between the premium received for the option and the price of the futures contract, currency or commodity underlying the option which the writer must purchase or deliver upon exercise of the option.

**Trading on Non-U.S. Futures Markets.** The Fund may engage in trading on futures markets outside the United States. Trading on such markets is not regulated by any United States government agency and may involve certain risks not applicable to trading on United States exchanges. For example, some non-U.S. markets, in contrast to United States exchanges, are "principals' markets" similar to the forward markets in which performance is the responsibility only of the individual member with whom the trader has entered into a futures contract and not of any exchange or clearing corporation. In a number of non-U.S. markets, a substantial volume of trades which in the United States could only be executed on a regulated exchange are executed off an exchange in privately negotiated transactions. The Fund may not have the same access to certain trades as do various other participants in markets outside the United States. Furthermore, with respect

to trading in non-U.S. markets the Fund is subject to the risk of fluctuations in the exchange rate between the local currency and dollars as well as the possibility of exchange controls.

**Forward Currency Trading**. The Fund may engage in trading forward contracts in currencies. Such forward contracts are not traded on exchanges; rather, banks and dealers act as principals in these markets. Neither the CFTC nor any banking authority regulates trading in such forward contracts. In addition, there is no limitation on the daily price movements of forward contracts. Principals in the forward markets have no obligation to continue to make markets in the forward contracts traded. There have been periods during which certain banks or dealers have refused to quote prices for forward contracts or have quoted prices with an unusually wide spread between the price at which they are prepared to buy and that at which they are prepared to sell. The Fund will be subject to the risk of the failure of, or the inability to perform with respect to, its forward contracts by the principals with which the Fund trades. Capital of the Fund on deposit with such principals will also generally not be protected by the same segregation requirements imposed on CFTC-regulated futures brokers in respect of Fund funds on deposit with them. In addition, the Fund may trade in such markets through agents. The insolvency or bankruptcy of such agents could also subject the Fund to the risk of loss.

**Swap Agreements**. The Fund may enter into swap agreements. Swap agreements can be individually negotiated and structured to include exposure to a variety of different types of investments or market factors. Depending on their structure, swap agreements may increase or decrease the Fund's exposure to long-term or short-term interest rates (in the United States or abroad), foreign currency values, corporate borrowing rates, or other factors such as currency, commodity or security prices, baskets of equity securities or inflation rates. Swap agreements can take many different forms and are known by a variety of names. The Fund is not limited to any particular form of swap agreement if consistent with the Fund's investment objective and policies.

Swap agreements tend to shift the Fund's investment exposure from one type of investment to another. For example, if the Fund agrees to exchange payments in dollars for payments in foreign currency, the swap agreement would tend to decrease the Fund's exposure to U.S. interest rates and increase its exposure to foreign currency and interest rates. Depending on how they are used, swap agreements may increase or decrease the overall volatility of the Fund's portfolio. The most significant factor in the performance of swap agreements is the change in the specific interest rate, currency, commodity, individual equity values or other factors that determine the amounts of payments due to and from the Fund. If a swap agreement calls for payments by the Fund, the Fund must be prepared to make such payments when due. In addition, if a counterparty's creditworthiness declines, the value of swap agreements with such counterparty can be expected to decline, potentially resulting in losses by the Fund.

**Failure of an FCM**. Under CFTC regulations, futures commission merchants ("FCMs") are required to maintain a client's assets in a segregated account. If the Fund's FCM fails to do so, the Fund may be subject to a risk of loss of its funds on deposit with the FCM in the event of its bankruptcy. In addition, under certain circumstances, such as the inability of another client of the FCM or the FCM itself to satisfy substantial deficiencies in such other client's account, a party such as the Fund may be subject to a risk of loss of funds on deposit with the FCM, even if such funds are properly segregated. In the case of any such bankruptcy or client loss, a party such as the Fund might recover, even in respect of property specifically traceable to that party, only a pro rata share of all property available for distribution to all of the FCM's clients.

**Increased Use of Trend-Following and Counter-Trend Systems**. Trading systems that employ trend-following timing signals and systems that employ counter-trend techniques have increased in use in recent years. With respect to trend-following systems, while the precise effect of such increase cannot be determined, such increase could alter trading patterns or affect trade execution to the detriment of the Fund. As to counter-trend systems (or other systems that attempt to profit from the wide use of trend-following systems by running stop points or otherwise), their effect is even harder to determine but such increase could also alter trading patterns to the detriment of the Fund.

**Substantial Fees and Expenses.** The Fund will have to earn substantial trading profits to avoid depletion of assets due to commissions and fees. The fees charged the Fund include both a Management Fee and a Performance Fee, and such fees may be higher or lower than the fees paid in other investment funds. Monthly Management Fees charged by the Trading Manager are based on the Net Asset Value of a Shareholder's investment as of the end of each calendar month, without regard to the profitability of the account. Quarterly Performance Fees payable to the Trading Manager are based on the Net New Profits as of the end of each calendar quarter. Both calculations include unrealized profits (net of unrealized losses) in open positions, and the Management Fee includes interest income earned in the account. Any such increase may never be realized. The expenses of operating the Fund (including the fees payable to the Trading Manager under the terms of the Trading Manager Agreement) may from time to time exceed the Fund's income and may thus decrease the Fund's capital.

**Current Equity Level.** The Fund may accept substantial additional capital in the near future. Many analysts believe that traders' rates of return tend to decrease as assets under management increase. There can be no assurance that the Fund will be able to manage its current or future equity level in the same manner as in the past or that speculative position limits, liquidity constraints or other factors related to equity levels will not adversely affect its trading.

**General Uncertainty Concerning Future Regulatory Changes.** The United States and foreign commodities and securities markets are subject to ongoing and substantial regulatory changes. It is impossible to predict what statutory, administrative or exchange changes may occur in the future or what impact such changes may have on the Fund's prospects for profitability.

**Potential Conflicts of Interest.** The Fund is subject to certain potential conflicts of interest. (See "*Conflicts of Interest*".)

**Management.** The investors will have no right or power to take part in the management or control of the business of the Fund. The Trading Manager will control all voting securities and accordingly possess the right to elect all members of the Fund's Board of Directors.

**Foreign Exchanges and Currency Conversions.** The Fund may trade on exchanges located outside of the United States. Unless the Fund hedges itself against fluctuations in the exchange rate between the United States dollar and the currencies in which trading takes place on such exchanges, any potential profits could be eliminated and losses could be incurred as a result of adverse changes in the exchange rate. Finally, the Fund may have to convert assets into other currencies in order to meet margin requirements. In such cases, the Fund may or may not attempt to hedge itself against fluctuations in the exchange rate. Such hedging may or may not be successful.

