**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- X

INDEPENDENT ASSET MANAGEMENT LLC )   Case No. 1:07-cv-06431-JSR
and OLA HOLMSTROM,                                  )
                                                        )
               Plaintiffs,                      )
                                                         )   ECF
vs.                                                              )
                                                        )
DANIEL ZANGER,                                        )
                                                        )
               Defendant.                      )
                                                          )
                                                          )
                                                          )

-------------------------------------------------------------- X


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO**
**DISMISS THE AMENDED COMPLAINT**



JONES DAY
222 East 41st Street
New York, NY 10017

*Attorneys for Defendant Daniel Zanger*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................... 4

ARGUMENT ........................................................................................................................ 5

    I.      PLAINTIFFS' ALLEGATIONS OF BREACH OF CONTRACT FAIL AS A MATTER OF LAW ................................................................................... 5

          A.    Plaintiffs' Allegations That Defendant Violated Exchange Rules and Agreements by Inducing 115 Margin Calls Fail as a Matter of Law, and As These Alleged Violations Constitute the Sole Basis of Alleged Gross Negligence and Willful Malfeasance, No Breach of This Contract Has Been Alleged ........................................................... 5

               1.    As A Matter Of Law, The Alleged Margin Calls Were Not Margin "Violations" ................................................................. 5

               2.    Plaintiffs Do Not Competently Allege Gross Negligence or Willful Malfeasance, As Required To State A Claim for Breach of This Contract ................................................... 9

          B.    Other Alleged Breaches of this Contract Do Not State A Plausible Causal Connection to Alleged Damages Sustained By Plaintiffs As Required By Twombly, Do Not Involve Gross Negligence or Willful Malfeasance, And Are At Best Technical and Trivial ................ 11

               1.    Twombly And Its Progeny Require a Claim To Be "Plausible" To Survive a Motion To Dismiss Under Fed ............ 11

               2.    The Alleged Breaches By Wiring Funds and By Making Withdrawals of Funds Are Not "Plausibly" Tied To Any Alleged Damages Sustained By Plaintiffs, Do Not Involve Gross Negligence or Willful Malfeasance, and Are At Best Technical and Trivial ............................................... 12

               3.    The Alleged Breach By Failure to Disclose Positions to IAM is Similarly Not Plausibly Tied To Any Alleged Damages Sustained By Plaintiffs, Does Not Involve Gross Negligence or Willful Malfeasance, and Is At Best Technical and Trivial ............................................... 13

               4.    Per The Terms of the Agreement, the 20% Drawdown Was Not A Violation ..................................................... 13

               5.    The Two Alleged Day Trading Violations Do Not Constitute Gross Negligence or Willful Malfeasance, And Are Not Plausibly Tied To Any Alleged Damages Sustained By Plaintiffs .................................................. 14

    II.     IAM's CLAIM OF BREACH OF FIDUCIARY DUTY IS BARRED AS A MATTER OF LAW IN THAT THE RELATIONSHIP OF THE PARTIES WAS GOVERNED BY THE EXPRESS AGREEMENT ................ 16

III.   HOLMSTROM'S CLAIMS MUST FAIL, AS NO FACTS THAT
       WOULD ESTABLISH A FIDUCIARY DUTY OWING BY
       DEFENDANT TO HOLMSTROM WERE ALLEGED, AND THE
       ALLEGATIONS IF TRUE WOULD NOT ESTABLISH THAT
       DEFENDANT "INTENTIONALLY" INTERFERED WITH THE
       HOLMSTROM-IAM AGREEMENT OR THAT DEFENDANT WAS A
       THIRD PARTY LEGALLY CAPABLE OF TORTIOUS
       INTERFERENCE WITH HOLMSTROM'S ALLEGED
       CONTRACTUAL RELATIONS WITH IAM .................................................. 18

       A.     Holmstrom Does Not Allege Any Fiduciary Duty Of Defendant To
              Holmstrom ........................................................................................... 18

       B.     Based On The Allegations In The Complaint, There Is No
              Plausible Claim Of An "Intentional" Interference With Contract;
              and Defendant Was Not a Third Party To The Contract And Was
              Therefore Not Legally Capable of Tortious Interference With The
              Contractual Relations Between Holmstrom and IAM ............................ 21

CONCLUSION ........................................................................................................................ 24

NYI-4037038v2

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

*ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)............................................11

*Albert v. Loksen*, 239 F.3d 256, 274-75 (2d Cir. 2001) ......................................................21, 22, 23

*American Tel. & Tel. Co. v. City of N.Y.*, 83 F.3d 549, 556 (2d Cir. 1996)...................................10

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965-70 (2007)...........................1, 11, 12, 13, 14

*Bell v. J.D. Winer & Co.*, 392 F. Supp. 646, 651 (D.C.N.Y. 1975)..................................................8

*Berry v. Souza*, 564 F.2d 1347, 1349 (9th Cir. 1977).....................................................................7

*Cal Distributor Inc. v. Cadbury Schweppes Americas Beverages, Inc.*, No. 06-CIV-0496-
    RMB, 2007 WL 54534 at *9 (S.D.N.Y. Jan. 5, 2007).......................................................16

*Cohen v. Davis*, 926 F. Supp. 399, 404 (S.D.N.Y. 1996)..............................................................23

*Drake v. Laboratory Corp. of America Holdings*, No. 02-CV-1924-FB, 2007 WL 776818
    at *3-4 (E.D.N.Y. Mar. 13, 2007)..............................................................................21, 23

*Fitzpatrick v. Sony-BMG Music Entertainment, Inc.*, No. 07-Civ.-2933-SAS, 2007 WL
    2398801 at *2 (S.D.N.Y. Aug. 15, 2007) ......................................................................1, 11

*Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).................................................................1, 11

*Kinsey v. Cendant Corp.*, No. 04-CIV-0582-RWS, 2005 WL 1907678 at *7 (S.D.N.Y.
    Aug. 10, 2005) ..................................................................................................................10

*Page Mill Asset Management v. Credit Suisse First Boston Corp.*, No. 98-CIV-6907-
    MBM, 2000 WL 335557 at * 10-11 (S.D.N.Y. Mar. 30, 2000) ............................18, 19, 22

*R.H. Damon & Co.. Inc. v. Softkey Software Products. Inc.*, 811 F. Supp. 986, 989
    (S.D.N.Y. 1993)...........................................................................................................21, 22

*Regions Bank v. Wieder & Mastroianni. P.C.*, 423 F. Supp.2d 265, 270 (S.D.N.Y. 2006)..........19

*Roselink Investors LLC v. Shenkman*, 386 F.Supp. 2d 209, 228 (S.D.N.Y. 2004)........................23

