Craig Stuart Lanza
William S. Holleman[1]
John Balestriere
**BALESTRIERE PLLC**
225 Broadway, Suite 2700
New York, NY 10007
Telephone: 212-374-5404
Email: clanza@balestriere.net
*Attorneys for Plaintiff*s

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **INDEPENDENT ASSET MANAGEMENT LLC and OLA HOLMSTROM,** | **1:07-CV-06431-JSR** |
| **Plaintiffs** | |
| **- against -** | **ECF** |
| **DANIEL ZANGER,** | |
| **Defendant.** | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 2

   I.   DEFENDANT'S CAVILS DO NOT COME ANY WHERE NEAR THE HIGH
STANDARD NEEDED FOR DISMISSAL ........................................................... 2

      A.   Defendant's Actions Shut Down IFL and Cost Plaintiff Money .......................... 3

      B.   Defendant Clearly Acted Willfully and With Gross Negligence ....................... 14

   II.   HOLMSTROM ADEQUATELY STATES BREACH OF FIDUCIARY DUTY AND
TORTIOUS INTERFERENCE CLAIMS ............................................................. 17

      A.   Holmstrom's Fiduciary Duty Claim ........................................................ 17

      B.   Holmstrom's Claim for Tortious Interference Must Stand .................................. 19

   III.   PRAYER FOR RIGHT TO AMEND IN THE ALTERNATIVE ........................... 21

CONCLUSION ..................................................................................................... 21

## **TABLE OF AUTHORITIES**

PAGE

### **CASES**

*Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 1996)…………………………19,20

*American Telephone & Telegraph Co. v. City of New York*, 83 F.3d 549 (2d Cir. 1996)………………………………………………………………..…15

*ATSI Communications v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007)……...16

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007)…………………...…16,17

*Berry v. Souza*, 564 F.2d 1349 (9th Cir. 1977)……………………………...6,7

*Bower v. Weisman,* 639 F. Supp. 532, 539 (S.D.N.Y. 1986)……………………2

*Colnaghi, USA. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823 (N.Y. 1993)………………………………………………………………..15

*Fesseha v. TD Waterhouse Investor Services, Inc.*, 747 N.Y.S.2d 676 (N.Y. Sup. Ct., Mar. 20, 2002)…………………………………………………..5,6

*Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir.1996)……………………...19,20

*Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25, 29 (2d. Cir 1995)………..21

*Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, 2000 U.S. Dist. LEXIS 3941, at *32. (S.D.N.Y. Mar. 30, 2000)………………........17,18

*Rennie & Laughlin, Inc. v. Chrysler Corp.*, 242 F.2d 208, 213 (9th Cir. 1957)………………………………………………………………...2

*Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 555 (1992)……………….…15

*Thermal Imaging, Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001)……...…17,18

Plaintiffs Independent Asset Management ("IAM") and Ola Holmstrom ("Holmstrom") (collectively, "Plaintiffs"), by their attorneys, Balestriere PLLC, respectfully submit this Memorandum of Law in opposition to Defendant Daniel Zanger's ("Zanger" or "Defendant") Motion to Dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Defendant committed numerous violations of applicable laws, rules, regulations, and exchange rules while he was acting as trading manager for The Independent Fund Limited ("IFL"). Defendant also breached the prime brokerage agreement ("Primer Brokerage Agreement") with Goldman Sachs ("Prime Broker"). Due to these violations and breaches, Defendant breached the agreement that he had with IAM ("Agreement") to be IFL's trading manager, thus forcing IFL to shut down and cease operating as a hedge fund. In its motion to dismiss, however, Defendant claims that the many, well-documented breaches of the Agreement are not breaches at all, and that the continued excessive violations of the rules of the prime broker are not violations "per se."

Yet, the facts of this case are clear: IFL was shut down by the prime broker because of Defendant's trading violations. When Defendant agreed to be the trading manager for IFL, he agreed to comply with any and all applicable laws, rules, regulations, and rules of exchanges on which Defendant traded. Defendant did not do this. Instead, upset with the terms of the Agreement, Defendant flagrantly ignored his contractual and fiduciary duties by trading in a woefully reckless manner; he induced

1

at least 115 margin violations and multiple day trading violations and failed to comply with several vital provisions of the Agreement and the Primer Brokerage Agreement. As a direct result of Defendant's actions, IFL was forced to shut down and has ceased operating as a hedge fund.

Defendant's argument thus compels the question: if Defendant did not cause any trading violations, then why was the Fund shut down for multiple trading violations?

Finally, Defendant owed a fiduciary duty to Holmstrom, the investor whose money Defendant egregiously mismanaged.  Defendant argues that the Amended Complaint should be dismissed as a matter of law because Holmstrom's relationship with Defendant differs from the traditional investor-investment manager relationship. However, Defendant asserts this without explanation, such that Holmstrom's claims against Defendant must stand.

## ARGUMENT

### I.    DEFENDANT'S CAVILS DO NOT COME ANY WHERE NEAR THE HIGH STANDARD NEEDED FOR DISMISSAL

Defendant has an extremely high standard to meet, as "courts are wary of dismissal in view of the policy of the federal rules which seeks to have determinations reached on the merits." *Bower v. Weisman,* 639 F. Supp. 532, 539 (S.D.N.Y. 1986) (citing *Rennie & Laughlin, Inc. v. Chrysler Corp.,* 242 F.2d 208, 213 (9th Cir. 1957) ("[A] motion to dismiss is viewed with disfavor in the federal courts . . . .")).  At this early stage of the proceedings, "allegations are accepted as true, and the complaint is construed in a light most favorable to the pleader." *Bower,* 639 F. Supp at 539.

### A.    Defendant's Actions Shut Down IFL and Cost Plaintiff Money

While serving as the trading manager for IFL, Defendant committed numerous trading violations, failed to comply with rules and regulations as established by various regulatory bodies, committed multiple breaches of the Primer Brokerage Agreement, and committed multiple breaches of the Agreement with IAM. As a direct result of Defendant's misconduct, IFL lost substantial amounts of money and was shut down by the Prime Broker and by the Fund Administrator.

Defendant complains that Plaintiffs did not append specific correspondences involving allegations made by the Prime Broker that Defendant had committed certain violations. *See id.* Def's Mot. Dismiss 6.   However, Plaintiffs are free to plead their claims in whichever manner they see fit.  Moreover, for the purpose of adjudicating a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), it suffices that Plaintiffs have alleged sufficient facts to allege a claim by which relief can be granted, and there is no need to append any additional documents.

Nonetheless, for the sake of expediency, Plaintiff attaches some exchanges from IFL's Administrator and the Prime Broker which plainly indicate that Defendant committed many breaches of contract as well as many violations of applicable laws, rules, regulations, and exchange rules.  Communications involving the Prime Broker clearly indicate that Defendant committed numerous violations and that, as a result, the Prime Broker was going to terminate IFL. *See* Prime Broker Memoranda 1,2 (hereinafter Exhibit 1).  Communications involving the Fund Administrator additionally indicate that Defendant's committed numerous violations, violations which ultimately led to the

termination of the Fund Administrator's relationship with IFL. *See* Fund Administrator Letters 1, 2 (hereinafter Exhibit 2).  It is clear from Exhibits 1 and 2 alone that Defendant committed many violations of the law and numerous breaches of the contracts he had signed with both IAM and the Prime Broker and that these violations were the direct cause of IFL's shutting down.

> **1.    In support of his Motion to Dismiss, Defendant improperly and repeatedly makes untrue statements to this Court.**

Because this is a motion to dismiss, this Court needs to be concerned with the legal sufficiency of Plaintiffs' complaint and not get entrenched in a factual dispute at this time. However, it is important to note that, in Defendant's motion to dismiss, Defendant makes several untrue factual assertions which are so easily contradicted that they must be addressed here, even if expounded upon below.  Defendant's mere reliance on these factual assertions compels this case beyond the pleading stages.  Most notably Defendant states that some of the violations of the agreement were "trivial" and caused no damage, that Defendant cured all margin calls within the time allotted and that Defendant's wiring in his own money into the Fund was unimportant.   These statements are simply untrue.  Exhibits 1 and 2, cited above, show that these violations were in fact severe and incurable.  Also, email communications cited in the complaint and below make clear that Defendant did not, in fact, cover his margin calls in time. *See* Emails and Instant Message Communications (hereinafter Exhibit 3).

2.    **Defendant's initial margin calls violated the applicable laws, rules, regulations, and rules of exchanges; the Primer Brokerage Agreement; and, consequently, the Agreement with IAM.**

Defendant violated Regulation T, NYSE Rule 431, the Primer Brokerage Agreement, and, consequently, the Agreement with IAM. The Agreement compels Defendant to comply with the Primer Brokerage Agreement as well as any applicable laws, rules, regulations, and rules of exchanges on which Defendant might trade. Any violation of the Primer Brokerage Agreement or of any applicable laws, rules, regulation, or exchange rules constitutes a violation of the Agreement between Defendant and IAM.

a.    <u>Defendant violated applicable laws, rules, regulations, and exchange rules by inducing at least 115 margin calls.</u>

Regulation T and NYSE Rule 431 prescribe initial and maintenance margin requirements, respectively, requirements which must be adhered to at all times— nothing contained therein states that the margin requirements are optional, for any period of time. Quite simply, if anyone fails to maintain the required margin, he has violated the plain language of the applicable law, rule, regulation, or exchange rule. The broker-dealer is then compelled to issue a margin call, after which the errant trader is required to take action to correct the margin deficiency.

In New York State, a margin violation occurs when the margin call is issued and there is no right to cover the deficiency. *See Fesseha v. TD Waterhouse Investor Services, Inc.*, 747 N.Y.S.2d 676 (N.Y. Sup. Ct., Mar. 20, 2002). In *Fesseha*, the plaintiff-trader caused a margin violation under Regulation T on a Friday and appeared on a Monday

morning to cover the violation. *See id.* at 679. However, against the wishes of the plaintiff, the defendant-broker TD Waterhouse liquidated a portion of the plaintiff's account in order to satisfy the margin deficiency before the plaintiff arrived on a Monday morning to cover the margin call, well within the timeframe allowed by the rules and regulations cited by Defendant Zanger in *this* case. *See id.* at 680-81. In rejecting the plaintiff's argument that Regulation T and NYSE Rule 431 permitted him a certain timeframe in which to cure, the court in *Fesseha* explained that investors have no right to a certain amount of time to deposit additional margin and that broker-dealers may impose even stricter requirements than any applicable rule or regulation. *See id.*

This is precisely the case here. As discussed below, the Primer Brokerage Agreement is stricter than Regulation T and NYSE Rule 431, and Defendant violated the Primer Brokerage Agreement by causing margin calls and, in many instances, by either covering margin calls late or refusing to cover them altogether.

While ignoring *Fesseha,* Defendant relies on a Ninth Circuit case, *Berry v. Souza,* 564 F.2d 1349 (9th Cir. 1977), yet Defendant either fails to include or fails to notice all of the relevant portions of the case on which it relies. In the same paragraph Defendant quotes, the Ninth Circuit acknowledges that "Regulation T is violated when a brokerage house exceeds the permissible credit limitations in margin transactions." *Id.* at 1349.

The language of *Berry* is unambiguous—a margin violation has occurred whenever the permissible amount of margin has been exceeded. Furthermore, Defendant's assertion of what constitutes a violation disregards this language and renders much of what the Ninth Circuit wrote in *Berry* superfluous. With this is mind,

6

it is impossible to accept Defendant's assertion as to the point in which Regulation T is violated, especially when there is a more plausible interpretation which reconciles these two apparently contradictory notions.  Whether under Regulation T, NYSE Rule 431, or any other applicable standard, the plain language prescribes a specific amount of margin that must be either initially present or maintained to remain compliant. A failure to maintain this required amount is a violation, plain and simple.

Here, Defendant failed to maintain adequate margin in the account for IFL no fewer than 115 times, thereby resulting in at least 115 margin calls.  *See* Compl. ¶ 29. Each and every one of these instances of deficiency represented a failure to comply with the terms of Regulation T, NYSE Rule 431, and/or margin requirements established by the Prime Broker. In fact, no such margin call would issue in the absence of a violation.

Aside from erroneously arguing that these margin violations are not, in fact, violations, Defendant seems to miss the point altogether.  The cases Defendant cites deal with causes of action under Regulation T.  Plaintiffs do not sue under Regulation T or Rule 431, but for violations of an Agreement which requires Defendant to obey any and all applicable rules of the exchanges which Defendant trades on.  By inducing repeated margin calls, by delaying and sometimes flat out refusing to satisfying the deficiencies, Defendant did not obey the rules of the exchanges which he traded on.

      b.    <u>Defendant violated the Primer Brokerage Agreement by forcing the Prime Broker to issue repeated margin calls.</u>

The Defendant constantly violated the Primer Brokerage Agreement.[1]  The Prime

---

[1] The second paragraph of the Prime Brokerage Agreement States as follows:

Brokerage Agreement states how its terms "may exceed the margin requirements set ***by any exchange or other regulatory authority*** and need not be in uniform as among other customers or commodities." *See* Ex. 4 7 (emphasis added).  The Prime Broker is clear: its margin limits are strict.  The Defendant must "continually" maintain original and maintenance requirements as established by the Prime Broker, which might exceed the requirements set forth in any applicable law, rule, regulation, or exchange rule.  Moreover, in the event that a margin deficiency does actually arise, Defendant was obligated to correct this violation "immediately," which is far more restrictive than Regulation T, NYSE Rule 431, or any other applicable law, rule, regulation, or exchange rule.  Because Defendant did not, he violated the Prime Brokerage Agreement.

