UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

INDEPENDENT ASSET MANAGEMENT ) No. 07-cv-06431-JSR
LLC and OLA HOLMSTROM, )
                                Plaintiff, ) ECF
 
-against- )
 
DANIEL ZANGER, )
                              Defendant. )

---------------------------------------------------------x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS THE AMENDED COMPLAINT**

JONES DAY
222 East 41st Street
New York, NY 10017

*Attorneys for Defendant Daniel Zanger*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................... 1
ARGUMENT .................................................................................................................................. 3

    I.    PLAINTIFF IAM HAS NOT STATED A CLAIM FOR BREACH OF CONTRACT, AS IAM DOES NOT "PLAUSIBLY" ALLEGE GROSS NEGLIGENCE BY DEFENDANT, AND DEFENDANT'S ACTIONS WERE NOT "PLAUSIBLY" TIED TO ANY ALLEGED DAMAGES OF IAM .................................................................................................................................. 3

        A.    Although The 115 Margin Calls Alleged By Plaintiff IAM Are Patently And Facially *Not* Violations And Not Breaches of The Agreement, IAM Bases Its Allegation Of Gross Negligence On The *Number* Of Alleged Breaches By Defendant, And Thus Fails To State A Claim For The Breach Of This Contract ................................. 3

            1.    Plaintiff IAM Must Meet A Strict Burden To Demonstrate "Gross Negligence" ................................................................................... 3

            2.    The Alleged "Pattern" of Margin Violations Prior to November 2006 Were Not In Fact Violations At All ..................... 4

            3.    The Two Day Trading Calls On November 9, 2006 And November 30, 2006 Did Not Constitute Gross Negligence And Did Not Impact Any Right of Plaintiff IAM Or Cause Any Legally Cognizable Damages to Plaintiff IAM ..................... 6

            4.    Other Alleged Breaches Either Simply Did Not Occur Or Did Not "Plausibly" Cause Legally Cognizable Damages To Plaintiff IAM ............................................................................ 7

    II.    PLAINTIFF IAM DOES NOT ADDRESS MOTION TO DISMISS COUNT II, BREACH OF FIDUCIARY DUTY (BROUGHT BY IAM), AND THEREFORE THIS COUNT SHOULD ALSO BE DISMISSED ............. 8

    III.    PLAINTIFF HOLMSTROM DOES NOT ADEQUATELY STATE A CLAIM, AND IN ANY EVENT HIS CLAIMS ARE DERIVATIVE CLAIMS THAT HE DOES NOT HAVE STANDING TO ASSERT .................. 9

    IV.    THIS COURT MUST DENY LEAVE TO REPLEAD ...................................... 10

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Amron v. Morgan Stanley Investment Advisors, Inc.*,
 464 F.3d 338, 345-46 (2d Cir. 2006) ..................................................................................10

*Bell Atlantic Corp. v. Twombly*,
 127 S.Ct. 1955, 1965-70 (2007)..........................................................................................2, 6

*Berry v. Souza*,
 564 F.2d 1347, 1349 (9th Cir. 1977) ...................................................................................5

*Hong Kong Export Credit Insurance Corp. v. Dun & Bradstreet*,
 414 F. Supp. 153, 160 (D.C.N.Y. 1975) .........................................................................1, 3, 4

*Nordberg v. Lord, Day & Lord*,
 107 F.R.D. 692, 697-98 (D.C.N.Y. 1985) ...........................................................................10

## STATE CASES

*Cal Distributor Inc. v. Cadbury Schweppes Americas Beverages, Inc.*,
 No. 06-CIV-0496-RMB, 2007 WL 54534 at *9 (S.D.N.Y. Jan. 5. 2007).......................8, 9

*Fesseha v. TD Waterhouse Investor Services, Inc.*,
 747 N.Y.S.2d 676 (N.Y. Sup. Mar. 20, 2002) ....................................................................5

*Ross v. MSG PrivatAir, Inc.*,
 03-CIV-7929-NRB, 2004 WL 1837366 at *3 (S.D.N.Y. Aug. 17, 2004)..........................6

*In re Walt Disney Co. Derivative Lit.*,
 906 A.2d 27, 64-65 (Del. Supr. Jun. 6, 2006)....................................................................4

