

**JOHN BALESTRIERE**
225 BROADWAY SUITE 2700
NEW YORK, NY 10007
PHONE:   +1.212.374.5401
CELL:    +1.917.318.3844
FAX:     +1.212.208.2613
JB@BALESTRIERE.NET
WWW.BALESTRIERE.NET

April 15, 2008

United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     Independent Asset Management, LLC v. Daniel Zanger (1:07-CV-06431-JSR)

To the Clerk of Court:

We attempted to file this document last night multiple times. Due to a failure with the ECF system, however, we were unable to do so. We gave notice and a copy of the documents to opposing counsel.

Sincerely,

Craig Stuart Lanza

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**INDEPENDENT ASSET**
**MANAGEMENT, LLC,**

                                        **Plaintiff,**

        **- against -**

**DANIEL ZANGER,**

                                        **Defendant.**

---

**1:07-CV-06431-JSR**

**ECF**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Craig Stuart Lanza (CL-2452)
John Balestriere (JB- 3247)
**BALESTRIERE LANZA PLLC**
225 Broadway, Suite 2700
New York, NY 10007
Telephone:    (212) 374-5400
Facsimile:    (212) 208-3613
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 1

SUMMARY JUDGMENT STANDARD ........................................................................... 4

ARGUMENT ....................................................................................................................... 5

   There Is No Dispute That Defendant Breached the Agreement with Plaintiff ............... 5

     A.   A Valid Agreement Existed Between Plaintiff and Defendant Whereby Defendant Agreed to Invest Money and Trade in Class Z Shares for the Independent Fund Limited ....................................................................... 6

     B.   Plaintiff IAM Satisfied Its Obligations under the Agreement .............................. 8

     C.   Defendant Zanger Breached His Obligations Under the Agreement ................. 9

   There is No Genuine Dispute That Defendant Breached His Fiduciary Duty to Plaintiff ............................................................................................................................. 15

     A.   Plaintiff and Defendant Entered Into a Joint Venture Agreement ..................... 16

     B.   Defendant Owed Plaintiff a Fiduciary Duty of Care Because They Were Co-Venturers in a Joint Venture Agreement and Because IAM Reposed Trust and Confidence in Defendant ........................................................................................ 18

     C.   Defendant Breached His Fiduciary Duty to IAM by Placing His Own Interests Ahead of those of IAM as a Joint Venturer ......................................................... 19

CONCLUSION ................................................................................................................... 22

## TABLE OF AUTHORITIES

### CASES

Allen Chase & Co. v. White, Weld & Co., 311 F. Supp. 1253, 1260 (S.D.N.Y. 1970) ......... 18

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ....................................................... 4, 5

Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466 (1989) ............................................................ 18

Brown v. Cara, 420 F.3d 148 (2d Cir. 2005) ........................................................................ 16

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ....................................................................... 5

Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) .................................................................. 11

Insurance Company v. Dutcher, 95 U.S. 269 (1877) ............................................................... 6

Liberty Lobby .................................................................................................................... 5, 16

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ............................. 5

New Windsor Volunteer Ambulance Corps., Inc. v. Meyers, 442 F.3d 101 (2d Cir. 2006) 6

Regions Bank v. Weider & Mastroianni, P.C., 423 F. Supp. 2d 265 (S.D.N.Y. 2006) ........ 15

Richbell Information Servs. ................................................................................................... 16

Richbell Information Servs., Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288 (App. Div. 1st
    Dep't 2003) .................................................................................................................. 16, 19

Smart Egg Pictures, S.A. v. New Line Cinema Corp., 624 N.Y.S.2d 150, 151 (App. Div.
    1995) ................................................................................................................................ 18

Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 442-43 (S.D.N.Y. 2006 ........................... 18

Stratford Group, Ltd. v. Interstate Bakeries Corp., 590 F. Supp. 859, 863 (S.D.N.Y. 1984)
    ......................................................................................................................................... 17

Terwilliger v. Terwilliger, 206 F.3d 240 (2d Cir. 2000) .......................................................... 5

Thermal Imaging, Inc. v. Sandgrain Sec., Inc., 158 F. Supp. 2d 335 (S.D.N.Y. 2001) ........ 15

Two Guys from Harrison N.Y., Inc. v. S.F.R. Realty Assoc., 63 N.Y.2d 396, 403 (1984) .. 10

### STATUTES

Fed. R. Civ. P. 56(c) .............................................................................................................. 4

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, Plaintiff Independent Asset Management, LLC ("Plaintiff" or "IAM"), by its attorneys, Balestriere Lanza PLLC, respectfully submits this memorandum in support of its motion for partial summary judgment on all counts against Defendant Daniel Zanger ("Defendant" or "Zanger").

