# Exhibit C

1

1

2    UNITED STATES DISTRICT COURT    COPY

3    SOUTHERN DISTRICT OF NEW YORK

4    ----------------------------------------------X

5    INDEPENDENT ASSET MANAGEMENT LLC and OLA
     HOLMSTROM,
6                              Plaintiffs,

7              -against-

8    DANIEL ZANGER,

9                              Defendant.

10   ----------------------------------------------X

11                    225 Broadway
                      New York, New York
12

13                    March 21, 2008
                      9:56 a.m.
14

15              EXAMINATION BEFORE TRIAL of

16   DANIEL ZANGER, the Defendant herein, taken by

17   the Plaintiffs, pursuant to a Notice, and held

18   at the above-noted time and place, before

19   David Sheldon, RPR, a Notary Public of the

20   State of New York.

21

22

23

24

25

```
 1                                                          2

 2        A P P E A R A N C E S:

 3

 4     LAW OFFICE OF JOHN BALESTRIERE, P.L.L.C.
              Attorney for the Plaintiffs
 5            225 Broadway
              Suite 2700
 6            New York, New York 10007

 7            BY:  CRAIG STUART LANZA, ESQ.
              BY:  WILLIAM HOLLEMAN, ESQ.
 8

 9

10

11
       LAW OFFICES OF JONES DAY, ESQS.
12            Attorneys for the Defendant
              222 East 41st Street
13            New York, New York 10017

14            BY:  THOMAS H. SEAR, ESQ.

15

16     ALSO PRESENT:
       GEORGE SZELE
17            **              **              **

18

19

20

21

22

23

24

25
```

1                                                                    3

2                    S T I P U L A T I O N S

3        IT IS HEREBY STIPULATED AND AGREED by and

4    among counsel for the respective parties

5    hereto, that the sealing and certification of

6    the within deposition shall be and the same

7    are hereby waived;

8        IT IS FURTHER STIPULATED AND AGREED that all

9    objections, except as to the form of the

10   question, shall be reserved until the time of

11   trial;

12       IT IS FURTHER STIPULATED AND AGREED that the

13   within deposition may be signed before any

14   Notary Public with the same force and effect

15   as if signed and sworn to before the Court.

16       IT IS FURTHER STIPULATED AND AGREED that

17   counsel representing the witness examined

18   herein shall be furnished with a copy of the

19   within deposition without charge.

20

21              **              **              **

22

23

24

25

1                                                                        4

2          D A N I E L   Z A N G E R, the Defendant

3          herein, after having first been duly sworn by

4          David Sheldon, RPR, a Notary Public in and for

5          the State of New York, was examined and

6          testified under oath as follows:

7          EXAMINATION BY

8          MR. LANZA:

9                  Q      State your name for the record,

10         please.

11                 A      Daniel Zanger.

12                 Q      State your address for the record,

13         please.

14                 A      4779 Collins Avenue, Number 903,

15         Miami Beach, Florida, 33140.

16                 MR. LANZA:  The time is 9:57.

17                 Mr. Zanger, I am going to ask you

18                 a series of questions.  I ask you to

19                 just allow me to finish the question

20                 before you answer it.

21                 If you need time to talk to your

22                 attorney, just let me know and I will,

23                 of course, give you that time.  The only

24                 thing that I ask is that you give me an

25                 answer to the question that is asked

```
 1                         ZANGER                    5

 2              prior to talking to your attorney.

 3              Q       In October of 2004, you signed an

 4      agreement with Independent Asset Management;

 5      is that correct?

 6              A       I believe it is.

 7              Q       Why did you enter into that

 8      agreement?

 9              A       Well, I was under the impression

10      that Independent Asset Management was going to

11      in turn raise two hundred million dollars for

12      me.

13              Q       And did you speak with Independent

14      Asset Management?  I will refer to them as IAM

15      from hereon in.  Did you speak to any

16      principal of IAM?

17              A       George Szele.

18              Q       When you spoke to George Szele,

19      did he indicate his motivation for entering

20      into the agreement?

21              A       Yes.

22              Q       What did he say?

23              A       He basically said that with my

24      trading record, which he heard was phenomnal,

25      that he could raise two hundred and that I
```

```
 1                        ZANGER                        6
 2      would get 15 percent of the profits and he
 3      would get 5 percent.
 4              Q       Whose idea was it initially to
 5      enter into the agreement?
 6                      MR. SEAR:   Objection to the form.
 7                      MR. LANZA:   I will rephrase the
 8              question.
 9              Q       Prior to signing the agreement
10      when you first met George Szele, did you
11      approach him or did he approach you?
12              A       He approached me.
13                      MR. SEAR:   Objection to the form.
14              Go ahead.
15              A       He approached me.
16              Q       When he approached you, what did
17      he say?
18                      MR. SEAR:   Objection to the form.
19              A       He said that with my trading
20      record, he could raise two hundred million
21      dollars.
22              Q       How did you meet George Szele?
23              A       He called me out of the blue one
24      day.
25              Q       When he called you, when you spoke
```

|   |   |   |
|---|---|---|

1                                    ZANGER                                    7

2         on the phone, did he indicate to you how he

3         got your information?

