**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

INDEPENDENT ASSET MANAGEMENT LLC )    Case No. 1:07-cv-06431-JSR
and OLA HOLMSTROM,                              )
                                                              )
                    Plaintiffs,                        )
                                                              )    ECF
vs.                                                        )
                                                              )
DANIEL ZANGER,                                    )
                                                              )
                    Defendant.                        )
                                                              )
                                                              )
                                                              )
                                                              )

------------------------------------------------------------ x

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 4

ARGUMENT ......................................................................................................... 9

    I.     Plaintiff Has Not Established A Basis For Partial Summary Judgment ................ 9

         A.     Zanger Did Not Breach The Agreement .................................................. 10

              1.     Zanger's Creation of Margin Calls Did Not Breach The Agreement .......................................................................... 11

              2.     Zanger's Inducement of Day Trading Calls Did Not Breach the Agreement or Shut Down the Fund ....................................... 13

              3.     Zanger's Withdrawal of Funds Did Not Violate The Agreement ......................................................................... 14

              4.     Plaintiff Has Presented No Factual Basis for Its Assertion That Zanger Breached the Agreement by His Failure to Maintain Sufficient Liquidity .................................................... 15

              5.     There is No Evidence That Zanger Ever Failed to Disclose His Trading Positions to IAM ....................................... 15

              6.     Plaintiff Has Presented No Evidence To Support Its Allegation That Zanger Was Required to Maintain a $5 Million Investment in the Fund for a Period of Five Years ........ 16

              7.     There Is No Factual Support For Plaintiff's Allegation That 20% Drawdowns In The Account Represent a Breach of the Agreement ................................................................. 16

         B.     The Factual Record Illustrates That IAM Did Not Comply With Its Responsibilities Under The Agreement ............................................... 17

         C.     IAM Has Not Alleged Any Facts To Establish a Claim That Zanger Breached His Fiduciary Duty .................................................... 17

    II.    Defendant Is Entitled To Cross Motion For Partial Summary Judgment ............ 19

         A.     It Is Undisputed That Zanger's Creation of Margin Calls by Themselves Did Not Violate Any GSEC Rule or Regulation ................ 20

         B.     It Is Undisputed That Zanger Was Not Required To Invest $50 Million In The Fund .......................................................................... 21

         C.     It Is Undisputed That Zanger Was Not Required To Maintain An Investment Of $5 Million in the Fund .................................................... 22

         D.     It Is Undisputed That if Zanger's Trading Resulted In A 20% Drawdown, He Cannot Be Held Liable Under the Agreement .............. 22

         E.     IAM Breached the Agreement By Failing To Pay Management Fees To Zanger ...................................................................... 23

CONCLUSION.................................................................................................... 23

NYI-4083125v3

## TABLE OF AUTHORITIES

**Page**

### CASES

*America Telegraph & Telegraph Co. v. City of New York*, 83 F.3d 549 (2d Cir.1996) ...............10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................20

*Cal Distributor Inc. v. Cadbury Schweppes  Americas Beverages, Inc.*, No. 06-CIV-
      0496-RMB, 2007 WL 54534 (S.D.N.Y. Jan. 5. 2007) ................................................17, 18

*Tilden of N.J., Inc. v. Regency Leasing System, Inc.*, 230 A.D.2d 784..........................................18

### STATUTES

Fed. R. Civ. P. 56.......................................................................................................................10

Defendant Daniel Zanger ("Zanger") submits this Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment (the "Motion") and in Support of Defendant's Cross Motion for Partial Summary Judgment.

## PRELIMINARY STATEMENT

Plaintiff Independent Asset Management ("IAM") has filed a motion for partial Summary judgment (the "Motion") alleging that Defendant Daniel Zanger ("Zanger") breached his agreement (the "Agreement") with IAM, and that IAM satisfied all of its obligations to Zanger under the Agreement. That Motion is based upon allegations which not only are not supported by, but are also contradicted by, the undisputed factual record.

Zanger performed above and beyond what the Agreement required of him in an attempt to make his relationship with IAM successful. In accordance with the Agreement, Zanger invested $5 million dollars in the class Z shares of the Independent Fund Limited ("IFL") that IAM managed, profitably managed the trading of these shares for over 18 months, and initially provided $100,000 of working capital to IAM. Moreover, despite no obligation to do so, in early 2005, Zanger provided an additional $50,000 of working capital, and in mid 2006, he provided an additional $50,000 for marketing expenses to IAM. In October 2006, Zanger also met a $1.45 million day trading call with his own funds.

IAM's main responsibility in the relationship was to attract investors into the fund which it continuously represented it could and would do. However, as a result of IAM's failure to attract any outside investors, Zanger's initial $5 million investment represented over 95% of the total investment in the fund—with the remaining $450,000 investment made by an IAM owner. The Agreement provided for a sharing of management and performance fees between IAM and Zanger. Zanger could have and would have retained 100% of his investment and the trading profits he made if not for his relationship with IAM. Accordingly, because performance and

management fees would be paid to IAM from the monies invested in the fund and all trading

profits, the only way for the Agreement to be a commercial success for Zanger would be if

additional investors invested in the fund so that Zanger and IAM could collect management and

performance fees based on the additional investment and trading profits from those additional

investments.

Plaintiff now alleges a breach because Zanger's trading resulted in over 115 margin calls.

This allegation is unsupported by the factual record.  As George Szele ("Szele"), an owner and

director of IAM and Plaintiff's 30(b)(6) witness acknowledged at his deposition, those calls were

met within the time specified by the fund's prime broker, Goldman Sachs Execution and

Clearing ("GSEC").  IAM has provided no evidence, and there is none that exists that margin

calls that were met, violated any GSEC Rule or Regulation.  Moreover, Zanger's alleged breach

based on his trading contrasts dramatically with the documentary record of the position IAM

took during the period of the Agreement.  Zanger's trading resulted in over 70 margin calls in

2005.  However, in November 2005, George Szele, a director of IAM, who constantly monitored

the account, told Zanger in an instant message conversation that Zanger was viewed as a

"gunslinger" and that this would be attractive to certain investors and that IAM would find them.

