# Exhibit A

# (Part 1 of 2)

3

```
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    --------------------------------x
      INDEPENDENT ASSET MANAGEMENT
 4    LLC and OLA HOMSTROM,

 5            Plaintiffs,

 6    v.              1:07-CV-06431-JSR

 7    DANIEL ZANGER,

 8            Defendant.
      --------------------------------x
 9
10
11            March 5, 2008
12            10:27 a.m.
13
14        Deposition of GEORGE SZELE, taken by
15    defendant, pursuant to notice, at the offices of
16    Jones Day, 222 East 41st Street, New York, NY,
17    before Lisa Mango, a Shorthand Reporter and
18    Notary Public of the State of New York.
19
20
21
22
23
24
25
```

---

1

```
 1    STIPULATIONS
 2
 3
 4        IT IS HEREBY STIPULATED AND AGREED,
 5    by and between counsel for the respective parties
 6    hereto, that all objections, except as to form,
 7    are reserved to the time of trial.
 8        IT IS FURTHER STIPULATED AND AGREED
 9    that the deposition may be signed and sworn to
10    before any officer authorized to administer an
11    oath.
12        IT IS FURTHER STIPULATED AND AGREED
13    that the sealing and filing of the deposition be
14    waived.
15
16
17
18
19
20
21
22
23
24
25
```

2

```
 1    APPEARANCES:
 2
 3
 4    BALESTRIERE, PLLC
 5        Attorneys for plaintiffs
 6        225 Broadway
 7        Suite 2700
 8        New York, NY 10007
 9    BY: CRAIG STUART LANZA
10        WILLIAM HOLLEMAN
11
12    JONES DAY
13        Attorneys for defendant
14        222 East 41st Street
15        New York, NY 10017
16    BY: THOMAS H. SEAR
17
18
19
20
21
22
23
24
25
```

---

4

```
 1                         Szele
 2    GEORGE SZELE,
 3        called as a witness, having been duly sworn,
 4        testified as follows:
 5            MR. SEAR: Let me just note for the
 6        record it is about 10:27. I assume you got
 7        caught in traffic?
 8            THE WITNESS: Train.
 9            MR. LANZA: Despite my promises to the
10        contrary, I do have to say I was here at
11        10 o'clock.
12            THE WITNESS: They had about 20-minute
13        delays on the train, Metro North.
14    EXAMINATION
15    BY MR. SEAR:
16        Q.  Mr. Szele, let me show you what we
17    previously marked as Zanger Exhibit 3 and ask you
18    to take a look at that and tell us what that is.
19        A.  It's an agreement between Daniel Zanger
20    and Independent Asset Management.
21        Q.  And is this an agreement that you
22    executed on behalf of Independent Asset
23    Management on or about October 19, 2004?
24        A.  It is.
25        Q.  Can we refer in this deposition to
```

5

7

Szele

1    Szele
2    Independent Asset Management by the name IAM?
3    A.   Yes.
4    Q.   There is reference in the agreement to
5    the Independent Fund Limited, IFL. Can with we
6    refer to that as the Fund?
7    A.   Yes.
8    Q.   Approximately how much prior to
9    October 19, 2004 was it that you first had
10   contact with Mr. Zanger?
11   A.   September 28, 2004 was the
12   introduction. September 29 in the morning we had
13   our first conversation.
14   Q.   Approximately how many times did you
15   have conversations with Mr. Zanger before
16   entering into this agreement?
17   A.   I'm not sure.
18   Q.   Can you tell us approximately?
19   A.   I'd have to check. I really can't
20   approximate.
21   Q.   Was it more than ten?
22   A.   I don't think so.
23   Q.   Was it more than five?
24   A.   I'm just not sure. I'd have to check.
25   Q.   What would you check?

Szele

1    Szele
2    A.   I said what does high net worth mean,
3    because I need a minimum. He said, well, I'd be
4    going to transfer up to $50 million of my money
5    to rev this up. I said that would be fantastic
6    because that would help us ramp it up. I said I
7    needed at least 5 million.
8    Q.   What else was said in the negotiations
9    in substance by you or by him?
10   A.   We discussed the terms that are in
11   here. Then he said write it up.
12   Q.   Beyond what you told us, what else did
13   you say, what else did he say?
14   A.   Just everything that's in this
15   agreement is what we discussed. Then he had me
16   write it up. He said you write it and give it to
17   me as a draft.
18   Q.   Beyond what you've told us, what else
19   did you say and what else did he say in substance
20   leading up to the execution of this agreement?
21   A.   Besides what's in this contract, I
22   don't believe we discussed too much else than
23   what he wanted me to put in here based on his
24   desire to be involved in a joint venture.
25   Q.   So have you now told us to the best of

6

8

Szele

1    Szele
2    A.   I would check e-mails and IMs.
3    Q.   Did you have e-mails with Mr. Zanger in
4    this late September, October 2004 period?
5    A.   The first e-mail was September 29.
6    That was the first e-mail when I sent him the
7    first draft of the agreement based on our
8    discussions.
9    Q.   Okay. Do you recall how many other
10   such e-mails there were?
11   A.   I'm not sure.
12   Q.   Could you tell us to the best of your
13   recollection the substance of what you
14   communicated to and from Mr. Zanger prior to
15   entering into this agreement?
16   A.   We discussed what I do -- I'm just
17   going to summarize here. We discussed what I do,
18   the Fund structure and what he's looking to do.
19   He said to me I'd like to get an offshore effort
20   going with most of my net worth to build a
21   business offshore. That was the gist of how we
22   started the conversation.
23   Q.   What did you say in response to that or
24   in any other respect in terms of the
25   negotiations?

Szele

1    Szele
2    your recollection what he said and what you said
3    in substance in writing or orally concerning
4    matters covered by the agreement leading up to
5    the agreement?
6    A.   What we discussed that morning is what
7    I put into the draft agreement. And he asked me
8    how much, you know, how much time I'm going to
9    put in. I said I'm going to put in a lot of
10   time. He said I'll put in a lot of capital and
11   we'll ramp up the business. Sounds great. He
12   was excited.
13   Q.   Beyond what you told us, what else did
14   you say and what else did he say concerning these
15   matters before the agreement was executed?
16   A.   I don't think really too much else was
17   discussed besides what's in here.
18   Q.   Okay. Do you recall anything being
19   said concerning the Fund beyond what is set forth
20   in the agreement?
21   A.   I'm not sure what you mean by that
22   question.
23   Q.   Beyond what you've told us, do you
24   recall telling him anything with respect to the
25   Independent Fund Limited?

9

Szele

1  A.  I told him that we're trading manager
2  of that fund. That we built the business with
3  top service providers. That we can offer him a
4  class of share to manage. Exactly what's in here
5  is what we discussed. And I can get going with
6  him as soon as he wants.
7      Q.  Beyond what you've now told us, do you
8  recall telling him anything else concerning IAM
9  or the Fund prior to the execution of this
10  agreement?
11     A.  Specifically I don't recall anything
12  else besides what's memorialized in the draft.
13     Q.  Generally do you recall anything else
14  being discussed between you and him concerning
15  IAM or the Fund prior to the execution of this
16  agreement?
17     A.  I do not.
18     Q.  Did you prepare for your testimony
19  before you came here today?
20     A.  Did I prepare?
21     Q.  Did you do anything in connection with
22  getting ready to testify?
23     A.  Yes.
24     Q.  Did you meet with counsel?

10

Szele

1  A.  Yes.
2      Q.  Did you go over the matters covered by
3  the complaint in this action?
4      A.  Yes.
5      Q.  How long did you meet with counsel?
6      A.  I'm not sure. I'd have to check with
7  them. Three hours, four hours.
8      Q.  When was that?
9      A.  Yesterday.
10     Q.  Did you look at documents?
11     A.  I looked at some documents.
12     Q.  Did you look at documents relating to
13  the agreement?
14     A.  That's not clear to me that question.
15     Q.  Did you look at the agreement?
16     A.  Yes, I did.
17     Q.  Did you look at the complaint in this
18  action?
19     A.  I did.
20     Q.  Did you talk with Mr. Porco?
21     A.  I did.
22     Q.  Did you talk with him about his
23  deposition?
24     A.  I did.

11

Szele

1      Q.  Did you meet with him in person?
2      A.  I did not.
3      Q.  How did you get introduced to Mr.
4  Zanger?
5      A.  Through Mr. Bryce James.
6      Q.  Who is that?
7      A.  It is a gentleman that contacted me,
8  learned about me through I believe HedgeFund.net.
9      Q.  What is HedgeFund.net?
10     A.  It's a website.
11     Q.  What does the website involve?
12     A.  It involves hedge funds. It's a
13  database of hedge funds.
14     Q.  What does this individual do, Mr.
15  James?
16     A.  To tell you the truth, I'm not sure at
17  all. I'm not sure what he does. He is an
18  investment -- he has been in the investment
19  management business in general, but I don't know
20  specifically what he's doing.
21     Q.  Okay. Would it be fair to say that
22  when you met with Mr. Zanger and discussed the
23  Fund and IAM, you decided that you were not going
24  to tell him some material relevant facts

12

Szele

1  concerning the Fund and IAM?
2      A.  Not true at all.
3      Q.  Did you decide that you were going to
4  hide certain facts from him because you wanted
5  him to agree with IAM as per the terms and
6  conditions of this agreement?
7      A.  No.
8      Q.  When was IAM formed?
9      A.  We started forming it in late 2001. I
10  think it was officially formed in early 2002.
11  I'd have to get the exact date for you.
12     Q.  And at one point was there
13  approximately $4-and-a-half million invested in
14  the Fund?
15     A.  At what point?
16     Q.  At some point between 2001 and 2004.
17     A.  Oh, there was 5 million invested in the
18  Fund by an institutional investor. That was our
19  first investor.
20     Q.  Between 2001 and 2004 was there more
21  money invested in the fund than the 5 million?
22     A.  Yes, various amounts.
23     Q.  What was the total aggregate amount
24  invested in the fund at any time between 2001 and

13

Szele

1
2 2004?

3    A.   I'm not sure. I'd have to check
4 exactly. 6 million approximately.

5    Q.   That's 5 million plus 1 million?

6    A.   Yes. But at different times. It
7 ranged. Different times. It wasn't all at once.

8        We had different investors at different
9 times.

10    Q.   Would it be fair to say the performance
11 of IAM and the Fund from 2001 up to 2004 was a
12 disaster?

13    A.   Not at all.

14    Q.   Do you believe the performance of IAM
15 and the Fund from 2001 to 2004 was a success?

16    A.   That's debatable.

17    Q.   Well, would it be fair to say that by
18 the time you were speaking to Mr. Zanger, all of
19 the investors in the fund had left?

20    A.   They had left for reasons much out of
21 my control.

22    Q.   But they were gone?

23    A.   They were gone or on their way out --
24 or on the way out, yes.

25    Q.   And when did they start leaving?

14

Szele

1
2    A.   2004, early, I believe.

3    Q.   Would it be fair to say that on an
4 overall basis IAM from this period 2001 to 2004
5 did not make any money in terms of profits?

6    A.   That's correct. Net profits we did not
7 make.

8    Q.   Would it be fair to say that from 2001
9 to 2004 IAM suffered enormous losses?

10    A.   I wouldn't say enormous losses.

11    Q.   Would you say large losses?

12    A.   I would say some losses.

13    Q.   Would you characterize them as large?

14    A.   I would say some losses.

15    Q.   What was the order of magnitude?

16    A.   I can't gauge magnitude. It's all
17 relative. To me it was some loss.

18    Q.   Was it over a half million dollars?

19    A.   I don't gauge loss in just monetary
20 value like that. I gauge loss in many different
21 ways.

22    Q.   Can you tell me whether from this
23 period 2001 to 2004 IAM lost over a half million
24 dollars in the aggregate?

25    A.   I'd have to check that number.

15

Szele

1
2    Q.   You don't know as you sit here now?

3    A.   I'd have to check. I'm not sure.

4    Q.   Can you give me an approximation of the
5 losses?

6    A.   I would just have to check. I'd like
7 to give an accurate number. I'm just not sure.

8    Q.   With the understanding that the
9 documents will show us whatever the numbers, I am
10 asking for your recollection.

11        Do you have any recollection how much
12 money IAM lost --

13    A.   In the neighborhood of 10 percent or
14 less.

15    Q.   10 percent or less than what?

16    A.   Of the assets under management.

17    Q.   So can you tell me in total dollar
18 terms how much IAM lost during that time period?

19    A.   4 or 500,000 or less.

20    Q.   How did IAM finance itself during this
21 2001 to 2004 period if it was losing money?

22    A.   Through management fees and through
23 myself funding our own capital.

24    Q.   And was IAM's situation so desperate
25 that you and Mr. Porco actually had to borrow

16

Szele

1
2 money from family members?

3    A.   We did. But I wouldn't call it as so
4 desperate. We felt we wanted to borrow some
5 money from family members and they wanted to lend
6 it.

7    Q.   Initially did IAM obtain certain back
8 office support?

9    A.   I'm not sure. I'm not sure what you
10 mean by that. Sorry.

11    Q.   Was there an administrator at IAM?

12    A.   We had an administrator from the very
13 beginning.

14    Q.   Some time between '01 to '04 did that
15 administrator quit?

16    A.   If you are referring to Forum, yes.

17    Q.   They quit because of the performance
18 problems of IAM and the Fund?

19    A.   No. They quit because of lack of
20 funds. They wanted more funds under management.
21 Not because of the performance.

22    Q.   Was there an offshore administrator
23 initially in addition to Forum?

24    A.   Forum was the offshore administrator.

25    Q.   Was there another administrator besides

Szele

1 Szele
2 Forum?
3    A.    Not besides Butterfield.
4    Q.    Butterfield replaced Forum?
5    A.    Um-hum.
6    Q.    Did IAM have an accountant initially?
7    A.    We did. We've always had an
8 accountant.
9    Q.    Who was that?
10    A.    Frances Infurchia. Separate from the
11 fund accountant, which was KPMG.
12    Q.    Did the Fund accountant quit?
13    A.    No, they did not. We wanted to go with
14 another one, Deloitte.
15    Q.    Why did you want to go with another
16 one, Deloitte?
17    A.    They gave us a better deal and they
18 worked with Butterfield. So the gentleman at
19 Butterfield recommended Deloitte.
20    Q.    How many new investors came into the
21 Fund in 2003?
22    A.    I think -- I'd have to check to make
23 sure, but I think there was one new one and one
24 old one reinvested because they wanted to go into
25 a manager that we were working with in Greenwich.

18

1 Szele
2    Q.    Who was that manager?
3    A.    Sea Carriers.
4    Q.    Did those people leave in 2004 then?
5    A.    They started -- again, I'm going to
6 check to make sure if you would like, but they
7 started departing in late 2003 and into 2004.
8    Q.    Did the Fund invest in Sea Carriers?
9    A.    Yes.
10    Q.    Was that a disaster?
11    A.    No, not a disaster.
12    Q.    How would you characterize that?
13    A.    I think the best way to characterize
14 that is the specialists on the New York Stock
15 Exchange took huge -- took advantage of us --
16 took advantage of Sea Carriers and therefore its
17 investors which we were one of.
18    Q.    Would you agree the result of those
19 specialists taking advantage of Sea Carriers and
20 this takes advantage of the Fund was a disaster
21 for the Fund?
22    A.    If you want to use the word disaster,
23 you are welcome to. I can put many different
24 words to it.
25    Q.    Would you agree that is one of the

1 Szele
2 words you could put on it fairly?
3    A.    Maybe.
4    Q.    What about --
5    A.    Are the specialists a disaster, yes,
6 they are a disaster.
7    Q.    Other than calling what happened to the
8 Fund a disaster, is there any other better way to
9 describe it?
10    A.    I would say there was a gross injustice
11 done there by the investors to Sea Carriers.
12    Q.    Would you say there was a better way to
13 describe the result of that gross injustice as
14 anything other than a disaster?
15    A.    I'm not sure.
16    Q.    What was the result of this gross
17 injustice?
18    A.    The result was that Sea Carriers was
19 bleeding money every month because the
20 specialists were taking advantage of those
21 trades.
22    Q.    What was the impact on the Fund?
23    A.    We suffered pro rata losses with the
24 Sea Carriers Limited Partnership.
25    Q.    Those were enormous losses?

20

1 Szele
2    A.    Not at all.
3    Q.    Well, as of 2004 --
4    A.    They were half a percent member month
5 loss average.
6    Q.    Half a percent of a billion dollars is
7 a lot of money?
8    A.    Correct, but we didn't have a billion
9 dollars.
10    Q.    Half a percent of $10 million is a fair
11 amount of money, right?
12    A.    Relatively half a percent is not a big
13 loss in the hedge fund world. It is a very
14 actually reasonable loss.
15    Q.    Would you characterize the losses that
16 the Fund had as a result of the Sea Carriers
17 instance or activity as reasonable?
18    A.    Those are reasonable drawdowns, yes.
19    Q.    So what happened to the Fund you
20 considered to be reasonable?
21    A.    Reasonable drawdowns.
22    Q.    What happened to the Fund as a result
23 of the investment by the Fund in Sea Carriers,
24 was that reasonable or was that something
25 extraordinary?

