# Exhibit B

249

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ----------------------------x
 4   INDEPENDENT ASSET MANAGEMENT, LLC,
     and OLA HOMSTROM,
 5
             Plaintiffs,
 6
         v.           1:07-CV-06431-J5R
 7
     DANIEL ZANGER,
 8
             Defendant.
 9
     ----------------------------x
10
                  April 17, 2008
11                 10:22 a.m.
12
13
14        Deposition of GEORGE SZELE, taken by
15   defendants, at the offices of Jones Day, 222 East
16   41st Street, New York, NY 10017, before Jessica
17   L. Loschky, a Shorthand Reporter and Notary
18   Public.
19
20
21
22
23
24
25
```

250

```
 1
 2   APPEARANCES:
 3
 4   BALESTRIERE, PLLC
 5      Attorneys for plaintiffs
 6      225 Broadway, Suite 2700
 7      New York, NY 10007
 8   BY: CRAIG STUART LANZA
 9      WILLIAM HOLLEMAN
10
11
12   JONES DAY
13      Attorneys for defendant
14      222 East 41st Street
15      New York, NY 10017
16   BY: THOMAS H. SEAR
17      MICHAEL D. SILBERFARB
18
19
20
21
22
23
24
25
```

251

```
 1
 2                STIPULATIONS
 3
 4        IT IS HEREBY STIPULATED AND AGREED,
 5   by and between counsel for the respective parties
 6   hereto, that all objections, except as to form,
 7   are reserved to the time of trial.
 8        IT IS FURTHER STIPULATED AND AGREED
 9   that the deposition may be signed and sworn to
10   before any officer authorized to administer an
11   oath.
12        IT IS FURTHER STIPULATED AND AGREED
13   that the sealing and filing of the deposition be
14   waived.
15
16
17
18
19
20
21
22
23
24
25
```

252

```
 1                  Szele
 2   GEORGE SZELE,
 3      called as a witness, having been duly sworn,
 4      testified as follows:
 5           (IAM 006362 through IAM 006502 marked
 6      Zanger Exhibit 41 for identification.)
 7           MR. SEAR:  Let me note a couple of
 8      things for the record.  The time is
 9      approximately 10:20.  Mr. Szele's
10      examination had previously been scheduled
11      for April 11th.  We received notice in the
12      late evening the night before that he was
13      unable to attend.  We have been invoiced
14      from the court reporter for $150, which I'm
15      going to give counsel the bill and I'm
16      asking them to take care of this since it
17      was not our fault --
18           MR. LANZA:  Sure.
19           MR. SEAR:  -- for the cancellation.
20           Also, let me note for the record that
21      we received a letter from counsel for the
22      plaintiff on April 10th concerning the Rule
23      11 motion.  We responded that day.  Unless I
24      hear to the contrary today, I'm assuming
25      there will be no response back from counsel
```

253

| | |
|---|---|
| 1 | Szele |
| 2 | for the plaintiff. |
| 3 | MR. LANZA: For the record, it's our |
| 4 | intention that we will respond to you |
| 5 | tomorrow by 5 p.m. |
| 6 | MR. SEAR: Thank you. |
| 7 | MR. LANZA: Also, some other things I |
| 8 | want to address. This is pursuant to our |
| 9 | agreement to bring our client back in light |
| 10 | of production of additional documents and in |
| 11 | light of the fact that there were some |
| 12 | incomplete questions as a 30(b)(6) witness. |
| 13 | In addition, some of the questions from |
| 14 | the last deposition related to accounting |
| 15 | questions, which my client has now made an |
| 16 | effort to, it being tax season, get personal |
| 17 | statements to address those questions. We |
| 18 | have -- to date we do not have those in |
| 19 | hand. Some of those questions will, again, |
| 20 | be incomplete, but we will follow-up with |
| 21 | them immediately upon receipt of them and |
| 22 | you should have them relatively soon. |
| 23 | MR. SEAR: Thank you. |
| 24 | EXAMINATION |
| 25 | BY MR. SEAR: |

254

| | |
|---|---|
| 1 | Szele |
| 2 | Q.  Mr. Szele, let me show you what we've |
| 3 | marked as Zanger Exhibit 41. For the record, |
| 4 | it's a collection of documents bearing the Bates |
| 5 | numbers IAM 006362 through IAM 006502. A set of |
| 6 | these documents was provided to us by hand I |
| 7 | believe on March 21st by your counsel. |
| 8 | Do you recognize these documents? |
| 9 | A.  You want me to go through each one? |
| 10 | Q.  No. Let's go at it this way because |
| 11 | there are a number of documents. |
| 12 | A.  So far I recognize them, yes. |
| 13 | Q.  You were deposed on March 5th, 2008, |
| 14 | and we were then provided with these documents on |
| 15 | March 21. After your deposition, did you do |
| 16 | anything to search for any documents? |
| 17 | A.  I have not had a chance to go through. |
| 18 | you are aware, my wife's illnesses, my illnesses, |
| 19 | my children's illnesses. It's just been a |
| 20 | non-stop ordeal. We had our child the other day, |
| 21 | and I have not had a chance to go through |
| 22 | anything in detail. Just briefly I went over |
| 23 | some things. |
| 24 | Q.  Did you provide any additional |
| 25 | documents to your counsel after your deposition |

255

| | |
|---|---|
| 1 | Szele |
| 2 | on March 5th? |
| 3 | A.  I don't believe so. I may have. I'm |
| 4 | not sure. |
| 5 | Q.  Well, do you have any explanation as to |
| 6 | why we received these documents on March 21st |
| 7 | about more than two weeks after your deposition? |
| 8 | A.  I don't know why. You have to ask |
| 9 | them. They gave it to you? |
| 10 | Q.  As I've indicated on the record, these |
| 11 | documents were provided to us by hand on |
| 12 | March 21. |
| 13 | A.  I can't answer why they do things. |
| 14 | They are the lawyers. I let them do whatever |
| 15 | they feel they should be doing. |
| 16 | MR. SEAR: Could counsel make a |
| 17 | representation on that? |
| 18 | MR. LANZA: I can't at this time. May |
| 19 | I have a moment with my client? My |
| 20 | understanding is -- I can't make a |
| 21 | representation at this time. I need a |
| 22 | moment. May we have a moment? |
| 23 | MR. SEAR: Sure. I don't understand |
| 24 | why you can't tell me why we got these |
| 25 | documents on March 21st as opposed to well |

256

| | |
|---|---|
| 1 | Szele |
| 2 | in advance of his deposition. You are |
| 3 | telling me you can't answer that now without |
| 4 | conferring among yourselves? |
| 5 | MR. LANZA: I can't answer it because |
| 6 | I'm not the individual who produced those |
| 7 | documents. |
| 8 | MR. SEAR: Mr. Holleman in your offices |
| 9 | provided them to me after the deposition of |
| 10 | Mr. Zanger, and I might add, after -- some |
| 11 | of these documents were utilized at |
| 12 | Mr. Zanger's deposition before we had been |
| 13 | given copies of them. |
| 14 | MR. LANZA: These documents were |
| 15 | utilized in Mr. Zanger's deposition and have |
| 16 | not been provided to you? |
| 17 | MR. SEAR: There were documents from |
| 18 | this set of documents that were utilized at |
| 19 | Mr. Zanger's deposition that had not been |
| 20 | previously provided to us. |
| 21 | Now, Mr. Holleman, can you make a |
| 22 | representation as to why we received these |
| 23 | documents on March 21? |
| 24 | MR. HOLLEMAN: With regard to some of |
| 25 | the documents, we were reproducing them as |

257

Szele

1   Szele
2   cleaner copies. I think some of the earlier
3   copies like the agreement had a lot of
4   markings on them. We wanted to produce the
5   documents without markings.
6       There were communications that earlier
7   there had been some formatting troubles and
8   for some -- I guess some sort of clerical
9   error that happened in our office, there was
10  an oversight, or there was some formatting
11  inconsistencies with the instant messages
12  that we had to iron out. I'm not exactly
13  sure as to why, assuming these messages were
14  not earlier produced, but there was
15  additional leg work that had to be done
16  through some inadvertent oversight I would
17  imagine.
18      A.   Some of these documents were shown by
19  you to me in our deposition.
20      Q.   No. For the record, these documents,
21  each page of these documents has a Bates number
22  on it. The page may be similar to another
23  document, but there is a reason why we Bates
24  number each page. Yes, there is a cleaner copy
25  of an agreement in here. There are also instant

258

1   Szele
2   message that we hadn't seen before and there are
3   other documents we hadn't seen before.
4       Let me ask you this, after your
5   deposition on March 5th, did you do anything to
6   go out and go through the materials relating to
7   this case to answer any of the unanswered
8   questions that had been posed to you in your
9   earlier examination where you indicated you would
10  follow-up?
11      A.   Like I said, I didn't have much time.
12  I have personal things going on, but I went
13  through my deposition a bit, I went through
14  Mr. Porco's deposition a bit, and then I listened
15  to Mr. Zanger and did that, went through a little
16  bit of that deposition, and then just recently I
17  went through a little bit of Mr. Zask's
18  deposition. That's all I really had time to do.
19  I haven't had time to do anything else.
20      You have to understand, we had a lot of
21  things going on in my family. It's just family
22  had to be a priority here. I'm not feeling well
23  actually. In fact, I have to use the restroom
24  every so often because I have a stomach virus. I
25  had a stomach virus last night, the night before,

259

Szele

1   Szele
2   and I had it that night we had to cancel before.
3       My wife has had bronchitis and major
4   difficulties during her pregnancy and I had to be
5   there for her. I can only do what I can
6   physically possibly do as a human being.
7       Q.   Well, when you went through your
8   deposition transcript, did you see in any places
9   that you indicated you would make a search for
10  documents?
11      A.   I believe said that I would look into
12  some things. I believe we actually asked
13  specifically what it is you want us to look into
14  as well being on a time constraint, and I don't
15  think it was provided by you. Specific --
16  anything I have to go back for specifically. We
17  asked -- I'm pretty sure they asked about giving
18  us a specific question or something that I need
19  to look into it.
20      MR. SEAR: Can we have this marked as
21  Zanger Exhibit 42.
22      (E-mails dated 4/9/08 marked Zanger
23  Exhibit 42 for identification.)
24      Q.   For the record, this is a two-page
25  document that's a series of e-mails between

260

1   Szele
2   Mr. Holleman and Mr. Silberfarb, my colleague,
3   who is here today and, in part, the document
4   contains an e-mail from Mr. Holleman to
5   Mr. Silberfarb on April 9th, 2008 in which he
6   says, "George is already reviewing whatever
7   materials he can so as to be prepared to answer
8   your questions on damages. As to the additional
9   documents, it would be helpful to know which ones
10  as best as you can say so he might be able to
11  better answer your questions. Thanks."
12      And then there is an e-mail back from
13  Mr. Silberfarb on April 10th to Mr. Holleman
14  setting forth the topics and open questions that
15  we intended to ask Mr. Szele about in his
16  deposition indicating the pages in his transcript
17  where he had represented that he would look for
18  information.
19      Were you informed of the pages from
20  your deposition transcript that we intended to
21  ask you about before you came here today?
22      A.   No, but I told them that I was just
23  very preoccupied with my family at the moment so
24  I told them that I was going to research whatever
25  needed to be researched, you know, when I have

261

Szele

1 specifics and I have a bit more time and things
2 have calmed down a bit and we can produce
3 anything in specifics that needs to be produced,
4 but there are a lot of documents and a lot of --
5 I don't know the accounting. I would have to go
6 to the accountant. I'm sure that whatever you
7 guys need, I can get.
8        You know, I must say, there is a lot of
9 things that we requested as well from Mr. Zanger
10 that we never got that were relevant to his
11 trading track record, his history in the '90s.
12 We never got anything that I'm aware of, K-1's we
13 can get easily from the accountant.
14    Q.   Let me show you what is a copy of the
15 transcript of your deposition. Let me direct
16 your attention to page 48, lines 14 through 22.
17    A.   Where it says, "Let's stick with 2005"?
18    Q.   Yes. Let me read it into the record.
19 "Question, let's stick with 2005. Have you ever
20 seen an e-mail from Goldman Sachs indicating that
21 any margin call that took place in 2005 as a
22 result of Dan's trading constituted a violation
23 of anything?  Answer, I am not sure if there are
24 e-mails.  They are in the e-mails I gave. Can

262

Szele

1 you point me to one? Answer, I would have to
2 look at the e-mails."
3        Are you prepared today to tell us
4 whether there are any such e-mails?
5    A.   I am not. That would take a lot of
6 time for me to peruse e-mails, but I'm happy to
7 do it as soon as possible.
8    Q.   When you say you are happy to do it as
9 soon as possible, within what time frame are you
10 prepared to do it in?
11    A.   When my wife gets out of the hospital
12 and everything is okay with the baby and I have a
13 minute to not have to deal with the two other
14 kids as well as their needs and the family needs
15 and trying to make some money to pay the bills
16 and trying to borrow more money so I can just
17 survive, I can go on and on and on.
18    Q.   Can you put a time frame on that?
19    A.   I can try to get to it next week. I
20 can try -- I can try to get to it in the next
21 couple days. I just can't make any promises. I
22 can do the best I can. Again, I can only do the
23 best I can. I have obligations to a
24 seven-year-old, a four-year-old, my wife, we

263

Szele

1 can't afford help, we can't afford nannies, we
2 can't afford babysitters, we can't afford
3 anything, we live in a tiny house. I can't do
4 more than I'm humanly capable of doing. I can
5 only promise you I can do it as soon as I can.
6    Q.   Let me direct your attention to page
7 202 of the transcript starting on line 6.
8 "Question, let me read you a statement that was
9 made in court to the judge in this case by your
10 counsel on October 4th, 2007." Mr. Lanza, page
11 7, line 5. Mr. Lanza, "Well, your Honor, I
12 would really be just requiring taking a look at
13 the e-mail exchanges from the prime broker to
14 IFL, specifically to Independent Asset Management
15 saying you are in violation of our rules. You've
16 done this 125 times or saying." The Court, "Do
17 they say that?" Mr. Lanza, "They do say that.
18 There are exchanges from a woman named Gia Nina
19 Arturo who works for Goldman Sachs who is
20 contently irate over these margin calls and they
21 were. Do you know what e-mail exchanges are
22 referred to in that statement? Answer, I would
23 have to find those e-mails. Question, do you
24 have any idea what e-mails are referred to there?

264

Szele

1 Answer, I have some idea. But to -- I would have
2 to find them to give you specific information.
3 What year did they take place? Answer, what
4 year, I would have to look. 2005, 2006. How
5 many such e-mail exchanges were there? Answer, I
6 don't know. I would have to look to count.
7 Would these be in the documents produced to us?
8 I would assume so."
9        As you sit here now, can you provide us
10 any information concerning what e-mails is
11 referred to or was referred to by Mr. Lanza in
12 the representation to the court?
13    A.   There are definitely e-mails from Gia
14 at different times.
15        MR. LANZA: I'm going to object to the
16 question. You are asking him what my
17 motivation for my statement was.
18        MR. SEAR: No, I'm not.
19        MR. LANZA: You did. Do you know what
20 e-mail exchanges are referred to in that
21 statement.
22        MR. SEAR: And he says I would have to
23 find those e-mails.
24        MR. LANZA: Well, regardless, and we've

265

Szele

1    also provided an answer to that question
2    with references to Bate stamp numbers.
3    MR. SEAR: This witness represented
4    that he could find those e-mails. This was
5    on March 5th, 2008. Let's lay it right out.
6    Our position is that that was a false
7    representation to the court. It was false
8    then, it's false now. These 125 e-mails
9    don't exist.
10   MR. LANZA: There is no statement here
11   that there is 125 e-mails. I would like you
12   to point to where I say there is 125
13   e-mails.
14   MR. SEAR: Fine. I'm corrected. You
15   represented to the court that all it would
16   take was to just look at the e-mail
17   exchanges from the prime broker to IFL,
18   specifically to Independent Asset Management
19   saying you are in violation of our rules.
20   And I'm quoting -- you represented to the
21   Court. You've done this 125 times or saying
22   and the Court says, "Do they say that?" You
23   say, "They do say that."
24   Now, I asked this witness in his

266

Szele

1    deposition previously if he knew what those
2    e-mail exchanges were. He said I would have
3    to find those e-mails. He goes on to say,
4    "I would have to find them to give you
5    specific information."
6    Q. My question to you now is: As you sit
7    here now, can you give me any specific
8    information about those e-mail exchanges?
9    A. Okay. Have you seen the e-mail which
10   has a memo from Goldman Sachs saying violation,
11   violation, violation, violation? I think you
12   showed it to me in my deposition, did you not?
13   You even showed me the spreadsheet. That is a
14   representation -- there was a two-page memo from
15   Goldman Sachs via Gia in her back office which
16   states specifically these were the violations,
17   whatever times, 125 times, these were the ones
18   covered, these were the reg T, these were the
19   margins. They have a specific breakdown on the
20   spreadsheet. She gave us that. That is one of
21   her e-mails out of several where she expresses,
22   you know, lots of things and verbally she
23   expressed to me various things as well. This
24   can't go on, you know, obviously this is what is

267

Szele

1    going to cause shut down verbally on the phone
2    when I asked her, you know, what's going on.
3    Then I asked her specifically what kind of
4    violations these are and said these are NYSE
5    violations. There is a whole slew of e-mails
6    that I believe you have because I think you
7    showed it to me in my deposition.
8    Q. Let me show you Zanger --
9    A. That is the e-mail we are referring to
10   as one of them.
11   Q. Zanger Exhibit 28, this is a document
12   that was provided to me at 1:00 the day of your
13   examination. Take a look at that and let me know
14   if that's the first e-mail that you are referring
15   to.
16   A. This is one of the e-mails from Gia
17   that I'm referring to.
18   Q. Can you identify any other such e-mails
19   as you sit here now?
20   A. To my recollection, this is the
21   e-mail -- this is the only substantive e-mail
22   from Gia that actually gave us a full breakdown
23   of all the violations and the details of the
24   violations, which is what I requested from them.

268

Szele

1    When she said to me that there are
2    violations here over the years -- over the last
3    year '05 and '06. I said, "There are? How
4    many?"
5    That was the first time I was actually
6    made aware of the number of these. I was made
7    aware of some of them that Dan covered, like a
8    few of them, but I was never aware until this
9    time that there was this many of them that he
10   experienced.
11   Let me also say that -- so this
12   complete breakdown as she provides me is the only
13   one I received, as thorough as this, was this
14   day. This was the biggest one I ever received
15   and so clear and substantive of the information.
16   Q. As you sit here now, you can't refer me
17   to other such e-mails, is that correct?
18   A. I can find other e-mails where she
19   talks about violations, okay, but she has never
20   sent me an e-mail, to my recollection, that has
21   this much detail. There are other e-mails where
22   she sends that in a way -- in a tone that says,
23   okay, another violation, or -- you know, I have
24   to find that. I have to find those e-mails.

269

Szele

1    Szele
2    Verbally, also, she has said -- orally she also
3    said that, you know, we can't -- like if we asked
4    for money to be transferred that we needed to do
5    for a payment that was approved, then she said
6    that -- none of that can take place obviously
7    because Dan has another call or another situation
8    where your account can't move money.
9        Those were the instances where she had
10   also e-mailed me in the prior period, but I was
11   never aware of the number of them to this extent
12   until 2006.
13       Q.   Let's look at the last two pages of
14   this.
15       A.   Okay.
16       Q.   Do you see there is reference there to
17   two call amounts with due dates of November 16th,
18   '06 and December 7th, '06?
19       A.   Yes.
20       Q.   Are these the day trading violations
21   that are referred to in the e-mail to the best of
22   your knowledge?
23       A.   I think that's what she calls it, yes.
24       Q.   Okay. Now, do you see for the margin
25   calls listed in the document that there are trade

270

1    Szele
2    dates and due dates listed?
3        A.   Which page?
4        Q.   Well, it's not Bates numbered.
5        A.   The very first page?
6        Q.   I think the sixth page in. The first
7    entry is a trade date of January 6th, '06. Do
8    you see that?
9        A.   Yes.
10       Q.   With a due date of January 11th, '06?
11       A.   Yes.
12       Q.   And if we go over to the next page,
13   does that indicate that that was a house call?
14       A.   I believe so.
15       Q.   And then there are other margin calls
16   that the key indicates were reg T calls?
17       A.   I believe so if it says reg T.
18       Q.   Well, if you look at --
19       A.   Wherever it says "T," I assume it's reg
20   T.
21       Q.   -- under type, is that correct?
22       A.   That's what I would assume, yes.
23           Just for the record, no matter what
24   they are called here, what they are labeled, they
25   are all violations of our contract.

271

1    Szele
2        Q.   And there are also New York calls under
3    the type listed in one of the columns?
4        A.   Yes.
5        Q.   And for each of these calls, there is a
6    due date listed, is that right?
7        A.   Looks like it.
8        Q.   Do you have any information that would
9    in any way indicate that any of these calls,
10   putting aside the two-day trading violations that
11   are specified by the document, were any of these
12   margin calls not met by the due date listed in
13   this document?
14       A.   Can you repeat the full question,
15   please?
16       Q.   Let me rephrase it. I'm putting aside
17   the two-day trading matters set forth at the end
18   of the document. I'm directing your attention to
19   the margin calls specified in the rest of the
20   document where there is a house margin call, a
21   reg T call, or New York call. My question to you
22   is: Do you have any information that would
23   indicate that any of these calls were not met by
24   the due date listed in this document?
25       A.   To my understanding, they were met.

272

1    Szele
2        Q.   They were met by the due date?
3        A.   I believe so. I wouldn't know because
4    I wasn't aware of many of them until December of
5    '06, so I wouldn't have even known about some of
6    them because I wasn't informed by Dan like I was
7    supposed to about each one of these.