**Counterparty, Valuation and Settlement Risk.** To the extent the Fund invests in swaps, "synthetic" or derivative instruments, repurchase agreements, certain types of option or other customized financial instruments, or, in certain circumstances, non-U.S. securities, the Fund takes the risk of non-performance by the other party to the contract. This risk may include credit risk of the counterparty and the risk of settlement default. This risk may differ materially from those entailed in exchange-traded transactions which generally are supported by guarantees of clearing organizations, daily marking-to-market and settlement, and segregation and minimum capital requirements applicable to intermediaries. Transactions entered directly between two counterparties generally do not benefit from such protections and expose the parties to the risk of counterparty default.

In addition, there are risks involved in dealing with the custodians or brokers who settle Fund trades particularly with respect to non-U.S. investments (may not pertain to all Classes of Shares). It is expected that all assets deposited with custodians or brokers will be clearly identified as being assets of the Fund and hence the Fund should not be exposed to a credit risk with respect to such parties. However, it may not always be

possible to achieve this segregation and there may be practical or timing problems associated with enforcing the Fund's rights to its assets in the case of an insolvency of any such party.

**General Investment Risks.** The Fund's investment program is speculative and entails substantial risks. There can be no assurance that the investment objectives of the Fund will be achieved. The use of short selling, leverage, limited diversification and other investment techniques can, in certain circumstances, maximize the adverse impact to which the Fund's investment portfolio may be subject. Accordingly, the Fund's activities could result in a loss of the entire amount invested.

There can be no assurance that the Trading Manager's assessments of the short-term or long-term prospects for the Fund's investments will prove accurate. Past performance is not a guarantee of future results.

THE FOREGOING RISK FACTORS DO NOT PURPORT TO BE A COMPLETE EXPLANATION OF ALL OF THE RISKS INVOLVED IN AN INVESTMENT IN THE FUND. POTENTIAL INVESTORS SHOULD READ THIS OFFERING MEMORANDUM IN ITS ENTIRETY BEFORE DETERMINING WHETHER TO SUBSCRIBE FOR SHARES.

CONFLICTS OF INTEREST

Certain conflicts of interest may arise in the operation of the Fund, including but not limited to the following:

**Other Activities of the Trading Manager and its Affiliates.** The Trading Manager and its affiliates will not be required to devote full time to Fund activities. The principals of the Trading Manager may be engaged on behalf of entities other than the Fund and which compete for their professional time and energies.

**Trading Own Account.** The Trading Manager and its principals and employees may trade for their own proprietary accounts in the same types of assets as are held by the Fund. Hence, it is possible that the Trading Manager and/or its principals may, from time to time, as a result, for example, of a new allocation system, testing a new trading system, trading their proprietary accounts more aggressively, or any other actions that would not constitute a violation of fiduciary duties, compete with the Fund for similar positions in one or more assets or markets or may take positions in their proprietary accounts which are opposite, or ahead of, the positions taken by the Fund. The records of such trading will not be made available to Shareholders.

**Trading Multiple Accounts.** The Trading Manager and its principals may manage and trade numerous accounts, including other commodity pools or investment funds for which the Trading Manager may serve as CPO, CTA or investment adviser. The Trading Manager may have a conflict of interest because its benefit from managing some other accounts may exceed its benefit from managing the Fund and, therefore, may provide an incentive to favor such other accounts. In addition, the Fund's acceptance of additional capital may adversely impact the performance of its existing trading activity because of speculative position limits, liquidity constraints or other factors. Because of price volatility, occasional variations in liquidity and differences in order execution, it is impossible for the Trading Manager to obtain identical trade execution for all its clients. Such variations and differences may produce differences in performance among client accounts over time. In an effort to treat its clients fairly when orders for client accounts are filled at different prices, the Trading Manager will attempt to allocate trades on a systematic, pro rata basis.

**Performance-Based Fees.** The quarterly performance fee payable to the Trading Manager is based on a percentage of Net New Profits. This arrangement may create an incentive for the Trading Manager to make trades that are riskier or more speculative than would be the case if it were compensated solely by an asset-based management fee.

**Affiliated Parties.** The Trading Manager and the Fund are affiliated with each other. As a result, among other things, the fees to be paid to the Trading Manager were not negotiated at arm's length, and the

35

decision to retain the Trading Manager by the Fund was made by the Fund's Board of Directors, which was appointed by the Trading Manager.

## EXCHANGE CONTROL AND TAX

**Exchange Control**. The Fund has been classified as resident outside the Bermuda Exchange Control Area by the Bermuda Monetary Authority, Foreign Exchange Control, whose permission for the issue by the Fund of up to 1,000,100 Shares has been obtained. In view of the Fund's non-resident status for exchange control purposes, it is free to acquire, hold and sell any foreign currencies and securities without restriction.

The transfer of Shares between persons resident outside Bermuda for exchange control purposes and the issue of Shares to and redemption of Shares by any such persons may be effected without specific consent under the provisions of the Bermuda Exchange Control Act 1972 and regulations made thereunder. Issues, redemptions and transfers involving persons regarded as resident in Bermuda for exchange control purposes require specific exchange control authorization under the Act.

### Taxation of the Fund

**Bermuda**. At the date of this Offering Memorandum, Bermuda does not provide for the imposition of income, corporation or profits tax, withholding tax, capital gains tax, capital transfer tax, estate duty or inheritance tax with respect to income or gain of the Fund or its Shareholders, other than Shareholders ordinarily resident in Bermuda.

As an exempted company under Bermuda law, the Fund is liable to pay in Bermuda a registration fee based upon its authorized share capital and the amount of the Fund's share premium account (if any) at a rate not exceeding BD $27,825 per annum.

The Fund has applied to, and expects to receive from the Minister of Finance of Bermuda under the provisions of the Exempted Undertaking Tax Protection Act 1966, as amended, an undertaking that, in the event of there being enacted in Bermuda any legislation imposing tax computed on profits or income, or computed on any capital assets, gain or appreciation or any tax in the nature of estate duty or inheritance tax, such tax shall not be applicable to the Fund or to any of its operations or to the Shares, debentures or other obligations of the Fund except insofar as such tax applies to persons ordinarily resident in Bermuda and holding such shares, debentures or other obligations of the Fund or to land in Bermuda leased to the Fund.

**United Kingdom**. It is intended that the affairs of the Fund will be conducted so that it will be resident for taxation purposes outside of the United Kingdom and will not be liable to United Kingdom taxation on its worldwide profits and gains.