*Thermal Imaging. Inc. v. Sandgrain Securities. Inc.*, 158 F.Supp.2d 335, 343 (S.D.N.Y.
    2001) ............................................................................................................................18, 19

*Verrecchia v. Paine. Webber. Jackson & Curtis*, 563 F. Supp.360, 364 (D.C.Puerto Rico,
    1982) ...................................................................................................................................7

NYI-4037038v2

## STATE CASES

*Loughran v. Markle*, 242 A.D. 331, 334; 275 N.Y.S. 721, 725 (3d Dep't 1934)......................9, 10

*Tilden of N.J., Inc. v. Regency Leasing System, Inc.*, 230 A.D.2d 784, 785-86; 646
     N.Y.S.2d 700, 701 (2d Dep't 1996)..................................................................................17

## STATUTES

Fed. R. Civ. P. 12(b)(6)..............................................................................................................1, 11

## REGULATIONS

12 C.F.R. § 220 ..............................................................................................................................7

New York Stock Exchange Rule 431 .............................................................................................7

## SECONDARY AUTHORITIES

69 Am Jur. *Securities* § 489 (2007) ..............................................................................................7

69 Am. Jur.2d *Securities* § 489 (2007) ........................................................................................7

23A Broker-Dealer Operations Sec. & Comm. Law § 8:5 ............................................................7

5A Disclosure & Remedies Under the Sec. Laws. § 4:3 ...............................................................7

NYI-4037038v2

Defendant Daniel Zanger (the "Defendant") submits this memorandum of law in support of his motion to dismiss the Amended Complaint dated October 23, 2007, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### PRELIMINARY STATEMENT

This Motion to Dismiss the Amended Complaint dated October 23, 2007 follows the Motion to Dismiss the Complaint dated July 16, 2007. The Motion to Dismiss the original Complaint was filed on September 14, 2007, with oral argument on October 4, 2007. On October 5, 2007, this Court ordered two of the counts contained in the original Complaint dismissed with prejudice (unjust enrichment and promissory estoppel), and the remaining four Counts were dismissed without prejudice (breach of fiduciary duty claim brought by IAM, breach of contract claim brought by IAM, breach of fiduciary duty claim brought by Holmstrom, and tortious interference claim brought by Holmstrom).

The Complaint must be dismissed in its entirety for failure to state a claim upon which relief may be granted. Under the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007), for a complaint to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the complaint must "amplify a claim with some factual allegations . . . to render the claim *plausible* (emphasis added)." *See Fitzpatrick v. Sony-BMG Music Entertainment*, No. 07-CIV-2933-SAS, 2007 WL 2398801 at *2 (S.D.N.Y. Aug. 15, 2007) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)).

In seeking permission to amend the Complaint at oral argument, Plaintiffs' counsel represented to this Court that he possessed certain documents, specifically email exchanges from Goldman Sachs which contained complaints about 115 margin violations. However, notwithstanding those representations to this Court, Plaintiffs have not alleged the existence of any such statements by Goldman Sachs. Instead, Plaintiffs allege that because Defendant

allegedly induced 115 margin calls, there were 115 alleged margin "violations." However, the law and the regulations relied upon by Plaintiffs are clear that inducing a margin call is not a violation at all. Margin calls may be, and routinely are, covered within prescribed time frames, and the 115 margin calls were covered in full compliance with all rules and regulations. Therefore, the prime basis for the motion to amend the Complaint does not exist.

Furthermore, in order to state a claim for the breach of this contract, there must be gross negligence or willful malfeasance. The *sole* basis for Plaintiffs' claim that Defendant's actions constituted gross negligence or willful malfeasance is set forth at ¶ 61 of the Amended Complaint, which asserts that gross negligence or willful misconduct is found in the "incessant nature" of Defendant's alleged conduct.[1] However, when the alleged 115 margin violations do not exist *at all*, there can be no *cumulative* conduct that would form the basis of a competent claim of gross negligence or willful malfeasance. Thus, no "plausible" basis exists for Plaintiffs' claim that Defendant's conduct constituted gross negligence or willful malfeasance, as required to state a claim for the breach of this contract.

Also, while Plaintiffs refer to Defendant's "unwillingness to accept responsibility" for trading losses in this paragraph of the Amended Complaint,[2] there are no allegations of any wrongdoing in connection with any trading losses.

Moreover, other alleged breaches of the Agreement by Defendant, such as the withdrawal of personal funds, the failure to disclose positions, a 20% drawdown, and the wiring of funds into IFL, are at most technical and trivial, and if true, do not constitute willful malfeasance or

_____

[1] The Amended Complaint states that "[g]iven the incessant nature of Defendant's malfeasance as well as his unwillingness to accept responsibility for any trading losses or any violations that he caused, it is clear that Defendant's actions rose to the level of gross negligence and/or willful malfeasance." Amended Compl. at ¶ 61.

[2] Amended Compl. ¶ 61.

gross negligence and are not causally connected to any alleged injury or damages sustained by Plaintiffs.

Further, the two day-trading violations alleged by Plaintiffs do not rise to the level of willful malfeasance or gross negligence and are not causally connected to any alleged injury or damages sustained by the Plaintiffs.

As discussed in the original Memorandum of Law in Support of Defendant's Motion to Dismiss the original Complaint, IAM's allegations of breach of fiduciary duty fail as well. Because there was an express Agreement between Defendant and IAM, Defendant did not owe IAM any fiduciary duties separate and apart from the duties and obligations created under the contract.

Also as argued in previous papers, Holmstrom has not sufficiently pled a cause of action against Defendant. Holmstrom does not allege any facts that would establish any fiduciary duties owed to him by Defendant. Despite a bald and conclusory assertion that Defendant "agreed to manage Holmstrom's money" (*see* Amended Compl. at ¶ 1), the facts alleged in the Amended Complaint reflect that Defendant agreed to manage certain funds in IFL, pursuant to an express understanding with IAM.

Holmstrom's claim of tortious interference with Holmstrom's contractual relationship with IAM must also fail. No "intentional" interference with the Holmstrom-IAM agreement has been competently alleged. Also, the allegations in the Amended Complaint on this score solely relate to Defendant's activities pursuant to and within the scope of Defendant's agreement with IAM. As such, Defendant is not alleged to have been a third party in the context of the business relations between IAM and Holmstrom, and Defendant was therefore legally incapable of tortious interference with the contractual relations between IAM and Holmstrom.