In the instant case, because Defendant did not maintain the requisite amount of margin at least 115 times, Defendant thus breached the Primer Brokerage Agreement in this manner at least 115 times. Moreover, Defendant seems to have forgotten that he did ***not*** meet margin requirements immediately but, rather, ignored Gianina Arturo ("Arturo"), a representative of the Prime Broker, for days at a time.  In January 2006, for

---

> Customer agrees at all times to maintain adequate margins in the account so as continually to meet the original and maintenance margin requirements established by GSEC in its sole discretion from time to time. GSEC's margin requirements may exceed the margin requirements set by any exchange or other regulatory authority and need not be in uniform as among other customers or commodities. Customer agrees to pay to GSEC the amount of the premium for every option purchased for the account. Customer agrees to deposit margins and pay premiums immediately upon GSEC's request. Payments shall be made in immediately available U.S. dollars to GSEC at the address shown at Section 8 herein or as GSEC shall notify customer. GSEC shall have the right to retain any interest with respect to any cash margins deposited in the account.

*See* Prime Brokerage Agreement 7 (hereinafter Exhibit 4).

example, Defendant failed to respond to Arturo with respect to an outstanding margin call, waiting several days before addressing the matter. *See* Ex. 3 1. And again in April 2006, Defendant did the same thing. *See id.* at 2  In November 2006, Defendant failed to take immediate action pursuant to the Primer Brokerage Agreement and ignored Arturo's efforts to ascertain what Defendant was going to do about the violation. *See id.* at 3, 4.  In fact, Defendant even expressed anger at Arturo's persistence. *See id.*  And finally, in December 2006, Defendant failed to address the day trading margin violation, indicating rather abruptly that he had no intention of handling it. *See id.* at 5.

Defendant constantly violated the Primer Brokerage Agreement and, consequently, the Agreement with IAM.

> c.    Contrary to Defendant's assertions, Defendant did not cover margin calls within the time limits prescribed

Defendant blatantly misrepresents facts with respect to covering his margin calls. In its motion to dismiss, Defendant writes: "Defendant cured the margin deficiencies within the applicable time period avoided thereby exchange rule violations." *See* Def's Mot. Dismiss 2.  This is pure fiction.  At times, Defendant failed to cover margin calls altogether, such as for margin calls issued on November 9, 2006, and November 30, 2006. *See* Compl. ¶¶ 39-46. Moreover, Defendant frequently failed to cover, and even flat out ignored the Prime Broker, for days at a time.  Thus, Defendant's claims that he covered *all* margin calls in full compliance with all applicable rules and regulations are simply untrue.

d. <u>Defendant's violation of the applicable rules and regulations as well as the Primer Brokerage Agreement shut down IFL</u>

Contrary to Defendant's blatant misstatements, Defendant's actions not only resulted in mere violations, but they also had the direct effect of shutting down IFL. As a result of Defendant's massive trading losses, IAM was unable to entice additional individuals to invest in IFL. More important, however, is the fact that Defendant's actions definitively caused the Fund Administrator to terminate its relationship with IFL, which triggered the total collapse of IFL.  On December 1, 2006, Megan Woloshyn, Vice President of the Fund Administrator, to IAM, wrote to IAM, complaining of Defendant and unambigously stating that Defendant's actions had forced the Fund Administrator to terminate the Fund Administrator's status as fund administrator of IFL. *See* Ex. 2 1.

Statements from the Prime Broker also indicate that Defendant's actions resulted in IFL being shut down. *See* Ex. 1 3. In a memorandum issued by the Prime Broker shortly after November 9, 2006, the Prime Broker states that, due to Defendant's failure to meet a day trading call, IFL's account was to be restricted to trading on a cash available basis for 90 days or until the call is met. *See id. at 2.*  In a separate memorandum, issued shortly after the November 30, 2006, day trading margin violation, the Prime Broker stated that, due to the the November 9 and November 30 violations, the account thereafter restricted to liquidating transactions only." *See id.*  at 1. Finally, in a memorandum informing Defendant of IFL's termination, the Prime Broker

stated that it was terminating IFL's account due to Defendant's violations and that only closing transactions would be accepted. *See id.*

Defendant's actions, and nothing else, caused IFL to shut down.

### 3. Defendant's margin violations are not the "sole" violations of the Agreement

Plaintiffs base their many claims against Defendant not only on his hundred plus margin violations, but also on several different types of misconduct. The 115 margin violations induced by Defendant constitute only a portion of the Defendant's wrongdoing. Indeed, in addition to the 115 margin violations, the Complaint clearly states that Defendant is liable to Plaintiffs due to violations of several other provisions of the Agreement with IAM as well, provisions which were designed to prevent the type of losses that Defendant's grossly negligent trading patterns ultimately caused.

Pursuant to the Agreement with IAM, Defendant was obligated to (a) stay within risk confines as indicated by the offering memorandum; (b) limit leverage; (c) emphasize liquidity in maintaining positions; (d) disclose to IAM the fund's positions at all times; (e) comply with all Prime Broker limits, rules, or guidelines; (f) be transparent and compliant to IAM and IFL; (g) keep drawdowns below 20%; (h) comply with all applicable laws, rules, regulations, and rules of exchanges on which Defendant traded; and (i) comply with any and all of IAM's reasonable requests of Defendant. *See* Agreement with IAM 2 (hereinafter Ex. 5).

With regard to (a), (b), and (c), Defendant was required to limit the amount of leverage in an effort to prevent IFL from being exposed to excessive amounts of risk. In

managing IFL, however, Defendant willfully ignored these concerns and excessively leveraged the funds assets. Although the obligation to limit leverage is an independent concern, that Defendant induced 115 margin violations and several day trading violations clearly illustrates Defendant's refusal to limit leverage as required by the Agreement. *See* Compl. ¶¶ 19, 29-32, 37, 39, 44.

With regard to (d), Defendant was required to disclose to IAM the fund's positions at all times. Defendant consistently failed to disclose the fund's positions, likely because Defendant's reckless trading patterns resulted in huge losses that Defendant preferred to cover up or simply not mention. *See id.* at ¶¶ 33-36.

With regard to (e), Defendant was require to comply with all Prime Broker limits rules or guidelines. As discussed further below, Defendant failed to comply with the Prime Broker guidelines, as embodied by the Primer Brokerage Agreement, by failing continually to meet the initial and maintenance margin requirements and also by failing to refrain from making personal withdrawals from IFL's account without the requisite authorization from IFL's board of directors. *See id.* at ¶¶ 29-45.

With regard to (f), Defendant was required to be transparent to and compliant with IAM and IFL. As indicated by numerous emails and instant message communications, Defendant flatly refused to comply with even the most basic requests from IAM, whether those requests were directed at carrying out IFL's investment objectives or aimed at complying with obligations incidental to Defendant's Agreement with IAM, such as the Primer Brokerage Agreement. Moreover, Defendant failed to be transparent to and compliant with IAM and IFL when he failed to disclose

unauthorized attempts to withdraw funds from IFL's account, in direct violation of the Primer Brokerage Agreement. Indeed, it was not until the Fund Administrator notified IFL of Defendant's actions that IAM was aware of Defendant's malfeasance. As the Complaint explains, Defendant's [total] non-compliance definitively caused the Fund Administrator to terminate its relationship with IFL, which triggered the total collapse of IFL. Had Defendant been compliant to IAM, many of these losses could have been avoided, so Defendant's lack of compliance was significant. *See id.* at ¶¶ 24, 26, 28, 36.

With regard to (g), Defendant was required to comply with all applicable laws, rules, regulations, and rules of exchanges on which Defendant traded. As discussed in great detail below, Defendant continually failed to comply with initial and maintenance margin requirements as set forth by various laws, rules, regulations, and exchange rules. *See id.* at ¶¶ 29-32, 37, 39, 44.

Defendant violated its Agreement with IAM in many ways, each of which cannot be summarily dismissed by Defendant as unimportant, not given either the purpose of the provisions or the level of culpability that rests with Defendant. It is not for Defendant to determine whether or not these violations were unimportant. Rather, this determination is for the Prime Broker and the Fund Administrator, who both clearly thought that the violations were important enough to shut IFL down.

### 4. Defendant's wiring in his own money caused damages

In direct violation of the Power of Attorney signed in connection with the Primer Brokerage Agreement, Defendant attempted to wire money out of IFL and into his own personal account. *See* Compl. ¶ 36. In signing the Power of Attorney, Defendant agreed

to refrain from wiring any money, even if it were money that Defendant himself deposited into IFL, out of IFL without the express consent of IFL's board of directors. *See* Ex. 4 3.Express prohibitions notwithstanding, Defendant attempted to do this on multiple occasions, causing the Fund Administrator to terminate its relationship with IFL, thereby shutting down IFL. *See id.* at ¶ 49.

### B. Defendant Clearly Acted Willfully and With Gross Negligence

#### 1. Defendant's actions were intentional

The Agreement between IAM and Defendant requires that, in order to sue on a breach of contract, there must be at least gross negligence. Here, Defendant's misconduct rose above a level of gross negligence to intentional misconduct. Defendant continually refused to maintain adequate margin levels in IFL's trading account. When instructed by IAM to execute certain trading orders, in order to protect the fund's positions, Defendant ignored such instructions, refusing to comply with IAM's simple demands. On multiple occasions, Defendant attempted to wire money out of IFL and into his personal account, in direct contravention of the Primer Brokerage Agreement. When Defendant committed multiple day trading violations, Defendant flatly refused to cover these margin calls.

Defendant, an accomplished trader by his own representations to IAM, realized after signing the Agreement with IAM that he was unwilling to honor his contractual obligations. Thereafter, Defendant proceeded to carry out his obligations in a willfully disruptive and violative manner until his very actions caused IFL to shut down, thus absolving Defendant of the oppressive burden that was the Agreement which he so

willingly entered into in October 2004.  Defendant makes his intention clear in an

instant message communication in January 2006, where Defendant threatened IAM,

saying that "[he] would drain the account," *See* Ex. 3 6.

### 2.    Defendant Acted with Gross Negligence

Defendant was, at a minimum, grossly negligent while acting as trading

manager for IFL.  The existence of absence of gross negligence is an issue of fact. *See*

*Colnaghi, USA. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823 (N.Y. 1993).

Defendant cites *American Telephone & Telegraph Co. v. City of New York*, 83 F.3d 549 (2d

Cir. 1996), as establishing the standard for gross negligence, in which the Second Circuit

describes gross negligence as requiring "conduct that evinces a reckless disregard for

the rights of others or 'smacks' of intentional wrongdoing.'" *Id.* at 556.  The court in *AT*

*& T* held that mistake or a series of mistakes alone, without a showing of recklessness, is

insufficient for a finding of gross negligence." *Id.* (citing *Sommer v. Federal Signal Corp.*,

79 N.Y.2d 540, 555 (1992)).

Plaintiffs make clear that Defendant's conduct was not the product of a simple

"mistake" or even a "series of mistakes."   Rather, Defendant engaged in a pattern of

reckless trading, he was not complaint to IAM and ignored their suggestions, he

inducing at least 115 margin calls; he created multiple day trading violations and

refused to cover his margin calls; he refused to cover "immediately" any margin calls

that he did induce; he violated rules regarding personal withdrawals with full

knowledge that his actions were prohibited by the Primer Brokerage Agreement; he

refused to comply with simple demands from IAM; and he did all of these things

15

without regard or without care for the consequences that his actions would have on IFL. All of this eventually shut down IFL.  Defendant's malfeasance way surpasses ordinary negligence and amounts to gross negligence, at the very least, and more plausibly rises to a level of intentional misconduct.

### 3.    *Bell Atlantic Corp. v. Twombly* **has not altered the Pleading Standards of the Federal Rules of Civil Procedure.**

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," and nothing contained in the language of *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), or in any subsequent case, has altered the basic requirements of Rule 8.  In *Twombly*, the Court held that, "to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of 'plausibility.'" *Id.* at 1970.  Although courts have intimated this plausibility standard is not limited to antitrust cases, *see ATSI Communications v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), the plausibility standard demands that a plaintiff do more than make bald assertions of necessary elements of a claim.  Much debate has occurred over whether *Twombly* changed the basic pleading requirements of Rule 8, although it should be clear that, given the context of *Twombly* and subsequent case law addressing its impact, that the requirement of "plausibility" does not elevate pleading standards beyond that which Plaintiffs meet in their complaint.

Plaintiffs here have set forth plausible allegations as well as substantial factual detail supporting these allegations. Defendant argues that Defendant's actions "could not plausibly have created any alleged injury or damages to the Plaintiffs." *See* Def's

Mot. Dismiss 12. As is plainly indicated by correspondences from the Prime Broker, by which the Prime Broker indicated that it was terminating IFL's account due to Defendant's misconduct, Defendant's actions were not only a plausible cause of IFL's shutting down, but they were also the *sole* cause of IFL's shutting down. Moreover, as quoted twice above, the December 1, 2006, letter from the Fund Administrator to IAM plainly indicates that, due solely to Defendant's incessant malfeasance, the Fund Administrator was forced to terminate its status as IFL's fund administrator. In light of this, it is clear that Defendant's plausibility argument makes no sense and that Plaintiffs have fully satisfied not only Rule 8 but also the plausibility requirement of *Twombly*.

## II. HOLMSTROM ADEQUATELY STATES BREACH OF FIDUCIARY DUTY AND TORTIOUS INTERFERENCE CLAIMS

### A. Holmstrom's Fiduciary Duty Claim

Holmstrom has properly alleged the fiduciary duty owed to him by Defendant. A party must allege the existence of a fiduciary duty and a breach of the duty. *See Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, 2000 U.S. Dist. LEXIS 3941, at *32. (S.D.N.Y. Mar. 30, 2000). Whether or not a party is a fiduciary to another cannot be determined by "rigid analysis", but is based on "whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first," and whether that trust or confidence has been accepted by the other party. *See Thermal Imaging, Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001). As a manager of Holmstrom's investment, Defendant had placed himself unambiguously in a position of superiority and influence over Holmstrom. Holmstrom placed $500,000 in IFL's Class Z

shares with the full knowledge that Defendant would be the one managing the funds and Holmstrom trusted Defendant to manage his funds responsibly. Defendant violated Holmstrom's trust by placing his interests above Holmstrom's and intentionally engaging in conduct which he knew was likely to harm Holmstrom.