Defendant Daniel Zanger (the "Defendant") submits this reply memorandum of law in support of his motion to dismiss the Amended Complaint dated October 23, 2007, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff IAM has not adequately pled gross negligence, as required to state a claim for breach of this contract. Under this contract, it was explicitly clear that the recovery of damages would require a high level of wrongful activity. Specifically, gross negligence is "a disregard of the consequences which may ensue from [Defendant's conduct] and indifference to the rights of others," and consists of "the want of even scant care." *See Hong Kong Export Credit Insurance Corp. v. Dun & Bradstreet*, 414 F. Supp. 153, 160 (D.C.N.Y. 1975). In its Amended Complaint, Plaintiff cites the *number* of alleged margin violations as the sole support for its conclusory allegation that Defendant was grossly negligent. *See* Amended Compl. at ¶ 61. Therefore, Plaintiff effectively acknowledges that, by themselves, the allegations of two day trading calls, even if true, would not constitute sufficient support for an allegation of gross negligence.

Specifically, Plaintiff attempts to demonstrate gross negligence by alleging that Defendant was responsible for 115 margin "violations" in addition to two alleged day trading calls in November of 2006. In support of this argument, Plaintiff represented to this Court that Goldman Sachs had confirmed that over 125 violations had taken place.[1] *See* October 4, 2007

---

[1]
```
 5    MR. LANZA:  Well, your Honor, it really would just
 6    require taking a look at the e-mail exchanges from the prime
 7    broker to IFL specifically to Independent Asset Management
 8    saying you are in violation of our rules.  You've done this 125
 9    times, or saying --
10    THE COURT:  Do they say that?
11    MR. LANZA:  They do say that.  There are exchanges
12    from a woman named Giovana Artura who works for Goldman, Sachs
13    who was consistently irate over these margin calls, and they
14    were --
15    THE COURT:  Well, being consistently irate doesn't
16    state a breach of contract.  It may, you know, give her lots of
17    stress, but I understand that's part of being an employee of
```

Hearing Tr. at 6-7. However, despite these promises, Plaintiff has merely supplied a few isolated communications which do not reflect any violations at all.[2] Also, in reality, despite Plaintiff's protestations to the contrary, there is no allegation in the Amended Complaint that the 115 alleged margin violations prior to the two alleged November 2006 day trading margin calls were not covered. In short, there is no competent allegation that these calls constituted margin *violations*. Therefore, there was no multiplicity of alleged breaches by Defendant, which, again, according to Plaintiff's own arguments, must be shown in order to plead gross negligence.

Moreover, there is no competent allegation that Defendant's alleged actions "shut down" the Fund, thereby causing damage to the Plaintiff. Nowhere in its papers does Plaintiff allege any "plausible"[3] causal connection between any action or alleged breach by Defendant (taken as true for the purposes of this Motion) and any alleged damages to the Plaintiff. The sole alleged causal connection between Defendant's alleged actions and any alleged damage to IAM is that because of Defendant's inducement of two day trading calls, IFL was required to trade with the Prime Broker on a cash available basis, and therefore that IFL "was effectively forced to shut down its operations and cease functioning as a hedge fund."[4] First, even if it is taken as true that

---

(continued…)

>     18    Goldman, Sachs anyway. But does she say you violated the
>     19    rules?
>     20    MR. LANZA: Yes, your Honor. *It's our understanding*
>     21    *that she does, and she actually indicates which rules were*
>     22    *violated by these margin calls* (emphasis added).

[2]    For example, Plaintiff introduces an April 10, 2006 email from Gianina Arturo of Goldman Sachs to Defendant and George Szele of IAM, stating "[p]lease advise on the house call that is outstanding for the Independent Fund account. This is the 4th day for the call and we prefer to have all calls met by Day 3." *See* Pl. Opp. Mem., Ex. 3 at 2.

[3]    *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965-70 (2007).

[4]    The allegation states in full that "[b]ecause of [alleged actions by Defendant], the Prime Broker restricted IFL's account to trading on a cash available basis for ninety (90) days or until Defendant's day trading calls were met. Because IFL was highly leveraged and was required by the Prime Broker to trade on a cash available basis, IFL was effectively forced to shut down its operations and cease functioning as a hedge fund." *See* Amended Compl. ¶ 45.