## PRELIMINARY STATEMENT

At the conclusion of discovery, there exists no genuine issue of material fact regarding Defendant's breach of contract and breach of fiduciary duty. During Defendant's deposition of March 21, 2008, Defendant clearly and succinctly articulated how he breached his agreement with and his fiduciary duty to IAM in detail. It is clear that the only issues left to be decided in this matter relate to the extent of damages which resulted from Zanger's actions and the issue of Zanger's counter-claims.

## STATEMENT OF FACTS

In 2004, Plaintiff IAM and Defendant Zanger embarked on a joint venture in which Zanger agreed to invest between $5 million and $50 million into the Independent Fund Limited ("IFL"), a Bermuda-based hedge fund that IAM had spent many years developing. (Agreement at 1, attached as Lanza Decl. Ex. D.) IFL's administrator, the entity that handled a lot of the IFL's ministerial duties, was Butterfield Fund Services (Bermuda) Limited ("BFS"), and IFL's broker was Goldman Sachs Execution & Clearing, L.P. ("GSEC" or the "Prime Broker"). Zanger was very successful trader who had a domestic hedge fund but not an offshore hedge fund. (Zanger Dep. 7:17-21,

attached as Lanza Decl. Ex. C.)  The contemplated joint venture allowed Zanger to gain the benefits of an offshore fund in addition to Zanger's domestic fund.

Managing a hedge fund requires skill and experience.  While Zanger was an accomplished trader he did not have a background in finance or hedge fund management—he worked as a swimming pool contractor, a dog catcher, a cab driver, and a dishwasher. (Zanger Dep. 70:9-16.)  By contrast, the principals of IAM had finance backgrounds and knew how to manage a fund. (Agreement at 1; Zanger Dep. 18:6-11.) While Zanger knew a great deal about trading, he knew nothing about running an offshore fund. (Instant Message Communications at 29; Zanger Dep. 69:24-70:16.)

Apart from having an offshore fund, the joint venture contemplated that IAM would market Zanger's performance to interested investors. (Zanger Dep. 55:5-10.) Thus, Zanger would have an offshore hedge fund and dedicated marketing.  In exchange, Zanger promised to deposit "$5 to $50 million dollars" into IAM for a term of 5 years. (Agreement at 1-2.)  Zanger would also trade the amount which Zanger placed in the account in addition to whatever additional money was raised. (Agreement at 2.) IAM would receive a percentage of the fees which Zanger traded on. See id.

Hedge funds traditionally have two sorts of fees: performance and management fees.  The Management Fee is the amount a hedge fund manager, such as IAM, receives annually as compensation for managing the fund.  Here, the Management Fee was 2% of the value of assets under management ("AUM").  IAM received half of that under the Agreement (Zanger received the other half).  IAM was therefore entitled to an annual fee equal to 1% of IFL's AUM. (Agreement at 2.)

The Performance Fee is the amount a hedge fund manager is paid based on the performance of the fund. In this case, the Performance Fee was 20% of all returns of the fund. IAM received a percentage of the Performance Fee. In total, through the Performance Fee, IAM was entitled to 5% of all returns of the fund. Zanger in turn received 1% of IFL's AUM in the form of the Management Fee and the balance of the Performance Fee. (Agreement at 2.)

Because Zanger had a reputation as a volatile trader, IAM inserted a number of key provisions in the Agreement: IAM limited Zanger's leverage to 4:1; Zanger agreed to maintain sufficient liquidity in the account; Zanger agreed to disclose his positions at all times; Zanger agreed to comply at all times with Prime Broker limits, rules or guidelines; Zanger agreed to remain transparent and compliant on all levels at all times to IFL and IAM; Zanger agreed to keep drawdowns below 20%; Zanger agreed to comply with all Bermuda, U.S., and other federal, state and local laws, as well as any applicable rules and regulations, including exchange rules and regulations; and Zanger further agreed to conform with all reasonable requests of IAM. (Agreement at 2.)

Unfortunately, Zanger did none of these things. From testimony taken during Zanger's March 21, 2008, deposition, it became clear that Zanger took no steps to comply with the Agreement. He had no idea what the rules and regulations he was supposed to obey were. (Zanger Dep. 44:22-49:8.) He never employed a compliance officer or anyone else regarding the matter. (Zanger Dep. 47:18-48:48:9.) Indeed, he could not even recognize the agreement which outlined GSEC's rules (the "Prime Broker Agreement"). (Zanger Dep. 44:4-11.) In his own words, he indicated that he had

many margin calls (Zanger Dep. 53:2-4) and testified that having sufficient liquidity can prevent a margin call from ever occurring (Zanger Dep. 52:14-25).  He did not keep drawdowns below 20%. (Zanger Dep. 37:2-13; Instant Messages at 13, 14, 16, 19, 31-32, 40, 43, and 55, attached as Lanza Decl. Ex. G.)  He was unaware of how much leverage he had (Zanger Dep. 50:3-10) and even incorrectly explained how leverage works (Zanger Dep. 32:12-19).  It became evident throughout his testimony that Zanger never really paid any attention to the agreement and never made any attempt to comply with it.  Indeed, from his deposition it became clear that Zanger never gave any thought whatsoever to what the Agreement required or what IAM expected of him. (Zanger Dep. 20:17-19.)