4              A        From a friend of mine.

5              Q        Who was that?

6              A        Bryce James.

7              Q        Did Bryce James tell you first

8         that George Szele would be calling you?

9              A        I don't remember that.

10             Q        Around what time did these

11        conversations take place?

12             A        Boy, I couldn't nail it down

13        precisely, to tell you the truth.  Before the

14        contract was signed.

15             Q        Can you give us a year?

16             A        2004.

17             Q        And in 2004, you had a domestic

18        hedge fund; is that correct?

19             A        Yes.

20             Q        What was the name of that fund?

21             A        Westwood Capital.

22             Q        And you did not at that time have

23        an offshore hedge fund; is that correct?

24             A        That's correct.

25             Q        Would you say it is common in the

1                           ZANGER                        8

2       hedge fund family to have a domestic and

3       offshore hedge fund?

4              A      That I couldn't answer.

5              Q      If you had an offshore fund in

6       addition to a domestic fund, would it help you

7       to attract investors to the domestic fund?

8              A      I couldn't say that it could.

9              Q      Well, can you say the Independent

10      Funds Limited helped you to attract any

11      investors to Westwood?

12             A      None that I know of.

13             Q      Just to be clear, there was never

14      an occasion in which somebody had looked at

15      the Independent Funds Limited first and had

16      ended up in Westwood Capital Partners?

17             A      None that I'm aware of.

18             MR. LANZA:  At this time, I will

19             now show you a document.

20             Let's have this marked as IAM's

21             Exhibit 1.

22             (Whereupon, a document was marked

23             as IAM's Exhibit 1 for identification as

24             of this date by the Reporter.)

25             Q      I have just handed you a document

ZANGER                                            9

 2      that was marked as IAM's Exhibit 1 (handing).

 3      Do you recognize that document?

 4                      MR. SEAR:  I object to the form.

 5                 I mean, the exhibit is a fairly

 6                 voluminous document and I'm not sure if

 7                 you are asking the witness if he

 8                 recognizes the pages or just the pages

 9                 generally.  Answer it as best that you

10                 can.  I'm not blocking the inquiry.

11                      MR. LANZA:  Sure.

12           A      Well, it resembles from the front

13      page, the front page resembles what I have

14      seen previously, but I can't say for sure that

15      it is the exact document that was presented to

16      me.

17           Q      By the exact document that was

18      presented to you, are you referring to the

19      Independent Funds Limited confidential

20      offering memorandum?

21           A      I am making reference to the

22      Independent Funds confidential offering

23      memorandum.  I am basically saying this

24      particular page here (indicating), this front

25      page looks similar, but I can't say factually

1

2      that it was what was presented to me.

3          Q      But can you explain to us, you are

4      familiar with what an offering memorandum is

5      for an offshore hedge fund, is that correct,

6      in general?

7          A      Well, I understand the concept.

8          Q      What do you understand that

9      concept to be?

10         A      That there's an outline and it is

11     basically an outline.

12         Q      Explain what you mean.

13         A      Well, it is an outline of the

14     offering.

15         Q      If you can just sort of flesh that

16     out.  What do you mean by "outline"?

17         A      It gives you the parameters of the

18     offering.

19         Q      Do you understand it to have any

20     legal significance?

21         A      Yes.

22         Q      And in your experience, most hedge

23     funds have offering memorandums; is that

24     correct?

25         A      Yes.

```
 1                        ZANGER                        11

 2          Q       Do these go out to potential

 3     investors?

 4          A       Yes.

 5          Q       I would like you to turn to page 7

 6     of the document.

 7          A       (Witness complies.)

 8          Q       Do you see where it says, "The

 9     trading manager"?

10          A       Okay.

11          Q       Have you read that, Mr. Zanger?

12     Did you read it just now?

13               MR. SEAR:  What do you mean by

14          "it"?

15               MR. LANZA:  The paragraph where it

16          says, "The trading manager," the words

17          "trading manager" on the left-hand side,

18          but there is a paragraph to the right of

19          it that begins with "the fund" and it

20          ends with "dissolve."

21          A       Okay.

22          Q       Is it safe to say that that

23     paragraph in sum and substance says that IAM

24     according to this document is the trading

25     manager for Independent Funds Limited?
```

ZANGER                                    12

1

2              MR. SEAR:  Objection to the form.

3       Answer it if you can.

4       A      Do you want to restate the

5  question?

6       Q      Sure.  According to this document,

7  and according to what you just read, is

8  Independent Asset Management the trading

9  manager of the Independent Funds Limited?

10      A      Well, I would have to say that it

11  doesn't deny it.

12      Q      So let's move onto page 17.

13      A      Okay.

14      Q      There is a paragraph there that

15  says, "Risk control."

16      A      Uh-huh.

17      Q      Can you read that whole paragraph

18  to yourself?  You don't need to read it out

19  loud.

20      A      Okay.

21      Q      Now, you traded for the

22  Independent Funds Limited; correct?

23             MR. SEAR:  Objection to the form.

24      Answer it.

25      A      Yes.

1                              ZANGER                          13

2          Q      Now, according to what you just

3    read, isn't it true that Independent Asset

4    Management had a duty to continually monitor

5    your positions as a trader?

6                 MR. SEAR:  Objection to the form.

7          A      Can you repeat that again?

8          Q      You just read a paragraph that

9    indicates, "Risk control"; is that correct?