In early 2006, Szele informed Zanger that he had had a "great year."  Further proof of the fact

that Zanger did not breach the Agreement in 2005 is the fact that, in early 2006, Ola Holmstrom,

an owner of IAM, invested approximately $450,000 in the fund.  Moreover, after Zanger's

trading resulted in additional margin calls, in September 2006, Szele begged Zanger to, "hang in

there and be patient – it's only a matter of time before people realize your/our added value,

especially if you kick some beeehind [sic] between now and year end."  Tellingly, despite over

100 emails and 50 instant message conversations between Zanger and Szele from 2005 through

2006, Szele never once informed Zanger that his creation of margin calls breached the Agreement in any way.

Plaintiff's additional allegations that two day trading violations created by Zanger terminated the fund and violated the Agreement are also unsupported by the facts. The day trading calls did not have a material impact on the fund. Goldman Sachs placed the account on a liquidation basis because the calls were not met, but IAM could have transferred the fund to another prime broker. Trading on behalf of the Class Z shares was terminated because Zanger exercised his right to redeem his investment at the end of 2006 because his relationship with IAM had been unsuccessful as a result of IAM's failure to attract additional investors.

Plaintiff's remaining allegations of breach are unsupported by the facts and rely on a misstatement of the plain language of the Agreement. Plaintiff alleges that Zanger violated the Agreement by withdrawing portions of his initial $5 million investment before five years; however, the Agreement explicitly allowed Zanger to withdraw his investment at any time, and even prescribed for a penalty if he did so within the first year. Moreover, Plaintiff's assertion that Zanger was required to make an initial investment of $50 million is contradictory to the terms of the Agreement which only required him to place an investment of <u>between</u> $5 and $50 million. Plaintiff's argument that Zanger breached by failing to maintain sufficient liquidity in the account to avoid margin calls, also fails because the Agreement only required that Zanger "notify" IAM if the account became illiquid. And Plaintiff's allegation that Zanger caused a breach of the agreement which entitles it to damages by causing drawdowns of over 20% disregards the plain language of the Agreement which provides that the sole action IAM could take based on such drawdowns was to terminate the agreement.

Szele and his partner Joseph Porco both admitted that under the Agreement, IAM was required to provide written notice of any breach to Zanger. In 2005 and 2006, IAM never provided any such notice to Zanger.

## **BACKGROUND**

In Mid 2004, George Szele ("Szele"), a director and owner of IAM, approached Zanger regarding the possibility of Zanger managing a class of shares of IAM. Szele indicated that he could raise up to $200 million worth of investments for Zanger to manage. Declaration of Daniel Zanger dated April 28, 2008 at ¶ 3 (hereinafter, the "Zanger Decl.") Szele failed to reveal to Zanger that, by its own admission, prior to speaking to Zanger, IAM was on the "brink of financial ruin" and had lost all of its previous investors. Letter from Szele and Porco to the United States Securities and Exchange Commission, dated January 4, 2006, at 6 ("SEC Letter"); (Zanger Decl., at ¶ 3).[1]

On October 19, 2004, Zanger and IAM entered an agreement (the "Agreement"), whereby Zanger agreed to manage Class Z shares of the Independent Fund Limited, IFL, of which IAM was the fund manager.[2] Pursuant to the Agreement, Zanger was required to purchase at least $5 million worth of Class Z shares. (Agreement ¶ 1). Zanger was entitled to have this amount redeemed at any time, but, if he withdrew any of his initial investment within

---

[1] The SEC Letter is attached to the Silberfarb Declaration as Exh. E. The Letter stated "the NYSE fraud set off a wave of related events that drove IAM to the brink of financial ruin and in doing so caused IAM's principals and their families to accumulate personal debt and to suffer credit damage as well as professional and personal embarrassment." (emphasis added) (Id. at 6; See also Deposition of George Szele, dated March 5, 2008 at 37:19-39:7 (hereinafter, "the March 5 Szele Deposition") (admitting that the quote was "true" and that he approved the use of the statement). A copy of the transcript from the March 5 Szele Deposition is attached to the Silberfarb Declaration as Exh. A. Before speaking to Zanger, IAM was forced to borrow over $450,000 from its family and friends, and Szele was forced to borrow additional funds to pay personal creditors and basic living expenses. (SEC Letter, p. 6 n. 13).

[2] The Agreement is attached to the Zanger Declaration as Exh. A. Szele drafted the agreement. (March 5 Szele Deposition at 84:12-84:15.)

the first year, he would be required to pay IAM a 2% withdrawal fee.  (Agreement ¶¶ 1c, 4).

Zanger was also required to place $100,000 in the account to fund IAM's working capital

requirements.  (Agreement ¶ 2II.)

As part of the Agreement, IAM and Zanger agreed split the 2% fees of assets under

management and 1/5 of the 20% performance fees generated by Class Z shares, which would be

paid from the fund on a monthly basis.[3]  (Agreement at ¶ 2i.)  If IAM wanted to assert a breach

of the Agreement, IAM had to notify Zanger in writing.  Deposition of Joseph Porco, dated

March 3, 2008, at 29:18-29:24 (hereinafter, the "Porco Deposition"; March 5 Szele Deposition

54:4-54:11.)[4]

In early 2005, Zanger wired a $5 million investment into IFL's Class Z shares in

accordance with the Agreement.  (Zanger Decl. ¶ 8.)  In 2005, Zanger's trading resulted in an

increase of over $4 million in Class Z shares value.[5]  (Id. At ¶ 9.)  Zanger also provided working

capital that allowed IAM to continue as a going concern.  In accordance with the Agreement,

Zanger provided $100,000 of working capital to IAM.  (March 5 Szele Deposition, at 168.)