21

23

Szele

1

2    A.   All I can answer is those were

3    reasonable drawdowns considering what the

4    specialists were doing to Sea Carriers.

5        Q.   What's a drawdown?

6    A.   A peak to trough loss in any given

7    month or period.

8        Q.   So your testimony is that the losses

9    that the Fund incurred were reasonable?

10    A.   Reasonable drawdowns they were, yes.

11    Were we happy with them, no.  But they were

12    reasonable drawdowns.

13        Q.   Why did all of the Fund's investors

14    leave if these were reasonable drawdowns?

15    A.   Because prior to that they had been up

16    every month a percent to 5 percent or more.

17    That's why.

18        Q.   They left because they had been up

19    before as opposed to being down then?

20    A.   The investors saw a track record given

21    by Sea Carriers that was average positive every

22    month for three to four years.  As volatility

23    dropped in the market, specialists took advantage

24    of the trading of Sea Carriers and the ending

25    result was these small monthly losses.

Szele

1

2    did you obtain any further investment?

3        A.   Not at the time -- no, not -- on the

4    two new ones we had we did not get them

5    investment.

6        Q.   From '01 to '04, besides management of

7    the Fund, did IAM have any additional business

8    activities?

9        A.   No.  We were looking to build the Fund.

10        Q.   Do you believe that Mr. Zanger might

11    have wanted to know these facts that we just

12    reviewed about the performance of the Fund in IAM

13    from '01 to '04 before entering into this

14    agreement?

15        A.   I told him the history in very brief

16    terms.  Any question he had I told him.  I can't

17    possibly recalibrate the entire history of the

18    Fund and IAM.

19        Q.   I think the record will reflect about

20    half an hour ago you told us everything you

21    recollected about what you told Mr. Zanger.  You

22    didn't make reference to any history.

23        As you sit here now under oath, what

24    history did you tell Mr. Zanger about the Fund

25    and IAM before this agreement, this October 2004

22

24

Szele

1

2        Q.   What efforts did the Fund and IAM make

3    in 2003 or 2004 to invest in some other entity

4    than Sea Carriers?

5    A.   Our investors in the Fund wanted us to

6    be in Sea Carriers.

7        Q.   They didn't want you to be in Sea

8    Carriers after they left, did they?

9    A.   They wanted us to invest in Sea

10    Carriers.  The investors in IFL prior to our

11    investment obviously.

12        Q.   Yes.

13    A.   After when the monthly drawdowns kept

14    happening, they wanted to exit the Fund -- the

15    Sea Carriers and therefore the Fund.

16        Q.   After they exited in '03 and '04, what

17    efforts did the Fund make and IAM make to get the

18    Fund invested in something else?

19    A.   We were doing due diligence on other

20    managers.

21        Q.   Did any of that due diligence result in

22    any success?

23    A.   Sure.  We found a couple of good

24    managers that we wanted to work with.

25        Q.   As a result of finding these managers,

Szele

1

2    agreement was entered into?

3        A.   What I am referring to is I spent

4    considerable time and money and other resources

5    over the past few years to develop, establish and

6    promote alternative investments, strategies and

7    vehicles, including IFL, primarily in the

8    offshore domain.

9        Q.   That's what you told him?

10        A.   That's what I told him.

11        Q.   Why didn't you tell him about all the

12    losses that the Fund and IAM had incurred?

13    A.   I would have been happy to tell him

14    anything if he asked.

15        Q.   Why didn't you volunteer?

16    A.   He told me to put this stuff in the

17    memo in draft and get to it.  He didn't want to

18    talk anymore.  I told him what he asked.  We

19    talked.  He said write up a draft agreement and

20    we will meet and talk more.

21        Q.   Why didn't you tell him about the

22    administrator leaving?

23    A.   Like I said, I discussed everything he

24    wanted to discuss.

25        Q.   What do you base that on?

25

27

Szele

1      Szele
2    A.  What do I base --
3    Q.  You just said you told him everything
4 that he wanted to discuss.  What are you basing
5 that statement on, that testimony?
6    A.  He and I talked.  He wanted to talk
7 again.  He said get me a draft agreement.  I want
8 to get going.  We'll talk -- we'll meet again,
9 we'll talk, and then I'll sign the agreement if I
10 am comfortable.
11    Q.  Would it be fair to say in 2004 the
12 Fund's investment in Sea Carriers had put IAM on
13 the brink of financial ruin?
14    A.  Could you go back to that, because it
15 was not an investment in 2004 that we did in Sea
16 Carriers?
17    Q.  My question is -- the investment was
18 earlier.  As of 2004, was IAM on the brink of
19 financial ruin because of the Fund's investment
20 in Sea Carriers?
21    A.  I don't know if I would term it in
22 those words.  We were definitely needing working
23 capital to continue on.
24    Q.  Do you understand that there is a
25 difference between needing working capital and

1      Szele
2 working capital and we would continue on and we
3 had great managers lined up.
4    Q.  In 2004 is it your testimony that you
5 were not close to financial ruin?
6    A.  I don't feel those are the appropriate
7 words.  There is working capital in the
8 marketplace for guys like us.  It was just a
9 matter of finding the right joint venture
10 partner.
11    Q.  When you are saying they are not the
12 right words, are you saying they are not the
13 right words because they aren't true or are you
14 saying that for some other reason?
15    A.  I just don't know how to address that.
16 I don't feel comfortable with those words.  I
17 don't think they address the situation at the
18 time.
19    Q.  When you say they don't address the
20 situation at the time, can you answer the
21 question whether as of 2004 IAM was on the brink
22 of financial ruin because of what had happened
23 with Sea Carriers?
24    MR. LANZA:  Objection.  I mean, he
25    addressed that.

26

28

1      Szele
2 being on the brink of financial ruin?  Do you
3 understand there is a difference between those
4 two situations?
5    A.  I believe I do.
6    Q.  My question to you is, as of 2004, as a
7 result of the Fund's earlier investment in Sea
8 Carriers, was IAM on the brink of financial ruin?
9    A.  My answer to that is we needed more
10 working capital to continue on and we weren't
11 about to quit.
12    Q.  Were you close to financial ruin?
13    A.  I'll repeat what I said before.  We
14 were needing more working capital to continue on
15 our business model and our multi-strategy fund.
16    Q.  Were you in a position if you didn't
17 obtain working capital that you would be over in
18 terms of your existence?
19    A.  There were other means of potentially
20 getting working capital.
21    Q.  Were you close to financial ruin in
22 2004?
23    A.  I wouldn't use those terms.
24    Q.  And why wouldn't you use those terms?
25    A.  Because I think we would get more

1      Szele
2    MR. SEAR:  I know.
3    If the witness thinks he can't answer
4    that question, he is incapable of answering
5    that question, let him tell me.
6    A.  I am telling you I am answering it the
7 way I want to answer it.  That is working capital
8 was available for guys like us in the
9 marketplace.  I was going to go out and find it
10 in a joint venture opportunity.  That's the only
11 way I can answer it.
12    Q.  If working capital was available, then
13 you were not on the brink of financial ruin, is
14 that right?
15    A.  Can I have a word with my counsel?
16    Q.  No.
17    MR. LANZA:  Finish answering the
18    question.
19    A.  I'm not sure.  I don't understand your
20 question.  I have given you the answer several
21 times the way I think I am able to answer it.  I
22 am not sure what you are asking me at this point.
23    Q.  Good.  You can't tell me whether IAM
24 was on the brink of financial ruin as of 2004, is
25 that your testimony?

29

31

Szele

2   A.   Okay.  I do not think that we were at
3   the brink of financial ruin.
4       Q.   Okay.
5       A.   Is that what you would like me to say?
6       Q.   No, I want the truth.  I want the
7   truth.  Is that the truth?
8       A.   I'm telling you the truth.
9       Q.   Let me show you what we marked as
10  Zanger Exhibit 16.
11          (Letter from Thomas McVey to the SEC
12      marked Zanger Exhibit 16 for identification)
13          MR. SEAR:  Here is a copy for counsel.
14          MR. LANZA:  Thank you.
15      Q.   Take a look at that.  Take as much time
16  as you want and tell us what it is.
17      A.   I know what this is.
18      Q.   What is it?
19      A.   It's comments from -- written by our
20  attorney for the Fund administrator's proposed
21  fair fund distribution plan.
22      Q.   Who is your attorney?
23      A.   Thomas McVey.
24      Q.   Did you understand that the document is
25  representing to the United States Securities &

30

Szele

1   Exchange Commission it is coming from you and
2   Joseph Porco as principals and managing directors
3   of Independent Asset Management LLC?
4       A.   Yes.
5       Q.   Is everything in this document
6   truthful?
7       A.   As far as I can tell, yes.
8       Q.   When --
9       A.   But I didn't write this document, so
10  there are aspects legally that I'm not an expert
11  on.
12      Q.   Did you read the document before it was
13  submitted to the SEC?
14      A.   Yes.
15      Q.   Did you understand that you were asking
16  the SEC to rely upon the factual representations
17  made in the document?
18      A.   Yes.
19      Q.   Were you seeking the SEC to do
20  something to give IAM some money?
21      A.   Yes.
22      Q.   What did you understand the purpose of
23  submitting this document to them?
24      A.   It was to comment on the fair fund

Szele

1   administrator's plan.
2       Q.   What was that plan?
3       A.   It was a plan to distribute funds to
4   damaged people that were hurt by this specialist
5   activity.
6       Q.   And you were trying to tell the SEC how
7   IAM was damaged, is that right?
8       A.   That was counsel's advice, to tell them
9   how we were damaged, yes.
10      Q.   Well, whether or not it was counsel's
11  advice, you were telling the SEC how IAM was
12  damaged in order to get money, is that right?
13      A.   Fair enough.
14      Q.   Let me direct your attention to page 5.
15  Do you see the footnote 12?
16      A.   Um-hum.
17      Q.   I'm sorry.  You have to say yes or no.
18      A.   Yes.  Sorry.
19      Q.   Specifically, as existing investors
20  grew more and more discontent with performance,
21  IAM began to lose credibility with its back
22  office vendors and its administrator.
23          Was that true?
24      A.   Existing investors grew more and more

32

Szele

1   discontent with Sea Carriers' performance, that's
2   true.
3       Q.   It doesn't say Sea Carrier's
4   performance, does it?
5       A.   Yes, but it is referring to that.
6       Q.   Well, it is not referring to IAM's
7   performance?
8       A.   I believe it is referring to Sea
9   Carrier's performance.
10      Q.   How would IAM begin to lose credibility
11  based upon Sea Carrier's performance?
12      A.   Because IAM is a trading manager of the
13  Fund which invests in Sea Carriers.
14      Q.   OSI/Sungard was the first to resign.
15          Who was OSI/Sungard?
16      A.   They were doing some accounting work
17  when we had Forum signed on.
18      Q.   Did they resign because of a loss of
19  credibility of IAM?
20      A.   I think that was one of the reasons
21  they said they resigned, yes.
22      Q.   It says, this event triggered concern
23  among the remaining investors but also required
24  IAM to spend time and effort to find a

33

Szele

1  replacement administrator and in essence start
2  over.
3  
4         So you needed to get a replacement
5  administrator because OSI and Sungard had
6  resigned?
7      A.  OSI and Sungard are one.
8      Q.  Yes.
9      A.  I think they are referring to the
10 administrator as being Forum here.
11     Q.  Let me read the sentence to you, two
12 sentences, OSI/Sungard was the first to resign.
13 This event triggered concern among the remaining
14 investors but also required IAM to spend time and
15 effort to find a replacement administrator and in
16 essence start over.
17        How did the resignation of OSI/Sungard
18 require IAM to spend time and effort to find a
19 replacement administrator?
20     A.  It's intertwined.  OSI and Forum were
21 working together.  I believe that's how that came
22 about.
23     Q.  Well, then it says, next, IAM's
24 offshore administrator Forum Fund Services
25 resigned.

34

Szele

1  
2         Do you see that?  That was a separate
3  resignation, correct?
4      A.  Um-hum.
5      Q.  I'm sorry.  You have to say yes or no.
6      A.  I'm reading it.  I believe the previous
7  sentence is feeding into the next sentence.  That
8  is what is meant there.
9      Q.  Did the OSI/Sungard resignation require
10 IAM to spend time and effort to find a
11 replacement administrator?
12     A.  Like I said, it was intertwined.  So
13 OSI/Sungard resigned.  Forum resigned.  And we
14 had to move on and find a new offshore
15 administrator.
16     Q.  Then it says, next, IAM's offshore
17 administrator Forum Fund Services resigned.  This
18 event caused further concern with remaining
19 investors.
20        Was that true?
21     A.  Yes, that was true.  Sure.
22     Q.  It says, remaining investors had
23 concerns regarding performance and concerns
24 regarding the resignations of IAM's strategic
25 administrative partners.

35

Szele

1  
2         Was that true?
3      A.  Yes.
4      Q.  Then, KPMG suggested that it terminate
5  the relationship with IAM.
6         Is that right?
7      A.  Yes, that's true, although we at the
8  same time wanted to get a new auditor as well,
9  Joe and I.  Because we had the new administrator
10 that worked with Deloitte.
11     Q.  Did the resignation of KPMG cause
12 additional concern to investors?
13     A.  Perhaps.  Although switching auditors
14 is not usually -- it is hard for me to gauge
15 exactly if switching an auditor would be a huge
16 concern to investors.  But I believe it could
17 definitely give concern to some investors, yes.
18     Q.  Let me read the sentence in your
19 submission to the SEC.
20     A.  Okay.
21     Q.  This event caused additional concern
22 with remaining investors and required IAM to
23 spend the time and effort to find a replacement
24 auditor.
25        Was that true?

36

Szele

1  
2      A.  Yes.  What I am saying is investors
3  have different views on -- some investors think
4  it is horrendous to switch auditors.  Some
5  investors think it is maybe not.
6         Certainly the investors we had were
7  concerned about the switch in service providers.
8      Q.  Let's look at page 6, footnote 13.
9  Does that reflect the fact that initially IAM
10 borrowed more than $500,000 to start up from
11 family and friends?
12     A.  We borrowed around that amount of money
13 from family and friends.
14     Q.  Which you said exceeded $500,000.  Was
15 that true?
16     A.  Yes, it was over $500,000.
17     Q.  Was it true from '01 up through '04 you
18 didn't receive your full salary?
19     A.  '01 to '04 I didn't receive my full
20 salary, I think that's accurate, yes, I didn't
21 get close to my -- 150 was going to be the first
22 and then 250.  I have to check.  I don't think I
23 got to my full salary.
24     Q.  It says both principals -- is that you
25 and Mr. Porco?