8        Q.   Would it be your understanding that
9    this due date is the due date set by Goldman
10   Sachs for meeting the call?
11           MR. LANZA: Objection.
12       A.   I would assume it's set by Goldman
13   Sachs because the memo is from Goldman Sachs, but
14   I'm not be 100 percent certain. It could be NYSE
15   rules, it could be Goldman rules. Gia several
16   times said these are NYSE violations and Goldman
17   Sachs violations so it's not just a matter of a
18   due date issue here.
19       Q.   Now, there are a number of pages
20   listed --
21       A.   I just want to make one more thing very
22   clear. I hope it's on the record that every
23   single one of these violations, whether you call
24   them violations or house calls or NYSE, I was
25   supposed to be informed by Mr. Zanger on each and

273

Szele

1 every one of these instances per my contract with
2 him, and he never once informed me. That's very
3 important to note.
4     Q.    Okay. Now, if I was to go through the
5 other areas of your transcript where you
6 indicated that you would need to look for
7 information, would it be fair to say that you
8 have not had the opportunity to obtain that
9 information since your deposition?
10     A.    I have not for the reasons already
11 mentioned.
12     Q.    Let me show you what we've previously
13 marked as Zanger Exhibit 15, a copy of the
14 amended complaint in this action. I'll direct
15 your attention to the tabbed page. That's the
16 Goldman Sachs Execution & Clearing, L.P. That's
17 the heading on it. It's Customer Futures and
18 Option Agreement. Do you see that?
19     A.    Yes.
20     Q.    And if we go to the last page of that
21 document, is that your signature?
22     A.    Yes.
23     Q.    Are you aware of any other documents
24 setting forth any house rules of Goldman Sachs

274

Szele

1 that were applicable to the trading of the IFL
2 account beyond this agreement?
3     A.    I'm sorry. Repeat that.
4         (Record read)
5     A.    I'm sure there is other documents. My
6 partner Joe filled out some documents at the
7 outset I believe to set up the account for
8 Independent Fund. I'm sure they are out there
9 somewhere. I can't be sure that they are out
10 there.
11         Let me just say this, to my
12 understanding Mr. Porco took care of setting up
13 the account for Independent Fund Limited and
14 whatever Goldman Sachs needed or we needed, you
15 know, the information was exchanged somehow or
16 else they never would've allowed us to start
17 trading.
18     Q.    Beyond the documents that set up the
19 account and this agreement, are you aware of any
20 other Goldman Sachs' rules or regulations that
21 were applicable to the trading that you can
22 identify?
23     A.    Any documents?
24     Q.    Yes.

275

Szele

1     A.    That specify the rules and regulations?
2     Q.    Yes.
3     A.    Not that I can recall right now.
4     Q.    Let's take a look at Zanger Exhibit 41,
5 which is the collection of documents provided to
6 us on March 21.
7         Can you tell us what the first page
8 reflects that is Bates number 6362?
9     A.    It's a statement from Butterfield Bank.
10 I'm not sure I get these. I think these go
11 directly to the client. I get a different report
12 I think, but this one I think goes directly to
13 the client from the administrator.
14     Q.    Look at Bates page 6368, which is
15 headed Redemption Notice. Can you tell us what
16 that is? I'm including the next page 6369, which
17 appears to be apart of the same document.
18     A.    Yes. It looks like the redemption
19 form.
20     Q.    Do you have any knowledge or
21 information as to what redemption is referred to
22 therein?
23     A.    I'm sorry. I don't understand the
24 question.

276

Szele

1     Q.    Do you have any knowledge or
2 information as to what redemption is reflected in
3 this document?
4     A.    It's Mr. Zanger's redemption, Victory
5 Lane.
6     Q.    And this was a redemption that took
7 place in October of 2006?
8     A.    That looks like the redemption date,
9 yes.
10     Q.    And what do you recall about the facts
11 and circumstances about that redemption, if any?
12     A.    You are going to have to specify that a
13 bit more. What circumstances?
14     Q.    What do you know about this redemption?
15 Do you know anything about this redemption?
16     A.    Yes. He wanted to redeem his capital.
17 I mean, I really don't know what you are wanting
18 me to respond to. I don't know what you are
19 specifically referring to.
20     Q.    I'm asking for your knowledge about the
21 redemption. Beyond your testimony that he wanted
22 to redeem his capital, do you have any
23 information or knowledge that relates to this
24 redemption?

277

Szele

1        A.    Besides that he wanted to redeem his
2   capital, I don't know how else to answer your
3   question. I'm sorry. He wanted to redeem his
4   capital and wanted to do it against the contract
5   that we agreed. I mean, it's opposite of what
6   the contract says he is allowed to do, my
7   contract.
8        Q.    Were you a director of Independent
9   Fund?
10       A.    Yes.
11       Q.    And as a director of Independent Fund
12  in 2006, did you take any action to oppose or
13  disagree with any redemption by Mr. Zanger of his
14  shares in IFL?
15       A.    You mean on the telephone or e-mail or
16  any -- in any way?
17       Q.    In any way.
18       A.    There is an e-mail in late 2006, which
19  I believe we've already shared, talking about
20  that. There were conversations saying we're
21  going to -- him saying we should talk about --
22  this is in 2006 -- him talking about we are going
23  to have to come up with a new plan here. We are
24  going to have to discuss this contract that we

278

Szele

1   signed together when he wanted to redeem also for
2   his taxes.
3        Then there were conversations, and I
4   would have to check the IM's too, but there were
5   definitely conversations with him telling him
6   that he can't put money in directly, and he can't
7   take money out directly from Goldman Sachs
8   account. You have to do this through proper
9   channels, which he kind of just disregarded.
10       To the best of my recollection, you
11  know, those were the extent of any significant
12  conversations, but I definitely expressed to him
13  my dissatisfaction of, you know, whenever it went
14  below five million, or that I was concerned about
15  something. He would either brush it off or not
16  be available or whatever. He has a way of sort
17  of ignoring things.
18       Q.    Did the directors of IFL approve all
19  the redemptions that Dan actually did?
20       A.    Depends how you define "approve"
21  because there is technically a way to approve by
22  signature, but do we approve of it as part of the
23  overall contract, no, we didn't approve of it in
24  that sense.

279

Szele

1        As far as technical signature, did we
2   approve it, yes, we approved the redemption. You
3   really don't have the right to not approve a
4   redemption as a director. You are basically
5   forced to allow a redemption if the investor
6   wants his money back per the offering memorandum,
7   per the rules of the Bermuda law. There is no
8   way we could've said no.
9        Q.    Let's look at the Bates number 6372,
10  that and the next page 6373. Is that a so-called
11  instant message?
12       A.    Yes.
13       Q.    This one is dated May 9th, 2006?
14       A.    Looks like it, yes.
15       Q.    And how were these instant messages
16  retained?
17       A.    There is a save function. I just saved
18  -- I just hit the save button to a file.
19       Q.    In your computer?
20       A.    Yes.
21       Q.    And what did you do in terms of
22  collecting the instant messages that had been
23  produced here in this case? Were you the one
24  that did the search for them?

280

Szele

1        A.    Did I search the instant messages?
2        Q.    No. Let me --
3        A.    I'm sorry.
4        Q.    Okay. What was done in connection with
5   producing the instant messages that were produced
6   in this case? What process was followed?
7        A.    If I understand your question
8   correctly, my answer is, I took all the instant
9   messages that I had saved and provided them to
10  counsel.
11       Q.    So as far as you know, we have been
12  provided with all of the instant messages that
13  exist of conversations between you and Dan?
14       A.    What I know is that I provided them
15  everything I have.
16       MR. SEAR: Let me ask counsel, do we
17  have all of the instant messages that exist
18  between Mr. Szele and Mr. Zanger concerning
19  the matters at issue in this case?
20       MR. LANZA: We handed over everything
21  that's been provided to us. Apparently
22  there was some sort of glitch that caused us
23  to produce additional ones, but we provided
24  everything that we have.

281

Szele

Q. So, Mr. Szele, did you print out hard copies of these messages and provide them to your counsel?

A. No. I saved them on a file and transferred it. I believe everything was done electronically.

Q. Okay.

A. There may have been one or two that I printed out, but most of them, to my recollection, were electronically transferred.

Did you want me to respond to this.

Q. Let me direct your attention to Bates 6379. Is this an instant message of August 30, 2005?

A. It looks like it, yes.

Q. And so the record is clear, when we say this is an instant message, is this a computer conversation that you had with Mr. Zanger from time to time as opposed to a telephone conversation?

A. This is through Yahoo Instant Messenger. This is something Dan wanted. Dan liked this a lot.

Q. And is Mr. Zanger listed in this and

282

Szele

other instant messages as Chart Pattern?

A. That's right.

Q. And you are GB Szele, G-B S-Z-E-L-E?

A. That's right.

Q. Let me read part of this. "GB Szele, Dan, can you give me the total assets under your management including all accounts personal and fund? It's about 40 million? Chart Pattern, about 37. Chart Pattern, mil. GB Szele, K. I'm putting 35 into PowerPoint to be conservative."

Does this reflect the fact that you understood that he had about $40 million under management as of August of 2005?

A. Repeat the question. I'm not sure -- I'm not sure I'm understanding the question. I think I'm clear on it, but I'm not understanding it. Are you asking me if I was thinking that it's $40 million of his assets on August 30th? Was that my belief?

Q. Yes.

A. I think it was my guess that he was around that number at that time.

Q. And --

A. That's why I put a question mark there.

283

Szele

Q. And he indicated to you that it was about 37 million, is that right?

A. That's what he says, yes.

Q. And did that include, or exclude the money under management of IFL?

A. My understanding is that that was his total -- my understanding is he was saying that his total assets under management was 37 at that time.

Q. That would include approximately five million, or something a little bit more that was in IFL?

A. I think it was a little bit more in IFL at that point because he made some money.

Q. So that would be roughly 32 million, give or take?

A. Around 30, 32, yes, in that range.

Q. Let me direct your attention to the Bates page 6380. Is that an instant message between you and Dan of March 23, 2006?

A. Looks like it, yes.

Q. And you say, in part, "Looks like we have 1.1 mm coming in April 1."

Is the "mm" million?

284

Szele

A. Yes.

Q. And below that Mr. Zanger says, "Nice regular meaning margin," is that right?

A. I have no idea what he is asking here, but right now I'm trying to figure out -- okay. I see what he is referring to. Yes, I believe he was wanting it to come into his Class Z where there is no one-to-one situation, meaning there is leverage allowed.

Q. Do you say, "Yeah, Class Z is where all the money is - Class Z2 is the one with no margin/leverage."

A. That's what I wrote.

Q. And that was true?

A. Class Z2 was in the process of being set up so I was making it clear to him, again, that obviously we are going into Class Z, but we want to set up Class Z2 because it could be institutionally more friendly to have his strategy that doesn't utilize leverage.

By the way, if he would've listened to me on that, he probably would've gotten 30 to 50 million from an investor in Western Connecticut that said, you know, we would've invested in him

285

Szele

1    if he didn't have a 20 percent drawdown.
2        Q.  Can I have the exhibit in front of you,
3    41.
4        For the record, I'm going to mark
5    another copy of this because the copy I have has
6    handwritten notations of mine.  I'll mark a clean
7    copy.
8        Let me direct your attention to Bates
9    page 6389 and ask if that's an instant message
10   between you and Dan dated November 10th, 2005?
11       A.  It looks like that.
12       Q.  And am I correct that you first asked
13   Dan, and let me quote, "Dan, at the end of
14   October about how many total investors do you
15   have (approx) and how much assets (40 mil)"?
16       Did I read that right?
17       A.  Yes.
18       Q.  Was that your question to Dan?
19       A.  Yes.
20       Q.  The does he respond, "about 43 mil"?
21       A.  Yes.
22       Q.  And does he then say, "50 investors"?
23       A.  Yes.
24       Q.  And you say, "Thanks"?
25

286

Szele

1    A.  Yes.
2        Q.  Does he say, "Plus or minus"?
3        A.  Yes.
4        Q.  And then does he say, "Why"?
5        A.  Yes.
6        Q.  Do you know what the "why" indicates?
7        A.  No.  I assume it indicates yes.
8        Q.  Let me direct your attention to Bates
9    page 6392.
10       A.  Which one?  Sorry?
11       Q.  6392.  Is that an instant message
12   between you and Dan dated March 1, 2006?
13       A.  Looks like it, yes.
14       Q.  And let me direct your attention down
15   to the entry for 11:25:14 a.m. where Dan is
16   saying, "I told him I have two funds, one on and
17   off.  He chose the onshore."
18       Do you see that?
19       A.  I do.
20       Q.  Did you say, "What did he say about
21   that?"
22       A.  I see that.
23       Q.  Did he say, "That is wanted -- the
24   on -- that was all"?  And you say, "He put 800 K
25

287

Szele

1    into Westwood," is that right?
2        A.  Yes.  That's right and I followed up
3    with a question mark.
4        Q.  And what was Westwood as of that point
5    in time?
6        A.  His domestic fund.
7        Q.  Does Dan then say, "He said he has
8    plenty of money offshore and was only interested
9    in the onshore at this time.  No, the trader
10   raised 800 K for me total.  Paul was 200 K."  And
11   then he says, "Another 100 K," is that right?
12       A.  Looks like it, yes.
13       Q.  Do you then say, "Excellent.  It's all
14   good to grow you"?
15       A.  Yes.
16       Q.  Does he say, "Another 250 K"?
17       A.  Yes.
18       Q.  Do you say "excellent" again?
19       A.  Yes.
20       Q.  Does he say, "Yep"?
21       A.  Yes.
22       Q.  And do you say "excellent" a third
23   time?
24       A.  Yes.
25

288

Szele

1    Q.  When you are saying --
2        A.  It's very odd that I don't recall
3    saying excellent three times like that, but I
4    guess it is what it is.
5        Q.  The three excellents, what are they
6    referring to?
7        A.  Growing his assets, growing assets in
8    general is good for everyone.
9        Q.  These were assets that were growing in
10   his Westwood fund, is that correct?
11       A.  Yes.  I believe these were assets in
12   the Westwood.  Whether or not he used his access
13   to my offshore fund to help him raise money
14   domestically is another question so I think that
15   would need to be addressed down the road.
16       Q.  Let me direct your attention to Bates
17   page 6408.  Is this an instant message between
18   you and Dan dated February 16th, 2006?
19       A.  Yes.  Looks like it, February 16th,
20   '06.
21       Q.  And the third entry from Dan, is he
22   saying -- it's W-H-E, but am I correct that it
23   is, "When are you giving me my 4 mil?"  He says,
24   "I need it right now"?
25

289

Szele

1
2    A.   Yes.  It looks like he is referring to
3    "when."
4        Q.   And do you say, "Yes. BFS is working
5    on it right now.  It doesn't happen overnight,
6    Dan"?
7    A.   Yes.
8        Q.   Do you then say after a couple comments
9    by him, "When did you get them the actual
10   redemption doc?"
11   A.   Yes.
12       Q.   Do you next say, "I'll call them again
13   to make sure"?
14   A.   Yes, I see that.
15       Q.   Do you later say, "We told them to
16   speed it up"?
17   A.   Yes.
18       Q.   Had you told BFS to speed up the
19   redemption?
20   A.   I'm sure I did.
21       Q.   And BFS, so we are clear on that, is
22   that Butterfield?
23   A.   Butterfield Fund Servicing.
24       Q.   And that's the administrator of the
25   Fund?

290

Szele

1
2    A.   That's right.  I tried to go out of my
3    way to help Dan when he asked me to.
4        Q.   Let me direct your attention to 6409
5    and ask you if that's an instant message between
6    you and Dan dated January 3, 2006?
7    A.   Looks like it, yes.
8        Q.   And is the first comment on this
9    instant message by you?
10   A.   Yes, it is.
11       Q.   Do you say, "Happy New Year, my man!
12   How are you feeling?"
13   A.   Yes, that's what I wrote.
14       Q.   And is there a discussion of certain
15   personal matters in the instant message then?
16   A.   If you are referring to my father and
17   his secretary, yes, I guess you can say that's
18   personal.
19       Q.   And then you make a comment concerning
20   his performance for 2005?
21   A.   I'm sorry.  Could you repeat the
22   question?
23       (Record read)
24   A.   If you are referring to you had a great
25   year, yes.

291

Szele

1
2        Q.   Was that your true belief as of
3    January 3rd, 2006?
4    A.   Performance-wise, yes.  Actual trading
5    performance-wise as a result on a return, yes, I
6    thought that was good.
7        Q.   When you say, "You had a great year,"
8    was there any aspect about anything Dan had done
9    in 2005 that was inconsistent with having a great
10   year?
11   A.   I was referring to the performance.
12   The performance was a great year.  Had I known
13   that he had all these violations, I may not have
14   thought it was a great year.  Had he, you know --
15   I mean, it was a great year in terms of
16   performance --
17       Q.   Well --
18   A.   -- relative to the market.
19       Q.   You used the words, "You had a great
20   year," is that right?
21   A.   Yes.
22       Q.   Do you qualify that anyplace in this
23   instant message?
24   A.   I don't think I qualify it in this
25   instant message, no.

292

Szele

1
2        Q.   Are you aware of any instant message or
3    e-mail or any other document that indicates that
4    Mr. Zanger did not have a great year in 2005 in
5    any respect at all?
6    A.   Like I said, the performance is a great
7    year.  Had I known about some of these other
8    things, I might have said it's a good year, you
9    know.  There is information I was not aware of
10   when I said that.
11       Q.   As you sit here now, can you refer me
12   to any instant message or e-mail or document that
13   indicates in any way that Mr. Zanger did not have
14   a great year in any respect with regard to his
15   trading in IFL?
16   A.   Not that I can recall right now.
17       Q.   Do you then -- does he say, "Yes,
18   thanks to you"?
19   A.   He does.
20       Q.   And then did you ask him, "What is the
21   estimate for Westwood?"  And does he say, "About
22   98 percent"?
23   A.   Yes.
24       Q.   What does the 98 percent refer to, to
25   the best of your knowledge?

293

Szele

1

2 A. His return for the year in Westwood,
3 which was 30 percent higher than the return in
4 the Fund, so in that respect, it wasn't a great
5 year. That's what I was referring to before.
6 Q. Well, are you aware of any instant
7 message or e-mail or document that indicates that
8 you felt that some comparison with his Westwood
9 performance indicated that he did not have a
10 great year with respect to the trading in IFL?
11 A. Actually, I definitely had a
12 conversation with Mr. Zanger about this saying
13 that I wish he would've put in his money at the
14 end of December, beginning of January like he
15 said he would so he wouldn't have missed out on
16 the 30 percent, that he would've had the same
17 result in the offshore fund that we had in his
18 domestic fund had he done what he said he was
19 going to do, which is put all the money in, the
20 five million, in the beginning of January or end
21 of December like he promised so I did comment to
22 him on that.
23 Q. Can you point me to an instant message
24 or e-mail or other document that reflects that
25 such a conversation took place?

294

Szele

1

2 A. I would have to look at the IM's. I
3 can't recall right now.
4 MR. SEAR: Why don't we take a break
5 and let's chat during the break.
6 (Recess)
7 MR. SEAR: While we were off the record
8 I discussed with counsel for the plaintiff
9 the issues relating to the questions that
10 were posed of this witness at his initial
11 deposition examination in which the witness
12 indicated, in substance, in various spots in
13 the transcript that he would look for
14 certain documents or look for certain
15 information.
16 I raised with counsel the fact that the
17 witness testified on the record and his
18 testimony is what it is. I'm not purporting
19 to characterize his testimony, but I think a
20 fair take on it is, is that for the reasons
21 he articulated, he came here today
22 unprepared to go through those types of
23 questions because he had not looked for the
24 documents or information for those
25 unanswered questions in those instances

295

Szele

1

2 where he indicated he would look for
3 information. He just wasn't ready to do
4 that here today.
5 I raised with counsel for the plaintiff
6 the issue of what their position was going
7 to be relative to whether Mr. Szele would
8 voluntarily come back prepared to go through
9 those items. Those items were items that we
10 had specified by page numbers in the e-mail
11 that we marked here today as exhibit number
12 42, Zanger 42.
13 My understanding is that counsel for
14 the plaintiff is committed to getting back
15 to us by the end of the day tomorrow with
16 their position on that issue.
17 MR. LANZA: That is correct.
18 A. If I may just address two points from
19 previous.
20 Q. No. If your counsel wants to ask you
21 questions at the end of the deposition, that's
22 fine.
23 Let me direct your attention to 6412.
24 Is that an instant message exchange between you
25 and Mr. Zanger dated January 25th, 2005?

296

Szele

1

2 A. Which one?
3 Q. 6412?
4 A. Sorry. What is the question?
5 Q. Is this an instant message exchange
6 between you and Mr. Zanger dated January 25th,
7 2005?
8 A. I believe so.
9 Q. Take a look at that. My question to
10 you is going to be if this deals with matters
11 relating to his sending money into the Fund?
12 A. Okay.
13 Q. Does this deal with the matter of
14 Mr. Zanger wiring money into the Fund for his
15 shares?
16 A. It deals with that and the amount of
17 damage it's taking form him to get the money in
18 there, too, dealing with that, too.
19 Q. Let me direct your attention to the
20 entry for 11:03:03 a.m. Is that a statement by
21 you?
22 A. I believe so.
23 Q. You say, "I'll alert Anthony to get
24 ready to wire to Class Z shares Bermuda. How
25 much are you wiring now and how many tranches?"

297

Szele

1
2  A.  Looks like I wrote that, yes.
3  Q.  Does he say, "Many tranches"?
4  A.  He says "trenches," but, yes, I assume
5  he means tranches.