### U.S. Federal Income Taxes.

Taxation of the Fund. The Fund is treated as a corporation for U.S. federal income tax purposes. It is intended that the Fund's affairs will be conducted such that (i) no income realized by the Fund will be effectively connected with the conduct of a U.S. trade or business and (ii) the income of the Fund will not otherwise be subject to regular U.S. federal income taxation on a net basis. If, contrary to its intended method or operation, the Fund is considered to be engaged in U.S. trade or business, any income that is effectively connected with such U.S. trade or business will be subject to regular U.S. federal income taxation, plus a 30% U.S. "branch profits" tax on amounts distributed or treated as distributed by the Fund.

Interest. Under current U.S. federal income tax law and regulations, payments of principal and interest (including payments in respect of original issue discount) on debt obligations issued by a U.S. person or the U.S. Government after July 18, 1984 generally are not subject to U.S. federal withholding tax, provided that, with respect to interest (including original issue discount), certain certification and other requirements are

36

met. Notwithstanding the general rule, certain payments of contingent interest are subject to U.S. withholding tax, which would be imposed at a 30% rate in the case of the Fund.

Payments of principal, premiums and interest on debt obligations issued by a non-U.S. issuer generally will not be subject to U.S. withholding tax.

Dividends.  Under current U.S. federal income tax law and regulations, payments of dividends from U.S. sources (generally, dividends paid by U.S. corporations) will be subject to U.S. withholding tax, imposed at a 30% rate in the case of the Fund.  Payments of dividends not from U.S. sources will not be subject to U.S. withholding tax.

Gains.  Under present law, the Fund will not be subject to U.S. federal income tax on its capital gains whether from sources within or without the United States to the extent that such gains are not derived from securities classified as "United States real property interests" within the meaning of Section 897 of the Internal Revenue Code of 1986, as amended.  In this connection, the Fund does not presently intend to acquire any securities which would be classified as "United States real property interests".  Similarly, such gains will, in general, not be subject to U.S. federal withholding taxes (including "back-up" withholding taxes), provided that, in the case of securities held by a custodian or nominee in the United States, the Fund certifies to its non-U.S. status or otherwise establishes an exemption from "back-up" withholding.

Taxation of Shareholders.  Shareholders that are not U.S. persons for U.S. federal income tax purposes and that are not engaged in a trade or business in the United States will not be subject to any United States federal income, withholding, capital gains, estate or inheritance taxes with respect to dividends received or gains realized on the sale or exchange of the Shares owned by them, except that nonresident individuals who are present in the U.S. for more than 183 days in a taxable year will be subject to U.S. income tax on capital gains recognized by them during such year.

General.  The Directors expect that Shareholders in the Fund will be resident for tax purposes in many different countries and, accordingly, no attempt is made in this Memorandum to summarize the tax consequences for every investor who might become a Shareholder in the Fund.  **Prospective investors should therefore consult their professional advisors on the possible tax consequences of subscribing for, acquiring, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence, domicile or incorporation.**

The Fund will not be subject to any income, withholding or capital gains taxes in Bermuda.

Shareholders who are not residents of Bermuda will not be subject to any income, withholding or capital gains taxes in Bermuda with respect to the Shares of the Fund owned by them and dividends received on such Shares, nor will they be subject to any estate or inheritance taxes in Bermuda.

The Fund may be subject to income or withholding taxes imposed by the various jurisdictions in which the Fund invests.

## REGULATION UNDER ERISA

The Fund may sell, at the discretion of the Board of Directors, Shares to pension and profit-sharing trusts and similar investors including qualified retirement plans, IRAs or accounts holding "plan assets" (discussed below) which are subject to Title I of the Employee Retirement Income Security Act of 1974 ("ERISA") or to Section 4975 of the Internal Revenue Code (collectively "Qualified Plans").  Qualified Plans must comply with complex fiduciary and tax requirements imposed by the U.S. Department of Labor ("DOL") and the Internal Revenue Service ("IRS").  THE LIMITED DISCUSSION THAT FOLLOWS IS NOT INTENDED TO SUBSTITUTE FOR THE ADVICE OF INDEPENDENT QUALIFIED LEGAL COUNSEL.

A fiduciary considering investing assets of a Qualified Plan in the Fund should take into account the particular facts and circumstances of the Qualified Plan and should consider among other things (i) whether the Qualified Plan's governing documents permit investments of the type that will be made by the Fund; (ii) the definition of plan assets under ERISA and the application of DOL regulations (discussed below); (iii) whether the investment satisfies the diversification requirements of Section 401(a)(1)(C) of ERISA; (iv) whether, under Section 404(a)(1)(B) of ERISA, the investment is prudent, considering the nature of an investment in and the compensation structure of the Fund, and the fact that there is not expected to be a market created in which the fiduciary can sell or otherwise dispose of the Shares; and (v) whether the Fund or any of its affiliates is a fiduciary of or a party-in-interest with respect to the Qualified Plan (also discussed below).

The DOL has issued a regulation (29 C.F.R. §2510.3-101) concerning the definition of what constitutes the assets of a Qualified Plan (the "Plan Asset Regulation") for purposes of ERISA. This regulation provides that, as a general rule, the underlying assets of certain entities, such as the Fund, in which a Qualified Plan purchases an "equity interest" will be treated as assets of that Qualified Plan. The Plan Asset Regulation defines an "equity interest" as any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features. The Shares offered hereby should be treated as an "equity interest" for purposes of the Plan Asset Regulation. The Plan Asset Regulation provides that the general rule will not apply, and the underlying assets of the entity will not be treated as the assets of an investing Qualified Plan, if (i) at all times, less than 25% of each class of "equity interests" in the entity is held by "benefit plan investors" (which is defined to include plans that are not subject to ERISA, such as governmental and foreign retirement plans, as well as Qualified Plans), or (ii) the entity is a "real estate operating company" ("REOC"). (To be a REOC, an entity must have at least 50% of its assets (other than short-term investments pending long-term commitment or distribution to investors), valued at cost, invested in real estate, which is managed or developed, and with respect to which the entity has the right to substantially participate, and in the ordinary course of its business does participate, directly in the management or development activities.)

Whether or not the underlying assets of the Fund are treated as "plan assets" under the Plan Asset Regulation, a Qualified Plan may not acquire Shares if the Fund or any of its affiliates either (i) exercises any discretionary authority or discretionary control respecting management of such Qualified Plan or exercises any authority or control respecting management or disposition of the Qualified Plan's assets; (ii) renders investment advice for a fee or other compensation, directly or indirectly, with respect to any moneys or other property of such Qualified Plan, or has any authority or responsibility to do so; (iii) has any discretionary authority or discretionary responsibility in the administration of such Qualified Plan; or (iv) is an employer that maintains or contributes to such Qualified Plan on behalf of its employees. A party that is described in clause (i), (ii) or (iii) of the preceding sentence is a fiduciary under ERISA, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

## GENERAL INFORMATION

Copies of the following documents (which may be obtained at Shareholder expense) are available for inspection during normal business hours at the offices of the Administrator: (i) the Memorandum of Association and Bye-Laws of the Fund; and (ii) all contracts or agreements described herein or hereafter executed by the Fund.