## BACKGROUND

As described in previous papers, Defendant and IAM entered an agreement (the "Agreement") on October 19, 2004, whereby IAM granted Defendant the right to manage Class Z shares within IFL upon his purchase of at least $5 million of said Class Z shares. In consideration of this management right, IAM was to be allocated 50% of the Management Fee awarded in connection with the capital managed by Zanger in Class Z shares, and 25% of the Performance Fee. As stated in the Amended Complaint, this was a business arrangement in which "Defendant would invest his own money in IFL and then manage that money" (Amended Compl. ¶ 13), and the purpose of the arrangement was for IAM and Defendant to use Defendant's performance in IFL as a means of marketing Defendant. *Id.* Additionally, the Amended Complaint alleges, Defendant "agreed to certain risk parameters." (*Id.* ¶ 19-20). Upon execution of the Agreement and pursuant to its terms, Defendant invested $5 million in IFL. (*Id.* ¶ 24).

The Amended Complaint also alleges that Defendant induced "at least" 115 margin calls, "each of which was a direct violation of his agreement with IAM to comply with the Prime Brokerage Agreement and also with applicable statutes, rules, and regulations." (*Id.* ¶ 29). Furthermore, it is alleged that the Defendant further violated the Agreement "by refusing to keep drawdowns below 20%" (*Id.* ¶ 55), by wiring money to the fund in a manner inconsistent with the rules of the Prime Broker (*Id.* ¶ 35), by withdrawing his personal funds from the account (*Id.* ¶ 60), and by failing to disclose his positions to IAM. (*Id.* ¶ 36). Plaintiffs also claim that Defendant failed to meet two day trading calls (*see* Amended Compl. ¶¶ 42, 44), which allegedly "forced [IFL] to shut down its operations." (*Id.* ¶ 45).

## ARGUMENT

I.    **PLAINTIFFS' ALLEGATIONS OF BREACH OF CONTRACT FAIL AS A MATTER OF LAW**

   A.    **Plaintiffs' Allegations That Defendant Violated Exchange Rules and Agreements by Inducing 115 Margin Calls Fail as a Matter of Law, and As These Alleged Violations Constitute the Sole Basis of Alleged Gross Negligence and Willful Malfeasance, No Breach of This Contract Has Been Alleged**

   1.    **As A Matter Of Law, The Alleged Margin Calls Were Not Margin "Violations"**

First, it must be noted that as to Plaintiffs' basic claim, that of breach of contract, the basis on which Plaintiffs' request to amend the Complaint was granted by this Court was a representation made by counsel for the Plaintiffs at oral argument on October 4, 2007 – namely that Goldman Sachs had, in various email exchanges, stated that there were 125 violations by Defendant of applicable exchange and prime broker rules.[3]  *See* October 4, 2007 Hearing Tr. at

---

[3] THE COURT:  Excuse me.  So are you saying that there's
21    no express rule of any exchange that they violated directly?
22        MR. LANZA:  No, your Honor.  I'm saying I can't at
23    this time cite chapter and verse as to what that rule is, but I
24    can say --
25        THE COURT:  Well, that's the gauntlet that your
1    adversary has laid down in his papers.  If you are not ready to
2    tell me today in court in oral argument after requesting leave
3    to replead, when will you be ready?  I mean, this is your
4    opportunity.
5        MR. LANZA:  Well, your Honor, it really would just
6    require taking a look at the e-mail exchanges from the prime
7    broker to IFL specifically to Independent Asset Management
8    saying you are in violation of our rules.  You've done this 125
9    times, or saying --

6-9 (Exhibit A to the Declaration of Matthew E. Szwajkowski in Support of Defendant's Motion

to Dismiss the Amended Complaint).  However, again, notwithstanding their representations to

this Court, Plaintiffs have not alleged the existence of any such statements by Goldman Sachs or

any of its employees.

      In the Amended Complaint, Plaintiffs assert that Defendant "induced at least 115 margin

calls, each of which was a direct violation of his agreement with IAM to comply with the Prime

Brokerage Agreement and also with applicable statutes, rules, and regulations.  Of these 115

margin calls, 66 represented violations of the Prime Broker's house margin rules; 46 represented

---

(continued…)

    10       THE COURT:  Do they say that?

    11       MR. LANZA:  They do say that.  There are exchanges

    12   from a woman named Giovana Artura who works for Goldman, Sachs

    13   who was consistently irate over these margin calls, and they

    14   were --

    15       THE COURT:  Well, being consistently irate doesn't

    16   state a breach of contract.  It may, you know, give her lots of

    17   stress, but I understand that's part of being an employee of

    18   Goldman, Sachs anyway.  But does she say you violated the

    19   rules?

    20       MR. LANZA:  Yes, your Honor.  *It's our understanding*

    *21*   *that she does, and she actually indicates which rules were*

    *22*   *violated by these margin calls* (emphasis added).

      Court:  "Mr. Sear, your adversary, though arguably less prepared than he ideally might
have been, says that there are specific e-mails that identify specific rules that allegedly were
violated."  October 4, 2007 Hearing Tr. at 8.

      Court:  "[Plaintiff] says there are a bunch of e-mails saying that your client repeatedly
violated the rules."  October 4, 2007 Hearing Tr. at 8-9.

violations of Regulation T . . .; and the remaining 3 represented violations of Rule 431 of the
New York Stock Exchange." *See* Amended Compl. ¶ 29-30.  However, Plaintiffs' claim that
115 margin violations occurred is incorrect as a matter of law.[4]  Plaintiffs *do* in fact allege that
115 margin *calls*[5] took place.  These calls required an additional deposit of funds to repair
margin requirement deficiencies within seven days, pursuant to the requirements of Regulation T
(12 C.F.R. § 220)[6]  and Rule 431 of the New York Stock Exchange,[7] and were properly met by

---

[4]  The Amended Complaint provides, in relevant part, that "[i]f the value of the securities
[purchased with borrowed funds] falls below [a] preset amount, *a margin violation has occurred*,
a margin call will subsequently issue, and the investor will be required to deposit additional
funds to restore the account value to or above the preset value [emphasis added]."  Amended
Compl. at ¶ 23.  This is fundamentally and demonstrably false.

[5]  As stated in previous papers, a "'margin call' is a demand by a creditor on a customer
for a deposit of additional cash or securities in order to eliminate or reduce a margin deficiency,"
which results when the value of a security that has been purchased on a leveraged basis drops
below a certain level.  69 Am. Jur. 2d *Securities* § 489 (2007).