There is no doubt that Defendant owed Holmstrom a duty of loyalty, and that he blatantly breached that duty. Defendant breached his fiduciary duties to Holmstrom by, among other things, (a) intentionally and knowingly refusing to abide by their agreed upon investment strategy, (b) creating at least 115 margin calls, and (c) refusing to cover the deficit caused by the last margin call, an action which he knew would result in Holmstrom losing at least $170,000.

Defendant's reliance on *Thermal Imaging* and *Page Mill Asset Management* are misplaced. Holmstrom was not a "client of a client" to Defendant. Defendant and IAM were engaged in joint-venture whereby Defendant would invest his own money in IFL and then manage that money. IAM and Defendant would then use Defendant's performance in IFL as a means of marketing Defendant. Compl. ¶ 13. Defendant was not an employee of IAM nor, as Defendant argues elsewhere, an agent. IAM's role was to "help market" Defendant as a trader and to provide an "existing offshore vehicle" for him to engage in the managing of funds. *See* Compl. ¶ 13. Holmstrom was a client of Defendant. Moreover, it was Defendant, not IAM, who was solely responsible for managing Holmstrom's money—the Agreement states that Defendant "will be the *sole* manager on assets it has brought in for Class Z and IAM has no intention to replace or

terminate [Defendant] from the management of Class Z shares so long as [Defendant] remains within the guidelines outlined herein." *See* Ex. 5 2 (emphasis added).

In its motion to dismiss, Defendant inexplicably states that "[n]owhere are facts set forth to competently allege that Defendant accepted a relationship of trust of confidence with Holmstrom (*such as would be the case in a typical broker-client relationship whereby a broker places a client's investments in exchange for a commission or fee*)." *See* Def's Mot. Dismiss 19 (emphasis added).

However, this is precisely the relationship alleged: Holmstrom invested money with IFL with full awareness and intention that this money would be invested by Defendant. Defendant was aware of this influx of money, and Defendant knew that he was investing this money on someone else's behalf, expecting to receive a commission or a fee in exchange for investing this money. Indeed, given that Defendant concedes that a fiduciary relationship exists in the scenario quoted above, it is clear that a fiduciary relationship exists between Holmstrom and Defendant, and that Defendant can continue to maintain that no fiduciary relationship exists makes no sense. Holmstrom's claim for breach of fiduciary duty must stand.

### B.   Holmstrom's Claim for Tortious Interference Must Stand

Holmstrom's claim for tortious interference with contractual relations must stand. To establish a claim of tortious interference, a plaintiff must show: (1) a valid contract exists, (2) the third party has knowledge of the contract, (3) the third party intentionally and improperly caused a breach of the contract against the plaintiff, and

(4) damages. *See Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 1996) (citing *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir.1996)).

Defendant argues that Holmstrom has failed to "establish that Defendant intentionally and improperly procured the breach" of the agreement between Holmstrom and IAM. *See* Def's Mot. Dismiss 21. Once again, it is plain that if all allegations alleged in the Complaint are found to be true, Defendant will have committed intentional violation of such an agreement. Defendant is not merely being accused of aggressive trading, as he claims. Defendant is being accused of intentionally disregarding a clear Agreement to manage his funds in a responsible and relatively conservative manner. As an experienced investment professional, Defendant can be assumed to understand such a mandate well enough that a stark deviation from it could only be intentional. Defendant knew that IAM brought Holmstrom's investment into the Class Z shares pursuant to a legally binding understanding. Defendant then proceeded to act in direct opposition to that understanding. As such, IAM was in breach of the promises it made to Holmstrom, and Holmstrom was harmed. All of the elements of tortious interference are properly established.

Finally, Defendant argues that he was not a third party to the agreement between Holmstrom and IAM because he was an agent of IAM. *See* Def's Mot. Dismiss 22. As discussed above, Defendant was not an agent of IAM and IAM was not the principal of defendant. IAM and Defendant were engaged a relationship that was contemplated by the parties as a joint venture. *See* Compl. ¶¶ 12-15. Defendant was in no way, as he suggests, an employee of IAM, nor was IAM his supervisor. As such,

Holmstrom does not need to allege that Defendant operated outside the scope of his agency as no such agency relationship existed.

Even if Defendant were an agent of IAM, the allegations in the Complaint would consist of his acting outside the bounds of such agency. Defendant's claim that he is accused on "simply conduct[ing] trades" is disingenuous. Rather, Defendant blatantly and intentionally stepped outside the clear terms which he agreed to when he entered into his respective relationships with IAM and Holmstrom. Defendant agreed to trade in a certain way, violated this agreement, and then refused to take responsibility for such actions. As such, Holmstrom's claim for tortious interference must stand.

## III.    PRAYER FOR RIGHT TO AMEND IN THE ALTERNATIVE

After a response to a complaint has been made, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party." Fed. R. Civ. P. Rule 15(a). "However, Rule 15(a) specifies that "leave shall be freely given when justice so requires," and the Supreme Court has emphasized that amendment should normally be permitted." *Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25, 29 (2d. Cir 1995). Thus, if the Court disagrees with Plaintiffs' arguments and believes that the Complaint should be dismissed, Plaintiffs respectfully request the right to amend the Complaint so that it pleads Plaintiffs' causes of action in a manner found proper by this Court.

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint adequately states several claims against Defendant. It should not be dismissed, either in whole or in part.

21

Dated: New York, New York                               Respectfully submitted,
        November 20, 2007


                                                        By: /s/ Craig Stuart Lanza
                                                        Craig Stuart Lanza (CL-2452)
                                                        John Balestriere (JB- 3247)
                                                        **BALESTRIERE PLLC**
                                                        225 Broadway
                                                        Suite 2700
                                                        New York, NY 10007
                                                        Telephone 212-374-5404
                                                        Email:clanza@balestriere.net
                                                        *Attorneys for Plaintiffs*

---

[1] Passed the New York Bar Examination, Application for admission pending.

# Exhibit 1

**GOLDMAN SACHS EXECUTION & CLEARING , L.P**
30 Hudson Street Jersey City, New Jersey  07302

March 19, 2007

**Re: Second Day Trade Call**
**Client ID: 379326 / Independent Fund Limited**

Dear Customer:

A review of the above referenced account indicates that you failed to meet a second day trade call issued on trade date **11/30/06** due on **12/7/06** in the amount of **$2,850,461**.  Please be advised that as a result of failing to satisfy a second day trade call, <u>the account is being restricted to liquidating transactions only effective December 11, 2006.</u>

If you have any questions, please contact the Margin Department at (212) 357-3520, or the Clearing Services Department at (212) 357-2266.

| Name | Co. Code | CLIENT ID | A/C # | Customer Name | Trade date | Due Date | Amt. |
|------|----------|-----------|-------|---------------|------------|----------|------|
| GSEC | 001 | 379326 | 4LG0 | INDEPENDENT FUND LIMITED | 9-Nov-06 | 16-Nov-06 | 134,372 |
| GSEC | 001 | 379326 | 4P2H | INDEPENDENT FUND LIMITED | 30-Nov-06 | 7-Dec-06 | 2,850,461 |

Regards,

GSEC Margin Department

00001

### GOLDMAN SACHS EXECUTION & CLEARING , L.P
30 Hudson Street Jersey City, New Jersey  07302

March 19, 2007

**Re: First Day Trade Call**
**4LG0 / Independent Fund Limited**

Dear Customer:

A review of the above referenced account indicates that you failed to meet a day trade call issued on trade date **November 9**th due on **November 16**th in the amount of **$134,372.** The account shall be restricted to trading only on a cash available basis for 90 days or until the call is met.  Please be advised that failure to meet a second day trade call may result in the account being placed on a liquidating basis only.

If you have any questions, please contact the Margin Department at (212) 357-3520, or the Clearing Services Department at (212) 357-2266.

Regards,

GSEC Margin Department

**GOLDMAN SACHS EXECUTION & CLEARING , L.P**
30 Hudson Street Jersey City, New Jersey 07302

# Memo

| | |
|---|---|
| **To:** | **Dan Zanger / George Szele** |
| **From:** | Janitza López |
| **CC:** | Compliance |
| | Clearance Services |
| | GSEC Order Room |
| | Redi-Services |
| | New Accounts |
| | P & S Operations |
| | Option Operations |
| **Date:** | 3/19/2007 |
| **Re:** | Day Trading |

The following client must be closed for multiple Day Trading or Equity day trading violations effective 12/11/06 start of the business day. Only closing transactions will be accepted. Please inform account holder of this restriction.

**Client ID: 379326 / Independent Fund Limited**

● Page 1

# Exhibit 2

<u>BY AIRMAIL & E-MAIL</u>

December 1st, 2006



**Butterfield Fund Services**

Independent Asset Management, LLC
177 Broad Street
Suite 1051
Stamford, Connecticut 06901
USA

Butterfield Fund Services (Bermuda) Limited
Rosebank Centre, 11 Bermudiana Road,
Pembroke, HM 08, Bermuda

<u>Attn: Mr. George Szele</u>

P.O. Box HM 195
Hamilton, HM AX, Bermuda
Tel: (441) 299 3882   Fax: (441) 295 6759

www.butterfieldbank.com

Dear Mr. Szele,

Re: <u>The Independent Fund, Limited, (the "Fund")</u>

We write further to your conversation with our Mr. Andrew Collins and Mrs. Megan Woloshyn on or about November 7th, 2006 in relation to the actions of one of the Fund's trading managers, a Mr. Dan Zanger.

By way of background information, on or about October 19th, 2006 we, Butterfield Fund Services (Bermuda) Limited ("BFSL"), as administrators of the Fund, were notified that Mr. Zanger had requested Spear Leeds, the Fund's Investment Manager, wire him proceeds from the Fund's account. Upon further investigation it was learned that Mr. Zanger had been investing the Fund's portfolio on margin without reserving proceeds within the portfolio to meet a margin call, should that occur. Unfortunately for Mr. Zanger, a margin call was made and the Fund's portfolio did not have the proceeds to cover the margin call. Rather than reduce the Fund's exposure by selling off positions Mr. Zanger chose to wire his own personal funds to Spear Leeds to meet the margin call, thereby co-mingling his personal funds with those of the Fund. Once the margin had been met and the proceeds were no longer required to cover the margin Mr. Zanger requested Spear Leeds wire his personal funds back to him. Although Spear Leeds could accept proceeds without approval of the directors of the Fund (the "Directors"), they required Director consent to release any money from the Fund. Only when Spear Leeds contacted the Directors for permission to release the funds to Mr. Zanger did the Directors and subsequently, BFSL, learn what Mr. Zanger had done.

In order to rectify the situation the money paid in by Mr. Zanger was treated as a subscription into the Fund (Mr. Zanger already held shares in the Fund under the name Victory Lane, a Cook Islands company) and Mr. Zanger had to request a redemption in the usual way to get his funds back. As the date for subscriptions and redemptions had past, the Directors had to exercise their discretion to allow a late subscription application and late redemption instructions. In exercising their discretion the Directors had to be satisfied that their actions would not prejudice any of the other shareholders of the Fund. As Mr. Zanger was the majority shareholder and since Mr. Zanger's actions actually prevented a devaluation of the Fund's portfolio by preventing a reduction of the positions, the Directors concluded that no shareholders would be prejudiced and approved the late subscription and late redemption.

A wholly owned subsidiary of The Bank of N.T. Butterfield & Son Limited

**Butterfield Fund Services**

The above must be considered in light of the fact that a similar situation arose over one year ago. In the autumn of 2005 Mr. Zanger requested permission to wire his personal funds to Spear Leeds to meet a margin call. When Mr. Zanger was informed that he could not do that the matter seemed to resolve itself and we heard no more about it.

Although the problem created by Mr. Zanger in October 2006 has been resolved, we as administration of the Fund are extremely concerned about Mr. Zanger's trading activities and the level of risk associated with them. As a result we can no longer act as administrator of the Fund while Mr. Zanger continues to be a trading manager of the Fund. We would greatly appreciate receiving your comments on the above so that we may determine if a formal notice of termination of the Administration Agreement needs to be sent.

Should the matter with Mr. Zanger be resolved, we must inform you that the accounting fees currently being charged for the Fund will be increasing from $1,825 per month to $3,000 per month as of January 1st, 2007. This increase is due to a significant increase in activity within the Fund. The volume of trades have risen from approximately 100 per month to more than 1,000 and the opening up of an account with a second broker (Interactive Broker) doubles the amount of time spent manually uploading trades.

We have enjoyed a good business relationship with you and do not wish to lose the Fund as a customer. We look forward to receiving your comments on the above-mention situation and confirmation that Mr. Zanger is no longer acting as a trading manager for the Fund and that the Fund consents to the increase in accounting fees.

If you have any questions in relation to the above, please feel free to contact our Mr. Andrew Collins by telephone at 441-299-3954 or by email at andrewcollins@bntb.bm or Mrs. Megan Woloshyn by telephone at 441-299-3922 or by email at meganwoloshyn@bntb.bm.

Yours sincerely,

Megan Woloshyn
Vice President
Butterfield Fund Services (Bermuda) Limited

00002

# Exhibit 3

-----Original Message-----
**From:** Arturo, Gianina F. [mailto:gianina.arturo@gs.com]
**Sent:** Thursday, January 12, 2006 10:34 AM
**To:** Daniel Zanger
**Cc:** george; Joe
**Subject:** House Call- Independent Fund

Dan,

I see you are on Day 4 of a $2 million house call for the Independent Fund Limited.

Please advise the action that is being taken and if this call will be met today.

Regards,

Gia

_____

Goldman Sachs Execution & Clearing, L.P.