Defendant's actions forced the Fund to trade on a cash available basis, there is no allegation that the Fund could not continue to do business—either with another Prime Broker, on a cash available basis, or through some other vehicle.[5]  Second, as Defendant was permitted to redeem his $5 million investment at any time (*see* Agreement at ¶ 4),[6] Plaintiff had no reasonable expectation to receive Management Fees and Performance Fees based on a permanent minimum AUM (assets under management) of $5 million, or any level of fees for any particular length of time.  In sum, the alleged "shut down" of the Fund is only actionable if Plaintiff had a right to such Management and Performance Fees, and as Defendant could withdraw his funds at any time, Plaintiff did not have a right to, or a reasonable expectation of receiving, such fees.  Thus, there are no legally cognizable damages alleged as a consequence of this alleged "shut down" of the Fund.

I.  **PLAINTIFF IAM HAS NOT STATED A CLAIM FOR BREACH OF CONTRACT, AS IAM DOES NOT "PLAUSIBLY" ALLEGE GROSS NEGLIGENCE BY DEFENDANT, AND DEFENDANT'S ACTIONS WERE NOT "PLAUSIBLY" TIED TO ANY ALLEGED DAMAGES OF IAM**

   A.  **Although The 115 Margin Calls Alleged By Plaintiff IAM Are Patently And Facially *Not* Violations And Not Breaches of The Agreement, IAM Bases Its Allegation Of Gross Negligence On The *Number* Of Alleged Breaches By Defendant, And Thus Fails To State A Claim For The Breach Of This Contract**

      1.  <u>**Plaintiff IAM Must Meet A Strict Burden To Demonstrate "Gross Negligence"**</u>

Under New York law, gross negligence is defined as "a disregard of the consequences which may ensue from [Defendant's conduct] and indifference to the rights of others."  *See Dun*

---

[5]  Plaintiff did not include such an allegation because it would be patently and demonstrably false, as numerous potential Prime Brokers are in business to perform exactly these functions.

[6]  The Agreement states that "[Defendant] is free to redeem or remove all capital [he] has raised or brought into Class Z shares for the purposes of [Defendant's] management program . . . IAM acknowledges that [Defendant] has control of – redeeming from or remaining in IFL – the assets [Defendant] has placed or raised into Class Z, under the terms and guidelines of this Agreement."  (Agreement ¶ 4).

- 3 -

*& Bradstreet*, 414 F. Supp. at 160.  Gross negligence consists of "the want of even scant care." *Id*.  Also, inherent to a breach of a duty of care through gross negligence is "a failure to inform one's self of available material facts."  See *In re Walt Disney Co. Derivative Lit.*, 906 A.2d 27, 64-65 (Del. Supr. Jun. 6, 2006).

In an attempt to meet this strict burden and to paint Defendant's behavior as "grossly negligent," Plaintiff insists that Defendant "engaged in a pattern of reckless trading" (*see* Pl. Opp. Mem. at 15) "without regard or without care" for his alleged duties under the contract.  *Id*. at 16.  However, by merely proffering these conclusory allegations of a "pattern" of alleged malfeasance—which, as demonstrated in previous papers and as argued again, below, do not have any basis in the allegations—Plaintiff has not met its substantial burden of demonstrating "the want of even scant care" (*see Dun & Bradstreet*, 414 F. Supp. at 160).

### 2. The Alleged "Pattern" of Margin Violations Prior to November 2006 Were Not In Fact Violations At All

Plaintiff continues to conflate margin *calls* with margin *violations*.  However, as demonstrated in previous papers, these are very distinct concepts.  The logical inconsistency of Plaintiff's position is best illustrated by the following real-world hypothetical: if Plaintiff is correct, and a simple margin *call* is disallowed by the rules and regulations of the national exchanges, then the purchase of stock on credit would be effectively barred, as substantial decreases in the value of such a security—a normal occurrence in the capital markets *every day*—would often result in a margin violation.  This cannot logically be, and is not the case.  As common sense would dictate, the exchange rules and regulations allow margin deficiencies caused by the normal fluctuations in the value of securities to be repaired within a defined period of time.  *See* Def.'s Mot. to Dismiss at 6-9.