Finally, and most importantly, during his deposition, Zanger explained that he created large day trading calls on November 10, 2006, and again on November 30, 2006, and then willfully refused to cover those calls because he was unhappy with the rules of the administrator. (Instant Message Communications at 59; Zanger Dep. 57:25-58:16.)  Thus, beyond just disobeying the rules of the GSEC, Zanger actually used such rules as motivation to breach his fiduciary duty to IAM.

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if the pleadings, depositions, affidavits, and other discovery establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The moving party bears the initial burden of identifying the bases for its motion and the evidence that demonstrates the

4

absence of a genuine factual issue. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the non-moving party must proffer admissible evidence demonstrating that a trial is required because disputed issues of material fact exist. See Liberty Lobby, 477 U.S. at 249.  However, "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Liberty Lobby, 477 U.S. at 248 (explaining that the non-movant cannot escape summary judgment by presenting conclusory or speculative evidence).

## ARGUMENT

### THERE IS NO DISPUTE THAT DEFENDANT BREACHED THE AGREEMENT WITH PLAINTIFF

The Court should grant summary judgment on Plaintiff IAM's Count I against Defendant Zanger because there is no genuine dispute that Zanger breached the Agreement with IAM.  To prevail on a breach of contract claim under New York law, a plaintiff must prove (1) the existence of a valid contract, (2) performance of the contract by one party, (3) breach of the contract by the other party, and (4) damages suffered as a result of that breach. See Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000). Here, because IAM has established elements one through three, this Court should grant summary judgment in favor of IAM with respect to those elements and reserve for trial the issue of damages.

**A.    A Valid Agreement Existed Between Plaintiff and Defendant Whereby Defendant Agreed to Invest Money and Trade in Class Z Shares for the Independent Fund Limited**

In September 2004, IAM and Zanger began discussing the possibility of working together in connection with IFL, IAM's Bermuda hedge fund.  On October 20, 2004, IAM and Zanger signed an Agreement whereby Zanger agreed to invest between $5 million and $50 million in IFL's Class Z shares and to manage those Class Z shares. (Agreement.)   IAM was going to be IFL's trading manager, handling assorted administrative and marketing duties (Agreement at 1; Zanger Dep. 55:5-10), while Zanger was going to handle all of the trading for IFL's Class Z shares (Agreement at 1; Zanger Dep. 12:21-25, 15:21-23).   As established by the Agreement, Zanger was responsible for trading in Class Z shares.

Moreover, the parties' course of dealing confirms that Zanger was solely responsible for anything to do with trading in IFL Class Z shares. See, e.g., Insurance Company v. Dutcher, 95 U.S. 269, 273 (1877) ("There is no surer way to find out what parties meant, than to see what they have done. . . . Parties in such cases often claim more, but rarely less, than they are entitled to.") (quoted by New Windsor Volunteer Ambulance Corps., Inc. v. Meyers, 442 F.3d 101, 112 (2d Cir. 2006))  In this case it is clear from Zanger's words and actions that he assumed full responsibility for all aspects of trading, including ascertaining what to invest in (Instant Message Communications at 18, 19, 43), determining when to exit a position (Zanger Dep. 36:14-17), and covering margin calls whenever they arose (Email Communications at 3, 5, 8, 51, 52, attached as Lanza Decl. Ex. F; Instant Message Communications at 56, 59; Mot. Dismiss Am. Compl.

2, 7, 8). Prior to signing the Agreement with Zanger, IAM had done extensive due diligence on Zanger's prior trading history and concluded that a venture with Zanger could be highly successful, but only if certain conditions were implemented and imposed. Indeed, when building a hedge fund, when marketing a fund to potential investors, it is important to demonstrate low levels of volatility, ability to respond to sudden adverse conditions in the market, minimal drawdowns, absolute or near absolute compliance with applicable rules and regulations, and a high level of transparency with respect to all matters relating to the fund's operations. (Instant Message Communications at 13, 14, 16, 19, 28, 31, 40, 43.) Accordingly, IAM insisted that Zanger adhere to a number of provisions, including:

- Limiting leverage to 4:1;

- Maintaining sufficient liquidity;

- Disclosing positions at all times;

- Complying at all times with Prime Broker limits, rules or guidelines;

- Remaining transparent and compliant on all levels to IFL and IAM;

- Keeping drawdowns below 20%;

- Complying with all Bermuda, U.S., and other federal, state and local laws, as well as any applicable rules and regulations, including exchange rules and regulations; and

- Conforming with all reasonable requests of IAM. (Agreement at 2.)