10         A      Uh-huh.

11         Q      According to that, Independent

12   Asset Management had a duty to monitor your

13   positions as a trader; is that correct?

14                MR. SEAR:  Objection to the form.

15         A      Well, I don't see in here where it

16   says that Independent Asset will monitor.

17         Q      Well, let me ask you this:  Do you

18   know what a stop loss level is?

19         A      The question, as I understand it,

20   you asked me if the Independent Asset would

21   monitor.

22                MR. SEAR:  He is asking you a

23           different question.

24         Q      I'm asking a different question.

25           Do you know what a stop loss

ZANGER                                                  14

1
2     level is?

3           A      Yes, I know.

4           Q      Can you explain what that means?

5           A      It means when a stock hits a

6     certain level, the asset will be sold.

7           Q      Do you see that sentence there

8     under risk control, it begins with fourth?

9           A      Yes.

10          Q      Can you read that out loud?

11          A      "Fourth, proper exit points or

12    stop loss levels are continuously identified

13    and closely monitored."

14          Q      And that sentence is referring to

15    the trading manager, isn't that correct, are

16    monitored by the trading manager?

17                 MR. SEAR:  Objection to the form.

18          A      Yes.

19          Q      So isn't it saying here that the

20    trading manager had a duty to monitor stop

21    loss limits on your trading?

22                 MR. SEAR:  Just note my objection

23          to this line.  You can answer it.

24          Asking him to interpret the legal

25          significance of this paragraph having

1

2          read it, there is no reference to him.

3          Answer it as best that you can, but I

4          think the whole line is improper.

5     A      Can you repeat the question?

6     Q      Okay.  According to what you read

7   here, isn't that saying that the trading

8   manager, namely IAM, had a duty to

9   continuously monitor, identify stop loss

10  levels; is that correct?

11         MR. SEAR:  Objection to the form.

12    A      Just repeat the same question.

13    Q      Does what you read indicate that

14  IAM had a duty to monitor stop loss levels?

15         MR. SEAR:  Just note my objection

16         to the form.

17    A      IAM?

18    Q      That's correct, IAM.

19    A      It says here that they are

20  continuously identified and closely monitored.

21    Q      You traded for Independent Funds

22  Limited?

23    A      I did.

24    Q      So wouldn't IAM have a duty to

25  monitor your stop loss levels?

```
 1                        ZANGER                        16

 2                 MR. SEAR:  Just note my objection

 3          to the form.

 4          A      Well, as I read it, it says, "The

 5    trading manager will attempt stop losses."

 6          Q      Will monitor; is that correct?

 7          A      Yes.

 8          Q      And the trading manager is IAM?

 9          A      The trading manager?  The trading

10    manager -- I can't see where it says that IAM

11    will or will not.

12          Q      Okay.  I will move on.

13                 You entered into an agreement

14    with IAM; is that correct?

15          A      Yes.

16          Q      Was there anything else that went

17    into determining whether or not you would work

18    with IAM, apart from that agreement?

19                 MR. SEAR:  Objection to the form.

20          A      Was there anything else that

21    determined --

22          Q      Did you have anything in addition

23    to that agreement, any additional agreements

24    with IAM?

25          A      I had no additional written
```

1                          ZANGER                          17

2      agreements.

3              Q      Before you entered into that

4      agreement, did you talk to anyone about the

5      prospect of working for IAM?

6                      MR. SEAR:  Objection to the form.

7              You mean besides --

8                      MR. LANZA:  Look, it is a broad

9              question.  He can answer however.

10             A      I talked to George Szele and

11     that's it.

12             Q      You only spoke to George Szele?

13             A      As far as I know, I only spoke to

14     George Szele.

15             Q      You testified before that George

16     Szele indicated that he would raise two

17     hundred million dollars based on your track

18     record; is that correct?

19             A      Correct.

20             Q      What other sorts of things did you

21     and George discuss prior to signing the

22     agreement?

23             A      Well, we discussed my prior track

24     record.

25             Q      Anything else?

```
 1                          ZANGER                        18

 2         A      We discussed that he was employed

 3    by Goldman Sachs, he told me.

 4         Q      Did you discuss anything else

 5    about George Szele's background?

 6         A      That he was an employee of Goldman

 7    Sachs, a trader for Goldman Sachs, that

 8    basically he had proprietory-type of trading

 9    stuff, propriety-type of trading at Goldman

10    Sachs and specifically about his record you

11    are referring to?

12         Q      Sure.  That is what I am talking

13    about, his background.

14         A      His background is basically as a

15    trader, he worked at Goldman Sachs.  That's

16    how I remembered it.

17         Q      Before signing the agreement, did

18    you discuss any of the provisions of the

19    agreement?

20              MR. SEAR:  Objection to the form.

21         You may answer.

22         A      We went over a number of the

23    sections.

24         Q      Do you remember the substance of

25    those discussions?
```

| | | |
|---|---|---|
| 1 | ZANGER | 19 |

2          A          The discussions were that I would

3     get 25 -- of the 20 percent profits, I would

4     get 15 percent and he would get 5 percent,

5     that we would split the management fees

6     equally.  Basically, he told me that I could

7     get out virtually at any time and he

8     reiterated that I could get out at any time if

9     things weren't working out and that was his

10    inducement for me to sign.