Moreover, on April 17, 2005, Zanger entered an Addendum Agreement with IAM under which

he agreed to provide an additional $50,000 to IAM for its working capital needs.  He fulfilled

this obligation immediately.  (Zanger Decl. ¶ 10.)  (Addendum Agreement, ¶ 2).[6]  In 2006,

Zanger provided an additional $50,000 to IAM to fund IAM's agreement with R Capital

Advisers, LLC, who IAM represented would provide marketing resources.  (Zanger Decl. ¶ 11.)

---

[3] Under an Addendum Agreement between Zanger and IAM (the "Addendum Agreement"), dated April 17, 2007, IAM waived its right to fees until Zanger was reimbursed for $50,000 of working capital he provided to the fund.  (Addendum Agreement ¶ 2.).

[4] A transcript of the Porco Deposition is attached to the Silberfarb Declaration.

[5] This is equivalent to an increase in share value of approximately 80% rise.  (Zanger Declaration ¶  )

[6] The Addendum Agreement is attached to the Zanger Declaration as Exh. B.

Finally, on October 19, 2006, despite the fact that the Agreement did not require him to do so, Zanger wired $1.45 million of his own funds to meet a day trading call. (Zanger Decl. at ¶ 23.)[7]

In exchange for the value that Zanger provided, IAM continuously represented that it could and would attract investors to the fund. (Compl. ¶ 12) (IAM's role under the Agreement was to "use Defendant's performance in IFL as a means of marketing Defendant" to attract investors.) Throughout the relationship, Szele indicated to Zanger that he was in the process of lining up outside investors. (Zanger Decl. ¶ 12.) However, despite these promises, Szele was unable to attract any outside investors. The only additional investment came from an owner at IAM, who invested approximately $450,000 in early 2006. (March 5 Szele Deposition, 68:19-68:25.)

Attracting other investors was critical to the commercial success of the Agreement and was the only reason that the relationship between IAM and Zanger existed. (Zanger Decl. ¶ 13; March 5 Szele Deposition 86:24-87:8.) Had he not entered into the Agreement with IAM, Zanger could and would have retained his investment and any profits made as a result of his trading. Pursuant to the Agreement, fees were to be paid to IAM out of the moneys Zanger invested in the fund and profits generated by his trading on behalf of the fund. Thus, the only way for the agreement to be a commercial success for Zanger would be if IAM attracted additional investors so that Zanger could collect fees based on such additional investment and the trading profits associated with such additional funds.[8]

_____

[7] After the margin call was met, Zanger requested that IFL's fund administrator, Butterfield Financial Services ("BFS"), redeem these funds. (Zanger Decl. ¶ 23). After Butterfield contacted Porco and Szele, and they consented to the redemption, the funds were redeemed to Zanger. (Id.)

[8] From May 2006 through the end of the relationship in December 2006, IAM failed to pay Zanger his management fees in accordance with the Agreement, an amount totaling approximately $57,000. (March 5 Szele Deposition at 170:13-171:12.) During the course of the

Throughout the relationship, IAM was aware of and even encouraged Zanger to trade using leverage which inevitably lead to the creation of these margin calls.[9]  For example, both the Agreement and the fund's Offering Memorandum indicated that Zanger would use leverage when trading in the account. [10]  Zanger's reputation as a chart trader (which Szele was aware) further indicated that he should expect Zanger to use leverage while trading.[11]  Moreover, Gianina Arturo ("Arturo"), a representative of Goldman Sachs Execution and Clearing ("GSEC"), IAM's Prime Broker informed Directors at IAM that Zanger had created several margin calls.  For example, on December 1, 2005, Szele sent an email to Zanger indicating that Arturo said, "this sort of thing (day trading call) happens quite frequently with [Zanger] and others and" she was "not so concerned about that.")[12]  (See also Silberfarb Decl. Exh. M).

Szele did not discourage Zanger's use of leverage or the creation of margin calls.  In fact, he encouraged it.  On November 4, 2005 in an instant message conversation, Szele said to

---

(continued…)

Agreement, IAM received in excess of $250,000 of fees from the fund.  (Silberfarb Decl., Exh. O).

[9] Expert Report of Raymond L. Aronson dated February 29, 2008 (hereinafter, the "Aronson Report," at ¶ 18) (indicating that the use of leverage often leads to margin calls).  A copy of the Aronson Report is attached to the Silberfarb Declaration as Exh. F.

[10] The Offering Memorandum is attached to the Zanger Declaration as Exh. D.  The Agreement provides that, "it is understood by IAM that higher leverage is perhaps desirable and appropriate for [Zanger] and IAM will make every effort to quickly allow higher leverage limits either through IFL or through IAM's BVI offshore fund."  (Agreement ¶ 6).  The Offering Memorandum, provides: "[s]hares of each segregated account of the fund offered hereby are suitable only for sophisticated investors who are able to bear the possible loss of their entire investment in shares of the fund."  (Offering Memorandum, p. 5).

[11] Chart trading is a style of trading that disregards fundamentals.  Chart traders take positions based on directionality in stocks which may already be overpriced by any standard measure but continue to rise merely because they were already rising.  Chart traders typically use significant leverage because leverage multiplies potential profits.  (Aronson Report ¶¶ 16-17.)

[12] A copy of this email is attached to the Zanger Declaration as Exh. I.

Zanger, "you are considered a gunslinger in some ways – some people want and love that – we'll find them."[13]   In early 2006, Szele informed Zanger during an instant message conversation that he had a "great year".[14]   And, in early 2006, after IAM was aware of Zanger's use of leverage and creation of a significant amount of margin calls, Ola Holmstrom, an IAM director, invested $450,000 in the fund.  On September 17, 2006, Szele begged Zanger to continue the relationship: "Let's hang in there and be patient – it's only a matter of time before people realize your/our added value, especially if you kick some beeehind [sic] between now and year end."[15]   On September 26, 2006, Szele followed up this email with another email to Dan stating, "please give this 6 months, listen to me – do not give up."[16]   During the relationship between Zanger and IAM, Zanger exchanged over 100 emails and had in excess of 50 instant message conversations with him; yet, Szele never indicated that these margin calls breached the Agreement.  (Zanger Decl. at ¶ 24.)