Szele

```
2    A.  Yes.
3    Q.  -- had been forced to borrow additional
4  funds to pay personal creditors and basic living
5  expenses and both have incurred tremendous
6  personal debt.
7         Was that true?
8    A.  Yes.
9    Q.  As of January '06, the date of this
10 submission to the SEC, did IAM owe you in excess
11 of a million dollars in terms of the salaries you
12 had not received?
13   A.  Yes.
14   Q.  Let me direct your attention back to
15 page 5. Let me read the last paragraph that runs
16 over into 6.
17        Moreover, as investors began to
18 withdraw their funds from IFL and as assets under
19 management declined, management fees were lost -
20 management fees that were necessary for the
21 principals of IAM personally to survive.
22 Therefore, besides diminishing the performance
23 generated by Sea Carriers, the NYSE fraud set off
24 a wave of related events that drove IAM to the
25 brink of financial ruin and in doing so caused
```

38

Szele

```
2  IAM's principals and their families to accumulate
3  personal debt and to suffer credit damage as well
4  as professional and personal embarrassment.
5         Is that statement true?
6    A.  Yes, that's true.
7    Q.  That's a statement that you wanted the
8  SEC to rely upon --
9    A.  Well, again, I didn't draft this. I
10 just approved the drafting of it. I didn't draft
11 it. I let the lawyer put it in his words and I
12 approved it or I didn't approve it. I approved
13 it.
14   Q.  I am not asking whether you drafted or
15 somebody else drafted it.
16        I am asking you whether the statement I
17 just read into the record which you have
18 testified under oath was true was a statement
19 that you wanted the SEC to rely upon in order for
20 them to pay money to IAM?
21   A.  It's a statement that was written by my
22 lawyer and I approved this statement.
23   Q.  Would you have approved this statement
24 if it wasn't 100 percent true?
25   A.  Words can be read differently by
```

Szele

```
2  different people. I approved the way he wrote
3  this document.
4    Q.  Would you have approved that statement
5  if it wasn't 100 percent true?
6    A.  I approved this document the way he
7  wrote it.
8    Q.  And was it 100 percent true when you
9  approved it? Can you answer that?
10   A.  I'm going to answer I approved this
11 document the way he wrote it.
12   Q.  Will you tell me whether that statement
13 was true, 100 percent true without any doubt at
14 all?
15   A.  I approved the way he wrote this
16 document.
17   Q.  You won't tell me more than that,
18 whether it was 100 percent true or not?
19   A.  What I am going to say is that he wrote
20 this document in his words and I approved it.
21 Joe and he reviewed it and I approved it.
22   Q.  If he had written a sentence that was
23 partially false, would you have approved it?
24   A.  No. If it was partially false, I
25 wouldn't approve anything. I only approved what
```

40

Szele

```
2  is in his words true and what I think is truthful
3  as well.
4    Q.  Incidentally, as of January 2006, were
5  you a principal of IAM?
6    A.  January 2006, yes.
7    Q.  Was Mr. Porco a principal of IAM?
8    A.  Yes.
9    Q.  And was anyone else a principal of IAM?
10   A.  What do you mean by principal now?
11   Q.  An owner.
12   A.  In January of 2006, yes.
13   Q.  Was that Ola Homstrom?
14   A.  Yes.
15   Q.  What was his share in January 2006?
16   A.  I'm not sure exactly, but close to 10
17 percent. Close to 10 percent.
18   Q.  What was your percentage share in IAM
19 in January 2006?
20   A.  I'd have to --
21   Q.  Approximately.
22   A.  -- get the exact number. Around 53.
23 Around 53.
24   Q.  What percent did Mr. Porco own
25 approximately?
```

41                                                                                                                            43

Szele

1     A.    Approximately 33.
2
3     Q.    When did Mr. Hornstrom invest in IAM?
4     A.    He invested, I have to get the exact
5  dates for you, but during the course of 2004 --
6  it was intermittent investments. It was a
7  schedule based on certain things.
8     Q.    Did he invest at all -- make any
9  additional investment in IAM after January of
10  2006?
11     A.    After January of 2006. Directly into
12  IAM I don't believe so. No, I don't believe so.
13  He did invest in IFL.
14     Q.    Let me show you what we previously
15  marked as Zanger Exhibit 15. Do you recognize
16  this as the amended complaint and amended summons
17  in this action?
18     A.    Yes.
19     Q.    You can look at any part of it you
20  want. Take as long as you want looking at it.
21         Let me direct your attention to pages 8
22  through 10.
23     A.    Okay.
24     Q.    Do you see that there is a list of what
25  purports to be a summary of regulation T margin

Szele

1  never made aware of them.
2
3     Q.    Were there a number of margin calls you
4  were made aware of by Goldman Sachs in '05 and
5  '06?
6     A.    I would have -- I would have to check
7  exactly how many, but in January of '06 I was
8  made aware of one and in April of '06 I was made
9  aware of one by Gia, not by Dan. Dan was
10  supposed to inform me of any violations.
11     Q.    Were you aware of margin calls having
12  been made in '05?
13     A.    I'd have to check. I'm not sure. On
14  the few occasions I was made aware of any
15  violations, I was made aware of them by Gia,
16  never by Dan.
17     Q.    I understand. I am not asking whether
18  John Smith made you aware of them.
19     A.    Okay.
20     Q.    I am asking you the timing of your
21  awareness.
22     A.    I'm not sure. I'm sure of January of
23  '06 and April '06.
24     Q.    Did you have any recollection of being
25  aware margin calls were being made and being met

42                                                                                                                            44

Szele

1
2  violations?
3     A.    Yes.
4     Q.    Do you see that there are 46 of them
5  listed for the period February 24, '05 up through
6  August 22, '05?
7     A.    Yes.
8     Q.    Were these margin calls that were met?
9     A.    I am not -- I believe they were, but I
10  didn't find out about these until I got a memo
11  from Gia in late 2006.
12         Dan was supposed to let me know of
13  these violations, and I never was notified. I
14  don't know when exactly they were met. I assumed
15  they were met or else I would have heard from
16  Gia.
17     Q.    Didn't you monitor Dan's trading on a
18  daily basis?
19     A.    I monitored the P&L activity. Almost
20  every day.
21     Q.    Isn't it true you were aware of margin
22  calls existing and having been met in '05 and
23  '06?
24     A.    There were many margin calls I was
25  never made aware of. Neither by Dan. I was

Szele

1
2  in '05?
3     A.    Very, very few. I'd have to check how
4  many. But never by Dan. I was never made aware
5  of them by Dan.
6     Q.    I know. You told us four times now. I
7  don't care whether Santa Claus made you aware of
8  them.
9         I am asking you in 2005, I take it you
10  were aware of some margin calls having been made
11  and having been met in '05 and you were aware of
12  that in '05?
13     A.    I have to check how many. Very, very
14  few.
15     Q.    But some?
16     A.    Very few. I don't know the number.
17  Some, I don't know what that means. One, two?
18     Q.    Let's stick with your word. Few, that
19  means more than one?
20     A.    Very few. One or two.
21     Q.    That's your testimony?
22     A.    One or two as far as I can recall. I'd
23  have to check.
24     Q.    These margin calls that were met in
25  '05, is it your position that they constitute a

Szele

1   violation of something?
2   A.  Absolutely.
3   Q.  What are they a violation of?
4   A.  They are a violation of the broker's
5   rules and regulations.
6   Q.  What do you base that on?
7   A.  I base it on what Gia tells me and what
8   they tell me are violations of their rules.
9   Q.  In '05, in writing or orally, did Gia
10  tell you that any margin call that had been made
11  that Dan had met constituted any violation of any
12  rule or regulation?
13  A.  Did she tell me?
14  Q.  Yes.
15  A.  I don't recall.
16  Q.  Did anyone tell you in '05 that any
17  margin call, any of these 46 margin calls that
18  had been made and met constituted any violation
19  of anything?
20  A.  I discussed it with Joe and I discussed
21  it with Dan that trading violations are trading
22  violations, that we can't have them.
23  Q.  I understand.  I am not asking whether
24  trading violations are trading violations.

Szele

1   Q.  I am talking about the year 2005.
2   A.  Okay.  Yes, through 2005, 24.
3   Q.  If you add 24 to the 46 referenced in
4   the earlier grouping, we have 70 alleged
5   violations in 2005, is that right?
6   A.  If that's -- yes, that's what Gia gave
7   us, yes, as a list.
8   Q.  In 2005 did Gia give you a list of
9   violations?
10  A.  She gave this list -- some time late
11  2006 or early 2007 she gave me a list of the
12  violations.
13  Q.  We will get to that later.
14  Let's stick with 2005.  As to these 70
15  alleged violations, in 2005 did Gia or anyone at
16  Goldman Sachs send an e-mail or other writing to
17  you indicating that any of these calls
18  constituted violations?
19  A.  I'm just not sure.
20  Q.  Do you have any recollection of any
21  such e-mails?
22  A.  I'm not sure.  I'm not sure is all I
23  can say.
24  Q.  There was a representation made to the

46

Szele

1   I'm asking you, in 2005 did Gia or
2   anyone at Goldman Sachs indicate to you in any
3   way that the 46 margin calls listed here that had
4   been met constituted a violation of anything?
5   A.  I don't recall.  I'm just not sure.
6   Q.  Okay.  Let's take a look at pages 12
7   and 13.  Do you see the prime broker margin
8   violations listed there?
9   A.  At the bottom?
10  Q.  Yes.
11  A.  Yes.
12  Q.  This is IAM's complaint.  Do you
13  understand that?
14  A.  Yes.
15  Q.  Am I correct that there are 24 alleged
16  prime broker margin violations listed there for
17  the year 2005?
18  A.  You are talking about a different page
19  now?
20  Q.  12 and 13.
21  A.  Yes, those are prime broker margin
22  violations.
23  Q.  So that's 24 of them, allegedly?
24  A.  Looks like 66.

48

Szele

1   judge in this case there were 125 e-mails
2   corresponding to the alleged violations in the
3   complaint here that were sent by Goldman Sachs
4   indicating they were violations.
5   Do you have any knowledge as to any
6   such e-mails?
7   A.  I'm just not sure what you are
8   referring to here.
9   Q.  Okay.  Have you ever seen any such
10  e-mails?
11  A.  Again, I'm not sure what you are
12  referring to.
13  Q.  Let's stick with 2005.  Have you ever
14  seen an e-mail from Goldman Sachs indicating that
15  any margin call that took place in 2005 as a
16  result of Dan's trading constituted a violation
17  of anything?
18  A.  I am not sure.  If there are e-mails,
19  they are in the e-mails I gave.
20  Q.  Can you point me to one?
21  A.  I'd have to look at the e-mails.
22  Q.  Well, in getting -- did you authorize
23  this complaint?
24  A.  Yes, I did.

Szele

1
2    Q.  Did you look at the documentation that
3    existed relative to Dan's trading before you
4    authorized the complaint?
5        A.  Did I look at the -- what
6    documentation?
7        Q.  The documentation relating to Dan's
8    trading.
9        A.  I'm not sure -- did I look at it when?
10       Q.  In connection with the authorizing this
11   complaint.
12       A.  I gave -- I gave whatever information I
13   had to counsel and they drafted this document.
14       Q.  Do you recall ever seeing one e-mail
15   sent by Goldman Sachs in 2005 to IAM or to anyone
16   indicating that any margin call that had taken
17   place in 2005 constituted a violation of
18   anything?
19       A.  I'm not sure.  I read hundreds and
20   hundreds of e-mails almost every day.  So I just
21   can't remember every e-mail.
22       Q.  Can you remember one?
23       A.  I'd have to check.  I cannot remember
24   specifically --
25       Q.  I would ask you to confer with your

50

Szele

1
2    counsel.  Then when we come back on the record,
3    I'm going to ask you again if you can refer us to
4    one.
5            One e-mail -- let me make it clear.
6    One e-mail.  We have 70 alleged margin violations
7    for 2005.  My question to you is if you can come
8    up with one e-mail showing that Goldman Sachs
9    said that those margin calls involved any
10   violation of anything in 2005.  Do you understand
11   the question?
12       A.  I believe so.
13       Q.  Good.
14           In 2005 did Gia ever talk with you and
15   indicate in any way that any margin call that
16   happened in 2005 as a result of Dan's trading
17   constituted a violation of anything?
18       A.  We did discuss with Gia that Dan's
19   trading is creating some violations.  We didn't
20   get into really any specific details.  But I did
21   discuss -- I did discuss that -- and I have to
22   check exactly the e-mail as to what I am
23   referring to in a conversation.  There was
24   discussion with Gia as to Dan's trading and the
25   violations.

Szele

1
2    Q.  Did this take place in 2005?
3        A.  Yes, I believe in 2005 we did have
4    maybe one conversation with Gia about some of
5    these violations.
6        Q.  What did she say and what did you say?
7        A.  I just can't recall exactly.  I can't
8    recall exactly.
9        Q.  Can you recall anything about these
10   conversations?
11       A.  Just that in the case if there was one,
12   that he covered it.  That he rectified the
13   situation and covered it.  That was the basis of
14   what I can recall.
15           If there was one, we talked about it.
16   She called me and let me know there was one.  And
17   then I asked her if she covered -- if Dan covered
18   it and she said yes.  Within a day or two.
19       Q.  Did she indicate whether or not this
20   was a violation of anything?
21       A.  I just can't recall talking about
22   specifically about that, you know, specifically
23   about is it a violation.  I can't recall.
24       Q.  How would a margin --
25       A.  I knew it was a violation.

52

Szele

1
2    Q.  What do you base that on?
3        A.  The broker's rulings and regulations.
4    Q.  What rule?
5        A.  It is in this agreement here that he
6    can't -- he has to let me know if he does it.  I
7    have known for a long time certain trading
8    violations are violations per broker guidelines.
9    Q.  Did you know that in 2005?
10       A.  Did I know that in 2005?  Yes, I did.
11       Q.  Is it your position you knew in 2005
12   that Dan was violating the agreement or had
13   violated the agreement?
14       A.  Was it my position in 2005?  Whenever
15   he did a trading violation -- first of all, I
16   wasn't aware of many of them until very late in
17   the game.
18           But when I was made aware of say one,
19   and I would have to check exactly when, he
20   quickly covered it.  So the problem went away.
21       Q.  As of January 1, 2006, did you believe
22   that Dan had violated the contract in any respect
23   in 2005?
24       A.  Yes.
25       Q.  And what was your belief as to his

55

Szele

1  alleged violation of the contract in 2005?
2  A.    He violated in so many ways I have to
3  think exactly which one in 2005. Certainly there
4  was I'm sure at least one violation that I was
5  made aware of that year with Gia, but that he
6  covered it.
7  I would have to go back and check
8  exactly, but he breached the agreement even early
9  on in '05 when he didn't put in the amount of
10  money he was supposed to put in right away.
11  Q.    Were any of these alleged violations in
12  2005 at all meaningful in your judgment?
13  A.    Meaningful?
14  Q.    Yes.
15  A.    I'm not sure what you mean by
16  meaningful.
17  Q.    Did they have any significance at all?
18  A.    Yes, they had some significance.
19  Q.    What was that?
20  A.    That I had to keep a closer eye on him.
21  Q.    In 2005 did you ever send him an e-mail
22  in which you said you violated the contract?
23  A.    I don't believe I ever sent an e-mail.
24  I said on the phone to him that -- we said some

54

Szele

1  things on the phone, but not by e-mail as far as
2  I can recall.
3  Q.    You understand under the contract if
4  you are going to assert there is a violation you
5  have to provide notice in writing?
6  A.    I think it says I would have to put in
7  writing, but I can also have a phone conversation
8  with him and he can accept it or not accept it
9  and fix the problem or not fix the problem if he
10  wants.
11  Q.    Would it be fair to say as of January
12  1, 2006 IAM was extraordinarily satisfied with
13  the extraordinary performance of Dan?
14  A.    As of when?
15  Q.    January 1, 2006.
16  A.    I would say we were happy with 2005.
17  Q.    Would you say you were extraordinarily
18  happy?
19  A.    No, I wouldn't say we were
20  extraordinarily happy.
21  Q.    What was his performance in 2005?
22  A.    In our fund or his Westwood fund?
23  Q.    Pursuant to the contract.
24  A.    You are asking me what his performance

Szele

1  was pursuant to the contract?
2  Q.    Yes.
3  A.    I'm sorry. I want to make sure I have
4  it clear. You could be talking about trading
5  performance or talking about contractual
6  performance or you could be talking about other
7  things.
8  Q.    I am talking about any kind of
9  performance you want to think of. Any way of
10  evaluating Dan in terms of his performance
11  pursuant to all the terms and conditions of the
12  contract.
13  My question to you is, what was your
14  view on that performance as of January 1, 2006.
15  A.    I thought his trading performance was
16  strong and that I had to keep a close eye on him
17  for some things he had done that made me feel
18  uncomfortable.
19  Q.    What was that that made you feel
20  uncomfortable?
21  A.    Many things. His way of communicating
22  which he often didn't do. Delaying putting up
23  the marketing documents for me. The volatility
24  was getting more erratic. I was concerned about

56

Szele

1  that. I could go on.
2  Q.    Please do. I would like to have a full
3  answer to my question.
4  A.    Okay.
5  Q.    Everything that you can recall.
6  A.    I would have to actually go back to my,
7  you know, notes and give you a full list of where
8  I thought he was not doing where I was expecting
9  him to do certain things and where he was I think
10  violating or not abiding by several of these
11  points in my agreement.
12  Q.    Okay. Tell us now if you can recall
13  anything beyond what you testified to.
14  A.    I can't. I would have to go through it
15  all and write it down for you. Because I'm
16  not -- I just know that I was starting to feel
17  uncomfortable by January 2006 with some things.
18  Q.    Do you know that you are testifying
19  here today on behalf of IAM as to all the matters
20  covered by the complaint?
21  A.    Yes, I do.
22  Q.    Did you prepare yourself today to
23  provide all --
24  A.    I --

57

Szele

1    Q. Let me finish the question.
2        Did you prepare yourself today to
3    provide all relevant information that would
4    relate to the allegations set forth in the
5    complaint?
6    A. I prepared myself to the best of my
7    abilities.
8    Q. Fine.
9        The 70 violations that are set forth in
10   the complaint for 2005, did you view them as
11   significant as of January 1, 2006?
12   A. When? When I read this?
13   Q. No.
14       MR. SEAR: Read the question back.
15       (Record read)
16   A. I didn't know about them as of January
17   1, 2006. Remember, I got the memo from Gia late
18   in 2006 or early 2007.
19   Q. Did you have any concern about margin
20   calls that had been met as of January 1, 2006?
21   A. Based on some of the activity in 2005 I
22   had some concern, yes.
23   Q. Would you say that was minor concern?
24   A. I can't label it as minor. Some points

58

Szele

1    I had major. Some points I had minor.
2    Q. What did you have major concern about?
3    A. His communication. At times his
4    arrogance. The increase in volatility. The lack
5    of communication on the marketing material. That
6    he hadn't gotten his account up to 50 million
7    like he said he would. That was a pretty big
8    concern, too.
9    Q. Did you express those concerns to him
10   in writing?
11   A. I did not in writing. I may have
12   mentioned some things in the IMs to him?
13   Q. IM is an instant message?
14   A. Yes. But I did have conversations
15   about these things with him.
16   Q. These concerns?
17   A. Yes. Some of these concerns I voiced
18   stronger than others, yes.
19   Q. Okay. Did you have a conversation with
20   Mr. Hornstrom about investing in the Fund in late
21   2005 or early 2006?
22   A. I discussed with Mr. Hornstrom investing
23   at various times. I can't recall the exact
24   dates.