6  Q.  What is a tranche?
7  A.  I assume in a different segment.
8  Q.  Okay.  Does he say, "Nothing today.
9  Maybe tomorrow.  The next day to start.  Can't
10  unwind my eBay or Google shorts while they are
11  breaking down so hard, would cost me too much
12  money.  I'm unwinding my lower beta stocks right
13  now.  It's half of what I have"?
14  A.  I see that, yes.
15  Q.  You say, "Okay, your call"?
16  A.  Yes.
17  Q.  Let me direct your attention to 6416.
18  A.  I also make it clear to him how much of
19  a waste that was and how much difficulty that
20  actually proved to be to us to raise money.  I
21  made it very clear down here, which is part of
22  the great question that we were talking about
23  earlier, why I didn't think it was so great, '05.
24  Because he told me he was going to have the money
25  in at the end of December, January 1.

298

Szele

1
2  Q.  Is there any document that reflects
3  such a commitment on Mr. Zanger's part?
4  A.  I would have to go back and try to find
5  it.
6  Q.  Will you do that?
7  A.  Yes, I will.
8  Q.  Let me direct your attention to 6416.
9  A.  Which one?
10  Q.  6416.
11  Is that an instant message exchange
12  between you and Mr. Zanger dated January 6th,
13  2005?
14  A.  It looks like it, yes.
15  Q.  And let me direct your attention to the
16  entry for you for 3:45:11 p.m.  Do you see that
17  at the bottom?
18  A.  Yes.
19  Q.  Do you say to him, "Dan, are we in
20  agreement that if I raise you money in the US
21  domestically, that we have the same agreement as
22  offshore."  It's spelled M-E-N-A-I-N-G, but,
23  presumably, it's, "meaning 25 percent of all
24  fees?"
25  Is that a question by you to Dan?

299

Szele

1
2  A.  It looks like it.
3  Q.  What are you referring to there?
4  A.  That if he gets assets into Westwood,
5  that I have a similar compensation.  In other
6  words, if he -- whether he gets an investor who
7  like this gentleman that he got that we mentioned
8  in our earlier IM that comes in and let's say he
9  learned about it through my offshore fund and I
10  get some sort of -- I may be eligible to get some
11  sort of a fee, which is similar to our agreement
12  with the offshore.
13  It's only fair when you are raising
14  money for offshore, you are bound to have cross
15  currents of investors that may want to come in
16  your domestic and your offshore.  Having offshore
17  fund, in and of itself, helped Dan to raise money
18  domestically and, therefore, I should be getting
19  paid something for that, or be eligible to get
20  paid something for that.
21  Q.  Were you asking him to get paid for
22  that if you raised money in his domestic fund?
23  A.  If assets came into his domestic fund
24  through any of my efforts, my affiliation, then I
25  would be eligible to get paid a fee.  That's what

300

Szele

1
2  I was asking him for.
3  Q.  Incidentally, this IM and the IM before
4  it that's dated January 2005, looking at the
5  substance of it, is it possible that these IM's
6  were generated in early 2006 instead of early
7  2005?
8  A.  It's possible.  There are some sort of
9  an electronic -- it's doubtful.  I would say
10  these are probably accurate.  If you show me one
11  specifically --
12  Q.  Is it your understanding that the
13  January 6th, 2005 notation at the top is
14  generated by the system?
15  A.  Well, that was the date I assume that
16  Yahoo IM had placed on the IM.
17  Q.  Let's look at 6422.
18  A.  It could though also be a function of
19  saving the -- when you are saving this to the
20  file, there is a functionality in the computer
21  that also will date it I think.  There is a date
22  for Yahoo, and there may be a date when you are
23  actually saving the file so there could be, you
24  know, I guess there is room for a potential
25  glitch there.

301

Szele

1    Q.   Let me direct your attention to 6422
2    and ask if that's an instant message between you
3    and Dan dated December 14th, 2005?
4    A.   Looks like it.
5    Q.   And in the entry for 9:45:27 a.m., were
6    you telling Mr. Zanger that he had had an
7    excellent month in his trading for the Fund?
8    A.   Looks like it, yes.
9    Q.   Are you aware of any instant message or
10   e-mail in which you indicated in words or
11   substance to Mr. Zanger that his trading for the
12   Fund had breached the agreement between him and
13   IAM?
14   A.   I would have to look. I'm not sure.
15   Q.   As you sit here now, can you point me
16   to any one such instant message or e-mail?
17   A.   Where I specifically say you
18   violated --
19   Q.   Yes.
20   A.   I can't point to one right now. I'm
21   not sure that I did.
22   Q.   Let's look at the Bates number 6435.
23   Is that page 2 of an instant message from
24   November 4th, 2005?

302

Szele

1    A.   Looks like it, yes.
2    Q.   And do you see the entry for 12:00:56
3    p.m. from you?
4    A.   Which one?
5    Q.   12:00:56 p.m.?
6    A.   I see it.
7    Q.   Do you say, "I'll try to get more
8    people also to meet with us when you are here.
9    Frankly, a lot of people are afraid of your
10   volatility, but then some aren't and they want to
11   watch you a little longer. Maybe by new year
12   they will be comfortable."
13        Did you say that to him?
14   A.   Looks like it.
15   Q.   Did he respond, "My two-year record
16   very impressive, very sorry three years since
17   December '02. Westwood is up some 600 percent
18   since then."
19        Did he say that back to you?
20   A.   Looks like it.
21   Q.   Then do you say, "I agree. Very
22   impressive." Then you go on to say, "You must
23   understand that people are afraid of getting in
24   before you drop 20 percent, 30 percent. That is

303

Szele

1    just the nature of the human, right?" And he
2    says, "Sure is"?
3    A.   Yes.
4    Q.   Did that reflect your true belief about
5    his prior performance as of November 2005?
6    A.   Some of it, yes. I can get into that a
7    lot more.
8    Q.   What I'm saying is, what you said to
9    him, is that a true statement of your belief?
10   A.   That is a true statement of my belief,
11   yes. It's part of my belief, but that's a true
12   statement of my belief.
13   Q.   Let's look to the next page. Do you
14   see the entry for 12:10:22 p.m. from you?
15   A.   12:10 -- which one?
16   Q.   22 p.m.?
17   A.   Okay.
18   Q.   Does that set forth a statement by you
19   to him?
20   A.   I believe so.
21   Q.   Do you say to him as of this date,
22   November 4th, 2005, and I quote, "Remember, you
23   are considered a gunslinger in some ways. Some
24   people want and love that. We'll find them."

304

Szele

1        Did you say that to him?
2    A.   Yes.
3    Q.   Was --
4    A.   Looks like it.
5    Q.   Was that a true statement of your
6    belief as of November 2005?
7    A.   That we would find them at some point
8    if he stuck to the agreement, yes, I definitely
9    thought that was true at that time, yes. It
10   wasn't going to happen in one day or one year or
11   two years though.
12   Q.   When you say, "Remember, you are
13   considered a gunslinger in some ways," was that a
14   true statement in your belief as to his trading
15   approach?
16   A.   Actually, yes, someone had just told me
17   that they saw him as a gunslinger so, yes.
18   Q.   Did your view as to the fact that he
19   was considered a gunslinger in some way change at
20   all from November 4, 2005 up through the end of
21   2006?
22   A.   I don't think so. Not materially.
23   Q.   Let me direct your attention to the
24   Bates pages 6438 and 39 and ask you what they

305

Szele

1  are, if you know?
2     A.  You said 6438 and 39?
3     Q.  Yes.
4     A.  Yes, I believe this is a report or a
5  summary from the Fund administrator going through
6  the NAV's for Dan's specific classes and series
7  of shares.
8     Q.  When you say "NAV," what are you
9  referring to?
10    A.  Net asset value.
11    Q.  So looking at, say, the entry for
12 1/31/2005 where it says a thousand, what does the
13 thousand refer to?
14    A.  That's just what they start with, that
15 number.
16    Q.  So do the different numbers here, one
17 two and three, reflect the different times when
18 money was put in?
19    A.  No.  This is a net asset value at the
20 end of each month for each class and series of
21 shares, which was Dan's.
22    Q.  Well, what is the difference between,
23 say, S1 and S2?
24    A.  S1 was Series 1, meaning the first

306

Szele

1  tranche that Dan invested.  Series 2 was the next
2  tranche.  Then he tried to move money out so they
3  to creat a Series 3 tranche to help him so he
4  wouldn't get hit with a redemption fee.  We
5  actually did these different series as to help
6  him not to have redemption fee, which I waived
7  redemption fee to help him again based on his
8  mistake of wiring money in and out directly from
9  his account.
10    Q.  At the top the entry is S401, what does
11 that refer to?
12    A.  You have to ask the administrator.  I'm
13 not sure what that refers to.
14    Q.  Let's go to the next page, 6439.  You
15 see there is four entries.  It looks like
16 Independent Class T01.
17    A.  I'm sorry.  I believe S4 refers to the
18 other series they created for him to help him
19 with the redemption and putting it back in on
20 10/31.  Each time they moved money, they created
21 a new series in that effect.
22    Q.  What did you ask?
23    Q.  There is four entries.  It likes like
24 Independent Class T01.  Do you see them?

307

Szele

1     A.  Yes.
2     Q.  Do you know what those entries refer
3  to?
4     A.  That's our new investor that came in
5  for another class of shares in February of '07.
6     Q.  When did that investor leave?
7     A.  We wound that up in basically
8  September, October of '07.
9     Q.  Who managed the trading of the Fund
10 while that investor was in?
11    A.  Who managed the trading of the
12 strategy?
13    Q.  Yes.
14    A.  Another manager.
15    Q.  Who was that?
16    A.  Top Water.
17    Q.  When did Top Water come in?
18    A.  February of '07 -- you mean Top Water
19 came in as manager, or the investment?
20    Q.  No, the manager.  When did Top Water
21 come in as a manager?
22    A.  When did we hire them?  I think we
23 wrote an agreement in '06, early '07.  I would
24 have to check the exact date, but they were the

308

Szele

1  new manager that we had that we were going to
2  work with as well.
3     Q.  How much money was invested by this new
4  investor?
5     A.  1.5 million, I believe.
6     Q.  Was the trading of those moneys
7  successful?
8     A.  It was quite successful.  The trading
9  actually itself was quite successful.  The
10 manager was quite good.
11    Q.  How much money was in the Fund when
12 those moneys were redeemed?
13    A.  I would have to check exactly.  I don't
14 know, but that manager was up every single month
15 very conservatively so they are considered quite
16 good.
17    Q.  Do you have any recollection of how
18 much money that manager made in '07 while this
19 investor had moneys in the Fund approximately?
20    A.  I don't.  I would have to look at the
21 audit, the Fund audit.  I don't know exactly.  I
22 mean, it was minimal.  After fees -- you know,
23 it's very expensive so they got operating fees,
24 administration fees, it all affects the

309

Szele

1  investment. One of the reasons they left is
2  because Zanger wasn't there. He was supposed to
3  be there with his five million. Had he been
4  there with his five million, like he said he
5  would, this investor wouldn't have been hit with
6  the fees, which gets prorated, distributed to
7  each investor so it hurt -- this relationship was
8  redeemed and hurt because specifically Zanger's
9  withdrawal from the Fund.
10     Q.  Were the fees calculated as a
11  percentage of assets in the Fund?
12     A.  Which fees?
13     Q.  The fees you just referred to in your
14  answer?
15     A.  There are expense fees, administration
16  fees, and operating fees per the offering
17  memorandum. These get expensed prorate to the
18  investors.
19     Q.  When you say "prorate" to the
20  investors, what do you mean?
21     A.  If you put in $100 and I put in $1,000,
22  10 percent of the expenses get prorate to the
23  100, and the 90 percent get allocated to the 900.
24     Let's say -- okay, you have 900. You

310

Szele

1  represent 900 out of 1,000 in a Fund and I
2  represent 100. Ten percent goes to me of the
3  fees as prorate, of my prorate portion of my fees
4  and expenses.
5     When that big investor leaves like
6  Zanger left, all the expenses goes to one guy so
7  he can't absorb it. It makes the investor
8  withdraw. He can't pay all the fees and
9  expenses. The Fund is too small.
10     Q.  Were there fees charged to this
11  investor beyond the percentage of the amounts
12  invested in the Fund?
13     A.  I'm not sure what you are saying. Were
14  his fees larger than his investment in the Fund?
15     Q.  No. Was there a management fee charged
16  to that investor, the investor that came in '07?
17     A.  To the new investor, yes, we waived the
18  management fee for him. He had operational and
19  administrative fees, accrual of legal and
20  accounting, all that stuff.
21     There is a whole slew of fees that get
22  accrued each month per the offering memorandum.
23  It's detailed in the offering memorandum. And
24  because Mr. Zanger left with his five million,

311

Szele

1  this investor had to absorb all that and got
2  smacked causing us more damage.
3     Q.  Are you aware of any documents
4  reflecting any of these matters that you've just
5  talked about? I'll tell you, I haven't seen any
6  in the production.
7     A.  First of all, the whole thing was
8  unwinding at the end of '07. We just got the
9  audit just now for -- we just completed the 2007
10  audit, so I have to get you a copy of that. I
11  can get a copy of that and that will detail a lot
12  of that on this Class T.
13     Other than that, I don't know what else
14  to provide. I think I already mentioned in the
15  deposition that you had with me previously that
16  we did have a Class T, we did have a new
17  investor. I think that was explained, if I
18  recall correctly.
19     Q.  Let's look at 6440, which is
20  denominated the Independent Fund Limited. Below
21  that it looks like IAM, Independent Asset
22  Management. Let me ask you if this document
23  continues to and includes 6470.
24     A.  Okay.

312

Szele

1     Q.  Is that the last page of this document?
2     A.  Looks like it.
3     Q.  What is this document?
4     A.  It's a very generic discussion piece.
5  It was probably really just put together to start
6  talking to some potential investors. A generic
7  PowerPoint.
8     Q.  Looking at page 6443, there is
9  reference there to the "global pattern
10  recognition model." What does that refer to, if
11  you know?
12     A.  That's actually my model that I had
13  developed.
14     Q.  And did IAM have any success in
15  obtaining investors through the utilization of
16  this document?
17     A.  I'm trying to think, this is dated
18  July '04. I'm not sure if this was actually
19  handed out as a final PowerPoint to really
20  anyone. I don't know. As far as raising any
21  money directly from this document, I can't say
22  for sure if this document was shown to anyone
23  else and we got some money in. I just can't
24  recall.

313

Szele

1    Q.   As you sit here now, can you identify
2  any investor that came in as a result of the
3  utilization of this document or the matters set
4  forth therein?
5    A.   You got to remember, some of this
6  information has been moved over to other
7  PowerPoints so part of this probably helped raise
8  money, and part of it probably helped raise money
9  in the past. I raised five million for GPRM in
10  2002. That did quite well so pieces of this in
11  the past raised money, pieces of this in the
12  future raised money, and then some of it was
13  taken out. I mean, there is a couple of -- I
14  think there is a couple modifications here.
15    Q.   When you say "in the future," what are
16  you referring to?
17    A.   Well, some aspects of this kept going
18  on into other PowerPoints I think.
19    Q.   What money was raised after 2004
20  besides Mr. Zanger's --
21    A.   I can't tell you, for example, that Dan
22  didn't look at this and say, oh, okay, and this
23  helped raise money with him. I don't know. I
24  don't know if he saw this or not.

314

Szele

1    Q.   Do you have any recollection of you
2  providing that to him?
3    A.   I provided him a PowerPoint. I don't
4  know which one.
5    Q.   Is there another PowerPoint than this?
6    A.   I would -- there are other versions of
7  PowerPoints, but somewhere in the past and,
8  again, pieces of it -- there may be another one
9  after that. We were working on one with Dan,
10  which was the whole marketing effort, where he
11  was giving us -- he was working on giving us his
12  track record audited and put together in a format
13  and put it into PowerPoint.
14    There is a PowerPoint that they
15  approved using, Dan and his accountant, Jeff, but
16  I would have to pinpoint where that is exactly.
17    MR. SEAR: Has that been produced to
18  us?
19    MR. HOLLEMAN: Yes, I believe so.
20    MR. SEAR: I would ask for the Bates
21  numbers on that then.
22    MR. HOLLEMAN: Specifically which
23  PowerPoint are you requesting?
24    MR. SEAR: The PowerPoint that the

315

Szele

1    witness just referred to, whatever that is.
2    A.   There is a PowerPoint that we worked on
3  that Dan approved and Jeff approved, his
4  accountant, and I believe that was completed
5  in -- I have to check exactly. I believe that
6  was completed in -- I have to check exactly when
7  it was completed.
8    MR. SEAR: I'm just asking. I'm not
9  aware of it. That doesn't mean that it
10  wasn't produced. I don't have an
11  encyclopedia of the documents. If it's been
12  produced, I would appreciate the Bates
13  numbers being provided to us.
14    MR. HOLLEMAN: Sure.
15  BY MR. SEAR:
16    Q.   Let me direct your attention to 6481.
17  Is that an instant message between you and Dan
18  dated May 18th, 2006?
19    A.   What is the number again?
20    Q.   6481.
21    A.   It looks like May 18th, '06.
22    Q.   And is there reference here -- do you
23  make reference here to the RCA material?
24    A.   Okay. I see that.

316

Szele

1    Q.   Is that the material you talked about
2  before?
3    A.   I'm not sure what you are referring to.
4    Q.   You testified previously about RCA. My
5  question to you is: Are you referring to the
6  same material here as you did in your earlier
7  testimony, not here today, your earlier testimony
8  the first time?
9    A.   If RCA is utilized as a word, then I'm
10  referring to the same RCA, yes, there is only one
11  RCA that was involved with us. Yes, only one
12  RCA.
13    Q.   Okay. And on this date you tell Dan at
14  2:42:14 p.m., "You are doing a great job hanging
15  onto dough in the last day or so, nice." And Dan
16  says, "K." And you say, "Good for marketing and
17  record," is that true?
18    A.   I did say that.
19    Q.   Let me direct your attention to 6497
20  and ask you if that's an instant message between
21  you and Dan dated September 21, 2006.
22    A.   Looks like it, yes.
23    Q.   Let me read the entry for you for
24  3:06:49 p.m., "Dan, are you busy? If, yes, can

317

Szele

1  we set a time tonight to talk/wrap up our new
2  agreement because I've got to get these things
3  resolved. Plus I need to work on figuring out
4  the infrastructure issue in the Miami office.
5  Thank."
6
7       What are you referring to there?
8       A.  I'm not sure. I believe -- I believe
9  it was to talk about more working capital, to
10  talk about how he wants to proceed. I assume it
11  also has to do with -- we were thinking about
12  setting up another office. I think we were going
13  to try to set up another office. That's to the
14  best of my recollection.
15      Q.  When you say "wrap up our new
16  agreement," what new agreement are you referring
17  to?
18      A.  Like I said, I think it's referring to
19  the additional working capital agreement that I
20  was requesting that we come up with a plan how,
21  you know, he wants to, you know, how he wants to
22  move forward with, you know, the needs we have to
23  continue I think. I think that's what it was
24  referring to. We were talking about more working
25  capital and, you know, how we go forward because

318

Szele

1
2  he was having these drawdowns and he had
3  complained about -- he complained about, you
4  know, how he thought he was getting -- he thought
5  I was getting paid off of his money. He made
6  these ridiculous accusations about, you know, he
7  thought that I was just making money off of him,
8  so I think it is referring to a new agreement
9  about that and also possibly even the RCA
10  situation so I can't recall exactly. That's what
11  I think it is. That's to the best of my
12  knowledge or recollection.
13      Q.  How much more money were you asking
14  from Dan?
15      A.  I don't recall exactly.
16      Q.  Was --
17      A.  I don't recall.
18      Q.  Was IAM having trouble paying its bills
19  as of September 2006?
20      A.  No. I think we were starting to run
21  out of capital, working capital. We were still
22  paying the bills, but starting to run out of
23  capital. I mean, Dan several times said let's
24  discuss a new situation or new agreement, you
25  know, in verbal conversation. He said let's sit

319

Szele

1  down and talk about it, and I said, yeah, that we
2  should do that. He often said things, but never
3  followed up or just ignored it after a while or
4  forgot about it so I think that he probably
5  wanted to also discuss, you know, what is the
6  best way to move forward with the issues of his
7  drawdowns and things like that.
8
9       Q.  Was the idea of a new agreement yours,
10  or his?
11      A.  I think the working capital need was on
12  our part, and I think maybe he wanted to talk
13  about some sort of a new arrangement, discuss the
14  current arrangement.
15      Q.  Why do you think that?
16      A.  Because he said things like, I'm not
17  happy you are making money off of me.
18      Q.  Beyond that, did he indicate that he
19  desired any new agreement?
20      A.  Well, you can just sort of tell. His
21  tone gets a little bit more sharp I would say,
22  and certainly his conversations with me got a
23  little more sharp as he was I think also
24  frustrated with his drawdowns and the fact
25  that -- I guess he expected we would raise money

320

Szele

1  like that overnight and that just wasn't
2  realistic.
3
4       I can't tell you everything he was
5  thinking, but from the brief conversations we
6  had, he wasn't -- he was wanting to come up with
7  some sort of a new situation, and he knew we
8  needed more working capital because I told him
9  we're going to need more working capital.
10      Q.  Did you tell him you needed more
11  working capital so you can pay your bills?
12      A.  I told him we needed more working
13  capital for marketing purposes, for IAM to
14  continue to pay its bills, and to continue the
15  effort, the same, you know, what we agreed on.
16      Q.  Is it fair to say that you were anxious
17  to have him put up this additional capital?
18      A.  Well, I would've liked to come up with
19  a solution where he is happy, we're putting up
20  more capital, and we give him, say, a percentage
21  more of IAM. He had a percentage of IAM anyway
22  so he was just going to get a little more
23  percentage of IAM. My point was to make him
24  happy and make us continue on to try to raise the
25  money, which I think we could have over time.