Upon request, the Administrator will make available to any prospective investor at a reasonable time the opportunity to ask questions and receive answers concerning the terms and conditions of this offering and to obtain any additional relevant information which the Fund possesses or can acquire without unreasonable effort or expense regarding the Fund or this offering.

The Administrator will mail to each Shareholder a periodic account statement indicating the Net Asset Value of the Fund; the number of Shares outstanding; and the Net Asset Value for each Class of Share as of the last business day of such month.

The Auditors to the Fund are KPMG.

The Fund's fiscal year ends on December 31 of each year. Annual audited accounts for the Fund are expected to be sent to Shareholders not later than March 31 of each year or as soon as possible after such date.

### Anti-Money Laundering.

As part of the Administrator's responsibility for the prevention of money laundering, the Administrator, its affiliates, subsidiaries or associates may require a detailed verification of the investor's identity and the source of the payment. Depending upon the circumstances of each application, a detailed verification may not be required where: (i) an investor makes the payment from an account held in the investor's name at a recognized financial institution; or (ii) the application is made through a recognized intermediary.

These exceptions only will apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti-money laundering regulations. The Administrator reserves the right to request such information as is necessary to verify the identity of an investor. In the event of delay or failure by the investor to produce any information required for verification purposes, the Administrator may refuse to accept the application and the subscription moneys related thereto. If any person who is resident in Bermuda (including the Administrator) has a suspicion that a payment to the Fund, by way of subscription or otherwise, contains the proceeds of criminal conduct, that person is required to report such suspicion pursuant to the Proceeds of Crime Act, 1997.

**SCHEDULE A**

**ACCOUNT OBJECTIVES AND RESTRICTIONS**

OBJECTIVES

      The Fund's investment goal is to achieve capital appreciation through the speculative trading of currencies, commodities, futures, options and forward contracts, securities and other financial instruments and assets. The Fund intends to utilize a proprietary quantitative probabilistic model called the Global Pattern Recognition Model ("GPRM" or the "Model") developed in 1991 by George B. Szele, a principal and the founder of the Trading Manager. The Fund has developed trading strategies utilizing the Model and discretionary analysis to trade a variety of assets and asset classes in the effort to achieve short, medium and long-term trading profits. Assets intended to be traded or invested in include, but are not limited to: (i) futures contracts, options, options on futures contracts and spot and forward contracts on currencies, commodities, stock, financial and economic indices, financial instruments, metals and agricultural products; (ii) securities; and (iii) other financial instruments and assets. There can be no assurance that the Fund will achieve its investment objective, and its investment results may vary substantially from period to period. The Fund will employ significant leverage, but will seek to limit leverage as set forth in the Offering Memorandum. In addition, the Fund may invest up to 100% of the capital from its Class A Shares, Class D Shares, Class P Shares (strategy to be managed by Mr. Paul Berman), and Class Z Shares (strategy to be managed by Mr. Daniel Zanger) in other investment funds, under other trading managers or under trading strategies other than the Global Pattern Recognition Model, without limitation, as determined by the Trading Manager. In the case of Class A Shares, Class D Shares, Class P Shares, and Class Z Shares, the Trading Manager may permit the individual managers for such classes to make trading allocations, select brokers and make other investment decisions for capital invested in their specific classes. There can be no assurance that the Fund will achieve its investment objective.

RESTRICTIONS

      There are no restrictions on the amount of Assets that may be committed to any one investment.

## SCHEDULE B

## FEES

**Management Fee**. The Trading Manager will receive compensation for its performing management services to the Fund at a rate of one-sixth of one percent (1/6%) per month (approximately 2% per annum) of the Net Asset Value of the Fund, calculated and paid on a monthly basis (the "Management Fee"). Such fee shall be calculated as of the last business day of each month and paid in arrears as soon as practicable.

If the Fund, in its discretion, permits subscriptions to be made by new or existing Shareholders on any date that does not fall on the first day of a calendar month, the Management Fee shall be pro rated to take into account the actual number of calendar days remaining in such partial calendar month. If the Fund, in its discretion, permits a withdrawal by a Shareholder other than as of the last day of a calendar month, a pro rata portion of the Management Fee shall be paid by the withdrawing Shareholder to the Trading Manager based on the actual number of calendar days remaining in such partial calendar month. The Trading Manager may elect to waive a portion of the Management Fee with respect to any Shareholder.

**Performance Fee**. The Trading Manager will receive additional compensation for its services to the Fund in the form of a performance fee which shall be twenty percent (20%) of the Net New Profits (as defined below) with respect to each Shareholder's Shares for each quarter (including net realized and unrealized gain and net investment income) (the "Performance Fee").

"Net New Profits" means, with respect to each Shareholder investment, the Shareholder's share of (a) the net realized profits and losses for the period, plus (b) the net unrealized profits and losses for the period, minus (c) the net unrealized profits and losses at the end of the previous period, minus (d) any net losses carried forward from previous periods that have not been recouped. Net profits and losses with respect to each Shareholder investment for a period are calculated taking into consideration all cash and cash equivalents (valued at cost), accrued interest and the market value of all open trading positions and all other assets less the brokerage and floor commissions and fees and other transaction costs that would be payable with respect to closing of each open trading position and all other liabilities of the investment, including the Shareholder's pro rata share of accrued legal, accounting and auditing fees, accrued organizational expenses, accrued management fees, expenses of the continuous offering and any extraordinary expenses (e.g. non-recurring legal expense) determined in accordance with U.S. generally accepted accounting principles consistently applied under the accrual basis of accounting. Accrued and paid Performance Fees are specifically not deducted in determining Net New Profits. The carry-forward loss is proportionally reduced if and to the extent a Shareholder's Shares are redeemed during a period that a carry-forward loss exists.

In the event a Shareholder subscribes for additional Shares after making its initial investment, the Fund will issue a new Series of Shares and the subsequent subscription will be treated as a separate investment for purposes of calculating Performance Fees. The Performance Fee will only be paid on a Shareholder's Net New Profits for the period when the Net Asset Value of the Series of Shares exceeds the highest closing Net Asset Value of the same Shares in any previous accounting period in which a Performance Fee was paid. In addition, if a Shareholder redeems Shares when the Net Asset Value with respect to those Shares is below its highest previous value, such highest previous value shall be reduced (solely for purposes of calculating Net New Profits) by the percentage obtained by dividing the redemption amount by the Share's Net Asset Value immediately before the redemption. Redemptions will be accounted for on a first in, first out basis with respect to each individual Shareholder's investments, in the event that a Shareholder has more than one investment.