[6]  Under Regulation T, a "margin call is required to be satisfied within 7 business days
after [a] margin deficiency was created or increased" or there is a violation.  *See* 69 Am. Jur. 2d
*Securities* § 489 (2007) at 2.  Thus, Regulation T "is violated only when whatever margin is
required is not tendered by the investor within [the applicable time period; seven business days
under current regulations] of the time the stock transactions in question occur" (*see Berry v.
Souza*, 564 F.2d 1347, 1349 (9th Cir. 1977)); "[n]ormally, under Regulation T, if a customer's
margin purchase or short sale is involved, the executing broker would have to determine whether
a margin deposit is required in a margin account.  The required margin amount would have to be
deposited in the customer's account . . . within seven business days after the margin deficiency
had been created" (*see* 23A Broker-Dealer Operations Sec. & Comm. Law § 8:5); "[a] broker
can effect a margin transaction only if the customer has in his account, or deposits with the
broker within seven business days sufficient collateral for the purchase" (*see* 5A Disclosure &
Remedies Under the Sec. Laws § 4:3).  In fact, "by itself, the issuance of margin calls against the
express wishes of the account holder is not a violation of Regulation T."  *See Verreccchia v.
Paine, Webber, Jackson & Curtis*, 563 F. Supp. 360, 364 (D.C.Puerto Rico 1982).

[7]  Traders are not required by the exchange rules to insure a client's account from the
vagaries of the market and dropping prices of securities—the margin requirements allow a
reasonable time to cure margin deficiencies that will inevitably occur because of rising and
falling prices of securities.  As indicated in Rule 431 of the New York Stock Exchange, "[t]he
amount of margin or 'mark to market' required by any provision of this Rule [431] shall be
obtained as promptly as possible and in any event within fifteen business days from the date such
deficiency occurred, unless the Exchange has specifically granted the member organization
additional time."  *See* Rule 431.  Only the failure to repair the margin deficiency within that

the Defendant within a seven day period.  Thus, far from constituting margin violations, these

115 margin calls were met by the Defendant within the seven-day grace period for the cure of

margin deficiencies under Regulation T and Rule 431 of the NYSE, as alluded to in Plaintiffs'

own Amended Complaint.[8]  Therefore, Plaintiffs have not properly alleged "violations" of these

exchange rules, as Defendant cured the margin deficiencies within the applicable time period and

avoided thereby exchange rule violations.

Similarly, with regard to the contractually imposed requirements of the Prime Broker

agreement, there was no violation – as demonstrated by the language Plaintiffs themselves cite.[9]

This Prime Broker agreement, typical in the industry and boilerplate in form, follows the rubric

of the generally applicable Regulation T and Rule 431 of the New York Stock Exchange by

allowing a trader to correct margin deficiencies that commonly arise in the ordinary course of

business due to the rise and fall of securities prices in the marketplace ("[c]ustomer agrees to

deposit margins and pay premiums immediately upon GSEC's request.")  *See* Amended Compl.,

Ex. 2 at 7 ¶ 2.

Indeed, the conclusion that Plaintiffs apparently wish this court to adopt – that margin

calls *per se* violate exchange rules and typical Prime Broker risk limitations – is nonsensical, as

---

(continued…)

period would constitute a violation in this context; indeed, "the failure to sell securities pledged
as collateral on a margin loan, *within a reasonable time after their value falls below the margin
maintenance requirements*, would itself violate Rule 431 (emphasis added)." *See Bell v. J.D.
Winer & Co.*, 392 F. Supp. 646, 651 (D.C.N.Y. 1975).

    [8] Plaintiffs describe Defendant's "attempt to cover [margin calls]" (*see* Amended Compl.
¶ 33) and admit that he "initially covered [margin calls]." *Id*. at ¶ 34.

    [9] The Agreement provided in relevant part: "Customer agrees at all times to maintain
adequate margins in the account so as continually to meet the original and maintenance margin
requirements established by GSEC [Goldman Sachs Execution & Clearing, L.P.] in its sole
discretion from time to time.  . . .Customer agrees to deposit margins and pay premiums
immediately upon GSEC's request." *See* Plaintiffs' Amended Compl., Ex. 2 at 7 ¶ 2.

margin requirements (deficiencies in which will provoke margin calls) are tied to the market value of a security on a given day and are thus subject to the vagaries and whims of the market. The Agreement expressly contemplated the use of leverage in at least a 4:1 ratio (*see* Agreement at ¶ 1(a)), and therefore it was *inevitable* that there would be multiple margin calls. In fact, Plaintiffs appear to be alleging that no margin calls were permitted, and yet at the same time they assert that "Defendant was required to pay immediately any margin deficiencies that might arise" (*see* Amended Compl. at ¶¶ 20, 58). Plaintiffs admit that Defendant caused these 115 margin calls to be covered each and every time and repaired margin deficiencies through the sale of securities or the deposit of funds. Therefore, again, while Plaintiffs have alleged margin *calls*, no margin *violations* took place as a matter of law, and these events certainly cannot be said to have constituted gross negligence or willful malfeasance as required to state a claim for breach of this contract. Lastly, Plaintiffs do not tie the existence of these margin calls or Defendant's meeting them to any alleged injury or damages.

> **2.    Plaintiffs Do Not Competently Allege Gross Negligence or Willful Malfeasance, As Required To State A Claim for Breach of This Contract**

Importantly, as discussed in earlier papers, the Plaintiffs must successfully plead gross negligence or willful malfeasance in order to state a claim for the breach of this contract, as the Agreement contains an express provision which states that Defendant is not liable in the absence of "willful malfeasance, fraud, theft, or gross negligence."[10] Thus, the contract set a very high standard for recovery, as willful malfeasance requires a "corrupt intent" (*see Loughran v. Markle,*

---

[10] The provision in question states that "[n]either party will hold, or attempt to hold, the other party liable for any damages or losses suffered as a result of the other party's conduct as contemplated hereunder, except to the extent that such conduct constitutes willful malfeasance, fraud, theft, or gross negligence. In particular, but without affecting the generality of the preceding, IAM will not hold DZ [Defendant] liable for any trading losses in its accounts, unless due to fraud, theft, or gross negligence of DZ." (Agreement ¶ 9).

242 A.D. 331, 334; 275 N.Y.S. 721, 725 (3d Dep't 1934)), and gross negligence requires "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *See American Tel. & Tel. Co. v. City of N.Y.*, 83 F.3d 549, 556 (2d Cir. 1996) (citation omitted). Plaintiffs do not allege any fraud or theft in the Amended Complaint.

Moreover, mere "conclusory allegation[s] that Defendants 'acted recklessly and/or with conscious disregard' [do] not meet the standard required to adequately plead a gross negligence claim." *See Kinsey v. Cendant Corp.*, No. 04-CIV-0582-RWS, 2005 WL 1907678 at *7 (S.D.N.Y. Aug. 10, 2005) (citations omitted).