30 Hudson Street I 9th Floor I Jersey City I NJ 07302

☎ 212-357-5986 🖹 212-256-4524

📨 gianina.arturo@gs.com

### Goldman
### Sachs

**Gianina F. Arturo**

**Associate – Equities Division**

_____

(c) 2005, The Goldman Sachs Group, Inc. All rights reserved.
See http://www.gs.com/disclaimer/gsec/ for important risk disclosure, conflicts of interest and other terms and conditions relating to this e-mail and your reliance on information contained in it. This message may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete this message. See http://www.gs.com/disclaimer/email/ for further information on confidentiality and the risks of non-secure electronic communication. If you cannot access these links, please notify us by reply message and we will send the contents to you

0000*I*

3/19/2007 2:42 PM

-----Original Message-----
**From:** Arturo, Gianina F. [mailto:gianina.arturo@gs.com]
**Sent:** Monday, April 10, 2006 11:06 AM
**To:** Daniel Zanger
**Cc:** Joe; george
**Subject:** Independent Fund-House Call
**Importance:** High

Dan,

Please advise on the house call that is outstanding for the Independent Fund account.

This is the 4th day for the call and we prefer to have all calls met by Day 3.

Regards,

Gia

---

Goldman Sachs Execution & Clearing, L.P.

30 Hudson Street I 9th Floor I Jersey City I NJ 07302

☎ 212-357-5986 📠 212-256-4524

📧 gianina.arturo@gs.com

### Goldman
### Sachs

**Gianina F. Arturo**

Associate – Equities Division

---

(c) 2005, The Goldman Sachs Group, Inc. All rights reserved.
See http://www.gs.com/disclaimer/gsec/ for important risk disclosure, conflicts of interest and other terms and conditions relating to this e-mail and your reliance on information contained in it. This message may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete this message. See http://www.gs.com/disclaimer/email/ for further information on confidentiality and the risks of non-secure electronic communication. If you cannot access these links, please notify us by reply message and we will send the contents to you

nov 10 06 im

gbszele (3:22:12 PM): dan have you spoken with Gia on your margin call?
chartpattern (3:22:18 PM): yup
gbszele (3:22:19 PM): she keepd emailing me
gbszele (3:22:21 PM): keeps
gbszele (3:34:00 PM): dan we need to talk
gbszele (3:34:15 PM): gia said she has not heard from you
chartpattern (3:34:29 PM): I'm not sending in any more money            if
chartpattern (3:34:38 PM): no more 3-4 week waits
gbszele (3:35:33 PM): you have a margin call - again - why and what do you propose
to do?
chartpattern (3:35:41 PM): nothing
chartpattern (3:35:49 PM): I liquidated
chartpattern (3:35:55 PM): today
chartpattern (3:36:05 PM): its all I will or can do
gbszele (3:36:08 PM): so the why is she complaining
gbszele (3:36:14 PM): then
chartpattern (3:36:14 PM): nos ure
chartpattern (3:36:17 PM): not sure
gbszele (3:39:33 PM): there is nothin i can do about the wires - it is out of my
hands - there are laws and they have to be followed
chartpattern (3:39:41 PM): ok
chartpattern (3:39:55 PM): last time cost me over 600K
chartpattern (3:40:24 PM): had to liquidate my calls in CME the day before it shot
up 30 points
chartpattern (3:40:30 PM): never again
gbszele (3:47:15 PM): dan- you are the one creating the problem with the calls - you
are costing yourself- why do you keep doing it?  I 'm not the one trading - you are

he must

liq.

00003



-----Original Message-----
**From:** Arturo, Gianina F. [mailto:gianina.arturo@gs.com]
**Sent:** Friday, November 10, 2006 8:34 AM
**To:** Daniel Zanger
**Cc:** george; Joe
**Subject:** Day Trading Call- Independent Fund
**Importance:** High


Dan,

There is a day trading call this morning on Independent Fund-- call amount is $117,705
The call was caused due to the position of naked Google options

Please advise how the call will be met as soon as possible.

Regards,

Gianina

---

Goldman Sachs Execution & Clearing, L.P.

30 Hudson Street l 9th Floor l Jersey City l NJ 07302

☎ 212-357-5986 📠 212-256-4524

📧 gianina.arturo@gs.com

### Goldman Sachs

**Gianina F. Arturo**

Associate — Equities Division

---

© 2005, The Goldman Sachs Group, Inc. All rights reserved.
See http://www.gs.com/disclaimer/gsec/ for important risk disclosure, conflicts of interest and other terms and conditions relating to this e-mail and your reliance on information contained in it. This message may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete this message. See http://www.gs.com/disclaimer/email/ for further information on confidentiality and the risks of non-secure electronic communication. If you cannot access these links, please notify us by reply message and we will send the contents to you

**Subject:** FW: Day Trading Call- URGENT
**From:** "George Szele" <gs@independentfunds.com>
**Date:** Mon, 19 Mar 2007 10:07:22 -0400
**To:** <clanza@balestriere.net>

-----Original Message-----
**From:** Arturo, Gianina F. [mailto:gianina.arturo@gs.com]
**Sent:** Friday, December 01, 2006 9:11 AM
**To:** Daniel Zanger; george
**Subject:** Day Trading Call- URGENT

Dan/George,

There is a day trading call for $2,850,461 today on Independent Fund.

Please keep me informed as to if the call will be met with cash. Liquidation of positions will not satisfy a day trading call.

Regards,

Gianina

---

Goldman Sachs Execution & Clearing, L.P.

30 Hudson Street I 9th Floor I Jersey City I NJ 07302

☎ 212-357-5986 📄 212-256-4524

📠 gianina.arturo@gs.com

### Goldman
### Sachs

**Gianina F. Arturo**

Associate – Equities Division

---

© 2005, The Goldman Sachs Group, Inc. All rights reserved.
See http://www.gs.com/disclaimer/gsec/ for important risk disclosure, conflicts of interest and other terms and conditions relating to this e-mail and your reliance on information contained in it. This message may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete this message. See http://www.gs.com/disclaimer/email/ for further information on confidentiality and the risks of non-secure electronic communication. If you cannot access these links, please notify us by reply message and we will send the contents to you

jan 19 06 im

gbszele (11:43:34 AM): Gmorning Dan...please ask Jeff to be available ASAP to discuss TAX stuff with Joe re your payouts
chartpattern (11:43:53 AM): JUST CALL HIM
chartpattern (11:44:15 AM): MAKE SURE YOU DO NOT TAKE A CUT FOR PROFIT
chartpattern (11:44:36 AM): WE TAKED ABOUT THIS LAST OCT
chartpattern (11:44:40 AM): TALKED
chartpattern (11:44:57 AM): 1% FINE
gbszele (11:45:04 AM): also you are up 400k today - i'd suggest getting out with much of the positions at least half - looks like a bounce before lower - plus would go a long way for marketing you
chartpattern (11:45:13 AM): OK
chartpattern (11:45:18 AM): WILL DO
gbszele (11:48:46 AM): not sure what you mean - we already discussed the cuts as we agreed in agreement - we don't take any management fee for 18 months, not even 1% - the perf fee we agreed on would continue until we discussed in the new year...we would not be able to operate and manage everything without that..it would be an impossility -we discussed this and you said you understood.
chartpattern (11:49:02 AM): NO
gbszele (11:49:03 AM): I really need your responses for marketing questions
chartpattern (11:49:21 AM): No I said if you did that I would drain the account
chartpattern (11:50:07 AM): I'm not here to make you money off my money
gbszele (11:52:30 AM): Dan - we are not making ANY money - we are building a massive marketing and distribution effort to get you 100's of millions - make no mistake we are not making money - it is all opertaing capital until investors come in at which point you can take out all your money if you wish - I did agree to revisiit the fees but we have to be able to operate and that is where the money goes - for bare minimums to operate
chartpattern (11:53:14 AM): yea and after one year nothing
chartpattern (11:53:28 AM): I'm paying for everything and nothing coming in!
chartpattern (11:54:05 AM): you can borrow the fee against futere profits
chartpattern (11:55:40 AM): I have to take some maoney out to pay taxes anyway
gbszele (11:57:13 AM): Plenty about to come in and if I can get those 3 answers from you which I have been asking for months it will help.  You only got the track record ready in the summer - it takes 3-6 months for investors just to get comfortable - ask anyone - you have to be reasonable.  For many it takes 1-2 years before they see results even with great returns, especially when volatiliyy is high and your past indicates a 90% drawdown.  If you would listen to me a bit and take profits when you are up so much and dampen your volatility, then we will raise billions for you - not just millions.
chartpattern (11:58:01 AM): ok
chartpattern (11:58:13 AM): I still need money for taxes
chartpattern (11:58:30 AM): and you can borrown against future profits
gbszele (11:58:47 AM): of course that is why we are needing to talk to Jeff ASAP
chartpattern (11:58:55 AM): ok
chartpattern (11:58:58 AM): call him
gbszele (11:59:11 AM): k
chartpattern (11:59:19 AM): you don't need me for that
gbszele (11:59:24 AM): no
gbszele (11:59:37 AM): Jeff, our accountant and Joe can handle it
gbszele (11:59:54 AM): then Jeff will tell you what to do
chartpattern (12:00:04 PM): k
gbszele (12:01:52 PM): Dan please - please - please get back to me on those three questions I re-sent in email...I am heading out to Geneva conference in a week and need to prepare the material ---this can't wait any longer.
gbszele (12:02:32 PM): We also really need to put together a due diligence package on you for general questions -
chartpattern (12:03:20 PM): can get those responses out today
chartpattern (12:03:27 PM): fine
gbszele (12:03:46 PM): remember - take half those profits ;)
gbszele (12:04:04 PM): it's good for the track record
gbszele (12:04:18 PM): how's future wife?
chartpattern (12:04:28 PM): remember you can take a loan on those profits
chartpattern (12:04:35 PM): fine thanks

00006

jan 19 06 im

chartpattern (12:04:38 PM): frisky
gbszele (12:04:56 PM): what do you mean loan on those profits?
chartpattern (12:05:17 PM): if you take 25% of the profits
chartpattern (12:05:54 PM): consider it a loan against future profits when you bring in the money
chartpattern (12:06:27 PM): that or take none of the profit on my money
gbszele (12:06:31 PM): I meant you should cover half your positions because you are up so much - protect gains - market may pull back - terrorist threats again and overbought
chartpattern (12:06:42 PM): heard that
gbszele (12:12:19 PM): We will have to discuss that specifically and amend the agreement then - we gave you access to a reputable, established offshore vehicle which cost us close to a million overall over the past few years and 100's and 100's of hours - something you would never have wanted nor been willing or able to do so fast without us. Our agreement expresses this and you have no idea how incredibly time consuming and costly it is to manage these types of funds. You had access to that immediately and we bascially agreed to loan that money from you as per our agreement - you are getting back all the management fee and you won't always make money so neither will we then.
chartpattern (12:13:25 PM): but no money is coming in
chartpattern (12:13:53 PM): I'm still paying
gbszele (12:13:56 PM): no money had come in yet - IT TAKES TIME - ask anyone
chartpattern (12:14:16 PM): this I understand
gbszele (12:14:28 PM): people are asking us for due diligence packages...do you have one?
chartpattern (12:14:30 PM): still I need 5 to 6 to pay my taxes
chartpattern (12:14:36 PM): no
gbszele (12:14:53 PM): right so guess who is putting that together - me
chartpattern (12:15:00 PM): yup
gbszele (12:15:03 PM): but i need your answers
chartpattern (12:15:06 PM): this I know
chartpattern (12:15:10 PM): ok
chartpattern (12:15:18 PM): tonight I will put that together
gbszele (12:15:34 PM): so get em to me- it's a process - very time consuming
gbszele (12:15:39 PM): thanks
chartpattern (12:15:42 PM): I still need 5-6 for my txes
gbszele (12:16:25 PM): need to call you - what number?
chartpattern (12:16:42 PM): 1818-712-0500

# Exhibit 4

# Goldman Sachs Execution & Clearing, L.P.

## CORPORATE AUTHORIZATION

**CERTIFICATION**

I, _Roslyn O Brien_ , Secretary of _The Independent Fund Limited_ , a Corporation _limited liability_ ~~unlimited company~~ organized under the laws of the ~~State of~~ _Bermuda_ , hereafter called _By Unanimous Written Resolutions dated_ (the "Corporation") do hereby certify ~~that a meeting of the Board of Directors of the Corporation duly held on the~~ _7th_ day of _September_ 20 _05_ , the resolutions set forth below were duly adopted, that said resolutions have not been amended, rescinded or revoked and are in no way in conflict with any of the provisions of the charter or by-laws of said Corporation.

I further certify that the Corporation is duly organized and has the power to take the action called for by the resolutions set forth below and that each of the following has been duly elected and is now legally holding the office set opposite his name.

_George B Szele_ President _John McCarvey III_ Vice President ~~Assistant~~ _President_

_Roslyn oBrien_ ~~Secretary~~ _Secretary_ Treasurer _Donna Philips_ ~~Secretary~~ Assistant Secretary

IN WITNESS WHEREOF I have hereunto subscribed my name and affixed the seal of the Corporation this

_9th_ day of _September_ 20 _05_

Seal of Corporation
(to be affixed here.)