In an attempt to discredit this simple principle of the capital markets, Plaintiff egregiously misstates the holdings of several cases.  According to Plaintiff, *Fesseha v. TD Waterhouse Investor Services, Inc.*, 747 N.Y.S.2d 676 (N.Y. Sup. Mar. 20, 2002) stands for the proposition that "a margin violation occurs when the margin call is issued and there is no right to cover the deficiency."[7]  *See* Pl. Opp. Mem. at 5-6.  However, *Fesseha* merely addresses the *manner* and not the *propriety* of cure, and in no way couches its analysis in terms of a violation.[8]  Thus, far from defeating Defendant's argument, *Fesseha* supports it by illustrating the sound and basic principle that a reasonable time is permitted to cure margin deficiencies that constantly arise in the ordinary operation of the capital markets.  Also, Plaintiff misrepresents the square holding of *Berry v. Souza*.[9]

Plaintiff's reliance on inapposite cases and out-of-context quotations is telling.  Plaintiff is forced to do so in order to "disprove" this patent and simple consequence of the exchange rules and of the operation of the capital markets—that margin *calls* do not constitute margin *violations*.[10]

---

[7] As an initial matter, this statement is internally non-sensical and inconsistent.  It is difficult to fathom a supposed rule of law that would disallow a right (in some form) to cover a deficiency in margin requirements.  The repairing of margin requirements ameliorates what would be a significant vulnerability to the capital markets—stock purchased on margin without sufficient collateral.

[8] *Fesseha* describes the circumstances under which an investor is permitted (even when the contract is silent) to cover a margin deficiency with personal funds as opposed to having the margin deficiency remedied through automatic liquidation of his/her securities by the brokerage—which are both methods to *remedy* or cure margin deficiencies so that a margin *violation* does not in fact occur.

[9] As stated in previous papers, *Berry* states that "the regulation [Regulation T] is violated *only* when whatever margin is required is not tendered by the investor within [the applicable time period; seven business days under current regulations] of the time the stock transactions in question occur."  *See Berry v. Souza*, 564 F.2d 1347, 1349 (9th Cir. 1977)(emphasis added).

[10] Plaintiff claims that "Defendant seems to miss the point altogether" when citing cases and sources that explicate the requirements of Regulation T and NYSE Rule 431, in that "[p]laintiffs do not sue under Regulation T or Rule 431, but for violations of an Agreement which requires Defendant to obey any and all applicable rules of the exchanges which Defendant trades on."  *See* Pl. Opp. Mem. at 7.  First, Plaintiff cites Regulation T and Rule 431 repeatedly in its Amended Complaint—which is consistent with their allegation that, under the Agreement,

### 3. The Two Day Trading Calls On November 9, 2006 And November 30, 2006 Did Not Constitute Gross Negligence And Did Not Impact Any Right of Plaintiff IAM Or Cause Any Legally Cognizable Damages to Plaintiff IAM

The two alleged day trading calls do not constitute "incessant" activity (*see* Amended Compl. ¶61), which is promulgated by Plaintiff as the sole basis for Defendant's alleged gross negligence. Also, nowhere does Plaintiff allege how the two alleged day trading calls, taken as true for the purposes of this Motion, had any "plausible"[11] causal connection[12] to any alleged damages to the Plaintiff. The sole alleged causal connection between Defendant's alleged actions and any alleged damage to IAM is that because of Defendant's alleged actions, IFL was required to trade on a cash available basis, and therefore "was effectively forced to shut down its operations and cease functioning as a hedge fund."[13] However, even if taken as true that Goldman Sachs would not continue as Prime Broker except on a cash available basis, nowhere is it alleged that IAM/IFL could not use another Prime Broker to continue trading, or that it could not trade from that point forward on a cash available basis.

Moreover, in addition to positing no factual allegations supporting the notion that Defendant's actions caused these alleged damages, Plaintiff alleges damages that are simply invented numbers. The sole allegations pertaining to damages as to IAM are as follows:

---

(continued…)

Defendant was required to conform his conduct to "the applicable rules of the exchanges." Most fundamentally, there is no violation of these provisions of the Agreement unless there is a violation of the rules and regulations of the applicable exchanges. Therefore, the existence (or non-existence) of a violation of these rules and regulations is the key point.