Regarding IAM's obligations under the Agreement, according to Zanger's own testimony, IAM was required simply "to raise cash." (Zanger Dep. 21:10-15.) This being

symptomatic of Zanger's lack of recollection as to many aspects of the relationship, IAM actually had no obligation "to raise cash" under the Agreement. IAM was, however, obliged to pay a share of management fees and performance fees (the "Fees") to Zanger within twenty business days of receiving such fees from IFL through BFS, IFL's administrator. (Agreement at 2.)

The Agreement was to last for five years (Agreement at 1, 2; Zanger Dep. 22:2-4, 30:19-31:5) but could be terminated under paragraph 1 or 7 of the Agreement, although neither party terminated the Agreement during the period relevant to this case. Zanger has never repudiated the Agreement nor any of its terms, notwithstanding his apparent ignorance of the significance of the terms of the Agreement.[1] Therefore, it is clear that a contract existed between IAM and Zanger.

**B.    Plaintiff IAM Satisfied Its Obligations under the Agreement**

Throughout the entire duration of IAM's relationship with Zanger, IAM satisfied its contractual obligations to Zanger. IAM exercised its best efforts to attract additional investors and market IFL. (Instant Message Communications at 11, 12, 14, 22, 24, 26.) IAM eventually brought in an additional investor, Ola Holmstrom. (Szele Dep. 59:11-12, Mar. 5, 2008.) IAM also carried on the day to day management of the Fund. Indeed, to

---

[1] Throughout his deposition, Zanger demonstrated a total lack of awareness as to any of his obligations under the Agreement, an ignorance that could stem *only* from a reckless lack of care. Indeed, Zanger claimed a general knowledge of the Agreement (Zanger Dep. 20:20-21:3), and he claimed that he obeyed applicable laws, rules, regulations, guidelines, and policies (Zanger Dep. 46:5-49:8). Yet, when questioned, Zanger was wholly unable to clarify any obligations or to identify even one law, rule, or regulation that he had ever read. (Zanger Dep. 20:17-19, 21:9, 22:14, 26:6-10, 28:8-30:13, 32:12-19, 45:2-49:8.)

date, after discovery not a single shred of evidence can support the proposition that IAM breached its duty to Zanger. There can be no doubt that IAM did what it was required to do under the Agreement.

**C.    Defendant Zanger Breached His Obligations Under the Agreement**

From early on in the venture, and culminating in December 2006 when Zanger refused to cover his second day trading call, Defendant Zanger breached numerous provisions of the Agreement with IAM, provisions which were designed by IAM to ensure that the venture would be a success.

    1.    <u>Zanger's Failure to Maintain Sufficient Liquidity</u>

In breach of Section 1.b. of the Agreement (Agreement at 2), Defendant Zanger failed to maintain sufficient liquidity in IFL's account, effectively guaranteeing that he would be unable to adjust to changing market conditions and avoid unnecessary and costly margin calls. Based on Defendant's own deposition testimony, Zanger's 115 margin calls are symptomatic of his failure to maintain sufficient liquidity.

As Zanger himself explained, "if you have enough liquidity, you would not have a margin call." (Zanger Dep. 52:23-25.) Yet, Zanger had more than 100 margin calls trading Class Z shares for IFL (Email Communications at 51, 52; Mot. Dismiss Am. Compl. 2, 7, 8.) IAM concedes that if this were to occur once, twice, or even a handful of times, it could be attributed to uncontrollable market conditions or a temporary lapse of attention. However, that Zanger caused 115 margin calls over fewer than two years leads to one conclusion: Zanger was systematically reckless in ensuring that he maintained sufficient liquidity in IFL's holdings (Szele Dep. 78:10-14, Mar. 5, 2008;

Mem. Op. of Mar. 18, 2008 at 6 n.2.)  This was further confirmed by a letter from BFS, IFL's administrator, addressed to IAM's Szele on the issue of Zanger's misconduct.  The letter states as follows: "Upon further investigation, it was learned [by BFS] that Mr. Zanger had been investing the Fund's portfolio on margin without reserving proceeds within the portfolio to meet a margin call, should one occur." (BFS Letter at 1, attached as Lanza Decl. Ex. H.)

Based on the foregoing, it is beyond dispute that Zanger failed to maintain sufficient liquidity while trading Class Z shares for IFL and, therefore, that Zanger breached the Agreement with IAM with respect to this provision.