11          Q          Was this memorialized in any way?

12          A          What do you mean by

13    "memorialized"?

14          Q          Was this written down in any way,

15    by e-mail or --

16          MR. SEAR:  Objection to the form.

17          A          I have no recollection that it was

18    done by e-mail.

19          Q          Did you communicate with George by

20    e-mail?

21          MR. SEAR:  Objection to the form.

22          A          There have been e-mails.

23          Q          How about instant messenger?

24          A          Yes.  There have been instant

25    messengers.

ZANGER                                                    20

1

2          Q      You read the agreement before

3    signing it?

4          A      Yes.

5          Q      When was the last time that you

6    read the agreement?

7                 MR. SEAR:  I don't think it is

8          fair to go into what we did in terms of

9          discussions preparing the witness for

10         his testimony.

11                MR. LANZA:  I will withdraw my

12         question.

13         Q      Without going into any prep that

14   you had done with your attorney, when was the

15   last time that you read the agreement?

16         A      I can't give an exact date.

17         Q      Did you read the agreement after

18   you signed it?

19         A      I can't recall that I did.

20         Q      How would you characterize your

21   knowledge of your contractual obligations

22   under the agreement?

23                MR. SEAR:  Objection to the form.

24         A      That is fairly general.

25         Q      You mean that you characterize

ZANGER                                             21

1

2      your knowledge as fairly general?

3              A       General.

4              Q       So, as best that you can recall,

5      what were your obligations under the

6      agreement?

7                      MR. SEAR:  I object.  Answer it as

8              best that you can.

9              A       I was to trade the account.

10             Q       And what was Independent Asset

11     Management required to do under the agreement?

12                     MR. SEAR:  The same objection.

13             Answer it.

14             A       Well, as I remember it now, in

15     general, it was just basically to raise cash.

16             Q       How long was the agreement for?

17             A       There were various provisions in

18     there.

19             Q       You indicated that under the

20     agreement, you were to trade the account; is

21     that correct?

22             A       Uh-huh.

23             Q       Based on your recollection under

24     the agreement, how many days, weeks, months or

25     years were you to trade the account?

```
 1                          ZANGER                    22
 2          A      Again, I think that there are
 3   various provisions in there, but there's an
 4   overall clause for five years.
 5          Q      What were the bases for
 6   terminating the agreement?
 7          A      At this time?
 8          Q      In the agreement itself, from what
 9   you can recall, was there a basis for
10   terminating the agreement outlined in the
11   agreement?
12          A      There appears so, yes.
13          Q      What were those bases?
14          A      Well, I can't recall.
15                 MR. LANZA:  I'm going to show you
16          a copy of the agreement.  Let's have
17          this marked as IAM's Exhibit 2.
18                 (Whereupon, a document was marked
19          as IAM's Exhibit 2 for identification as
20          of this date by the Reporter.)
21          Q      Dan, take a look at that
22   (handing).  Do you recognize what I just
23   handed you, what is marked as IAM's Exhibit 2?
24          A      What was the question?  Just that
25   I have read it?
```

```
 1                          ZANGER                      23

 2                    MR. LANZA:  Can you read back the

 3          question?

 4                    (Whereupon, the referred to

 5          question was read back by the Reporter.)

 6                    THE WITNESS:  Yes.

 7          Q         What do you recognize that to be?

 8          A         An agreement.

 9          Q         Specifically, what agreement?

10          A         An agreement between Dan Zanger

11    and Independent Asset Management.

12          Q         When was that agreement signed?

13          A         Well, the date says, "10/20/04."

14          Q         So is it fair to say that you were

15    required to adhere to the agreement as of

16    October 20, 2004?

17                    MR. SEAR:  Objection to the form.

18          A         It is fair.

19          Q         Let's look at the second page of

20    the agreement.  Let's look at point four at

21    the bottom of the page.  Do you see that?

22          A         Uh-huh.

23          Q         Do you see that first sentence

24    there that begins with "it is understood"?

25          A         Okay.
```

ZANGER                                    24

1
2          Q      Can you read that out loud?

3          A      "It is understood by all parties

4    that DZ will be the sole manager in assets it

5    has brought in for Class Z and IAM has no

6    intention to replace or terminate DZ from the

7    management of Class Z shares so long as DZ

8    remains within the guidelines outlined herein

9    and is not in breach."

10         Q      In your own words, can you explain

11   what that means?

12                MR. SEAR:  Objection to the form.

13         A      It says that "DZ will be the sole

14   manager."

15         Q      The sole manager of what, to be

16   clear?

17         A      On assets that DZ has brought in.

18         Q      Can you explain what that means,

19   assets that DZ has brought in?

20                MR. SEAR:  Objection to the form.

21         A      To me, it means cash.

22         Q      Can you read the next sentence?

23         A      "If for some reason IAM needs to

24   terminate this agreement and/or DZ as manager,

25   DZ is free to redeem or remove all capital it

1

2   has raised or brought into Class Z shares for

3   the purpose of DZ's management program within

4   the terms and guidelines of this agreement."

5          Q      What does that mean?

6                 MR. SEAR:  I object.  You can

7          answer.