GSEC never indicated that any of the margin calls created by Zanger's trading that were met constituted a violation of any rule or regulation.  From 2005 through December 2006, Gianina Arturo exchanged in excess of 100 emails with Szele or Porco; however, in these emails she never once indicated that Zanger's creation of margin calls that were met violated any Goldman Sachs rule or regulation.  (Zanger Decl. at ¶ 26.)  In late 2006 upon the request of IAM, Arturo attached a memo of all of the margin calls that had been made and met as a result of

---

[13] A copy of the transcript from this Instant Message conversation is attached to the Zanger Declaration as Exh. E.

[14] A copy of the transcript from this Instant Message conversation is attached to the Zanger Declaration as Exh. F.

[15] A copy of this email is attached to the Zanger Declaration as Exh. G.

[16] A copy of this email is attached to the Zanger Declaration as Exh. H.

Zanger's trading.[17]  In that email, Arturo was explicit in specifying that 115 margin calls had

been made and met and in no way did she indicate that these calls represented violations.  Szele

admitted that there is no basis to believe that any of these calls were not met by their due date.[18]

Deposition of George Szele, dated April 17, 2008, 271:16-273:4 ("April 17 Szele Deposition").

In November 2006, trading of class Z shares resulted in 2 pattern day trading calls.  The

calls were not met, and as a result GSEC placed trading in the account on a liquidation only basis.

This did not shut down the fund because IAM could have transferred the fund to another prime

broker.  (Aronson Report ¶ 24.)[19]  In December 2006, the trading on behalf of Class Z shares

effectively shut down because Zanger exercised his right to redeem his shares.[20]  (March 5 Szele

Deposition at 181:22-182:9) ("Dan wanted his money back.  He is the investor.  The account was

shut down by his actions.")

## ARGUMENT

### I.    Plaintiff Has Not Established A Basis For Partial Summary Judgment

---

[17] The email and attached memo are attached to the Silberfarb Declaration as Exhibit L. The copy of this email attached as part of Exhibit F to the Declaration of Craig Stuart Lanza in Support of Plaintiff's Motion for Summary Judgment is an inaccurate copy of the email.  The attachment to the email put forth by Plaintiffs does not attach the actual version of the memo. Instead, it includes an illegible version of the memo, with handwritten comments.

[18]    Q.    Do you have any information that would indicate that any of those calls were not met by the due date listed in this document?

A.    To my understanding, they were met.

Q.    They were met by the due date?

A.    I believe so.

A copy of the April 17 Szele Deposition is attached to the Silberfarb Declaration as Exhibit B.

[19] IAM did not attempt to transfer the account to another Prime Brokerage in order to continue trading.  (March 5 Szele Deposition at 180:22-181:4.)

[20] During the course of the relationship, IAM never once provided Zanger with written notice that he was in breach of the Agreement for any reason.  (Zanger Decl. ¶ 27.)

Under Rule 56 of the Federal Rules of Civil Procedure, the party moving for summary judgment "is entitled to a judgment as a matter of law" when "there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c). Here, there is a genuine issue of material fact regarding whether Zanger breached the Agreement.

### A.    <u>Zanger Did Not Breach The Agreement</u>

Zanger did not act with gross negligence, as would be required to show a breach under the agreement. The Agreement provides:

> Neither party will hold, or attempt to hold, the other party liable for any damages or losses suffered as a result of the other party's conduct as contemplated hereunder, except to the extent that such conduct constitutes willful malfeasance, fraud, theft, or *gross negligence*. In particular, but without affecting the generality of the preceding, IAM will not hold [Zanger] liable for any trading losses in its accounts, unless due to fraud, theft, or gross negligence of [Zanger]. Zanger was simply not grossly negligent."

(Agreement ¶ 9.)

Gross negligence is defined as conduct that, "evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Am. Tel. & Tel. Co. v. City of New York,* 83 F.3d 549, 556 (2d Cir.1996). Rather than acting in a manner that "smacks" of "intentional wrong doing," the factual record illustrates that Zanger did everything in his power to increase the likelihood that his relationship with IAM would succeed.

When the Agreement was signed, IAM, by its own admission, was on the "brink of financial ruin." During the relationship, Zanger invested $5 million in the Class Z shares, and contributed $150,000 for necessary working capital and $50,000 to hire a marketing firm to IAM. He even met a margin call with $1.45 million despite the fact that he was not required to do so under the Agreement. Moreover, solely as a result of Zanger's trading, Class Z shares turned a

profit of over $4.0 million dollars in the first calendar year of trading.  Zanger clearly met his

responsibilities under the Agreement.

1.    <b>Zanger's Creation of Margin Calls Did Not Breach The Agreement</b>

Plaintiff asserts that Zanger violated GSEC's rules and derivately the Agreement by

creating margin calls that were met.  (Motion p. 11-12.)  However, IAM has set forth no

evidence, and none exists to support this allegation.  IAM has acknowledged that the only

document which purports to create a GSEC rule or regulation is the Prime Broker Agreement.

(Letter from Craig Lanza to Mike Silberfarb, dated April 25, 2008; April 17 Szele Deposition

274:19-275:4.)[21]  There are no additional GSEC "house rules or regulations" that applied to

Zanger's trading.  (Id.)  The Prime Broker Agreement does not set forth any specific trading

rules or regulations.  Rather, it sets forth that Goldman Sachs at its discretion, can set forth limits

on the degree of margin used in IAM's account.  (Prime Broker Agreement ¶ 2.)

Plaintiff has not set forth a shred of evidence, and none exists, to show that GSEC

exercised this discretion or that GSEC ever indicated that Zanger's creation of margin calls

(aside from the two November 2006 day trading calls) violated any of its rules or regulations.