59

Szele

1    Q. Well, can you recall whether you had a
2    conversation with him in or around the end of
3    2005 or early 2006?
4    A. Maybe. I don't know the exact dates.
5    But I had told Mr. Hornstrom about Zanger in 2005
6    and I'm sure -- I'm sure we talked about him in
7    2006 because he invested.
8    Q. What did you tell Mr. Hornstrom about
9    Dan in late 2005 or early 2006?
10   A. I told Mr. Hornstrom he should consider
11   investing in this class of shares.
12   Q. Did you give him any reasons?
13   A. I told Mr. Hornstrom that I thought it
14   was an interesting investment for him and that it
15   could yield some profits. Could yield some nice
16   returns.
17   Q. Did you tell him you thought it was a
18   good investment?
19   A. I don't recall if I told him I thought
20   it was a good investment.
21   Q. Did you --
22   A. I told him that he should take a look
23   at Mr. Zanger and let us know if he is
24   interested.

60

Szele

1    Q. Did you tell him that Mr. Zanger had
2    violated the contract even once?
3    A. I believe I told Mr. Hornstrom about his
4    volatility --
5    Q. I wasn't asking about volatility. With
6    all due respect, I'm asking whether you told Mr.
7    Hornstrom that Mr. Zanger had ever violated any
8    term or condition of this contract before Mr.
9    Hornstrom invested in the Fund in early 2006.
10   A. I'm sorry. I don't recall.
11   Q. Isn't it something you would recall if
12   you told that to him?
13   A. Not necessarily, because we talk a lot.
14   Q. Well, if you thought that Dan had
15   violated the agreement, wouldn't you have felt a
16   legal obligation to tell Mr. Hornstrom?
17   A. Not necessarily. Why would that be a
18   legal obligation to tell Mr. Hornstrom?
19   Q. You were inducing Mr. Hornstrom to make
20   an investment in the Fund, correct?
21   A. I was not inducing Mr. Hornstrom to do
22   anything. Mr. Hornstrom is a friend. He can make
23   his own decisions. I told him I had concerns
24   about Dan. I told him he has high volatility. I

Szele

1   told him he can have calls at different times.
2   And to make your own decision. I wasn't inducing
3   him at all. He will tell you I wasn't inducing
4   him.
5       Q. In those conversations, wouldn't you
6   agree you had a legal obligation to be truthful
7   and provide full disclosure?
8       A. I have a legal obligation to disclose
9   anything that I am asked by anyone and at any
10  time I can disclose everything that needs to be
11  disclosed truthfully and --
12      Q. I am not asking about what you are
13  asked. Isn't it true you have a legal obligation
14  to disclose any material and relevant facts about
15  a subject matter whether you are asked about it
16  or not?
17      A. I am not clear on your question. And,
18  frankly, I would like to have a minute with my
19  counsel.
20      Q. Why don't we get an answer to the
21  question and we will take a break.
22      A. I'm not sure. I'm not even sure what
23  you are asking me.
24      Q. I am --

62

Szele

1       A. I don't know all the legalities of
2   everything, so...
3       Q. If you don't know, you don't know. In
4   your conversations with Mr. Homstrom, didn't you
5   have a legal obligation to disclose any material
6   or relevant facts concerning Mr. Zanger before
7   Mr. Homstrom invested half a million dollars in
8   the Fund?
9       A. Anything that Mr. Homstrom asked me I
10  answered truthfully.
11      Q. Can you answer my question?
12      A. That's my answer. My answer is
13  whatever Mr. Homstrom asked me I truthfully
14  answered.
15      Q. Did you hide any facts from him that
16  were material or relevant?
17      A. I did not hide any facts from Mr.
18  Homstrom.
19      Q. He actually was a principal at IAM at
20  the time he made the investment, right?
21      A. Yes.
22      Q. When did he cease becoming a principal
23  of IAM?
24      A. Mr. Homstrom?

Szele

1       Q. Yes.
2       A. He's not. He still is a principal of
3   IAM.
4           MR. SEAR: Let's take a break.
5           When you get a chance, let me talk with
6   you.
7           MR. LANZA: Okay.
8           (Recess)
9   BY MR. SEAR:
10      Q. Mr. Szele, let me direct your attention
11  to the end of 2005 or early 2006. Did you tell
12  Mr. Homstrom anything concerning the making of
13  margin calls in connection with Dan's trading in
14  and around that time?
15      A. I'm quite certain I mentioned to Ola
16  that Dan does experience trading violations.
17      Q. Did you say anything about margin
18  calls?
19      A. I don't recall.
20      Q. What trading violations did you tell
21  Mr. Homstrom about?
22      A. I don't recall specifically except that
23  because he's quite an active trader he
24  experiences these violations at times. And he is

64

Szele

1   supposed to let us know when he experiences them.
2       Q. What did Mr. Homstrom say to you?
3       A. I don't recall.
4       Q. Do you recall saying anything else to
5   Mr. Homstrom about margin calls in late 2005 or
6   2006 before he made this investment?
7       A. I don't recall anything else.
8       Q. Directing your attention to 2006, did
9   Goldman Sachs, Gia or anyone else at Goldman
10  Sachs ever communicate with you orally or in
11  writing that Dan had violated any rule or
12  regulation in connection with his trading?
13      A. E-mails from Gia that there was a
14  violation, trade -- I don't know exactly the
15  word, but there are e-mails from Gia.
16      Q. About violations?
17      A. Violations.
18      Q. How many?
19      A. I can't recall exactly, but I remember
20  January of '06 there is one and April of '06
21  there is one. Then there were more later.
22      Q. When you say more later, what are you
23  referring to?
24      A. I believe it was down around November

Szele

1
2  was another one and then the big one that he
3  decided not to cover was in late November.
4      Q. Do you believe that Mr. Zanger had any
5  obligation to cover any margin call himself
6  personally?
7      A. Absolutely.
8      Q. What do you base that on?
9      A. It's his money. It's his account.
10     Q. Besides the fact --
11     A. Plus it is Class Z shares which he had
12  a responsibility for.
13     Q. Besides the fact it was his money,
14  Class Z shares which he had responsibility for,
15  is there any other basis for your statement that
16  he had an obligation that he had to cover a
17  margin call personally?
18     A. He had done it all the previous times
19  apparently, covered every single one of them.
20  Ones I didn't even know about. So he established
21  a pattern of covering everything if he had to.
22     Q. Beyond what you told us, do you base
23  your position on anything else?
24     A. Not that I can think of at the moment.
25  There may be other things.

66

1                    Szele
2      Q. If I direct your attention back to the
3  agreement, Zanger Exhibit 3, is there anything in
4  there that obligated Mr. Zanger to invest more in
5  the Fund than the initial $5 million?
6      A. That obligated him?
7      Q. Yes.
8      A. There is nothing here that specifically
9  obligates him.
10     Q. Did he have an obligation to put in
11  more than $5 million according to you?
12     A. According to me, yes, because he
13  verbally said he would at the very beginning on
14  September -- when we first had that conversation
15  that morning of September 29, he said I would
16  like to put in my net worth if we can ramp this
17  up. Do you think that's a good idea? I said
18  yes, I think it's a good idea.
19     Q. Is that the basis for his obligation
20  according to you?
21     A. You mean the verbal discussion, is that
22  the basis?
23     Q. Yes.
24     A. Well, verbally I would expect that,
25  yes. I would expect that since he had me put it

Szele

1
2  in there, agreed to it and never said anything
3  against it, I assumed he would want to get up to
4  50 million with his own money in there fairly
5  quickly.
6      Q. When you said you put it in there, what
7  are you referring to?
8      A. His investment capital into IFL, into
9  the Fund is what he was wanting to do.
10     Q. I understand. You just referred to you
11  putting something in. Were you talking about
12  putting something into the agreement?
13     A. No, I was referring to him putting the
14  money into the Fund.
15     Q. He put the $5 million in, right?
16     A. Right. But you asked me about the
17  verbal -- you asked me about the obligation that
18  was to me an obligation orally or verbally.
19     Q. Have you now told us the full basis for
20  your position that he was obligated to put in
21  more than $5 million?
22     A. He said he would, yes. He said he
23  would put in up to $50 million and to put it into
24  the draft agreement.
25     Q. You put in the up to $50 million in the

68

1                    Szele
2  agreement, correct?
3      A. Correct.
4      Q. Let me show you what we marked as
5  Zanger Exhibit 1 which is the Fund financial
6  statement for the year end December 31, 2006.
7  You can look at any part of that you want.
8         If you would look at page 2, do you see
9  under net asset value per share it is listed
10  Class Z Series 3 share?
11     A. Um-hum.
12     Q. You have to say yes or no.
13     A. Sorry. Yes.
14     Q. What does that refer to?
15     A. I'm not an accountant, but it looks
16  like it -- I believe that is referring to Mr.
17  Homstrom, Class Z Series 3. Each investor has
18  allocated a series to him.
19     Q. Was there some investor in the Fund
20  other than Mr. Zanger and Mr. Homstrom in 2006?
21     A. No. Two series were allocated to Mr.
22  Zanger because he came in at two different times
23  in '05, which technically was to me a breach.
24  That was a breach because he should have come in
25  with a minimum of 5 million.

Szele

1
2    Q.   Am I correct the Class Z --
3    A.   Sorry. Series 3 was Ola Homstrom in
4    early '06.
5    Q.   I think Mr. Porco -- the testimony will
6    be what it is in the record. Mr. Porco indicated
7    there was some mystery investor whose identity he
8    didn't know that came into the Fund other than
9    Mr. Zanger or Mr. Homstrom. Do you know of any
10   such investor?
11   A.   A mystery investor?
12   Q.   He was an investor he didn't know the
13   identity of.
14   A.   He thought?
15   Q.   Yes.
16   A.   No, there was no other -- no, I would
17   know. I hope so. I didn't -- you know, it was
18   Mr. Zanger's two series and -- not into Class Z
19   that is. Not into Class Z. We are talking about
20   Class Z now, right?
21   Q.   We are talking about the Fund.
22   A.   In 2007 there was an investor into a
23   different class of shares. Not Class Z. Maybe
24   that is what he is referring to.
25   Q.   Who was that?

70

Szele

1
2    A.   This was an investor out of Bermuda
3    that came into a different class of shares in the
4    Fund. Not Class Z.
5    Q.   What class?
6    A.   Class T.
7    Q.   How much was invested?
8    A.   1.5 million.
9    Q.   Aside from that investor and Mr.
10   Homstrom and Mr. Zanger from the beginning of
11   '05, 2005 up until today, has anybody else
12   invested in the Fund?
13   A.   No.
14   Q.   Do you know if Goldman Sachs in 2006
15   ever told Dan orally or in writing that he had
16   violated any rule or regulation?
17   A.   Sorry. Could you repeat that.
18        MR. SEAR: Could you read it back.
19        (Record read)
20   A.   I believe they had, yes.
21   Q.   And how many times?
22   A.   I don't know. I don't know how many
23   times they communicated between Dan and Goldman.
24   Q.   What do you base your testimony on that
25   you think that they did this?

Szele

1
2    A.   I was copied on an e-mail, but I don't
3    know how many such times.
4    Q.   How many such e-mails?
5    A.   I can't recall exactly. January and
6    April 2006, those were copy -- going to Dan,
7    copied to me.
8    Q.   Okay. In 2006 did you ever in writing
9    notify Dan that he had violated the contract in
10   any respect?
11        THE WITNESS: Could you repeat that.
12        (Record read)
13   A.   No.
14   Q.   Would it be fair to say you didn't so
15   notify him because you didn't believe he had
16   violated the contract?
17   A.   No. I notified him of things verbally.
18   Q.   Did you ever notify him orally in 2006
19   that he had violated the contract?
20   A.   Yes, orally I did tell Dan, for
21   example, you are below 5 million and you
22   shouldn't be below 5 million when he took money
23   out to pay for his taxes.
24        I did inform Dan in writing at the end
25   of 2006 in an e-mail, it was in early November

72

Szele

1
2    approximately, I wrote a paragraph to Dan that
3    certain things he shouldn't do which is going to
4    hurt us, not to continue doing it, et cetera,
5    et cetera.
6    Q.   Beyond what you've told us just now,
7    did you notify him orally in 2006 of any alleged
8    violation of the contract?
9    A.   Orally, yes.
10   Q.   Would you tell us what you told him?
11   A.   I can't recall the exact words. Like I
12   just said, when he went under 5 million, I told
13   him he shouldn't, that he needs to get that back
14   up there. I said I'm concerned about your
15   trading violation. This was after the January
16   '06 violation.
17        And I told him I was concerned about
18   marketing, his needs to continue to help me put
19   together marketing material. Basically that's
20   what I discussed with him. I have to think about
21   it. If you give me ten minutes to think about
22   it, I can write down notes and give it more
23   thought. Off the cusp that is --
24   Q.   Based on all the things you did to
25   prepare for coming here today, that's the best

73

75

Szele

1    Szele
2    you can do, is that right?
3        A.    If you would like me to think about
4    more things that I discussed, I can do that. I
5    would need maybe a ten-minute timer.
6        Q.    Why don't you take three minutes.
7        A.    I will do the best I can in three
8    minutes.
9        Q.    Good.
10            (Pause)
11        A.    Tell me when it's up, three minutes.
12            (Pause)
13        Q.    I gave you more than three minutes.
14        A.    I noticed that. Thank you.
15        Q.    So what have you now recalled?
16        A.    And, again, this is to the best of my
17    abilities. I can't recall every word we shared,
18    but when I was finally able to get through to him
19    and talk to him or when he would return my call,
20    I did express that we were going to -- you know,
21    that we were sort of concerned about working
22    capital needs and that we needed to talk about,
23    you know, how we were going to address that going
24    forward.
25        Q.    Is it true that IAM was basically broke

1    Szele
2    the telephone bill or rent and assets is the
3    Fund. The assets of the Fund is the investor
4    assets.
5        Q.    How much working capital did IAM have
6    in say mid 2006?
7        A.    Mid 2006. Minimal. Quite minimal.
8        Q.    50 grand?
9        A.    I don't know the exact number. It was
10    minimal.
11        Q.    What else -- you told him about working
12    capital needs?
13        A.    We needed also more cooperation from
14    him and much better communication. I told him
15    the volatility I thought was probably going to
16    hurt a little bit -- if he didn't stick to his
17    volatility level that he promised that he would,
18    that would not be good for us to attract maybe
19    more investors there and needed to maybe ramp
20    down a little bit there.
21        I told him we needed more consistency
22    in the trading.
23        That just made me remember another
24    thing I talked to him about. He asked me to give
25    him my opinions on when to take profits.