321

Szele

1  Q.  Let me direct your attention to 6499.
2  Is that an instant message exchange between you
3  and Dan?
4     A.  Looks like it, yes.
5     Q.  Do you initiate the interchange at 8:30
6  and 48 seconds a.m.?
7     A.  8:30?
8     Q.  Yes.
9     A.  Which Bates number?
10    Q.  6499?
11    A.  I'm sorry. I see the IM.
12    Q.  Do you say, "Hey, Dan, you are on a
13 margin call. Can you resolve that this a.m. as
14 soon as possible, please. Thanks"?
15    A.  At 8:30 and at 10:31.
16    Q.  So you repeated it at 10:31?
17    A.  Yes. He didn't respond for two hours
18 so I figured I would try again.
19    Q.  Did he respond to you then at 10:31,
20 15 seconds a.m.?
21    A.  Looks like it, yes.
22    Q.  So he responded ten seconds after your
23 second instant message?
24    A.  Looks like it.

322

Szele

1  Q.  Did he say, "Done"?
2     A.  That's what he writes.
3     Q.  Then did you say at 10:45:49 seconds
4  a.m., "Good month. Look out though, market may
5  turn soon," and he responded, "K"?
6     A.  Looks like that's what's there.
7     Q.  And do you understand "K" to be okay?
8     A.  I do.
9     Q.  Let me direct your attention to IAM
10 6500 and ask you, first, is that an instant
11 message between you and Dan on October 26th,
12 2006?
13    A.  Looks like it.
14    Q.  What does this refer to in substance?
15    A.  I think it's referring to the money he
16 had moved out of his account and tried to wire it
17 and then he tried to get it back. He had to fill
18 out docs for the administrator so everything was
19 done officially and properly. That's what docs
20 refers to, but then it gets into other matters
21 like RCA.
22    Q.  Let me direct your attention to the
23 entry of 2:02:56 p.m. from Mr. Zanger. He says,
24 "When does that wire go out?"

323

Szele

1     Do you see that?
2     A.  Yes. I do see that.
3     Q.  You then say, "Okay. Told you at
4  month end. They can't do it any other way."
5     What are you referring to?
6     A.  That's probably the amount of money
7  that he -- again, money I believe -- this is to
8  the best of my recollection, but I believe he
9  wired in money to cover something directly, which
10 he shouldn't have done, then he had to fill out
11 documents per the administrator which caused
12 further problems, and then he expected to get his
13 money back right away, like he always did.
14 That's why he capitalizes it. "When does that
15 wire go out?" That was his chief concern, his
16 issue, and his questions.
17    He was obviously getting impatient that
18 money didn't get to him as quickly as he hoped
19 from the administrator, which they can't do. It
20 has to be processed by the end of the month
21 according to the standard administrator, you
22 know, process. That's what I believe it refers
23 to, that improper wire activity.
24    Q.  Let me show you Zanger Exhibit 13.

324

Szele

1  It's denominated First Supplement to Plaintiff's
2  Response to Defendant's First Set of
3  Interrogatories. I direct your attention to page
4  2 of this document. Do you see that there is an
5  entry that begins Lost Fees?
6     A.  Yes. I see it down here.
7     Q.  And then the fees are broken down into
8  two forms of fees on page 3, Lost Management Fees
9  and Lost Performance Fees?
10    A.  Yes.
11    Q.  And can you tell us how the Lost
12 Management Fees set forth therein were
13 calculated?
14    A.  The management fee that I'm to get and
15 Dan is to get is -- were issued, allotted 1
16 percent of assets under management. If you have
17 50 million under management, then the annual
18 management fee in total is 500,00 for each
19 person, for Dan and for us. You multiply that by
20 about three for three more years that was left on
21 the contract, so that's a management fee.
22    Q.  Is that management fee calculation
23 based upon your position that Dan was supposed to
24 place $50 million into IFL?

325

Szele

1    A.  I thought Dan was going to place 50
2  million and then, according to his testimony, we
3  were going to raise another 50 to 200.  That
4  calculation is actually very small.  Yes, that is
5  based on that.
6      Q.  When you say "that is based on that,"
7  this calculation is based upon the allegation
8  that Dan was obligated to put in the $50 million,
9  is that right?
10     A.  The management fee is based on the 50
11 million, this number is.
12     Q.  When you say "this number"?
13     A.  50 million.  50 million in management
14 fees equates to about 1.5 in lost management fee.
15     Q.  So the $1.5 million is based upon the
16 $50 million, is that right?
17     A.  That's for three years, yes, but it
18 could have been five, six, seven, eight years or
19 more if we are doing what we are supposed to do
20 here on all sides.
21     Q.  The Lost Performance Fees, you see
22 there is a calculation there?
23     A.  Yes.
24     Q.  Is that calculation also based upon the

326

Szele

1 allegation that he was obligated to put in the
2 $50 million?
3     A.  It's a number that's based on 50
4 million.
5     Q.  Okay.  Let's look at the lost trading
6 revenue.  Do you see that calculation set forth?
7     A.  Yes.
8     Q.  How is that calculated?
9     A.  That is the amount of trading we
10 could've made on my own trading.  Dan wanted to
11 use my model to create revenue as well.  We
12 talked about this quite a bit.  He actually
13 placed 100,000 into a futures account,
14 Interactive Brokers, for me to trade, so he was
15 obviously interested in -- it's part of our
16 agreement that we can both raise assets for all
17 our strategies.  That was clear from the
18 beginning that that might happen.
19     I mean, that's a minimum.  I was
20 actually telling these guys that I had a small
21 trading account last year in June.  I'm up 300
22 percent.  It could've been far, far greater than
23 that.  My trading is kind of like the opposite of
24 Dan's, mine can do very well when his doesn't do

327

Szele

1 so well, so we were anticipating a potential
2 hedge with he and I together being uncorrelated.
3     This is something we were hoping to
4 raise money for as well so Dan put 100,000 into
5 Interactive Brokers, which I was trading on the
6 futures account so he could see how it worked.  I
7 actually made three percent for him on that while
8 he was losing money during that period.  I mean,
9 that's just a tiny minimal number of the
10 potential trading revenue that we could've earned
11 on my trading as well.
12     Q.  So the $100,000 is set forth there --
13     A.  The five million.
14     Q.  Pardon?
15     A.  Yeah, that's based on I guess the five
16 million, if the five million were in there.
17     Q.  So how is the $100,000 calculated?
18     A.  I would have to look exactly back at
19 how I calculated that, but it's basically --
20     it's -- I would to look at my spreadsheet that I
21 did it on.  I can get that to you as well if you
22 want the exact calculation.  It's based on my
23 percentage of profit, based on my performance
24 that I cut in half, you know, by multiples to be

328

Szele

1 very conservative.  I'm sure I gave them a
2 formula so I would have to get that.
3     Q.  I take it you can't explain that
4 calculation to us here today, is that right?
5     A.  No.  I'm telling you it's a percentage
6 of the profits on an X percent of profitability
7 over a certain amount of time.  I'm not sure
8 exactly how I have it in the spreadsheet, but
9 it's based on a performance of the trading -- of
10 my trading.
11     Q.  Have you given us all the information
12 you have here today concerning the calculation of
13 that $100,000 in alleged damages?
14     A.  I would like to go back to my
15 spreadsheet and look how exactly I come up with
16 that, but I think it's extremely conservative.
17     MR. SEAR:  This is the second time
18 we've had exactly the same sort of testimony
19 where the witness has indicated he was
20 unable to do a calculation at the
21 deposition.  He indicated he wanted to go
22 back and look at his spreadsheets and
23 produce them to us and so forth.
24     A.  Well, I've given you information on the

329

Szele

1    Szele
2    management and performance fees, which you asked
3    me last time so I've given you that. It's not
4    quite exactly the same in the deposition. On the
5    100,000 I can give you the exact calculation. I
6    don't have a calculator in front of me. If you
7    want to give me a calculator, I'll look at
8    exactly how I figured it out.
9        Q.   What did you do to prepare the
10   yourself --
11       A.   Or take the 100,000, Mr. Sear, and our
12   damages would still be in excess of 10 to $20.
13   You can take it out, but it's still in there as
14   trading revenue that I could have. I can tell
15   you that Mr. Zask will tell you the same thing, I
16   could've made millions on my strategy with Mr.
17   Zanger on that strategy that I had that even
18   Mr. Zanger liked, otherwise he wouldn't have put
19   100,000 into it of his money.
20       Q.   The information technology cost, the
21   $20,000, how would those damages calculate in?
22       A.   Very conservative again. The amount of
23   money it cost to move around from service
24   provider to service provider. It's across the
25   board. Everything from the guys that we have to

330

Szele

1    Szele
2    pay to keep up the technology for the computers,
3    the network synergy who helps provide our
4    internet and keeping everything in tact, the
5    databases and servers. All of that is very
6    expensive. We had to ask them to reduce cost and
7    find ways -- we had to go and tell every vendor
8    to give us breaks and wait, so on and so forth,
9    so that we could come up with these different
10   expenditures and pay them and come up with ways
11   of keeping the doors open on IAM so we can pay
12   these other expenses for information technology
13   as well. Again, it's very conservative.
14       Q.   Have you provided us all the facts that
15   IAM is aware of that would support that alleged
16   damages amount of $20,000?
17       A.   I believe it's been provided. I
18   believe the information has been provided. I've
19   provided much of the information that I know to
20   counsel.
21           MR. SEAR: Let me note, I'm unaware of
22       any documentation that would support that.
23       If counsel believes there is any that
24       they've produced to us, I would appreciate
25       the Bates numbers.

331

Szele

1    Szele
2    BY MR. SEAR:
3        Q.   Now, the next item is IAM's unpaid
4    debts. It lists $690,595 in debts. When were
5    those debts incurred?
6        A.   Some were incurred early -- I mean,
7    actually I think it's higher. I think it's 8 or
8    900,000. This was incurred over a period of
9    three years, four years. We had some sea unit
10   holders that were brought in 2002, 2001 and then
11   a couple others over time, but it's kind of
12   spread out over a period of time.
13       Q.   Is that from 2001 going forward?
14       A.   Approximately -- it's more 2002-ish,
15   early 2002-ish. Maybe late 2001 we had one or
16   two.
17       Q.   From late 2001 or 2002, how far forward
18   did those unpaid debts extend to?
19       A.   They are extending to today.
20       Q.   During what years were they incurred
21   besides 2001 or 2002?
22       A.   Each year there was a little bit of
23   debt added. I can't give you the exact number,
24   but each year there is a little bit of debt added
25   to that total of 800.

332

Szele

1    Szele
2        Q.   As you sit here now, can you give us
3    any specificity as to the amounts that you add up
4    to get to the $690,595?
5        A.   Specificity, I can't. It would be an
6    accounting thing. I can get you the accounting
7    specifically of debt exactly for each year from
8    the accountant.
9            Actually, didn't we provide -- okay. I
10   thought we provided something there.
11       Q.   What do you think --
12       A.   Isn't there a debt -- a list from the
13   accountant -- there was one page from the
14   accountant that I believe I gave to them that
15   shows the actual debt for IAM. I believe there
16   is one sheet or two sheets that came directly
17   from my accountant that shows the debt of about
18   $860,000.
19       Q.   This is IAM's debts?
20       A.   IAM.
21       Q.   These are not personal debts. These
22   are IAM debts?
23       A.   IAM.
24           MR. SEAR: Okay. I would appreciate
25       the Bates number on that.

333

| | Szele |
|---|---|
| 1 | Szele |
| 2 | MR. LANZA: We'll get that to you. |
| 3 | Q. What basis, if any, is there for the |
| 4 | allegation that Mr. Zanger is responsible to |
| 5 | cover IAM's unpaid debts? |
| 6 | A. Could you repeat that, please. |
| 7 | (Record read) |
| 8 | A. Well, I think it's clear in my opinion |
| 9 | that he has an enormous responsibility to repay |
| 10 | these and also any future lost revenue. |
| 11 | First of all, we had a five-year |
| 12 | agreement with Mr. Zanger to place five million |
| 13 | at least and up to 50. Okay. That would've |
| 14 | provided enough revenue to build a very |
| 15 | successful hedge fund as I believe others -- I |
| 16 | believe Mr. Zask has also testified to that, that |
| 17 | if you have working capital and you have a good |
| 18 | trading strategy, it doesn't matter what the past |
| 19 | says, you can start fresh with a whole new |
| 20 | strategy in potential of being very successful in |
| 21 | this industry. I made it very clear to Mr. |
| 22 | Zanger that this is not going to be a one year, |
| 23 | two-year proposition. This has to take time. |
| 24 | His performance has to be put together, people |
| 25 | have to get to know him and trust him and make |

335

| | Szele |
|---|---|
| 1 | A. Yes. |
| 2 | |
| 3 | Q. It says here, "Because IFL was shut |
| 4 | down." When was IFL shut down? |
| 5 | A. IFL was -- what's the exact date? I |
| 6 | mean, IFL has been in the process of shutting |
| 7 | down or going dormant since the fall, you know, |
| 8 | of 2007. Basically when we knew these things in |
| 9 | September/October of '07, we started shutting -- |
| 10 | we started basically shutting things down in the |
| 11 | sense of going dormant. It's kind of been |
| 12 | happening since the fall of '07, and we are still |
| 13 | in the process now dealing with issues around the |
| 14 | shutting down or going dormant of the Fund. We |
| 15 | are still having to deal with countless issues |
| 16 | around the legal aspects of the final investor, |
| 17 | the audit which is just completed, so I'm still |
| 18 | having to do deal with that right now, but it was |
| 19 | basically shut down last -- when we had the final |
| 20 | redemption. |
| 21 | Q. That was sometime in the fall of 2007? |
| 22 | A. Yes. I mean, it's been sort of an |
| 23 | ongoing process, but you can argue that IFL was |
| 24 | shut down when Mr. Zanger caused all those |
| 25 | damages in '06. It was effectively shut down |

334

| | Szele |
|---|---|
| 1 | Szele |
| 2 | sure his volatility is going to be handleable. |
| 3 | And when his actions and his failure to comply |
| 4 | with almost all of our agreements causes us to |
| 5 | lose our fund practically or lose our ability to |
| 6 | really do too much else at this point is -- takes |
| 7 | away our opportunity to pay back these debts. |
| 8 | He's breached this thing across the board. |
| 9 | The absolute minimum is the |
| 10 | reputational damage of my earnings potential, as |
| 11 | well as his five million up to 50 million, as |
| 12 | well as his management fee and performance fee |
| 13 | revenues which would've sustained us for a couple |
| 14 | more years to come even past the five-year |
| 15 | agreement, not to mention the other investors |
| 16 | that we lost because he pulled out. |
| 17 | The damages are across the board for |
| 18 | him on us that we can't continue and has affected |
| 19 | us in every way possible. That agreement is only |
| 20 | with Dan. We only had a five-year agreement with |
| 21 | Dan Zanger. I think he bears practically all the |
| 22 | responsibility of this. |
| 23 | Q. Let me direct your attention to the |
| 24 | 5,000 in damages for moving costs. Do you see |
| 25 | that on page 4? |

336

| | Szele |
|---|---|
| 1 | Szele |
| 2 | temporarily even then, so I can't give you an |
| 3 | exact date, but we did incur a lot of cost with |
| 4 | moving out of our office and losing our office, |
| 5 | which was a very respectable small office in |
| 6 | Stamford, you know, that we were forced to leave |
| 7 | because we didn't have working capital or no |
| 8 | revenue. |
| 9 | Q. And when did you move your offices? |
| 10 | A. We moved out February of -- February of |
| 11 | '07. |
| 12 | Q. So after you moved out, IFL got another |
| 13 | investor, right? |
| 14 | A. No. That actually was effectively |
| 15 | coming in -- you can't, you know, it's not one |
| 16 | day to the next. It took a long time to get |
| 17 | people comfortable to some extent, you know, for |
| 18 | the 1.5 million in the first place. It's not |
| 19 | that it was after -- I mean, the actual |
| 20 | investment was in the process of coming in from |
| 21 | the end of '07 -- around the end of '07 -- I'm |
| 22 | sorry, end of '06. It's a process that takes |
| 23 | place. It's not one day to the next. It was |
| 24 | like a four-month process. If that investor |
| 25 | wanted to come into that Class T shares based on |

337

Szele

1
2  Class T shares investing into that manager. I
3  can't give you an exact date on when that
4  investment was taking place, but it's that
5  four-month span.
6          MR. SEAR:  Why don't we take a short
7  break.
8          (Recess)
9          MR. SEAR:  I have no further questions
10  of this witness at this time.  We do reserve
11  our rights with respect to precluding trial
12  testimony and various claims that have been
13  made with respect to damages and otherwise
14  given the record that we have with respect
15  to the witness's inability to answer certain
16  questions and provide certain facts or to
17  testify here today to the matters that he
18  represented in his last session he would be
19  prepared to testify about.
20          MR. LANZA:  I have no questions.
21          THE WITNESS:  I can expand on the
22  $100,000 if you would like on the trading.
23          MR. SEAR:  That's up to your counsel.
24  If counsel thinks your testimony needs to be
25  change, he'll ask you questions about it.

338

Szele

1
2          THE WITNESS:  It doesn't need to be
3  changed.  I can add to it.
4          MR. SEAR:  My questioning is finished.
5  We have our record here.  If your counsel
6  wants to ask you questions because there is
7  something in your testimony that's not
8  accurate, go ahead.
9          MR. LANZA:  Okay.  Would you please
10  expand on your statement with regard to the
11  $100,000 worth of damage that was listed on
12  your interrogatories?
13          THE WITNESS:  Sure.  Our agreement was
14  signed in October, as you know, with
15  Mr. Zanger.  That gave him plenty of time to
16  put the money in, the five million by
17  December 1st if he wanted to or by the end
18  of December or certainly by the beginning of
19  January.  Conservatively, if he put his
20  money in by January 1, he says he was up 38
21  percent in Westwood during those first two
22  months that he was not in IFL, which
23  translates in management fees and
24  performance fees to about 100,750.  If you
25  take the management fee and the performance

339

Szele

1
2  fee calculation, five million would've
3  turned into 6.9 million.  Based on that
4  figure, we would've received an additional
5  100,000 in fees.
6  BY MR. SEAR:
7          Q.  Mr. Szele, am I correct that you've
8  been looking at and pointing at a document in
9  connection with giving us this testimony just
10  now?
11          A.  I am looking at a document.
12          Q.  What is that document?
13          A.  It's a document that shows a
14  calculation.
15          Q.  Who prepared that document?
16          A.  I believe it was prepared by one of our
17  counsel.
18          Q.  Did your counsel just give you that
19  document while we were on break?
20          A.  Yes.
21          MR. SEAR:  I would call for its
22  production.
23          MR. LANZA:  We'll produce it.  We'll
24  give it to you now provided we have an
25  agreement that we are not waiving privilege

340

Szele

1
2  by handing this over.
3          MR. SEAR:  Well, I believe --
4          A.  I mean, this is what I gave them.  In
5  prior times I've given them this calculation.
6  It's pretty -- it's not rocket science.  If
7  January 1st he puts in five million, that's what
8  we would have been paid.  That is a damage to me.
9          MR. SEAR:  Could you mark this as
10  Zanger Exhibit 43.  This is the document
11  that counsel just gave to us that the
12  witness has identified as having been
13  prepared by counsel and provided to him
14  during the break.
15          (Notes marked Zanger Exhibit 43 for
16  identification.)
17          Q.  Mr. Szele, do you want to change any of
18  the testimony that you gave us before the break
19  concerning the basis for the $100,000 damages
20  claim?
21          A.  Do I want to change?  I don't want to
22  change anything else.  This is an additional
23  damage that I was referring to on my trading as
24  well that I simply forgot to mention.  I can come
25  up with lots of other damages as well even beyond

341

Szele

1  what is marked here.
2      Q.   So the testimony you gave concerning
3  the calculation of the 100,000 in lost trading
4  revenue before the break, that still stands?
5      A.   Absolutely as a minimum.
6          MR. SEAR:  Consistent with my prior
7          position and reservation of all our rights,
8          I have no further questions of this witness
9          at this time.
10          MR. LANZA:  I have no additional
11          questions.
12              (Time noted:  1:00 p.m.)

343

Szele

7      _____

8              GEORGE SZELE

10  Subscribed and sworn to
11  before me this     day
12  of         2008
13  _____

342

1              Szele
2  April 17, 2008
3
4              ERRATA
5
6  PAGE/LINE CHANGE/REASON
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

344

1
2              CERTIFICATE
3
4  STATE OF NEW YORK )
5              ) ss.
6  COUNTY OF NEW YORK)
7
8      I, Jessica L. Loschky, a Shorthand
9  Reporter and Notary Public within and for the
10  State of New York, do hereby certify:
11      That GEORGE SZELE, the witness whose
12  deposition is hereinbefore set forth, was duly
13  sworn by me and that such deposition is a true
14  record of the testimony given by such witness.
15      I further certify that I am not related
16  to any of the parties to this action by blood or
17  marriage and that I am in no way interested in
18  the outcome of this matter.