The Trading Manager may elect to defer payment of all or part of the Performance Fee (or the Management Fee). Any such deferred amounts shall be treated, and the amounts payable at the end of any deferral period shall be determined, as if such deferred fees had been invested in the Fund without any charge for Performance

(or Management) Fees. The deferred fees, including any appreciation or depreciation, shall be paid promptly at the end of the deferral period. The Trading Manager may reduce the Performance Fee with respect to any Shareholder. Such fee shall be accrued monthly and paid quarterly in arrears. Net New Profits shall be determined before any deduction for Management or Performance Fees. The Performance Fee is also paid when Shares are redeemed. The Trading Manager has no obligation to restore to the Fund any fees previously earned and paid notwithstanding a loss in a subsequent period.

In the event the Fund invests capital in other funds and/or under other trading advisors other than the Trading Manager, the Fund may be required to pay additional management and/or performance fees to such other funds or trading advisors.

# FUND DIRECTORY

**The Fund**
The Independent Fund Limited
3rd Floor, Washington Mall I
22 Church Street
Hamilton, HM 11, Bermuda
E-mail: forum-bda@forum-financial.com

**The Trading Manager**
Independent Asset Management, LLC
177 Broad Street, Suite 1051
Stamford, CT  06901
U.S.A.
Tel. No. (203) 355-1160
Fax No. (203) 355-1169
E-mail: gs@independentfunds.com

**Administrator, Registrar and Transfer Agent**
Forum Fund Services Ltd.  A division of Citigroup Global Transaction Services
3rd Floor, Washington Mall I
22 Church Street
Hamilton, HM 11, Bermuda
Tel. No. (441) 296-1300
Fax No. (441) 296-1301
E-mail:  Forum-bda@forum-financial.com

**Auditors**
KPMG  LLP
Stamford Square
3001 Summer Street
Stamford, CT 06905
Att: Tom Canfarotta

**Bank**
Bermuda Commercial Bank Limited
Bermuda Commercial Bank Building
44 Church Street
Hamilton HM 12, Bermuda

**Clearing Broker**
Citigroup/ Smith Barney, Inc.
388 Greenwich Street
New York, NY  10013
U.S.A.

**U.S. Counsel**
Williams Mullen
1666 K St. NW
Washington, DC 20006
Tel. No. (202) 293-8118
Fax. No. (202) 293-5939

**Bermuda Counsel**
Appleby Spurling & Kempe
Cedar House
41 Cedar Avenue
Hamilton HM 12, Bermuda

**EXHIBIT A**

**THE INDEPENDENT FUND LIMITED**

**SUBSCRIPTION AGREEMENT AND APPLICATION FORMS**

To: The Directors                                  Memorandum Number _____
The Independent Fund Limited
3rd Floor, Washington Mall I
22 Church Street
Hamilton, HM 11, Bermuda

    1.  **Name of Applicant(s)**

        _____

        _____

        Principal Business Address:

        _____

        _____

        Telephone: _____Fax: _____E-mail:_____

    2.  **Subscription Amount.**  Purchaser hereby irrevocably applies to subscribe for redeemable non-voting Class _____ (please indicate Class A, B, C, D, P, Z or other common shares) (the "Shares") of The Independent Fund Limited (the "Fund") in the subscription amount of U.S. $_____ (minimum initial subscription of U.S. $250,000, subject to the discretion of the Fund to raise or lower such minimum, provided that such minimum shall not be less than $100,000).

        The subscription amount set forth above must be **remitted in accordance with the instructions set forth in Schedule C, hereto** and, upon acceptance of the application, shall be used for the purchase of Shares at the Initial Offering Price of $1000 per Share, in accordance with the Fund's Bye-Laws and as described in the Offering Memorandum referred to below.

        If the Fund does not accept the subscription for any reason whatsoever, the amount of the subscription payment shall be returned to Purchaser with interest thereon, and thereupon this Agreement shall be null and void and of no further force and effect.

    3.  **Representations and Warranties of Purchaser.**  As an inducement to the Fund to sell Shares for which Purchaser has subscribed, Purchaser (either in an individual capacity or as an authorized representative of an entity) hereby represents and warrants to the Fund as follows:

        3.1    Purchaser is at least 21 years of age and competent to execute this Agreement.

        3.2    *Circle one.*  [Purchaser is not: a citizen or resident of the United States of America, its territories or possessions (including any corporation, partnership or other entity formed or organized within or

42

under the laws of the United States of America); or an estate or trust other than an estate or trust the income of which comes from sources outside of the United States of America and is not included in gross income for the purposes of computing United States income tax; or acting, directly or indirectly, on behalf of or in concert with, any person described above.] [Purchaser is a tax exempt entity formed or organized within or under the laws of the United States of America and is a "qualified eligible persons" as such term is defined under the Commodity Exchange Act and the rules of the Commodity Futures Trading Commission.]

3.3     Purchaser is not a citizen or resident of Bermuda.

3.4     Purchaser understands that the Shares are only suitable for persons with such knowledge and experience in business and financial matters as to understand the risks involved in this type of investment and trading.

3.5     Purchaser understands that the Shares cannot be transferred or assigned without the prior approval of the Board of Directors of the Fund.

3.6     Purchaser's execution and delivery of the Subscription Agreement has been duly authorized by all necessary action.

3.7     Purchaser, if other than an individual, is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

3.8     Neither the execution and delivery of this Agreement, nor the performance of its obligations hereunder, constitute a default under or conflict with (if Purchaser is other than an individual) any organizational document of Purchaser, or any provision of any instrument or contract to which it is a party or by which it is bound, or any provision of any federal, state or foreign judgment, writ, decree, order, statute, rule or governmental regulation applicable to it.

3.9     This Agreement constitutes a valid and legally binding obligation of Purchaser, enforceable in accordance with its terms.

3.10     Purchaser is an "accredited investor" as that term is defined on Schedule A hereto and in Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and is acquiring the Shares solely for Purchaser's own account as a principal and not with a view to the sale or distribution of all or any part thereof. If an individual, Purchaser's net worth is at least $1,500,000 or Purchaser will have at least $750,000 in assets under management with the Fund. Purchaser has evaluated the risks of the investment, including those described in the Offering Memorandum and has determined that such investment is suitable for Purchaser. Purchaser acknowledges that Purchaser could bear a complete loss of his investment in the Fund.