Here, in setting forth 46 alleged violations of Regulation T, three alleged violations of Rule 431, and 66 alleged violations of the Prime Broker agreement, the Amended Complaint makes it clear that the *number* of alleged violations is material to the issue of Defendant's alleged gross negligence or willful malfeasance–the existence of which is required to state a claim for breach of this contract. *See* Amended Compl. ¶ 61. Indeed, properly analyzed, the sole basis for Plaintiffs' claim that Defendant acted with gross negligence or willful malfeasance is the alleged "incessant nature" of Defendant's alleged misconduct.

Moreover, given that the alleged margin violations were not violations at all (as described above), their cumulative effect cannot constitute a violation, nor can they constitute "incessant" wrongdoing on the part of Defendant. Therefore, as this was the sole basis for Plaintiffs' claim that gross negligence and/or willful malfeasance was present (per the Amended Complaint at ¶ 61), this allegation fails as a matter of law; and as gross negligence and/or willful malfeasance must be shown to state a claim for the breach of this contract, the claim itself must fail.

Also, given that this is an Amended Complaint, and that the primary basis for the dismissal of the original breach of contract claim was that no facts alleging gross negligence or

willful malfeasance were pled, the paucity of allegations in the Amended Complaint concerning gross negligence and willful malfeasance is notable.  Thus, as allegations of gross negligence and willful misconduct were ostensibly the focus of Plaintiffs in drafting the Amended Complaint, Plaintiffs' sole reliance on the alleged cumulative effect of non-violative behavior to support their allegation of gross negligence and willful malfeasance underscores the lack of any specific conduct on the part of Defendant that would support such an allegation, as required to state a claim for the breach of this contract.

**B.**   **Other Alleged Breaches of this Contract Do Not State A Plausible Causal Connection to Alleged Damages Sustained By Plaintiffs As Required By *Twombly*, Do Not Involve Gross Negligence or Willful Malfeasance, And Are At Best Technical and Trivial**

**1.**   ***Twombly* And Its Progeny Require a Claim To Be "Plausible" To Survive a Motion To Dismiss Under Fed. R. Civ. P. 12(b)(6)**

Under the recently elaborated pleading requirements set forth by the Supreme Court in *Twombly*, "to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of 'plausibility.'"  *See Twombly*, 127 S.Ct. at 1970; *Fitzpatrick v. Sony-BMG Music Entertainment, Inc.*, No. 07-Civ.-2933-SAS, 2007 WL 2398801 at *2 (S.D.N.Y. Aug. 15, 2007).  Thus, the complaint must "amplify a claim with some factual allegations . . . to render the claim *plausible*" (*see id*. (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)), in order to provide the "grounds upon which [plaintiffs'] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1965).  Further, the "plausibility" standard is clearly applicable outside of the antitrust context of *Twombly*.  *See ATSI Commc'ns*, 493 F.3d at 98; *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).

2.    **The Alleged Breaches By Wiring Funds and By Making Withdrawals of Funds Are Not "Plausibly" Tied To Any Alleged Damages Sustained By Plaintiffs, Do Not Involve Gross Negligence or Willful Malfeasance, and Are At Best Technical and Trivial**

Plaintiffs allege that "[t]he manner in which Defendant wired the money [into IFL] was inconsistent with the rules of the Prime Broker, which amounted to yet another violation of the Agreement." *See* Amended Compl. at ¶ 35. There are no allegations as to how this alleged "violation," if true, was anything more than a technical and trivial matter or had any negative pecuniary consequences for Plaintiffs.

Plaintiffs further allege that Defendant violated the Agreement by withdrawing his funds from IFL after satisfying the margin deficiencies, for which he was required to obtain "written authorization from IFL."[11] *See* Amended Compl. at ¶¶ 33, 60. First, it is significant that Plaintiffs do not allege that no authorization or consent was obtained; rather, Plaintiffs focus on the lack of "written authorization." Moreover, even if there was no authorization at all from IFL, these actions, even if true, could not plausibly have created any alleged injury or damages to the Plaintiffs, as required under *Twombly* et al. (as described above). There is no allegation that Defendant was not entitled to any monies that he allegedly withdrew to compensate himself for funds used to satisfy margin deficiencies, and in fact the allegations themselves support the reality that Defendant was entitled to withdraw funds. The point is that the Amended Complaint does not allege anything more than a "wash" on the account ledger, as Defendant was compensated for having covered margin calls with his own personal funds.

_____

[11]  Plaintiffs allege that Defendant violated the provision of the Power of Attorney which stated that the "[t]rading manager is not authorized to withdraw from Customer's account any monies, security or property whether in Customer's name or otherwise unless such withdrawal or payment is specifically authorized in writing by Customer." *See* Amended Compl., Exhibit 2 at 3 ¶ 3; *see also* Amended Compl. at ¶¶ 33, 34.

Furthermore, even if true, Defendant's alleged actions to wire funds and to withdraw funds from IFL without written consent were technical errors that do not rise to the level of gross negligence or willful malfeasance, as defined above. These actions, at best, would constitute minor and immaterial deviations from the Agreement, with no material impact on the accounts nor any pecuniary implication for the Plaintiffs.

### 3. The Alleged Breach By Failure to Disclose Positions to IAM is Similarly Not Plausibly Tied To Any Alleged Damages Sustained By Plaintiffs, Does Not Involve Gross Negligence or Willful Malfeasance, and Is At Best Technical and Trivial

Plaintiffs allege that Defendant breached the Agreement by "refusing to disclose to IAM the fund's position at all times." *See* Amended Compl. at ¶ 54. However, again, these actions (if true) could not plausibly have created any alleged injury or damages sustained by the Plaintiffs, as required under *Twombly* et al. (as described above). Plaintiffs do not allege that they would have used another broker, liquidated positions, or indeed done anything differently if they had been aware of the fund's positions.

Furthermore, again, even if true, Defendant's failure to disclose positions in the fund does not rise to the level of gross negligence or willful malfeasance, as defined above. Again, these actions, at best, would constitute minor and immaterial deviations from the Agreement, with no material impact on the accounts nor any pecuniary implication for the Plaintiffs.

### 4. Per The Terms of the Agreement, the 20% Drawdown Was Not A Violation

Plaintiffs claim that "Defendant breached the Agreement by refusing to keep drawdowns below 20%." *See* Amended Compl. at ¶ 55. However, the Agreement between IAM and Zanger merely states that IAM had the option to *terminate* the Agreement if Zanger could not keep drawdowns below 20%. *See* Agreement at ¶ 1(g). Therefore, again, Plaintiffs have not stated a plausible claim for the breach of this contract.