_Roslyn O'Brien_

Secretary

---

**CORPORATE RESOLUTIONS**

_Manager of class 2 shares of the corporation_

RESOLVED: That the President or any ~~Vice President of the Corporation~~ _Kenmar Dealer Kenger_ be and he hereby is authorized and empowered, for and on behalf of the Corporation, to buy, sell (including short sales) and otherwise deal in, on margin or otherwise, commodities, commodity futures contracts and commodity options; to receive on behalf of the Corporation account demands, notices, confirmations, reports, statements of account and communications of every kind; to receive on behalf of the Corporation account money, securities and property of every kind, and to dispose of same; to make on behalf of the Corporation account agreements relating to any of the foregoing matters and to terminate or modify same or waive any of the provisions thereof and generally to deal with Goldman Sachs Execution & Clearing, L.P. ("GSEC") on behalf of the Corporation account ~~as fully and completely as if the~~ ~~or the others were interested in said account,~~ all without notice to the other or others interested in said account and to execute and deliver to GSEC the customer agreement and all other related documents on behalf of the Corporation. The authority hereby conferred shall remain in force until written notice of its revocation addressed to GSEC and delivered at its offices and it was further

RESOLVED: That any and all past transactions of any kind herein authorized, which may have been heretofore made on behalf of this Corporation through or with GSEC is hereby ratified; and it was further

RESOLVED: That GSEC is authorized to act upon the authority of these resolutions until receipt by it of a certificate showing rescission or modification thereof signed by the Secretary of this Corporation and under its seal, and that GSEC is also authorized to recognize and deal with the officers of the Corporation whose names are set forth below, until receipt by said firm of a further certificate, setting forth the names of another person or persons as such officers.

| NAME | TITLE |
|------|-------|
| _Roslyn OBrien_ | _Secretary_ |
| _George B. Szele_ | _President_ |
|  |  |
|  |  |

## The Independent Fund Limited

### Written Resolutions of the Directors
Pursuant to § 63 of the Bye-Laws

We, the undersigned, being all of the Directors for the time being of The Independent Fund Limited (the "Company"), pursuant to Bye-law 63 of the Company's Bye-laws, DO HEREBY CONSENT to the following action and adopt the resolutions set out below. This Written Consent may be executed in counterparts, and a copy shall be inserted into the Company's Minute Book. Any action taken herein shall be of the same force and effect as if the same had been passed by a Meeting of the Board of Directors duly called and constituted.

### Goldman Sachs Execution & Clearing, L.P.

RESOLVED that the President or any Manager of Class Z Shares of the Corporation currently Daniel Zanger, be and he hereby is authorised and empowered, for and on behalf of the Corporation, to buy, sell (including short sales), and otherwise deal in, on margin or otherwise, commodities, commodity futures contracts and commodity options; to receive on behalf of the Corporation account demands, notices, confirmations, reports, statements of account and communications of every kind; to receive on behalf of the Corporation account money, securities and property of every kind, and to dispose of same; to make on behalf of the Corporation account agreements relating to any of the foregoing matters and to terminate or modify same or waive any of the provisions thereof and generally to deal with Goldman Sachs Execution & Clearing, L.P. ("GSEC") on behalf of the Corporation account, all without notice to the other or others interested in said account; and to execute and deliver to GSEC the customer agreement and all other related documents on behalf of the Corporation. The authority hereby conferred shall remain in force until written notice of its revocation addressed to GSEC and delivered at its office; and it was

FURTHER RESOLVED that any and all past transactions of any kind herein authorised, which may have been heretofore made on behalf of this Corporation through or with GSEC is hereby ratified; and it was

FURTHER RESOLVED that GSEC is authorised to act upon the authority of these resolutions until receipt by it of a certificate showing recision or modification thereof signed by the Secretary of this Corporation and under its seal, and that GSEC is also authorised to recognize and deal with the officers of the Corporation whose names are set forth below; until receipt by said firm of a further certificate, setting forth the names of another person or persons as such officers.

*Dated this 7th day September, 2005*

George B. Szele

John McCorvey

Andrew Collins

# POWER OF ATTORNEY

Customer hereby authorizes _Daniel Zanger_
(Name of Trading Manager)

_4872 Topanga Canyon Blvd PMB # 401 Woodland Hills CA 91364_
(Address of Trading Manager)

as Customer's manager ("Trading Manager") to buy and sell physical commodities, forward contracts, futures contracts and commodity options (including options on futures contracts) and to make or take delivery in fulfillment of such contracts or options for Customer's account and risk through Goldman Sachs Execution & Clearing, L.P. ("GSEC"). Customer hereby indemnifies GSEC and its directors, officers, employees and agents from and against all liability arising directly or indirectly, from following Trading Manager's instructions and will pay GSEC promptly, on demand, any losses arising from such trades and any debit balance resulting therefrom.

In all such purchases, sales or trades, GSEC is authorized to follow Trading Manager's instructions in every respect and Trading Manager is authorized to act for Customer with the same force and effect as Customer might do with respect to such purchases, sales or trades and all things necessary or incidental to the furtherance of such purchases, sales or trades. GSEC is directed to send to Trading Manager a copy of all statements that GSEC sends to Customer concerning Customer's account, including, but not limited to, monthly statements, confirmations and purchase and sale agreements. Customer hereby ratifies and confirms any and all transactions with GSEC heretofore and hereafter made by Trading Manager for Customer's account

Trading Manager is not authorized to withdraw from Customer's account any monies, securities or any property either in Customer's name or otherwise unless such withdrawal or payment is specifically authorized in writing by Customer. However, Customer authorizes GSEC to deduct from Customer's account and pay Trading Manager's fees upon presentation of a bill therefore. Customer acknowledges that GSEC has no responsibility to determine or verify the accuracy of any such bills.

This Power of Attorney shall remain in full force and effect until GSEC receives from Customer written notification of Customer's revocation thereof.

Customer understands that GSEC is in no way responsible for any loss to Customer occasioned by actions of the individual or organization named above and that GSEC does not, by implication or otherwise, endorse the operation or methods of such individual or organization.

CUSTOMER NAME: _The Independent Fund Limited_

By: _George Szele_                                DATE: _8/25/05_
Authorized Signature _George Szele, Director_

PRINT NAME AND TITLE: _George Szele , Director_

# TRADING MANAGER'S ACCEPTANCE

The undersigned acknowledges receipt of a copy of the foregoing Power of Attorney and a copy of the Futures and Options Customer Agreement between Goldman Sachs Execution & Clearing, L.P. ("GSEC") and Customer and hereby accepts appointment as Customer's Trading Manager.

Trading Manager also represents and warrants to GSEC that Trading Manager is:

___(a) a Commodity Trading Advisor ("CTA") registered as such pursuant to the Commodity Exchange Act, as amended ("CEAct"), and a member of National Futures Association and has furnished Customer with a copy of its CTA disclosure document, which disclosure document fully complies with the requirement of CFTC Regulation Section 4.34; or

___(b) a CTA exempt from registration pursuant to the CEAct; or

_✓_(C) excluded from the definition of CTA.

Check (a) or (b) or (c). If (b) or (c) is checked, state the basis for exemption or exclusion.

_____

_____

The undersigned agrees promptly to give GSEC written notice if any of the representations or warranties set forth above become inaccurate or in any way ceases to be true, complete and correct.

The following officers or employees of Trading Manager are authorized to buy, sell, exchange and otherwise deal in any and all securities, options, futures and contracts for the purchase or sale of commodities on margin and/or otherwise. The power to sell includes the power to sell "short". GSEC may absolutely rely on all instructions, whether verbal or written, received by it from such officers or employees with respect to any of the transactions referred to above without further inquiry until it receives written notice of a change from the Trading Manager or Customer.

(ONLY) _Daniel Zanger_    _Trader_    ~~Signature~~
Name                          Title                 Signature

_____    _____    _____
Name                          Title                 Signature

_____    _____    _____
Name                          Title                 Signature

NAME OF TRADING MANAGER: _Daniel Zanger_

By: _George Steele_    DATE: _8/25/05_
    Authorized signature

PRINT NAME AND TITLE: _The Independent Fund Limited, George Steele, Director_

## CUSTOMER ACKNOWLEDGMENT OF
## DISCRETIONARY ACCOUNT TERMS

The undersigned has carefully examined the provisions of the documents by which we have given trading authority or control over our account with Goldman Sachs Execution & Clearing, L.P. to:

*Daniel Zanger, Topanga Canyon Blvd PmB#401 Woodland Hill CA*
*91364*
(Name and Address of Trading Manager)

and understand fully the obligations which we have assumed by executing that document.

We hereby acknowledge that:

_____ We have received a copy of the disclosure document of the party named above prepared pursuant to Regulation 4.34 adopted by the CFTC.

___✓___ The party named above has not furnished us with a disclosure document prepared pursuant to Regulation 4.34 because said party has advised that he/she is not registered with the CFTC as a Commodity Trading Advisor and is not required to be so registered.

**[please check the appropriate box]**

**CUSTOMER NAME:** *The Independent Fund Limited*

By: *George Szele*                              **DATE:** *8/25/05*
    Authorized Signature

**PRINT NAME AND TITLE:** *George Szele   Director*

# Goldman Sachs Execution & Clearing, L.P.

## Futures Account Application
Corporation, Partnership and Limited Liability Company Accounts

| Account Title And Mailing Address *New Address :* | Full Corporate or Partnership Name | Account Description |
|---|---|---|
| *The Independent Fund Limited*<br>*Butterfield Fund Services*<br>*RoseBank Center, 11 Bermudiana Rd*<br>*PemBroke, Bermuda HM08*<br>*Bermuda Contact: Siu Kei Chung 441-294-2030*<br>*CT USA Contact: George Szele 203-355-1160* | | ___Corporation<br>___Partnership<br>___Limited Liability Company<br>___Pension Plan (include Plan and supplement Form<br>___Trust (include Trust Agreement)<br>✓Other *OFFSHORE Fund*<br>*Bermuda Limited Liability Co.* |

| Tax Identification Number<br>*N.A*<br>*OFFSHORE EXEMPT* | Tax ID Applied For<br>Date *N.A*<br>*OFFShore Exempt* | Business Phone Number<br>*(203) 355·1180* | Principle Business of Account:<br>*Hedge Fund* |
|---|---|---|---|

**REGISTERED WITH THE CFTC AS:**
___FCM  ___FLOOR BROKER  ✓CPO  ___CTA  ___B/D  ___INVESTMENT ADVISOR     **MEMBER OF NFA:** ✓YES, NFA ID # *310602*  ___NO

| INVESTMENT OBJECTIVES:<br>NO Speculation<br>NO Spreading   ✓Hedging *ONLY*<br>NO Other–   NO Arbitrage | DUPLICATE STATEMENTS TO:<br>*Independent Asset Management Mc*<br>*177 Broad Street*<br>*Stamford CT 06901* |
|---|---|

| Does this account, or do any principals of this account: | | FOR EXCHANGE MEMBERS ONLY: | | | |
|---|---|---|---|---|---|
| - Control the trading of any other accounts with us? | ___Yes ___No | | | | |
| - Have a financial interest in the trading of any other accounts with us? | ___Yes ___No | OWN | LEASE | EXCHANGE | ACRONYM |
| - Have any other futures accounts with us? (If yes, provide names and numbers of other accounts below) | ___Yes ___No | ___ ___ | CBOT | AM | ___ |
| Do any other non-related persons or entities: | | | | GIM | ___ |
| - Control the trading of this account? (If yes, provide name and address below) | ___Yes ___No | ___ ___ | AMEX | COM | ___ |
| - Have a financial interest in this account? (If yes, provide name, address and % of financial interest below.) | ___Yes ___No | | | NYFE<br>NYSE<br>PHBT<br>FHLX | ___<br>___<br>___<br>___ |
| - Guarantee this account? | ___Yes ___No | ___ ___ | | CBOE<br>tDBM<br>CME<br>IMM<br>tOM | ___<br>___<br>___<br>___<br>___ |
| Have any participants in this account now or in the past, whether or not this was publicly disclosed, been suspended, expelled, fined, barred, censured or otherwise disciplined by any regulatory body or by any securities or commodities exchange or association or been refused membership therein? If Yes, explain on separate sheet. | ___Yes ___No | ___ ___ | | KCBT<br>CBOE<br>PSE<br>OTHER | ___<br>___<br>___<br>___ |
| have any participants in this account ever been subject to federal or state bankruptcy proceedings, receivership, or similar proceedings (voluntary or involuntary) If Yes, explain on separate sheet. | ___Yes ___No | SLK EQUITY ACCOUNT # _____ | | | |

**CUSTOMER CONTACTS:**

*George Szele       Director of Fnd*      *203.355.1160*
Officer Responsible for Account Relationship    Title    Phone      *203. 422. 2988*

*Daniel Zanger       Trader*   *305-484-1711*
Trader
Operations      *425-766-0722*
      *800-901-2500*

Fax Number *(203) 355 1169*    *★818-712-0500* ✓

**BROKER IS AUTHORIZED TO DEBIT ACCOUNT FOR CHARGES INCLUDING BUT NOT LIMITED TO:**
___Membership Lease Payment   ___Floor Brokerage
___Insurance   ___Telecommunications
___Rent   ___Jackets & Printing
Other ___

*George Szele , DIRECTOR*     *8/25/05*
Signature     Date

**INCLUDE COPY OF PARTNERSHIP AGREEMENT OR LIMITED LIABILITY COMPANY AGREEMENT AND MOST RECENT AUDITED FINANCIAL STATEMENT AND UNAUDITED STATEMENT, FOCUS REPORT OR FORM 1-FR.**

# Goldman Sachs Execution & Clearing, L.P.
## Customer Futures and Options Agreement

In consideration of the acceptance by Goldman Sachs Execution & Clearing, L.P., of one or more accounts of the undersigned customer ("Customer") (if more than one account is carried by GSEC, they shall, all are referred to collectively as the "account") and GSEC's agreement to act as Customer's broker for the execution, clearance and/or carrying of transactions for the purchase and sale of commodity futures contracts, forward contracts, commodity options and physical commodities (collectively, "Commodity Interests"), Customer agrees as follows:

**1. PAYMENTS TO GSEC:**
Customer agrees to pay to GSEC:

(a) commission and service charges at rates established by GSEC from time to time for each transaction in connection with the account;

(b) funds which may be advanced by GSEC for the account, and any other costs incurred by GSEC occasioned by effecting commodity interest transactions for Customer or carrying the account;

(c) the amount of any debit balance or any other liability that may result from transactions executed by GSEC; and

(d) interest on any funds advanced by GSEC at the rates then charged by GSEC and service charges, together with any reasonable costs and expenses incurred in collecting any such debit balance or liability.

GSEC may debit the account such payments and if, in the sole discretion of GSEC, the account is not sufficient for such purpose, Customer shall make such payments immediately following GSEC's request for payment. Payments shall be made in immediately available U.S. dollars to GSEC at the address shown at Section 8 herein or as GSEC shall notify Customer. Customer agrees to deposit margins for every option purchased for the account, and pay premiums immediately upon GSEC's request. Customer agrees to deposit margins with respect to any interest any interest with respect to retain the right to retain any cash margins deposited in the account.