[11]   *See Twombly*, 127 S.Ct. at 1965-70.

[12]   Under New York law, a breach of contract claim must allege, *inter alia*, a breach of the contract by Defendant and *resulting* damages to the Plaintiff. *See Ross v. MSG PrivatAir, Inc.*, 03-CIV-7929-NRB, 2004 WL 1837366 at *3 (S.D.N.Y. Aug. 17, 2004).

[13]   The allegation states in full that "[b]ecause of [alleged actions by Defendant], the Prime Broker restricted IFL's account to trading on a cash available basis for ninety (90) days or until Defendant's day trading calls were met. Because IFL was highly leveraged and was required by the Prime Broker to trade on a cash available basis, IFL was effectively forced to shut down its operations and cease functioning as a hedge fund." *See* Amended Compl. ¶ 45.

"IAM is estimating conservatively $6 million to $8 million in revenue lost and lost opportunities, and in conjunction with debt and other obligations which now cannot be handled for lack of revenues from the five (5) year deal." *See* Amended Compl. at ¶ 50.

"As a result of Defendant's multiple breaches, IAM was damaged in that it was forced to shut down its operations and was denied the opportunity to receive the benefit of five (5) years' worth of Management Fees and Performance Fees of the fund, based on a minimum AUM [assets under management] of $5 million." *See* Amended Compl. at ¶ 62.

There was no provision in the Agreement providing for Management Fees and Performance Fees based on a permanent minimum AUM of $5 million, and no reasonable expectation to receive such fees, as Defendant was permitted to redeem his $5 million investment at any time (*see* Agreement ¶ 4). Furthermore, there is no basis in the Agreement, in the facts, or elsewhere for IAM's "conservative" expectation or estimate of $6 million to $8 million in damages. Indeed, Plaintiff IAM simply had no right under the Agreement to receive any management fees or other compensation for any specific length of time. As such, these alleged damages are not legally cognizable, as is required to state a claim for the breach of this contract.

**4.    Other Alleged Breaches Either Simply Did Not Occur Or Did Not "Plausibly" Cause Legally Cognizable Damages To Plaintiff IAM**

Plaintiff IAM argues that Defendant failed to disclose the fund's positions, as required under his Agreement with IAM. *See* Pl. Opp. Mem. at 12. However, as demonstrated by emails included by Plaintiff with their opposition papers, George Szele of IAM was copied on correspondence between the Prime Broker and Defendant that described the fund's positions. *See* Plaintiffs' Ex. 3.

Next, Plaintiff again argues that Defendant failed to meet Prime Broker guidelines and to comply with "all applicable laws, rules, regulations, and rules of exchanges on which Defendant traded," "by failing continually to meet the initial and maintenance margin requirements." *See*

Pl. Opp. Mem. at 12-13.  As argued above, and in previous papers, Defendant did not fail "continually" to meet the initial and maintenance margin requirements.

Plaintiff also claims that "Defendant breached the Agreement by refusing to keep drawdowns below 20%." *See* Amended Compl. at ¶ 55.  However, the Agreement between IAM and Zanger merely states that IAM had the option to *terminate* the Agreement if Zanger could not keep drawdowns below 20%.  *See* Agreement at ¶ 1(g).  Therefore, again, Plaintiff has not stated a plausible claim for the breach of this contract.

Lastly, Plaintiff asserts that "Defendant's wiring in [sic] of his own money caused damages" (*see* Pl. Opp. Mem. at 13), and that Defendant attempted to wire his own personal funds out of IFL "in direct violation of the Power of Attorney." *Id.* at 13-14. However, according to Plaintiff's own papers, at least one redemption of Defendant's personal funds was duly authorized by a resolution of the Directors of IFL, who concluded that "no shareholders would be prejudiced" by such an action.  *See* Pl. Opp. Mem., Ex. 2, at 1.  Furthermore, the Amended Complaint does not allege any actual damages as a result of the Fund Administrator's alleged termination of its relationship with IFL (*see* Amended Compl. ¶ 49), or any facts indicating that other Fund Administrators could not be used.