### 2.    Zanger's Failure to Disclose Positions

Zanger also breached his obligations by refusing to disclose his positions at all times to IAM.  Zanger and his attorneys have stressed that IAM could intermittently access Zanger's positions (Porco Dep. 10:17-11:15, attached as Lanza Decl. Ex. A; Zanger Dep. 54:17-55:4), but that argument misses the point.  With respect to Zanger's positions, the Agreement mandated disclosure, not access, which imposed an affirmative duty on Zanger "to make known" his positions to IAM. Webster's Encyclopedic Unabridged Dictionary (1996).  Moreover, Zanger's construction renders moot this disclosure provision.  Indeed, IAM was the accountholder on record at GSEC and had access to Zanger's trading records regardless of what the Agreement provided, so a provision guaranteeing the same would be meaningless.  Considering that courts seek "to avoid an interpretation that would leave contractual clauses meaningless," Two Guys from Harrison N.Y., Inc. v. S.F.R. Realty Assoc., 63 N.Y.2d 396, 403 (1984); see

also <u>Galli v. Metz</u>, 973 F.2d 145, 149 (2d Cir. 1992), it is clear that Zanger had an affirmative duty to actively disclose his positions.  Yet, as with other things, he did not.

Whenever Zanger caused a margin call, which happened more than 100 times, he never disclosed that to IAM.  Instead, IAM was forced to learn of the margin calls from Gianina Arturo ("Arturo"), IAM's contact at GSEC, sometimes more than a year and a half after the fact. (Email Communications 3-4, 5-7, 47-53.)  But beyond the margin calls, Zanger established a pattern of non-responsiveness and non-disclosure, informing IAM of his positions or performance only when it gave Zanger the opportunity to gloat over a particularly lucrative day, week, or month. (Porco Dep. 10:13-16; Instant Message Communications at 6, 8, 9, 25.)  As discussed above, this was a material provision to the Agreement, and every time Zanger failed to disclose his positions to IAM, Zanger committed a material breach of the Agreement and is liable to IAM for all the damages flowing from such non-disclosure.

3.    <u>Zanger's Non-Compliance with Prime Broker Limits, Rules or Guidelines</u>

Under the Agreement with IAM, Defendant Zanger was required to adhere to all "regulations, rules and guidelines" of GSEC. (Agreement at 2); under the Prime Broker Agreement with GSEC, Zanger was (1) prohibited from withdrawing any funds from IFL without first obtaining permission from IFL's board of directors (Prime Broker Agreement at 3, attached as Lanza Decl. Ex. E) and (2) required to comply with GSEC original and maintenance margin requirements, which were required to have been at least as stringent as SEC, NYSE, or any other margin requirements (Prime Broker Agreement at 7).  Regrettably, Zanger discretely attempted to withdraw monies from

IFL without permission (Email Communications at 16-21; BFS Letter at 1, attached as Lanza Decl. Ex. H), induced more than 100 margin calls (Email Communications at 51-52; Mot. Dismiss Am. Compl. 2, 7, 8), and flatly refused to cover two day trading calls (Email Communications at 26, 40, 53; Instant Message Communications at 59), all in violation of GSEC's rules, regulations, and guidelines and, derivatively, of the Agreement with IAM.

In October 2006, Zanger induced one of his more than 100 margin calls and attempted to cover it by injecting his own capital directly into IFL. (BFS Letter at 1; Email Communications at 16-21.)  As explained by BFS's Megan Woloshyn in a letter to IAM's George Szele on December 1, 2006:

> Once the margin call had been met and the proceeds were no longer required to cover the margin Mr. Zanger requested Spear Leeds wire his personal funds back to him. Although Spear Leeds could accept proceeds without approval of the directors of the Fund (the "Directors"), they required Director consent to release any money from the Fund.  Only when Spear Leeds contacted the Directors for permission to release the funds to Mr. Zanger did the Directors and subsequently, [BFS], learn what Mr. Zanger had done.
>
> . . .
>
> Although the problem created by Mr. Zanger in October 2006 has been resolved, we as administrators of the Fund are extremely concerned about Mr. Zanger's trading activities and the level of risk associated with them.  As a result we can no longer act as administrator of the Fund while Mr. Zanger continues to be a trading manager of the Fund. . . .

(BFS Letter at 1-2.)

In addition to attempting to withdraw money from IFL's account improperly, Zanger violated other provisions the Prime Broker Agreement as well. Oftentimes when Zanger caused a margin call, he failed to remedy the margin deficiency as promptly as the Prime Broker Agreement required. The Prime Broker Agreement provides that "Customer agrees to deposit margins and pay premiums immediately upon GSEC's request." (Prime Broker Agreement at 7.) Zanger failed to cover the deficiencies "immediately," sometimes delaying for several days (Email Communications at 3, 5-6, 8; Instant Message Communications at 59). Thus, Zanger ran afoul of the Prime Broker Agreement in another way.