8          Q      In your own words, can you explain

9   what that sentence means?

10         A      Well, it says here "if for some

11  reason IAM needs to terminate this agreement

12  and/or DZ as manager, DZ is free to redeem or

13  remove all capital it has raised or brought

14  into Class Z for purpose of DZ's management

15  program."

16         Q      There are two words there.  One

17  word is "raised" and the other word is

18  "brought."

19         A      Correct.

20         Q      Can you explain what those words

21  mean in this context?

22         A      Well, it is kind of confusing.

23  Well, it makes it confusing instead of he.

24         Q      Just to be clear, what you are

25  saying is what is confusing is that the

ZANGER                                        26

2    pronoun "it" is there as opposed to the terms

3    "raised" or "brought"; is that correct?

4              MR. SEAR:  Objection to the form.

5         A    Yes.  It troubles me.  It just --

6         Q    Is it safe to say, you really

7    can't explain what that sentence means?

8              MR. SEAR:  Objection to the form.

9         A    I will leave it up to my attorney

10   to fully explain it.

11        Q    How about the third sentence?  Do

12   you want to take a look at the third sentence,

13   which begins with "IAM acknowledges"?

14        A    "IAM acknowledges that DZ has

15   control of redeeming from or remaining in IFL,

16   the assets it has placed or raised into

17   Class Z under the terms and guidelines of this

18   agreement."

19        Q    Do you see that there are terms

20   "placed" or "raised" there?  Can you explain

21   what those words mean in this context?

22        A    Well, it still bothers me.  I

23   think it should be something else, but it is

24   what it is and it says, "IAM acknowledges that

25   DZ has control of redeeming or remaining in

1

2    IFL, the assets it has placed."

3         Q     So let me just sort of ask you a

4    specific question:  You put in, approximately,

5    five million dollars at the inception of this

6    agreement, correct, or sometime not too long

7    after you signed the agreement; is that

8    correct?

9         A     Yes.

10         Q     Do you read that this last

11    sentence, do you understand that to mean that

12    you could have removed that five million

13    dollars at any period of time?

14         A     Well, the sentence kind of implies

15    that I can redeem or remove it at any time

16    that I have complete control over my own

17    assets.

18         Q     How about without just referring

19    to the sentence per se?  Is it your

20    understanding that according to this

21    agreement, the agreement that you had with

22    IAM, you could have removed that five million

23    dollars at any period of time?

24              MR. SEAR:  Objection to the form.

25         Answer it as best that you can.

```
 1                          ZANGER                      28
 2          A       Can you repeat the question?
 3                  MR. LANZA:  Read it back.
 4                  (Whereupon, the referred to
 5          question was read back by the Reporter.)
 6                  THE WITNESS:  Without referring to
 7          this agreement or this sentence?
 8          Q       No.  Just to be clear, I was
 9   asking you questions based on your
10   interpretation of this sentence before.  I am
11   not referring to that sentence per se anymore.
12   I am just saying in this agreement that you
13   signed with IAM, according to this agreement,
14   could you remove that five million dollars at
15   any time?
16          A       It is my understanding that yes.
17          Q       So hypothetically, you could have
18   redeemed your shares as early as July of 2005?
19          A       Hypothetically, yes.
20          Q       Even May of 2005?
21          A       Yes.
22          Q       You could have removed that five
23   million dollars an hour after you put it in;
24   is that correct?
25          A       Well, not only did I kind of get
```

ZANGER

1

2    that inference from the agreement, George

3    specifically told me that I was free to take

4    my money out at any time.

5         Q    Did you have an obligation to even

6    put any money in?

7              MR. SEAR:  Objection to the form.

8         A    Well, I believe that I did have an

9    obligation to put the money in.

10        Q    So the way that you understood the

11   agreement, to be clear, you had an obligation

12   to put the money in, but you could have taken

13   it out immediately thereafter?

14        A    Well, I never had any concepts to

15   take it out at all for any period of time.  I

16   did intend to take it out once the fund got

17   going.

18        Q    Just to be clear, I wasn't asking

19   about your intention.  I was asking about what

20   you understand the agreement to be.  You

21   indicated before that this agreement obligated

22   you to put five million dollars in; is that

23   correct?

24        A    Yes.

25        Q    You also indicated that that

```
 1
 2      agreement didn't obligate for you to have that

 3      money in for any specific period of time?

 4            A     Yes.

 5            Q     So according to your understanding

 6      of the agreement, the agreement effectively

 7      says that you can put five million dollars in

 8      say on a Monday morning at 9:00 and remove it

 9      at 9:15 that same day?

10                 MR. SEAR:  Objection.  Answer it.

11            A     I am basically under the

12      understanding that I had the freedom to do

13      that.

14            Q     Alright.  I want to sort of direct

15      your attention to point seven.  You don't have

16      to read it out loud, but I kind of ask you to

17      just read that.

18            A     Okay.

19            Q     That paragraph discusses a term of

20      the agreement; is that correct?

21            A     It says, "The term of this

22      agreement."

23            Q     It says that the term of the

24      agreement is five years; is that correct?

25            A     Yes.
```

```
 1                          ZANGER                      31

 2          Q       What is the term referring to?

 3                  MR. SEAR:  Objection to the form.

 4          A       Five years is referring to this

 5   agreement.

 6          Q       Can you point to any other part of

 7   that agreement that indicates a different term

 8   of the agreement?

 9                  MR. SEAR:  Objection to the form.

10          A       I'm not an attorney.

11          Q       So I will take that as a no at

12   this time?

13          A       I wouldn't say that.  I just said

14   that I'm not an attorney.  I am reading the

15   thing because you are asking me does it state

16   any other points.  I don't have the agreement

17   memorized, but there are a number of areas

18   here.

19          Q       Do you want to take some time to

20   point that out?

21          A       No.  Again, I am not an attorney,

22   but it appears that there are a number of

23   areas.

24          Q       I will move on.  Let's turn to

25   page 2.  Do you see paragraph 1 on page 2?
```