And the documentary evidence illustrates that GSEC never alleged a violation of its rules as it

would have done if Zanger had violated one of its rules.  Between April 2005 and October 2006,

Szele and Arturo exchanged in excess of over 100 emails regarding trading in Class Z shares;

however, during this period, Arturo never once even suggested that Zanger violated any rule or

---

[21] A copy of Prime Broker Agreement is attached to the Silberfarb Declaration as attachment G.  Plaintiff attempts to assert a breach because Zanger had not seen this agreement between GSEC and IAM.  This by itself does establish whether in substance Zanger violated the Prime Broker Agreement.  Zanger timely met 115 margin calls whether or not he saw the Prime Broker Agreement.

regulation.  (Zanger Decl. at ¶ 26.)[22]  Moreover, when asked to point to any evidence that

Zanger's creation of a margin call without more amounted to a violation of GSEC rules, Szele

could only point to one email from Arturo to Szele.  The memorandum attached to that email

distinguishes between the 115 margin "calls" that were met and the two day trading "violations."

Each of the 115 margin calls cited by defendant as "violations" by Plaintiff were described by

GSEC as "calls" and not "violations".  The email and attached memorandum are attached to the

Silberfarb Declaration as Exhibit L.  Moreover, every call listed in the memo has a due date.  At

his deposition, George Szele, IAM's 30(b)(6) witness, admitted that IAM could provide no

---

[22] In support of Plaintiff's allegation that Zanger violated GSEC rules or regulations,
Plaintiff's counsel, Craig Lanza, Esq., falsely indicated to this Court that a representative of
GSEC informed IAM that Zanger's margin calls were violations of GSEC's rule and regulations.
During oral argument on October 4, 2007, Lanza represented as follows:

> **Mr. Lanza**: Well your Honor, it really would just require taking a
> look at the e-mail exchanges from the prime broker to IFL
> specifically to Independent Asset Management saying you are in
> violation of our rules.  You've done this 125 times, or saying –
>
> **The Court**: Do they say that?
>
> **Mr. Lanza**: They do say that.  There are exchanges from a woman
> named Giovana Artura [sic] who works for Goldman, Sachs who
> were consistently irate over these margin calls, and they were –
>
> **The Court**: Well being consistently irate doesn't state a breach of
> contract.  It may, you know, give her lots of stress, but I
> understand that's part of being an employee of Goldman, Sachs
> anyway.  But does she say you violated the Rules.
>
> **Mr. Lanza**: Yes, your Honor.  It's our understanding that she does,
> and she actually indicates which rules were violated by these
> margin calls.

(Transcript of Oral Argument, October 4, 2007, at p. 7.)  A copy of the relevant excerpts
from this passage are attached to the Silberfarb Declaration as Exhibit N.  That representation
was false.  There are no such email exchanges in which the prime broker said that there were 125
violations of its rules, or any violation beyond the two November 2006 day trading calls.

evidence that any of the 115 margin calls were not met by the due dates. (April 17 Szele Deposition 271:16-273:8.)[23] Thus, there is no evidence in the record to support Defendant's allegation that Plaintiff's margin calls that were met violated any GSEC or Goldman Sachs rule or regulation.

### 2.    Zanger's Inducement of Day Trading Calls Did Not Breach the Agreement or Shut Down the Fund

Plaintiff argues that Zanger's creation of two day trading calls in November 2006 resulted in the a breach of the Agreement. However, Plaintiff has not established that there is no genuine issue of material fact regarding whether causing the day trading calls constituted gross negligence, which is necessary to show a breach of the Agreement. Day trading calls occur as a result of active trading and do not constitute, by themselves, a violation of anything. (Aronson Report at ¶ 20 n.1.) Zanger had no reason to sabotage the Class Z shares because his investment represented the significant majority of the total investment in those shares and because he would be the main individual who would suffer from any negative impact on the shares. Moreover, Zanger was aware that if he wanted to terminate his relationship with IAM, he could have removed his funds in accordance with the Agreement at any time. (Zanger Decl. ¶ 5.) Thus, at the very least, Plaintiff has failed to establish that there is no material issue of fact regarding whether Zanger had the requisite mental state for his actions to arise to the level of gross negligence, a mind state that "smacks" of "intentional wrongdoing."[24]

---

[23] The other two other emails cited by Plaintiff as evidence of Zanger's margin violation also indicate that Zanger created margin "calls" but never suggest that these calls were violations. (Silberfarb Decl. Exh. M).

[24] Plaintiff argues that Zanger's failure to meet the day trading calls violates NYSE Rule 431 (Motion, at 14); however IAM has set forth no evidence that Zanger had any responsibility to meet these margin calls. Plaintiff's argument that the Course of Dealing establishes Zanger's responsibility for all aspects of trading, including meeting calls, is an attempt to give Zanger more responsibilities than the Agreement provides. The Agreement and the Addendum

Plaintiff also argues that Zanger's day trading calls caused the termination of the agreement. However, as Szele admitted at his deposition, trading on behalf of the Class Z shares was terminated because Zanger decided to withdraw his funds in recognition that his relationship with IAM was unsuccessful. (March 5 Szele Deposition 86:24-87:8.) IAM could have moved the account to another broker at that time (where it would no longer be on liquidation status) (Aronson Report ¶ 24); however, IAM never sought to find such a broker. (March 5 Szele Deposition 180:22-181:4.)

### 3.    Zanger's Withdrawal of Funds Did Not Violate The Agreement

In October 2006, Zanger met a margin call on behalf of IAM with a cash wire of $1.45 million of his own funds despite the fact that he was not required to do so under the Agreement. (Zanger Decl. at ¶ 23.) Plaintiff argues that Zanger's withdrawal of funds from the account to repay that amount without the consent of IAM violated the Agreement. (Motion at p. 11-12.) However, the record establishes that the repayment was fully authorized. The day after the call had been met Zanger requested that the Butterfield Financial Services ("BFS"), the fund's administrator, wire the funds back to him because the call had been met and IAM was no longer at risk of a violation. (Zanger Decl. at ¶ 23.) Prior to wiring the funds back to Zanger, BFS notified IAM of the requested withdrawal. (Id.) Szele and Porco consented to the wire. (Id.; Silberfarb Decl. Exh. K.) Thus, there is no factual basis to Plaintiff's claim that Zanger's withdrawal of these funds violated the Agreement.[25]

_____

(continued…)

Agreement represent the only documents establishing responsibilities owed by Zanger to IAM. (Agreement ¶ 20.)