74

76

1    Szele
2    in 2006?
3        A.    You can use those words if you would
4    like. We needed more working capital. We needed
5    more working capital for sure.
6        Q.    Would it be fair to say IAM had no
7    assets left or very little assets left in 2006?
8        A.    Well, the assets we had were Dan's and
9    Ola's.
10        Q.    No, I meant IAM. I wasn't talking
11    about the Fund.
12        A.    The assets -- we are just a trading
13    manager.
14        Q.    I understand. I am asking about the
15    assets of IAM in 2006. Isn't it true that --
16        A.    IAM doesn't have assets. It never had
17    assets. It has the Fund -- as far as assets,
18    it's the Fund that it manages.
19        Q.    IAM has working capital?
20        A.    Working capital is different from
21    assets in my --
22        Q.    How is working capital different from
23    assets?
24        A.    Because working capital is specifically
25    used for things like marketing, traveling, paying

1    Szele
2        If I had been tracking when I would
3    take profits and he asked me to keep him up to
4    date on when he would take profits, turned out I
5    would have saved us in excess of 20 percent gains
6    if he had taken profits when I told him to take
7    profits and he thanked me for that in an IM.
8        Violations were a concern. I told him
9    violations were definitely -- I wasn't happy with
10    that.
11        Q.    What violations?
12        A.    The January violation. I talked to him
13    about the April violation too.
14        Getting below 5 million was a concern.
15    I told him we are below 5 million here. He is
16    like I got to pay my taxes. That was his answer.
17        Then section 1 A through G, I could
18    address all those. He wasn't telling me about
19    liquidity. I told him you have to tell me about
20    liquidity. You have to fully disclose your
21    positions at all times. You have to let me know
22    if you have a violation. I don't want to just
23    hear it from Gia. I would like to hear it from
24    you.
25        And I needed more transparency. Needed

77

Szele

1  more cooperation from him.
2      Q.  Have you completed your answer?
3      A.  That's, yes, essentially what I recall.
4      Q.  Am I correct the agreement provides he
5  is permitted to trade 4 to 1 leverage?
6      A.  He was permitted 4 to 1 leverage
7  initially, yes.
8      Q.  Is there any way to trade at 4 to 1
9  leverage and not have margin calls?
10     A.  Sure.  I believe there are.  You can
11  get out of that at the end of the day.
12     Q.  You can make the call, right?
13     A.  No.  I am saying there is ways to trade
14  with that leverage and not have a call.  You have
15  to get out maybe of -- I'm not an equity trader,
16  so I'm not a professional equity trader in the
17  sense he is or in the sense I can tell you
18  exactly when or how these are going to occur.
19         But I can tell you that -- I know guys
20  that lever 4 to 1 and they don't have margin
21  calls in this respect at all that he had.
22     Q.  When you say in this respect, they do
23  have margin calls, right?
24     A.  My guess is traders have margin calls,

78

Szele

1  yes, but I have never seen margin calls like
2  this.
3      Q.  Meeting margin calls is a normal part
4  of equity trading for somebody like Dan?
5      A.  There are different types, right.
6  There is a trading violation.  There is a margin
7  call.  I mean, margin in and of itself I think is
8  fairly -- I want to use the right word.
9         Having a margin call is not so
10  untypical.  But trading violations, multiples and
11  these things continuously, continuously,
12  continuously is very severe according to any
13  major broker.
14     Q.  If you look at the 2005 violation, the
15  70 violations alleged in the complaint, did they
16  involve anything beyond simply a margin call and
17  meeting a margin call?
18     A.  I would have to look at that.
19     Q.  Go ahead.
20     A.  Which one --
21     Q.  In your complaint, Zanger 15.
22     A.  If there are any significant day
23  trading requirements, we were notified by Gia and
24  Dan took care of it.  Inappropriately so one time

79

Szele

1  I should say.
2      Q.  My question to you, so we are clear,
3  you are looking at the complaint.  The 70
4  violations that we reviewed earlier for 2005, did
5  they involve anything more than a margin call
6  being made and subsequently being met?
7      A.  I was just looking at whether they were
8  listing that here like they did on the memo from
9  Gia.  I don't see that.
10         I don't know.  I'd have to check.
11     Q.  What memo from Gia are you referring
12  to?
13     A.  I asked Gia to list for me all the
14  violations from day one in an e-mail, which she
15  did.  She went to her department.  She got me all
16  the trading violations, all the margins,
17  everything.  She sent me that in an e-mail.  In a
18  memo.
19         They were violations I never even heard
20  of.  I never even knew about.  No one informed
21  me.  Dan didn't inform me.  He was supposed --
22     Q.  When was the date of this e-mail from
23  Gia?
24     A.  As I said before, either late '06 or

80

Szele

1  early '07.
2      Q.  So the Fund was liquidated by that
3  point in time?
4      A.  No, the Fund was not liquidated yet.
5      Q.  When was the Fund liquidated?
6      A.  It takes time to -- the liquidation
7  process was taking place from the time Dan
8  decided not to cover the call until the time he
9  got his money back.  Totally at the end, whatever
10  month that is.
11         MR. SEAR:  I don't believe I have seen
12  this e-mail from Gia.  I would ask that
13  counsel provide --
14         MR. LANZA:  I think we --
15         MR. HOLLEMAN:  It has been provided.
16         MR. SEAR:  Do you have it with you now?
17         MR. HOLLEMAN:  I do not.
18         MR. SEAR:  If you can do it over the
19  lunch break, that would be helpful.  Can you
20  do that?
21         MR. HOLLEMAN:  We probably can, sure.
22         MR. SEAR:  Thanks.
23  BY MR. SEAR:
24     Q.  Had you spoken with litigation counsel,

81

Szele

1
2  prospective litigation counsel when you asked
3  this question to Gia?
4          MR. LANZA: Objection.
5      Q.  You can answer the question.
6          MR. LANZA: You can answer.
7      A.  Have --
8          THE WITNESS: Can you repeat it.
9          (Record read)
10     A.  I don't think so.  I don't think so.
11     Q.  Why did you ask this question of Gia at
12 this point?
13     A.  Because I was getting very concerned
14 there were things I wasn't aware of with Dan from
15 the past.  I wanted to make sure I knew all the
16 violations that perhaps I hadn't known of up to
17 that point and I was quite shocked to find
18 hundreds that I didn't know about.
19     Q.  As of that point in time when you asked
20 the question of Gia, how many violations did you
21 know of?
22     A.  I did ask her, sure.
23     Q.  You didn't listen to my question.
24     A.  Oh, I'm sorry.
25     Q.  As --

82

Szele

1
2      A.  It is not that I didn't listen.  I may
3  have misunderstood.
4      Q.  As of the time you asked Gia this
5  question, before she answered it, how many
6  violations did you know of?
7      A.  I'd have to check.
8      Q.  More than five?
9      A.  I'd have to check.  I'd have to check.
10     Q.  Less than five?
11     A.  I can tell you by looking at my
12 e-mails.  I just -- I don't know for sure.  I
13 believe less than five.  I believe less than
14 five, but I'd have to check.
15     Q.  Now, let me show you what was
16 previously marked as Zanger Exhibit 7.  Do you
17 see this is an e-mail to you from a shareholder
18 services specialist at Butterfield Fund Services?
19     A.  I'm not sure what Lori's title is.
20     Q.  Look below her name.  Was she a
21 shareholder services specialist?
22     A.  If that is what it says, I suppose
23 that's what she is.
24     Q.  Did you receive this e-mail?
25     A.  I did.

83

Szele

1
2      Q.  Do you see she is saying, Good day, Mr.
3  Szele.  We received today the attached request to
4  redeem $4 million for Class Z Series 1 and 2.
5  Regards, Lori Fuhrtz.  Did I read that correctly?
6      A.  Sounds right.
7      Q.  In response, did you agree that Mr.
8  Zanger had the right to redeem the $4 million?
9      A.  I'm sorry.  I'm just trying to recall
10 exactly what this was for.  Okay.  This was for
11 his taxes.  I approved this, yes, because he -- I
12 don't know where he was.  9 or 10 million -- I'm
13 not sure where he was.  But I did approve this so
14 he could pay his taxes, yes.
15     Q.  When the redemption was made, did that
16 take the --
17     A.  But, sorry.  Let me add one thing.  I
18 did tell him this puts him below 5 million and I
19 was concerned about that.
20     Q.  Okay.  That was what I was going to ask
21 you.  The redemption you approved did take him
22 below 5 million, right?
23     A.  It did.  It did take him below.  I
24 expressed my concern about that to him.  I would
25 like it back up to 5 as we agreed.  He said I've

84

Szele

1
2  got to pay my taxes.
3      Q.  Did you understand that the agreement
4  allowed him to withdraw the money that he put
5  into Class Z shares at any time that he wanted
6  to?
7      A.  No, that's incorrect.  He could not
8  take money out any time he wanted to.
9      Q.  Okay.  Take a look at the agreement.
10 Incidentally, who drafted this --
11     A.  As long as he didn't stay below 5.
12     Q.  Who drafted this?
13     A.  I drafted this per our conversation
14 that morning based on similar other drafts that
15 I've had with other people.
16     Q.  And you had used this form before?
17     A.  I have used this, yes.
18     Q.  Okay.
19     A.  Not ever the piece of him putting In 50
20 million.  He was the only one that ever suggested
21 that to me.
22     Q.  Okay.  Did you see under paragraph 4,
23 the last sentence it says, IAM acknowledges that
24 DZ has control of - redeeming from or remaining
25 in IFL - the assets it has replaced or raised

85

Szele

1    into Class Z?
2        Do you see that?
3    A.   You are talking about the last
4    sentence?
5    Q.   Yes.
6    A.   Yes, I see it.
7    Q.   Isn't it true that gave Mr. Zanger the
8    right to redeem from IFL the assets that he had
9    placed or raised into Class Z?
10   A.   What this meant, and what we discussed
11   very clearly, was that he had the right to redeem
12   or remove assets he had placed to raise. Meaning
13   any assets he has raised from investors of his
14   own contact base, which is why it says here IAM
15   and DZ may introduce assets or may wish to raise
16   assets.
17       So Dan had free reign to remove assets
18   from the fund that he raised or that he placed
19   via his contacts.
20   Q.   So if he placed the $5 million in, he
21   had the right to redeem it, correct?
22   A.   Not his 5 million.
23   Q.   Why didn't you say that in the
24   agreement?

86

Szele

1    A.   Because it was understood. He
2    understood it. He understood it. We talked
3    about it. He was very clear on that. He wanted
4    to raise assets. I said I'm not going to control
5    your contacts and what you want to bring in.
6    Q.   Looking at this agreement, it makes
7    reference to a management fee and a performance
8    fee, correct?
9    A.   Correct, yes.
10   Q.   And it gave IAM certain rights to
11   participate in those fees?
12   A.   Correct.
13   Q.   The payment of the performance fee or
14   the management fee, am I correct it would come
15   out of the Fund?
16   A.   That's right.
17   Q.   When Mr. Zanger put in his $5 million,
18   all of the money in the fund would come out of
19   the Fund, correct, his shares?
20   A.   Well, not for the first 18 months on
21   the management fee and up to the point other
22   investors come in.
23   Q.   Am I correct the only way he could make
24   any net money out of this agreement was for other

87

Szele

1    investors to come in?
2    A.   I suppose you can look at it that way.
3    He could also make money in different ways. If
4    he put money into my strategy and I made him
5    money which we talked about and we did, he could
6    have made money there too and actually probably
7    pretty good money.
8    Q.   Did anybody put money into your
9    strategy?
10   A.   When?
11   Q.   In '04 or '05 or '06.
12   A.   Dan did. Dan put in $100,000 in my
13   strategy.
14   Q.   Besides Dan?
15   A.   In '03 and '04 part of the assets in
16   IFL were being managed on my strategy, yes. But
17   I wasn't marketing my strategy. So I didn't
18   expect investors to want that.
19   Q.   Let's look at the Independent Fund
20   Limited offering memorandum, Zanger Exhibit 6.
21   Do you recognize that?
22   A.   Um-hum. Yes.
23   Q.   Is this a document that is dated July
24   2006?

88

Szele

1    A.   Yes.
2    Q.   Was this offering memorandum used to
3    try to attract investors into the Fund?
4    A.   It is not used to attract investors
5    into the Fund. It is used to establish the
6    parameters for the investment into the Fund.
7    It's a memorandum. It's not a marketing
8    document.
9    Q.   It's an offering memorandum?
10   A.   It's not a marketing document if that
11   is what you are asking.
12   Q.   But it is an offering memorandum?
13   A.   It's an offering memorandum, that's
14   right.
15   Q.   Do you understand this document is
16   supposed to be truthful and accurate and provide
17   full disclosure as to all the matters set forth
18   in it?
19   A.   Yes.
20   Q.   Do you believe that this document,
21   Zanger Exhibit 6, was truthful and accurate and
22   did provide full and proper disclosure of all
23   material and relevant facts as set forth therein?
24   A.   I believe to the extent we had to we

Szele

1    did because Appleby, the top offshore law firm in
2    the world, wrote it, approved it with the top
3    administrator in the world approving it.
4         So, yes, I think I am safe to assume it
5    is quite safe and it is disclosing what it needs
6    to. Of course I don't know Bermuda law. That's
7    why we hired Appleby.
8         Q. Am I correct though that you and Mr.
9    Porco provided the facts that the lawyers needed
10   to provide this full disclosure?
11        A. Yes. I mean, Dan may have provided
12   something or other people may have provided
13   something that we told the lawyers to consider.
14   Any questions they had we answered for their
15   writing this document purposes.
16        Q. And were you truthful and complete in
17   answering those questions?
18        A. I believe so, yes.
19        Q. Was this document used right up until
20   through November in terms of prospective
21   investors coming into the Fund?
22        A. I believe so. I mean, there are a
23   couple of other versions before or after, but I
24   would have to check. Yes, this was definitely

90

Szele

1    used during that period for the potential for
2    people to invest if they -- they had to request
3    this document if someone was interested, an
4    investor.
5         Q. Okay. Am I correct the Fund could only
6    accept under Bermuda law qualified investors who
7    were not United States persons except for a
8    limited class of investors?
9         A. Where is that?
10        Q. Page 4, fifth paragraph down.
11        A. Um-hum.
12        Okay.
13        Q. Is that true?
14        A. What's the question?
15        Q. The question is, am I correct that the
16   shares of each class may be offered, sold or
17   delivered only to qualified investors who are not
18   United States persons with a minor exception?
19        A. It is not really a minor exception. It
20   is just an exception.
21        We can actually let anyone into the
22   Fund. There just may be tax implications.
23        Q. Let me read the sentence and ask if
24   this is true. Shares of each class may be

Szele

1    offered, sold and delivered only to qualified
2    investors who are not United States persons
3    (except that the board of directors has the
4    discretion to accept subscriptions from limited
5    numbers of U.S. investors that are qualified
6    eligible persons and pension or profit sharing
7    trusts or other tax exempt entities).
8         Do you see that?
9         A. Yes, I do.
10        Q. Is that a true statement?
11        A. Yes, it is.
12        Q. There are redeemable shares listed here
13   for Class A, B, C, D, P, Z, Z2, T, T2 and T3, is
14   that right?
15        A. That's right.
16        Q. In 2005 and 2006, other than Mr. Zanger
17   and Mr. Homstrom, was the Fund and IAM successful
18   in convincing other investors to invest in any of
19   these shares?
20        A. We were working on it, but we had not
21   yet raised more capital.
22        Q. Why not?
23        A. It takes time for investors to come in.
24   Lots of due diligence, performance tracking.

92

Szele

1         Q. Am I correct the Fund had been
2    soliciting investors going back before 2005 for
3    some of these shares?
4         A. Yes, but different managers were
5    different shares. So it is like each time you
6    have a new manager, you have to start from that
7    day to explain to potential investors what the,
8    you know, due diligence is on that particular
9    manager.
10        Q. Well, looking at page 8, that makes
11   reference to Mr. Zanger, is that right?
12        A. Page 8, Mr. Zanger. You mean Class Z
13   and Class Z2 shares are to be managed by Mr.
14   Daniel Zanger?
15        Q. Yes.
16        A. Yes, that is referenced to him.
17        Q. If we go up to the paragraph where it
18   says Business and Investment Objective, do you
19   see that paragraph?
20        A. Yes.
21        Q. Third sentence down, this will be
22   achieved through various segregated classes of
23   shares which are managed by selected and
24   qualified sub-managers and through the

93

95

Szele

1  application of IAM's own investment model.
2          Do you see that?
3      A.  Yes.
4      Q.  There are two other managers listed
5  there. Argosy Asset Management?
6      A.  Yes.
7      Q.  When did you obtain them as a manager
8  or prospective manager?
9      A.  I would have to check exactly in the
10  contract. I would have to check exactly when
11  that was. Prior to this date obviously.
12      Q.  Do you recall the year?
13      A.  I believe it is 2005.
14      Q.  There is also three classes of shares
15  that were to be managed by MarketTrend Advisors.
16  Do you see that?
17      A.  That's right.
18      Q.  When did they come aboard as a
19  prospective manager?
20      A.  I would have to check for sure, but I
21  think 2005.
22      Q.  Other than the fact it takes time, can
23  you provide us with any additional reason why the
24  Fund did not attract any other investors beyond

Szele

1  basic corporation, the objective, the share
2  capital. But in no way, shape or form is it
3  supposed to disclose everything that is done by
4  investors in a due diligence process.
5          Every investor will go through a due
6  diligence process to determine how many
7  violations does this guy have, how many trading
8  calls, what else has he done that is good or bad
9  in a due diligence process. That's generally
10  disclosed in a fund offering memorandum.
11      Q.  Isn't it true if IAM in 2006 had any
12  information that suggested that Dan Zanger
13  violated his contract with IAM, IAM would have
14  had an obligation to put those facts in this
15  document?
16      A.  No, it's not true. It's not an
17  obligation whatsoever.
18          The obligation is to have an investor
19  ask questions and through a due diligence process
20  the investor has the obligation to make sure that
21  he is satisfied in any response that is given by
22  me or by Zanger on any activity. That would have
23  come up in a questionnaire due diligence process
24  between an investor and us with Zanger present.