19
20
21      _____
22          JESSICA L. LOSCHKY

1
2    April 17, 2008

3
                    INDEX
4

5    WITNESS        EXAMINATION BY    PAGE

6    George Szele    Mr. Sear        253

7

8    EXHIBIT   PAGE

9    41      275    IAM 006362 through IAM 006502

10   42      259    E-mails dated 4/9/08

11   42      340    Notes

12

13
     REQUEST: 314, 330, 332, 339
14

15
16
17
18
19
20
21
22
23
24
25

## $

**$1,000** [1] - 309:22
**$100** [1] - 309:22
**$100,000** [6] - 327:13, 327:18, 328:14, 337:22, 338:11, 340:19
**$150** [1] - 252:14
**$20** [1] - 329:12
**$20,000** [2] - 329:21, 330:16
**$40** [2] - 282:13, 282:19
**$50** [4] - 324:25, 325:9, 325:17, 326:3
**$690,595** [2] - 331:4, 332:4
**$860,000** [1] - 332:18

## '

**'02** [1] - 302:18
**'04** [1] - 312:19
**'05** [2] - 268:4, 297:23
**'06** [11] - 268:4, 269:18, 270:7, 270:10, 272:5, 288:21, 307:24, 315:22, 335:25, 336:22
**'07** [12] - 307:6, 307:9, 307:19, 307:24, 308:19, 310:17, 311:9, 335:9, 335:12, 336:11, 336:21
**'90s** [1] - 261:12

## 0

**006362** [3] - 252:5, 254:5, 345:9
**006502** [3] - 252:5, 254:5, 345:9

## 1

**1** [6] - 283:24, 286:13, 297:25, 305:25, 324:16, 338:20
**1,000** [1] - 310:2
**1.1** [1] - 283:24
**1.5** [4] - 308:6, 325:15, 325:16, 336:18
**1/31/2005** [1] - 305:13
**10** [2] - 309:23, 329:12
**10/31** [1] - 306:21
**100** [4] - 272:14, 287:12, 309:24, 310:3
**100,000** [7] - 326:14, 327:5, 329:5, 329:11, 329:19, 339:5, 341:4
**100,750** [1] - 338:24
**10007** [1] - 250:7
**10017** [2] - 249:16, 250:15
**10:20** [1] - 252:9
**10:22** [1] - 249:11
**10:31** [3] - 321:16, 321:17, 321:20
**10:45:49** [1] - 322:4
**10th** [3] - 252:22, 260:13, 285:11
**11** [1] - 252:23
**11:03:03** [1] - 296:20
**11:25:14** [1] - 286:16
**11th** [2] - 252:11, 270:10
**125** [6] - 263:17, 265:9, 265:12, 265:13, 265:22, 266:18
**12:00:56** [2] - 302:3, 302:6
**12:10** [1] - 303:16
**12:10:22** [1] - 303:15
**13** [1] - 323:25
**14** [1] - 261:17
**14th** [1] - 301:4
**15** [2] - 273:14, 321:21
**16th** [3] - 269:17, 288:19, 288:20
**17** [3] - 249:10, 342:2, 345:2
**18th** [2] - 315:19, 315:22
**1:00** [2] - 267:13, 341:13
**1:07-cv-06431-J5r** [1] - 249:6
**1st** [2] - 338:17, 340:7

## 2

**2** [3] - 301:24, 306:2, 324:5
**20** [2] - 285:2, 302:25
**200** [2] - 287:11, 325:4
**2001** [5] - 331:10, 331:13, 331:15, 331:17, 331:21
**2002** [4] - 313:11, 331:10, 331:17, 331:21
**2002-ish** [2] - 331:14, 331:15
**2004** [1] - 313:20
**2005** [22] - 261:18, 261:20, 261:22, 264:5, 281:15, 282:14, 285:11, 290:20, 291:9, 292:4, 295:25, 296:7, 298:13, 300:4, 300:7, 300:13, 301:4, 301:25, 303:6, 303:23, 304:7, 304:21
**2006** [16] - 264:5, 269:12, 276:8, 277:13, 277:19, 277:23, 279:14, 283:21, 286:13, 288:19, 290:6, 291:3, 300:6, 304:22, 315:19, 316:22, 318:19, 322:13
**2007** [4] - 263:11, 311:10, 335:8, 335:21
**2008** [7] - 249:10, 254:13, 260:5, 265:6, 342:2, 343:12, 345:2
**202** [1] - 263:8
**21** [5] - 254:15, 255:12, 256:23, 275:7, 316:22
**21st** [3] - 254:7, 255:6, 255:25
**22** [2] - 261:17, 303:17
**222** [2] - 249:15, 250:14
**225** [1] - 250:6
**23** [1] - 283:21
**25** [1] - 298:23
**250** [1] - 287:17
**253** [1] - 345:6
**259** [1] - 345:10
**25th** [2] - 295:25, 296:6
**26th** [1] - 322:12
**2700** [1] - 250:6
**275** [1] - 345:9
**28** [1] - 267:12
**2:02:56** [1] - 322:24
**2:42:14** [1] - 316:15

## 3

**3** [3] - 290:6, 306:4, 324:9
**30** [6] - 281:14, 283:18, 284:23, 293:3, 293:16, 302:25
**30(b)(6** [1] - 253:12
**300** [1] - 326:22
**30th** [1] - 282:19
**314** [1] - 345:13
**32** [2] - 283:16, 283:18
**330** [1] - 345:13
**332** [1] - 345:13
**339** [1] - 345:13
**340** [1] - 345:11
**35** [1] - 282:11
**37** [3] - 282:10, 283:3, 283:9
**38** [1] - 338:20
**39** [2] - 304:25, 305:3
**3:06:49** [1] - 316:25
**3:45:11** [1] - 298:16
**3rd** [1] - 291:3

## 4

**4** [3] - 288:24, 304:21, 334:25
**4/9/08** [2] - 259:22, 345:10
**40** [2] - 282:9, 285:16
**41** [5] - 252:6, 254:3, 275:5, 285:4, 345:9
**41st** [2] - 249:16, 250:14
**42** [6] - 259:21, 259:23, 295:12, 345:10, 345:11
**43** [3] - 285:21, 340:10, 340:15
**48** [2] - 261:17, 321:7
**4th** [3] - 263:11, 301:25,

303:23

## 5

**5** [2] - 253:5, 263:12
**5,000** [1] - 334:24
**50** [11] - 284:23, 285:23, 324:18, 325:2, 325:4, 325:11, 325:14, 326:4, 333:13, 334:11
**500,00** [1] - 324:19
**5th** [4] - 254:13, 255:2, 258:5, 265:6

## 6

**6** [1] - 263:8
**6.9** [1] - 339:3
**600** [1] - 302:18
**6362** [1] - 275:9
**6368** [1] - 275:15
**6369** [1] - 275:17
**6372** [1] - 279:10
**6373** [1] - 279:11
**6379** [1] - 281:14
**6380** [1] - 283:20
**6389** [1] - 285:10
**6392** [2] - 286:10, 286:12
**6408** [1] - 288:18
**6409** [1] - 290:4
**6412** [2] - 295:23, 296:3
**6416** [3] - 297:17, 298:8, 298:10
**6422** [2] - 300:17, 301:2
**6435** [1] - 301:23
**6438** [2] - 304:25, 305:3
**6439** [1] - 306:15
**6440** [1] - 311:20
**6443** [1] - 312:9
**6470** [1] - 311:24
**6481** [2] - 315:17, 315:21
**6497** [1] - 316:20
**6499** [2] - 321:2, 321:11
**6500** [1] - 322:11
**6th** [3] - 270:7, 298:12, 300:13

## 7

**7** [1] - 263:12
**7th** [1] - 269:18

## 8

**8** [1] - 331:7
**800** [3] - 286:25, 287:11, 331:25
**8:30** [3] - 321:6, 321:8, 321:16

347

**9**

**90** [1] - 309:24
**900** [3] - 309:24, 309:25, 310:2
**900,000** [1] - 331:8
**98** [2] - 292:22, 292:24
**9:45:27** [1] - 301:6
**9th** [2] - 260:5, 279:14

**A**

**ability** [1] - 334:5
**able** [1] - 260:10
**absolute** [1] - 334:9
**Absolutely**[1] - 341:6
**absorb** [2] - 310:8, 311:2
**access** [1] - 288:13
**according** [2] - 323:22, 325:3
**account** [10] - 269:8, 274:3, 274:8, 274:14, 274:20, 278:9, 306:10, 322:17, 326:14, 326:22, 327:7
**accountant** [8] - 261:7, 261:14, 314:16, 315:5, 332:8, 332:13, 332:14, 332:17
**accounting** [5] - 253:14, 261:6, 310:21, 332:6
**accounts** [1] - 282:8
**accrual** [1] - 310:20
**accrued** [1] - 310:23
**accurate** [2] - 300:10, 338:8
**accusations** [1] - 318:6
**action** [3] - 273:15, 277:13, 344:16
**actions** [1] - 334:3
**activity** [1] - 323:24
**actual** [3] - 289:9, 332:15, 336:19
**Actual**[1] - 291:4
**add** [2] - 256:10, 332:3, 338:3
**added** [2] - 331:23, 331:24
**addition** [1] - 253:13
**additional** [10] - 253:10, 254:24, 257:15, 260:8, 280:24, 317:19, 320:17, 339:4, 340:22, 341:11
**address** [3] - 253:8, 253:17, 295:18
**addressed** [1] - 288:16
**administer** [1] - 251:10
**administration** [2] - 308:25, 309:16
**administrative** [1] - 310:20
**administrator** [8] - 275:14, 289:24, 305:6, 306:13, 322:19, 323:12, 323:20,

323:22
**advance** [1] - 256:2
**affected** [1] - 334:18
**affects** [1] - 308:25
**affiliation** [1] - 299:24
**afford** [4] - 263:2, 263:3
**afraid** [2] - 302:10, 302:24
**agree** [1] - 302:22
**Agreed**[3] - 251:4, 251:8, 251:12
**agreed** [2] - 277:6, 320:15
**Agreement**[1] - 273:19
**agreement** [26] - 253:9, 257:3, 257:25, 274:3, 274:20, 298:20, 298:21, 299:11, 301:13, 304:9, 307:24, 317:3, 317:16, 317:19, 318:8, 318:24, 319:9, 319:19, 326:17, 333:12, 334:15, 334:19, 334:20, 338:13, 339:25
**agreements** [1] - 334:4
**ahead** [1] - 338:8
**alert** [1] - 296:23
**allegation** [3] - 325:8, 326:2, 333:4
**alleged** [2] - 328:14, 330:15
**allocated** [1] - 309:24
**allotted** [1] - 324:16
**allow** [1] - 279:6
**allowed** [3] - 274:17, 277:7, 284:10
**almost** [1] - 334:4
**amended** [1] - 273:15
**amount** [6] - 296:16, 323:7, 326:10, 328:8, 329:22, 330:16
**amounts** [3] - 269:17, 310:12, 332:3
**annual** [1] - 324:18
**Answer**[6] - 261:24, 262:2, 263:23, 264:2, 264:4, 264:6
**answer** [11] - 255:13, 256:3, 256:5, 258:7, 260:7, 260:11, 265:2, 277:3, 280:9, 309:15, 337:15
**Anthony**[1] - 296:23
**anticipating** [1] - 327:2
**anxious** [1] - 320:16
**anyplace** [1] - 291:22
**anyway** [1] - 320:21
**apart** [1] - 275:18
**Appearances**[1] - 250:2
**applicable** [2] - 274:2, 274:22
**appreciate** [3] - 315:13, 330:24, 332:24
**approach** [1] - 304:16
**approve** [7] - 278:19, 278:21, 278:22, 278:23,

278:24, 279:3, 279:4
**approved** [5] - 269:5, 279:3, 314:16, 315:4
**approx** [1] - 285:16
**April**[8] - 249:10, 252:11, 252:22, 260:5, 260:13, 283:24, 342:2, 345:2
**areas** [1] - 273:6
**argue** [1] - 335:23
**arrangement** [2] - 319:13, 319:14
**articulated** [1] - 294:21
**Arturo**[1] - 263:20
**aside** [2] - 271:10, 271:16
**aspect** [1] - 291:8
**aspects** [2] - 313:18, 335:16
**asset** [2] - 305:11, 305:20
**Asset**[4] - 249:4, 263:15, 265:19, 311:22
**assets** [13] - 282:7, 282:19, 283:9, 285:16, 288:8, 288:10, 288:12, 299:4, 299:23, 309:12, 324:17, 326:17
**assume** [9] - 264:9, 270:19, 270:22, 272:12, 286:8, 297:4, 297:7, 300:15, 317:10
**assuming** [2] - 252:24, 257:13
**attend** [1] - 252:13
**attention** [25] - 261:17, 263:7, 271:18, 273:16, 281:13, 283:19, 285:9, 286:9, 286:15, 288:17, 290:4, 295:23, 296:19, 297:17, 298:8, 298:15, 301:2, 304:24, 315:17, 316:20, 321:2, 322:10, 322:23, 324:4, 334:23
**Attorneys**[2] - 250:5, 250:13
**audit** [5] - 308:22, 311:10, 311:11, 335:17
**audited** [1] - 314:13
**August**[3] - 281:14, 282:14, 282:19
**authorized** [1] - 251:10
**available** [1] - 278:17
**aware** [16] - 254:18, 261:13, 268:7, 268:8, 268:9, 269:11, 272:4, 273:24, 274:20, 292:2, 292:9, 293:6, 301:10, 311:4, 315:10, 330:15

**B**

**baby** [1] - 262:13
**babysitters** [1] - 263:3
**Balestriere**[1] - 250:4

**Bank**[1] - 275:10
**Based**[1] - 339:3
**based** [14] - 306:8, 324:24, 325:6, 325:7, 325:8, 325:11, 325:16, 325:25, 326:4, 327:16, 327:23, 327:24, 328:10, 336:25
**basis** [2] - 333:3, 340:19
**Bate**[1] - 265:3
**Bates**[19] - 254:4, 257:21, 257:23, 270:4, 275:9, 275:15, 279:10, 281:13, 283:20, 285:9, 286:9, 288:17, 301:23, 304:25, 314:21, 315:13, 321:10, 330:25, 332:25
**bearing** [1] - 254:4
**bears** [1] - 334:21
**beginning** [4] - 293:14, 293:20, 326:19, 338:18
**begins** [1] - 324:6
**belief** [9] - 282:20, 291:2, 303:5, 303:10, 303:11, 303:12, 303:13, 304:7, 304:15
**believes** [1] - 330:23
**Below**[1] - 311:21
**below** [2] - 278:15, 284:3
**Bermuda**[2] - 279:8, 296:24
**best** [10] - 260:10, 262:23, 262:24, 269:21, 278:11, 292:25, 317:14, 318:11, 319:7, 323:9
**beta** [1] - 297:12
**better** [1] - 260:11
**between** [19] - 251:5, 259:25, 280:14, 280:19, 283:21, 285:11, 286:13, 288:18, 290:5, 295:24, 296:6, 298:12, 301:3, 301:13, 305:23, 315:18, 316:21, 321:3, 322:12
**beyond** [3] - 274:3, 310:12, 340:25
**Beyond**[3] - 274:19, 276:22, 319:18
**Bfs**[3] - 289:4, 289:18, 289:21
**big** [1] - 310:6
**biggest** [1] - 268:15
**bill** [1] - 252:15
**bills** [5] - 262:16, 318:18, 318:22, 320:11, 320:14
**bit** [13] - 258:13, 258:14, 258:16, 258:17, 261:2, 261:3, 276:14, 283:12, 283:14, 319:21, 326:13, 331:22, 331:24
**blood** [1] - 344:16

348

**board** [3] - 329:25, 334:8, 334:17
**borrow** [1] - 262:17
**bottom** [1] - 298:17
**bound** [1] - 299:14
**breached** [2] - 301:13, 334:8
**break** [7] - 294:4, 294:5, 337:7, 339:19, 340:14, 340:18, 341:5
**breakdown** [3] - 266:20, 267:23, 268:13
**breaking** [1] - 297:11
**breaks** [1] - 330:8
**brief** [1] - 320:5
**briefly** [1] - 254:22
**bring** [1] - 253:9
**Broadway** [1] - 250:6
**broken** [1] - 324:8
**broker** [2] - 263:14, 265:18
**Brokers** [2] - 326:15, 327:6
**bronchitis** [1] - 259:3
**brought** [1] - 331:10
**brush** [1] - 278:16
**build** [1] - 333:14
**busy** [1] - 316:25
**Butterfield** [3] - 275:10, 289:22, 289:23
**button** [1] - 279:19

# C

**calculate** [1] - 329:21
**calculated** [5] - 309:11, 324:14, 326:9, 327:18, 327:20
**calculation** [15] - 324:23, 325:5, 325:8, 325:23, 325:25, 326:7, 327:23, 328:5, 328:13, 328:21, 329:5, 339:2, 339:14, 340:5, 341:4
**calculator** [2] - 329:6, 329:7
**calmed** [1] - 261:3
**cancel** [1] - 259:2
**cancellation** [1] - 252:19
**capable** [1] - 263:5
**capital** [19] - 276:17, 276:23, 277:3, 277:5, 317:9, 317:19, 317:25, 318:21, 318:23, 319:11, 320:8, 320:9, 320:11, 320:13, 320:17, 320:20, 333:17, 336:7
**capitalizes** [1] - 323:15
**care** [2] - 252:16, 274:13
**case** [5] - 258:7, 263:10, 279:24, 280:7, 280:20
**caused** [3] - 280:23,

323:12, 335:24
**causes** [1] - 334:4
**causing** [1] - 311:3
**certain** [7] - 272:14, 290:14, 294:14, 328:8, 337:15, 337:16
**certainly** [1] - 319:22, 338:18
**Certificate** [1] - 344:2
**certify** [2] - 344:10, 344:15
**chance** [2] - 254:17, 254:21
**change** [5] - 304:20, 337:25, 340:17, 340:21, 340:22
**Change/reason** [1] - 342:6
**changed** [1] - 338:3
**channels** [1] - 278:10
**characterize** [1] - 294:19
**charged** [2] - 310:11, 310:16
**Chart** [3] - 282:2, 282:9, 282:10
**chat** [1] - 294:5
**check** [5] - 278:5, 307:25, 308:14, 315:6, 315:7
**chief** [1] - 323:16
**child** [1] - 254:20
**children's** [1] - 254:19
**chose** [1] - 286:18
**circumstances** [2] - 276:12, 276:14
**claim** [1] - 340:20
**claims** [1] - 337:12
**class** [2] - 305:21, 307:6
**Class** [13] - 284:8, 284:11, 284:12, 284:16, 284:18, 284:19, 296:24, 306:17, 306:25, 311:13, 311:17, 336:25, 337:2
**classes** [1] - 305:7
**clean** [1] - 285:7
**cleaner** [2] - 257:2, 257:24
**clear** [11] - 268:16, 272:22, 281:17, 282:17, 284:17, 289:21, 297:18, 297:21, 326:18, 333:8, 333:21
**Clearing** [1] - 273:17
**clerical** [1] - 257:8
**client** [5] - 253:9, 253:15, 255:19, 275:12, 275:14
**colleague** [1] - 260:2
**collecting** [1] - 279:23
**collection** [2] - 254:4, 275:6
**columns** [1] - 271:3
**comfortable** [2] - 302:13, 336:17
**coming** [3] - 283:24, 336:15, 336:20
**comment** [3] - 290:8, 290:19, 293:21

**comments** [1] - 289:8
**commitment** [1] - 298:3
**committed** [1] - 295:14
**communications** [1] - 257:6
**comparison** [1] - 293:8
**compensation** [1] - 299:5
**complained** [2] - 318:3
**complaint** [1] - 273:15
**complete** [1] - 268:13
**completed** [5] - 311:10, 315:5, 315:7, 315:8, 335:17
**comply** [1] - 334:3
**computer** [3] - 279:20, 281:18, 300:20
**computers** [1] - 330:2
**concern** [1] - 323:16
**concerned** [1] - 278:15
**concerning** [7] - 252:22, 264:11, 280:19, 290:19, 328:13, 340:19, 341:3
**conferring** [1] - 256:4
**Connecticut** [1] - 284:24
**connection** [2] - 280:5, 339:9
**conservative** [5] - 282:11, 328:2, 328:17, 329:22, 330:13
**Conservatively** [1] - 338:19
**conservatively** [1] - 308:16
**considered** [4] - 303:24, 304:14, 304:20, 308:16
**Consistent** [1] - 341:7
**constituted** [1] - 261:23
**constraint** [1] - 259:14
**contains** [1] - 260:4
**contently** [1] - 263:21
**continue** [5] - 317:23, 320:14, 320:24, 334:18
**continues** [1] - 311:24
**contract** [8] - 270:25, 273:2, 277:5, 277:7, 277:8, 277:25, 278:24, 324:22
**contrary** [1] - 252:24
**conversation** [5] - 281:19, 281:21, 293:12, 293:25, 318:25
**conversations** [7] - 277:21, 278:4, 278:6, 278:13, 280:14, 319:22, 320:5
**copies** [4] - 256:13, 257:2, 257:3, 281:3
**copy** [8] - 257:24, 261:15, 273:14, 285:6, 285:8, 311:11, 311:12
**correct** [7] - 268:18, 270:21, 285:13, 288:11, 288:23, 295:17, 339:7
**corrected** [1] - 265:15
**correctly** [2] - 280:9,

311:19