3.11     Purchaser acknowledges that any sale or other transfer of the Shares is subject to limitations as set forth in the Fund's Bye-Laws and described in the Offering Memorandum. The Shares have not been and will not be registered under the Securities Act and may not be transferred or resold without registration under the Securities Act or unless pursuant to an exemption therefrom.

3.12     Purchaser has received a copy of the Offering Memorandum and, prior to entering into this Agreement, has thoroughly reviewed the Offering Memorandum and has had an the opportunity to ask questions of, and has received full and complete answers from, representatives of the Trading Manager and the Fund. Purchaser (i) has such knowledge in business and financial matters as to be fully capable of evaluating the purchase of the Shares hereunder, (ii) is not relying on any advice or representation of the Trading Manager or any representative of the Trading Manager or the Fund in connection with entering into this Agreement or the transactions contemplated hereby (other than the representations contained herein), (iii) has not received from the Trading Manager or any representative of the Trading Manager or the Fund any assurance or guarantee as to the

43

merits (whether legal, regulatory, tax, financial or otherwise) of entering into this Agreement or purchasing the Shares, and (iv) has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent that it has deemed necessary, and has entered into this Agreement based on its own independent judgment and on the advice of its advisors as it has deemed necessary, and not on any view (whether written or oral) expressed by the Trading Manager or any representative of the Trading Manager or the Fund.

3.13    Purchaser acknowledges that the Fund is conducting the Offering pursuant to an exemption from the registration requirements of the Securities Act, and is relying on the accuracy and completeness of the representations made by Purchaser herein in complying with such exemption.

3.14    Purchaser acknowledges that the Fund may at any time and from time to time following the completion of the Offering issue additional Shares, and that upon such issuance, the percentage of the outstanding equity of the Fund represented by the Shares may be diluted, which dilution could be substantial.

3.15    Purchaser represents that it has completed and delivered to the Fund, Schedule B hereto, that the information provided by Purchaser on Schedule B hereto is complete and accurate, and that the Fund and the Trading Manager may rely on such information.

4.    **Indemnification.**  Purchaser hereby agrees to indemnify and hold harmless the Fund, the Trading Manager, the Administrator and any individuals affiliated therewith, from any and all damages, losses, costs and expenses (including reasonable attorneys' and accountants' fees) which they, or any of them, may incur by reason of Purchaser's failure to fulfill any of the terms and conditions of this subscription or Agreement, or by reason of Purchaser's breach of any of its representations and warranties contained herein.

5.    **Entire Agreement; Amendments; Waiver.**  This Agreement constitutes the entire agreement between the parties with regard to the subject matter hereof, superseding all prior agreements or understandings, whether written or oral, between or among the parties.  Except as expressly provided herein, neither this Agreement nor any term hereof may be amended except pursuant to a written instrument executed by or on behalf of the Fund and Purchaser.

6.    **Governing Law; Jurisdiction.**  This Agreement shall be governed by and construed under the laws of Bermuda without regard to the conflict of laws provisions thereof.  Each party irrevocably submits to the non-exclusive jurisdiction of the courts of Bermuda for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.

7.    **Successors and Assigns.**  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.  Neither party may assign its rights and obligations hereunder without the prior written consent of the other party, which consent may be withheld for any reason whatsoever.

8.    **Money Laundering Compliance.**  Purchaser agrees to complete and submit to the Fund the Fund's Money Laundering Compliance Rider and warrants and represents that the information set forth therein is accurate, complete and not misleading.

In Witness Whereof, the parties have executed this Subscription Agreement as of the ___ day of _____, _____, intending to be legally bound thereby.

The Independent Fund Limited


By: _____
Name:
Title:


_____
[Name of Purchaser]

By: _____
Name:
Title

45

**SCHEDULE A**

**Accredited Investor**

"Accredited investor" shall mean any person who comes within any of the following categories:

1.   Any bank as defined in section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2.   Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

3.   Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

4.   Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

5.   Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

6.   Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

7.   Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in §230.506(b)(2)(ii); and

8.   Any entity in which all of the equity owners are accredited investors.

**SCHEDULE B**

**Investor Information**

**Investor Name:** _____

**Residence Address:** _____

_____

**Residence Telephone Number:** _____

**Mailing Address:** _____

_____

_____

**E-mail Address:** _____

**Employer and Position:** _____

**Business Address:** _____

_____

_____

**Business Telephone Number:** _____

**Amount of Subscription:** _____

**Class of Shares:** _____

**Manner in which Title is to Be Held:** _____

___ Community Property                    ___ Individual Property
___ Joint Tenancy with Right of Survivorship    ___ Tenants-in-Common
___ Tenants-in-Entirety                   ___ Partnership
___ Corporation                           ___ Pension or Profit Sharing Plan
___ Fiduciary for a Minor                 ___ Trust or Fiduciary Capacity
                                          ___ Other (Please indicate) _____

**Bank Account Information:** _____

47

## SCHEDULE C

### Subscription Instructions

USD – STANDARD SETTLEMENT INSTRUCTIONS INTO BERMUDA COMMERCIAL BANK ACCOUNT:

PLEASE USE A MT 100 FORM / PAYMENT ORDER

| | |
|---|---|
| CORRESPONDENT BANK:<br>(RECEIVING BANK) | BARCLAYS BANK PLC<br>222 BROADWAY<br>NEW YORK, NEW YORK |
| SWIFT CODE:<br>ABA NO: | BARCUS33XXX<br>026 002 574 |
| BENEFICIARY BANK: | BERMUDA COMMERCIAL BANK LTD<br>44 CHURCH STREET<br>HAMILTON, BERMUDA |
| SWIFT CODE:<br>ACCOUNT NO: | BPBKBMHMXXX<br>050 022857 |

BENEFICIARY DETAILS:

| | |
|---|---|
| ACCOUNT NAME: | The Independent Fund Limited |
| SUBSCRIPTION ACCOUNT NO: | 06800039444 |