5.    **The Two Alleged Day Trading Violations Do Not Constitute Gross Negligence or Willful Malfeasance, And Are Not Plausibly Tied To Any Alleged Damages Sustained By Plaintiffs**

The sole remaining allegations of breach of contract center on alleged day trading violations on November 16, 2006 and December 7, 2006. First, no facts have been alleged in connection with the two alleged violations which plausibly allege that the alleged violations were anything but unintentional. Next, no facts have been alleged that would plausibly support a conclusion that Defendant was grossly negligent or exhibited willful malfeasance in his failure to meet the two day trading deficiencies. In evaluating these alleged violations, it is significant that there have been no allegations of any obligation on the part of Defendant to meet any margin deficiencies with his own personal funds. Moreover, by arguing that the sole basis for gross negligence or willful malfeasance was the "incessant nature" of Defendant's alleged breaches in connection with the 115 margin calls[12] (*see* Amended Compl. ¶ 61), Plaintiffs effectively admit that two isolated instances such as these cannot constitute gross negligence or willful malfeasance.[13]

There is no allegation that these two isolated alleged violations caused any direct monetary losses or damages to Plaintiffs. The sole allegation of a negative effect of these alleged violations is that they caused Plaintiffs to shut down IFL because the Prime Broker allegedly would not continue to service IFL's trades. However, it is not "plausible" (*see Twombly*) to claim that these actions, if true, caused IAM to shut down the fund. Plaintiffs cannot plausibly claim that these two isolated alleged events shut down IFL without alleging facts that IFL could not have used another Prime Broker to continue trading. There is no

---

[12] As discussed above, these margin *calls* did not constitute margin *violations* (they were not violations of any Exchange Rule, nor violations of the Prime Broker agreement).

[13] Even after amending their complaint, Plaintiffs fail to allege any factual basis for gross negligence or willful malfeasance in connection with the two alleged day trading violations.

allegation that IFL could not legally operate or that dissolution was required, and there are no allegations that IFL could not have utilized another Prime Broker.

Also, it is not "plausible" to claim that these actions, if true, *in*directly caused any loss or injury to Plaintiffs. There are two forms of alleged "damages" mentioned in the Amended Complaint. First, Plaintiffs claim the loss of management and performance fees as compensation for marketing efforts, but the allegations in the complaint reflect that the alleged problems with marketing the fund occurred prior to these two events. *See* Amended Compl. at ¶ 25.[14] Moreover, the Agreement did not require Defendant to facilitate IAM's marketing efforts. Still further, there are no allegations in the Amended Complaint to make these alleged damages anything more than speculative.

The only other "damages" alleged are the loss of contractual management and performance fees as compensation for fund management and based on a minimum AUM of $5 million for a term of five years (*see* Amended Compl. at ¶ 14). However, Defendant had a contractual right to redeem his $5 million investment at any time. *See* Agreement at 1(c). Therefore, it is also not "plausible" to claim that Plaintiff had a reasonable expectation of management fees based on a minimum AUM of $5 million over that time, nor that such fees were guaranteed pursuant to the Agreement.

In short, there is no "plausible" factual allegation of any losses causally connected to Defendant's alleged wrongdoing tied to the two alleged day trading violations. Fairly read, the Amended Complaint reflects that the only actual "damages" were alleged trading losses in

---

[14] This section of the Amended Complaint alleges that "[n]otwithstanding IAM's experience in marketing funds and its unrelenting efforts to find additional investors for IFL, due to Defendant's poor performance, IAM was able to find only one additional investor. On March 1, 2006, Holmstrom invested $500,000 in IFL as a result of the marketing efforts of IAM."

connection with declining values of securities. *See* Amended Compl. at ¶ 24[15]; *Id.* at ¶ 61.[16]
There is no allegation in the Amended Complaint that those alleged losses involved or were a
result of breaches of the contract or are actionable.

## II.    IAM'S CLAIM OF BREACH OF FIDUCIARY DUTY IS BARRED AS A MATTER OF LAW IN THAT THE RELATIONSHIP OF THE PARTIES WAS GOVERNED BY THE EXPRESS AGREEMENT

IAM cannot merely reiterate and repackage its claim of breach of contract under the
rubric of a breach of fiduciary duty claim. "A cause of action for breach of fiduciary duty which
is merely duplicative of a breach of contract claim cannot stand." *See Cal Distributor Inc. v.
Cadbury Schweppes Americas Beverages, Inc.*, No. 06-CIV-0496-RMB, 2007 WL 54534 at *9
(S.D.N.Y. Jan. 5. 2007) (citations omitted).  Thus, a claim for breach of fiduciary duty that is
"premised upon the same facts and seeks damages for the same alleged wrong as the breach of
contract claim" must be dismissed as a matter of law. *See id.*  The rationale for this rule is that
"parties to an express contract are bound by an implied duty of good faith, but breach of that
duty is merely a breach of the underlying contract." *See id.*  The allegation of breach of fiduciary
duty contained in the Complaint mirrors the breach of contract claim,[17] and does not add any

---

[15]  This section of the Amended Complaint alleges that Defendant "began to manage the
account in a very aggressive and very volatile manner, leading to significant trading losses. . .".

[16]  This section of the Amended Complaint alleges that given Defendant's "unwillingness
to accept responsibility for any trading losses or any violations that he caused, it is clear that
Defendant's actions rose to the level of gross negligence and/or willful malfeasance."

[17]  In Count I, Breach of Contract (Brought by IAM Against Defendant), IAM alleges that
Defendant breached by refusing to disclose the fund's positions at all times, refusing to keep
drawdowns below 20%, refusing to comply with all applicable exchange rules, refusing to
comply with Prime Broker rules, inducing 115 margin calls and two day trading violations, and
refusing to cover the last margin call.  Compare Count II, Breach of Fiduciary Duty (Brought by
IAM Against Defendant), which states that "IAM and Defendant were engaged in a joint
venture" (Amended Compl. ¶ 64), and that "Defendant recklessly caused excessive margin calls
and then intentionally refused to cover such calls in order to shut IFL down and redeem his
money." *Id.* at ¶ 67.

new facts or additional allegations other than merely renaming the claim. Therefore, IAM's claim for breach of fiduciary duty must be dismissed.

Still further, IAM claims that it was engaged in a joint venture with Defendant. *See* Amended Compl. ¶ 64. IAM does not reference any provision of the Agreement that would evince an intent to enter into a joint venture, or a provision for the sharing of profits and losses.[18] Therefore, no joint venture was alleged to have existed and may not be the basis for a claim of breach of fiduciary duty "above and beyond" Defendant's contractual duties.