**2. MARGINS; PREMIUMS:**
Customer agrees at all times to maintain adequate margins in the account so as continually to meet the original and maintenance margin requirements established by GSEC in its sole discretion from time to time. GSEC's margin requirements may exceed the margin requirements set by any exchange or other regulatory authority and need not be uniform as among customers or commodities. Customer agrees to pay to GSEC the amount of the premium for every option purchased for the account. Customer shall make such payments immediately following GSEC's request. Customer acknowledges that GSEC does not have any obligation to establish uniform commission rates and that GSEC therefore determines such commission rates in such manner as it may determine.

**3. DELIVERY; OPTION EXERCISE:**

(a) Customer acknowledges that making or taking delivery on a commodity interest contract may involve a much higher degree of risk than liquidating a position by offset and that GSEC has no control over and makes no warranty with respect to grade, quality or tolerances of commodities to and for the account or to be delivered.

(b) Customer agrees to give GSEC timely notice (immediately upon request to inform GSEC if Customer intends to make or take delivery under any commodity interest contract or to exercise any option contract. If requested, Customer shall provide GSEC with satisfactory assurances that Customer can fulfill Customer's obligation to make or take delivery under any such contract. Customer shall furnish GSEC with property deliverable by it under any such delivery obligation in accordance with GSEC's instructions and shall deposit with GSEC the full cash value of securities or commodities to be delivered immediately upon demand thereof.

(c) GSEC shall not have any obligation to exercise any long option contract unless Customer has furnished GSEC with exercise instructions and sufficient initial margin with respect to each underlying futures contract not less than two (2) business days prior to the last day of trading in such option.

**4. FOREIGN CURRENCY:**
If GSEC enters into any commodity interest transaction for an account which is effected in a foreign currency:

(a) Any profit or loss caused by changes in the rate of exchange for such currency shall be for Customer's account and risk; and

(b) unless another currency is designated in the confirmation for such transaction, all margins for such transaction, any profit or loss on the liquidation of such transaction and any other payment between the Customer and GSEC under this Agreement shall be in United States dollars at a rate of exchange determined by GSEC in its sole discretion on the basis of their prevailing market rates of exchange for such foreign currency.

**5. POSITION LIMITS:**
Customer acknowledges and agrees that GSEC has the right at its sole discretion to limit the number of open positions (net or gross) which Customer may execute, clear and/or carry with or acquire through it. Customer agrees

(a) not to make any trade which would have the effect of exceeding the limitations thus imposed on it and

(b) that GSEC may require Customer to reduce open positions carried with GSEC or may refuse to accept any order from Customer which establishes a new position.

GSEC may require such limitation, reduction or refusal whether or not such limitation, reduction or refusal is required by applicable regulations or exchange rules (as defined in Section 22). Customer shall comply with all position limits established by any regulatory or self-regulatory authority or any exchange. In addition, Customer agrees to notify GSEC promptly if Customer is required to file position reports with any regulatory authority or with any exchange.

**6. GSEC DUTIES; LIABILITY:**
Customer acknowledges and agrees:

(a) That the commissions GSEC receives are consideration solely for the execution, clearance and reporting of Customer's trades and the carrying of positions resulting from these trades until they are liquidated. GSEC assumes no other duty or responsibility, fiduciary or otherwise, to Customer, except with respect to the safekeeping of Customer's funds;

(b) That the agency relationship between Customer and GSEC extends only to the foregoing and that, in no margins, value of commodities bought and sold, and all other sums due, or which may become due, to GSEC from Customer, the relationship of Customer to GSEC is that of debtor and creditor;

(c) To waive any claims, rights or causes of action which Customer has or may have against GSEC and its partners, directors, officers, employees and agents arising in whole or in part, directly or indirectly, out of any act or act of omission of any person, whether or not legally deemed an agent of GSEC, who refers or introduces Customer to GSEC or places orders with GSEC for Customer;

(d) To waive any claims or rights it may have against GSEC and its partners, directors, officers, employees or agents for any punitive damages and to limit any claims or rights arising out of this Agreement or the account to direct consequential damages;

(e) That if Customer has authorized any third party or parties to place orders or effect transactions in the account, such party has been selected by Customer based on its own evaluation and assessment of such party and that such party is solely the agent of Customer; any designation or change of designation by Customer or persons authorized to trade for the account or otherwise to give instructions to GSEC with respect to the account, shall be effective only when given by Customer in writing and acknowledged by GSEC in writing;

(f) That any trading recommendations or market or other information furnished to Customer by GSEC are incidental to the conduct of GSEC's business as a futures commission merchant and do not constitute an offer to sell (or buy) or the solicitation of an offer to buy (or sell) any commodity interest; any such recommendation and/or information, although based upon sources deemed by GSEC to be reliable, may be incomplete or unverified and may be changed by GSEC without notice to Customer, and accordingly, GSEC makes no representation, warranty or guaranty as to the accuracy or completeness of any trading recommendation or other information furnished to Customer.

(g) That GSEC, and its partners, directors, officers, employees and agents may have a position in and may buy or sell commodity interests which are the subject of information or recommendations furnished to Customer, and that the position or transactions of GSEC or any such persons may or may not be consistent with recommendations furnished to Customer by GSEC; and

(h) That Customer will not commence any legal proceeding against GSEC or its partners, directors, officers, employees and agents arising directly or indirectly out of this Agreement until all debit balances in the account have been paid to GSEC; provided that such payment shall be without prejudice to Customer's right to claim that such debit balance is not correct.

### 7. EXTRAORDINARY EVENTS;

Customer shall have no claim against GSEC for any loss, damage, liability, cost, charge, expense, penalty, fine or tax caused directly or indirectly by

(a) governmental, court, exchange, regulatory or self-regulatory restrictions or rulings,
(b) suspension or termination of trading,
(c) war, civil or labor disturbance,
(d) delay or inaccuracy in the transmission or reporting of orders due to a breakdown or failure of transmission nor communication facilities,
(e) the failure or delay for any reason of any broker selected by GSEC on behalf of Customer to fulfill its obligations or to pay in full amounts owed to GSEC in respect to contracts,
(f) failure or delay by any exchange or related clearing organization to enforce its rules or to pay to GSEC any margin due in respect of Customer's account, or
(g) any other cause or causes beyond GSEC's control.

### 8. COMMUNICATIONS;

Any notice, instruction or other communication required or permitted to be given hereunder (other than orders to buy or sell a commodity interest which may be oral) shall be in writing, unless expressly provided otherwise in this Agreement, and addressed to the respective parties as follows:

(a) If to the Customer:                          As set forth in the accompanying Futures Account Application.
(b) If to GSEC:                                  Goldman Sachs Execution & Clearing, L.P.
                                                 Attention: Compliance Department
                                                 30 Hudson Street
                                                 Jersey City, NJ 07302
                                                 Telecopy:      (917) 343-3293
                                                 Telephone:     (212) 357-0517

or to such other address as Customer or GSEC herewith shall specify to the other in writing.

### 9. CONFIRMATION CONCLUSIVE;

Confirmation of trades, statements of account, and any other notices sent to Customer shall be conclusive and binding on Customer unless Customer notifies GSEC to the contrary (i) in the case of an oral report, at the time received by Customer or his agent or (ii) in the case of a written report, prior to opening of trading on the business day next following receipt of the report. In addition, if within three business days after Customer has placed an order to buy or sell a commodity interest, and has been informed or believes that such order has been or should have been executed, but has not received a written confirmation thereof, Customer shall immediately communicate by telephone such fact to GSEC and further shall immediately send written notification of such fact, and the details thereof, to GSEC by hand delivery, telex, telefax or telegram. Failing in this regard, Customer shall conclusively be deemed estopped to object and to have waived any such objection to the failure to execute or cause to be executed any transaction for any account of Customer. Nothing in this Section 9 withstanding, neither Customer nor GSEC shall be bound by any transaction or price reported in error.

### 10. SECURITY INTEREST;

Customer hereby grants to GSEC a continuing lien, as security for the performance of its obligations to GSEC, upon all monies, securities, financial instruments, futures contracts, precious metals and other property, including, but not limited to, any credit balance (collectively, "property"), now or at any future time in Customer's account with or held for Customer by GSEC, by any GSEC affiliate or subsidiary or by any clearing futures commission merchant or organization through which trades of such Customer are executed by or on behalf of GSEC and any income and proceeds of any property. Any property may at any time or from time to time without notice or compliance with any condition precedent (which is hereby expressly waived) be set off, appropriated and applied by GSEC against any and all such obligations, including, but not limited to, any deficit balance in Customer's account, in such manner as GSEC in its discretion may determine.

### 11. TRANSFER OF FUNDS;

GSEC may at any time, and from time to time, without prior notice to Customer, transfer from one account to another account carried by GSEC in which Customer has any interest, such excess funds, equities, securities or other property as in GSEC's judgment may be required for margin, or to reduce any debit balance or to reduce or satisfy any deficits in such other accounts except that no such transfer may be made from an account subject to the Commodity Exchange Act to another account maintained by Customer unless either Customer has authorized such transfer in writing or GSEC is effecting such transfer to enforce GSEC's lien pursuant to Section 10. Notice of each transfer made pursuant hereto shall be promptly given in writing to Customer.

### 12. LIQUIDATION OF CUSTOMER POSITIONS - If;

(a) GSEC is directed or required by a regulatory or self-regulatory body or exchange on or subject to the rules of which commodity interests are traded for Customer;
(b) GSEC considers it necessary for its protection because of margin requirements or otherwise;
(c) Customer repudiates, violates, breaches or fails to perform on a timely basis any term, covenant or condition on its part to be performed under this Agreement;
(d) Customer dies or becomes incompetent or mentally disabled;
(e) a case in bankruptcy is commenced or a proceeding under any insolvency or other law for the protection of creditors or for the appointment of a receiver, liquidator, trustee, conservator, custodian or similar officer is filed by or against Customer or any affiliate of

(f)    Customer, or any affiliate of Customer makes or proposes to make any arrangement or composition for the benefit of its creditors, or Customer (or any such affiliate) or any or all of its property is subject to any agreement, order, judgment or decree providing for Customer's dissolution, winding-up, liquidation, merger, consolidation, reorganization or for the appointment of a receiver, liquidator, trustee, conservator, custodian or similar officer of Customer, such affiliate or such property; or if an attachment or similar order is levied against an account or any other account maintained by Customer or any affiliate of Customer with GSEC;

then GSEC shall have the right to (i) satisfy any obligations (either directly or by way of guaranty or suretyship) due GSEC out of any Customer's property in GSEC's custody or control, (ii) liquidate any or all of Customer's commodity interest positions, (iii) cancel any or all of Customer's outstanding orders, (iv) treat any or all of Customer's obligations due GSEC as immediately due and payable, (v) sell any or all of Customer's property in GSEC's custody or control in such manner as GSEC determines to be commercially reasonable, and/or (vi) terminate any or all of GSEC's obligations for future performance to Customer, in each and every such case without any notice of default, demand for margin or additional margin, notice to Customer of sale or purchase, or other notice or advertisement and whether or not the ownership interest shall be solely Customer's or held jointly with others, it is understood that, in all cases, a prior demand, call or notice of the time or place of sale or purchase shall not be considered a waiver of GSEC's right to sell or buy without demand or notice as herein provided, that Customer shall at all times be liable for the payment of any debit balance owing in each account upon demand whether occurring upon a liquidation as provided under this Section 12 or otherwise under this Agreement, and that in all cases Customer shall be liable for any deficiency remaining in each account in the event of liquidation thereof in whole or in part together with interest thereon and all costs relating to liquidation and collection (including reasonable attorneys' fees).

### 13. CUSTOMER REPRESENTATIONS, WARRANTIES AND AGREEMENTS;

Customer represents and warrants to and agrees with GSEC that:

(a)    Customer has full power and authority to enter into this Agreement and to engage in the transactions and perform its obligations hereunder and contemplated hereby and (i) if a corporation or a limited liability company, is duly organized under the laws of the jurisdiction set forth in the accompanying Futures Account Application, or (ii) if a partnership, is duly organized pursuant to a written partnership agreement and the general partner executing this Agreement is duly authorized to do so under the partnership agreement, and (iii) the execution, delivery and performance of this Agreement by Customer require no action by or in respect of or filing with any governmental body, agency or official;

(b)    neither Customer nor any partner, director, officer, member, manager or employee of Customer nor any affiliate of Customer is a partner, officer, director, member, manager or employee of a futures commission merchant, introducing broker, exchange or self-regulatory authority or an employee or commissioner of the Commodity Futures Trading Commission ("CFTC"), except as previously disclosed in writing to GSEC;

(c)    except as disclosed in writing to GSEC, Customer is acting solely as principal and no one other than Customer has any interest in any account of Customer;

(d)    all information contained in the accompanying Futures Account Application or otherwise provided in writing by or on behalf of Customer to GSEC in connection with the opening of the account is true, complete and correct and GSEC may cause an investigation to be made concerning Customer's credit standing and reputation;

(e)    Customer has determined that trading in commodity interests is appropriate for Customer, is prudent in all respects and does not and will not violate Customer's charter or by-laws (or other comparable governing document) or any law, rule, regulation, judgment, decree, order or agreement to which Customer or its property is subject or bound;

(f)    Customer recognizes that representations or guarantees of profit or freedom from loss are impossible in trading commodity interests and acknowledges that it has received no such guarantees from or on behalf of GSEC, and has not entered into this Agreement and shall place no order hereunder in consideration of or in reliance upon any such guarantee or representation;

(g)    GSEC, for and on behalf of Customer, is authorized and directed in its sole discretion to select floor brokers and, on markets where GSEC is not a clearing member, clearing brokers which will act as Customer's broker and agent in the execution, clearing and/or carrying of transactions for Customer, which brokers may be affiliates of GSEC or may be non-affiliated agents, and GSEC shall be responsible only for using good faith and reasonable care in the initial selection of such brokers;

(h)    Unless GSEC is a party to a written give-up agreement, GSEC in its sole discretion, may, but shall not be obligated to, accept from other brokers contracts executed by such brokers on an exchange or market for Customer and proposed to be "given-up" to GSEC for clearance and/or carrying in the account;

(i)    if Customer is subject to the Financial Institutions Reform, Recovery and Enforcement Act of 1989, the certified resolutions set forth following this Agreement have been caused to be reflected in the minutes of Customer's board of directors (or other comparable governing body) and this Agreement is and shall be, continuously from the date hereof, an official record of Customer;

(j)    Customer consents to the electronic recording, at GSEC's sole discretion, of any or all telephone conversations with GSEC (without automatic tone warning device), the use of same as evidence by either party in any action or proceeding arising out of the Agreement and in GSEC erasure, at its sole discretion, of any recording as part of its regular procedure for handling of recordings;

(k)    Customer shall furnish such financial statements to GSEC as GSEC reasonably requests from time to time;

(l)    Customer promptly will notify GSEC if Customer opens an account with an FCM not named in the New Account Form and Customer agrees that GSEC may disclose information concerning the account to any other FCM with which Customer maintains an account and that any such FCM may disclose to GSEC any information requested by GSEC concerning Customer's business with such other FCM;

(m)    Customer shall furnish a certificate of all persons who are authorized to furnish instructions to GSEC hereunder and GSEC shall be fully protected in relying upon any instructions whether oral or written received from any such person without any duty to make inquiry as to the genuineness of the instructions and, further, GSEC shall also be entitled to rely on instructions received from any person identifying himself or holding himself out as or stating that he is such a person, regardless of whether said instructions are actually given by such a person and, finally, GSEC's determination of the contents of any oral instructions shall be conclusive and binding on Customer;

(n)    GSEC shall have no responsibility for compliance by Customer with any law or regulation governing Customer's conduct.