## II. PLAINTIFF IAM DOES NOT ADDRESS MOTION TO DISMISS COUNT II, BREACH OF FIDUCIARY DUTY (BROUGHT BY IAM), AND THEREFORE THIS COUNT SHOULD ALSO BE DISMISSED

Plaintiff IAM has not addressed Defendant's argument in his Motion to Dismiss centered on the proposition that "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." *See Cal Distributor Inc. v. Cadbury Schweppes Americas Beverages, Inc.*, No. 06-CIV-0496-RMB, 2007 WL 54534 at *9 (S.D.N.Y. Jan. 5. 2007) (citations omitted).  Therefore, as a claim for breach of fiduciary duty that is "premised upon the same facts and seeks damages for the same alleged wrong as the breach of

contract claim" must be dismissed as a matter of law (*see id.*), and the allegation of breach of fiduciary duty contained in the Amended Complaint mirrors the breach of contract claim, IAM's claim for breach of fiduciary duty must be dismissed.

### III. PLAINTIFF HOLMSTROM DOES NOT ADEQUATELY STATE A CLAIM, AND IN ANY EVENT HIS CLAIMS ARE DERIVATIVE CLAIMS THAT HE DOES NOT HAVE STANDING TO ASSERT

Holmstrom's claim of breach of fiduciary duty must be dismissed. There are no factual allegations supporting the notion that Holmstrom was a "client" of Defendant. As the allegations demonstrate, Defendant agreed with IAM to manage certain funds in IFL, and IAM contracted separately with Holmstrom. Thus, as stated previously, Defendant did not accept a relationship of trust and confidence with Holmstrom (such as in a typical broker-client relationship), and therefore their relationship cannot be considered fiduciary in nature.

Also as described in previous papers, Defendant did not intentionally and improperly procure the breach of the Agreement between IAM and Holmstrom, as required to state a claim for tortious interference with contractual relations. Although Holmstrom accuses Defendant of "intentionally disregarding a clear Agreement to manage his funds in a responsible and relatively conservative manner," the Offering Memorandum that described the terms of Holmstrom's investment in IFL explicitly provided that "the Shares are speculative and involve a high degree of risk. Trading losses can sharply reduce the Net Asset Value of the Fund and consequently the value of the investor's Shares of the Fund." *See* Def. Mot. Dismiss, Ex. B, at 4-5. Also, as the trading manager, and having executed a Power of Attorney with IFL/IAM (*see* Pl. Opp. Mem., Ex. 4), Defendant was not a third party to any alleged IAM-Holmstrom agreement.

Lastly, Holmstrom has not alleged any injury other than that inuring from his status as a shareholder or investor in IFL. It is axiomatic that an "action is derivative, that is, in the

corporate right, if the gravaman [sic] of the complaint is injury to the corporation," and it is only where the "injury sustained to one's stock is peculiar to [a shareholder] alone, and does not fall alike upon other [shareholders], that one can recover as an individual." *See Nordberg v. Lord, Day & Lord*, 107 F.R.D. 692, 697-98 (D.C.N.Y. 1985). Furthermore, where, as here, "generalized allegations" are "neither specific to the [Fund] directors nor to the purchase of the . . . stock at issue," demand must be brought prior to suit. *See Amron v. Morgan Stanley Investment Advisors, Inc.* 464 F.3d 338, 345-46 (2d Cir. 2006). In this case, all trading losses fell upon every investor equally (including the Defendant), and Holmstrom has no individual standing to assert these claims.

## IV. THIS COURT MUST DENY LEAVE TO REPLEAD

As Plaintiffs have already been given leave to amend their complaint, this Court should deny Plaintiffs' request to further amend.

Dated: November 27, 2007                                   Respectfully submitted,

*s/ Matthew E. Szwajkowski*
Thomas H. Sear (TS-5570)
Matthew E. Szwajkowski (MS-8362)
JONES DAY
222 East 41st Street
New York, NY 10017-6702
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
mszwajkowski@jonesday.com

*Attorneys for Defendant Daniel Zanger*

CERTIFICATE OF SERVICE

The foregoing document was served on the following counsel of record on November 27, 2007 via the method listed below:

**E-Mail and Federal Express**
John Balestriere
Craig Stuart Lanza
Balestriere PLLC
225 Broadway, Suite 2700
New York, NY 10007
clanza@balestriere.net

*s/ Matthew E. Szwajkowski*