In addition to the aforementioned violations, there is no dispute that Zanger intentionally refused to cover two separate day trading calls, thereby resulting in violations which ultimately forced GSEC to shut down IFL. On November 9, 2006, Zanger exceeded his day trading margin allowance and, in so doing, induced a day trading call for $134,372. (Email Communications at 22-25, 53.) After Zanger created the deficiency, Gianina Arturo of GSEC attempted to contact Zanger numerous times to address the situation, but Zanger simply refused to respond. (Instant Message Communications at 59.) When IAM's Szele contacted Zanger in an instant message communication, Zanger sidestepped his obligations and said that he was going to do "nothing" about it. (Instant Message Communications at 59.) Apparently, Zanger liquidated some positions—which by the rules cannot be done to remedy a deficiency under Rule 431—and he told Szele: "its all I will or can do." (Instant Message Communications at 59.) As expected, Zanger refused to cover this day trading call by

13

the November 16, 2006, deadline—in violation of NYSE Rule 431, the Prime Broker Agreement, and the Agreement with IAM—and GSEC appropriately imposed certain trading restrictions.[2]

On November 30, 2006, when the account with GSEC was already operating on a reduced margin basis, Zanger again exceeded his day trading margin allowance and, in so doing, induced a second day trading call for $2,850,461. (Email Communications at 30-39.)  Zanger again refused to cover the call. (Email Communications at 40-41.)  IFL's account was subsequently restricted to liquidating transactions and, shortly thereafter, was "closed for multiple Day Trading or Equity day trading violations" that were caused by Zanger. (Email Communications at 42-50.)

Based on the foregoing, it is unquestionable that Zanger violated the Prime Broker Agreement with GSEC and, derivatively, the Agreement with IAM: Zanger wrongfully attempted to wire money directly out of IFL, caused more than 100 margin calls, delayed in covering many of those calls, and flatly refused to cover the two day trading calls.

4.    Zanger's Lack of Transparency and Compliance with IFL and IAM

Zanger failed to remain transparent and compliant with IFL and IAM by attempting to withdraw funds directly from IFL in contravention of the Prime Broker Agreement, with making any attempt to either inform IFL or IAM or to obtain

---

[2] As Arturo explained to Zanger and Szele in November 10, 2006, email, Zanger's day trading buyer power was going to be reduced to 2:1 and, if not covered, was thereafter going to be reduced to 1:1.  Arturo also advised that, "[i]f at any point during the 90 day restriction period day trading buying power is exceeded, the account will be placed in a liquidation only status." (Email Communications at 26-27.)

permission from the same. As discussed in the preceding section, this violated the Prime Broker Agreement and constituted a derivative violation of the Agreement with IAM. Moreover, it outraged BFS, the IFL's administrator, which triggered BFS's ultimate decision to terminate its relationship with IAM and IFL. (BFS Letter at 1-2.)

5.    Zanger's Non-Compliance with Applicable Laws, Rules, and Regulations

As discussed above in connection with Zanger's violation of the Prime Broker Agreement, Zanger outright refused to cover two day trading calls that he induced in November 2006. As Zanger has conceded in papers filed with the Court, such conduct constitutes an outright violation of NYSE Rule 431 (Mot. Dismiss Am. Compl. 14) and, accordingly, a breach of the Agreement with IAM, whereby Zanger agreed to comply with all applicable laws, rules, regulations, including NYSE Rule 431. Accordingly, it is clear that Zanger breached the Agreement by failing to comply with applicable laws, rules and regulations.

**THERE IS NO GENUINE DISPUTE THAT DEFENDANT BREACHED HIS FIDUCIARY DUTY TO PLAINTIFF**

The Court should grant summary judgment on Plaintiff IAM's Count II against Defendant Zanger because there is no genuine dispute that Zanger breached his fiduciary duty to IAM. In order to prove breach of a fiduciary duty under New York law, plaintiff must prove (1) that a fiduciary duty existed between the plaintiff and the defendant and (2) that the defendant breached that duty. See Regions Bank v. Weider & Mastroianni, P.C., 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006) (citing Thermal Imaging, Inc. v. Sandgrain Sec., Inc., 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001)). Here, Defendant

Zanger had a fiduciary obligation to Plaintiff IAM because they had entered into a joint venture agreement, and Zanger breached his fiduciary duty by placing his own interests ahead of those of the joint venture.

A.    **Plaintiff and Defendant Entered Into a Joint Venture Agreement**

Based on the Agreement between IAM and Zanger, and numerous other discussions leading up to the Agreement, there is no genuine dispute that IAM and Zanger entered into a joint venture in connection with IFL.  In ascertaining whether a joint venture exists, it is necessary to consider the following: (1) whether the parties intended to enter into a joint venture, (2) mutual contribution to the venture through combination of property, financial resources, effort, skill, or knowledge, (3) a measure of joint control over the enterprise, and (4) a provision for sharing profits and losses. See Richbell Information Servs., Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 298 (App. Div. 1st Dep't 2003) (cited by Brown v. Cara, 420 F.3d 148 (2d Cir. 2005)).