1                          ZANGER                          32

2          A       Yes.

3          Q       Do you see where it says,

4    "Leverage" under subheading A?  It says,

5    "Leverage will be limited to four to one

6    initially"?

7          A       Yes.

8          Q       Can you explain what leverage is?

9          A       Leverage is leverage, borrowing

10   money and using that to finance your -- your

11   wherewithal.

12         Q       So what does it mean when that

13   says, "Leverage four to one"?

14         A       You will have four times your cash

15   value.

16         Q       So explain what that means, just

17   to be clear.

18         A       It means if you have $100, you can

19   borrow $400.

20         Q       And you have subheading B under

21   that.  You have the term "liquidity is

22   important under any market condition."  Do you

23   see that?

24         A       Yes.

25         Q       Can you explain what liquidity

1

2      means?

3          A      Well, it is the ability to move

4      products around quickly.

5          Q      Can you elaborate on that?  I'm

6      not clear on what you mean by that.

7          A      It means the ability to be able to

8      sell something quickly.  It is a form of

9      quickly, you know.  It is up for

10     interpretation, but --

11              MR. SEAR:  Off the record.

12              (Whereupon, an informal discussion

13          was held off the record.)

14         Q      Can you explain to us -- there is

15     a point C and the term "redemptions."  Can you

16     explain that?

17         A      It says, "If any amounts are

18     redeemed within one year, two percent of such

19     amount shall be forfeited," which goes back to

20     your prior question.

21         Q      How about point D, "full

22     disclosure of positions will be necessary at

23     all times."  Can you explain what that means?

24         A      Well, full disclosure of positions

25     will be necessary at all times.  That means

1
2      the disclosure of your positions will be

3      necessary at all times, that basically anybody

4      will be able to see your positions, as

5      necessary, at all times.

6           Q      How are positions disclosed,

7      generally?

8           A      Well, um, there's -- you can log

9      into the system and see your positions.

10          Q      You mean the computer system that

11     you can log in?

12          A      Yes.

13          Q      What is the name of that system

14     that you use?

15          A      The one that we were using was

16     Redi, R-E-D-I.

17          Q      Now, point E, it says, "DZ shall

18     remain in full compliance at all times with

19     prime broker's limits, rules or guidelines."

20     Can you explain what that means in layman's

21     terms?

22          A      Well, it means that I will be in

23     full compliance at all times with trying to be

24     within broker's limits, rules and guidelines.

25          Q      That is essentially what I just

ZANGER                           35

2    read.   Can you sort of elaborate on that?

3          A      It pretty much means what it says.

4          Q      So I will take that as sort of no,

5    that you don't have anything to add to that?

6          A      Correct.

7          Q      How about point F?  Do you see it

8    says that "DZ must remain transparent and

9    compliant on all levels at all times to IFL

10   and IAM."  Can you in layman's terms explain

11   what it means to be transparent and compliant

12   in this context?

13         A      Again, the positions must be able

14   to be seen and that you must be compliant with

15   guidelines.

16         Q      With guidelines?  Where are you

17   getting the term "guidelines" from?

18         A      Well, I am getting it from the

19   English library, basically.

20         Q      Understood, but I mean, is the

21   term "guidelines" used in that sentence that

22   we just looked at?

23         A      In that sentence that we just

24   looked at, it is not.

25         Q      But you understand that the term

1
2    "compliant" means compliant with guidelines;

3    is that correct?

4         A    Yes.

5         Q    Is it broader than guidelines?

6              MR. SEAR:  Objection to the form.

7         A    Well, I can't interpret that.

8         Q    Let me ask you, let me give you a

9    specific situation and you can tell me about

10   subsection F, how it would apply.  Let's say

11   IAM requested you to sell a position at a

12   specific period of time.  Would you be

13   required to under subsection F?

14        A    If IAM asked me to sell a

15   position, would I be required to?

16        Q    That's correct.

17        A    No.

18        Q    Take a look at the next sentence.

19   It says something about draw downs below

20   20 percent.  Do you see that?

21        A    Yes.

22        Q    Can you explain what a draw down

23   is?

24        A    Well, draw down is referring to a

25   high water mark.

ZANGER                                              37

    Q        Explain what is a high water mark.

    A        A high water mark is the absolute

high point that a fund reaches at any one

given time.

    Q        What is a draw down in relation to

a high water mark?

    A        Well, any amount below the high

water mark is called a draw down.

    Q        So, effectively, what this is

saying is if you go below 20 percent of the

high water mark, that agreement may be

terminated; is that correct?