[25] IAM failed to notify Zanger in writing that his withdrawal constituted a breach as was required under the Agreement. (Zanger Decl. ¶ 27.)

4.    **Plaintiff Has Presented No Factual Basis for Its Assertion That Zanger Breached the Agreement by His Failure to Maintain Sufficient Liquidity**

Plaintiff argues that Zanger breached the Agreement by failing to "maintain sufficient liquidity to avoid creation of margin calls."[26]  However, this allegation, distorts the plain language of the Agreement and the factual record.  The Agreement did not require Zanger to maintain sufficient liquidity to avoid the creation of margin calls.  Instead, it required Zanger to "notify" IAM if the account became "illiquid."  Thus, under the plain language of the Agreement, IAM's allegation of a breach based solely on Zanger's failure to maintain sufficient liquidity, without reference to notice, must fail.

Moreover, even assuming that Zanger could violate the Agreement simply by causing illiquidity, Plaintiff's assertion places a higher standard on Zanger than the Agreement dictates.  The Agreement says nothing about Zanger maintaining sufficient liquidity to maintain margin calls.[27]  Instead, it requires that he notify them if the account became illiquid.  Plaintiff has made no allegation that the account ever became illiquid.

5.    **There is No Evidence That Zanger Ever Failed to Disclose His Trading Positions to IAM**

Plaintiff also argues that "Zanger…breached his obligations by refusing to disclose his positions at all times to IAM." (Motion ¶ 14.)  However, there is no evidence in the record that, when requested, Zanger failed to disclose him positions to Szele.  Moreover, Szele constantly

---

[26] Pursuant to this Court's Order on March 19, 2008, the Court dismissed Plaintiff's allegations that NYSE and Regulation T margin calls arise to gross negligence.  Therefore, it is not relevant to the issue here of whether Zanger's actions violated the Agreement.

[27] Any lack of sufficiency of liquidity in the account was caused by IAM's failure to attract additional investors.  Had there been additional funds in the account from other investors, Zanger would have had sufficient liquidity to meet any margin calls.  IAM now attempts to blame the insufficient liquidity in the account on Zanger, when in fact, it was its failure to attract investors that resulted in the level of assets in the fund.

monitored the account.  Szele's awareness of Zanger's positions was illustrated by the fact that

he constantly advised Zanger regarding the position of Class Z shares.  (Zanger Decl., at ¶ 24.)

Finally, despite his awareness of Zanger's margin calls, Szele never once informed Zanger in

writing that Zanger was in breach for failure to disclose—as was required to notice a breach

under the Agreement.  (Zanger Decl. ¶ 27.)  There is thus no factual basis to this allegation.

6.    **Plaintiff Has Presented No Evidence To Support Its Allegation That Zanger Was Required to Maintain a $5 Million Investment in the Fund for a Period of Five Years**

Plaintiff also argues that "Zanger promised to deposit '$5 to $50 million dollars' into

IAM for a term of 5 terms."  (Motion, at p. 2.)  Although the Agreement established that Zanger

was required to deposit an initial investment of between $5 and $50 million into the Agreement,

the agreement provides that "IAM acknowledges that [Zanger] has control of – redeeming from

or remaining in IFL – the assets it has placed or raised into Class Z, under the terms and

guidelines of this Agreement."  (Agreement, at ¶ 4.)  The agreement further provides that "[i]f

any amounts are redeemed within one year, 2% of such amounts shall be forfeited to IAM."

(Agreement, at ¶ 1c.)  The plain language of the Agreement makes clear that Zanger was allowed

to redeem his investment within the first five years.

7.    **There Is No Factual Support For Plaintiff's Allegation That 20% Drawdowns In The Account Represent a Breach of the Agreement**

IAM argues that Zanger violated the Agreement because "[h]e did not keep drawdowns

below 20%."  (Motion at pp. 6-7.)  The Agreement does not provide an absolute requirement that

Zanger would be liable to IAM if his trading resulted in 20% drawdowns.  It provides a specific

remedy that: "if [Zanger] is not able to keep drawdowns below 20% this Agreement may be

terminated by IAM."  (Agreement, at ¶ 1g.)  IAM did not terminate the agreement after any

drawdowns.  Therefore, under the plain language of the Agreement, Zanger could not have breached the Agreement based on the alleged creation of a 20% drawdown.[28]

**B.**    **The Factual Record Illustrates That IAM Did Not Comply With Its Responsibilities Under The Agreement**

Plaintiff argues that "[t]hroughout the entire duration of IAM's relationship with Zanger, IAM satisfied its contractual obligations to Zanger…There can be no doubt that IAM did what it was required to do under the Agreement."  (Motion, at 8-9.)  However, this allegation too, is not supported by the factual record.  Under the Agreement, IAM was required to pay Zanger monthly maintenance fees.  (Agreement at ¶ 1i.)  At his deposition, George Szele admitted that IAM intentionally withheld approximately $57,000 in management and fees from May 2006 through the end of Agreement in December.  (March 5 Szele Deposition at 170:13-171:12.)  This breach occurred despite Zanger's continued performance of the Agreement through the end of 2006.  (Id.)  To date, these fees still have not been paid, and Szele admitted he has no intention to pay these fees.  (Id.)  Therefore, it is undisputed that IAM has intentionally failed to perform its obligations under the Agreement.

**C.**    **IAM Has Not Alleged Any Facts To Establish a Claim That Zanger Breached His Fiduciary Duty**

As discussed in Defendant's Motion to Dismiss the Amended Complaint, IAM cannot merely reiterate and repackage its claim of breach of Agreement under the rubric of a breach of fiduciary duty claim.  "A cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand."  *See Cal Distributor Inc. v. Cadbury Schweppes*

---

[28] IAM never informed Zanger in writing that 20% drawdowns constituted a breach of the Agreement as required by the Agreement.  In fact, Szele appeared to encourage Zanger to employ a trading style that could result in 20% drawdowns.  In an email to Zanger dated May 23, 2005, he stated, "[s]o we would have Class Z shares which is Dan's money and which can take those investors that can withstand 20% drawdowns or more, like Dan can." (Zanger Decl. Exh. J).