94

96

Szele

1  Mr. Zanger or Mr. Homstrom in 2005 or 2006?
2      A.  I cannot. There is a due diligence
3  process and a time process and some investors
4  will come in sooner rather than later. It is
5  just across the board in the hedge fund world.
6      Q.  Does this document indicate in any way
7  that Mr. Zanger had ever violated in any respect
8  at all his agreement with IAM?
9      A.  I don't believe that's in this
10  document.
11      Q.  So would an investor be fair to
12  conclude then there were no facts in 2006 --
13      A.  Not at all.
14      Q.  Can I finish the question?
15      A.  I'm sorry. I thought you were
16  finished.
17      Q.  Reading this document then, am I
18  correct that up through the end of 2006 an
19  investor could fairly conclude that IAM had no
20  knowledge or information that Dan had violated
21  his agreement with IAM in any respect?
22      A.  Not accurate at all. These documents
23  are made to the best of anyone's ability, you
24  know, talk about the strategy, talk about the

Szele

1      Q.  If IAM in 2006 had knowledge or
2  information that Dan had violated his contract
3  with IAM in a material and relevant way, would
4  IAM have had an obligation to put disclosure of
5  the facts supporting that in this document?
6      A.  That would be a question for Appleby.
7          MR. LANZA:  I'm going to object.
8      A.  That would be a question for Appleby.
9      Q.  Why didn't IAM put in this document any
10  suggestion or hint that Dan had violated his
11  agreement with IAM?
12          MR. LANZA:  Objection.
13      A.  Again, these are questions for Appleby.
14          As I said, my biggest concern came up
15  when Dan didn't cover his margin call at the end
16  of 2006, whatever that was, the date. That was
17  what really triggered in my mind that this guy is
18  out in left field.
19      Q.  There are 70 violations, alleged
20  violations set forth in the complaint for 2005,
21  correct?
22      A.  Correct. I didn't know about them
23  until late 2006.
24      Q.  You've told us you knew about some of

Szele

1    Szele
2    them?
3    A. I knew about a couple of them. I don't
4    know exactly how many.
5    Q. Why didn't you disclose them in this
6    document?
7    A. There's absolutely no need to disclose
8    margin violations or anything of that sort as far
9    as I know legally into these documents.
10    It is a due diligence process by the
11    investor where that stuff comes out.
12    This is just about Independent Fund
13    talking about a strategy for the Fund. It
14    doesn't purport to disclose everything in every
15    aspect on any of the managers.
16    Q. Wouldn't IAM have had an obligation to
17    disclose in this document if Mr. Zanger had
18    violated an SEC rule or regulation?
19    A. It's a question for the attorney. I
20    really don't know. I --
21    Q. If IAM believed that some time in 2006
22    that Mr. Zanger had violated a prime broker rule
23    or regulation, wouldn't it have disclosed it in
24    this document?
25    MR. LANZA: Objection.

98

Szele

1    Szele
2    A. I just don't know. I mean, as far as
3    I'm concerned, Appleby makes those decisions.
4    The Fund administrator looked at it and anything
5    that needed to be disclosed was disclosed.
6    Again, the investors don't go by these
7    documents to know everything about a manager.
8    That is done in a due diligence process.
9    Q. Am I correct that Appleby relied upon
10    IAM to give it the facts for disclosure in this
11    document?
12    A. Sure. And Appleby and the
13    administrator were aware of some of these things
14    as well, these questions. So they were aware of
15    that.
16    Q. If Mr. Zanger had committed acts of
17    gross negligence in 2005 or 2006, would IAM have
18    disclosed them in this document?
19    A. Again, I think that's a question --
20    that's a question I would pose to Appleby whether
21    or not that would need to be in there.
22    Q. Did you pose that question to Appleby?
23    A. I did not pose that question to
24    Appleby.
25    Q. At any time in 2005 and 2006 did you

100

Szele

1    Szele
2    conclude that Mr. Zanger had acted in a grossly
3    negligent fashion?
4    A. My grossly negligent fashion was at the
5    end of 2006 when he didn't cover the margin call.
6    That was the most significant of gross negligence
7    activity that I had actually felt was just absurd
8    and unbelievable.
9    Q. Prior to that point in time, prior --
10    A. Prior to due diligence?
11    Q. Prior to November 1, 2006, did Mr.
12    Zanger act in any way that you considered to be
13    grossly negligent?
14    A. Since I'm not a lawyer and I don't know
15    the definition of grossly negligent, I would
16    defer that to a lawyer.
17    Q. What's your view?
18    A. Again, I mean, my view is that there
19    was some negligence there on Dan's part prior to
20    September or the date you said of 2006.
21    Q. Can you point to any act that Dan
22    engaged in prior to November 1, 2006 that you
23    believe was grossly negligent?
24    MR. LANZA: Objection.
25    A. The wiring out of funds that he tried

Szele

1    Szele
2    to do may or may not be considered grossly
3    negligent. I don't know.
4    Q. Beyond what you've told us, can you
5    point to any other act that took place in 2005 or
6    2006 that you think indicated that Dan acted in a
7    grossly negligent fashion?
8    A. Again, the definition of that is I
9    think a legal issue and -- all I can do is
10    present the facts of what Dan did and let someone
11    else decides what gross negligence is on that.
12    Q. Can you point to any such act that you
13    believe was grossly negligent prior to November
14    1, 2006 beyond what you told us about the wiring
15    in and out of funds?
16    A. I would have to review and go back to
17    think about that. Right now that wiring was a
18    pretty major issue.
19    Q. You told us that. My question to you
20    is, putting that aside, putting your other
21    testimony aside, can you point to any fact that
22    took place prior to November 1, 2006 that Dan
23    engaged in that you believed established that he
24    acted in a grossly negligent fashion?
25    A. Again, since I don't know the accurate

101

Szele

1  legal definition of that, I can't say either way.
2  I'd have to look at it. I'd have to just go back
3  and look and after I talked with someone about
4  what is exactly the definition of grossly
5  negligent.
6      Q. Is there anything though that you
7  believe indicated he acted in a grossly negligent
8  fashion prior to November 1, 2006?
9      A. Can I say same the answer or do I have
10  to repeat it?
11      Q. You are the witness here. You are here
12  as a representative of, the witness of IAM in
13  addition to your personal capacity.
14      A. I understand. I don't know the
15  definition of grossly negligent to comfortably be
16  able to say this and this and this, whatever was
17  grossly negligent.
18      I believe the wiring out of money from
19  a fund by Dan is -- I can't even -- to me that's
20  pretty negligent.
21      Q. You are telling us you think that is
22  grossly negligent, right?
23      A. I think that that's -- again, I don't
24  know the definition, but I think that is quite

102

Szele

1  negligent.
2      Q. You keep saying you don't know the
3  definition. Is there any other act that you can
4  sit here now as the representative of IAM that
5  Dan engaged in prior to November 1, 2006 that you
6  are saying you believe constituted gross
7  negligence?
8      A. The repeated violations which I found
9  out in late 2006 I think are actually quite
10  negligent as well. The repetitiveness of it all
11  that I wasn't even aware of is I think pretty
12  negligent.
13      Q. The fact --
14      A. January of '06, April of '06.
15      Q. You think that is pretty negligent,
16  right?
17      A. I think that's -- actually, I don't
18  know if it is very negligent. It is way too many
19  violations and it's absurd I wasn't notified by
20  Dan of these violations. So is it legally,
21  what's the term, I don't know. But it is
22  extremely negligent on his part just in general
23  to not even inform me of these violations.
24      Q. Who knew about all these violations

103

Szele

1  before you did in late '06 or early '07?
2      A. It looks like only Gia and Dan from the
3  memo she sent.
4      MR. SEAR: Let's take our lunch break.
5  We will come back in 45 minutes.
6      MR. LANZA: Sounds good.
7      (Luncheon recess: 12:50 p.m.)

104

Szele

1      AFTERNOON SESSION
2      1:35 p.m.
3  EXAMINATION CONTINUED
4  BY MR. SEAR:
5      Q. Mr. Szele, let me show you what we
6  marked as Zanger Exhibit 17.
7      (Document Bates stamped 115-117 marked
8  Zanger Exhibit 17 for identification)
9      Q. For the record these are three pages
10  produced to us by your counsel. They have the
11  Bates numbers 115, 116 and 117. The first page
12  has a bunch of listings and in handwriting says
13  70 margin calls. It is actually printing.
14      Second page has a bunch of listings,
15  says 45 margin calls.
16      The third page has two listings, says
17  day trading violations.
18      Do you see that?
19      A. Yes.
20      Q. Do you recognize those pages?
21      A. Yes, I do.
22      Q. What are they?
23      A. They are lists of the violations. This
24  is part of the memo that Gia sent.

Szele

2  Q.  Whose printing is on this?

3  A.  You mean handwriting?

4  Q.  Yes.

5  A.  That's mine.

6  Q.  Am I correct in the first --

7  A.  I believe that's mine, yes.

8  Q.  On the first page you wrote 70 margin

9  calls?

10  A.  I am just counting off the numbers.

11  That's all I am doing. Just counting, one, two,

12  three, four, five, six, seven --

13  Q.  As you sit here now, do you have any

14  knowledge whether these margin calls were met in

15  a timely fashion?

16  A.  I wouldn't know until I looked at them

17  specifically.

18  Q.  Okay.

19  A.  I can't recall right now.

20  Q.  Looking at page 2 where it says 45

21  margin calls, is that also your printing?

22  A.  I believe so.

23  Q.  Do you have any knowledge or

24  information as to whether those margin calls were

25  met in a timely fashion?

Szele

2  A.  Again, I would have to look at it. I

3  assume that they were.

4  Q.  Would that assumption be the same for

5  the first page?

6  A.  I assume they were met, yes, because I

7  didn't hear anything else about them.

8  Q.  The third page, that is your printing,

9  says day trading violations?

10  A.  I believe so, yes.

11  Q.  There are two entries there?

12  A.  Yes.

13  Q.  Is this what you received from Gia or

14  at least part of what you received --

15  A.  I believe this is part of what I

16  received -- I believe this is her Excel

17  spreadsheet that she put -- they put together.

18  Q.  Okay. Is it your understanding that a

19  margin call listed on the first page of Zanger

20  Exhibit 17 if met in a timely fashion nonetheless

21  would constitute a violation of some rule or

22  regulation?

23  MR. LANZA:  Objection.

24  THE WITNESS:  Could you repeat that.

25  (Record read)

Szele

2  A.  My understanding is that a margin call

3  is a violation whether met or not.

4  Q.  Let me show you what is marked as

5  Zanger Exhibit 21.

6  (E-mail dated 12/1/05 from George Szele

7  to Daniel Zanger marked Zanger Exhibit 21

8  for identification)

9  MR. SEAR:  Here is a copy for counsel.

10  MR. LANZA:  Thanks.

11  Q.  This purports to be an e-mail from you

12  to Mr. Zanger with a cc to Joe dated Thursday,

13  December 1, 2005. Do you see that?

14  A.  I do.

15  Q.  Is this an e-mail that you did send to

16  Dan?

17  A.  Yes.

18  Q.  Let me read the e-mail, at least the

19  first page. Dan, Gia says the following (do you

20  agree?) Gia says that what happened will not be

21  acceptable by them from now on. She said that

22  she got 900 separate files from National

23  Financial (they are the only problem). They need

24  the breakdowns as quickly as possible faxed or

25  e-mailed in a spreadsheet if possible. She said

Szele

2  this sort of thing (day trading call) happens

3  quite frequently with you and others and she is

4  not so concerned about that as long as trades are

5  not a mess to break down. She said you are

6  currently in a day trading call and they are

7  still breaking down trades. Dan, what is the

8  solution? Thanks. Great month!! George Szele.

9  Did I read that correctly?

10  A.  I believe so.

11  Q.  Did you send this to Dan?

12  A.  It looks like I did, yes.

13  Q.  Does this e-mail correctly reflect the

14  substance of a conversation you had had with Gia?

15  A.  I don't recall the conversation with

16  Gia specifically. I don't recall specifically

17  this conversation. But obviously I did discuss

18  it with her.

19  Q.  Do you recall generally a conversation

20  with Gia that was consistent with this e-mail?

21  A.  I don't recall any phone conversation

22  specifically, you know, about this. But it is

23  something that I said we -- before that we

24  probably discussed somewhat in some terms with

25  Gia on the day trading calls.

111

Szele

1
2     Q.  Do you know what is referred to in your
3  e-mail about the breakdowns? Do you know what
4  that refers to?
5     A.  I'm not sure, but I think it is
6  referring to some sort of a clearing firm maybe.
7  National Financial is a clearing -- I don't
8  really remember what this is about actually.
9     Q.  Okay.
10    A.  I would have to really revisit this. I
11  don't remember what this is about, these 900
12  separate files.
13    Q.  You see where you say in your e-mail,
14  she said this sort of thing (day trading call)
15  happens quite frequently with you and others and
16  she is not so concerned about that? Do you see
17  that?
18    A.  I do.
19    Q.  Do you recall her telling you that in
20  words or substance in around December of 2005?
21    A.  If that is what I am writing, then
22  that's what she probable told me.
23    Q.  Does that refresh your recollection
24  that in or around the end of 2005 she said she
25  was not concerned about day trading calls

110

Szele

1
2  happening quite frequently with Dan?
3     A.  She said she is not so concerned about
4  that as long as traders are not a mess to break
5  down. If that is what she said, then that's what
6  she said.
7        Again, I don't recall specifically the
8  conversation. And I don't recall at all what
9  this 900 separate files is about.
10    Q.  Do you recall there were night trades
11  that had to be broken down when they were
12  submitted to Goldman Sachs by National Financial
13  and there was an issue as to breaking all these
14  separate reports down?
15    A.  Sounds familiar, but I just don't
16  recall the instance clearly at all. I would have
17  to go back to all the e-mails around this. There
18  is probably others.
19    Q.  Did you frequently have e-mails with
20  Dan in around 2005 and 2006?
21    A.  I got more e-mails from him on
22  pornography than he got from me. The e-mails I
23  did give him I also followed up with IM or tried
24  to call him as well.
25    Q.  My question is whether you communicated

Szele

1
2  with him frequently in 2005 and 2006 concerning
3  his trade.
4     A.  I'm sure I did.  How many times I would
5  have to go back to the e-mails or the IMs.
6     Q.  And you were congratulating him on a
7  great trading month, is that correct?
8     A.  I believe that is referring to his
9  performance, yes.
10    Q.  As of 2005, December, did you have any
11  concern about his day trading calls or margin
12  calls?
13    A.  Could you repeat the dates.
14       MR. SEAR:  Could you read the question
15  back.
16       (Record read)
17    A.  I don't remember.  If -- I just don't
18  remember specifically. Maybe e-mails or IMs. I
19  just don't recall specifically if I did prior to
20  that date.
21    Q.  Do you recall when you first had any
22  concern about Dan's margin calls or day trading
23  calls?
24    A.  Well, it looks like I was pretty
25  concerned about it here. Prior to this I'd have

112

Szele

1
2  to check my e-mails. I was very concerned about
3  it in January of '06 and April of '06.
4        Prior to this date I'd have to check
5  when specifically I was concerned about it and if
6  I --
7     Q.  What are you referring to in January of
8  '06?
9     A.  January of '06 was a pretty significant
10  violation that I was made aware of by Gia.
11    Q.  Let me show you Zanger Exhibit 22 and
12  ask you if this is what you are referring to.
13       (E-mail from Gia marked Zanger Exhibit
14  22 for identification)
15    Q.  Is that what you are referring to?
16    A.  Is your question I just said January of
17  '06 if this is what I am referring to?
18    Q.  Correct.
19    A.  I believe -- yes, I'd have to check my
20  e-mails, but it looks like this is the one I am
21  specifically talking about, yes.
22    Q.  Do you know why Gia doesn't indicate
23  this is a violation in this e-mail, if it was a
24  violation of anything?
25    A.  I don't know why Gia says or doesn't

Szele

1  
2  say things.
3      Q.  Okay.  Do you have any indication or
4  facts or anything that would suggest the $2
5  million house call referred to here in Zanger
6  Exhibit 22 constituted a violation of anything?
7      A.  Again, I don't know what Gia --
8          THE WITNESS:  Could you repeat that
9      again if it is more specific.
10         (Record read)
11     A.  I believe it is a violation of the
12  brokerage rules and I later on got the memo from
13  Gia they also thought it was a violation of
14  broker trading rules.
15     Q.  Going back to Exhibit 17, you referred
16  to 70 margin calls and 45 margin calls.  Did Gia
17  ever indicate that they were a violation of
18  anything?
19     A.  In her memo e-mail, yes, I believe she
20  does.  So does her department, a separate
21  department.
22         In fact, they reference this is why you
23  are getting shut down is because these violations
24  that are listed.  And this day trading violation.
25         I will go back and get the e-mail for

114

Szele

1  
2  you with counsel to specifically what she said.
3  They do note that specifically those are
4  violations.
5      Q.  Okay.  Prior to December 1st of '06,
6  did Gia ever say that anything that had been done
7  was a violation of any rule or regulation by Dan?
8      A.  I am not sure.  I had conversations
9  with Gia like I said before where we did discuss
10  violations and I told her my concern about his
11  violations.  But I don't recall when or
12  specifically what length.
13     Q.  Okay.
14     A.  Or anything like that.  We did discuss
15  it with Gia.
16     Q.  You can't give me a month or a year?
17     A.  I probably could if I looked at all the
18  e-mails in front of me.  I probably could find
19  any specific given month or day.
20     Q.  Before coming here today you didn't do
21  that, you didn't look at those e-mails?
22     A.  Not specifically Gia e-mails, no.
23     Q.  You didn't look at your e-mails?
24     A.  Which ones?
25     Q.  The ones related to the matters related