**cost** [5] - 297:11, 329:20, 329:23, 330:6, 336:3
**costs** [1] - 334:24
**could've** [5] - 279:9, 326:11, 326:23, 327:11, 329:16
**counsel** [25] - 251:5, 252:15, 252:21, 252:25, 254:7, 254:25, 255:16, 263:11, 280:11, 280:17, 281:4, 294:8, 294:16, 295:5, 295:13, 295:20, 330:20, 330:23, 337:23, 337:24, 338:5, 339:17, 339:18, 340:11, 340:13
**count** [1] - 264:7
**countless** [1] - 335:15
**County** [1] - 344:6
**couple** [7] - 252:7, 262:22, 289:8, 313:14, 313:15, 331:11, 334:13
**Court** [4] - 249:2, 263:17, 265:22, 265:23
**court** [5] - 252:14, 263:10, 264:13, 265:8, 265:16
**cover** [2] - 323:10, 333:5
**covered** [2] - 266:19, 268:8
**Craig** [1] - 250:8
**creat** [1] - 306:4
**create** [1] - 326:12
**created** [2] - 306:19, 306:21
**cross** [1] - 299:14
**current** [1] - 319:14
**currents** [1] - 299:15
**Customer** [1] - 273:18
**cut** [1] - 327:25

# D

**damage** [6] - 296:17, 311:3, 334:10, 338:11, 340:8, 340:23
**damages** [11] - 260:8, 328:14, 329:12, 329:21, 330:16, 334:17, 334:24, 335:25, 337:13, 340:19, 340:25
**Dan** [50] - 268:8, 269:7, 272:6, 278:20, 280:14, 281:23, 282:7, 283:21, 285:11, 285:14, 285:19, 286:13, 286:16, 287:8, 288:19, 288:22, 289:6, 290:3, 290:6, 291:8, 298:19, 298:25, 299:17, 301:4, 306:2, 313:22, 314:10, 314:16, 315:4, 315:18, 316:14, 316:16, 316:22, 316:25, 318:14, 318:23,

321:4, 321:13, 322:12, 324:16, 324:20, 324:24, 325:2, 325:9, 326:11, 327:5, 334:20, 334:21
**Dan's** [4] - 261:23, 305:7, 305:22, 326:25
**Daniel** [1] - 249:7
**databases** [1] - 330:5
**date** [21] - 253:18, 270:7, 270:10, 271:6, 271:12, 271:24, 272:2, 272:9, 272:18, 276:9, 300:15, 300:21, 300:22, 303:22, 307:25, 316:14, 335:5, 336:3, 337:3
**dated** [15] - 259:22, 279:14, 285:11, 286:13, 288:19, 290:6, 295:25, 296:6, 298:12, 300:4, 301:4, 312:18, 315:19, 316:22, 345:10
**dates** [3] - 269:17, 270:2
**days** [1] - 262:22
**deal** [4] - 262:14, 296:13, 335:15, 335:18
**dealing** [2] - 296:18, 335:13
**deals** [2] - 296:10, 296:16
**debt** [6] - 331:23, 331:24, 332:7, 332:12, 332:15, 332:17
**debts** [9] - 331:4, 331:5, 331:18, 332:19, 332:21, 332:22, 333:5, 334:7
**December** [9] - 269:18, 272:4, 293:14, 293:21, 297:25, 301:4, 302:18, 338:17, 338:18
**Defendant** [1] - 249:8
**defendant** [1] - 250:13
**Defendant's** [1] - 324:3
**defendants** [1] - 249:15
**define** [1] - 278:21
**definitely** [5] - 264:14, 278:6, 278:13, 293:11, 304:9
**denominated** [2] - 311:21, 324:2
**deposed** [1] - 254:13
**deposition** [32] - 251:9, 251:13, 253:14, 254:15, 254:25, 255:7, 256:2, 256:9, 256:12, 256:15, 256:19, 257:19, 258:5, 258:13, 258:14, 258:16, 258:18, 259:8, 260:16, 260:20, 261:16, 266:2, 266:13, 267:8, 273:10, 294:11, 295:21, 311:16, 328:22, 329:4, 344:12, 344:13
**Deposition** [1] - 249:14
**desired** [1] - 319:19

**detail** [3] - 254:22, 268:22, 311:12
**detailed** [1] - 310:24
**details** [1] - 267:24
**developed** [1] - 312:14
**difference** [1] - 305:23
**different** [7] - 264:15, 275:12, 297:7, 305:17, 305:18, 306:6, 330:9
**difficulties** [1] - 259:4
**difficulty** [1] - 297:19
**direct** [24] - 261:16, 263:7, 273:15, 281:13, 283:19, 285:9, 286:9, 286:15, 288:17, 290:4, 295:23, 296:19, 297:17, 298:8, 298:15, 301:2, 304:24, 315:17, 316:20, 321:2, 322:10, 322:23, 324:4, 334:23
**directing** [1] - 271:18
**directly** [8] - 275:12, 275:13, 278:7, 278:8, 306:9, 312:22, 323:10, 332:16
**director** [3] - 277:9, 277:12, 279:5
**directors** [1] - 278:19
**disagree** [1] - 277:14
**discuss** [4] - 277:25, 318:24, 319:6, 319:13
**discussed** [1] - 294:8
**discussion** [2] - 290:14, 312:5
**disregarded** [1] - 278:10
**dissatisfaction** [1] - 278:14
**distributed** [1] - 309:7
**District** [2] - 249:2, 249:2
**doc** [1] - 289:10
**docs** [2] - 322:19, 322:20
**document** [33] - 257:23, 259:25, 260:3, 267:12, 269:25, 271:11, 271:13, 271:18, 271:20, 271:24, 273:22, 275:18, 276:4, 292:3, 292:12, 293:7, 293:24, 298:2, 311:23, 312:2, 312:4, 312:17, 312:22, 312:23, 313:4, 324:5, 339:8, 339:11, 339:12, 339:13, 339:15, 339:19, 340:10
**documentation** [1] - 330:22
**documents** [38] - 253:10, 254:4, 254:6, 254:8, 254:11, 254:14, 254:16, 254:25, 255:6, 255:11, 255:25, 256:7, 256:11, 256:14, 256:17, 256:18, 256:23, 256:25, 257:5, 257:18, 257:20, 257:21, 258:3,

259:10, 260:9, 261:5, 264:8, 273:24, 274:6, 274:7, 274:19, 274:24, 275:6, 294:14, 294:24, 311:4, 315:12, 323:12
**domestic** [5] - 287:7, 293:18, 299:16, 299:22, 299:23
**domestically** [3] - 288:15, 298:21, 299:18
**done** [9] - 257:15, 263:17, 265:22, 280:5, 281:6, 291:8, 293:18, 322:20, 323:11
**Done** [1] - 322:2
**doors** [1] - 330:11
**dormant** [3] - 335:7, 335:11, 335:14
**doubtful** [1] - 300:9
**dough** [1] - 316:16
**down** [17] - 261:3, 267:2, 286:15, 288:16, 297:11, 297:21, 319:2, 324:7, 324:8, 335:4, 335:7, 335:10, 335:14, 335:19, 335:24, 335:25
**drawdown** [1] - 285:2
**drawdowns** [3] - 318:2, 319:8, 319:24
**drop** [1] - 302:25
**due** [10] - 269:17, 270:2, 270:10, 271:6, 271:12, 271:24, 272:2, 272:9, 272:18
**duly** [2] - 252:3, 344:12
**During** [1] - 331:20
**during** [5] - 259:4, 294:5, 327:9, 338:21, 340:14

# E

**e-mail** [26] - 260:4, 260:12, 261:21, 263:14, 263:22, 264:6, 264:21, 265:17, 266:3, 266:9, 266:10, 267:10, 267:15, 267:22, 268:21, 269:21, 277:16, 277:19, 292:3, 292:12, 293:7, 293:24, 295:10, 301:11, 301:17
**e-mailed** [1] - 269:10
**E-mails** [2] - 259:22, 345:10
**e-mails** [24] - 259:25, 261:25, 262:3, 262:5, 262:7, 263:24, 263:25, 264:11, 264:14, 264:24, 265:5, 265:9, 265:12, 265:14, 266:4, 266:22, 267:6, 267:17, 267:19, 268:18, 268:19, 268:22, 268:25
**early** [5] - 300:6, 307:24, 331:6, 331:15

**earned** [1] - 327:11
**earnings** [1] - 334:10
**easily** [1] - 261:14
**East** [2] - 249:15, 250:14
**ebay** [1] - 297:10
**effect** [1] - 306:22
**effectively** [2] - 335:25, 336:14
**effort** [3] - 253:16, 314:11, 320:15
**efforts** [1] - 299:24
**eight** [1] - 325:19
**either** [1] - 278:16
**electronic** [1] - 300:9
**electronically** [2] - 281:7, 281:11
**eligible** [3] - 299:10, 299:19, 299:25
**encyclopedia** [1] - 315:12
**end** [16] - 271:17, 285:14, 293:14, 293:20, 295:15, 295:21, 297:25, 304:21, 305:21, 311:9, 323:5, 323:21, 336:21, 336:22, 338:17
**enormous** [1] - 333:9
**entries** [3] - 306:16, 306:24, 307:3
**entry** [13] - 270:7, 286:16, 288:22, 296:20, 298:16, 301:6, 302:3, 303:15, 305:12, 306:11, 316:24, 322:24, 324:6
**equates** [1] - 315:15
**Errata** [1] - 342:4
**error** [1] - 257:9
**estimate** [1] - 292:21
**evening** [1] - 252:12
**exact** [7] - 307:25, 327:23, 329:5, 331:23, 335:5, 336:3, 337:3
**exactly** [15] - 257:12, 308:14, 308:22, 314:17, 315:6, 315:7, 318:10, 318:15, 327:19, 328:9, 328:16, 328:19, 329:4, 329:8, 332:7
**Examination** [2] - 253:24, 345:5
**examination** [4] - 252:10, 258:9, 267:14, 294:11
**example** [1] - 313:22
**Excellent** [1] - 287:14
**excellent** [4] - 287:19, 287:23, 288:4, 301:8
**excellents** [1] - 288:6
**except** [1] - 251:24
**excess** [1] - 329:12
**exchange** [4] - 295:24, 296:5, 298:11, 321:3

exchanged [1] - 274:16
exchanges [8] - 263:14,
263:19, 263:22, 264:6,
264:21, 265:18, 266:3, 266:9
exclude [1] - 283:5
Execution [1] - 273:17
Exhibit [11] - 252:6, 254:3,
259:21, 259:23, 267:12,
273:14, 275:5, 323:25,
340:10, 340:15, 345:8
exhibit [2] - 285:3, 295:11
exist [3] - 265:10, 280:14,
280:18
expand [2] - 337:21, 338:10
expected [2] - 319:25,
323:13
expenditures [1] - 330:10
expense [1] - 309:16
expensed [1] - 309:18
expenses [5] - 309:23,
310:5, 310:7, 310:10, 330:12
expensive [2] - 308:24,
330:6
experienced [1] - 268:11
explain [1] - 328:4
explained [1] - 311:18
explanation [1] - 255:5
expressed [2] - 266:24,
278:13
expresses [1] - 266:22
extend [1] - 331:18
extending [1] - 331:19
extent [3] - 269:11, 278:12,
336:17
extremely [1] - 328:17

**F**

fact [6] - 253:11, 258:23,
282:12, 294:16, 304:19,
319:24
facts [3] - 276:11, 330:14,
337:16
failure [1] - 334:3
fair [4] - 273:8, 294:20,
299:13, 320:16
fall [3] - 335:7, 335:12,
335:21
false [3] - 265:7, 265:8,
265:9
family [4] - 258:21, 260:23,
262:15
far [7] - 254:12, 279:2,
280:12, 312:21, 326:23,
331:17
father [1] - 290:16
fault [1] - 252:17
February [6] - 288:19,
288:20, 307:6, 307:19,
336:10

fee [17] - 299:11, 299:25,
306:5, 306:7, 306:8, 310:16,
310:19, 324:15, 324:19,
324:22, 324:23, 325:11,
325:15, 334:12, 338:25,
339:2
Fees [5] - 324:6, 324:9,
324:10, 324:13, 325:22
fees [25] - 298:24, 308:23,
308:24, 308:25, 309:7,
309:11, 309:13, 309:14,
309:16, 309:17, 310:4,
310:9, 310:11, 310:15,
310:20, 310:22, 324:8,
324:9, 325:15, 329:2,
338:23, 338:24, 339:5
felt [1] - 293:8
few [1] - 268:9
figure [2] - 284:6, 339:4
figured [2] - 321:19, 329:8
figuring [1] - 317:4
file [4] - 279:19, 281:5,
300:20, 300:23
filing [1] - 251:13
fill [2] - 322:18, 323:11
filled [1] - 274:7
final [3] - 312:20, 335:16,
335:19
Fine [1] - 265:15
fine [1] - 295:22
finished [1] - 338:4
first [12] - 267:15, 268:6,
270:5, 270:6, 275:8, 285:13,
290:8, 305:25, 316:9,
322:11, 336:18, 338:21
First [4] - 311:8, 324:2,
324:3, 333:11
five [19] - 278:15, 283:11,
293:20, 309:4, 309:5,
310:25, 313:10, 325:19,
327:14, 327:16, 327:17,
333:11, 333:12, 334:11,
334:14, 334:20, 338:16,
339:2, 340:7
five-year [3] - 333:11,
334:14, 334:20
follow [2] - 253:20, 258:10
follow-up [2] - 253:20,
258:10
followed [3] - 280:7, 287:3,
319:4
follows [1] - 252:4
forced [2] - 279:6, 336:6
forgot [2] - 319:5, 340:24
form [3] - 251:6, 275:20,
296:17
format [1] - 314:13
formatting [2] - 257:7,
257:10
forms [1] - 324:9

formula [1] - 328:3
forth [11] - 260:14, 271:17,
273:25, 303:19, 313:5,
324:13, 326:7, 327:13,
328:24, 330:8, 344:12
forward [5] - 317:22,
317:25, 319:7, 331:13,
331:17
four [8] - 262:25, 306:16,
306:24, 331:9, 336:24, 337:5
four-month [2] - 336:24,
337:5
four-year-old [1] - 262:25
frame [2] - 262:10, 262:19
Frankly [1] - 302:10
fresh [1] - 333:19
friendly [1] - 284:20
front [2] - 285:3, 329:6
frustrated [1] - 319:24
full [2] - 267:23, 271:14
function [2] - 279:18,
300:18
functionality [1] - 300:20
Fund [24] - 274:9, 274:14,
277:10, 277:12, 289:23,
289:25, 293:4, 296:11,
296:14, 301:8, 301:13,
305:6, 307:10, 308:12,
308:20, 308:22, 309:10,
309:12, 310:2, 310:10,
310:13, 310:15, 311:21,
335:14
fund [12] - 282:9, 287:7,
288:11, 288:14, 293:17,
293:18, 299:9, 299:17,
299:22, 299:23, 333:15,
334:5
funds [1] - 288:17
future [3] - 313:13, 313:16,
333:10
futures [2] - 326:14, 327:7
Futures [1] - 273:18

**G**

Gb [4] - 282:4, 282:6,
282:10
general [1] - 288:9
generated [2] - 300:6,
300:14
generic [2] - 312:5, 312:7
gentleman [1] - 299:7
George [8] - 249:14, 252:2,
260:6, 343:8, 344:11, 345:6
Gia [6] - 263:19, 264:14,
266:16, 267:17, 267:23,
272:15
given [7] - 256:13, 328:12,
328:25, 329:3, 337:14,
340:5, 344:14

glitch [2] - 280:23, 300:25
global [1] - 312:10
Goldman [14] - 261:21,
263:20, 266:11, 266:16,
272:9, 272:12, 272:13,
272:15, 272:16, 273:17,
273:25, 274:15, 274:21,
278:8
Google [1] - 297:10
Gprm [1] - 313:10
great [15] - 290:24, 291:7,
291:9, 291:12, 291:14,
291:15, 291:19, 292:4,
292:6, 292:14, 293:4,
293:10, 297:22, 297:23,
316:15
greater [1] - 326:23
grow [1] - 287:15
Growing [1] - 288:8
growing [2] - 288:8, 288:10
guess [7] - 257:8, 282:22,
288:5, 290:17, 300:24,
319:25, 327:16
gunslinger [4] - 303:24,
304:14, 304:18, 304:20
guy [1] - 310:7
guys [3] - 261:8, 326:21,
329:25

**H**

half [2] - 297:13, 327:25
hand [3] - 253:19, 254:6,
255:11
handed [2] - 280:21, 312:20
handing [1] - 340:2
handleable [1] - 334:2
handwritten [1] - 285:7
hanging [1] - 316:15
happy [5] - 262:7, 262:9,
319:17, 320:19, 320:24
Happy [1] - 290:11
hard [2] - 281:2, 297:11
headed [1] - 275:16
heading [1] - 273:18
hear [1] - 252:24
hedge [2] - 327:3, 333:15
help [7] - 263:2, 288:14,
290:3, 306:4, 306:6, 306:8,
306:19
helped [4] - 299:17, 313:8,
313:9, 313:24
helpful [1] - 260:9
helps [1] - 330:3
Hereby [1] - 251:4
hereby [1] - 344:10
hereinbefore [1] - 344:12
hereto [1] - 251:6
higher [2] - 293:3, 331:7
hire [1] - 307:23

**history** [1] - 261:12
**hit** [3] - 279:19, 306:5, 309:6
**holders** [1] - 331:10
**Holleman** [10] - 250:9, 256:8, 256:21, 256:24, 260:2, 260:4, 260:13, 314:20, 314:23, 315:15
**Homstrom** [1] - 249:4
**Honor** [1] - 263:12
**hope** [1] - 272:22
**hoped** [1] - 323:19
**hoping** [1] - 327:4
**hospital** [1] - 262:12
**hours** [1] - 321:18
**house** [5] - 263:4, 270:13, 271:20, 272:24, 273:25
**human** [2] - 259:6, 303:2
**humanly** [1] - 263:5
**hurt** [2] - 309:8, 309:9

**I**

**Iam** [21] - 252:5, 254:5, 301:14, 311:22, 312:15, 318:18, 320:13, 320:21, 320:23, 322:10, 330:11, 330:15, 332:15, 332:20, 332:22, 332:23, 345:9
**Iam's** [3] - 331:3, 332:19, 333:5
**idea** [4] - 263:25, 264:2, 284:5, 319:9
**identification** [3] - 252:6, 259:23, 340:16
**identified** [1] - 340:12
**identify** [3] - 267:19, 274:23, 313:2
**Ifi** [18] - 263:15, 265:18, 274:2, 277:15, 278:19, 283:6, 283:13, 283:14, 292:15, 293:10, 324:25, 335:3, 335:4, 335:5, 335:6, 335:23, 336:12, 338:22
**ignored** [1] - 319:4
**ignoring** [1] - 278:18
**illnesses** [3] - 254:18, 254:19
**Im's** [3] - 278:5, 294:2, 300:5
**imagine** [1] - 257:17
**immediately** [1] - 253:21
**impatient** [1] - 323:18
**important** [1] - 273:4
**impressive** [2] - 302:17, 302:23
**improper** [1] - 323:24
**inability** [1] - 337:15
**inadvertent** [1] - 257:16
**Incidentally** [1] - 300:3

**include** [2] - 283:5, 283:11
**includes** [1] - 311:24
**including** [2] - 275:17, 282:8
**incomplete** [2] - 253:12, 253:20
**inconsistencies** [1] - 257:11
**inconsistent** [1] - 291:9
**incur** [1] - 336:3
**incurred** [4] - 331:5, 331:6, 331:8, 331:20
**Independent** [11] - 249:4, 263:15, 265:19, 274:9, 274:14, 277:9, 277:12, 306:17, 306:25, 311:21, 311:22
**Index** [1] - 345:3
**indicate** [4] - 270:13, 271:9, 271:23, 319:18
**indicated** [11] - 255:10, 258:9, 259:9, 273:7, 283:2, 293:9, 294:12, 295:2, 301:11, 328:20, 328:22
**indicates** [6] - 270:16, 286:7, 286:8, 292:3, 292:13, 293:7
**indicating** [2] - 260:16, 261:21
**individual** [1] - 256:6
**industry** [1] - 333:21
**information** [25] - 260:18, 264:3, 264:11, 266:6, 266:9, 268:16, 271:8, 271:22, 273:8, 273:10, 274:16, 275:22, 276:3, 276:24, 292:9, 294:15, 294:24, 295:3, 313:7, 328:12, 328:25, 329:20, 330:12, 330:18, 330:19
**Informed** [4] - 260:19, 272:6, 272:25, 273:3
**infrastructure** [1] - 317:5
**Initial** [1] - 294:10
**initiate** [1] - 321:6
**instances** [3] - 269:9, 273:2, 294:25
**instant** [38] - 257:11, 257:25, 279:12, 279:16, 279:23, 280:2, 280:6, 280:9, 280:13, 280:18, 281:14, 281:18, 282:2, 283:20, 285:10, 286:12, 288:18, 290:5, 290:9, 290:15, 291:23, 291:25, 292:2, 292:12, 293:6, 293:23, 295:24, 296:5, 298:11, 301:3, 301:10, 301:17, 301:24, 315:18, 316:21, 321:3, 321:24, 322:11

**Instant** [1] - 281:22
**instead** [1] - 300:6
**institutionally** [1] - 284:20
**intended** [2] - 260:15, 260:20
**Intention** [1] - 253:4
**Interactive** [2] - 326:15, 327:6
**interchange** [1] - 321:6
**interested** [3] - 287:9, 326:16, 344:17
**Internet** [1] - 330:4
**interrogatories** [1] - 338:12
**Interrogatories** [1] - 324:4
**Invested** [4] - 284:25, 306:2, 308:4, 310:13
**investing** [1] - 337:2
**investment** [5] - 307:20, 309:2, 310:15, 336:20, 337:4
**investor** [22] - 279:6, 284:24, 299:6, 307:5, 307:7, 307:11, 308:5, 308:20, 309:6, 309:8, 310:6, 310:8, 310:12, 310:17, 310:18, 311:2, 311:18, 313:3, 335:16, 336:13, 336:24
**investors** [8] - 285:15, 285:23, 299:15, 309:19, 309:21, 312:7, 312:16, 334:15
**Invoiced** [1] - 252:13
**involved** [1] - 316:12
**irate** [1] - 263:21
**iron** [1] - 257:12
**issue** [6] - 272:18, 280:20, 295:6, 295:16, 