**THE INDEPENDENT FUND LIMITED**

**NOTICE OF REDEMPTION**

Date _____

To: The Directors
The Independent Fund Limited

     I hereby give notice of my intent to redeem _____ Redeemable Non-voting Class [A, B, C, D, P or Z], Series _____ Common Shares (the "Shares") in The Independent Fund Limited (the "Fund"). In giving this notice, I certify my full understanding as follows that: (1) this notice is irrevocable; (2) this notice must be received by the Administrator during business hours at least 15 business days prior to the last business day of the calendar month in which redemption shall be effected (the "Redemption Date"); (3) upon failure to satisfy condition (2) above, the Fund will not redeem such Shares until the last day of the calendar month in which such conditions shall be fulfilled; (4) that the Net Asset Value per Share at which such Shares shall be redeemed shall be the Net Asset Value per Share determined as of the Redemption Date as provided in the Fund's Bye-Laws and the Offering Memorandum, less any wire transfer or other transactions costs and less a 2% redemption charge if I have held the Shares to be redeemed for a period of less than 12 months; (5) where I do not hereby give notice to redeem all my Shares, then the Fund shall exercise its right to redeem the balance of my Shares if the Aggregate amount of the Net Asset Value of my outstanding Shares shall be less than U.S. $250,000, or such lesser amount as may have been accepted by the Fund as my initial subscription, as determined as of the Redemption Date; and (6) the redemption proceeds will be paid by the Fund within thirty (30) business days after the Redemption Date; except that under such special circumstances as are described in the Offering Memorandum relating to the Fund (including but not limited to the inability of the Administrator to reasonably determine the Net Asset Value of the Fund as of any Redemption Date), the Fund may suspend redemptions of Shares or hold such redemption proceeds in reserve, provided that the Fund shall as soon as practicable thereafter cause such Shares to be redeemed or such redemption payment to be made.

Redemption proceeds should be remitted as follows:

A.  If by check:     Payee:
                     Address:

B.  If by Wire:     Bank:
                     Bank Address:
                     ABA 1:
                     Account Name:
                     Account Number

_____
Shareholder's Name (Printed)

_____
Shareholder's Signature

**EXHIBIT B**

**TRADING MANAGER AGREEMENT**

In consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Independent Asset Management, LLC (the "Trading Manager") and The Independent Fund Limited (the "Fund"), intending to be legally bound, as of the _____ day of _____, 2002, hereby agree, subject to the terms and conditions set forth below, as follows:

1. Appointment and Retention

The Fund hereby appoints and retains the Trading Manager, and the Trading Manager hereby accepts appointment to act, as exclusive investment manager of the assets of the Fund in an account or accounts (the "Account") to be maintained by the Fund's custodian or prime broker (the "Custodian"), its sub-custodians or agents.

2. Information

The Fund represents and warrants that it has received all information which it believes to be necessary and desirable to determine whether to make the appointment pursuant to Paragraph 1 hereof and, further, to grant the authority provided for by this Agreement.

3. Management of Assets

(a) The Fund hereby grants, and the Trading Manager shall have, sole and absolute discretionary authority to invest and reinvest the currencies, commodities, securities, property, cash and other investments and interests including, without limitation, options, financial or other futures, forwards, swaps, over-the-counter derivative transactions, interests in mutual funds, other pooled investment vehicles, and similar investments and everything connected therewith in the Account, including any dividends, interest or other payments thereon (the "Assets") at such time, at such price and in such manner as the Trading Manager deems appropriate, subject only to the objectives, guidelines and restrictions set forth in Schedule A hereto.

All or any portion of the Assets may at any time be in the form of cash or cash-equivalent instruments, including, without limitation, money market instruments, repurchase and reverse repurchase agreements, interest bearing instruments of or interest bearing accounts with a bank or such instruments of or accounts with any affiliate of the Trading Manager.

(b) The Fund hereby appoints the Trading Manager as its attorney with power to perform in its name and on its behalf any and all acts which the Trading Manager, in its absolute discretion, deems necessary or appropriate for the investment and reinvestment of the Assets and for the fulfillment of its obligations hereunder.

Without limiting the foregoing, such power shall include the issuing of instructions to the Custodian, the Administrator , the placing of orders with brokers, dealers and other financial institutions, and the execution on behalf of the Fund of transactional, account or other documentation in connection with the investment and reinvestment of the Assets hereunder.

4. Custodian

The Trading Manager shall not act as custodian for the Assets. The Assets shall be held for safekeeping by the Custodian.

5.  Execution of Transactions

(a) The Trading Manager shall place orders for the purchase and/or sale of Assets with such brokers, dealers, or other persons (including, to the extent permitted by law or applicable regulation, any affiliate of the Trading Manager) as the Trading Manager, in its sole discretion, deems appropriate.

(b) In placing orders for the purchase or sale of Assets in the Account, the Trading Manager may allocate transactions to such brokers, dealers or other persons for execution on such exchanges or markets, at such prices, and at such commission rates as in the judgment of the Trading Manager will be in the best interests of the Fund.

(c) In selecting a broker, dealer, or other person for execution of a particular transaction the Trading Manager shall give principal consideration to the available prices and rates of commission but may also take account of additional factors, including, without limitation, execution capabilities (such as speed, efficiency, and confidentiality), financial responsibility, and research, brokerage or other services provided to the Trading Manager.  The Fund expressly acknowledges and agrees that the Trading Manager may pay a broker, dealer, or other person an amount of commission or commission equivalent for effecting a transaction in excess of the amount of commission or commission equivalent another broker, dealer or other person would have charged for effecting that transaction, if the Trading Manager determines that such amount of commission or commission equivalent is reasonable in relation to the value of the brokerage and research services provided by the broker, dealer or other person, viewed in terms of either that particular transaction or the overall responsibility of the Trading Manager with respect to the Account and to the other advisory accounts of the Trading Manager as to which it exercises investment discretion.

6.  Transaction Costs

The Fund shall be responsible for and the Account shall be charged all brokerage commission or commission equivalents, and any and all transaction-related fees, taxes, or other charges incurred in connection with transactions effected for the Account.

7.  Proxies and Other Corporate Events

The Fund shall retain all rights to vote, tender or convert any stock, securities or other Assets in the Account, to execute proxies, waivers or other consents with respect to any of the Assets in the Account, and to take any other action in respect of any corporate action requiring security holder votes.

The Trading Manager shall not be responsible for the receipt of any proxies, waivers, consents or other similar instruments and the Trading Manager shall give standing instructions to the Custodian to forward directly to the Fund all proxies, waivers, consents or other similar instruments.

8.  Reports

(a) The Trading Manager shall provide to the Fund performance reports with respect to the Account at such times and with such frequency as may be agreed between the Trading Manager and the Fund.

(b) Reports and statements of the holdings in the Account, Net Asset Value calculations, audited accounting and position valuation reports shall be the responsibility of the Custodian or the Administrator.  The Trading Manager shall not be responsible for the accuracy of any information supplied to the Fund by the Custodian, the Administrator or any other third party.

9.  Fees

As compensation for the services rendered hereunder, the Fund shall pay to the Trading Manager the fees set out in Schedule B hereto. Such fees shall be calculated, charged to the Account, and paid in accordance with the terms set forth in Schedule B. Fees due for periods of less than one month, including a period arising by reason of termination of the Agreement prior to the end of a month, shall be prorated. In the event the Fund invests capital in other funds and/or under other trading advisors other than the Trading Manager, fees which may be payable to such other trading advisors or in connection with such funds shall be in addition to the fees described herein.