Finally (as argued previously), totally apart from the existence of the Agreement that controlled the terms of the relationship between IAM and Defendant, even if IAM's allegations would support some fiduciary duty owing to IAM by Defendant related to care and loyalty with regard to his trading, there is no support for the proposition that Defendant had a duty to cover margin calls from his own funds.

---

[18] The required elements of a joint venture are an "agreement manifesting the intent of the parties to be associated as joint venturers, a contribution by the coventurers to the joint undertaking (*i.e.*, a combination of property, financial resources, effort, skill, or knowledge), some degree of joint proprietorship or control over the enterprise, and a provision for the sharing of profits and losses." *See Tilden of N.J., Inc. v. Regency Leasing Sys., Inc.*, 230 A.D.2d 784, 785-86; 646 N.Y.S.2d 700, 701 (2d Dep't 1996) (citation omitted).

III.    **HOLMSTROM'S CLAIMS MUST FAIL, AS NO FACTS THAT WOULD ESTABLISH A FIDUCIARY DUTY OWING BY DEFENDANT TO HOLMSTROM WERE ALLEGED, AND THE ALLEGATIONS IF TRUE WOULD NOT ESTABLISH THAT DEFENDANT "INTENTIONALLY" INTERFERED WITH THE HOLMSTROM-IAM AGREEMENT OR THAT DEFENDANT WAS A THIRD PARTY LEGALLY CAPABLE OF TORTIOUS INTERFERENCE WITH HOLMSTROM'S ALLEGED CONTRACTUAL RELATIONS WITH IAM**

A.    <u>**Holmstrom Does Not Allege Any Fiduciary Duty Of Defendant To Holmstrom**</u>

Holmstrom has not alleged any fiduciary duty owed to him by Defendant.  To succeed on a claim for breach of fiduciary duty, plaintiff must demonstrate the existence of a fiduciary duty between the parties and a breach of that duty by the defendant.  *See Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, No. 98-CIV-6907-MBM, 2000 WL 335557 at *10 (S.D.N.Y. Mar. 30, 2000) (citations omitted).  In New York, a fiduciary duty may be found "when one [person] is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation."  *See Thermal Imaging, Inc. v. Sandgrain Securities, Inc.*, 158 F.Supp.2d 335, 343 (S.D.N.Y. 2001) (citations omitted).  Although the existence of a fiduciary relationship cannot be determined "by recourse to rigid formulas" under New York law (*see id.* (citations omitted)), the analysis centers on "whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first," and whether that trust or confidence has been reciprocally accepted by the trusted party.  *See id.* (citations omitted).

Under these principles, when a party is "at most a client of a client," and the parties entered into no direct transaction, "the relationship . . .is far too attenuated to give rise to a fiduciary duty," and the claim must be dismissed as a matter of law.  *See id.* at 343-344 (where plaintiff (pledgor of stock pursuant to a breached loan agreement with pledgee) alleged that the third party brokerage firm of pledgee had breached a fiduciary duty by receiving the pledged

shares, there was "no direct business relationship, let alone a fiduciary relationship," no implied

fiduciary relationship, and no justifiable repose of trust or confidence (as plaintiff had had little

contact with the third party broker); furthermore, any hypothetical fiduciary duty owed by the

broker to the customer-pledgee "did not extend to a third party in privity with [pledgee].").  Also,

a bond issuer's affiliate that was "responsible for the issuer's performance of its duties with

respect to the redemption of the bonds" pursuant to a trust agreement owes no fiduciary duties to

a bondholder, and such claims must be dismissed as a matter of law.  *See Page Mill Asset Mgmt.*,

No. 98-CIV-6907-MBM, 2000 WL 335557 at *10-11.  Similarly, if a defendant who allegedly

owes fiduciary duties did not accept a relationship of trust or confidence with the plaintiff, the

defendant did not breach a fiduciary duty and is entitled to judgment as a matter of law.  *See*

*Regions Bank v. Wieder & Mastroianni, P.C.,* 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006)

(mortgage banker acting as a settlement agent to close mortgage loans did not owe fiduciary

duties to lender bank).

      In the Amended Complaint, the only changes in Holmstrom's allegations from the

original Complaint in connection with his claim of a breach of fiduciary duty allegedly owed by

Defendant are that Defendant "agreed to manage Holmstrom's money" (*see* Amended Compl. at

¶ 1) and that Defendant owed a fiduciary duty to Holmstrom as "manager of Holmstrom's

money" (*see id.,* at ¶ 70).  There are no alleged factual bases for these bald assertions, and

nowhere are facts set forth to competently allege that Defendant accepted a relationship of trust

or confidence with Holmstrom (such as would be the case in a typical broker-client relationship

whereby a broker places a client's investments in exchange for a commission or fee).  There

have been no allegations of any direct dealings whatsoever between these parties.  The Amended

Complaint alleges that Defendant agreed with IAM—which allegedly had contracted to manage

IFL—to manage certain funds in IFL. Regardless of whatever duties IAM owed Holmstrom or whatever duties Defendant owed IAM, there are no facts alleged that would create a fiduciary duty owing from Defendant to Holmstrom. Thus, Holmstrom's breach of fiduciary duty claim should be dismissed.

Also, the sole causal basis for the alleged breach of fiduciary duty of Defendant with respect to Holmstrom is that defendant "recklessly caus[ed] excessive margin calls and intentionally refus[ed] to cover the final margin call." *See* Amended Compl. ¶ 71. First, the Agreement between Defendant and IAM explicitly allowed trading on a leveraged basis of at least four-to-one (*see* Agreement ¶ 1(a)), and thus multiple margin calls were in fact inevitable. Also, as discussed above, Defendant's "excessive margin calls," if true, were not violations of the Exchange Rules or the Prime Broker Agreement in that they were covered by Defendant. Moreover, even if Defendant owed some sort of direct duty to Holmstrom, which he did not, given the allegations in the Amended Complaint, there are no facts alleged that would support a duty to Holmstrom on Defendant's part to cover with his funds a margin call on securities owned by IFL. Finally, as discussed above, any alleged losses by Holmstrom were *trading* losses, attributable to the vagaries of the market and the market price of securities, and thus there is no legally recognizable causal link between any alleged injury or losses sustained by Holmstrom to any alleged activities of Defendant, nor any legal detriment attributable to Defendant's activities as required to state a claim for this tort.

For all of these reasons, Holmstrom's claim of breach of fiduciary duty must be dismissed.

**B.**    **Based On The Allegations In The Complaint, There Is No Plausible Claim Of An "Intentional" Interference With Contract; and Defendant Was Not a Third Party To The Contract And Was Therefore Not Legally Capable of Tortious Interference With The Contractual Relations Between Holmstrom and IAM**

Holmstrom's claim for tortious interference with contractual relations cannot stand.  The elements of a claim of tortious interference with contractual relations are: 1) that a valid contract exists, 2) that a "third party" has knowledge of the contract, 3) that the third party intentionally and improperly procured the breach of the contract, and 4) that the breach resulted in damage to the plaintiff.  *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001) (citations omitted).

The Amended Complaint contains no allegations which, if true, establish that Defendant intentionally and improperly procured the breach of an alleged agreement between IAM and Holmstrom, as required to state a claim for tortious interference with contractual relations.  "By definition, 'the interference [alleged] must be intentional, not merely negligent or incidental to some other, lawful, purpose,'" or the allegation shall fail as a matter of law.  *See Drake v. Laboratory Corp. of America Holdings,* No. 02-CV-1924-FB, 2007 WL 776818 at *4 (E.D.N.Y. Mar. 13, 2007) (citation omitted).  Here, although Holmstrom has made a bald assertion that Defendant "intentionally and improperly caused IAM to breach [its] contract [with] Holmstrom" (*see* Amended Compl. at ¶ 75), its allegations of Defendant's conduct merely describe actions incidental to the lawful purpose expressed in the Agreement.  Indeed, the Subscription Agreement which formed the basis of the business relationship between Defendant and IAM explicitly provided that a large degree of risk was involved in any subscription to the Class Z shares, and expressly permitted the extensive use of leverage.[19]

---

[19]    Although Plaintiffs have neglected to attach the Confidential Offering Memorandum incorporated by reference in the Agreement that serves as the basis of the claim of breach of contract, this Confidential Offering Memorandum may be submitted by Defendant in connection with its motion under Rule 12(b)(6) as 1) plaintiffs have undisputed notice of the contents of this

Moreover, Holmstrom merely alleges trading losses as the basis for damages, which are not illegal nor cognizable as a legal detriment causally connected to defendant's alleged actions, as required to state a claim for this tort. Thus, here too, Holmstrom fails to sufficiently state a claim for tortious interference with contractual relations by Defendant, and his claim must be dismissed.

Also, for the reasons set forth in previous papers, Defendant was not a third party or a "stranger" to the alleged agreement between IAM and Holmstrom and thus is not legally capable of tortiously interfering with these alleged contractual relations. *See Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, No. 98-CIV-6907-MBM, 2000 WL 335557 at *10 (S.D.N.Y. Mar. 30, 2000) (where CS First Boston had an agreement with CMST with respect to causing the redemption of certain bonds and therefore agreed to be responsible to CMST for performance of CMST's obligation to Page Mills in connection with the bond redemption, CSFB was not a "stranger" to the contractual obligation created by the indenture between CMST and Page Mill). Also, an agent cannot be a "third party" for purposes of a claim of tortious interference with contractual relations by a complaining party against the agent's principal or employer. *See*

---

(continued...)

document, and 2) this document is integral to the plaintiff's claim. *See R.H. Damon & Co., Inc. v. Softkey Software Products, Inc.*, 811 F. Supp. 986, 989 (S.D.N.Y. 1993). Here, it is undisputed that Holmstrom has notice of the Confidential Offering Memorandum that was incorporated by reference in the IAM/Zanger Agreement of October 19, 2004.

The Confidential Offering Memorandum provides that "[t]he Shares are available only to sophisticated persons who are willing and able to bear the economic risks of this investment and who are able to bear a substantial or complete loss of their investment in the Shares of the Fund. The Shares are speculative and involve a high degree of risk. Trading losses can sharply reduce the Net Asset Value of the Fund and consequently the value of the investor's Shares of the Fund." *See* Confidential Offering Memorandum (Exhibit B to the Declaration of Matthew E. Szwajkowski in Support of Defendant's Motion to Dismiss the Amended Complaint), at 4-5. Also, "the Class Z shares will have flexible leverage limits," *Id.*, at 16, and "margin-to-equity may range between 10-50% but these figures are expected to change over time, and may change to 0% or more than 50% in certain situations." *Id.* at 16-17.

*Albert*, 239 F.3d at 275. Notwithstanding this rule, liability may result if the agent has "exceeded the bounds of his authority" (*see Drake*, No. 02-CV-1924-FB, 2007 WL 776818 at *3 (citations omitted)), or has "committed an independent tortious act against the plaintiff" (*see Roselink Investors LLC v. Shenkman*, 386 F.Supp. 2d 209, 228 (S.D.N.Y. 2004); *see also Cohen v. Davis*, 926 F. Supp. 399, 404 (S.D.N.Y. 1996) (citations omitted) ("[a] supervisor is considered to have acted outside the scope of his employment [for purposes of the "third party" requirement of a claim of tortious interference with contract] if there is evidence that the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, or that he acted purely from malice or self-interest")).

Here, Holmstrom has not alleged that Defendant operated outside the scope of his agency with IAM in order to tortiously interfere with the Holmstrom-IAM agreement, and no factual basis for an independent tortious act is alleged.[20] No behavior or conduct on the part of Defendant is alleged other than that Defendant simply conducted trades under the auspices of his express agreement with IAM—an Agreement which memorialized and defined his business relationship and agency with IAM. Because there has been no allegation that Defendant was working outside the scope of his agency with IAM, and no factual basis has been set forth for his bald allegation that Defendant committed an independent tortious act, Holmstrom has not competently alleged that Defendant was a "third party" to the IAM-Holmstrom business relationship as required to state a claim for tortious interference with contractual relations. Therefore, on this ground also the claim must be dismissed.

---

[20] Holmstrom merely makes a bald assertion that "Defendant intentionally and improperly caused IAM to breach [its] contract [with] Holmstrom." *See* Amended Compl. at ¶ 75.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed.

Dated: November 6, 2007                    Respectfully submitted,


                                           *s/ Matthew E. Szwajkowski*
                                           Thomas H. Sear (TS-5570)
                                           Matthew E. Szwajkowski (MS-8362)
                                           JONES DAY
                                           222 East 41st Street
                                           New York, NY 10017-6702
                                           Telephone: (212) 326-3939
                                           Facsimile: (212) 755-7306
                                           mszwajkowski@jonesday.com

                                           *Attorneys for Defendant Daniel Zanger*

<u>CERTIFICATE OF SERVICE</u>

The foregoing document was served on the following counsel of record on November 6, 2007 via the method listed below:

**<u>E-Mail and Federal Express</u>**

John Balestriere
Craig Stuart Lanza
Balestriere PLLC
225 Broadway, Suite 2700
New York, NY 10007
clanza@balestriere.net

*s/ Matthew E. Szwajkowski*