(o)    GSEC, for and on behalf of Customer, is authorized and empowered to place orders for commodity interest transactions through one or more electronic or automated trading systems (each a "system") maintained or operated by or under the auspices of an exchange and that GSEC shall not be liable or obligated to Customer for any loss, damage, liability, cost or expense (including but not limited loss or profits, loss of use or incidental or consequential damages) incurred or sustained by Customer and arising in whole or in part, directly or indirectly, from any fault delay, omission, inaccuracy or termination of a system or GSEC's inability to enter, cancel or modify an order on behalf of Customer on or through a system; and

(p)    Customer (i) is aware that CFTC Regulation § 1.35(a-2) (2) requires Customer to create, retain and produce upon the request of the CFTC, the United States Department of Justice and the applicable exchange documentation of cash transactions underlying exchanges of futures for cash commodities or exchanges of futures in connection with cash commodity transactions.

Customer shall promptly notify GSEC in writing if any of the warranties or representations contained in this Section 13 or if any information contained in the accompanying New Account Application or otherwise provided by or on behalf of Customer to GSEC becomes inaccurate or in any way cease to be true, complete and correct.

### 14. CONTRACT TERMS AND CONDITIONS;

The Customer acknowledges responsibility for acquainting itself with the material terms and conditions of any futures or options contracts which may be traded in the account. The Customer should consult with the relevant exchange or GSEC concerning these terms and conditions, particularly the

exercise, expiration and related contract provisions which may be subject to exception or modification by the rules or procedures of the exchange or GSEC.

**15. INDEMNIFICATION OF GSEC;**
Customer hereby agrees to indemnify, defend and hold harmless GSEC and its partners, directors, officers, employees and agents from and against any loss, cost, claim, damage (including any consequential cost, loss or damage), liability or expense (including reasonable attorneys' fees) and any fine, sanction or penalty made or imposed by any regulatory or self-regulatory authority or any exchange as the direct or indirect result of:

(a)   Customer's failure or refusal to comply with any provision of this Agreement or perform any obligation on its part to be performed pursuant to this Agreement;

(b)   Customer's failure or refusal to deliver any security, commodity or other property previously sold, or subject to any call option sold, by GSEC for the account; or

(c)   Any decline in value, for whatever reason, of any security or commodity of which GSEC takes delivery for the account.

**16. MODIFICATION OF AGREEMENT;**
This Agreement may only be altered, modified or amended by written agreement of the parties, except that if GSEC notifies Customer of any amendment to this Agreement and Customer continues to retain or thereafter places trades in accounts subject to this Agreement, Customer agrees that such action or inaction by Customer will constitute consent by Customer to such amendment. No employee of GSEC has any authority to alter, modify, or amend in any respect any of the terms of this Agreement and no supplemental or special understanding shall be binding upon GSEC unless one of GSEC's duly authorized officers shall have agreed thereto in writing. The rights and remedies conferred upon GSEC shall be cumulative, and its forbearance to take any remedial action available to it under this Agreement shall not waive its right at any time or from time to time thereafter to take such action.

**17. SUCCESSORS AND ASSIGNS;**
This Agreement shall inure to the benefit of GSEC, its successors and assigns, and shall be binding upon Customer and Customer's executors, trustees, administrators, successors and assigns, provided, however, that this Agreement shall not be assignable by Customer without the written consent of GSEC, without which consent any purported assignment shall be void.

**18. SEVERABILITY;**
If any term or provision hereof or the application thereof to any persons or circumstances shall to any extent be contrary to any exchange, government or self-regulatory regulation or contrary to any federal, state or local law or otherwise be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is contrary, invalid or unenforceable, shall not be affected thereby.

**19. CAPTIONS;**
All captions used herein are for convenience only, are not a part of this Agreement, and are not to be used in construing or interpreting any aspect of this Agreement.

**20. TERMINATION;**
This Agreement shall continue in force until written notice of termination is given by Customer or GSEC. Termination shall not relieve either party of any liability or obligation incurred prior to such notice. Customer, upon giving or receiving notice of termination, promptly will take all action necessary to transfer all open positions in each account to another futures commission merchant.

**21. ENTIRE AGREEMENT;**
This Agreement constitutes the entire agreement between Customer and GSEC with respect to the subject matter hereof and supersedes any prior agreements between the parties with respect to such subject matter.

**22. APPLICABLE RULES AND REGULATIONS;**
The account and each transaction therein shall be subject to the terms of this Agreement and to (a) all applicable laws, the regulations, rules and orders of all regulatory and self-regulatory organizations having jurisdiction (collectively "regulations"), and (b) the constitution, by-laws, rules, regulations, orders, resolutions, interpretations and customs and usage's (collectively "rules") of the contract market, board of trade, other market and any associated clearing organization (each an "exchange"), if any, on or subject to the rules of which such transaction is executed and/or cleared and neither GSEC, or any of its partners, directors, employees, officers or agents shall be liable to Customer for any action taken in compliance with applicable regulations or exchange rules. The reference in the preceding sentence to applicable regulations and exchange rules is solely for the protection of GSEC and GSEC's failure to comply therewith shall not constitute a breach of this Agreement or relieve Customer of any obligation or responsibility under this Agreement.

**23. GOVERNING LAW; CONSENT TO JURISDICTION;**
In case of a dispute between Customer and GSEC arising out of or relating to the making or performance of this Agreement or any transaction pursuant to this Agreement, (a) this Agreement and its enforcement shall be governed by the laws of the State of New York, without regard to principles of conflicts of law, and (b) if Customer has not signed the Arbitration Agreement set forth below or if such Arbitration Agreement is otherwise invalid or unenforceable, Customer will bring any legal proceeding Customer may initiate against GSEC in, and Customer hereby consents in any legal proceeding by GSEC to the jurisdiction of, any local, state or federal court located within the State and City of New York in connection with all legal proceedings arising directly, indirectly or otherwise in connection with, out of, related to or from Customers account(s), transactions contemplated by this Agreement or breach thereof. Customer hereby waives any and all objections Customer may, at any time, have as to the propriety of the court in which any such legal proceedings may be commenced. Customer also agrees that any service of process mailed to Customer at any address specified to GSEC shall be deemed a proper service of process on Customer. In any event, Customer agrees that if any dispute or controversy between Customer and GSEC involves or includes securities transactions which are directly or indirectly incidental to or related to any transactions in which are the subject of a dispute or controversy arising under this Agreement, then both such disputes or controversies shall be heard and determined in the same forum.

If customer signs the Arbitration Agreement set forth below, then Customer agrees that any question relating to whether Customer or GSEC has commenced an arbitration proceeding in a timely manner, whether a dispute is subject to the Arbitration Agreement or whether a party (other than Customer or GSEC) has consented to arbitration and all proceedings to compel arbitration and to confirm or set aside an arbitration award shall be determined by a court as specified in Section 23(b).

**24. AUTHORIZATION TO TRANSFER FUNDS; (OPTIONAL)**
GSEC is hereby authorized, at any time without prior notice to customer, to transfer from the Customer's regulated commodity account(s) to any other account the customer maintains with GSEC such amount of excess funds which in GSEC's judgment may be reasonably required to avoid margin calls or to reduce a debit balance in such other accounts. It is understood that GSEC will, within a reasonable time thereafter, confirm in writing to the Customer any such transfer.

"Regulated Commodity Account" means any account in which occur transactions in commodity futures or related options within the jurisdiction of the Commodity Exchange Act at the time of the transaction.

**25. AUTHORIZATION TO CROSS TRANSACTIONS; (OPTIONAL)**
Without prior notice to the Customer, the customer authorizes GSEC, any subsidiary or affiliate of GSEC, and their partners, directors, officers, employees, agents, and any floor broker acting on Customer's behalf in any transaction for the account, to take the other side of Customer's transaction through any account of such person subject to its being executed at prevailing prices in accordance with the Commodity Exchange Act and the rules and regulations promulgated thereunder, and applicable exchange rules.

**26. SUBORDINATION AGREEMENT; (applies only to accounts with funds held in foreign countries)**
Funds of customers trading on United States contract markets may be held in accounts denominated in a foreign currency with depositories located outside the United States or its territories if the customer is domiciled in a foreign country or if the funds are held in connection with contracts priced and settled in a foreign currency. Such accounts are subject to the risk that events could occur which hinder or prevent the availability of these funds for distribution to customers. Such accounts also may be subject to foreign currency exchange rate risks.

If authorized below, Customer authorizes the deposit of funds into such foreign depositories. For customers domiciled in the United States, this authorization permits the holding of funds in regulated accounts offshore only if such funds are used to margin, guarantee, or secure positions in such contracts or accrue as a result of such positions. In order to avoid the possible dilution of other customer funds, a customer who has funds held outside the United States agrees by accepting this subordination agreement that his claims based on such funds will be subordinated as described below in the unlikely event both of the following conditions are met: (1) the customer's futures commission merchant is placed in receivership or bankruptcy, and (2) there are insufficient funds available for distribution denominated in the foreign currency as to which the customer has a claim to satisfy all claims against those funds.

By signing the Subordination Agreement below, Customer agrees that if both of the conditions listed above occur, Customer's claim against GSEC's assets attributable to funds held overseas in a particular foreign currency may be satisfied out of segregated customers funds held in accounts denominated in dollars or other foreign currencies only after each customer whose funds are held in dollars or in such other foreign currencies receives its pro-rata portion of such funds. It is further agreed that in no event may a customer whose funds are held overseas receive more than its pro-rata share of aggregate pool consisting of funds held in dollars, funds held in a particular foreign currency, and non segregated assets of GSEC.

**27. ARBITRATION AGREEMENT; (OPTIONAL)**
Any controversy arising out of or relating to my account, to transactions with GSEC pursuant to the Customer Futures and Options Agreement between us or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the National Futures Association, or the contract market upon which the transaction giving rise to the claim was executed or the New York Stock Exchange, Inc. If I do not make such election either at the time I notify GSEC that I intend to commence an arbitration or, if GSEC notifies me that GSEC intends to commence an arbitration, by registered mail addressed to you at your main office within forty-five days after demand by you that I make such election, then GSEC may make such election. GSEC agrees to pay any incremental fees which may be assessed by the forum chosen by me for the provision of a "mixed panel" of arbitrators, unless the arbitrators determine that I have acted in bad faith in initiating or conducting the proceedings. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES: CIVIL COURT LITIGATION, REPARATIONS AT THE COMMODITY FUTURES TRADING COMMISSION (CFTC) AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANIZATION.

THE CFTC RECOGNIZES THAT THE OPPORTUNITY TO SETTLE DISPUTES BY ARBITRATION MAY IN SOME CASES PROVIDE MANY BENEFITS TO CUSTOMERS, INCLUDING THE ABILITY TO OBTAIN AN EXPEDITIOUS AND FINAL RESOLUTION OF DISPUTES WITHOUT INCURRING SUBSTANTIAL COSTS. THE CFTC REQUIRES, HOWEVER, THAT EACH CUSTOMER INDIVIDUALLY EXAMINE THE RELATIVE MERITS OF ARBITRATION AND THAT YOUR CONSENT TO THIS ARBITRATION AGREEMENT BE VOLUNTARY.

BY SIGNING THIS AGREEMENT, YOU (1) MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW; AND (2) ARE AGREEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS WHICH YOU OR GSEC MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT. YOU ARE NOT, HOWEVER, WAIVING YOUR RIGHT TO ELECT INSTEAD TO PETITION THE CFTC TO INSTITUTE REPARATIONS PROCEEDINGS UNDER SECTION 14 OF THE COMMODITY EXCHANGE ACT WITH RESPECT TO ANY DISPUTE WHICH MAY BE ARBITRATED PURSUANT TO THIS AGREEMENT. IN THE EVENT A DISPUTE ARISES, YOU WILL BE NOTIFIED IF GSEC INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU BELIEVE A VIOLATION OF THE COMMODITY EXCHANGE ACT IS INVOLVED AND IF YOU PREFER TO REQUEST A SECTION 14 "REPARATION" PROCEEDING BEFORE THE CFTC, YOU WILL HAVE 45 DAYS FROM THE DATE OF SUCH NOTICE IN WHICH TO MAKE THAT ELECTION. YOU NEED NOT SIGN THIS AGREEMENT TO OPEN AN ACCOUNT WITH GSEC.

**OPTIONAL ELECTIONS-**
The following provisions, which are set forth in this agreement, need not be entered into to open an account with GSEC. Customer agrees that its optional elections are as follows:

**AUTHORIZATION TO TRANSFER FUNDS:**
(Agreement Section 24)                                    Signature Required for Election

**CONSENT TO CROSS TRANSACTIONS:**
(Agreement Section 25)                                    Signature Required for Election

**ARBITRATION AGREEMENT:**
(Agreement Section 27)                                    Signature Required for Election

**ACKNOWLEDGMENT OF SUBORDINATION AGREEMENT**
(Agreement Section 26)                                    Required for accounts holding non U.S. currency

**HEDGE ELECTION:   "Please initial if applicable"**

Customer confirms that all transactions in the account will represent bona fide hedging transactions, as defined by the CFTC, unless, at the time we place an order, we notify GSEC otherwise.

Pursuant to CFTC Regulation 190.06(d), Customer specifies and agrees, with respect to hedging transactions in the account, that in the unlikely event of GSEC's bankruptcy, it prefers that the bankruptcy trustee (check appropriate box):

A.      Liquidate all open contracts without first seeking instructions either from or on behalf of Customer.

B.      Attempt to obtain instructions with respect to the disposition of all open contracts.

        (If neither A or B is checked, Customer shall be deemed to elect A)

**ACKNOWLEDGMENT OF RECEIPT OF RISK DISCLOSURE STATEMENTS.**

The undersigned each hereby acknowledges its separate receipt from GSEC and its understanding of each of the following documents prior to the opening of the account:

- CFTC Regulation 1.55, 1.37 and 1.90.10 Risk Disclosure Statement for Futures and Options
- NYMEX ACCESS Disclosure statement
- Globex Customer Information
- CBOT Project Disclosure Statement
- CME Average Pricing System Disclosure Statement
- Special Notice to Foreign Brokers and Foreign Traders

*The Independent fund Limited*
*George Szele, Director*
**CUSTOMER NAME(S)**

*George Szele*                          **8/25/05**
**AUTHORIZED SIGNATURE(S)**              **DATE**

*Director*
**TITLE**

# Exhibit 5

October 19, 2004

AGREEMENT between

**Mr. Daniel Zanger ("DZ")**
4872 Topanga Canyon Blvd
PMB #401
Woodland Hills, CA 91364

And,

**Independent Asset Management, LLC ("IAM")**
Att: George Szele
Managing Director
177 Broad Street, Suite 1051
Stamford, CT 06901

This document shall constitute a binding agreement (the "Agreement") between Independent Asset Management, LLC ("IAM") currently located at 177 Broad Street, Suite 1051, Stamford, CT 06901 USA, and Mr. Daniel Zanger ("DZ"), located at 4872 Topanga Canyon Blvd, PMB #401, Woodland Hills, CA 91364, whereby the parties agree to the following terms and conditions.

Whereas, IAM is the trading manager of an existing Bermuda based offshore Fund, the Independent Fund Limited ("IFL"), and IAM and DZ desire to have DZ manage a specific Class of Share of IFL, in this case Class Z shares (called "Class Z shares") which IAM is willing and immediately able to provide through its Fund IFL, and

Whereas, IAM has spent considerable time, money and other resources over the past few years, to develop, establish and promote alternative investment strategies and vehicles, including IFL, primarily in the offshore domain, and

Whereas, IAM and DZ may introduce assets or may wish to raise assets for either DZ's, IAM's or other managers' strategies within IFL or its product(s) by introducing investors directly or indirectly, and

Whereas, it is understood by IAM that DZ wishes to arrange for the investment and transfer of at least USD 5 million and up to 50 million into an existing vehicle such as IFL in order to commence management and trading of DZ's methodology, and

IAM/DZ Agreement          CONFIDENTIAL                    Page - 2 -

Whereas, the Agreement contemplates that IAM and DZ will work together to efficiently manage this Agreement for which each of the parties herein will be entitled to receive certain types of Fees as outlined herein.

It is therefore further agreed by IAM and DZ as follows:

1.  Commencing from the date of execution hereof and continuing until the termination or expiration as provided for herein, IAM grants DZ the right to manage Class Z shares within IFL upon the transfer and IFL's receipt of at least USD 5 million and up to 50 million into said Class Z shares. Throughout this Agreement, DZ hereby guarantees and promises to stay within the management boundaries of IFL's risk limits and parameters as outlined in the IFL offering memorandum and also agrees to the following points:

   a. Leverage shall be limited to 4 to 1 initially but may be promptly modified as performance results are monitored and as Prime Broker and IAM feel comfortable with strategy.
   b. Liquidity is important under any market condition - if illiquidity exists, IAM shall be promptly notified by DZ.
   c. If any amounts are redeemed within one year, 2% of such amounts shall be forfeited to IAM.
   d. Full disclosure of positions will be necessary at all times.
   e. DZ shall remain in full compliance at all times with Prime Broker limits, rules or guidelines.
   f. DZ must remain transparent and compliant on all levels at all times to IFL and IAM.
   g. If DZ is not able to keep drawdowns below 20%, this Agreement may be terminated by IAM.

2.  DZ agrees that IAM and DZ will share percentages of all Management and Performance Fees received by IAM as a result of DZ's management of Class Z shares as follows:

   i)  IAM will be allocated 50% of the 2% Management Fee (or 1 of the 2%) and 25% of the 20% Performance Fee (or 5 of the 20%), on the capital managed by DZ in Class Z shares. The remaining percentages (1 and 15) shall be allocated to DZ.
Payments shall be paid to DZ and IAM within twenty (20) business days of IAM's receipt of such fees from IFL. IAM may share its fees with any IAM contacts or business associates.

   ii)  DZ shall place USD 100 thousand with IAM immediately for working capital needs, in exchange for EITHER a) IAM waiving its share of the Management Fee for 18 months on USD 10 million in Class Z shares OR b) IAM agreeing to return the entire 100 thousand to DZ first before taking any portion of any Fees as described herein.

3.  It is understood and agreed by IAM that DZ currently trades and intends to continue trading his personal account as well as any existing relationships of DZ.

4.  It is understood by all parties that DZ will be the sole manager on assets it has brought in for Class Z and IAM has no intention to replace or terminate DZ from the management of Class Z shares so long as DZ remains within the guidelines outlined herein and is not in breach. If for some reason IAM needs to terminate this Agreement and/or DZ as manager, DZ is free to redeem or remove all capital it has raised or brought into Class Z shares for the purposes of DZ's management program, within the terms and guidelines of this Agreement. IAM acknowledges that DZ has control of - redeeming from or remaining in IFL - the assets it has placed or raised into Class Z, under the terms and guidelines of this Agreement.

IAM/DZ Agreement          CONFIDENTIAL                 Page - 3 -

5.  It is agreed by IAM and DZ that they will disclose to each other and to IFL, in strict confidentiality, all the names and specifics of entities invested or desiring to invest in Class Z shares of IFL, in order to avoid potential problems of money laundering and such.  It is also understood by all parties that all investors or potential investors shall be thoroughly scrutinized by IAM and IFL's Administrator, Citigroup.

6.  It is understood by IAM that higher leverage is perhaps desirable and appropriate for DZ and IAM will make every effort to quickly allow higher leverage limits either through IFL or through IAM's BVI offshore Fund.                                                                          *lock up*

7.  The term of this Agreement shall commence on the date of execution hereof and shall continue for a period of five (5) years from such date, and shall be automatically renewed for successive five (5) year periods, unless written notice to the contrary is given by either party to the other not less than sixty (60) days prior to the end of such period.  However, this Agreement may be terminated sooner by written notice, at the option of IAM or DZ, if the other party breaches this Agreement by failure to perform any obligation assumed by it under this Agreement or violated any provision of this Agreement and such failure and/or violation remains uncorrected for thirty (30) days or more after receipt of written notice of same from the non-breaching party.

8.  If this Agreement expires or is terminated for any reason, and DZ continues to manage the Fund(s) or any other client trading account opened due to IAM or IAM contacts' efforts during or after the term of this Agreement, then IAM shall continue to receive the Management and Performance Fees received by DZ as described herein for as long as DZ manages those Fund(s) or accounts.

9.  Neither party will hold, or attempt to hold, the other party liable for any damages or losses suffered as a result of the other party's conduct as contemplated hereunder, except to the extent that such conduct constitutes willful malfeasance, fraud, theft, or gross negligence. In particular, but without affecting the generality of the preceding, IAM will not hold DZ liable for any trading losses in its accounts, unless due to fraud, theft, or gross negligence of DZ.

10.  Neither IAM nor DZ shall divulge the contents of this Agreement to any third party except for their respective attorneys, authorized regulatory authorities or unless required to do so by a court of competent jurisdiction or by law.

11.  IAM and DZ each warrant and represent that they have the right, power and authority to enter into this Agreement and to grant all rights granted and that they are not under any disability, restriction or prohibition whether contractual or otherwise with respect to the rights granted or which would interfere with or derogate from the full enjoyment of all the rights granted to the other party.

12.  Failure of any party hereto to insist upon strict compliance with any of the terms, covenants and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provisions herein.

13.  IAM and DZ each agree to stay in compliance with all U.S. federal, state and local laws, as well as any applicable rules and regulations of Bermuda or Internationally, and of the CFTC and NFA, and IAM and DZ further agree to comply with all rules and regulations of any exchanges on which they trade.

14. IAM and DZ agree to conform with all reasonable requests of the other with respect to this Agreement and operations relating thereto, including requests to see financial and performance records, and to sign and promptly deliver all documents reasonably intended to effectuate the terms set forth herein and as may be required. Non-compliance with any reasonable request shall be considered a breach of this Agreement.

15. No party shall hold itself out contrary to the terms of this Agreement and no party shall become liable for any obligation, act or omission of the other party contrary to the provisions of this Agreement.

16. All notices to be given to the parties shall be sent to the addresses set forth above or to such other addresses as either party may designate in writing to the other. All notices shall be delivered by hand or registered or certified mail, return receipt requested, and the date of delivery shall be deemed the date of giving notice therefore.

17. The covenants and provisions in this Agreement which, by their terms, require their performance by any party after the expiration or other termination of this Agreement, shall be enforceable notwithstanding said expiration or other termination this Agreement for any reason whatsoever.

18. Any dispute, controversy or claim arising out of or in connection with this Agreement or the breach, termination or invalidity thereof, shall be settled by arbitration in New York in accordance with its rules as in force at the time when initiating such arbitration.

19. This Agreement shall be construed in accordance with the laws of the state of New York. If any terms or provisions herein or its application thereof to any person, entity or circumstance shall be held contrary to law or otherwise invalid or unenforceable, the remaining terms and provisions of this Agreement or its application thereof to persons, entities or circumstances shall not be effected and shall be fully enforceable as permitted by regulation or law.

20. This Agreement comprises the entire understanding between the parties and supercedes all other oral or written agreements.


If the foregoing correctly states the understanding and agreement as to the terms and conditions stated herein, each party should indicate its acceptance by signing in the space provided for below. Each party shall receive an executed copy of this Agreement. This document shall not constitute an offer or an agreement until agreed, accepted and signed by IAM and DZ.


Agreed and Accepted:                          Agreed and Accepted:
Mr. Daniel Zanger                             Independent Asset Management, LLC

By:_____                  By:_____
Dan Zanger                                    George Szele
                                              Managing Director

OCT-19-2004 TUE 12:01 PM SOFITEL NEW YORK
OCT-18-2004  15:49                    SEA CARRIERS CORP.            FAX NO. 212 782 3004          P. 01
                                                                                      2336510587   P. 05

IAM/DZ Agreement                   CONFIDENTIAL                              Page - 4 -

14. IAM and DZ agree to conform with all reasonable requests of the other with respect to this Agreement and operations relating thereto, including requests to sue financial and performance records, and to sign and promptly deliver all documents reasonably intended to effectuate the terms set forth herein and as may be required. Non-compliance with any reasonable request shall be considered a breach of this Agreement.

15. No party shall hold itself out contrary to the terms of this Agreement and no party shall become liable for any obligation, act or omission of the other party contrary to the provisions of this Agreement.

16. All notices to be given to the parties shall be sent to the addresses set forth above or to such other addresses as either party may designate in writing to the other. All notices shall be delivered by hand or registered or certified mail, return receipt requested, and the date of delivery shall be deemed the date of giving notice therefore.

17. The covenants and provisions in this Agreement which, by their terms, require their performance by any party after the expiration or other termination of this Agreement shall be enforceable notwithstanding said expiration or other termination th s Agreement for any reason whatsoever.

18. Any dispute, controversy or claim arising out of or in connection with this Agreement or the breach, termination or invalidity thereof, shall be settled by arbitration in New York in accordance with its rules as in force at the time when initiating such arbitration.

19. This Agreement shall be construed in accordance with the laws of the state of New York. If any terms or provisions herein or its application thereof to any person, entity or circumstance shall be held contrary to law or otherwise invalid or unenforceable, the remaining terms and provisions of this Agreement or its application thereof to persons, entities or circumstances shall not be affected and shall be fully enforceable as permitted by regulation or law.

20. This Agreement comprises the entire understanding between the parties and supersedes all other oral or written agreements.

If the foregoing correctly states the understanding and agreement as to the terms and conditions stated herein, each party should indicate its acceptance by signing in the space provided for below. Each party shall receive an executed copy of this Agreement. This document shall not constitute an offer or an agreement until agreed, accepted and signed by IAM and DZ.

Agreed and Accepted:                          Agreed and Accepted:
Mr. Daniel Zanger                             Independent Asset Management, LLC

By: _____                           By: _____
Dan Zanger                                    George Szele
10-20-04                                      Managing Director

                                                          TOTAL P.05