As to the first consideration, intent may be express or implied. See Richbell Information Servs., Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 298 (App. Div. 1st Dep't 2003).  There is no express joint venture agreement here, but it is clear from the parties' words and actions, as well as the language of the Agreement, that IAM and Zanger intended to enter into a joint venture agreement.  The Agreement itself contemplates jointly introducing and raising assets into IFL (Agreement at 1), working together and efficiently managing the relationship (Agreement at 2), sharing all fees derived from IFL (Agreement at 2), working together in the course of finding new investors (Agreement at 3), and conforming with each other's reasonable requests in

16

connection with the venture (Agreement at 4). Moreover, prior to signing the Agreement, Zanger expressed that he wanted to work with IAM to develop an offshore business (here, IFL) in addition to Westwood Capital, Zanger's pre-existing domestic hedge fund. (Zanger Dep. 7:17-24.) In return, IAM, through Szele, expressed that it wanted to develop a successful hedge fund with Zanger and, if successful, establish new classes of shares to further build assets under management.

Regarding each party's contribution to the venture, both IAM and Zanger brought something to the table that was uniquely important to IFL's chance of developing a several hundred million dollar hedge fund. Zanger would serve as the trader, generating strong returns for IFL and establishing a positive track record that would entice potential investors to contribute capital to IFL. In return, IAM had already spent significant amounts of time and money launching and developing IAM and establishing IFL (Agreement at 1; Instant Message Communications at 30), and the parties contemplated IAM's continued administrative support as well as a comprehensive, large scale marketing effort to attract new investors to IFL (Instant Message Communications at 28, 30, 31). Moreover, Zanger knew nothing about starting an offshore hedge fund and, therefore, needed IAM in order to get any offshore venture off the ground. (Instant Message Communications at 29.)

As to the third consideration, "[t]he control deemed essential for a joint venture is power over decision-making." See Stratford Group, Ltd. v. Interstate Bakeries Corp., 590 F. Supp. 859, 863 (S.D.N.Y. 1984); Allen Chase & Co. v. White, Weld & Co., 311 F.

Supp. 1253, 1260 (S.D.N.Y. 1970) ("Perhaps the most important criterion of a joint venture is the joint control or management.").

Regarding sharing profits and losses, the Agreement itself made clear that IAM and Zanger would share in the IFL's profits. (Agreement at 2.) The fees generated by IFL would be shared by IAM and Zanger, and both IAM and Zanger would each share the risk should the venture turn out to be unsuccessful.

Based on the foregoing, there is no dispute that a joint venture existed between IAM and Zanger in connection with, but independent of, the Agreement.

**B.    Defendant Owed Plaintiff a Fiduciary Duty of Care Because They Were Co-Venturers in a Joint Venture Agreement and Because IAM Reposed Trust and Confidence in Defendant**

It is well established that joint venturers owe a fiduciary duty to one another for as long as the enterprise continues. See Smart Egg Pictures, S.A. v. New Line Cinema Corp., 624 N.Y.S.2d 150, 151 (App. Div. 1995); Meinhard v. Salmon, 249 N.Y. 458, 463-64 (N.Y. 1928) (explaining that "[m]any forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties."); see also Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 442-43 (S.D.N.Y. 2006). Because IAM and Zanger were co-venturers, Zanger owed IAM such a fiduciary duty.

"This is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466 (1989). And where, as here, a fiduciary has certain contractual rights apart from the joint venture arrangement, those contractual rights

may not be exercised solely for personal gain in such a way as to deprive the other party of the fruits of the contract. See Richbell Information Servs., Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 302 (App. Div. 2003).

Accordingly, Zanger was prohibited from placing his own self-interests above that of the joint venture, and Zanger was further prohibited from acting for personal gain in a way that would have deprived IAM of its ability to benefit from the venture.

**C.    Defendant Breached His Fiduciary Duty to IAM by Placing His Own Interests Ahead of those of IAM as a Joint Venturer**

Instead of honoring his fiduciary duty to Plaintiff IAM as a co-venturer, Defendant Zanger breached his fiduciary obligations multiple times by engaging in self-interested behavior and depriving IAM of its ability to benefit from the venture.  Even early on in the venture, Zanger permitted his self-interest to dominate his actions. Despite representations to IAM that he wanted to invest $50 million to "ramp up the business" (Szele Dep. 8:10-12, Mar. 5, 2008), from day one Zanger considered nothing but his own interests.  In explaining his motives for entering into the joint venture with IAM, Zanger said, "Independent Asset Management was going to in turn raise two hundred million dollars for *me*," with no mention of IFL. (Zanger Dep. 5:10-12 (emphasis added).)

As time passed, things got worse.  Zanger was reluctant to cooperate with IAM on anything but his own terms, thrusting his own personal interests ahead of the joint venture.  Whereas Zanger once agreed to put between $5 million and $50 million into IFL (Agreement at 1, 2; Zanger Dep. 29:20-24, 40:4-5), he reneged on his commitment,

explaining that he wanted to invest a minimal amount until he was subjectively ready to put in more money. (Instant Message Communications at 9.)

Zanger eventually invested a full $5 million, but he soon became dissatisfied with the status of IFL.  In January 2006, almost a year after Zanger first invested in IFL, Zanger was disgruntled that IFL had not been able to attract additional investors and blamed IAM, instead of himself.  (Instant Message Communications at 28.)  During a January 19, 2006, instant message communication between IAM's Szele and Zanger, a dispute arose about apportioning management and performance fees.  Among other things, Zanger threatened to "drain the account" and complained, "I'm not here to make you money off my money." See id.  Of course, IAM was *not* making any money—IAM's minimal share of the fees was needed to cover various administrative and legal expenses. See id.  Still, Zanger refused to listen, complaining, "yea and after one year nothing . . . I'm paying for everything and nothing coming in!" See id.

Months later, after Zanger had caused the first of the two aforementioned day trading calls on November 10, 2006, Szele contacted Zanger to see what he was going to do about the day trading call, given that trading was strictly Zanger's responsibility.

> **gbszele** (3:22:12 PM): dan have you spoken with Gia on your margin call?
>
> **chartpattern** (3:22:18 PM): yup
>
> **. . .**
>
> **gbszele** (3:34:15 PM): gia said she has not heard from you
>
> **chartpattern** (3:34:29 PM): I'm not sending in any more money
>
> **chartpattern** (3:34:38 PM): no more 3-4 week waits

> **gbszele** (3:35:33 PM): you have a margin call - again - why and what do you propose to do?
>
> **chartpattern** (3:35:41 PM): nothing
>
> **chartpattern** (3:35:49 PM): I liquidated
>
> **chartpattern** (3:35:55 PM): today
>
> **chartpattern** (3:36:05 PM): its all I will or can do
>
> . . .
>
> **chartpattern** (3:39:55 PM): last time cost me over 600K
>
> **chartpattern** (3:40:24 PM): had to liquidate my calls in CME the day before it shot up 30 points
>
> **chartpattern** (3:40:30 PM): never again
>
> **gbszele** (3:47:15 PM): dan - you are the one creating the problem with the calls - you are costing yourself - why do you keep doing it? I'm not the one trading - you are

(Instant Message Communications at 59.)

Zanger recently confirmed all of the above sentiments at his deposition.  When asked if he felt that IAM was making money off of Zanger, he replied, "I do and he was." (Zanger Dep. 56:20-23.)  Moreover, when asked why he refused to cover the November 10, 2006, day trading call, Zanger at first claimed that the "three to four week waits" had nothing to do with his decision, but he ultimate conceded the point, admitting that "it had something to do with it, yes." (Zanger Dep. 57:25-58:16.)

Beyond Zanger's utter refusal to put aside his self-interest and put first the interests of the joint venturer, along with his co-venturer IAM, Zanger likely further breached his duty by steering investors away from IFL and toward Zanger's domestic fund, Westwood Capital.  Zanger once testified at his deposition that he did not recall anyone considering investing in IFL and then deciding to invest in Westwood. (Zanger Dep. 8:13-17.)  Zanger further stated that, even though he had two funds, he "never

described, that [he] can recall, IFL as [his] offshore fund." (Zanger Dep. 64:9-10.) However, whether it is Zanger's stubborn failure to recall or outright deceit, Zanger plainly acknowledged shortly thereafter that he advertised to individuals that he had "two funds," "one on and one off." (Instant Message Communications at 34; Zanger Dep. 80:19-83:7.)  Indeed, Zanger's aforementioned self-centered behavior while trading in IFL and elusive responses during his deposition is strongly suggestive that Zanger, in fact, deliberately steered investors away from IFL and over to his domestic hedge fund, Westwood Capital.  Thus, Zanger clearly placed his own interests first and breached his fiduciary duty to IAM.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff IAM respectfully requests that the Court grant its motion for partial summary judgment with respect to IAM's claims against Zanger.

Dated: New York, New York
     April 14, 2008

Respectfully submitted,

*/s Craig Stuart Lanza*
Craig Stuart Lanza (CL-2452)
John Balestriere (JB- 3247)
**BALESTRIERE LANZA PLLC**
225 Broadway, Suite 2700
New York, NY 10007
Telephone:   (212) 374-5400
Facsimile:    (212) 208-3613
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing document was served on the

following counsel of record on April 14, 2008, via the methods listed below:

**<u>By ECF and First Class Mail</u>**
Thomas H. Sear, Esq.
Jones Day
222 East 41st Street
New York, NY 10017
*Attorneys for Defendant*

                                        <u>*/s Craig Stuart Lanza*</u>
                                        Craig Stuart Lanza (CL-2452)
                                        **BALESTRIERE LANZA PLLC**
                                        225 Broadway, Suite 2700
                                        New York, NY 10007
                                        Telephone:    (212) 374-5400
                                        Facsimile:    (212) 208-3613
                                        *Attorneys for Plaintiff*