    A        That's what it says here.

    Q        There is also reference in this

agreement to your trading methodology?

    A        Okay.

    Q        Let me find it.  It says it on

page 1, the last whereas, "wheraas, it is

understood by IAM."

    A        Page 1?

    Q        Yes.  Go to the first page, where

it has whereas.  It says, "DZ's trading

methodology."  Just to be clear, DZ is you

here; is that correct?

ZANGER                                          38

2      A      Yes.

3      Q      So it talks about trading, your

4   trading methodology or your methodology.  Can

5   you explain what that is?

6      A      Do you want me to explain what my

7   trading methodology is?

8      Q      In sum and substance.  You don't

9   have to go in detail, I mean?

10      A      It is my acquired way of trading.

11      Q      But --

12      A      You want the exact methodology,

13   you know?

14      Q      Is there a term for it?

15      A      Yes.  Basically, I trade off

16   momentum.  I am highly dependent on momentum.

17      Q      What does that mean?

18      A      I am very dependent on leverage.

19      Q      Let me ask that.  What does it

20   mean to be dependent on momentum?

21      A      That is the velocity and change

22   and rate of change of stocks.

23      Q      You are dependent on stocks moving

24   a particular way; is that correct?

25      A      Yes.

ZANGER                                              39

1

2          Q       You say leverage is important; is

3     that correct?

4          A       My style.

5          Q       And why is that?

6          A       Well, because it is my style.

7          Q       I will move on.  It says some

8     points, it says a couple of points in that

9     same paragraph that I was referring to just a

10    moment ago.  It says, "It is understood by IAM

11    that DZ -- it is understood by IAM that DZ

12    wishes to arrange for the investment and

13    transfer of USD five million and up to fifty

14    million into an existing vehicle"; is that

15    correct.  It says that there?

16         A       Yes, that's correct.  It says that

17    there, that's correct.

18         Q       If you look on page 2 and you look

19    at paragraph 1, the third line, it is still

20    the first sentence, I believe, but the third

21    line of paragraph 1, it also says, "USD five

22    million up to fifty million"; is that correct?

23         A       It says it here.

24         Q       So just to be clear, did you

25    suggest -- I will withdraw that question.

```
 1
 2                Did you agree to put five million
 3      dollars or fifty million dollars in there?
 4           A      I agreed to put five million
 5      dollars in.
 6           Q      Then why does it say up to fifty
 7      million dollars?
 8           A      Well, my interpretation is that it
 9      gives me the option to add more if I so
10      choose.
11           Q      Did you ever discuss prior to
12      signing this agreement with anyone an
13      intention of putting more than five million
14      dollars in there?
15           A      Not that I can recall.
16           Q      You never did?
17           A      That's not what I said.  I said
18      that I don't recall that.
19           Q      So you don't know how the terms
20      and up to fifty million dollars got in there?
21           A      Well, George wrote it in there.
22      That's how it got in there.
23           Q      How do you know that George wrote
24      it in there?
25           A      I would assume that George or his
```

representative wrote it in there.

     Q    You just testified a moment ago
that you don't recall why it would be George
that put it in there as opposed to you.

     A    I didn't write the agreement.
George wrote the agreement.

     Q    Didn't you modify the agreement?

     A    I never modified the agreement,
none whatsoever.

     Q    You never made any modifications
on the agreement?

     A    I don't recall ever making a
modification on the agreement.

     MR. LANZA:  Let's move on.  I'm
going to show you the prime broker's
agreement here.  Let's have this marked
as IAM's Exhibit 3.

     (Whereupon, a document was marked
as IAM's Exhibit 3 for identification as
of this date by the Reporter.)

     Q    Mr. Zanger, why don't you take a
look at that (handing)?

     A    Do you want me to read the whole
thing?

1

2        Q      Just sort of take a look at it and

3    then I will ask you a question about it in a

4    moment.

5              MR. SEAR:  Off the record.

6              (Whereupon, an informal discussion

7         was held off the record.)

8              MR SEAR:  For the record, IAM's

9         Exhibit 3 is bates stamped five, six,

10        seven, eight, nine, ten, eleven, twelve,

11        thirteen, fourteen, fifteen and sixteen.

12             MR. LANZA:  Just for the record,

13        for some reason, there was a version out

14        there with bates stamped number 004236

15        in there.  I assume the copies that you

16        have shouldn't have it in there.

17             MR. SEAR:  That's correct.

18             MR. LANZA:  I appreciate you

19        pointing it out and I apologize for

20        handing you the wrong one.

21        Q      Mr. Zanger, have you had a chance

22    to look at IAM's Exhibit 3, what I just handed

23    you?

24        A      Okay.  I browsed briefly through

25    the pages, but I didn't read them thoroughly.

ZANGER                                          43

Q      Have you seen this document

before?

A      I can't recall ever seeing it

before.

MR. SEAR:  Objection to the form.

Q      Let's turn to the third page of

that document.  It is bates stamped 000007.

Do you see that?

A      Yes.

Q      Is that your name up on the top,

Daniel Zanger?

A      Yes.

Q      I just want to be clear, you have

never seen this document before?

A      I cannot recall seeing this

document before.

MR. LANZA:  Why don't we take a

five-minute break?

MR. SEAR:  Okay.

(Whereupon, a short recess was

taken.)

BY MR. LANZA:

Q      Prior to the break, I handed you a

document marked as IAM's Exhibit 3; is that

1                              ZANGER                        44

2          correct?

3                    A        Correct.

4                    Q        You said that you didn't recognize

5          the document, am I correct, that you did not

6          recognize the document?

7                    A        I don't recognize the document.

8                    Q        You have never seen this document

9          before?

10                   A        I don't recall seeing this

11         document before.

12                   Q        Were you aware that Goldman Sachs'

13         execution in clearing had an agreement with

14         Independent Funds Limited?

15                   A        The mere assumption.  I can only

16         assume that he had one.

17                   Q        You assume that there was an

18         agreement, but you have never seen it?

19                   MR. SEAR:  Objection.  He

20              testified three times on his

21              recollection.

22                   Q        We will move on.  You knew that

23         Goldman Sachs' execution in clearing had rules

24         and regulations; is that correct?

25                   A        They had various rules and various

1

2       regulations.

3               Q       Had you ever taken a look at them?

4               A       I don't recall ever taking a look

5       at them.

6               Q       Specifically, were you aware of

7       their regulations with regards to margins?

8               A       Again, they have various

9       regulations, rules and they seem to float.

10              Q       What do you mean by that?

11              A       Well, they just seem to be

12      modified periodically.

13              Q       Okay.  How do you know that they

14      are modified periodically?

15              A       Well, at times, I have been able

16      to go out beyond two to one on margin and they

17      never said anything.

18              Q       But you have never been aware of

19      their specific rules; is that correct?

20                      MR. SEAR:  Objection to the form.

21              A       I am not aware of their specific

22      rules insofar as the way that you are stating

23      it.

24              Q       Is it safe to say that you

25      concluded that their rules changed because

ZANGER                                              46

1
2       sometimes they didn't object to things that

3       you did?

4               A       Yes.

5               Q       Let's sort of turn to the

6       agreement itself again, which, I believe, was

7       Exhibit 2.  I am just going to ask you, in

8       general, would you say that you complied with

9       all U.S., federal and state and local laws

10      when you were trading on behalf of IFL, the

11      Independent Funds Limited?

12                      MR. SEAR:  Objection to the form,

13              but answer as best that you can.

14                      THE WITNESS:  Can you repeat the

15              question?

16                      (Whereupon, the referred to

17              question was read back by the Reporter.)

18                      THE WITNESS:  To the best of my

19              ability.

20              Q       What does it mean to comply with

21      U.S., federal, state and local laws while

22      trading?

23              A       Pretty much exactly what you said.

24              Q       I am confused.  I just asked if

25      you obeyed all U.S., federal, state and local

1                     ZANGER

2     laws.  My question was, specifically, what

3     does that mean to obey those laws?

4             MR. SEAR:  He just answered it.

5       A     To obey them.

6       Q     So just to be clear, your answer

7     is to obey laws means to obey laws; correct?

8       A     Well, pretty much.

9       Q     How about the applicable rules and

10    regulations of Bermuda?  Did you comply with

11    them while trading?

12       A     To my recollection, to the best of

13    my ability, I did.

14       Q     Are you aware of what those laws

15    are?

16       A     Well, I have never seen the laws

17    that I can recall.

18       Q     Do you work with a compliance

19    officer?

20             MR. SEAR:  Objection to the form.

21       Q     When you were trading with IFL,

22    did you have a compliance officer?

23       A     A Bermuda compliance officer?

24       Q     Any compliance officer.

25             MR. SEAR:  We are talking about

ZANGER                                              48

2      Dan personally?

3              MR. LANZA:  Yes.

4      A      I don't recall.  I don't recall.

5      Q      How about your other fund?  Is

6  there a compliance officer there at Westwood

7  Partners?

8      A      I don't recall a compliance

9  officer.

10      Q      Did you comply with the CFTC and

11  NFA regulations?

12              MR. SEAR:  Objection to the form.

13      Answer it as best that you can.

14      A      I can't say that I'm aware of

15  those regulations.

16      Q      My question was whether or not you

17  complied with the regulations.

18      A      Well, if I am not aware of them,

19  it would be hard to say that I complied with

20  them.

21      Q      Well, you did say that you

22  complied with the United States, federal,

23  state and local laws just a moment ago; is

24  that correct?

25      A      My interpretation is different

ZANGER

1
2    than what the other question is.

3        Q    I will move on.  Did you comply

4    with all of the rules or regulations on any

5    exchanges that you traded on while you were

6    carrying out your duties under the agreement?

7        A    Yes, to the best of my ability, I

8    did.

9        Q    Let's take another look at the

10   agreement.  Let's look at page 2.  Under

11   subsection A, which we just spoke about not

12   too long ago, "leverage shall be limited to

13   four to one initially, but promptly modified

14   as performance results are monitored," do you

15   see that?

16       A    I see that.

17       Q    While you were trading for IFL,

18   was leverage limited to four to one?

19           MR. SEAR:  You mean under this

20       agreement?

21           MR. LANZA:  Under this agreement,

22       while you were trading under this

23       agreement.

24       A    Initially.

25       Q    At a point where it went beyond