*Americas Beverages, Inc.*, No. 06-CIV-0496-RMB, 2007 WL 54534 at *9 (S.D.N.Y. Jan. 5, 2007) (citations omitted).  Thus, a claim for breach of fiduciary duty that is "premised upon the same facts and seeks damages for the same alleged wrong as the breach of contract claim" must be dismissed as a matter of law.  *See id.*  The rationale for this rule is that "parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."  *See id.*  Here, both parties acknowledge the existence of a valid contract which sets forth the total responsibilities they have to one another.  The Agreement has an integration clause which states "[t]his Agreement comprises the entire understanding between the parties and supersedes all other oral or written agreements."  (Agreement ¶ 20.)  The allegation of breach of fiduciary duty contained in the Amended Complaint mirrors the breach of contract claim,[29] and discovery has not revealed any facts to support a separate claim.

IAM's claim that it was engaged in a joint venture with Zanger also is not supported by any facts.  *See* Amended Compl. ¶ 64.  IAM cannot reference any provision of the Agreement that would evince an intent to enter into a joint venture, or a provision for the sharing of profits and losses.[30]  Therefore, no joint venture was alleged to have existed and may not be the basis for a claim of breach of fiduciary duty "above and beyond" Defendant's contractual duties.

---

[29]  In Count I, Breach of Contract alleges that Defendant breached by refusing to disclose the fund's positions at all times, refusing to keep drawdowns below 20%, refusing to comply with all applicable exchange rules, refusing to comply with Prime Broker rules, inducing 115 margin calls and two day trading violations, and refusing to cover the last margin call.  Compare Count II, Breach of Fiduciary Duty, which states that "IAM and Defendant were engaged in a joint venture" (Amended Compl. ¶ 64), and that "Defendant recklessly caused excessive margin calls and then intentionally refused to cover such calls in order to shut IFL down and redeem his money."  *Id.* at ¶ 67.

[30]  The required elements of a joint venture are an "agreement manifesting the intent of the parties to be associated as joint venturers, a contribution by the coventurers to the joint undertaking (*i.e.*, a combination of property, financial resources, effort, skill, or knowledge), some degree of joint proprietorship or control over the enterprise, and a provision for the sharing

Finally, even if IAM's allegations supported some fiduciary duty owing to IAM by Defendant related to care and loyalty with regard to his trading, IAM has set forth no evidentiary support for its claim that Zanger breached his fiduciary duty to them.  Zanger's trading resulted in significant profits for the fund.  The 115 margin calls that were made during the period of trading by Zanger were met in a timely fashion and he met one day trading call with his own funds despite the fact that he was not obligated to do so under the Agreement.  As illustrated above, it was Zanger's providing of substantial working capital to IAM that allowed IAM to continue as a going concern in 2005 and 2006.

Therefore, Plaintiff has set forth no evidence to support its claim that Zanger breached its fiduciary duty to Defendant.

## II.    Defendant Is Entitled To Cross Motion For Partial Summary Judgment

Defendant cross moves for summary judgment because there is no factual dispute that: Zanger's creation of margin calls, without more, did not violate any GSEC rule or regulation; Zanger was not required to place an initial investment of $50 million in the fund; Zanger was not required to maintain his initial $5 million investment in the account for a period of five years; and 20% drawdowns in the Class Z shares do not beach the Agreement.  Moreover, Zanger is entitled to summary judgment on its cross claim that IAM failed to pay him monthly management fees from May 2006-December 2006.

Under Rule 56 of the Federal Rules of Civil Procedure, the party moving for summary judgment "is entitled to a judgment as a matter of law" when "there is no genuine issue as to any

---

(continued…)

of profits and losses."  *See Tilden of N.J., Inc. v. Regency Leasing Sys., Inc.*, 230 A.D.2d 784, 785-86; 646 N.Y.S.2d 700, 701 (2d Dep't 1996) (citation omitted).

material fact." FED. R. CIV. P. 56(c). Whether a fact is material is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48.

**A.**     **It Is Undisputed That Zanger's Creation of Margin Calls by Themselves Did Not Violate Any GSEC Rule or Regulation**

In its Amended Complaint, Plaintiff alleges that Zanger's inducement of margin calls, by themselves, violated GSEC's rules or regulations. For example, Plaintiff alleges that "Defendant induced at least 115 margin calls, each of which was a direct violation of his Agreement with IAM to comply with the Prime Broker Agreement…." (Amended Compl. ¶ 29; see also Amended Compl. ¶¶ 30-32.)

There is no evidence, nor has there ever been any evidence, that Zanger's creation of margin calls, by themselves, violated any Goldman Sachs Rule or Regulation. As Plaintiff acknowledges, the only document which purports to describe any GSEC rule or regulation is the Prime Broker Agreement. (April 17 Szele Deposition 274:19-275:4). The Prime Broker Agreement does not set forth any specific rules or regulations about allowance or margin calls. It merely sets forth that GSEC has the discretion to set forth restrictions on IAM's trading. (Prime Broker Agreement, ¶ 2).

Of the 100 emails between Gia Arturo and Szele during the course of the relationship, not one indicates that Zanger ever violated GSEC house rules by the creation of a margin call that was subsequently met. (Zanger Decl. ¶ 26.) George Szele was not able to produce any such communication at either of his depositions. (March 5, 2008 Szele Deposition 45-50, 53, 64-65; April 17, 2008 Deposition 263:7-264:9).

In his deposition testimony, George Szele could only point to one document which he claimed illustrated that Zanger's margin calls violated GSEC's house rules. (April 17 Szele Deposition 267:19-267:25). However, as discussed above, this email lists margin calls as either "calls" or "violations." Each of the 115 margin calls cited by Defendant was described as a "call", not a violation. (Silberfarb Decl., Exh. G). Szele even admitted at his deposition that IAM had no factual support that these margin calls were not timely met. (April 17 Szele Deposition 271:16-273:4) Hence, there is no genuine issue of material fact, and these allegations should be dismissed.

### B.    It Is Undisputed That Zanger Was Not Required To Invest $50 Million In The Fund

There is no genuine issue of material fact regarding whether Zanger was required to place $50 million into class Z shares under the Agreement. Throughout these proceedings, Plaintiff has asserted that, under the Agreement, Plaintiff was required to make such an investment. For example, several of Plaintiff's alleged damages rely on a requirement $50 million investment by Zanger and the expert report of Ezra Zask assumes that Zanger was required to make a $50 million investment. (April 17 Szele Deposition, at 324:23-325:15, Expert Report of Ezra Zask, at ¶ 19.)[31] As Plaintiff acknowledges in the Amended Complaint, the plain language of the Agreement required Zanger to make an investment between $5 and $50 in Class Z shares. (Amended Compl., at ¶ 15.) Plaintiff's own expert explicitly testified that Szele admitted Zanger was not "legally obligated" to make an investment of $50 million in the fund Class Z shares. (Zask Deposition, at 71:25-72:5.) Therefore, there is no genuine issue of material fact regarding whether Zanger was required to invest $50M in the account, and summary judgment is appropriate.

---

[31] The Expert Report of Ezra Zask is attached to the Silberfarb Declaration as Exh. I.

C.    **It Is Undisputed That Zanger Was Not Required To Maintain An Investment Of $5 Million in the Fund**

There is also no genuine issue of material fact regarding whether Plaintiff was required to maintain his $5 million investment in IAM.  Plaintiff argues that "Defendant … agreed that he would keep at least $5 million in IFL for the entire five year period."  (Amended Compl., at ¶ 4.) This allegation is in stark contrast to the plain language of the Agreement which states, "IAM acknowledges that [Zanger] has control of – redeeming from or remaining in IFL – the assets it has placed or raised into Class Z, under the terms and guidelines of this Agreement." (Agreement ¶ 4.)  Moreover, the Agreement makes clear that withdrawal is allowed (even within the first year): "[i]f any amounts are redeemed within one year, 2% of such amounts shall be forfeited to IAM."  (Agreement ¶ 1c.)  The plain language of the Agreement makes clear that Zanger was not required under the Agreement to keep his money in Class Z shares for five years, and Plaintiff's have set forth no facts to contradict this language.[32]  Therefore, it is appropriate to grant summary judgment on this allegation against defendant Zanger.

D.    **It Is Undisputed That if Zanger's Trading Resulted In A 20% Drawdown, He Cannot Be Held Liable Under the Agreement**

IAM  alleges that Zanger violated the Agreement because his trading resulted in 20% drawdowns.  The Agreement did not, however, require Zanger to keep drawdowns below 20%; it simply provided a right of termination.  The relevant portion of the Agreement states that: "if [Zanger] is not able to keep drawdowns below 20% this Agreement may be terminated by IAM." (Agreement ¶ 1G.)  Therefore, the plain language of the Agreement makes clear that there is no factual support for Plaintiff's assertion that if Zanger's trading resulted in a 20% drawdown,

---

[32]  In fact, Szele admitted that he approved Zanger's withdrawal of $4 million in early 2006 which put the account at below $5 million.  (March 5 Szele Deposition, at 82:15-83:16.)

Plaintiff would be entitled to damages for breach of the Agreement.  Summary judgment is therefore appropriate.

**E.      IAM Breached the Agreement By Failing To Pay Management Fees To Zanger**

There is also no genuine issue of material fact that IAM breached the Agreement by failing to Zanger to pay him management and performance fees due under the Agreement.  The Agreement states that "IAM will be allocated 50% of the 2% Management Fee (or 1 of the 2%) and 25% of the 20% Performance Fee (or 5 of the 20%), on the capital managed by [Zanger] in Class Z shares.  The remaining percentages (1 and 15) shall be allocated to [Zanger]." (Agreement ¶ 2.i.)  Both Szele and Porco admitted in their depositions that IAM failed to pay Zanger management fees from April 2006 - November 2006 despite Zanger's continued trading on behalf of IFL, and despite the fact that IAM paid itself management fees out of IFL's Class Z shares.  (Porco Deposition, at 40:6-43:25, Szele Deposition, at 170:13-171:12.)  The management fees owed to Zanger under the Agreement total approximately $57,000 pursuant to a document created by Szele's accountant, and that amount still has not been paid.  (March 5 Szele Deposition, at 170:13-171:12)  Accordingly, IAM breached the Agreement.

**CONCLUSION**

For the reasons stated above, Defendant respectfully requests that the Court deny Plaintiff's Motion for Partial Summary Judgment and grant Plaintiff's Cross Motion for Partial Summary Judgment.

Dated: April 28, 2008                                    Respectfully submitted,


                                                        _s/_ Matthew E. Szwajkowski
                                                        Thomas H. Sear (TS-5570)
                                                        Michael D. Silberfarb (MS-9678)
                                                        Matthew E. Szwajkowski (MS-8362)
                                                        JONES DAY
                                                        222 East 41st Street
                                                        New York, NY 10017-6702
                                                        Telephone:  (212) 326-3939
                                                        Facsimile:  (212) 755-7306
                                                        msilberfarb@jonesday.com

                                                        *Attorneys for Defendant Daniel Zanger*

<u>CERTIFICATE OF SERVICE</u>

The foregoing document was served on the following counsel of record on April 28, 2008

via the method listed below:

**<u>E-Mail, and Courier</u>**

John Balestriere, Esq.
Craig Stuart Lanza, Esq.
Balestriere, Lanza, PLLC
225 Broadway, Suite 2700
New York, NY 10007
clanza@balestriere.net

*s/ Michael D. Silberfarb*