Szele

1  
2  to this case.
3      A.  I looked at some of them.
4      Q.  Some of them?
5      A.  Do you know how many e-mails there are?
6  4,000.
7      Q.  If there are 4,000 e-mails, we got
8  produced to us a fraction.
9      A.  I am saying there are 4,000 e-mails in
10  my inbox regarding all my work.  I can't possibly
11  look at all my e-mails.
12     Q.  We are talking about the e-mails that
13  are at issue in this case.  Did you look at all
14  of them?
15     A.  I looked at some e-mails, yes.
16     Q.  Let me show you Zanger Exhibit 73 and
17  ask you to identify that if you can.
18     A.  You want me to look at this?
19     Q.  Go ahead.
20     A.  Okay.
21         MR. SEAR:  Just for consistency sake,
22     let's remark this document as Zanger
23     Exhibit 23 so we keep some semblance of
24     order here.
25         (IM between George Szele and Daniel

116

Szele

1  
2     Zanger marked Zanger Exhibit 23 for
3     identification)
4      Q.  This is an instant message between you
5  and Dan?
6      A.  Yes.
7      Q.  What is an instant message?
8      A.  It's a form, I believe, of
9  communication over -- I think it is Yahoo Instant
10  Messaging and it allows people to communicate
11  back and forth much faster through texting.
12     Q.  And am I correct that in part this
13  refers to the fact that you were considering
14  doing something with the Class Z2 shares for Dan?
15     A.  That's right.  Class Z2 we were going
16  to set up to have a much less volatile profile.
17     Q.  Am I correct Class Z2 was going to
18  essentially have no leverage?
19     A.  I think that's what we were thinking
20  about doing, yes, no leverage in that one.
21  Because it would be more attractive maybe to
22  institutions.
23     Q.  Am I correct that was not set up
24  actually?
25     A.  Z2 we were in the process of setting

117

Szele

1 up. I'm trying to remember whether or not it was
2 actually set up.
3 Sorry. I have to check.
4 Q. Okay. Am I correct in part if you look
5 at the bottom of this instant message, the third
6 entry, you say to him in part, again, Class Z
7 will remain your usual style?
8 A. Yes, I see that.
9 Q. Did that refer to the fact that even
10 with setting up the Class Z2 shares that his
11 trading would remain the usual style for Class Z?
12 A. No. What is meant by that -- the Class
13 Z he wanted to be there and trade however and
14 whatever he wants to do at that juncture. He
15 wanted to leave that as volatile and whatever as
16 it was set up. Z2 would be for other investors
17 because he wouldn't want to trade more
18 conservatively for his own money.
19 Q. Was that consistent as to your
20 understanding as to what would happen if Class Z2
21 was set up and people invested in it?
22 A. I am not sure I am clear on that
23 question. Could you rephrase it or --
24 Q. Yes. You told us what the working
25

118

Szele

1 understanding was. My question to you is, did
2 you understand that if you set up Z2, Class Z
3 though would remain the same as you just
4 testified to?
5 A. Z would remain as it was, yes.
6 Q. Let me show you what we marked as
7 Zanger Exhibit 24.
8 (Document regarding house call marked
9 Zanger Exhibit 24 for identification)
10 Q. Does that refer to another house call?
11 A. I think so.
12 Q. What is a house call, if you know?
13 A. It's a type of margin call I believe.
14 The exact definition I don't have.
15 Q. Do you see on the second page of this,
16 the first e-mail is from Gia to Dan with a cc to
17 you?
18 A. I see that.
19 Q. And her e-mail is April 10, 2006, 11:06
20 a.m., is that right?
21 A. Yes.
22 Q. To the best of your knowledge and
23 understanding, did she copy you on communications
24 with Dan concerning the meeting of margin calls?
25

119

Szele

1 A. Here she did.
2 Q. Do you know if she did that generally?
3 A. Again, I don't know what Gia did or
4 didn't do. All I know is what I got from her.
5 Q. Did you get a number of e-mails like
6 this one, that is the second page of this
7 exhibit?
8 A. I got one in January, one in April that
9 I can recall, and the other one we talked about
10 earlier, which I believe was '05.
11 Q. Is this the April one that you recall?
12 A. I think so, yes.
13 Q. Her first e-mail says, Dan, please
14 advise on the house call that is outstanding for
15 the Independent Fund account. This is the fourth
16 day for the call and we prefer to have all calls
17 met by day three. Regards, Gia.
18 Do you see that?
19 A. I do.
20 Q. Do you know if she ever sent e-mails to
21 Dan or communicated to Dan that this call somehow
22 involved a violation?
23 A. I don't know what Gia sent to him.
24 Unless she copied me.
25

120

Szele

1 Q. Is the second e-mail in this chain an
2 e-mail from you to Gia or is this from Joe?
3 A. There is nothing from me on here.
4 Q. Is this from Joe?
5 A. IAM fund is Joe, yes.
6 Q. Does he say, Gia, I just spoke with Dan
7 Zanger and he said he sold off 2.2 million on
8 Friday to more than cover the 1.1 house call,
9 please advise, is that right?
10 A. Yes.
11 Q. Do you then receive an e-mail back from
12 her that is dated April 10, 3:15 p.m.?
13 A. That is an e-mail from her to Joe
14 copying me.
15 Q. She says, the house call is still
16 outstanding for $482,098.01. Please advise how
17 this will be met. Regards, Gia.
18 Is that what she says?
19 A. That's what the e-mail says.
20 Q. Do you have any information at any time
21 in '06 she indicated that this house call and
22 meeting of it involved a violation of anything?
23 A. I can't recall exactly if I talked to
24 her on the phone about this specifically, but,
25

Szele

1    again, we did discuss that I was concerned about
2    these types of violations.
3    Q. What did you say to her and what did
4    she say to you in that regard?
5    A. I can't recall exactly except that I
6    did express some concern about these violations
7    and --
8    Q. What did she say?
9    A. She generally responded by e-mail and
10   didn't have too much to say except that that's
11   kind of Dan's trading style. I can't recall
12   specifically anything else. Along those lines.
13   Q. Do you recall talking with her about
14   these things?
15   A. I do, yes.
16   Q. Beyond what you told us, do you recall
17   her saying anything else?
18   A. I don't.
19   Q. Then the last e-mail, it is from IAM
20   fund. Is that from --
21   A. Joe.
22   Q. Joe. With a cc to you?
23   A. The last one. 3:34, the first one?
24   Q. Yes.

122

Szele

1    A. That's Joe to Gia copying myself and
2    his other e-mail.
3    Q. And he is asking her to speak with Dan?
4    A. Looks like it.
5    Q. He is asking her to call him, Joe, and
6    that Joe will conference Dan in and Dan will
7    provide instructions?
8    A. That's right. We probably couldn't
9    reach Dan again.
10   Q. Okay.
11   A. Dan was usually unavailable when there
12   was a problem like this to talk to.
13   Q. Let me show you what we premarked as
14   Zanger Exhibit 25.
15        (E-mail dated 7/10/06 from George Szele
16        to Gia marked Zanger Exhibit 25 for
17        identification)
18   Q. Looking at page 1, is that an e-mail
19   from you to Gia and Joe dated July 10, 2006,
20   11:56 a.m.?
21   A. Yes.
22   Q. Do you say to Gia, please make sure the
23   wire gets done as Dan said he liquidated
24   positions, if you don't see it, please let me

Szele

1    know?
2    A. Yes.
3    Q. What wire are you referring to, if you
4    know?
5    A. I don't know what wire that is
6    referring to.
7    Q. Does it appear to you that IAM was
8    trying to get funds out of the Fund and that the
9    call had to be met for the wire to be sent?
10   A. I just don't know.
11   Q. Let's --
12   A. I would have to look at all the e-mails
13   surrounding this.
14   Q. Let me look at the last e-mail from Gia
15   to you, Joe and Ms. Vezina. Who was she?
16   A. Stephane Vezina. He was administrator.
17   Q. He's the administrator of?
18   A. Our fund. He is part of Butterfield.
19   Q. Does she say George, the call is for
20   today, If Dan liquidated positions today and the
21   call is removed for tomorrow, we can release
22   funds at that time, Regards, Gianina?
23   A. Right. Gia is saying that. Right.
24   Q. Does that refresh your recollection as

124

Szele

1    to what the meaning of this call involved?
2    A. No, because it doesn't tell me what
3    wire it is referring to.
4        It still doesn't tell me which wire we
5    are talking about. I would have to look at the
6    other e-mails around this.
7    Q. Let me show you what we premarked as
8    Zanger Exhibit 26.
9        (E-mail from George Szele to Daniel
10       Zanger marked Zanger Exhibit 26 for
11       identification)
12   Q. Do you recognize this?
13   A. What's this.
14   Q. The first page.
15   A. Are you referring to this first e-mail
16   on page 1?
17   Q. Yes.
18   A. I recognize it.
19   Q. What is it?
20   A. An e-mail from me to Dan.
21   Q. Does it reflect a discussion you had
22   had with Dan prior to sending him the e-mail?
23   A. Yes. It's -- we had a discussion and
24   it looks like I am putting it in an e-mail, yes.

Szele

1
2    Q.   What was the discussion that you had
3    with him before you sent him this e-mail?
4    A.   I wouldn't be able to recall any
5    specific discussion besides reading this.
6    Q.   Can you recall generally?
7    A.   Whatever is here is all I can recall on
8    that discussion.
9    Q.   As of September 17, 2006, did you
10   believe that Dan had violated the contract
11   between himself and IAM in any respect?
12   A.   I thought there were violations prior
13   to this date, yes.
14   Q.   Did you think they were significant?
15   A.   Yes.
16   Q.   Did you think they negatively impacted
17   IAM?
18   A.   I think that they negatively impacted
19   IAM -- yes, I do think they negatively impacted
20   IAM.
21   Q.   To what extent?
22   A.   I'd have to think about that.
23   Q.   Why don't you think about it.
24   A.   You want me to think about what extent
25   any violation --

126

Szele

1
2    Q.   Mr. Szele, this case is about alleged
3    violations of a contract.
4    A.   Right.
5    Q.   You are here as a representative of IAM
6    in addition to being a witness on your own.  My
7    question to you is -- as of September 17, 2006, I
8    asked you if any violations by Mr. Zanger of the
9    contract at issue here occurred and you indicated
10   yes.
11          My question is, to what extent had any
12   of those alleged violations negatively impacted
13   IAM in your judgment?
14   A.   Yes.  I don't know to what extent.
15   Q.   Okay.
16   A.   I don't know if that's a quantification
17   or qualification.  Certainly there is an impact.
18   I can't gauge to what extent.
19   Q.   Can you tell us beyond what you told us
20   with any specificity how any alleged violations
21   by Mr. Zanger prior to September 17, 2006 of the
22   contract had negatively impacted IAM?
23   A.   Well, the trading violations I think
24   were probably starting to concern Gia as well as
25   me for one.  So that's Goldman Sachs.  Anything

Szele

1
2    else I would just have to think about to what
3    extent exactly it may have.  I would have to
4    think about it.
5    Q.   Good.  When you say these violations
6    probably were affecting Gia, do you have any
7    documents to refer to on that?
8    A.   Well, once or twice I spoke with Gia
9    and she says Dan has another violation.  You
10   know, did you get my e-mail.  Or if I talked to
11   her after I got her e-mail, she says Dan's got
12   another violation, what are you guys going to do.
13   That sort of thing.
14          Joe would know about it.  You know, Joe
15   would say what's going on, why is he having
16   another violation.
17          That's essentially what I am trying to
18   tell you.
19   Q.   You told us everything you can in terms
20   of this probable concern by Gia?
21   A.   I'm sorry.
22   Q.   Have you told us everything that you
23   can concerning this probable concern by Gia?
24   A.   I don't know what else Gia would be
25   concerned about besides just what I sort of

128

Szele

1
2    recall that, you know, a couple of times we said
3    this to each other and she was like, yes, that's
4    Dan.  She said, you know, how long is -- in a
5    tone that suggested how long is that going to
6    continue.
7          But specifically I can't point to
8    anything in specific words that I would recall.
9    Q.   As of September --
10   A.   You have to understand something.  A
11   lot of people told me about, you know, Dan's
12   concerns of his trading, including his accountant
13   and so on and so forth.  It was something that
14   was discussed a couple of times by 2006.
15   Especially after the second one in April.
16   Q.   Would it be fair to say you were
17   begging Dan for money in September of 2006?
18   A.   Begging?  I don't think I was begging
19   him, no.
20   Q.   Was IAM so low on funds that it
21   couldn't pay any of its bills as of September
22   2006?
23   A.   I don't recall what bills we could and
24   could not pay.  I don't recall what bills we
25   could and could not pay.  I knew that we would

129

131

Szele

1

2  need to raise more working capital.

3      Q.  Were you seeking to raise working

4  capital from anybody other than Dan as of this

5  point in time?

6      A.  I don't know. I'd have to check. I'd

7  have to check if I was or wasn't.

8      Q.  Do you recall anybody else that you

9  were trying to hit up for working capital?

10     A.  Not off the cusp I don't.

11     Q.  Let me read the third paragraph to you.

12 Thanks again, Dan. Let's hang in there and be

13 patient. It's only a matter of time before

14 people realize your/our added value. Especially

15 if you kick some behind between now and year end.

16 Best, George Szele.

17         Did I read that right?

18     A.  Yes.

19     Q.  Did you believe as of September 2006

20 that Dan constituted added value to IAM?

21     A.  In some ways, yes.

22     Q.  Would it be fair to say in significant

23 ways?

24     A.  It was getting less and less

25 significant because of all the things that he was

130

Szele

1

2  doing.

3      Q.  Why did you ask him for $50,000 then if

4  you thought that he wasn't providing added value

5  as is referenced in this e-mail?

6      A.  Because we needed the working capital

7  and we were in a joint venture partnership and I

8  thought we were going to be building a business

9  together for at least five years.

10         Just because he has bad performance for

11 a while doesn't mean I don't think he can come

12 back and do great in pursuing and bringing in

13 investors.

14     Q.  You refer to a joint venture. What

15 joint venture are you referring to?

16     A.  To me, this is basically a joint

17 venture agreement.

18     Q.  What do you base that on?

19     A.  He brings the capital. I bring

20 everything else.

21     Q.  You are supposed to bring the

22 investors?

23     A.  We were both supposed to bring in

24 investors. That's why it is in the agreement.

25     Q.  Why isn't there any reference in this

Szele

1

2  e-mail or any other e-mail you state about Dan

3  stopping or ceasing from violating the agreement?

4      A.  I'm not sure what you are asking me. I

5  told him things verbally. I felt that was

6  sufficient.

7      Q.  There is a number of e-mails we've

8  seen. You told us about lots more you had with

9  Dan. Why isn't there an e-mail expressing to him

10 alleged violations of the contract?

11     A.  I believe there are references across

12 the board in his violating the agreement. I

13 would have to go back to all the items I pointed

14 out.

15     Q.  Is there one IM that talks about, that

16 says in substance I have concern about the fact

17 you have violated our contract?

18     A.  I don't know if I used the word you

19 violated the contract. I am almost certain I

20 used words that he is doing things that are

21 violations in and of themselves of the contract

22 terms. The liquidity, lack of transparency, not

23 telling me this. Those are referenced in the

24 IMs.

25     Q.  Why didn't you put that in this e-mail?

132

Szele

1

2      A.  Why didn't I put that in this e-mail?

3      Q.  When you are asking him for $50,000,

4  why didn't you put it in the e-mail?

5      A.  Why would I put it in the e-mail?

6      Q.  You are referring to the fact it is

7  only a matter of time people realize your/our

8  added value, especially if you kick some behind

9  between now and year end.

10         If you had thought he violated the

11 contract when you are asking him for $50,000 and

12 you refer to his added value, why didn't you

13 refer to these alleged violations of the

14 contract?

15     A.  That wouldn't make much sense. I don't

16 see how that -- I don't even see how there is any

17 relevance. I am trying to get more working

18 capital to continue our joint venture so I could

19 market more hoping that he has better

20 performance.

21         I don't give up on people like that.

22 If he had good performance and we had more

23 working capital and we all did here -- if he did

24 what he was supposed to do, we would have been

25 fine.

Szele

1
2    Q.  The performance you are talking about
3    is the trading performance?
4    A.  His trading performance, yes.
5    Q.  Let me show you what we premarked as
6    Zanger Exhibit 27.
7        (E-mail dated 9/22/06 from George Szele
8    to Daniel Zanger marked Zanger Exhibit 27
9    for identification)
10   Q.  I ask you what that is, if you know.
11   A.  Yes, I wrote that.
12   Q.  Is this a follow-up e-mail to Zanger
13   Exhibit 26?
14   A.  I'm not sure if it was a follow-up
15   e-mail or not.
16   Q.  Well, does it deal with the same issue?
17   A.  I'm not sure about that. It could
18   actually be requesting another 50K. I'm not sure
19   if it is a follow-up on the same issue or a
20   different 50K amount.
21   Q.  Take a look at Zanger Exhibit 26. That
22   is dated Sunday, September 17, 2006. Do you see
23   that?
24   A.  Um-hum.
25   Q.  You have to say yes or no.

134

Szele

1
2    A.  Sorry. Yes.
3    Q.  This e-mail -- the subject matter of
4    this e-mail is urgent, is that right?
5    A.  The September 22 one is urgent, yes.
6    Q.  That is five days later?
7    A.  Yes.
8    Q.  You say in the September 22 e-mail,
9    Dan, please agree to the terms for just one more
10   50K amount.
11   A.  Yes.
12   Q.  Is that the same 50K that you were
13   asking him for on September 17?
14   A.  I would assume it is, yes.
15   Q.  By the way, everything in the September
16   22, 2006 e-mail you sent him, was that true?
17   A.  Was everything in this e-mail true?
18   Q.  Everything you are telling Dan on
19   September 22, 2006.
20   A.  Everything I usually say is true, but
21   let me read through it.
22       Yes, it's true or it's saying that, you
23   know, I hope that everything else that's in the
24   future is going to be taking place.
25   Q.  When you say please agree to the terms

Szele

1    for just one more 50K amount, I cannot pay bills
2    and function without it, do you see that?
3
4    A.  Yes.
5    Q.  Was that a true statement as of
6    September 22, 2006?
7    A.  It must have been if I said it.
8    Q.  From September 22, 2006 up to the end
9    of 2006, did IAM or you receive any working
10   capital, that is additional working capital from
11   any source?
12   A.  Give me the dates again, please.
13       MR. SEAR:  Can you read the question
14   back.
15       (Record read)
16   A.  I'm not sure. I don't think so.
17   Q.  You say in here, in part, if I cannot
18   function and pay bills, then we risk shutting
19   down and that would accomplish nothing. Do you
20   see that?
21   A.  Sorry. I'm looking for it.
22   Q.  Take your time.
23   A.  If I cannot function to pay bills, then
24   we risk shutting down. Yes, I see that.
25   Q.  Was that true as of that point in time?

136

Szele

1
2    A.  Yes. It was a risk, yes.
3    Q.  In the absence of the additional
4    working capital that you were asking Dan for, is
5    it true that sooner or later in 2006 IAM would
6    have been forced to shut down?
7    A.  If we didn't raise additional capital,
8    we would have potentially been shut down.
9    Q.  And when did IAM stop functioning as an
10   ongoing active business entity?
11   A.  When did IAM?
12   Q.  Yes.
13   A.  IAM is still functioning as an entity.
14   Q.  What was its business activity after
15   January 1, 2007?
16   A.  It remained a trading manager to
17   Independent Fund.
18   Q.  And what were its business activities
19   in that capacity?
20   A.  What were IAM's business activities in
21   that capacity? The trading manager is
22   responsible for everything that's outlined in the
23   offering memorandum. Maintaining anything that
24   needs to be maintained or managing any assets.
25       I don't know how else to answer that

Szele

1    besides what's in the offering memorandum which
2    is the definition of what the trading manager
3    does.
4    Q.  I understand what a trading manager
5    does.  I am asking what IAM itself did in terms
6    of business activities, actual business
7    activities after January 1, 2007.
8    A.  We were trying to bring in another
9    investor into another class of share, which we
10   did.  We brought in 1.5 million.  This came in I
11   believe the beginning of March '07.  I'd have to
12   check that date.
13   And we were going to try to build that
14   business around that manager.
15   Q.  Which manager was that?
16   A.  Top Water.
17   Q.  What is Top Water?
18   A.  It's a multi-strategy hedge fund, U.S.
19   hedge fund.
20   Q.  What happened with that attempt?
21   A.  What happened is that when they found
22   out that Dan took out his money, they were very
23   concerned that they are going to be paying all
24   these fees, administrative fees, accounting fees.

138

Szele

1    So they said we are going to have to redeem
2    eventually because we can't be the only investor
3    in your fund.
4    So essentially Dan caused more damage
5    there for me.
6    Q.  Did you tell them when you were talking
7    with them about putting the money in that Dan had
8    redeemed his money?
9    A.  I didn't know at that point what was
10   going to happen.
11   Q.  When did you first talk with them about
12   putting their money in?
13   A.  When did I first talk to them?  I'd
14   have to check.  I don't know.
15   Q.  When did they put it in?
16   A.  They ended up putting it in -- like I
17   said, I think beginning of March or end of
18   February.
19   Q.  In January or February, did you tell
20   them that Dan had redeemed his shares in the
21   Fund?
22   A.  I'm not certain if I did or didn't, but
23   they were aware that Dan had been in there and
24   that -- I'm quite certain I told them Dan might

Szele

1    be getting out, but I had also perhaps other
2    investors lined up into this class of share I was
3    thinking of bringing in.
4    My recollection is that we discussed in
5    sort of basic terms.  But I was actually at that
6    time still hoping to just sit down with Dan and
7    come to an agreement with how we are going to
8    continue.
9    Q.  This was after the Fund was liquidated?
10   A.  Again, the Fund liquidation, if I am
11   correct, you are referring to sort of takes place
12   over several months.
13   Q.  After December of 2007, did you have a
14   conversation with Dan where you asked him if he
15   would trade for some other fund and put money in
16   some other fund?
17   A.  I don't recall.  It is possible.
18   I several times tried to contact Dan,
19   many times, phone, e-mail, IM, to sit down and
20   talk about next steps.
21   Q.  Was this after the day trading incident
22   in December of 2006?
23   A.  This was after he didn't cover that
24   major day trading violation.  He said I'm not

140

Szele

1    going to.
2    Q.  What did you say to him after he didn't
3    cover it in terms of going forward?
4    A.  I said we need to sit down and talk.
5    Q.  Did you try to convince him to go
6    elsewhere and trade?
7    A.  I don't know what you mean by that.  Go
8    elsewhere and trade --
9    Q.  In some other fund, to provide working
10   capital?
11   A.  I'd have to -- I'm not sure if I did or
12   not.
13   I did talk to him about giving me money
14   to trade which he did.  He gave me that $100,000.
15   Q.  When did he give you that?
16   A.  That was in I think mid summer of 2006.
17   Q.  I am directing your attention though --
18   we are talking about the end of '06.
19   A.  I understand.  You also asked me when
20   he did give me money as well.  I thought --
21   Q.  No, I didn't ask --
22   A.  I thought you were asking two different
23   things.
24   Q.  I asked you, after he failed to call --

Szele

1 he didn't meet the day trading call in December?

2     A. Right.

3     Q. And you indicated you spoke with him

4 afterwards about potentially doing business

5 together, is that right?

6     A. I don't recall if after the

7 violation -- I don't think -- because I couldn't

8 even get in touch with him. He was ignoring me

9 completely. I don't believe I talked to him

10 about any business deals after that happened in

11 December of '06.

12     Q. You didn't talk to him about you and he

13 going to some other fund and him trading with

14 some other fund?

15     A. I don't recall. I don't recall. I may

16 have. I don't recall. I don't recall that.

17     Q. When this other investor came in in

18 March of '07, they knew about the fact that Mr.

19 Zanger had redeemed his shares in the Fund?

20     A. I'm not sure if they knew about it or

21 not. But the discussion we were having since

22 December, even prior, I mean, November,

23 September, I was discussing with this investor

24 about coming into my fund. It was a long

142

Szele

1 discussion. It was a long due diligence process

2 he was doing. It took time.

3     Q. I think you indicated earlier though

4 this new investor knew some time in January or

5 February that Mr. Zanger had redeemed his shares

6 in the Fund before they came in?

7     A. I don't believe I said that. I think

8 what I said was that -- we can see what I said.

9 But I think it was a discussion that took place

10 with the new investor that what's going to happen

11 with Dan I don't know. I'm trying to get

12 investors into this Class T. I don't know what

13 is going to happen with Dan.

14     He didn't really ask that many

15 questions about Dan, this investor. He was

16 concerned only in investing in Top Water. He

17 didn't have -- as I recall, he didn't have too

18 many questions or concerns about Dan.

19     But later on in the year, like in --

20 they redeemed in September of 2007. They were

21 noticing the impact of being the only investor in

22 the summer of '07. They said that is too much

23 for us to bear alone.

24     Q. Has the Fund in any of the classes

Szele

1 obtained any other investor beyond this investor

2 who came in in March of 2007 to date?

3     A. No. No, not in the Fund.

4     Q. What were your business activities in

5 2007?

6     A. Well, I have been trying to find a job.

7 I have been trying to joint venture IAM in the

8 Fund somehow. In the meantime the Fund is now

9 dormant. We don't have an administrator. I've

10 contacted executive recruiters. I've been

11 thinking about how I am going to borrow money to

12 pay my bills. I'm trying to find deals I can

13 work on to create revenue. Trying to survive.

14     Q. When did the administrator leave?

15     A. The administrator I believe -- I'd have

16 to check. I'd have to check exactly the date,

17 but it is basically late '06.

18     Q. Late '06?

19     A. I mean, the administrator was saying --

20 they were still involved -- let me just think for

21 a second.

22     I'm sorry. I am referring to the

23 letter. The letter they sent they were going to

24 perhaps leave was in '06. They wound up staying

144

Szele

1 and administering all through 2007.

2     Q. It was late --

3     A. They actually terminated the

4 administration agreement yes, I believe it was

5 October of '07. Yes, October of '07. Around

6 there. I can get you the exact date.

7     Q. Did IAM operate at a substantial loss

8 in 2007?

9     A. At a substantial loss in 2007. Well,

10 accounting wise, yes, because they are adding up

11 the previous year.

12     But we always function on a skeleton

13 type structure. We had to leave our office. We

14 moved out of our office in February of '07. And

15 I've been working out of my home.

16     Q. In terms of a profit or loss though,

17 would it be fair to say that on an income basis

18 that IAM operated at a substantial loss for 2007?

19     A. I'd have to think about that and look

20 at the numbers. There wasn't any gain for sure,

21 yes.

22     Q. Did IAM operate at a loss for the

23 calendar year 2006?

24     A. I think so, yes.

145

147

Szele

1    Q.  Did it operate at a loss for the
2    calendar year 2005?
3        A.  I'd have to check exactly what, you
4    know -- how -- I don't even really know the exact
5    definition of what you mean by that.  I --
6    accounting wise, yes, it was a loss because it
7    was rolling forward with losses.
8        Q.  I am talking about the income -- did
9    IAM have any net income for 2005?
10       A.  I would have to just check.  I don't
11   know.  Any income for 2005?  I'm not even sure
12   what you mean by net income.  I'm not sure what
13   you mean by that.
14       Q.  You really don't know what net income
15   is?
16       A.  I am not sure what you mean by net
17   income.  Because accounting wise I'm not an
18   accountant.  So I'm not sure what you mean.
19       Q.  If positive income is the excess of
20   revenue over expenses, my question to you is, in
21   2006 did IAM have more earned revenue than it did
22   expenses?
23       A.  I don't think so.
24       Q.  How about 2005?

Szele

1    A.  Did we participate, yes.
2        Q.  And am I correct that IAM received
3    management fees for the second, third and fourth
4    quarters of 2006?
5        A.  I believe so.
6        Q.  Am I correct that Dan was not paid any
7    management fee from May '06 through the end of
8    the year?
9        A.  I believe that's accurate, yes.
10       Q.  Why wasn't Dan paid a share of the
11   management fee from May '06 through the end of
12   the year?
13       A.  Because we felt that he had violated
14   and he wasn't communicating and we needed the
15   working capital.
16       Q.  Did you ever send him any notice of the
17   violations you are relying upon to justify not
18   paying him the management fee from May going
19   forward?
20       A.  I talked to him verbally about that and
21   that's all I can recall.
22       Q.  When you talked to him verbally about
23   that, what did you say and what did he say?
24       A.  I don't recall exact words.  But I said

146

148

Szele

1    A.  I don't think so.
2        Q.  Now, am I correct that for 2005 IAM
3    participated in the performance fee that was
4    earned as a result of Dan's trading?
5        A.  2005?  Yes, we -- I believe we
6    participated in 2005 in the performance fee.
7        Q.  For 2005, what other earned revenue did
8    IAM have?
9        A.  I'd have to check.  My sense --
10   depending on when the management fee, 18 months
11   ran out that we were waiving the management fee,
12   which would have been I guess -- we didn't
13   participate in anything but performance fee.
14       Q.  I understand that.
15       A.  Yes.
16       Q.  My question is, putting aside the
17   performance fee that was based upon Dan's
18   trading, did IAM have any other earned revenue
19   for 2005, from any other source?
20       A.  I don't think so.
21       Q.  Directing your attention to 2006, am I
22   correct that IAM participated in a performance
23   fee that was earned as a result of Dan's trading
24   for the first quarter of 2006?

Szele

1    I'm concerned about the violations, the trading
2    violations.  And we need more working capital.
3    And he said we're going to have to sit down and
4    talk about a new agreement at some point.
5            And don't quote me on those exact
6    words, but he made it very clear he wanted to sit
7    down and discuss our agreement and come up with
8    some sort of a potential amendment or something.
9        Q.  You referred to earlier in your
10   testimony certain violations that you didn't
11   learn about, alleged violations, until the end of
12   '06.  Do you recall that?
13       A.  That's right.  Until Gia's memo.
14       Q.  How did those violations harm IAM or
15   the Fund in any respect?
16       A.  First of all, I didn't know about them.
17   And Dan has to tell me about them per our
18   agreement.
19           Number two, they are excessive.  Way,
20   way, way excessive.
21           Those are the key reasons why it is
22   harmful.
23       Q.  Assuming they were excessive and Dan
24   should have told you about them, how did they

Szele

1    harm IAM or the Fund?
2        A.   I would have talked to him about it and
3    I would have said stop.  It could impact
4    investors and how they view.  And if an investor
5    then maybe finds out I didn't know about these
6    violations because I wasn't told and it is in the
7    agreement I was supposed to be told, that could
8    harm us as well.
9        Q.   Could you point to any actual harm from
10   these unknown violations?
11       A.   Can I point to any actual harm?  I'm
12   sure I could.  One obvious harm is that he pulled
13   out the 5 million from the Fund.
14       Q.   You knew about that?
15       A.   Yes, I knew about that.
16            Are you asking me specifically just how
17   did the violation harm?
18       Q.   Yes.
19       A.   I would have to go and talk to
20   investors and see -- first of all, the investor
21   would go through a due diligence process.
22   Whether or not they would find that a major
23   impediment to investing, that would come to light
24   then.

---

150

Szele

1        But, in general, the reason I put it
2    into the agreement for him to inform me is that I
3    would be aware of that and I would manage that
4    and manage him and manage expectations for
5    investors going forward on the number of
6    violations.  That I have this being told to me
7    contractually by the underlying manager.
8        It is a function of knowing your
9    manager.  And that can be very harmful if your
10   investors think you have a manager that is not
11   telling you what he is doing.
12       Q.   As you sit here now, can you tell us
13   any actual harm that IAM suffered from these
14   unknown violations?
15       A.   I believe that some investors -- I
16   can't recall exactly, but I did mention this to
17   some investors and they think it did have an
18   impact on them.  It made them think twice.
19       Q.   When did you mention this to them?
20       A.   To the investors?
21       Q.   Yes.
22       A.   I don't know exactly.
23       Q.   We are talking about the unknown
24   violations you know, right?

---

Szele

1        A.   Yes, the unknown violations.  No, no,
2    no.  We are talking about the violations that I
3    did know about.
4        Q.   No.  I have been asking you about --
5    you testified about a bunch of violations that
6    were known to only Dan and Gia up until the end
7    of '06.
8        A.   Right.
9        Q.   I am asking you to identify any harm
10   caused to IAM as a result of those alleged
11   violations.
12       A.   I'm sorry.  Obviously on that I don't
13   have any -- I can't answer that obviously.  I
14   didn't know about it until the end of '06.
15       Q.   You can't identify any harm for me,
16   correct?
17       A.   Not indirectly right now.
18       Q.   Not indirectly right now?
19       A.   I would have to think about -- some
20   answers I can't just give to you like that.  I
21   would have to think about it.
22       Q.   As you sit here now, can you identify
23   any harm to IAM from any of these alleged unknown
24   violations that you testified about, as you sit

---

152

Szele

1    here now?
2        A.   I am having a hard time sort of
3    grasping the question.  But any damage --
4    anything that I would have had to explain to
5    investors after is significant to me.  Anything
6    that I would have had to explain before is
7    significant to me.
8        That's why I put in the agreement
9    everything I asked him to tell me about and he
10   didn't do any of them.  That is a big difficulty
11   for me to raise money on then perhaps in the
12   future with investors if I am not being told by
13   the manager.  It is a big no-no.
14       Q.   I am referring you specifically to the
15   alleged violations that you testified about that
16   only Gia and Dan knew about.  My question to you
17   is, as you sit here now, can you identify any
18   actual harm to IAM from those alleged violations?
19       A.   I think I've already answered that.  I
20   don't know how else to answer it.
21       Q.   Beyond what you testified, can you
22   specify any alleged harm from those alleged
23   violations that were known only to Gia and Dan?
24       A.   I just don't -- I'm just not even clear