317:5, 323:17
**issued** [1] - 324:16
**issues** [4] - 294:9, 319:7, 335:13, 335:15
**item** [1] - 331:3
**items** [3] - 295:9
**itself** [2] - 299:17, 308:10

**J**

**January** [15] - 270:7, 270:10, 290:6, 291:3, 293:14, 293:20, 295:25, 296:6, 297:25, 298:12, 300:4, 300:13, 338:19, 338:20, 340:7
**Jeff** [2] - 314:16, 315:4
**Jessica** [3] - 249:16, 344:8, 344:22
**job** [1] - 316:15
**Joe** [1] - 274:7
**Jones** [2] - 249:15, 250:12
**judge** [1] - 263:10
**July** [1] - 312:19
**June** [1] - 326:22

**K**

**K-1's** [1] - 261:13
**keep** [1] - 330:2
**keeping** [2] - 330:4, 330:11
**kept** [1] - 313:18
**key** [1] - 270:16
**kids** [1] - 262:15
**kind** [5] - 267:4, 278:10, 326:24, 331:11, 335:11
**knowledge** [7] - 269:22, 275:21, 276:2, 276:21, 276:24, 292:25, 318:12
**known** [3] - 272:5, 291:12, 292:7

**L**

**labeled** [1] - 270:24
**Lane** [1] - 276:6
**Lanza** [23] - 250:8, 252:18, 253:3, 253:7, 255:18, 256:5, 256:14, 263:11, 263:12, 263:18, 264:12, 264:16, 264:20, 264:25, 265:11, 272:11, 280:21, 295:17, 333:2, 337:20, 338:9, 339:23, 341:11
**larger** [1] - 310:15
**last** [11] - 253:14, 258:25, 268:3, 269:13, 273:21, 312:2, 316:16, 326:22, 329:3, 335:19, 337:18
**late** [4] - 252:12, 277:19, 331:15, 331:17
**law** [1] - 279:8
**lawyers** [1] - 255:14
**lay** [1] - 265:6
**learned** [1] - 299:9
**least** [1] - 333:13
**leave** [2] - 307:7, 336:6
**leaves** [1] - 310:6
**left** [4] - 309:2, 310:7, 310:25, 324:21
**leg** [1] - 257:15
**legal** [2] - 310:20, 335:16
**letter** [1] - 252:21
**leverage** [2] - 284:10, 284:21
**light** [2] - 253:9, 253:11
**Limited** [2] - 274:14, 311:21
**line** [2] - 263:8, 263:12
**lines** [1] - 261:17
**list** [1] - 332:12
**listed** [9] - 269:25, 270:2, 271:3, 271:6, 271:12, 271:24, 272:20, 281:25, 338:11
**listened** [2] - 258:14, 284:22

**lists** [1] - 331:4
**live** [1] - 263:4
**Llq**[1] - 249:4
**look** [33] - 259:11, 259:13, 259:19, 260:17, 262:3, 263:13, 264:5, 264:7, 265:17, 267:14, 269:13, 270:18, 273:7, 275:5, 279:10, 294:2, 294:13, 294:14, 295:2, 296:9, 300:17, 301:15, 301:23, 303:14, 308:21, 311:20, 313:23, 326:6, 327:19, 327:21, 328:16, 328:23, 329:7
**Look**[2] - 275:15, 322:5
**looked** [1] - 294:23
**Looking**[1] - 312:9
**looking** [4] - 300:4, 305:12, 339:8, 339:11
**looks** [10] - 275:19, 276:9, 281:16, 285:12, 289:2, 298:14, 299:2, 306:16, 311:22, 315:22
**Looks**[22] - 271:7, 279:15, 283:22, 283:23, 286:14, 287:13, 288:20, 290:7, 297:2, 301:5, 301:9, 302:2, 302:15, 302:21, 304:5, 312:3, 316:23, 321:5, 321:22, 321:25, 322:7, 322:14
**Loschky**[3] - 249:17, 344:8, 344:22
**lose** [2] - 334:5
**losing** [2] - 327:9, 336:4
**Lost**[5] - 324:6, 324:9, 324:10, 324:12, 325:22
**lost** [5] - 325:15, 326:6, 333:10, 334:16, 341:4
**love** [1] - 303:25
**lower** [1] - 297:12
**Lp**[1] - 273:17

**M**

**mail** [28] - 260:4, 260:12, 261:21, 263:14, 263:22, 264:6, 264:21, 265:17, 266:3, 266:9, 266:10, 267:10, 267:15, 267:22, 268:21, 269:21, 277:16, 277:19, 292:3, 292:12, 293:7, 293:24, 295:10, 301:11, 301:17
**mailed** [1] - 269:10
**mails** [26] - 259:22, 259:25, 261:25, 262:3, 262:5, 262:7, 263:24, 263:25, 264:11, 264:14, 264:24, 265:5,

265:9, 265:12, 265:14, 266:4, 266:22, 267:6, 267:17, 267:19, 268:18, 268:19, 268:22, 268:25, 345:10
**major** [1] - 259:3
**man** [1] - 290:11
**managed** [2] - 307:10, 307:12
**management** [19] - 282:8, 282:14, 283:6, 283:9, 310:16, 310:19, 324:15, 324:17, 324:18, 324:19, 324:22, 324:23, 325:11, 325:14, 325:15, 329:2, 334:12, 338:23, 338:25
**Management** [6] - 249:4, 263:15, 265:19, 311:23, 324:9, 324:13
**manager** [9] - 307:15, 307:20, 307:21, 307:22, 308:2, 308:11, 308:15, 308:19, 337:2
**March** [13] - 254:7, 254:13, 254:15, 255:2, 255:6, 255:12, 255:25, 256:23, 258:5, 265:6, 275:7, 283:21, 286:13
**margin** [9] - 261:22, 263:21, 269:24, 270:15, 271:12, 271:19, 271:20, 284:4, 321:14
**margin/leverage** [1] - 284:13
**margins** [1] - 266:20
**mark** [5] - 282:25, 285:5, 285:7, 287:4, 340:9
**marked** [8] - 252:5, 254:3, 259:20, 259:22, 273:14, 295:11, 340:15, 341:2
**market** [2] - 291:18, 322:5
**marketing** [3] - 314:11, 316:17, 320:13
**markings** [2] - 257:4, 257:5
**marriage** [1] - 344:17
**material** [3] - 315:24, 316:2, 316:7
**materially** [1] - 304:23
**materials** [2] - 258:6, 260:7
**matter** [5] - 270:23, 272:17, 296:13, 333:18, 344:18
**matters** [8] - 271:17, 280:20, 290:15, 296:10, 311:5, 313:4, 322:21, 337:17
**mean** [17] - 276:18, 277:6, 277:16, 291:15, 307:19, 308:23, 309:21, 313:14, 315:10, 318:23, 326:20, 327:9, 331:6, 335:6, 335:22, 336:19, 340:4

**meaning** [4] - 284:4, 284:9, 298:23, 305:25
**means** [1] - 297:5
**meet** [1] - 302:9
**meeting** [1] - 272:10
**memo** [3] - 266:11, 266:15, 272:13
**memorandum** [4] - 279:7, 309:18, 310:23, 310:24
**Menaing** [1] - 298:22
**mention** [2] - 334:15, 340:24
**mentioned** [3] - 273:12, 299:7, 311:15
**message** [29] - 258:2, 279:12, 281:14, 281:18, 283:20, 285:10, 286:12, 288:18, 290:5, 290:9, 290:15, 291:23, 291:25, 292:2, 292:12, 293:7, 293:23, 295:24, 296:5, 298:11, 301:3, 301:10, 301:17, 301:24, 315:18, 316:21, 321:3, 321:24, 322:12
**messages** [11] - 257:11, 257:13, 279:16, 279:23, 280:2, 280:6, 280:10, 280:13, 280:18, 281:3, 282:2
**Messenger** [1] - 281:23
**met** [4] - 271:12, 271:23, 271:25, 272:2
**Miami** [1] - 317:5
**Michael** [1] - 250:17
**might** [4] - 256:10, 260:10, 292:8, 326:19
**mil** [4] - 282:10, 285:16, 285:21, 288:24
**million** [37] - 278:15, 282:9, 282:13, 282:19, 283:3, 283:12, 283:16, 283:25, 284:24, 293:20, 308:6, 309:4, 309:5, 310:25, 313:10, 324:18, 324:25, 325:3, 325:9, 325:12, 325:14, 325:16, 325:17, 326:3, 326:5, 327:14, 327:17, 333:12, 334:11, 336:16, 338:16, 339:2, 339:3, 340:7
**millions** [1] - 329:16
**mine** [2] - 285:7, 326:25
**minimal** [2] - 308:23, 327:10
**minimum** [3] - 326:20, 334:9, 341:6
**minus** [1] - 286:3
**minute** [1] - 262:14
**missed** [1] - 293:15
**mistake** [1] - 306:9

**model** [3] - 312:11, 312:13, 326:12
**modifications** [1] - 313:15
**moment** [4] - 255:19, 255:22, 260:23
**money** [57] - 262:16, 262:17, 269:4, 269:8, 278:7, 278:8, 279:7, 283:6, 283:15, 284:12, 287:9, 288:14, 293:13, 293:19, 296:11, 296:14, 296:17, 297:12, 297:20, 297:24, 298:20, 299:14, 299:17, 299:22, 305:19, 306:3, 306:9, 306:21, 308:4, 308:12, 308:19, 312:22, 312:24, 313:9, 313:12, 313:13, 313:20, 313:24, 318:5, 318:7, 318:13, 319:17, 319:25, 320:25, 322:16, 323:7, 323:8, 323:10, 323:14, 323:19, 327:5, 327:9, 329:19, 329:23, 338:16, 338:20
**moneys** [3] - 308:7, 308:13, 308:20
**month** [9] - 301:8, 305:21, 308:15, 310:23, 322:5, 323:5, 323:21, 336:24, 337:5
**months** [1] - 338:22
**most** [1] - 281:10
**motion** [1] - 252:23
**motivation** [1] - 264:18
**move** [6] - 269:8, 306:3, 317:22, 319:7, 329:23, 336:9
**moved** [5] - 306:21, 313:7, 322:17, 336:10, 336:12
**moving** [2] - 334:24, 336:4
**multiples** [1] - 327:25
**multiply** [1] - 324:20
**must** [2] - 261:9, 302:23

**N**

**named** [1] - 263:19
**nannies** [1] - 263:2
**nature** [1] - 303:2
**Nav**[1] - 305:9
**Nav's** [1] - 305:7
**need** [10] - 255:21, 259:18, 261:8, 273:7, 288:16, 288:25, 317:4, 319:11, 320:9, 338:2
**needed** [7] - 260:25, 269:4, 274:15, 320:8, 320:10, 320:12
**needs** [5] - 261:4, 262:15, 317:22, 337:24
**Net**[1] - 305:11
**net** [1] - 305:20

353

**network** [1] - 330:3
**never** [8] - 261:11, 261:13, 268:9, 268:20, 269:11, 273:3, 274:17, 319:3
**new** [19] - 277:24, 302:12, 306:22, 307:5, 308:2, 308:4, 310:18, 311:17, 317:2, 317:15, 317:16, 318:8, 318:24, 319:9, 319:13, 319:19, 320:7, 333:19
**New** [10] - 249:2, 249:16, 250:7, 250:15, 271:2, 271:21, 290:11, 344:4, 344:6, 344:10
**next** [13] - 262:20, 262:21, 270:12, 275:17, 279:11, 289:12, 297:9, 303:14, 306:2, 306:15, 331:3, 336:16, 336:23
**Nice** [1] - 284:3
**nice** [1] - 316:16
**night** [4] - 252:12, 258:25, 259:2
**Nina** [1] - 263:19
**non** [1] - 254:20
**non-stop** [1] - 254:20
**none** [1] - 269:6
**Notary** [2] - 249:17, 344:9
**notation** [1] - 300:13
**notations** [1] - 285:7
**note** [4] - 252:7, 252:20, 273:4, 330:21
**noted** [1] - 341:13
**Notes** [2] - 340:15, 345:11
**Nothing** [1] - 297:8
**Notice** [1] - 275:16
**notice** [1] - 252:11
**November** [7] - 269:17, 285:11, 301:25, 303:6, 303:23, 304:7, 304:21
**number** [20] - 254:11, 257:21, 257:24, 268:7, 269:11, 272:19, 275:9, 279:10, 282:23, 295:11, 301:23, 305:16, 315:20, 321:10, 325:12, 325:13, 326:4, 327:10, 331:23, 332:25
**numbered** [1] - 270:4
**numbers** [7] - 254:5, 265:3, 295:10, 305:17, 314:22, 315:14, 330:25
**Ny** [3] - 249:16, 250:7, 250:15
**Nyse** [4] - 267:5, 272:14, 272:16, 272:24

---

**O**

**oath** [1] - 251:11

---

**object** [1] - 264:16
**Objection** [1] - 272:11
**objections** [1] - 251:6
**obligated** [2] - 325:9, 326:2
**obligations** [1] - 262:24
**obtain** [1] - 273:9
**obtaining** [1] - 312:16
**obviously** [5] - 266:25, 269:6, 284:18, 323:18, 326:16
**October** [6] - 263:11, 276:8, 285:15, 307:9, 322:12, 338:14
**odd** [1] - 288:3
**offering** [4] - 279:7, 309:17, 310:23, 310:24
**office** [8] - 257:9, 266:16, 317:5, 317:12, 317:13, 336:4, 336:5
**officer** [1] - 251:10
**offices** [3] - 249:15, 256:8, 336:9
**officially** [1] - 322:20
**offshore** [9] - 287:9, 288:14, 293:17, 298:22, 299:9, 299:12, 299:14, 299:16
**often** [2] - 258:24, 319:3
**Ola** [1] - 249:4
**old** [2] - 262:25
**once** [1] - 273:3
**one** [44] - 254:9, 262:2, 266:21, 267:11, 267:17, 268:14, 268:15, 271:3, 272:7, 272:21, 272:23, 273:2, 275:13, 279:14, 279:24, 281:9, 284:9, 284:12, 286:11, 286:17, 296:2, 298:9, 300:10, 301:17, 301:21, 302:5, 303:16, 304:11, 305:17, 310:7, 314:5, 314:9, 314:10, 316:11, 316:12, 331:15, 332:13, 332:16, 333:22, 336:15, 336:23, 339:16
**One** [1] - 309:2
**one-to-one** [1] - 284:9
**ones** [3] - 260:9, 266:18, 280:24
**ongoing** [1] - 335:23
**onshore** [2] - 286:18, 287:10
**open** [2] - 260:14, 330:11
**operating** [2] - 308:24, 309:17
**operational** [1] - 310:19
**opinion** [1] - 333:8
**opportunity** [2] - 273:9, 334:7
**oppose** [1] - 277:13

---

**opposed** [2] - 255:25, 281:20
**opposite** [2] - 277:6, 326:24
**Option** [1] - 273:19
**orally** [1] - 269:2
**ordeal** [1] - 254:20
**otherwise** [2] - 329:18, 337:13
**outcome** [1] - 344:18
**outset** [1] - 274:8
**overall** [1] - 278:24
**overnight** [2] - 289:5, 320:2
**oversight** [2] - 257:10, 257:16
**own** [1] - 326:11

---

**P**

**page** [32] - 257:21, 257:22, 257:24, 259:24, 261:17, 263:7, 263:11, 266:15, 270:3, 270:5, 270:6, 270:12, 273:16, 273:21, 275:8, 275:15, 275:17, 279:11, 283:20, 285:10, 286:10, 288:18, 295:10, 301:24, 303:14, 306:15, 312:2, 312:9, 324:4, 324:9, 332:13, 334:25
**Page** [2] - 345:5, 345:8
**Page/line** [1] - 342:6
**pages** [5] - 260:16, 260:19, 269:13, 272:19, 304:25
**paid** [6] - 299:19, 299:20, 299:21, 299:25, 318:5, 340:8
**Pardon** [1] - 327:15
**part** [11] - 260:3, 278:23, 282:6, 283:23, 297:21, 298:3, 303:12, 313:8, 313:9, 319:12, 326:16
**parties** [2] - 251:5, 344:16
**partner** [1] - 274:7
**past** [5] - 313:10, 313:12, 314:8, 333:18, 334:14
**Pattern** [3] - 282:2, 282:9, 282:10
**pattern** [1] - 312:10
**Paul** [1] - 287:11
**pay** [8] - 262:16, 310:9, 320:11, 320:14, 330:2, 330:10, 330:11, 334:7
**paying** [2] - 318:18, 318:22
**payment** [1] - 269:5
**people** [6] - 302:9, 302:10, 302:24, 303:25, 333:24, 336:17
**per** [6] - 273:2, 279:7, 279:8, 309:17, 310:23, 323:12

---

**percent** [18] - 272:14, 285:2, 292:22, 292:24, 293:3, 293:16, 298:23, 309:24, 310:3, 324:17, 326:23, 327:8, 328:7, 338:21
**percentage** [7] - 309:12, 310:12, 320:20, 320:21, 320:23, 327:24, 328:6
**performance** [16] - 290:20, 291:5, 291:11, 291:12, 291:16, 292:6, 293:9, 303:6, 327:24, 328:10, 329:2, 333:24, 334:12, 338:24, 338:25
**Performance** [3] - 291:4, 324:10, 325:22
**Performance-wise** [1] - 291:4
**performance-wise** [1] - 291:5
**period** [4] - 269:10, 327:9, 331:8, 331:12
**person** [1] - 324:20
**personal** [6] - 253:16, 258:12, 282:8, 290:15, 290:18, 332:21
**peruse** [1] - 262:7
**phone** [1] - 267:2
**physically** [1] - 259:6
**piece** [1] - 312:5
**pieces** [3] - 313:11, 313:12, 314:9
**pinpoint** [1] - 314:17
**place** [11] - 261:22, 264:4, 269:6, 276:8, 293:25, 324:25, 325:2, 333:12, 336:18, 336:23, 337:4
**placed** [2] - 300:16, 326:14
**places** [1] - 259:8
**plaintiff** [5] - 252:22, 253:2, 294:8, 295:5, 295:14
**Plaintiff's** [1] - 324:2
**Plaintiffs** [1] - 249:5
**plaintiffs** [1] - 250:5
**plan** [2] - 277:24, 317:20
**plenty** [2] - 287:9, 338:15
**Pllc** [1] - 250:4
**Plus** [2] - 286:3, 317:4
**Pm** [10] - 253:5, 298:16, 302:4, 302:6, 303:15, 303:17, 316:15, 316:25, 322:24, 341:13
**point** [10] - 262:2, 265:13, 283:15, 287:5, 293:23, 301:16, 301:21, 304:8, 320:23, 334:6
**pointing** [1] - 339:8
**points** [1] - 295:18
**Porco** [1] - 274:13

354

Porco's [1] - 258:14
portion [1] - 310:4
posed [2] - 258:8, 294:10
position [5] - 265:7, 295:6, 295:16, 324:24, 341:8
possible [6] - 262:8, 262:10, 300:5, 300:8, 321:15, 334:19
possibly [2] - 259:6, 318:9
potential [6] - 300:24, 312:7, 327:2, 327:11, 333:20, 334:10
Powerpoint [10] - 282:11, 312:8, 312:20, 314:4, 314:6, 314:14, 314:15, 314:24, 314:25, 315:3
Powerpoints [3] - 313:8, 313:19, 314:8
practically [2] - 334:5, 334:21
precluding [1] - 337:11
pregnancy [1] - 259:4
preoccupied [1] - 260:23
prepare [1] - 329:9
prepared [8] - 260:7, 262:4, 262:11, 295:8, 337:19, 339:15, 339:16, 340:13
presumably [1] - 298:23
pretty [2] - 259:17, 340:6
previous [1] - 295:19
previously [6] - 252:10, 256:20, 266:2, 273:13, 311:16, 316:5
prime [2] - 263:14, 265:18
print [1] - 281:2
printed [1] - 281:10
priority [1] - 258:22
privilege [1] - 339:25
problems [1] - 323:13
proceed [1] - 317:10
process [9] - 280:7, 284:16, 323:23, 335:6, 335:13, 335:23, 336:20, 336:22, 336:24
processed [1] - 323:21
produce [5] - 257:4, 261:3, 280:24, 328:24, 339:23
produced [10] - 256:6, 257:14, 261:4, 264:8, 279:24, 280:6, 314:18, 315:11, 315:13, 330:24
producing [1] - 280:6
production [3] - 253:10, 311:7, 339:22
profit [1] - 327:24
profitability [1] - 328:7
profits [1] - 328:7
promise [1] - 263:6
promised [1] - 293:21
promises [1] - 262:22

proper [1] - 278:9
properly [1] - 322:20
proposition [1] - 333:23
prorate [5] - 309:18, 309:20, 309:23, 310:4
prorated [1] - 309:7
proved [1] - 297:20
provide [7] - 254:24, 264:10, 281:3, 311:15, 330:3, 332:9, 337:16
provided [25] - 254:6, 254:14, 255:11, 256:9, 256:16, 256:20, 259:15, 265:2, 267:13, 275:6, 280:10, 280:13, 280:15, 280:22, 280:24, 314:4, 315:14, 330:14, 330:17, 330:18, 330:19, 332:10, 333:14, 339:24, 340:13
provider [2] - 329:24
provides [1] - 268:13
providing [1] - 314:3
Public [2] - 249:18, 344:9
pulled [1] - 334:16
purporting [1] - 294:18
purposes [1] - 320:13
pursuant [1] - 253:8
put [20] - 262:19, 278:7, 282:25, 286:25, 293:13, 293:19, 305:19, 309:22, 312:6, 314:13, 314:14, 320:17, 325:9, 326:2, 327:5, 329:18, 333:24, 338:16, 338:19
puts [1] - 340:7
putting [5] - 271:10, 271:16, 282:11, 306:20, 320:19

**Q**

qualify [2] - 291:22, 291:24
questioning [1] - 338:4
questions [21] - 253:12, 253:13, 253:15, 253:17, 253:19, 258:8, 260:8, 260:11, 260:14, 294:9, 294:23, 294:25, 295:21, 323:17, 337:9, 337:16, 337:20, 337:25, 338:6, 341:9, 341:12
quickly [1] - 323:19
quite [7] - 308:9, 308:10, 308:11, 308:16, 313:11, 326:13, 329:4
quote [2] - 285:14, 303:23
quoting [1] - 265:21

**R**

raise [12] - 288:14, 297:20,

298:20, 299:17, 313:8, 313:9, 313:24, 319:25, 320:24, 325:4, 326:17, 327:5
raised [8] - 287:11, 294:16, 295:5, 299:22, 313:10, 313:12, 313:13, 313:20
raising [2] - 299:13, 312:21
range [1] - 283:18
Rca[8] - 315:24, 316:5, 316:10, 316:11, 316:12, 316:13, 318:9, 322:22
read [8] - 261:19, 263:9, 274:5, 282:6, 285:17, 290:23, 316:24, 333:7
ready [2] - 295:3, 296:24
realistic [1] - 320:3
really [7] - 258:13, 263:13, 276:18, 279:4, 312:6, 312:20, 334:6
reason [1] - 257:23
reasons [3] - 273:11, 294:20, 309:2
receipt [1] - 253:21
received [7] - 252:11, 252:21, 255:6, 256:22, 268:14, 268:15, 339:4
recently [1] - 258:16
Recess[2] - 294:6, 337:8
recognition [1] - 312:11
recognize [2] - 254:8, 254:12
recollection [9] - 267:21, 268:21, 278:11, 281:11, 308:18, 314:2, 317:14, 318:12, 323:9
Record[3] - 274:5, 290:23, 333:7
record [21] - 252:8, 252:20, 253:3, 254:3, 255:10, 257:20, 259:24, 261:12, 261:19, 270:23, 272:22, 281:17, 285:5, 294:7, 294:17, 302:16, 314:13, 316:18, 337:14, 338:5, 344:14
redeem [5] - 276:17, 276:23, 277:2, 277:4, 278:2
redeemed [2] - 308:13, 309:9
Redemption[1] - 275:16
redemption [22] - 275:19, 275:22, 276:3, 276:5, 276:7, 276:9, 276:12, 276:15, 276:16, 276:22, 276:25, 277:14, 279:3, 279:5, 279:6, 289:10, 289:19, 306:5, 306:7, 306:8, 306:20, 335:20
redemptions [1] - 278:20
reduce [1] - 330:6
refer [8] - 268:17, 292:11,

292:24, 305:14, 306:12, 307:3, 312:11, 322:15
reference [4] - 269:16, 312:10, 315:23, 315:24
references [1] - 265:3
referred [9] - 263:23, 263:25, 264:12, 264:21, 269:21, 275:22, 309:14, 315:2
referring [25] - 267:10, 267:15, 267:18, 276:20, 284:7, 288:7, 289:2, 290:16, 290:24, 291:11, 293:5, 299:3, 305:10, 313:17, 316:4, 316:6, 316:11, 317:7, 317:16, 317:18, 317:24, 318:8, 322:16, 323:6, 340:23
refers [4] - 306:14, 306:18, 322:21, 323:23
reflect [3] - 282:12, 303:5, 305:18
reflected [1] - 276:3
reflecting [1] - 311:5
reflects [3] - 275:9, 293:24, 298:2
reg [5] - 266:19, 270:16, 270:17, 270:19, 271:21
regard [3] - 256:24, 292:14, 338:10
regardless [1] - 264:25
regular [1] - 284:4
regulations [2] - 274:21, 275:2
related [2] - 253:14, 344:15
relates [1] - 276:24
relating [3] - 258:6, 294:9, 296:11
relationship [1] - 309:8
relative [2] - 291:18, 295:7
relatively [1] - 253:22
relevant [1] - 261:11
Remember[2] - 303:23, 304:13
remember [1] - 313:6
repay [1] - 333:9
repeat [3] - 271:14, 290:21, 333:6
Repeat[2] - 274:4, 282:15
repeated [1] - 321:17
rephrase [1] - 271:16
report [2] - 275:12, 305:5
Reporter[2] - 249:17, 344:9
reporter [1] - 252:14
represent [2] - 310:2, 310:3
representation [6] - 255:17, 255:21, 256:22, 264:13, 265:8, 266:15
represented [5] - 260:17, 265:4, 265:16, 265:21, 337:18

reproducing [1] - 256:25
reputational [1] - 334:10
Request [1] - 345:13
requested [2] - 261:10, 267:25
requesting [2] - 314:24, 317:20
requiring [1] - 263:13
research [1] - 260:24
researched [1] - 260:25
reservation [1] - 341:8
reserve [1] - 337:10
reserved [1] - 251:7
resolve [1] - 321:14
resolved [1] - 317:4
respect [7] - 292:5, 292:14, 293:4, 293:10, 337:11, 337:13, 337:14
respectable [1] - 336:5
respective [1] - 251:5
respond [7] - 253:4, 276:19, 281:12, 285:21, 302:16, 321:18, 321:20
responded [2] - 252:23, 321:23, 322:6
response [1] - 252:25
Response [1] - 324:3
responsibility [2] - 333:9, 334:22
responsible [1] - 333:4
rest [1] - 271:19
restroom [1] - 258:23
result [4] - 261:23, 291:5, 293:17, 313:3
retained [1] - 279:17
return [3] - 291:5, 293:2, 293:3
revenue [8] - 326:7, 326:12, 327:11, 329:14, 333:10, 333:14, 336:8, 341:5
revenues [1] - 334:13
reviewing [1] - 260:6
ridiculous [1] - 318:6
rights [2] - 337:11, 341:8
road [1] - 288:16
rocket [1] - 340:6
room [1] - 300:24
roughly [1] - 283:16
Rule [1] - 252:22
rules [8] - 263:16, 265:20, 272:15, 273:25, 274:21, 275:2, 279:8
run [2] - 318:20, 318:22

**S**

S1 [2] - 305:24, 305:25
S2 [1] - 305:24
S4 [1] - 306:18
S401 [1] - 306:11

Sachs [12] - 261:21, 263:20, 266:11, 266:16, 272:10, 272:13, 272:17, 273:17, 273:25, 274:15, 278:8
Sachs' [1] - 274:21
save [2] - 279:18, 279:19
saved [3] - 279:18, 280:10, 281:5
saving [3] - 300:19, 300:23
saw [2] - 304:18, 313:25
scheduled [1] - 252:10
science [1] - 340:6
sea [1] - 331:9
sealing [1] - 251:13
Sear [38] - 250:16, 252:7, 252:19, 253:6, 253:23, 253:25, 255:16, 255:23, 256:8, 256:17, 259:20, 264:19, 264:23, 265:4, 265:15, 280:17, 294:4, 294:7, 314:18, 314:21, 314:25, 315:9, 315:16, 328:18, 329:11, 330:21, 331:2, 332:24, 337:6, 337:9, 337:23, 338:4, 339:6, 339:21, 340:3, 340:9, 341:7, 345:6
search [4] - 254:16, 259:9, 279:25, 280:2
season [1] - 253:16
second [2] - 321:24, 328:18
seconds [4] - 321:7, 321:21, 321:23, 322:4
secretary [1] - 290:17
see [26] - 259:8, 269:16, 269:24, 270:8, 273:19, 284:7, 286:19, 286:23, 289:14, 297:14, 298:16, 302:3, 302:7, 303:15, 306:16, 306:25, 315:25, 321:12, 323:2, 323:3, 324:5, 324:7, 325:22, 326:7, 327:7, 334:24
segment [1] - 297:7
sending [1] - 296:11
sends [1] - 268:23
sense [2] - 278:25, 335:11
sent [1] - 268:21
September [3] - 307:9, 316:22, 318:19
September/october [1] - 335:9
series [8] - 259:25, 305:7, 305:21, 306:6, 306:19, 306:22
Series [3] - 305:25, 306:2, 306:4
servers [1] - 330:5
service [2] - 329:23, 329:24
Servicing [1] - 289:23

session [1] - 337:18
set [17] - 254:5, 256:18, 271:17, 272:9, 272:12, 274:8, 274:19, 284:17, 284:19, 303:19, 313:4, 317:2, 317:13, 324:13, 326:7, 327:13, 344:12
Set [1] - 324:3
setting [4] - 260:14, 273:25, 274:13, 317:12
seven [2] - 262:25, 325:19
seven-year-old [1] - 262:25
several [3] - 266:22, 272:15, 318:23
shared [1] - 277:20
shares [8] - 277:15, 296:15, 296:24, 305:8, 305:22, 307:6, 336:25, 337:2
sharp [2] - 319:21, 319:23
sheet [1] - 332:16
sheets [1] - 332:16
short [1] - 337:6
Shorthand [2] - 249:17, 344:8
shorts [1] - 297:10
show [6] - 254:2, 261:15, 267:9, 273:13, 300:10, 323:25
showed [3] - 266:13, 266:14, 267:8
shown [2] - 257:18, 312:23
shows [3] - 332:15, 332:17, 339:13
shut [6] - 267:2, 335:3, 335:4, 335:19, 335:24, 335:25
shutting [4] - 335:6, 335:9, 335:10, 335:14
sides [1] - 325:21
signature [3] - 273:22, 278:23, 279:2
signed [3] - 251:9, 278:2, 338:14
significant [1] - 278:12
Silberfarb [4] - 250:17, 260:2, 260:5, 260:13
similar [3] - 257:22, 299:5, 299:11
simply [1] - 340:24
single [2] - 272:23, 308:15
sit [9] - 264:10, 266:7, 267:20, 268:17, 292:11, 301:16, 313:2, 318:25, 332:2
situation [5] - 269:7, 284:9, 318:10, 318:24, 320:7
six [1] - 325:19
sixth [1] - 270:6
slew [2] - 267:6, 310:22
smacked [1] - 311:3
small [4] - 310:10, 325:5,

326:21, 336:5
so-called [1] - 279:11
solution [1] - 320:19
someone [1] - 304:17
sometime [1] - 335:21
somewhere [2] - 274:10, 314:8
soon [8] - 253:22, 262:8, 262:10, 263:6, 321:15, 322:6
Sorry [2] - 286:11, 296:4
sorry [9] - 274:4, 275:24, 277:4, 280:4, 290:21, 302:17, 306:18, 321:12, 336:22
sort [11] - 257:8, 278:17, 280:23, 299:10, 299:11, 300:8, 319:13, 319:20, 320:7, 328:19, 335:22
Southern [1] - 249:2
span [1] - 337:5
Specific [1] - 259:15
specific [6] - 259:18, 264:3, 266:6, 266:8, 266:20, 305:7
Specifically [1] - 314:23
specifically [11] - 259:13, 259:16, 263:15, 265:19, 266:17, 267:4, 276:20, 300:11, 301:18, 309:9, 332:7
specificity [1] - 332:3
Specificity [1] - 332:5
specifics [2] - 261:2, 261:4
specified [3] - 271:11, 271:19, 295:10
specify [2] - 275:2, 276:13
speed [2] - 289:16, 289:18
spelled [1] - 298:22
spots [1] - 294:12
spread [1] - 331:12
spreadsheet [5] - 266:14, 266:21, 327:21, 328:9, 328:16
spreadsheets [1] - 328:23
ss [1] - 344:5
Stamford [1] - 336:6
stamp [1] - 265:3
standard [1] - 323:22
stands [1] - 341:5
start [5] - 274:17, 297:9, 305:15, 312:6, 333:19
started [2] - 335:9, 335:10
starting [3] - 263:8, 318:20, 318:22
State [2] - 344:4, 344:10
statement [14] - 263:9, 263:23, 264:18, 264:22, 265:11, 275:10, 296:20, 303:10, 303:11, 303:13, 303:19, 304:6, 304:15, 338:10
statements [1] - 253:17

states [1] - 266:17
States [1] - 249:2
stick [2] - 261:18, 261:20
still [7] - 318:21, 329:12, 329:13, 335:12, 335:15, 335:17, 341:5
Stipulated [3] - 251:4, 251:8, 251:12
Stipulations [1] - 251:2
stocks [1] - 297:12
stomach [2] - 258:24, 258:25
stop [1] - 254:20
strategies [1] - 326:18
strategy [6] - 284:21, 307:13, 329:16, 329:17, 333:18, 333:20
Street [2] - 249:16, 250:14
Stuart [1] - 250:8
stuck [1] - 304:9
stuff [1] - 310:21
Subscribed [1] - 343:10
substance [4] - 294:12, 300:5, 301:12, 322:15
substantive [2] - 267:22, 268:16
success [1] - 312:15
successful [5] - 308:8, 308:9, 308:10, 333:15, 333:20
Suite [1] - 250:6
summary [1] - 305:6
Supplement [1] - 324:2
support [2] - 330:15, 330:22
supposed [5] - 272:7, 272:25, 309:3, 324:24, 325:20
survive [1] - 262:18
sustained [1] - 334:13
sworn [4] - 251:9, 252:3, 343:10, 344:13
synergy [1] - 330:3
system [1] - 300:14
Szele [18] - 249:14, 252:2, 254:2, 260:15, 260:19, 281:2, 282:4, 282:6, 282:10, 295:7, 339:7, 340:17, 343:8, 344:11, 345:6
Szele's [1] - 252:9

T

T01 [2] - 306:17, 306:25
tabbed [1] - 273:16
tact [1] - 330:4
talk/wrap [1] - 317:2
talks [1] - 268:20
tax [1] - 253:16
taxes [1] - 278:3

technical [1] - 279:2
technically [1] - 278:22
technology [3] - 329:20, 330:2, 330:12
telephone [2] - 277:16, 281:20
temporarily [1] - 336:2
Ten [1] - 310:3
ten [1] - 321:23
terms [2] - 279:22, 291:15
testified [4] - 252:4, 294:17, 316:5, 333:16
testify [2] - 337:17, 337:19
testimony [14] - 276:22, 294:18, 294:19, 316:8, 325:3, 328:19, 337:12, 337:24, 338:7, 339:9, 340:18, 341:3, 344:14
therefore [1] - 299:18
therein [3] - 275:23, 313:5, 324:13
they've [1] - 330:24
thinking [3] - 282:18, 317:11, 320:5
thinks [1] - 337:24
third [2] - 287:23, 288:22
Thomas [1] - 250:16
thorough [1] - 268:14
thousand [2] - 305:13, 305:14
three [9] - 288:4, 288:6, 302:17, 305:18, 324:21, 325:18, 327:8, 331:9
tiny [2] - 263:4, 327:10
today [13] - 252:24, 260:3, 260:21, 262:4, 294:21, 295:4, 295:11, 297:8, 316:8, 328:5, 328:13, 331:19, 337:17
together [5] - 278:2, 312:6, 314:13, 327:3, 333:24
tomorrow [3] - 253:5, 295:15, 297:9
tone [2] - 268:23, 319:21
tonight [1] - 317:2
took [8] - 261:22, 274:13, 276:7, 280:9, 293:25, 336:16
top [3] - 300:13, 306:11
Top [4] - 307:17, 307:18, 307:19, 307:21
topics [1] - 260:14
total [7] - 282:7, 283:8, 283:9, 285:15, 287:11, 324:19, 331:25
track [2] - 261:12, 314:13
trade [3] - 269:25, 270:7, 326:15
trader [1] - 287:10
trading [33] - 261:12, 261:23, 269:20, 271:10,

271:17, 274:2, 274:18, 274:22, 291:4, 292:15, 293:10, 301:8, 301:12, 304:15, 307:10, 307:12, 308:7, 308:9, 326:6, 326:10, 326:11, 326:22, 326:24, 327:6, 327:11, 327:12, 328:10, 328:11, 329:14, 333:18, 337:22, 340:23, 341:4
tranche [4] - 297:6, 306:2, 306:3, 306:4
tranches [3] - 296:25, 297:3, 297:5
transcript [7] - 259:8, 260:16, 260:20, 261:16, 263:8, 273:6, 294:13
transferred [3] - 269:4, 281:6, 281:11
translates [1] - 338:23
trenches [1] - 297:4
trial [2] - 251:7, 337:11
tried [4] - 290:2, 306:3, 322:17, 322:18
trouble [1] - 318:18
troubles [1] - 257:7
true [11] - 284:15, 291:2, 303:5, 303:10, 303:11, 303:12, 304:6, 304:10, 304:15, 316:18, 344:13
trust [1] - 333:25
try [8] - 262:20, 262:21, 298:4, 302:8, 317:13, 320:24, 321:19
trying [4] - 262:16, 262:17, 284:6, 312:18
turn [1] - 322:6
turned [1] - 339:3
two [20] - 255:7, 259:24, 262:14, 266:15, 269:13, 269:17, 271:10, 271:17, 281:9, 286:17, 295:18, 302:16, 304:12, 305:18, 321:18, 324:9, 331:16, 332:16, 333:23, 338:21
two-day [2] - 271:10, 271:17
two-page [2] - 259:24, 266:15
two-year [2] - 302:16, 333:23
type [2] - 270:21, 271:3
types [1] - 294:22

U

unable [2] - 252:13, 328:21
unanswered [2] - 258:7, 294:25
unaware [1] - 330:21

uncorrelated [1] - 327:3
under [8] - 270:21, 271:2, 282:7, 282:13, 283:6, 283:9, 324:17, 324:18
understood [1] - 282:13
unit [1] - 331:9
United [1] - 249:2
Unless [1] - 252:23
unpaid [3] - 331:3, 331:18, 333:5
unprepared [1] - 294:22
unwind [1] - 297:10
unwinding [2] - 297:12, 311:9
up [36] - 253:20, 258:10, 274:8, 274:13, 274:19, 277:24, 284:17, 284:19, 287:3, 289:16, 289:18, 302:18, 304:21, 307:8, 308:15, 317:2, 317:12, 317:13, 317:15, 317:20, 319:4, 320:6, 320:17, 320:18, 320:19, 326:22, 328:16, 330:2, 330:9, 330:10, 332:3, 333:13, 334:11, 337:23, 338:20, 340:25
utilization [2] - 312:16, 313:4
utilize [1] - 284:21
utilized [4] - 256:11, 256:15, 256:18, 316:10

V

value [2] - 305:11, 305:20
various [3] - 266:24, 294:12, 337:12
vendor [1] - 330:7
verbal [1] - 318:25
verbally [2] - 266:23, 267:2
Verbally [1] - 269:2
versions [1] - 314:7
via [1] - 266:16
Victory [1] - 276:5
view [1] - 304:19
violated [1] - 301:19
violation [8] - 261:23, 263:16, 265:20, 266:11, 266:12, 268:24
violations [15] - 266:17, 267:5, 267:6, 267:24, 267:25, 268:3, 268:20, 269:20, 270:25, 271:10, 272:16, 272:17, 272:23, 272:24, 291:13
virus [2] - 258:24, 258:25
volatility [2] - 302:11, 334:2
voluntarily [1] - 295:8

## W

297:2, 307:24

**wait** [1] - 330:8
**waived** [3] - 251:14, 306:7, 310:18
**waiving** [1] - 339:25
**wants** [6] - 279:7, 295:20, 317:10, 317:21, 338:6
**waste** [1] - 297:19
**watch** [1] - 302:12
**Water**[4] - 307:17, 307:18, 307:19, 307:21
**ways** [4] - 303:24, 304:14, 330:7, 330:10
**week** [1] - 262:20
**weeks** [1] - 255:7
**Western**[1] - 284:24
**Westwood**[10] - 287:2, 287:5, 288:11, 288:13, 292:21, 293:2, 293:8, 299:4, 302:18, 338:21
**Whe**[1] - 288:23
**whole** [5] - 267:6, 310:22, 311:8, 314:11, 333:19
**wife** [3] - 259:3, 262:12, 262:25
**wife's** [1] - 254:18
**William**[1] - 250:9
**wire** [5] - 296:24, 322:17, 322:25, 323:16, 323:24
**wired** [1] - 323:10
**wiring** [3] - 296:14, 296:25, 306:9
**wise** [2] - 291:4, 291:5
**wish** [1] - 293:13
**withdraw** [1] - 310:9
**withdrawal** [1] - 309:10
**Witness**[4] - 337:21, 338:2, 338:13, 345:5
**witness** [14] - 252:3, 253:12, 265:4, 265:25, 294:10, 294:11, 294:17, 315:2, 328:20, 337:10, 340:12, 341:9, 344:11, 344:14
**witness's** [1] - 337:15
**woman** [1] - 263:19
**word** [1] - 316:10
**words** [3] - 291:19, 299:6, 301:11
**works** [1] - 263:20
**worth** [1] - 338:11
**would've** [11] - 274:17, 284:22, 284:23, 284:25, 293:13, 293:16, 320:18, 333:13, 334:13, 339:2, 339:4
**wound** [1] - 307:8
**wrap** [1] - 317:15
**writes** [1] - 322:3
**wrote** [4] - 284:14, 290:13,

## Y

**Yahoo**[3] - 281:22, 300:16, 300:22
**Year**[1] - 290:11
**year** [31] - 262:25, 264:4, 264:5, 268:4, 290:25, 291:7, 291:10, 291:12, 291:14, 291:15, 291:20, 292:4, 292:7, 292:8, 292:14, 293:2, 293:5, 293:10, 302:12, 302:16, 304:11, 326:22, 331:22, 331:24, 332:7, 333:11, 333:22, 333:23, 334:14, 334:20
**years** [10] - 268:3, 302:17, 304:12, 324:21, 325:18, 325:19, 331:9, 331:20, 334:14
**York**[9] - 249:2, 249:16, 250:7, 250:15, 271:2, 271:21, 344:4, 344:6, 344:10
**yourself** [1] - 329:10
**yourselves** [1] - 256:4

## Z

**Z2** [3] - 284:12, 284:16, 284:19
**Zanger**[43] - 249:7, 252:6, 254:3, 256:10, 258:15, 259:21, 259:22, 261:10, 267:9, 267:12, 272:25, 273:14, 275:5, 277:14, 280:19, 281:19, 281:25, 284:3, 292:4, 292:13, 293:12, 295:12, 295:25, 296:6, 296:14, 298:12, 301:7, 301:12, 309:3, 310:7, 310:25, 322:24, 323:25, 329:17, 329:18, 333:4, 333:12, 333:22, 334:21, 335:24, 338:15, 340:10, 340:15
**Zanger's** [7] - 256:12, 256:15, 256:19, 276:5, 298:3, 309:9, 313:21
**Zask**[2] - 329:15, 333:16
**Zask's** [1] - 258:17