### 10. Other Advisory Activities and Investments

(a) This Agreement shall not in any way restrict the ability of the Trading Manager, its managers, members, officers, employees, agents or affiliates to engage in any other business or investment activities either for its or their own accounts, or for the accounts of other customers. The Fund acknowledges and agrees that the Trading Manager, its managers, members, officers, employees, agents or affiliates may hold or deal in currencies, commodities, securities, property or other assets which may be the same as or different from the currencies, commodities, securities, property or other assets recommended for purchase, sale or retention in the Account, and that the Trading Manager and its managers, members, officers, employees, agents or affiliates may give advice and take action, or omit to take action, with respect to any of its or their own accounts or accounts of other customers which may differ from advice given or the time or nature of action taken, or omitted to be taken, for the Account. Furthermore, the Trading Manager shall have no obligation to recommend for purchase, sale or retention by the Account, or to effect transactions for the Account, with respect to any currency, commodity, security, property or other assets recommended for purchase, sale or retention by or for the Trading Manager, its managers, members, officers, employees, agents, affiliates or other customers (including customers of its affiliates).

(b) The Fund acknowledges and agrees that when the Trading Manager determines that it would be appropriate for the Fund to participate in an investment opportunity, the Trading Manager shall seek to execute orders for, or otherwise allocate such opportunities to, the Fund and the Trading Manager's other customers on an equitable basis. In such situations, the Trading Manager may place orders for the Fund and its other customers simultaneously and if all such orders are not filled at the same price, the Trading Manager may cause the Fund and its other customers to pay or receive the average of the prices at which such orders were in fact filled. If all such orders cannot be fully executed for any reason, the Trading Manager may allocate among the Account and its other customers the currencies, commodities, securities, property, or other assets traded in a manner which the Trading Manager considers equitable taking account of the size of the order placed for the Fund and each of its other customers, as well as any other factors deemed by the Trading Manager to be relevant.

### 11. Fund Authority

The Fund represents and warrants that the execution of this Agreement by the undersigned has been duly authorized by all appropriate action and this Agreement represents the valid and binding obligation of the Fund, enforceable against it in accordance with its terms.

### 12. Limitation of Liability

(a) All transactions effected for the Account shall be at the sole risk of the Fund. The Trading Manager shall at all times act in good faith but does not warrant or guarantee the investment performance of any of the Assets and shall not be responsible for errors in judgment or any action taken or omitted in good faith, and shall not be liable for any decrease in the value of the Account, except if such decrease is the result of the Trading Manager's gross negligence or willful misconduct.

(b) The Trading Manager shall be authorized to accept and rely upon all written or oral instructions or communications (however transmitted) given by any person whom the Trading Manager, in

good faith, believes to be an authorized agent of the Fund. The Trading Manager shall not be liable for any action taken or omitted in reliance upon any such instructions or communications given by any such person or persons.

(c) The Trading Manager, its managers, members, officers, employees or agents shall not be liable for any act, omission, loss, damage, expense, cost, liability, demand, charge or claim of any kind whatsoever (hereinafter referred to as "Losses"), including without limitation, any Losses arising out of or in connection with any act or omission or the insolvency of any broker, dealer, custodian or other person with whom the Trading Manager may deal in respect of the Account, or otherwise on the Fund's behalf, except if such Losses arise as the result of the Trading Manager's gross negligence or willful misconduct.

13. Indemnification

(a) The Fund shall hold the Trading Manager, its managers, members, officers, employees and agents ("Indemnified Persons") harmless from, and shall indemnify and reimburse the Indemnified Persons against and for any and all loss, damage, expense, cost, liability, demand, charge or claim (including attorneys' fees) as incurred by, or made against, any Indemnified Person in connection with any act or omission by any person in connection with this Agreement or the performance of any of the obligations arising hereunder, provided that the Trading Manager shall not be so held harmless, indemnified or reimbursed in respect of Losses arising as the result of the Trading Manager's gross negligence or willful misconduct.

(b) The Fund shall further hold the Indemnified Persons harmless from and shall indemnify and reimburse the Indemnified Persons against and for any Losses arising out of or in connection with the insolvency, bankruptcy or other legal disability of the Fund.

14. Termination

(a) This Agreement may be terminated for any reason without penalty by either party within five (5) business days following the date of its execution by giving written notice to such effect to the other party. Thereafter, this Agreement may be terminated with effect from the end of any month by either party upon the service of written notice to the other party at least fifteen days prior to the end of such month.

(b) Termination shall not affect the accrued rights, liabilities or obligations of the parties.

(c) In the event of termination, the Trading Manager shall have no obligation whatsoever to recommend any action with respect to the Assets.

15. Assignment

Neither party may assign this Agreement without the prior written consent of the other party. This Agreement shall be binding upon the successors and permitted assignees of the parties.

16. Amendment

This Agreement may be amended at any time by the mutual agreement of the parties in writing, but not otherwise.

17. <u>Notices</u>

        Any written notice required by or pertaining to this Agreement shall be delivered by prepaid first class mail or by telecopy addressed as follows:

If to the Fund:                          _____

                                       _____

                                       _____

Attention:                         _____

Telecopy No.:                     _____

If to the Trading Manager:         _____

                                       _____

                                       _____

Attention:                         _____

Telecopy No.:                     _____

18. <u>Governing Law, Jurisdiction and Venue</u>

        This Agreement shall be enforced, governed by, and construed in accordance with the laws of the State of Connecticut, without giving effect to its conflict of law principles. The parties hereto agree to the exclusive jurisdiction and venue of any federal or state court sitting in the State of Connecticut and waive any defense regarding lack of jurisdiction or venue of any such court.

19. <u>Severability</u>

        Any provision hereof which may prove invalid or unenforceable under any law, regulation, decision of a tribunal or otherwise shall not affect the validity or enforceability of any other provision hereof.

20. <u>Entire Agreement</u>

        This Agreement, together with the Schedules hereto, which are hereby expressly incorporated into and made a part of this Agreement, represents the entire agreement between the parties, and shall supersede all earlier written or oral understandings or agreements between the parties as to the subject-matter hereof.

**[Signature page to follow]**

**IN WITNESS WHEREOF,** this Agreement has been executed for and on behalf of the undersigned as of the day and year first above written.

THE INDEPENDENT FUND LIMITED

A Bermuda Company

By: _____
     Name:
     Title:


INDEPENDENT ASSET MANAGEMENT, LLC

A Delaware Limited Liability Company

By: _____
     Name:
     Title: