# Exhibit C

3

```
 1
 2  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 3  -----------------------------x
 4  INDEPENDENT ASSET MANAGEMENT LLC
    and OLA HOLMSTROM,
 5
            Plaintiffs,
 6
        v.              1:07-CV-06431-JSR
 7
    DANIEL ZANGER,
 8
            Defendant.
 9
    -----------------------------x
10
                March 3, 2008
11              10:30 a.m.
12
13
14          Deposition of JOSEPH J. PORCO, taken by
15  defendant, pursuant to notice, at the offices of
16  Jones Day, 222 East 41st Street, New York, NY
17  10017, before Joseph B. Pirozzi, a Registered
18  Professional Reporter and Notary Public of the
19  State of New York.
20
21
22
23
24
25
```

2

```
 1
 2  APPEARANCES:
 3
 4  BALESTRIERE, PLLC
 5      Attorneys for plaintiffs
 6      225 Broadway
 7      Suite 2700
 8      New York, NY 10007
 9  BY: CRAIG STUART LANZA
10      WILLIAM HOLLEMAN
11
12  JONES DAY
13      Attorneys for defendant
14      222 East 41st Street
15      New York, NY 10017
16  BY: THOMAS H. SEAR
17
18
19
20
21
22
23
24
25
```

```
 1
 2              STIPULATIONS
 3
 4          IT IS HEREBY STIPULATED AND AGREED,
 5  by and between counsel for the respective parties
 6  hereto, that all objections, except as to form,
 7  are reserved to the time of trial.
 8          IT IS FURTHER STIPULATED AND AGREED
 9  that the deposition may be signed and sworn to
10  before any officer authorized to administer an
11  oath.
12          IT IS FURTHER STIPULATED AND AGREED
13  that the sealing and filing of the deposition be
14  waived.
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1                      Porco
 2  JOSEPH J. PORCO
 3      called as a witness, having been duly sworn,
 4      testified as follows:
 5  EXAMINATION
 6  BY MR. SEAR:
 7          MR. SEAR: Let's just note the time.
 8      It is about 25 of 11. Counsel had informed
 9      me earlier that they were stuck in traffic
10      and that accounts for a late start.
11      Q.  Mr. Porco, directing your attention to
12  2005. Were you associated with an entity called
13  Independent Asset Management?
14      A.  Yes.
15      Q.  And can we refer to that as IAM?
16      A.  Sure.
17      Q.  And what was your position with IAM in
18  2005?
19      A.  Managing director.
20      Q.  And what were your responsibilities?
21      A.  I dealt with several different areas,
22  interacted with administration and the
23  administrator down in Bermuda, interacted with
24  counsel to the fund, assisted with compliance
25  issues, handled previous audit by the NFA, and
```

5

Porco

1 handled daily operations for the trading manager
2 in regards to administration in basic operational
3 things, but I did not, I was not involved in the
4 trading aspects of the company at all.
5     Q.  You referred to the fund. What fund
6 are you referring to?
7     A.  The Independent Fund Limited.
8     Q.  And as of at least some point in 2005
9 did Mr. Dan Zanger through an entity invest in
10 so-called Class Z shares in that fund?
11     A.  Yes.
12     Q.  Putting aside the Class Z shares that
13 Mr. Zanger purchased, did the fund in 2005 have
14 any other investors?
15     A.  At the time that Dan came into the
16 fund, none of the classes of shares, I believe,
17 had any funds in them at that point. Previously
18 there were.
19     Q.  In 2005 other than Mr. Zanger, at any
20 time during that year, were there any other
21 investors in the fund?
22     A.  I'm not clear on the date in which all
23 of the Holmstrom came in, but that's in the
24 record.

6

Porco

1     Q.  Assuming that Mr. Holmstrom, I think
2 the record will reflect, came in 2006, would it
3 be fair to say that the only investment in the
4 fund, to your knowledge, in 2005 was Mr. Zanger?
5     A.  I believe that is the case, yes.
6     Q.  And other than acting as trading
7 manager for IFL, did IAM have any business
8 activities in 2005?
9     A.  IAM's sole responsibility was to be the
10 trading manager for the fund.
11     Q.  In 2004 did Mr. Zanger contribute
12 approximately $100,000 in working capital?
13     A.  The date of which he wired in money is
14 in the records. He did make a contribution to
15 this agreement, which was outlined with George
16 Szele.
17     Q.  Was that $100,000 initially?
18     A.  I believe it was 100 and then 50.
19     Q.  And during 2005 did IAM obtain revenues
20 pursuant to performance fees from IFL?
21     A.  The lion's share of the revenues
22 generated from Class Z, which Dan was managing,
23 the lion's share of those revenues were passed
24 through to Dan. A small remainderment was

7

Porco

1 retained per the agreement by IAM.
2     Q.  Was that 25 percent?
3     A.  It was 25 percent of the performance
4 fee. For a period of time Dan received all of
5 the management fee.
6     Q.  18 months?
7         I'm sorry, you have to answer.
8     A.  Yes. That was the terms of the
9 agreement.
10     Q.  Other than those moneys, did IAM have
11 any other revenues in 2005?
12     A.  The sole revenue was being generated
13 from the fund. The only revenue coming in was
14 from the Independent Fund Limited to the trading
15 manager.
16     Q.  Besides the 25 percent of performance
17 fees that we've talked about and the working
18 capital contribution of Mr. Zanger in or about
19 2004 and 2005, did IAM receive any other moneys
20 from any source during that time frame?
21     A.  From what date?
22     Q.  2004 and 2005.
23     A.  I believe we had to borrow, we were
24 still in a situation where we had to borrow

8

Porco

1 funds.
2     Q.  And how much money approximately did
3 IAM borrow in 2005, order of magnitude?
4     A.  I don't know if I have a date. I don't
5 have dates on it, but it may have been another --
6 it may have been one of the last loans that we
7 received. I'm not sure of the date.
8     Q.  And what was the last loan that you
9 received?
10     A.  I believe it was $50,000. It may have
11 been within that time frame.
12     Q.  You were looking at a document just
13 now. What is that?
14     A.  Just some notes that I made for myself.
15         MR. SEAR: I would ask that since the
16     witness looked at the document in connection
17     with his testimony we be given a copy of it.
18         MR. LANZA: Sure.
19         MR. SEAR: We can do that at a break.
20     That's fine.
21     Q.  Did anybody else work at or for IAM in
22 2005 besides yourself?
23     A.  George Szele.
24     Q.  Besides Mr. Szele and yourself, did

9

Porco

1  anybody else work at IAM in 2004 and 2005?
2      A.  The services for the fund and services
3  for the trading manager were set up in an
4  out-sourced arrangement, so we had attorneys,
5  administration, auditors, accounting, et cetera,
6  but they weren't employees of IAM.
7      Q.  So just you and Mr. Szele were the only
8  employees at IAM in 2005?
9      A.  Correct.
10     Q.  And what were his duties and
11  responsibilities in 2005?
12     A.  George was a managing director senior
13  to myself.  He was involved in overseeing
14  responsibilities for the fund as a director at
15  that point in time for the fund itself.  He was
16  involved in following trading activity and
17  involved in every aspect of the operation, I mean
18  in general.
19     Q.  When you say following the trading
20  activity, it is something that Mr. Szele did on a
21  constant and frequent basis?
22     A.  He examined frequently talent of
23  managers, researched managers for potential
24  opportunities for the fund.  The fund had the
25

11

Porco

1  that were to be followed, and I believe that's,
2  in part, part of the problems, that Dan exceeded
3  those limitations.
4      Q.  Am I correct, though, that on a daily
5  basis at day end, Mr. Szele had full access of
6  all of the trading information through Goldman,
7  Sachs of Dan's trades?
8      A.  I believe the trades were visible at
9  day end, yes.  Some of the stuff would be
10  swept -- Goldman would sweep some money out to a
11  couple of other houses that Dan utilized and some
12  of that may have trailed behind.  It may not have
13  been there at the same exact time of any trades
14  that he did at Goldman.
15     Q.  Let me show you what we have premarked
16  as Zanger Exhibit 1.
17         (Zanger Exhibit 1 was marked for
18         identification)
19     Q.  And Zanger 1 purports to be a financing
20  statement for Independent Fund Limited for 2006.
21  And Zanger Exhibit 2 purports to be such a
22  statement for December 2005.
23         (Zanger Exhibit 2 was marked for
24         identification)
25

10

Porco

1      ability to expand into other classes and shares.
2          He interacted with Dan when he was able
3  to get Dan to respond.  And he interacted with
4  counsel, with the administrator, with the board
5  of directors of the fund, with Appleby Sperling,
6  the Bermuda counsel, dealt with issues as they
7  arose with every aspect of the operation, if
8  there were forms that needed to be done with the
9  BMA, or whatever would arise.
10     Q.  And did Mr. Szele follow Dan's trading
11  activities on a frequent and constant basis?
12     A.  Yes.  As frequent as he could.  There
13  was some lapse in response and then there was
14  some issues of nondisclosure which arose from
15  Dan.
16     Q.  Was Mr. Szele able on a daily basis to
17  access the trading records of Dan from Goldman,
18  Sachs?
19     A.  In real time, I don't believe so.  I
20  believe by day end, you know.
21     Q.  Yes.
22     A.  He could see, you know, after the fact.
23  But they were to have a very specific
24  understanding of limits and drawdowns and such

12

Porco

1      Q.  Is Zanger Exhibit 1 what it appears to
2  be, which is a copy of financial statement for
3  IFL for the year ending 2006?
4      A.  Yes, it's Deloitte's summary.
5      Q.  Is Zanger Exhibit 2 the same thing for
6  the year-end 2005?
7      A.  Yes.
8      Q.  Looking at Zanger Exhibit 1, page 3, do
9  you see expenses?
10     A.  Yes.
11     Q.  Other than payment from a portion of
12  the performance fee, did IAM for the year-end
13  2006 -- withdrawn.
14         Am I correct that in the year 2006 IAM
15  did receive a portion of the management fee for a
16  period of that year?
17     A.  I believe a very, very small amount,
18  yes.
19     Q.  Putting aside the portion of the
20  performance fee and the portion of the management
21  fee that IAM received for the year 2006, did IAM
22  receive any payments in connection with any of
23  the other expenses listed on this page for the
24  year 2006?

13

Porco

1         Porco

2    A.  I'm not quite sure I understand what

3  you are asking.

4     Q.  The administrative fees and expenses

5  listed there, were any of those moneys paid to

6  IAM for the year 2006?

7    A.  Paid to as revenue?  No.

8     Q.  Paid to in any form or fashion?

9    A.  They may have been passed through for

10  fees attributable, you know, they had to be

11  covered per the offering memorandum.  I'm not

12  quite sure looking at this from here, but the

13  offering memorandum provided for certain fees to

14  be covered from the fund and those fees, for

15  instance, if you had a fee payable to Williams

16  Mullen, which was the fund attorney, then those

17  fees would have to be, you know, covered per the

18  offering memorandum.  So things of that nature

19  only would be included in your statement.

20     Q.  Putting aside pass-throughs where IAM

21  received moneys and passed it on to somebody

22  else, were any of these other expenses, do they

23  reflect moneys paid to IAM that were not passed

24  through to somebody else, putting aside the

25  performance fee and the management?

14

Porco

2    A.  Other than reimbursement of expenses

3  per the offering memorandum, no.

4     Q.  And the other expenses listed here, do

5  you see $72,798?

6    A.  Yes.

7     Q.  Do you know what those expenses

8  represent?

9    A.  Those would probably be operational

10  reimbursement per the memorandum.

11     Q.  These would have been expenses to IAM?

12    A.  That may have been paid out of pocket

13  by IAM and then reimbursable per the offering

14  memorandum.

15     Q.  Is there any other way for us to figure

16  out what those expenses are in the absence of an

17  accounting for IFL?

18    A.  I'm sure they are all detailed exactly

19  by the fund administrator.  Everything had a

20  series of checks and balances to be sure that any

21  fee that ever came out of the fund was

22  appropriate and eligible and mandatory, et

23  cetera, and we would always check not only with

24  the fund administrator, but also with Tom McVeigh

25  of Williams Mullen on any fee whatsoever that

Porco

1  would come out of the fund.

2     Q.  And IAM has access to that information?

3    A.  I believe that information has already

4  been given to yourselves in the documents that

5  were forwarded, the answer would be yes.

6     Q.  So you have full access to the

7  underlying documentation for all these expenses?

8    A.  It would be broken down -- in order to

9  get a reimbursement for a fund expense you would

10  have to submit a formal document to the fund

11  administrator who would then review it for its

12  appropriateness per the offering memorandum and

13  then it would be released if and only if it was

14  an appropriate expense.

15     Q.  So the answer is you do have access to

16  that information?

17    A.  Which I just said a moment ago, yes, I

18  do.

19     Q.  What activities did Mr. Szele engage in

20  in 2005 in an attempt, if any, to increase the

21  revenues of the fund and IAM?

22    A.  Quite a few, which I'm sure he can

23  address in greater detail than I can myself.

24  George was continually trying to raise assets for

16

Porco

2  the fund for the methodology of Dan's trading,

3  numerous meetings, extensive travel, continual

4  attempts to present the fund opportunity and

5  Dan's investment strategy on behalf of the fund

6  to endless contacts that George has in his

7  database which was accumulated through many years

8  of previous activities and relationships that

9  he's had.

10     Q.  Did you do anything in terms of

11  accompanying to increase revenues for IAM and the

12  fund in 2005?

13    A.  To increase revenues of IAM, assets

14  would have to be increased in the fund, because

15  that's from where IAM drew its revenue if there

16  was to be any revenue.

17       So the bulk of the marketing

18  responsibilities were carried out by George.  My

19  role was more of an administrative role and a

20  liaison between different parties that the fund

21  operated with and following up on daily

22  operations.  But I myself also because of my

23  familiarity with the fund, AND in some degree

24  Dan's trading methodology, from time to time made

25  attempts to try to introduce the opportunity to

Porco

1 some high net worth individuals for their review
2 hoping that they would find favor with Dan's
3 methodology and find it appropriate for
4 themselves to contribute in assets as well.
5    Q.  Could you tell us the name or identity
6 of any of these individuals?
7    A.  I don't know that I -- do I need to
8 tell him the names of these individuals?
9         MR. LANZA: Tom, can we have a moment?
10    Q.  Well, how many such individuals did you
11 contact?
12    A.  I would say, you know, four or five
13 relationships that I had.
14    Q.  This was in 2005?
15    A.  2005 -- yes, the end of 2005, early
16 2006.
17    Q.  Let me show you what we have premarked
18 as Zanger Exhibit 4.  Is this a copy of the
19 agreement between Dan and IAM?
20         (Zanger Exhibit 4 was marked for
21         identification)
22    A.  Assuming that it is the exact one that
23 they signed, I would say yes.
24    Q.  Excuse me.  I misspoke.  The one I just

---

18

Porco

1 showed you, I think, is the April 2005 addendum,
2 is that right?
3    A.  This is the addendum.
4    Q.  Let me show you Zanger Exhibit 3.  Is
5 that a copy of the original agreement?
6         (Zanger Exhibit 3 was marked for
7         identification)
8    A.  Yes, it appears to be.
9    Q.  And other than what is set forth in
10 those two agreements, Zanger Exhibits 3 and 4,
11 did Dan have any other obligations or agreements
12 or understandings with IAM?
13    A.  Yes, I believe he did.
14    Q.  And what are you referring to?
15    A.  I believe that he had an agreement with
16 IAM with George via a group called RCA, I believe
17 was their name, that George can speak to the
18 exact terms of that.  And I'm sure there were
19 numerous specific, you know, understandings
20 between the parties.
21    Q.  Well, can you tell us any such
22 understandings between the parties beyond the two
23 agreements and the RCA matter?
24    A.  I think they would be best understood

---

Porco

1 reflecting upon the correspondence between George
2 Szele and Dan Zanger by e-mail, whatever they
3 exchanged back and forth for understandings as
4 you are operating a fund.
5         There were times there was concern
6 about Dan's investment performance and, you know,
7 phone calls were made and e-mails were sent
8 trying to get a response from him and
9 instructions were given and instructions were
10 ignored.
11    Q.  Were you part of any of those
12 conversations?
13    A.  No, but they exist by e-mail.
14    Q.  Beyond what you have told us, that they
15 exist by e-mail, can you tell us about any other
16 understanding between Dan and IAM beyond RCA and
17 in the agreements and understandings set forth in
18 Zanger Exhibits 3 and 4?
19    A.  Well, one of the understandings that
20 was my understanding, being in the phone
21 conversation with Dan and with George, addresses
22 this point of how much money Dan was going to put
23 into the fund and why.  And I understand the
24 language of what the agreement says, but Dan made

---

20

Porco

1 it very clear that he was going to put $50
2 million into the fund.
3    Q.  Is there any record of that, any
4 document in existence that refers to that
5 agreement?
6    A.  I believe the agreement itself and
7 other correspondence between George and Dan
8 reflect that.
9    Q.  What correspondence?  Can you tell me
10 what correspondence?  I haven't seen any.
11    A.  By e-mail, I believe, there is
12 supporting dialogue to that effect,
13 conversations --
14    Q.  When was this?
15    A.  I believe at the onset, the beginning
16 of the relationship.  And then early on in the
17 relationship after the contract was established
18 as well.
19    Q.  Can you point me to any such e-mail or
20 document?
21    A.  I cannot, but I think George would be
22 able to.
23    Q.  Any other agreement or understanding
24 beyond what you have told us now that you are

21

23

Porco

1  aware of between Dan and IAM?
2  A.   Not that I can recollect at this point.
3  I'm trying to think.  There's probably something.
4  Q.   Was IAM represented by counsel in
5  connection with the creation of the October 2004
6  agreement with Dan?
7  A.   George would have to, you know, answer
8  that in regards to what degree it was reviewed.
9  I believe it was forwarded to, I think, Tom
10  McVeigh or another attorney took a look at it.
11  But it wasn't drafted.  I don't believe it was
12  drafted by counsel, or by either party.
13  Q.   Do you know who drafted it?
14  A.   I think George and Dan collectively put
15  it together.
16  Q.   Are you familiar with the terms and
17  conditions of the agreement?
18  A.   To some degree, yes.
19  Q.   If you look at paragraph 4, page 2 of
20  the draft agreement.  Paragraph number 4.
21  A.   Okay.
22  Q.   It says, "IAM acknowledges that DZ has
23  control of - remaining from or remaining in IFL -
24  the assets it has placed or raised into Class Z,

Porco

1  does not reflect his own obligation of what he
2  put in and what he was to put in.
3  Q.   So this sentence doesn't deal with the
4  $5 million that he had placed into Class Z?
5  A.   No.
6  Q.   And the word "placed" has no meaning to
7  this sentence?
8  A.   Placement means just what I just
9  described in the hedge fund industry.
10  Q.   It means the same thing as raised?
11  A.   Placement means that when you place
12  assets into an investment vehicle, the party
13  making that introduction is making that
14  placement.
15  Q.   Would it be fair to say --
16  A.   George could elaborate further on this.
17  Again, the two of them worked through
18  this in great detail with great mutual
19  understanding.
20  Q.   Am I correct that for the calendar year
21  2005 Dan's trading was spectacularly successful?
22  A.   It's all relative.  It was very good in
23  2005 as the audit shows.  I think Dan has had
24  even better years than that in the past.

22

24

Porco

1  under the terms and guidelines of this
2  agreement."
3  Do you see that?
4  A.   I'm not sure I'm looking at the same
5  thing.  Can you point to it on the page?
6  Q.   Last sentence on page 2.
7  A.   What is your question?
8  Q.   My question is, did you understand in
9  2004 that Dan had the right to withdraw the
10  assets that he had placed or raised into Class Z
11  under the terms and guidelines of this agreement?
12  A.   My understanding is that's referencing
13  if Dan had raised capital of other people's
14  assets which he tried, made some attempt to bring
15  other investors into the fund, like any brokerage
16  relationship or managed account relationship, if
17  I'm an investment adviser or an introducing
18  party, and I brought in seven or eight clients
19  and their money comes in, but then decide I want
20  those other parties to go over to Tom Brown down
21  the street, that he had control over that.
22  In other words, we weren't going to
23  circumvent introductions that he made if he
24  wanted to move them elsewhere, but that sentence

Porco

1  Q.   Okay.  Early in 2006 did Dan withdraw
2  $4 million from Class Z?
3  A.   My recollection of the withdrawals of
4  Dan are as follows:  Upon getting his few
5  tranches of income from the fund, which were very
6  large, copies of which we sent to his accountant,
7  I believe to yourselves, Dan called up and was on
8  the phone and said, "I need to -- I need to take
9  some money out of the fund," which George
10  immediately got extremely concerned about because
11  he was saying he wanted to come beneath the 5
12  million and take money out of the fund.  And Dan
13  was emphatic about the fact that he wanted that
14  money because he wanted to pay taxes with it.
15  That was the first withdrawal that
16  violated the agreement and started to cause great
17  concern on George's part.
18  I, on the other hand, looked at that
19  scenario as being two separate issues.  If Dan
20  wanted to withdraw money and gave instruction to
21  withdraw money and that request comes, that
22  request has to be made known to the
23  administrator.  If he is saying I want to
24  withdraw money, you have to pass that through.

25

27

Porco

1  Porco
2  It is a procedurally prudent responsibility.
3  On one hand, you are carrying out an
4  instruction for a guy telling you I want to
5  retain money to pay taxes and on the other hand
6  he is violating the contract at the same time.
7  So that was my first recollection of
8  his withdrawing funds.
9  Dan then withdrew money at another
10  time. What had occurred was that he basically
11  forced the trading of the fund to shut down with
12  these margin calls and violations and forced the
13  redemption, you know, to occur. Those are my
14  two.
15  Q.  Directing your attention to the item I
16  asked you about the, $4 million, was there ever
17  any objection on the part of IAM or George or you
18  to withdraw the $4 million?
19  A.  Of course.
20  Q.  Where is that reflected?
21  A.  It's reflected, to begin with, in the
22  contract which Dan agreed to that he couldn't do
23  that within the time frame of the agreement, for
24  one, in writing. It's reflected in phone
25  conversations and I'm sure in some of George's

Porco

1  Porco
2  anywhere in this world that indicates that IAM or
3  you or George objected in any way to Dan
4  withdrawing the $4 million in or about early
5  2000 --
6  A.  Yes, I do.
7  Q.  Let me finish the question.
8  -- in or about early 2006?
9  A.  Now that you have been helpful in
10  rephrasing that, there are e-mails of great
11  concern to the administrator to Dan -- I mean
12  from George to the administrator about objecting
13  to this withdraw and the concern about the impact
14  of the fund because of the withdraw and I think
15  there's more than one e-mail to that effect that
16  I do recollect.
17  Q.  This was an e-mail sent from whom to
18  whom?
19  A.  From George as managing director and
20  IAM and also as director of the fund to the board
21  of directors at Butterfield Fund Services.
22  Q.  What month would this have been done
23  in?
24  A.  I couldn't tell you the exact timing.
25  I remember reading it. I was cc'd on it.

26

Porco

1  Porco
2  correspondence. There is also correspondence
3  between the administrator and Dan.
4  Dan was given correspondence from the
5  administrator and Goldman as well was
6  communicating to Dan about his trading activity.
7  Q.  I'm not asking about the trading
8  activity. I'm talking about the $4 million. Can
9  you point me to one piece of paper anywhere in
10  this world that even hints that IAM or George or
11  you objected to the $4 million withdrawal?
12  A.  As I said a moment ago, the fees of
13  paper that's sitting before us.
14  Q.  Other than the contract which clearly
15  does not prohibit it, can you point to any other
16  piece of paper?
17  A.  I don't agree that the contract does
18  not prohibit it. I think it is very clear that
19  the contract does prohibit it.
20  Q.  I know you don't.
21  A.  When you depose George, you can ask him
22  if he has any such e-mails.
23  Q.  I'm asking you if you are aware of any
24  piece of paper in the world, putting aside the
25  contract, are you aware of any piece of paper

28

Porco

1  Porco
2  Q.  Were they sent to Dan?
3  A.  I'm not sure who was cc'd on e-mails.
4  There were communications around that same time
5  period to Dan and I believe Dan corresponded
6  directly to Butterfield at some point as well.
7  Q.  About the $4 million?
8  A.  I believe he did.
9  Q.  What did the administrator do about the
10  $4 million?
11  A.  Well, I mean, the process occurred
12  historically as it has been noted. Eventually he
13  got his redemption.
14  Q.  I'm not talking about later in '06.
15  I'm talking about the $4 million that was
16  withdrawn by Dan in early 2006. Do you
17  understand that's what we're talking about?
18  A.  Yes, I understand.
19  Q.  Okay. My question to you is, were
20  there any written communications to Dan in any
21  way raising an objection to the $4 million
22  withdrawal?
23  A.  I believe, as I described, yes.
24  Q.  Can you point me to it now?
25  A.  I cannot point it to you now, but I'm

Porco

1 Porco
2 sure George can.
3    Q.  Did you understand that the contract
4 provided that if there was asserted violation of
5 the contract that written notices would be
6 provided?
7    A.  Where is that stated?
8    Q.  Well, first let me ask you your
9 understanding. Do you understand that if IAM
10 wanted to assert there was a violation of the
11 contract it was supposed to provide written
12 notice?
13    A.  Yes, I mean that's a standard clause in
14 most agreements.
15    Q.  So that was your understanding? It's a
16 simple question.
17    A.  Rephrase the question for me.
18    Q.  Am I correct that it was your
19 understanding that if there was a violation of
20 the contract in the mind of IAM that what it was
21 supposed to do was to provide written notice to
22 Dan of the violation?
23    A.  I believe that was my understanding,
24 yes.
25    Q.  Now, directing your attention to 2005,

30

1 Porco
2 was there any written notice of a violation of
3 the contract sent to Dan?
4    A.  There were written notices of
5 violations sent to Dan regarding trading activity
6 and then us being made aware of those violations.
7 There was written correspondence from George to
8 Dan pointing out that he couldn't do what he was
9 doing and to cease doing it.
10    Q.  This is in 2005?
11    A.  I'm not clear on the dates of these
12 e-mails. We're talking about thousands of
13 e-mails over time.
14    Q.  Let's stick to 2005. Were there any
15 written notices of the violation of the contract
16 sent to Dan by anybody on behalf of IAM during
17 that year?
18    A.  If it was, it would have been sent by
19 George.
20    Q.  Well, do you know of any?
21    A.  I'm not aware of the specific e-mail,
22 no. But any time any type of problem would
23 arise, standard procedure is to deal with it and
24 George would have addressed it.
25    Q.  He would have sent a written notice of

1 Porco
2 a violation?
3    A.  He would have contacted Dan by
4 correspondence and told him there's a problem
5 with this and there's a problem with that, yes.
6    Q.  Would it be fair to say that if Dan
7 violated that agreement that would be something
8 that was material?
9    A.  I think that he violated the agreement
10 is material, yes.
11    Q.  It would be material in terms of his
12 service as the trader for the Class Z shares?
13    A.  It would be clear materially in any
14 violation that he caused. Why would it not be?
15    Q.  I'm not suggesting that it wouldn't.
16 I'm just asking you the question.
17        Were you aware in 2005 there were
18 numerous margin calls that Dan had -- withdrawn.
19        Were you aware in 2005 there were
20 numerous margin calls that were met in connection
21 with Dan's trading on behalf of the Class Z
22 shares?
23    A.  I became aware of these margin calls
24 because my function for the fund, one of which,
25 was to see that vendors were paid and kept

32

1 Porco
2 occurring and what happened on several occasions
3 which was extremely disruptive was that Dan would
4 have a margin call and we would be in the process
5 of having finished the month end accounting and
6 then the transfers would be sent to Goldman to
7 forward the management fee and the performance
8 fee, if any, to Butterfield, and then the wire
9 would get interrupted.
10        And the wire would get interrupted
11 because Dan would be out on a margin call and
12 Goldman would refuse to wire any money, which
13 then created the domino effect of problems
14 because then the money wouldn't get to the
15 administrator on time, the administrator wouldn't
16 be paid on time, any other fees that were due to
17 legal counsel, whatever fees were due to the BMA,
18 et cetera, couldn't be met because the wire would
19 be held up and then would have to be done again.
20        And this happened a number of different
21 times with these margin calls and trading
22 violations to the point where it became a very,
23 very large problem.
24    Q.  Did this happen in 2005?
25    A.  I don't have the dates of the various

33

Porco

1  margin calls but they are all listed on some
2  document which was forwarded and it was a
3  staggering amount of violations that were going
4  on which was very, very untypical of someone with
5  Dan's trading acumen and knowledge and
6  understanding of the business.  It was bizarre.
7      Q.   Am I correct that you were aware that
8  these margin calls were being met in 2005?
9      A.   We became aware of them after they
10  occurred and then was notified, not always
11  notified immediately by Gia at Goldman, but then
12  eventually notified and we tried to get ahold of
13  Dan and to track him down and get him to call us
14  back after a few days and --
15      Q.   My question to you is:  Did any of
16  these margin calls that were met happen in 2005?
17      A.   I believe there were margin calls that
18  were met in 2005.
19      Q.   Am I correct that IAM knew about the
20  margin calls --
21      A.   At some point it had to know about
22  them.
23      Q.   Within days?
24      A.   Within days, yes.

34

Porco

1      Q.   So if there was margin call that was
2  met in November of 2005, IAM would know about it
3  at least within days?
4      A.   That's an accurate statement.
5      Q.   For the record, you did refer to this
6  woman named Gia.  Who is that?
7      A.   She's representative at Goldman, Sachs.
8      Q.   And who was Goldman, Sachs?
9      A.   Custodian, declaring broker.
10      Q.   Were they the so-called prime broker?
11      A.   It could be referred to as that, yes.
12      Q.   Let me show you what we have marked as
13  Zanger Exhibit 5.
14          MR. SEAR:  Here's a copy for counsel.
15          (Zanger Exhibit 5 was marked for
16  identification)
17      Q.   Can you tell us what these three checks
18  are?
19      A.   These checks are payments made to Dan
20  per the agreement where he received the
21  management fee in its entirety and 75 percent of
22  the performance fee.
23      Q.   So am I correct that the first check is
24  dated July 14, 2005?

35

Porco

1      A.   Yes.
2      Q.   And it covers the management and
3  incentive fee through June 2005?
4      A.   I'm not sure of the -- let's see down
5  at the bottom there's a note through June '05.
6      Q.   You signed this check?
7      A.   Yes, I did.
8      Q.   If we look at the next check dated
9  January 20, 2006, payable to Dan Zanger, is this
10  the balance of the 2005 management and incentive
11  fees?
12      A.   Yes.
13      Q.   You also signed this check?
14      A.   Yes.
15      Q.   As of January 20, 2006, had Dan ever
16  violated the terms and conditions of the
17  agreement that he had with IAM?
18      A.   Yes.
19      Q.   How many times?
20      A.   Well, the first violation, as I
21  understand it, was when he came down beneath the
22  5 million shortly after coming in.  Even prior to
23  that, I believe he was supposed to put money in
24  by a specific date and then dragged his feet and

36

Porco

1  didn't get it in on time, which we lost the
2  opportunity for his robust performance during
3  that period of time.  He also -- you had given
4  the date.
5      Q.   The date is January 20, 2006, which is
6  the date on the check.
7          It was your position that he had
8  violated the contract with IAM prior to that
9  date, and I'm asking on how many occasions.
10      A.   It is hard to describe because it's a
11  question of how he violated it, and in what
12  regards he violated it, versus how he ultimately
13  violated it.
14          He violated it in a number of different
15  ways.  He was supposed to stay within certain
16  drawdowns and he did not.
17      Q.   Prior to January of 2006 he didn't stay
18  within the drawdowns?
19      A.   I don't know the date of which he began
20  to violate the drawdown understanding of the
21  contract.  I don't know that by heart.
22      Q.   Let's start, again, to be fair to you.
23          My question to you is, prior to January
24  20, 2006, to the best of your knowledge, did Dan

Porco

2 ever violate the terms and conditions of the
3 contract between IAM and himself?
4    A.   I would say yes.
5    Q.   And in what way or ways did he violate
6 the contract prior to January 20, 2006?
7    A.   I believe he did not put the money in
8 on time per the agreement.  I believe that he
9 withdrew money beyond the set limit that he had
10 agreed to going in, as a minimum.  I believe that
11 he failed to communicate in and disclose to
12 George those areas of the contract which mandate
13 that he notify George of various trading activity
14 such as these trading violations, and I'm not a
15 trader myself, so I can't answer to the extent of
16 which that's very relevant, but I know it is very
17 relevant, his disclosures that he was supposed to
18 be providing to George were not as they should
19 have been per the agreement and then George did
20 discover it.
21         So it is a handful of examples of how
22 he violated the agreement.
23    Q.   When did he take money out before
24 January 20, 2006?
25    A.   He pulled money out to pay his taxes,

38

Porco

2 he claimed.
3    Q.   Do know when that was done?
4    A.   I don't have the documents.
5    Q.   You don't know whether it was before
6 January 20, 2006?
7    A.   Of course it was.  It was very early on
8 in the relationship.  It was right after he was
9 paid his first tranche of money.
10    Q.   So it was in 2005?
11    A.   I believe so.  Early on he had done
12 that.
13    Q.   Was this midway in 2005?
14    A.   Again, sir, I don't have the dates for
15 you.
16    Q.   Can you give me the month?
17    A.   It could be looked up.
18    Q.   Can you give me the month?
19    A.   We can go back to the administrator and
20 look at the records and see when the withdrawal
21 occurred.  It's that simple.
22    Q.   Let's look at the third check here,
23 which is April 21, 2006.  And you signed this
24 check also?
25    A.   Yes, I did.  However, the note on the

Porco

2 left is not in my handwriting, I don't believe.
3    Q.   But it says "For accrued management fee
4 plus first quarter performance fee 2006."  Is
5 that right?
6    A.   Yes.  Whenever I -- before I ever
7 processed a check and sent it out, George, being
8 senior to me in the company, I would bring the
9 checks, we would sit down and review it and then
10 he would okay it, and it would be released.
11    Q.   From January '06 to April of '06 had
12 Dan violated the contract?
13    A.   As I had stated before in that respect,
14 yes.
15    Q.   How many times?
16    A.   Again, a handful of times and numerous
17 times of which he did not give the disclosures
18 that George was asking for.  So I don't know how
19 many times that occurred.  I mean, Dan would
20 know.
21         George would know based on what he
22 found out after the fact.  I mean, he could put a
23 number on it for you, but I could not.
24    Q.   These nondisclosures, do you think they
25 were material?

40

Porco

2    A.   Yes, I do.
3    Q.   Material to his trading?
4    A.   Material to the well-being of the fund
5 and its investors, yes.
6    Q.   Am I correct that after April of 2006
7 IAM received payments of management fee amounts?
8    A.   After the 18-month period was over,
9 then IAM was entitled to begin to actually start
10 getting paid a little bit.  For the most part,
11 all through that cycle of time in which you see
12 those three checks, the lion's share of all the
13 revenue coming into the fund was going to Dan.
14    Q.   How much money did IAM invest in the
15 Class Z shares?
16    A.   How much money did IAM invest itself?
17    Q.   Yes.
18    A.   IAM did not make an investment into the
19 Class Z investment shares of its own money, no.
20    Q.   Okay.  Subsequent to April of 2006, did
21 IAM get paid moneys in connection with the
22 management fee?
23    A.   Prior to the 18-month agreement --
24    Q.   I'm not asking you prior.  I'm asking
25 you after April of 2006.

41

Porco

1    A.    If that's the date that the 18-month
2    had expired, then IAM became eligible for that
3    money and the answer would be yes. But prior to
4    its obligation to pay the full thing to Dan, all
5    of that was given to Dan.
6    Q.    From April of 2006 up through December
7    of '06, was IAM paid a monthly management fee?
8    A.    The management fee was paid. It's the
9    performance fee that would not be paid if there
10   was no performance. The management fee would
11   always be paid.
12   Q.    Was any management fee paid to Dan
13   after April of 2006?
14   A.    I believe after that point in time -- I
15   don't believe any longer the management fee was
16   paid to Dan.
17   Q.    Why not?
18   A.    I believe it was no longer owed to Dan.
19   Q.    How could a management fee be owed to
20   IAM and not owed to Dan?
21   A.    Because the trading manager of the
22   fund, quote, the entity is IAM, IAM was
23   outsourcing its management of that class of
24   shares to Dan per a contract and agreement with

42

Porco

1    the defined understanding.
2    Q.    Didn't IAM owe Dan a portion of the
3    management fees from April through December of
4    2006?
5    A.    Going back to the contract, does the
6    contract state that it would owe him a management
7    fee after a point in time?
8    Q.    I think it was the 50-50 granting.
9    A.    Again, this was drafted by Dan and by
10   George, so remembering every aspect of it ...
11   (Pause)
12   A.    Maybe you might help me find that
13   section that speaks specifically what happens
14   after the 18-month on just the management fee.
15   Q.    As you sit here now, do you know why
16   Dan wasn't paid a management fee after April of
17   2006?
18   A.    My understanding there was some small
19   remnant amount of money that was owed to Dan in
20   that regard, but the damages that were accruing
21   were far greater than that small amount of money,
22   but also there was a point in which Dan was --
23   Dan was always aware from the very beginning of
24   our a capitalization situation. I mean, he knew

Porco

1    this because he put money into the operation to
2    begin with for operational purposes.
3    At some point, I believe there is some
4    small amount, I don't know the exact figure, but
5    I think it was given to the accountant and also
6    forwarded earlier on in the paperwork that
7    forwarded it, but I think it is like $30,000 or
8    something along those lines.
9    Q.    Does $58,000 refresh your recollection?
10   A.    $58,000 referring to what moneys were
11   put together?
12   Q.    Referring to the amounts of moneys that
13   were not paid to Dan for fees that he was owed up
14   through the end of '06?
15   A.    What does that include?
16   Q.    That includes management fees and
17   performance fees.
18   A.    I would have to go back to the records
19   and look, but in any case it is not a great
20   amount of money that we're speaking about in
21   regards to management fee.
22   Q.    Who would know? Would George know?
23   A.    George would know. George has those
24   records.

44

Porco

1    Q.    Let me show you what we have premarked
2    as Zanger Exhibit 6.
3    (Zanger Exhibit 6 was marked for
4    identification)
5    Q.    Have you seen this before?
6    A.    Yes.
7    Q.    And what is it?
8    A.    It's the offering memorandum of the
9    fund, the Independent Fund Limited.
10   Q.    And who prepared this?
11   A.    This was prepared in part by Williams
12   Mullen and other counsel.
13   Q.    And who was the other counsel?
14   A.    It was an original document. George
15   would know the name of the attorney. Then
16   Williams Mullen worked on it from there and this
17   may have been over time evolved into this
18   document, you know.
19   Appleby & Sperling worked on the
20   segregated accounts portion of the document, so
21   that it would be compliant to the BMA.
22   Q.    What's the BMA?
23   A.    Bermuda Monetary Authority.
24   Q.    And is Appleby & Sperling a Bermuda law

45

47

Porco

1 firm?
2 A. Yes, it's one of the premier law firms
3 on the island.
4 Q. Did a lot of documents and time go into
5 the preparing of this document?
6 A. Yes, at great expense.
7 Q. Did a lot of time and expense go into
8 this document to make sure it fully disclosed
9 whatever had to be disclosed?
10 A. Yes.
11 Q. It says here the date of this
12 confidential offering memorandum is July 2006.
13 Do you see that?
14 A. Yes. That's the date of its last
15 revision.
16 Q. Was it used thereafter to attempt to
17 attract investors?
18 A. Yes, it was.
19 Q. And through what period of time, to the
20 best of your recollection?
21 A. It was continually used until the
22 implosion of the fund being shut down from
23 Dan's activities.
24 Q. And am I correct that the fund was

Porco

1 you know who this person was?
2 A. It was a subscription that George had
3 worked on exclusively for a separate class of
4 shares, and he can address it.
5 Q. I'm sure he can. I'm asking you if you
6 have any knowledge as to who this person is?
7 A. No, I don't because I was no longer
8 active as, you know, as doing administration on
9 the fund side as a director at that point. When
10 I was a director of the funds, I would have had
11 all of that information.
12 Q. When did this investor come in?
13 A. I believe he came in a few months prior
14 to the blowup with Dan.
15 Q. Was this September, October?
16 A. I can't answer that. I don't have the
17 dates.
18 Q. Were you still a director as of that
19 point?
20 A. Of the fund, no.
21 Q. When did you resign?
22 A. George became a director of the fund.
23 We're not talking about the Independent Fund
24 Limited.

46

Porco

1 liquidated in December?
2 A. I believe -- I'm not sure of the
3 redemption date, the final redemption date. The
4 fund exists as a shell entity for the time being.
5 There's no funds in it. The shutting down of the
6 fund forced the redemption of another investor as
7 well in another class of shares.
8 Q. Was that Mr. Holmstrom?
9 A. No, Ola Holmstrom was an investor in
10 Dan's class of shares. We had — George can
11 speak to the other class of shares, but once Dan
12 had imploded Class Z, you know, it was shortly
13 thereafter what we were trying to build in
14 another class naturally collapsed as well because
15 all the expenses of the fund and the entire
16 operation was to fall upon another small start-up
17 investor in another class of shares and they
18 couldn't bear the burden of the entire cost.
19 Q. Who was that?
20 A. George can speak to that subscription.
21 Q. Do you have any knowledge or
22 information concerning it?
23 A. I don't have any with me, no.
24 Q. I mean, do you have it in your head, do

48

Porco

1 Q. I understand.
2 A. Prior to Dan coming in, and that
3 decision was made because George was more
4 familiar with it and more active with the
5 operations of the fund at that point, and it only
6 made sense for -- rather than for me to act as a
7 director over activities that he was handling, it
8 made more sense for him to then become director
9 of the fund since he was handling those
10 activities for the fund.
11 Q. Do you know this person invested in
12 this other class?
13 A. I don't have any of those figures.
14 Q. Do you have any approximation of any of
15 the figures?
16 A. I believe it was several hundreds of
17 thousands of dollars.
18 Q. Incidentally, how much did you make
19 yourself? In other words, how much in revenues
20 did you receive in 2005?
21 A. Very, very, very little. My offering
22 agreement stated that in the first year of
23 operation my salary would be 150 and then
24 subsequent years it would be 200. The company

49

Porco

1  Porco
2  was unable to pay my salary, due to lack of
3  revenue during that time period, and even when
4  Dan was performing well, if you look at the math
5  of what Dan was paid per the agreement when IAM
6  was paid when you subtract out our operation or
7  expenses, neither George nor I could take our
8  full salaries. So it was really just a continual
9  effort to raise more assets for the fund which
10  became increasingly difficult given Dan's
11  trading.
12      Q.  My question to you, how much money did
13  you get paid by the fund and by IAM in 2005,
14  approximately?
15      A.  I don't have the figure. It's a
16  fraction. It should be on -- didn't we submit
17  our IAM tax returns? Weren't you given the
18  K-1's? It should all be on there.
19      Q.  I haven't seen them.
20      A.  It could be looked up. I think it
21  could be looked up and I think it was given to
22  you.
23      Q.  My question is, you are the person that
24  got paid the money. Did you get paid more than
25  50 grand?

50

1  Porco
2      A.  No.
3      Q.  Did George get paid more than 50 grand
4  in 2005?
5      A.  I believe he did get more than 50
6  grand.
7      Q.  Approximately how much?
8      A.  I believe he made somewhere -- I think
9  this is prior to his expenses, I think he made
10  somewhere around 80 or 100.
11      Q.  How much did you get paid in 2006 by
12  IAM?
13      A.  I believe even less than the prior year
14  because it was less revenue.
15      Q.  And how much did George get paid in
16  2006?
17      A.  I'm not sure. It is on the K-1.
18      Q.  Can you give me an approximate amount?
19      A.  I don't recall what his income was that
20  year, but it's listed in the document we gave
21  you.
22      Q.  What were the assets of IAM in 2006?
23      A.  Again, it's all in the accounting on
24  that document.
25          Do you have a copy of it? We could

51

Porco

1  Porco
2  look at it.
3      Q.  I do not have a copy of the K-1. I'm
4  not going to represent that it hasn't been
5  produced but I haven't seen a copy of it.
6      A.  All the assets, liabilities, income,
7  money paid to Dan, K-1's, all that stuff was
8  handed over to you guys.
9      Q.  When?
10      A.  Can I talk to my own counsel about it?
11      Q.  Yes.
12          MR. SEAR:  I will tell you that I
13  looked through the initial and supplemental
14  disclosures and haven't seen it.
15          MR. LANZA:  You don't have the K-1's?
16          MR. SEAR:  I don't have the K-1's for
17  IAM.
18          MR. LANZA:  My understanding is you
19  have been given it, and we also do have the
20  K-1's and we'll check and see what we have.
21          Do you mind if we take a two-minute
22  break?
23          MR. SEAR:  No, not at all. Let's go
24  off the record now.
25          (Recess)

52

1  Porco
2  EXAMINATION CONTINUED
3  BY MR. SEAR:
4          MR. SEAR:  We were having an
5  off-the-record conversation about a document
6  that the witness looked at during his
7  testimony here today. My understanding,
8  based on counsel, is that it was prepared to
9  help him in terms of his testimony. It
10  clearly refreshed his recollection. He was
11  looking at it right in the middle of
12  answering a question of mine and I think I'm
13  entitled to the document.
14          MR. LANZA:  Well, I don't think we're
15  going -- how about this? Give me some time
16  to kind of make a decision as to talking to
17  my client more about it.
18          I don't think we're ultimately opposed
19  to letting you see the document, but if it
20  is privileged, we certainly don't think the
21  fact that he may have looked down at it
22  would have waived any privilege, and we
23  would make it available to you pursuant to
24  some sort of an agreement, I don't think
25  that's -- at the end of the day, it's not

Porco

1  something we don't want to allow you to see.
2      MR. SEAR:  I will not claim there is
3  any subject matter waiver by giving us the
4  document.
5      MR. LANZA:  That was the concern.
6      MR. SEAR:  And if you have Bates
7  numbers on the K-1's or any of the documents
8  that he's referred to in terms of his
9  financial issues, that would be very helpful
10  if you could give me those numbers.
11 EXAMINATION CONTINUED
12 BY MR. SEAR:
13      Q.  Would it be fair to say that IAM was
14 essentially out of money by mid-2006?
15      A.  Yes, except for some material, you
16 know, small, small amounts of money, yes.
17      Q.  You mentioned a RCA matter before.
18 What was that?
19      A.  That was a, it was a company that had
20 expertise in helping to take manager information
21 and methodology and help develop marketing
22 materials and correspondence materials to
23 investors, institutional investors, high net
24 worth investors, and what they do is that they

Porco

1  in that marketing attempt.
2      Q.  Did you think that RCA performed
3  properly?
4      A.  We felt that they did not at the end of
5  the day.  However, I would say that's kind of a
6  catch-22.  Their position was if your manager had
7  given us the information that we had asked for,
8  we would have been able to help you.  But the
9  agreement that we had with them didn't stipulate
10 it that way exactly.
11      So George was involved in that
12 agreement with Dan and that agreement with RCA,
13 and he could speak better to the issues of that.
14 I really wasn't involved in that at all, other
15 than trying to get Dan to fill out the
16 information.
17      Q.  I take it George asked Dan for the
18 50,000 to pay to RCA?
19      A.  I believe Dan offered the money to
20 George because collectively after discussing what
21 this company claimed it could do, Dan was
22 interested in having them on board and assisting,
23 and together they reached an agreement, and then
24 Dan then forwarded $50,000.

54

Porco

1  forward a series of due diligence type questions,
2  methodology questions, trading questions, for the
3  manager that's trading particular methodology to
4  get a greater understanding so that they can
5  market, help market that manager on the
6  institutional level.
7      And Dan and George reached an agreement
8  amongst themselves in regards to that and then
9  they were engaged to help carry out that activity
10 and they forwarded a series of documents which we
11 then tried to have Dan get him to fill out as
12 many pages of questions.  Unfortunately, Dan only
13 answered a few of the questions in comparison to
14 the amount of questions they were asking, and
15 they just couldn't get enough specific
16 information that they were looking for the way in
17 which they market to do much good at the end of
18 the day based on what we were able to get from
19 Dan and from his assistant, Andrea, I believe is
20 her name.
21      And there is correspondence regarding
22 that where Dan was asked on more than one
23 occasion through Andrea and directly to complete
24 the questionnaire so that we could assist further

56

Porco

1      So I don't know if it was so much
2  George asking as much as Dan volunteering.
3      Q.  If you look back at Zanger Exhibit 3
4  with regard to the October, 2003 agreement, page
5  2, paragraph number 1, do you see that?
6      A.  This is 2004, page 1.
7      Q.  Page 2, paragraph number 1.  The first
8  sentence reads, "Commencing from the date of
9  execution hereof and continuing until the
10 termination or expiration as provided for herein,
11 IAM grants DZ the right to manage Class Z shares
12 within IFL upon the transfer and IFL's receipt of
13 at least USD 5 million and up to 50 million into
14 said Class Z shares."
15      Do you see that?
16      A.  Yes, sir.
17      Q.  If Dan was supposed to have an
18 obligation to put in $50 million, why did the
19 agreement say up to $50 million?
20      A.  Dan wanted to put the money in over
21 time.  He didn't want to just plop the 50 million
22 in immediately.  He was trading -- from my
23 understanding, Dan was trading a lot of his own
24 money, many millions of his own dollars and he

Porco

1  just didn't want to move it all over immediately.
2  He wanted to move it over a period of time.
3      Q.  Is there any document that sets forth
4  Dan's obligation to put in at least $50 million?
5      A.  I'm not sure, other than the agreement
6  and conversations and whatever e-mails that went
7  back and forth between George and Dan.
8      Q.  And the agreement is the agreement that
9  you have got in front of you, is that right?
10     A.  Yes.
11     Q.  Other than the reference to $50 million
12  that I just made, is there any other reference to
13  $50 million in this agreement?
14     A.  You are asking within this document.
15  Is there a second mention?
16     Q.  Yes.
17     A.  I don't believe the phrase 50 million
18  appears again, but I believe it is referenced in
19  its intent and its meaning throughout the
20  document.
21     Q.  Where?
22     A.  Point number 3 refers to what I had
23  just mentioned a moment ago.  Dan was going to
24  move the $50 million over from his other assets,

Porco

1  institutional mandates to raising money.
2          One of those mandates, very typically
3  is that an institutional investor is not going
4  want to be more than 20 percent into a fund.  So
5  to raise assets in a fund, let's say, you wanted
6  to raise $20 million, okay, or let's say $10
7  million or $5 million tranches, you would have to
8  have 25, 50, 75 and so on, in order for an
9  institutional investor to be comfortable with
10  that mandate that they typically have where we
11  don't want to be more than 20 percent into your
12  fund.
13          Dan understood that as a prerequisite
14  being in the business that without assets in the
15  funds, it is very difficult to get an
16  institutional investor by their own mandates to
17  put money into the fund and, hence, the whole
18  purpose of the $50 million from the onset of the
19  agreement it was just that Dan was going to put
20  it in over time.
21          And that, I mean, that's just common
22  knowledge within the industry.  That you have to
23  have a base of assets in order to raise assets
24  because of the institutional mandates that they

58

Porco

1  and point number 3 references this personal
2  account that he intends to continue trading that
3  it was from that he was to move those moneys
4  over, which were part of the discussions with
5  George.
6      Q.  Well, does 3 have anything to do with
7  investing 50 million?
8      A.  It references that he had these
9  personal accounts.  I'm just referring back to
10  the source of funds from which the 50 was to come
11  in from over time.
12     Q.  Doesn't 3 say that he is going to
13  continue trading in his personal account?
14     A.  It does.
15     Q.  It doesn't say anything --
16     A.  We weren't asking him to completely
17  shut down.  But it was Dan's intention from the
18  beginning to once he had the offshore exposure
19  that he wanted to move over more and more and
20  more of his assets to grow the fund.
21          Understanding just the basic
22  fundamentals of raising capital for a hedge fund,
23  anyone who is in that business and familiar with
24  it as Dan was, understands that there are

60

Porco

1  have of not wanting to be more than 20 percent
2  in.
3      Q.  Did Dan's desire to contribute some
4  moneys above $5 million to the fund create an
5  obligation on his part to do that?
6      A.  Dan made an obligation to put the money
7  into the fund.
8      Q.  In the agreement?
9      A.  In this agreement, it says that he will
10  put at least 5 and up to 50.
11     Q.  Is it your testimony that that creates
12  an obligation for him to put in 50?
13     A.  There was the understanding that that
14  was what was required in order for the marketing
15  of the fund to be successful.
16     Q.  And why wasn't that stated in the
17  agreement?
18     A.  Again, this is an agreement that was
19  drawn up by Dan and by George.  You know, I
20  guess, when one is drawing up an agreement, I
21  guess it's like a marriage, you have to plan for
22  divorce.
23          The relationship was good at the
24  beginning.  The camaraderie was good at the

Porco

beginning between George and Dan, the understandings were clear. Dan was coming in with a large amount of assets and a trading methodology.

Everybody was pleased and was happy. No one foresaw a need to imagine in advance, you know, such a thing when the language and the understanding and the agreement was clear between them.

Q. Is there any document created in 2005 in which George or you or anybody on behalf of IAM complains about the fact that Dan has not, had not contributed more than $5 million to the fund?

A. I'm not sure.

Q. Are you aware of any?

A. At this time I'm not aware of any. If I went back through e-mails and saw one, I might go, oh, yeah, I remember reading that. But it would probably be a question for George.

Q. Let me show you what we have premarked as Zanger Exhibit 7, which purports to be an e-mail from a shareholder services specialist at Butterfield Funds Services, Bermuda Limited. Her

Porco

name is Lori, L O R I, Fuhrtz, F U H R T Z.

(Zanger Exhibit 7 was marked for identification)

Q. Are you familiar with her?

A. I recall seeing e-mails as her being on that administrative team, yes.

Q. And is Butterfield Services, were they an administrator of the fund?

A. Yes.

Q. Am I correct that they took instructions from IAM?

A. Yes.

Q. You see where Ms. Fuhrtz is e-mailing George saying the date, "Mr. Szele, we received today the attached request to receive $4 million for Class Z series 1 and 2." Do you see that?

A. Yes.

Q. And for that transfer to be made, am I correct that IAM would have to agree to the redemption?

A. I don't know whether Dan had a copy of a redemption request because he had a copy of the offering memorandum. I don't know if Dan forwarded this directly to them and not through

Porco

George, or whether this is a confirmation that it went through George and George was just getting a confirm. I can't tell by this document.

Q. My question is different. Am I correct that before the $4 million would be paid per a redemption, that IAM would have to agree and convey that agreement to Butterfield before it would be done?

A. The procedurally prudent thing is that is how it is handled. However, if the administrator felt that a redemption was to be carried out, even if -- they are going to go by the rules of the offering memorandum.

So if a redemption has to be made and they feel it is going to be made and someone doesn't want it to be made, regardless of whether it's the trading manager IAM or not, it doesn't become an issue of the trading manager. It becomes an issue of the board of directors for the fund and then they ultimately answer to the administrator, not IAM.

Q. And George was on the board?

A. George was a director, yes, sir.

Q. Do you know what George did in response

Porco

to receiving this e-mail, if anything?

A. I'm not sure. But, again, like I said before, I don't know if this is a response to George confirming it had been received or whether Dan sent this in and they were saying to George we received this redemption request from Dan. It is not clear.

Q. It talks about "We received today the attached request," correct?

A. I'm not sure whether Dan sent that in or Dan sent it to George and --

Q. So you don't know?

A. I don't know.

Q. But as far as you know, George didn't object, is that right?

A. There were instantaneous concerns about this redemption.

Q. I'm not asking if there were concerns. I'm asking whether George objected to the $4 million in writing?

A. I don't believe that he did object for the purpose of making sure for a review of the funds and a compliance to the offering memorandum that everything was being done properly. Not the

65

Porco

1    ultimate -- I mean, at the end of the day, Dan
2    received his redemption. So I don't follow.
3        Q.   My question is, did George do anything
4    to object to the redemption, to your knowledge?
5        A.   I believe, yes.
6        Q.   In terms of following --
7        A.   I believe he corresponded to the
8    administrator regarding this whole matter, yes,
9    and there are e-mails as such to the
10   administrator and from the administrator to
11   George.
12       Q.   Did George say that Dan had no right to
13   redeem the $4 million in form or substance?
14       MR. LANZA: I'm going to object. We
15   went over precisely these questions before
16   we took our break.
17       MR. SEAR: And he couldn't tell me
18   when, he couldn't tell me anything. So I
19   put this in front of him in terms of the
20   specifics of the date, and if he doesn't
21   know something, he doesn't know. I'm trying
22   to get his knowledge.
23       A.   I'm not sure, you know, specifically,
24   but I know that there were communications

66

Porco

1    regarding the redemption from George to the
2    administrator, and I'm sure he can speak to the
3    specifics of it.
4        Q.   Do you know after the redemption was
5    made whether there was more than $5 million in
6    the fund?
7        A.   There was not after the redemption was
8    made. There was not more than $5 million in the
9    fund.
10       Q.   Let me show you what we have premarked
11   as Zanger Exhibit 8.
12           (Zanger Exhibit 8 was market for
13   identification)
14       Q.   It purports to be an accounting report
15   from Goldman, Sachs concerning the Class Z shares
16   in the fund. Have you ever seen this before?
17       A.   No. These are all, this is all under
18   the role of George's responsibilities.
19       Q.   If you look at -- fine. Are you aware
20   -- strike that.
21           I'm going to read to you a section of a
22   transcript in this matter, an appearance in front
23   of Judge Rakoff, October 4, 2007. Your counsel,
24   Mr. Lanza, was there for plaintiff's and I and my

67

Porco

1    associate were there for defendant Daniel Zanger.
2        At page 7, Mr. Lanza states:
3            "Well, your Honor, it really would just
4    require taking a look at the e-mail
5    exchanges from the prime broker to IFL
6    specifically to Independent Asset Management
7    saying you are in violation of our rules.
8    You have done this 125 times or saying" --
9            "The Court: Do they say that?
10           "Mr. Lanza: They do say that. They're
11   exchanges from a woman Giovanna Arturo who
12   works for Goldman, Sachs who was
13   consistently irate over these margin calls,
14   and they were."
15       Q.   Are you aware of such e-mail exchanges
16   from Ms. Arturo or anyone at Goldman, Sachs
17   saying that IAM has been in violation of their
18   rules 125 times?
19       A.   Yes.
20       Q.   Over what period of time?
21       A.   Over the period of time of the
22   relationship that Dan mentioned Class Z.
23       Q.   So these e-mail exchanges from Goldman,
24   Sachs would have been throughout 2005 and 2006?

68

Porco

1        A.   The violations and the margin calls, I
2    believe, began to escalate substantially after
3    2005.
4        Q.   Well, my question is not when they
5    began to escalate. It is whether the 125 times
6    that Goldman, Sachs is saying that there has been
7    a violation of their rules, what period of time
8    that took place?
9        A.   I don't know. I don't know.
10       Q.   You've seen these e-mails?
11       A.   Yes, I was cc'd on some of these
12   e-mails, and I would report them to George and he
13   would deal with them.
14       Q.   Approximately how many such e-mails
15   have you seen?
16       A.   At least all of the e-mails that
17   interrupted my ability to transfer funds at the
18   end of the month.
19       Q.   So how many such e-mails did you see in
20   which Goldman, Sachs said that IAM had been in
21   violation of Goldman, Sachs's rules in connection
22   with margin calls?
23       A.   I saw at least, you know, the ones that
24   pertained to the interruption of moving money.

Porco

1  
2  So that is at least four or five. And then I was  
3  cc'd on a number of e-mails which I read briefly,  
4  but George attended to that as is his role within  
5  the organization.  
6      Q.  So of the 125 exchanges you have told  
7  us about, how many did you actually see?  
8      A.  You mean personally?  
9      Q.  Yes.  
10     A.  In my role doing what I do in a  
11  fraction of them.  
12     Q.  And approximately how many?  
13     A.  I couldn't state. Ten or so. The  
14  ones, again, that I would see and have to  
15  immediately address are the ones that interrupted  
16  some activity that I was doing for my job.  
17     Q.  And these took place in 2005 and 2006?  
18     A.  I believe he disrupted the fund once  
19  before earlier. I think he did disrupt the  
20  operations in 2005 and then repeatedly disrupted  
21  them in 2006.  
22     Q.  I show you Zanger Exhibit 9 and ask you  
23  if you can identify that.  
24         (Zanger Exhibit 9 was marked for  
25         identification)

Porco

1  
2      A.  You'll have to ask George the specifics  
3  on that decision. It was a small amount, as I  
4  referenced earlier, that at that point it became  
5  clear what was going on and what Dan was doing in  
6  terms of trying to implode the fund.  
7      Q.  By April of '06 it was clear he was  
8  trying to implode the fund?  
9      A.  As the margin calls continued to  
10  increase and Dan had been advised not only by  
11  George but the administrator and the custodian  
12  not to do this anymore, and Dan continued to do  
13  it deliberately, what else might we conclude?  
14         MR. SEAR: Read back that answer.  
15         (Answer read)  
16     Q.  Let's pick September of '06. As of  
17  September of '06, had Dan been advised by the  
18  administrator not to do it anymore?  
19     A.  I don't know the dates but the  
20  administrator on more than one occasion had  
21  instructed him not to do what he was doing.  
22     Q.  Can you --  
23     A.  As well as Gia at Goldman.  
24     Q.  Can you tell me the year?  
25     A.  Both in 2005 and in 2006 Dan was given

70

Porco

1  
2      A.  Yes. This was sent to Dan, I believe,  
3  to his accountant and to Dan as a summary.  
4      Q.  Why wasn't there any reference in this  
5  letter to your position that Dan had violated the  
6  agreement in 2005?  
7      A.  It wasn't my role to do that. It was  
8  just simply to communicate to Jeff where we stood  
9  as far as what moneys were paid out to Dan. It  
10  just wasn't part of this letter.  
11     Q.  Why did IAM pay performance fees and  
12  management fees to Mr. Zanger for 2005 and 2006  
13  if he was in violation of the agreement?  
14     A.  Because Dan was owed this money per the  
15  contract. We paid what he was owed.  
16     Q.  And so your position that he was in  
17  violation of the agreement, that did not give IAM  
18  a right to withhold any moneys, is that right?  
19     A.  It wasn't a question of giving IAM a  
20  right to withhold anything, IAM paid Dan the  
21  moneys it was owed and paid Dan what was able to  
22  be paid. If there was no money to pay, there's  
23  no money to pay.  
24     Q.  Why didn't you pay his portion of the  
25  management fees after April of '06.

72

Porco

1  
2  such correspondence. In 2006 he began to do it  
3  more and more frequently, which never really made  
4  much sense other than he wanted to get out of the  
5  agreement and was looking for a way to do it.  
6      Q.  In 2006 did Dan cover one margin call  
7  with his own funds?  
8      A.  Inappropriately, Dan tried to wire  
9  money into the fund, into the custodial account  
10  at Goldman directly, without wiring the money,  
11  you know, advising us and wiring the money as a  
12  subscription to the fund. He circumvented the  
13  fund, the board of directors and George and sent  
14  money directly into Goldman.  
15         We found out about this after the fact  
16  and what alerted us to all of this was that Dan  
17  then after covering the call tried to wire money  
18  directly out of the fund to himself, at which  
19  point the custodian caught it and said, we're not  
20  going to allow you to wire money out to yourself.  
21         For some reason the custodian allowed  
22  the money to come in. I guess they viewed that  
23  as not so risky but they did catch the fact that  
24  he was trying to wire money out of the fund which  
25  is totally prohibited in the agreement, not only,

Porco

1  you know, of the offering memorandum, but in the
2  contract with Goldman that, you know, he didn't
3  have the authority to do that and he knew he
4  didn't have the authority to do that and he tried
5  to do it anyway and then it was stopped.
6          This was just one more of these major
7  issues that the relationship had now begun to
8  deteriorate and that Dan was kind of a loose
9  cannon.
10         Q.  Your testimony is that the payment to
11 Dan was stopped?
12         A.  Dan wired money into Goldman. Goldman
13 allowed that. Then once the margin call was
14 clear, Dan then, without notifying us, without
15 notifying the trading manager, without notifying
16 the administrator, without asking for a
17 redemption request, took it upon himself to send
18 in a request to Goldman to try to wire money out
19 of the fund to himself personally, not -- I mean,
20 on so many levels this is crazy.
21         If he wanted a redemption and was going
22 to try to force a redemption, it would have at
23 least had to have gone for a redemption request
24 and then when it wouldn't go to Dan Zanger

74

Porco

1  personally it would have gone to the company that
2  Dan had put his money in through this offshore
3  company, so he completely circumvented everybody
4  and tried to willy-nilly pull his money back out
5  of a fund regulated by the Bermuda Monetary
6  Authority, which was outrageous.
7          Q.  Then what happened?
8          A.  What happened was, we were notified
9  that it occurred. The administrator was furious,
10 I was furious, George was furious, Dan was
11 contacted, tensions flared.
12         Q.  And then what happened?
13         A.  George handled the matter from that
14 point forward and communications and
15 conversations with Dan. So I'm not entirely
16 privileged to what else was said or happened.
17         Q.  So you don't know what happened?
18         A.  In that regard. He was stopped. Dan's
19 attempt to take money out of the fund to wire
20 back to himself was stopped.
21         Q.  So there was no money paid to Dan?
22         A.  His attempt to wire the money
23 personally was stopped by the custodian. The
24 administrator was notified, who then notified the

Porco

1  trading manager and we all sat back and took a
2  deep breath and said, "Oh, my god, what the hell
3  is going on here?"
4          Q.  My question is, is it your testimony
5  under oath that eventually the payment wasn't
6  made to Dan?
7          A.  Eventually, the payment was released to
8  Dan through a proper redemption process with
9  regard to the funds rule which we had to go back
10 to the administrator and deal with a nightmare of
11 a situation.
12         I believe the accommodation of that
13 wire going back out was then handled with a
14 redemption request the proper way and --
15         Q.  So the payment was made?
16         A.  The redemption was -- the redemption
17 occurred, again, violating the contract.
18         Q.  So the fund consented to a violation of
19 the contract?
20         A.  The fund didn't consent to anything.
21 We were talking about two separate entities with
22 two separate responsibilities.
23         Q.  Your testimony is the fund didn't
24 consent to the redemption?

76

Porco

1          A.  I can't speak to what the fund
2  consented to or didn't consent to. George can
3  speak to that as a director of the fund. I'm,
4  you know, doing administrative work for the
5  trading manager.
6          Q.  The trading manager is IAM, right?
7          A.  The Independent Fund Limited is the
8  fund and this was a fund matter in which George
9  is a director and which George can address.
10         Q.  Were there conversations in or around
11 September or October that IAM did not have enough
12 money to operate?
13         A.  Conversations with who?
14         Q.  George.
15         A.  Between George and who?
16         Q.  And you.
17         A.  We knew what our situation was
18 continually, how much money we had because we
19 were getting so little in salaries. So I mean,
20 we were always aware of how much money we did or
21 did not have.
22         Q.  Well, were there conversations in or
23 around August, September or October in 2006 to
24 the effect that IAM did not have enough money to

77

Porco

1
2  continue to operate?
3      A.  IAM was getting by and continuing to
4  operate and we were continuing to try to market
5  up until the point that we could no longer market
6  Dan.
7      Q.  I'm not asking you about marketing Dan.
8  I'm asking you whether in August, September and
9  October there were conversations between you and
10  George to the effect that IAM did not have enough
11  money to continue to operate?
12      A.  No, because we were going to continue
13  to raise assets either for Dan or from other
14  classes of shares.
15      Q.  To your knowledge, was Dan told in or
16  around August, September, October that IAM did
17  not have enough money to pay its bills?
18      A.  Not by me.
19      Q.  Did IAM have enough money to pay its
20  bills during the months of August, September and
21  October.
22      A.  IAM had been paying their bills.
23      Q.  I'm not asking you what they had been
24  doing, I'm asking you during the months of
25  August, September and October if IAM had enough

78

Porco

1
2  even to pay its bills?
3      A.  Yes, IAM had enough money to pay its
4  bills.
5      Q.  During those months it did pay those
6  bills?
7      A.  Things were lean but we were continuing
8  to meet our obligations.
9      Q.  In connection with liquidation of the
10  fund, how much money did AIM get paid?
11      (Telephone interruption)
12      A.  IAM didn't get paid in regards to Dan's
13  redemption.
14      Q.  In connection with the liquidation in
15  or around December of 2006, did IAM get any
16  money?
17      A.  IAM didn't get revenue -- Dan was given
18  back the money that was his. Some portion was
19  retained per the offering memorandum by the
20  administrator and there was no gain to IAM.
21      Q.  Was IAM paid a management fee for
22  December of 2006?
23      A.  I don't know what the cutoff dates
24  were, but the history of the management fees
25  which were paid are all in the Butterfield

79

Porco

1
2  transcripts that show the monthly reportings, so
3  it would show a list of when the last payment was
4  made, it would be in there, and I believe you
5  have that.
6      MR. SEAR:  Has that been produced to
7  us?
8      MR. LANZA:  I believe so. We don't
9  have everything from Butterfield.
10      THE WITNESS:  You have all that stuff,
11  I think.
12      MR. SEAR:  I would either ask for the
13  production or I would ask for the Bates
14  numbers, please.
15      THE WITNESS:  I mean, it lays it all
16  right out. Everything is very transparent.
17  I mean, that's one of the reasons why we set
18  up in Bermuda. We worked with a group like
19  Butterfield Fund Service, had an auditor
20  like D&T, worked with Appleby Sperling and
21  had a legal team like Williams Mullen.
22  Everything was always very transparent. The
23  accounting was always done correctly and
24  then reviewed by the auditors.
25      So whatever these figures are and you

80

Porco

1
2  are looking for should all be available for
3  you guys to see what was paid and when.
4      Q.  Let me show you what we have marked as
5  Zanger Exhibit 10.
6      (Zanger Exhibit 10 was marked for
7  identification)
8      Q.  This is a letter to Mr. Steven Schulman
9  who was and is counsel for Mr. Zanger and to Mr.
10  Lanza, your counsel. Have you seen this letter
11  before?
12      A.  I don't know if this was forwarded just
13  to George or whether I received a cc on this.
14  But this would have come through our law firm. I
15  think you sent it just to George.
16      Q.  Do you have any knowledge as to whether
17  or not this letter was responded to?
18      A.  Is this the lawyer that Dan had prior
19  to you, the guy that got in all the trouble and
20  he had to fire him?
21      Q.  That's not correct what you just said,
22  but he is the lawyer that was representing Dan
23  during this period of time.
24      A.  I'm not familiar with this letter.
25      Q.  You don't know whether there was a

Porco

1  response to it or not?
2  A.  No, I don't know.
3  Q.  And you wouldn't know how we would go
4  about getting an answer to these questions in the
5  letter, questions concerning various expenses and
6  items and so forth?
7  A.  I think George responded with a lengthy
8  response to this guy through the firm, did he
9  not?
10  Q.  So you think George responded to this?
11  A.  I'm not sure. I'm not sure. I don't
12  remember -- what I remember is also hearing this
13  guy Schulman was, got in trouble with the bar and
14  he was off the team, and Dan is now looking for
15  another lawyer, and it just stalled any attempt
16  to discuss things with Dan. So I don't
17  remember --
18  Q.  You don't know whether the next thing
19  that happened after this was the filing of the
20  complaint?
21  A.  I don't know.
22  Q.  Is IAM an active company today?
23  A.  IAM and the fund are basically in a
24  dormant state.

82

Porco

1  Q.  And when did they become dormant?
2  A.  Shortly after the redemption of the
3  last class of shares that redeemed as a
4  consequence of Dan's actions.
5  Q.  When was that?
6  A.  I don't have that date but George will
7  have it for you.
8  MR. SEAR: Let's take a break.
9  (Luncheon recess: 12:41 p.m.)

Porco

1
2  AFTERNOON SESSION
3  1:15 p.m.
4  MR. SEAR: Let's mark this document as
5  Exhibit 11. If we could have marked as
6  Zanger Exhibit 11 a one-page document that
7  was provided to me just now by counsel for
8  the witness. It's the document that the
9  witness was looking at in connection with
10  his testimony.
11  (Zanger Exhibit 11 marked for
12  identification)
13  EXAMINATION CONTINUED
14  BY MR. SEAR:
15  Q.  Let me ask you, sir, do you have any
16  other notes with you today that you have used in
17  connection with your testimony here today?
18  A.  No. I was looking to see if there was
19  a date on the last thing. That was something
20  that I sent to these guys.
21  Q.  And could you tell us what this
22  document is?
23  A.  It lists the seed unit loans to IAM and
24  it lists loans that were made to the company. So
25  I thought maybe there was a column that had a

84

Porco

1
2  date, and you had asked me when was the last loan
3  made, and that's why I looked at it. I don't
4  have that in the column.
5  Q.  The reference here to seed unit, what
6  does that refer to?
7  A.  What that is, is those are individuals
8  that lent money to IAM in return for a portion of
9  profits should there be any some day.
10  Q.  And the loans were from whom?
11  A.  Primarily friends and family.
12  Q.  And then there's reference to "Joe,
13  unpaid vendor's debt." What does that refer to?
14  A.  What I had been asked for is, you know,
15  what are some of the things that have occurred,
16  you know, beyond the damages to the company,
17  beyond the damages to investors, what are some of
18  the repercussions that occurred to you over this
19  period of time and that's just a list of some
20  dollar amounts of vendors that I have that's
21  accumulated that remains a debt that I had
22  personally because of not getting revenue stream
23  from IAM.
24  Q.  And is depleted savings, savings that
25  you used up because of that?

Porco

1  A.  Savings that had been used over time,
2  yes.
3  Q.  And the equity line, is that the same
4  thing?
5  A.  Yes. Money I borrowed against my home.
6  Q.  And the spouse credit card?
7  A.  Well, money my spouse and I borrowed
8  against her home, I should say.
9  Q.  And the spouse credit card charges, is
10 that the same thing, your wife spent money on her
11 credit card?
12 A.  Yes, she dipped into her own card to
13 pay bills.
14 Q.  What's "Joe's personal loan to his
15 mother"?
16 A.  That's additional money that I borrowed
17 from a relative just to have, you know, funds to
18 continue to pay my personal obligations.
19 Q.  So it is a loan from your mother?
20 A.  From my mother to me, yes.
21 Q.  It just says to, but you mean it's
22 from?
23 A.  Yes.
24 Q.  Do you recall any conversations that

86

Porco

1  you personally had with Dan Zanger concerning any
2  violations of the contract in 2005?
3  A.  Not in 2005. I don't.
4  Q.  Do you recall any conversations with
5  Mr. Zanger in 2006 concerning the issue of
6  violations of the contract?
7  A.  I communicated by phone message trying
8  to reach him several times. On one occasion when
9  we could not process the month-end reporting
10 transfer of funds, I left messages for his
11 assistant, I believe her name is Andrea.
12 I think on one occasion Dan called back
13 and I think I spoke to him and said, you know,
14 Dan, this has interfered with the transfer. It's
15 on a margin call. He was -- I believe he said
16 it's being taken care of. That's the extent of
17 my conversation.
18 I didn't speak with Dan very
19 frequently. George did.
20 Q.  To the best of your recollection, you
21 told us totally the conversations you had with
22 him in 2006 concerning his trading?
23 A.  It wasn't my role, so, no. Just on one
24 occasion, you know, George was saying, "We got to

Porco

1  get ahold of him, where is he? Can you try to
2  reach him?"
3  I tried a couple of times to put calls
4  in to Andrea, and I don't know if her name is
5  pronounced Andrea or Adrianna. I do remember him
6  dialing back on one occasion and saying it is now
7  being taken care of.
8  Q.  Have you now told us, to the best of
9  your recollection, the substance of what you said
10 to him and he said to you in 2006 concerning his
11 trading?
12 A.  Again, it was not my role to talk to
13 Dan about his trading, it was George's.
14 Q.  Could you tell us what your educational
15 background is?
16 A.  Certainly. High school graduate,
17 college, insurance background, numerous insurance
18 designations, experience, you know, to the fund
19 level with auditing, you know, handling the audit
20 for D&T, the audit that was requested by the NFA;
21 no graduate school.
22 Q.  And where did you go to college?
23 A.  Southern Connecticut State University,
24 Sacred Heart University in Charter Oak,

88

Porco

1  Connecticut.
2  Q.  Did you graduate from Sacred Heart?
3  A.  No, I did not graduate. I have a
4  double major in English and psych and have, I
5  believe, two class credits to receive a BS.
6  Q.  You referred to the NFA. What were you
7  referring to?
8  A.  National Futures Association.
9  Q.  The D&T, is that Deloitte Touche?
10 A.  Yes, sir.
11 Q.  And what were you referring to?
12 A.  You were asking about educational
13 acumen, and I guess as a testimony to that I
14 handled that audit, but I'm not a CPA.
15 Q.  You handled the audit on behalf of who?
16 A.  Independent Asset Management.
17 Q.  In other words, you worked with
18 Deloitte Touche on the audit?
19 A.  KPMG was the auditor at that point in
20 time and also for the administrator, but
21 primarily it was my role to take IAM through that
22 audit which was five officers of the NFA who come
23 to your office, I think, it was three business
24 days and, you know, handle the audit and we

89

91

Porco

1    passed the audit and it was acceptable, and it is
2    no small undertaking.
3        Q. When was this, what year?
4        A. This was 2003, I believe.
5        Q. And when did you first start working
6    with IAM?
7        A. The very end of 2000, we began, George
8    and I began in 2001, I believe we were up and
9    running.
10       Q. Other than IFL, is there any other fund
11   that IAM has been involved with?
12       A. There was an initial interest
13   enlargement, a fund called IAM Global and that
14   fund was never funded. It was going to be part
15   of a package deal with another investment manager
16   but that didn't turn out to get funded. So
17   Independent Asset Management launched the
18   Independent Fund Limited with Bermuda and that
19   was the fund that began to be funded.
20       Q. When was that funded approximately?
21       A. This initial offering memorandum goes
22   back. It states the incorporation date. It was
23   shortly thereafter, May 31, 2001, is on page 4 of
24   the offering memorandum. Several months later

90

Porco

1    the fund was funded with its first subscription.
2        Q. And what was the size of that
3    subscription?
4        A. I believe that subscription was $5
5    million.
6        Q. And who put that money in?
7        A. That was put in from an ERISA plan, a
8    pension plan.
9        Q. And what happened with that investment?
10       A. Ultimately what happened was after a
11   period of time Sea Carrier's Limited Partnership
12   became the trading manager and then the issues
13   that occurred with the SEC finding that the New
14   York Stock Exchange failed to regulate the
15   specialist firms, and specialist firms failed to
16   regulate the specialists, Sea Carriers was caught
17   in the cross hairs of that and they were the
18   trading manager.
19       So for a long period of time we weren't
20   able to determine what was causing the lack of
21   positive performance but it was also determined
22   that it was specialist fraud. So without that
23   positive performance, slowly investors began to
24   redeem over time and precision in the pension

Porco

1    fund that was in there ultimately redeemed.
2        Q. And when did they redeem?
3        A. I don't know that date.
4        Q. Do you have the year?
5        A. I think they redeemed sometime late
6    '04.
7        Q. Other than that $5 million investment,
8    were there any other investments in IFL before
9    Mr. Zanger?
10       A. There were. With this, there were
11   other funders, a fund to fund that subscribed, a
12   couple of high net worth individuals that were
13   offshore investors as well.
14       Q. What was the volume of those
15   subscriptions or investments?
16       A. I think somewhere in total with all
17   that was placed with Sea Carriers from all
18   sources was somewhere around $10 million or so.
19       Q. What's the relationship or what was the
20   relationship between Sea Carriers and IAM?
21       A. Sea Carriers was an investment manager,
22   similar to the relationship with Dan as an
23   investment manager. They managed a class of
24   shares.

92

Porco

1        Q. So did they have an agreement with IAM
2    to manage this class of shares?
3        A. There was an agreement with the fund,
4    Sea Carriers being an entity, had its own
5    subscription document, so the fund was able to
6    take a stake in the limited partnership of Sea
7    Carriers' trading operation.
8        So unlike appointing Dan a manager and
9    him being in the venture that he was with us,
10   this is different. This is the fund selecting
11   another -- almost like a fund-to-fund sort of
12   relationship.
13       Q. And what was the overall performance of
14   Sea Carriers?
15       A. Prior to the period of time of the
16   fund's investments going into Sea Carriers, the
17   performance was very good, hence, the decision to
18   place, you know, funds with them by the fund and
19   any investors of the fund, but shortly thereafter
20   was when the bulk of the specialists fraud began
21   to occur. Of course, we didn't know that for
22   quite sometime.
23       It was finally discovered that it
24   wasn't that the model wasn't working, it was that

Porco

1  people down on Wall Street were committing fraud.
2  Q.  So what was the end result in terms of
3  the performance of Sea Carriers?
4  A.  It was flat and slightly down.
5  Q.  Over the entire period?
6  A.  Yes, just not good enough for people to
7  stay in, you know.
8  Q.  And how did IAM fund itself from '01 up
9  through the end of '04?
10  A.  We had seed unit participation. We
11  borrowed money. There were some remainderment
12  trading that was going on and we, basically, we
13  didn't take large salaries, you know.
14  Q.  In terms of revenues, earned revenues,
15  what money did IAM make from '01 up to the end of
16  '04?
17  A.  You would have to look at the K-1's and
18  the tax returns. I couldn't tell you.
19  Q.  Can you give me an order of magnitude?
20  A.  No, I couldn't from recollection.
21  Q.  Was it more than $200,000 over that
22  period of time?
23  A.  I'm not certain.
24  Q.  Was it over 400,000?

94

Porco

1  A.  I'm not certain what the figures say,
2  but it is in the documents.
3  Q.  This would be in the K-1's for IAM?
4  A.  Yes, all the tax returns.
5  Q.  What's this remainderment trading you
6  are talking about?
7  A.  I believe that there was a class of
8  shares, a second class of shares that was still
9  active other than the class that Sea Carriers was
10  in that was being traded.
11  Q.  IAM received some kind of fee out of
12  that trading?
13  A.  Right. There's always a fee. It is a
14  question of how the fee is shared and in the case
15  of Dan it was shared with Dan.
16  Q.  And how much, approximately, did IAM
17  make out of this remainderment trading you are
18  referring to?
19  A.  I'm not certain.
20  Q.  Was it over $100,000?
21  A.  I don't know.
22  Q.  So as you sit here now, can you tell me
23  even approximately how much earned revenue IAM
24  had from '01 to '04?

Porco

1  A.  Not without looking at the tax returns.
2  Q.  Did you work full time for IAM from '01
3  up until the end of '06?
4  A.  Yes.
5  Q.  And did George?
6  A.  Yes.
7  Q.  So we're clear, other than the
8  remainderment trading you talked about, was there
9  any other revenue from 2001 to 2004? I'm
10  contrasting from earned revenue other than seed
11  revenue or from loans?
12  A.  I'm not sure what the figures are that
13  came from the fund versus the breakdown of seed
14  and loan. But we were in a situation where
15  capital was tight and the venture formed with Dan
16  was addressing the goals of the fund going
17  forward. And that's one of the reasons why he
18  brought some capital in knowing what the goals
19  and the plans and the future of the fund and what
20  the circumstances were. So no surprise that
21  there wasn't a lot of money there.
22  Q.  From '01 up through the end of '04, did
23  IAM in terms of earned revenue exceed $50,000 in
24  any one year?

96

Porco

1  A.  I believe so.
2  Q.  Did it exceed $100,000 in earned
3  revenue in any one of those years?
4  A.  Other than what --
5  Q.  No. My question is -- I'm putting
6  aside investment money, seed money and loans, I'm
7  focusing on earned revenue, and my question to
8  you is, from '01 through the end of '04, did IAM
9  have earned revenue in excess of $50,000 in any
10  one of those years?
11  A.  Again, the tax returns will address
12  that. I don't know from memory.
13  Q.  When you first started talking with
14  Dan, had the subscription and investment that had
15  previously been made, had that been withdrawn?
16  A.  The way you phrased that question is
17  unclear to me.
18  Q.  You started talking with Dan sometime
19  in '04?
20  A.  Remember, this is George talking with
21  Dan, not Joe.
22  Q.  Okay. And as of that point in time,
23  was there any money invested in the fund when
24  George first started talking with Dan?

Porco

1  A.  I think there was a period of time
2  between the last redemption and Dan's
3  subscription where there was no money temporarily
4  in the fund in Dan's case.
5  Q.  What type of insurance did you work in?
6  A.  I had life, health insurance, did some
7  disability work, life insurance work, did some
8  pension work.
9  Q.  Did you work in the securities area at
10  all with funds, or otherwise, prior to becoming
11  involved with IAM?
12  A.  Yes.
13  Q.  And what was that?
14  A.  I was a registered rep with Phoenix
15  Equity Planning Corporation.
16  Q.  For how long?
17  A.  Several years.  It was also a
18  requirement if you were a career agent, at that
19  time, on their career program that you become a
20  licensed PEPCO.  And so I was.
21  Q.  And what was your work with them?
22  A.  With Phoenix early on I did a lot of
23  early pension work, and also some insurance work
24  associated to that, and I did fairly well with
25

98

Porco

1  that.  Received a number of accolades and
2  national awards with Phoenix.
3  Q.  How old are you?
4  A.  I am 46 now.
5  Q.  And what business activities have you
6  been involved in since December of 2006?
7  A.  Insurance, selling some insurance when
8  I can.
9  Q.  And what type of insurance?
10  A.  Some annuity work, some long-term care
11  work, not much of it is what I can -- I pretty
12  much became disengaged from all activity when I
13  came into the fund relationship.
14  So now it is very difficult because I
15  don't have, you know, the marketing irons in the
16  fire, so to speak, relationships.  There's no
17  marketing — no money for marketing.  So it's
18  kind of word-of-mouth referrals, kind of slow
19  going and I'm trying to sell insurance, again, as
20  a backup to pay the bills at home.
21  Q.  Did the business activities of IAM
22  cease after December of '06?
23  A.  No, I would say that they didn't cease.
24  The trading of money upon Dan's exit ceased other
25

Porco

1  than the other class of shares which remained a
2  little bit longer and then they redeemed.
3  The fund then going dormant still
4  required attentiveness for a number of different
5  reasons and communications to counsel and the BMA
6  and filing forms and, you know, so on.  The fund
7  needs to remain an existing entity.
8  Q.  But it was dormant after December of
9  '06?
10  A.  Dormant after the last redemption which
11  I don't have the date of.  But it followed
12  shortly after Dan's redemption.
13  Q.  Was that Holmstrom or the other
14  investor?
15  A.  That's the other investor.  Holmstrom
16  was in the class of shares that Dan was managing.
17  Q.  Has Holmstrom ever asserted any sort of
18  claim against IAM with respect to any kind of
19  alleged wrongdoing?
20  A.  No.
21  Q.  Has it asserted any claim at all
22  against IAM?
23  A.  Not against IAM, no.
24  Q.  If you look at Zanger Exhibit 2, the
25

100

Porco

1  '05 IAM financial statement, page 4, do you see
2  the performance fee listed there of $775,264?
3  A.  Yes.
4  Q.  Am I correct that IAM was paid 25
5  percent of that or retained 25 percent?
6  A.  That should be accurate, yes.
7  Q.  And that fee is calculated based upon
8  the profits that Dan generated in his trade,
9  correct?
10  A.  It was whatever the gains were, you
11  know, that was what the 2 and 20 charge to the
12  fund management fee and then performance fee and
13  then he would get 75 percent of the performance
14  fee.
15  Q.  And if you would look at page 3 of
16  Zanger Exhibit 1, the 2006 financial statement,
17  page 3.
18  A.  Okay, page 3.
19  Q.  Do you see the performance fee listed
20  there of $137,489.
21  A.  Yes.
22  Q.  Am I correct that IAM was paid 25
23  percent of that performance fee?
24  A.  It should have been, yes.

101                                                                          103

Porco

2    Q. And to the best of your recollection or
3 understanding, was it?
4    A. I believe so.
5    Q. I am going to show you what we
6 premarked Zanger Exhibit 12, a series of e-mails
7 to and from what appears to be Mr. Porco and Mr.
8 Szele, from March 30, 2007 up through April 1,
9 2007.
10       (Zanger Exhibit 12 was marked for
11    identification)
12       MR. SEAR: Here's a copy for counsel.
13    Q. Take your time to look at this, and my
14 question is, is this in fact a series of e-mails
15 back and forth between you and Mr. Szele?
16    A. It appears to be.
17    Q. If you look at the first e-mail, is
18 that a copy of an e-mail you sent to Mr. Szele at
19 approximately 2:53 p.m. on March 30, 2007?
20    A. Yes, that was from me.
21    Q. And you state in the e-mail, in part,
22 "You're twisting of my statement is ridiculous.
23 I said if you handled this matter in an
24 inappropriate way, contrary to what my counsel
25 told me is legal and proper, you would give me no

Porco

2    A. I think this was an individual who was
3 interested in some other sort of forward
4 scenario, instead of keeping the fund dormant and
5 just going dormant, my concern was that the fund
6 should stay dormant because it potentially could
7 receive part of the award that may one day be
8 forthcoming from Sea Carriers and other people's
9 feeling was, no, let's continue on and rather
10 than keep it dormant, that way let's, you know,
11 role it into some other business venture.
12       And I felt that that would be too
13 cumbersome. I wanted to keep things, you know,
14 isolated, unencumbered with new parties coming
15 in. But it got heated. I don't know how -- this
16 obviously must have got transferred in a batch of
17 e-mails by accident.
18    Q. Is there a claim against Sea Carriers?
19    A. No. Sea Carriers has a claim against
20 specialist firms.
21    Q. And how would IAM participate in that?
22    A. Well, the Independent Fund Limited, as
23 Dan knew, coming into this venture was damaged
24 when Sea Carriers was damaged because all of that
25 missed performance that Sea Carriers was involved

102                                                                          104

Porco

2 option but to take action against you and John."
3       Do you see that?
4    A. What paragraph?
5    Q. It is on the second to last page of the
6 document. The e-mail chain goes in reverse
7 chronological order. Bates number 4896.
8    A. You are on the second page from the
9 last?
10    Q. Yes.
11    A. What is the question?
12    Q. I read the first two sentences into the
13 record. My question to you is, you refer to
14 "you're twisting of my statement is ridiculous."
15 What statement are you referring to?
16    A. I have no idea. I would have to go
17 back and reconstruct what all the banter was
18 about. It was obviously personal e-mails between
19 George and I, probably over a heated argument.
20    Q. What was the heated argument about?
21    A. I don't recall. I would have to go
22 back and think about it.
23    Q. There's reference here that "you would
24 give me no option but to take action against you
25 and John." Who is John?

Porco

2 in was not able to realize, cost Sea Carriers
3 millions of dollars in investment returns because
4 then investment returns for the fund, Dan knew
5 coming in as part of his interest as well was,
6 hopefully, to benefit from that coming to
7 fruition at some point.
8    Q. And how might the fund participate in
9 any recovery that Sea Carriers might make?
10    A. Because the fund, if Sea Carriers, for
11 instance, received -- well, hopefully, it's when,
12 because the damages in the fraud is established
13 by the SEC and the New York Stock Exchange. I
14 mean, there's no question that the fraud
15 occurred.
16       The question is, it's a matter of
17 damages in the legal process. At some point Sea
18 Carriers should be reimbursed for its losses.
19       The Independent Fund Limited, as a
20 member of that limited partnership, with the
21 capital that it had in Sea Carriers being traded
22 is entitled to a pro rata share that should come
23 back to the fund. Hence, the importance of
24 keeping the fund dormant, you just can't shut the
25 fund down because eventually that could take

105

Porco

1
2  years but, eventually, that should all iron out,
3  and then there will be revenue that will come
4  forward into the fund, which would then be
5  disbursed to the investors of the fund that were
6  in those shares at that point in time, but
7  there's still a management fee that's entitled to
8  be taken and that amount would be a large amount
9  of money.
10      Q.  That management fee would go to IAM?
11      A.  So that e-mail you are reading, it was
12  an argument over should the fund be dormant,
13  should we do something else and what else should
14  we do.
15      We got a guy at home with two babies
16  and one on the way, you got me at home with my
17  situation, et cetera, and things start to get
18  heated and there was some banter.  But it is not
19  full disclosure of the reality of the parties,
20  but just private banter between George and I.
21      Q.  Who was the individual with the two
22  babies at home?
23      A.  George, two little ones and a baby on
24  the way.
25      Q.  What was the entity again?

106

Porco

1
2      A.  Sea Carriers.
3      Q.  Did the problems that Sea Carriers had
4  hurt the reputation of the fund?
5      A.  Well, I mean, people redeemed, so I
6  would have to say that's the consequence.  Should
7  we be vindicated and a large award came through,
8  the same investors will be singing our praises,
9  because we find the prudent man rule and pursued
10  what we had to pursue, kept our ducks in a row
11  and filed what we had to file and went after
12  damages on behalf of those investors.
13      Q.  But as of '03 and '04, would it be fair
14  to say that the fund's reputation had been
15  damaged because of what happened?
16      A.  No, you have to look at it as you have
17  a manager managing a class of shares and that
18  manager's investment methodology is interrupted,
19  you know, his trading performance is interrupted
20  because someone is committing a crime.  That's
21  not the fault of the fund.  However, an investor
22  in the fund is looking for one thing.  They are
23  looking for performance.  And if they don't
24  achieve that performance, they will look for that
25  performance somewhere else.  No one sued us,

Porco

1
2  nobody has come after us, no one has complained
3  or filed complaints against us.
4      We've always done the very best we can
5  to do what's right, to remain transparent, to
6  address concerns when they arose and to do things
7  appropriately, to be procedurally prudent.
8      Q.  I'm not asking if anything that was
9  done was wrong or whether it was fair or not, I'm
10  just asking whether the fund's reputation was
11  hurt by what happened.
12      A.  Well, you know, it's tough to continue
13  to market Sea Carriers but it is not impossible
14  to, if you brought in another manager as we did
15  with Dan, that had the person's history that he
16  had and struck the type of an agreement and
17  relationship that we did strike with him, now you
18  have a different opportunity and it's a
19  completely different story and explanation and
20  marketing pitch to put out there in the
21  community.
22      So they are very separate things.  But
23  could you continue to market Sea Carriers?  No,
24  Sea Carriers couldn't continue to market itself.
25  The fund was not destroyed by Sea Carriers, but

108

Porco

1
2  the damages to our, what otherwise would have
3  been our income had we been given the darn money
4  we were entitled to to begin with on a personal
5  level was tremendously damaging because that's
6  money we didn't get to enjoy which we otherwise
7  should have received.
8      Q.  What happened with Sea Carriers and the
9  result of the fraud that you talked about?  My
10  question to you is very simple:  Did that have an
11  impact on the reputation of the fund?
12      A.  You would have to say yes, I mean.
13      Q.  Let's look at — who is the John you
14  are referring to in these e-mails?
15      A.  That was a colleague of George's.
16      Q.  Do you recall his last name?
17      A.  I don't at this time.  You've got to
18  remember all of this is going back months and
19  months and months ago.
20      Q.  There's a reference to McCorvey.  Do
21  you know who that was?
22      A.  Yes, John McCorvey is somebody we
23  worked with.
24      Q.  What was his role with this?
25      A.  He was also involved in part of the

109

111

Porco

1 introduction relationship to Butterfield
2 initially. I'm not sure of all of his other
3 involvements.
4
5     Q.   Now, there's reference in a March 31,
6 2007 e-mail at 10:33 a.m. from you to George.
7 "George another ridiculous comment from you. I
8 understand that you are frightened now that IAM
9 is out of money. Tell it to Congressman Shays
10 when we meet."
11          What were you meeting with Congressman
12 Shays about?
13     A.   The congressman, us being constituents,
14 was willing to hear what our circumstances were
15 pertaining to Sea Carriers and how Sea Carriers
16 was hurt. The SEC had collected a large amount
17 of fines against these specialist firms and our
18 attorney, which was Tom McVeigh, had assisted us
19 in writing our appeal to the SEC to ask for our
20 portion of the distribution which was to be paid
21 out by Sarbanes-Oxley to victims of that fraud.
22          And the initial response by the SEC was
23 that they weren't going to pay those dollars,
24 they weren't sure how they were going to pay
25 those dollars out, and we had to pursue, you

Porco

1 done.
2
3          I remember our attorney saying to us
4 that was unusual then. It wouldn't just end at
5 the fines but they would also allow the second.
6          So, basically, they viewed IAM as being
7 derivatively hurt. And basically without saying
8 it specifically, you know, we're kind of looking
9 at that section of the document that says, well,
10 you know, you can still go after them yourselves.
11 Well, we're not -- you know, that was not what,
12 it was just not reasonable to think that you are
13 going to take on that size of
14 David-and-Goliath-type of circumstance.
15          So there's still this penalty portion
16 which they haven't determined how they are going
17 to distribute. They could turn around and say,
18 you know what, these guys over at IAM and
19 Independent Fund Limited, they really were
20 damaged and they really should receive a portion
21 of this and they haven't done that yet.
22          They also have the ability that Sea
23 Carriers will prevail. And if they do -- and all
24 of these things were things that were of interest
25 to Dan. He knew of all of these coming in, he

110

112

Porco

1 know, step by step, asking for relief based on
2 those damages.
3
4          So eventually we went to Congressman
5 Shays to make him aware of what had occurred and
6 he then in then on our behalf communicated to
7 Chairman Cox and others, by letter and so forth,
8 and we were eventually granted a meeting with the
9 SEC, where we were able to sit down with them and
10 explain what the damages were, how they occurred
11 and we asked, you know, that we be considered to
12 receive some of those because we were caught
13 right in the cross hairs with that in terms of
14 not receiving, the fund receiving its gains and
15 incomes and so forth. So congressman Shays
16 assisted us.
17     Q.   What has been the result of that?
18     A.   The end result is that the SEC
19 determined that even though these firms committed
20 this fraud and even though they damaged a lot of
21 people, my understanding is that they were made
22 to pay the fines, they had to pay these large
23 fines. But unlike many other circumstances where
24 that's the end of it, they also said that people
25 can also now sue them as well for what they've

Porco

1 was interested in being involved and he was
2 looking forward to a positive outcome as were we.
3
4     Q.   There's reference here "We lost the
5 case against Dieter." What is that?
6     A.   Dieter Behring is an investment
7 professional, was an investment professional
8 overseas, that when we first launched the company
9 with the assistance of Richard Kovner, who is
10 Bruce Kovner's brother, of Caxton, Richard is
11 familiar with George's background, my background,
12 became very interested in us, in assisting us in
13 the development of the company going forward and
14 he also lent some assistance back and forth with
15 the offering memorandum to counsel. And Richard
16 was going to help us raise assets but he felt we
17 should seek out an investment professional that
18 had been active for a longer period of time on a
19 greater volume of money, and we identified after
20 some period of time with George traveling Europe
21 and Switzerland, this gentleman Dieter Behring,
22 and he was very, very well known in the European
23 circles.
24          This was a gentleman, you know, moving
25 hundreds and hundreds of millions of dollars, but

Porco

1 it turned out that much to everyone's surprise,
2 including some of the most prestigious firms in
3 London and France and elsewhere, that Dieter
4 Behring was involved in cooking his books, and we
5 had gone to some length to, with Richard Kovner
6 who has since -- Richard passed on, he died, but
7 when we got to raise money into this venture,
8 which we had asked earlier was there any other
9 fund, which was going to be, I mentioned the
10 global fund earlier, before putting any money
11 into it, it was Dieter Behring was asked for
12 disclosure regarding his trading methodology and
13 when he began to be asked very pointed question
14 from the Kovner team who were prepared based on
15 everything up to that point to begin to invest
16 money in the fund, Dieter Behring basically
17 became very arrogant, and said, "I'm Dieter
18 Behring. I answer to no one," and later or
19 shortly thereafter we discovered he didn't want
20 to answer questions because we were asking
21 questions he couldn't answer.
22        To make a long story short, we went to
23 arbitration against him. Dieter Behring ended up
24 being arrested, put in jail in Basel, and we

114

Porco

1 filed a suit and attempted to get the damages
2 that he had caused.
3        But despite the fact that he was guilty
4 and he was thrown in jail and everything else,
5 the arbitration team determined that they could
6 not pierce the corporate veil, so even though he
7 was a crook, he was a crook with a good document.
8 And that was, I guess, the end of it. So that's
9 what that's referring to.
10     Q. You make reference here to "the TPM
11 scammed us for 50 K." What does that refer to?
12     A. Where is that?
13     Q. It's in an e-mail from you to George
14 April 1, 2007, 8:32.
15     A. What that's about is the RCA group
16 asked for the money back, and they didn't want to
17 give the money back, and I was referring to the
18 fact that that's a scam because they were
19 supposed to perform.
20     Q. What does TPM stand for?
21     A. Third-party marketing group.
22     Q. In one of these e-mails you state, "I
23 didn't take 100 K plus out of the company over
24 the last 12 months (while, you did)."

Porco

1        Did George Szele take more than
2 $100,000 out of IAM during --
3     A. Both George and I couldn't take our
4 salaries, you know, per the operating agreement.
5 George having two kids and one on the way was in
6 greater need of income than I and, you know, as
7 you get into a situation where there's less and
8 less moneys available, and you need to take
9 something for a draw, that references we had a
10 phone conversation, and it was heated, and I
11 said, "Look, I need something that's more
12 substantive, something."
13        He was in a bad space and I was in a
14 bad space. E-mail transpired and I was just kind
15 of running -- maybe I shouldn't have said that
16 because you have kids to feed, but he had taken
17 more because he needed more. But at that point
18 in time, you know, I was hurting pretty bad as
19 well and needed, I needed income for regular
20 expenses. I got vendors to call and they want to
21 be paid. So that's what that was about.
22     Q. If you look at the first page of this
23 in the third paragraph, it says, "In your
24 desperation you took 4 X the money I was paid for

116

Porco

1 your personal income. You also have been using
2 company dollars to pay for expensive software in
3 part trade your own account." Do you see that?
4     A. Yes.
5     Q. What are you referring to there?
6     A. What I am referring to is that the
7 amount of gross proceeds that came out to he and
8 to I was proportionately that much greater than
9 mine, and that subject to having done the taxes,
10 you know, where you do your capital contributions
11 and such, you know, that was -- those are
12 dollars, there really wasn't income to George.
13 You were just paying a software charge in order
14 to track the market. And I just wanted to point
15 out that this needs to be offset because I need
16 income too. So it's really just referencing, you
17 know, what little we have. You had a little bit
18 more and I need some money now.
19     Q. Let me show you what we have marked as
20 Zanger Exhibit 13.
21        (Zanger Exhibit 13 was marked for
22 identification)
23     Q. This is the First Supplement to
24 Plaintiff's Response to Defendant's First Set of

Porco

1 Interrogatories. Have you seen these before?
2 A. I think I read through it. It was
3 forwarded to me.
4 Q. Do you see on page 2, the first item,
5 Lost Fees?
6 A. Page 2, Lost Fees.
7 Q. And then it refers to Management and
8 Performance Fees at the top? Do you see where it
9 goes over to the top of page 3?
10 A. Yes.
11 Q. Do you have any knowledge or
12 information as to the alleged amount of any such
13 fees?
14 A. No. I don't have any knowledge.
15 Q. The next item is Lost Management Fees.
16 Do you have any knowledge or information about
17 any factual basis for the allegations set forth
18 in that section?
19 A. Well, I mean, I know what a fund, what
20 the fund was supposed to earn, what the fund
21 could have earned and what the -- that's just
22 pointing out what the amount that would have
23 otherwise been generated, right?
24 Q. So this is calculated on the basis of

118

Porco

1 defendant's suggestion to place $50 million into
2 IFL, is that right?
3 A. I don't know, I would have to read
4 through it again.
5 Q. Take your time.
6 A. The numbers seem low for it to be 50
7 million. I'm sorry I don't know. Except the
8 numbers seem at first glance without using a
9 calculator.
10 Q. So you didn't perform these
11 calculations?
12 A. No, I didn't.
13 Q. Did you have any knowledge or
14 information as to how the lost performance fees
15 are calculated as they have reference here?
16 A. No, they were calculated by George and
17 others.
18 Q. Do you see the reference to Lost
19 Trading Revenue? Do you know how that was
20 calculated?
21 A. No, all of this was George's role.
22 Q. When you say all this, you mean all of
23 the items in this document?
24 A. Yes, this is something George had done.

Porco

1 Q. I show you what we have marked as
2 Zanger Exhibit 14.
3 MR. SEAR: I have a copy for counsel.
4 (Zanger Exhibit 14 was marked for
5 identification)
6 Q. Can you tell me what this is?
7 A. It's stating that there's an extension
8 for us to file the tax return for Independent
9 Asset Management and he's also asking for payment
10 for this -- to the accounting firm.
11 Q. Who is this person Francis X?
12 A. He's the CPA of Independent Asset
13 Management, it's a firm.
14 Q. What's his last name?
15 A. Infurcia.
16 Q. This makes reference to a 2005 net loss
17 of $241,000, is that right?
18 A. It does.
19 Q. Is that consistent with your
20 understanding of IAM's performance in 2005?
21 A. If the accountant has that figure
22 there, I trust that it is accurate.
23 Q. Do you have any knowledge or
24 information as to what the loss was for 2006?

120

Porco

1 A. I don't have any in front of me.
2 MR. SEAR: Let's take a break.
3 I note for the record that I asked
4 earlier for either being informed as to the
5 Bates numbers for the financial documents
6 that were discussed earlier today or copies
7 of those documents.
8 Since Mr. Szele is going to be deposed
9 on Wednesday, I would appreciate being
10 informed of the Bates numbers, if those
11 documents were in fact previously produced
12 to us, by tomorrow morning.
13 (Recess)
14 (Zanger Exhibit 15 was marked for
15 identification)
16 MR. SEAR: Let me make a statement for
17 the record. This witness has testified to
18 the existence of e-mails from Goldman, Sachs
19 dealing with alleged violations by Mr.
20 Zanger of certain rules and regulations and
21 complaints by Goldman, Sachs of margin call
22 matters in 2005 and 2006.
23 Candidly, we don't know what he is
24 referring to since our review of the

121

1                    Porco
2       documents produced does not reveal any such
3       documents.
4            I would request that counsel provide us
5       with the Bates numbers of the documents that
6       correspond to what the witness has been
7       testifying to, if in fact those documents
8       have been produced.
9            (Recess)
10   EXAMINATION CONTINUED
11   BY MR. SEAR:
12       Q.   Let me show you what we've marked as
13   Zanger Exhibit 15, which is the amended summons
14   and amended complaint in this action and ask you
15   to take a look at it and tell us if you have seen
16   this before.
17       A.   Yes, I've seen it, yes.
18       Q.   Did you authorize this to be served and
19   filed?
20       A.   George did.
21       Q.   So I take it you did not?
22       A.   No.  George -- well, unless it
23   requested both of our signatures, then I did.
24   Let me see.
25            Where would that page be?

122

1                    Porco
2       Q.   I'm not sure that there is a signature
3   on this by principals.
4       A.   If I recall some documents asked for me
5   to sign, other documents were signed off by
6   George.
7       Q.   I don't believe you signed this
8   document.  So would it be fair to say that you
9   did not authorize this document to be served and
10  filed?
11      A.   The final, any final authorizations,
12  that power rests with George as the majority
13  owner of IAM.  I am a minority owner of the
14  company.
15      Q.   Do you have any recollection of
16  authorizing this to be filed?
17      A.   I don't personally recall signing off
18  on this particular document.  I'm just looking to
19  see if I did or not.  I don't see that signature
20  page.
21      Q.   I don't see you signing this.
22           MR. SEARS:  I have no further questions
23  of this witness at this time.
24           (Time noted:  2:31 p.m.)
25

123

1                    Porco
2   March 3, 2008
3
4                    ERRATA
5
6   PAGE/LINE CHANGE/REASON
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

124

1                    Porco
2
3
4
5
6
7            _____
8                 JOSEPH J. PORCO
9
10  Subscribed and sworn to
11  before me this    day
12  of        2008
13  _____
14
15
16
17
18
19
20
21
22
23
24
25

1

2                    CERTIFICATE

3

4    STATE OF NEW YORK )

5                    ) ss.

6    COUNTY OF NEW YORK)

7

8            I, Joseph B. Pirozzi, a Registered

9    Professional Reporter and Notary Public within

10   and for the State of New York, do hereby certify:

11           That JOSEPH J. PORCO, the witness whose

12   deposition is hereinbefore set forth, was duly

13   sworn by me and that such deposition is a true

14   record of the testimony given by such witness.

15           I further certify that I am not related

16   to any of the parties to this action by blood or

17   marriage and that I am in no way interested in

18   the outcome of this matter.

19

20

21           _____

22                    JOSEPH B. PIROZZI, RPR

23

24

25

                                           126
1
2    March 3, 2008

3
                    INDEX
4

5    WITNESS        EXAMINATION BY    PAGE

6    Joseph Porco    Mr. Sear        4

7
     ZANGER    PAGE
8
     1      11
9    2      11
     3      18.
10   4      17
     5      34
11   6      44
     7      62
12   8      66
     9      69
13   10     80
     11     83
14   12     101
     13     116
15   14     119
     15     120
16
     REQUEST: 79, 120, 121
17

18          .
19
20
21
22
23
24
25

**$**

**$10** [2] - 59:7, 91:19
**$100,000** [5] - 6:13, 6:18, 94:21, 96:3, 115:3
**$137,489** [1] - 100:21
**$20** [1] - 59:7
**$200,000** [1] - 93:22
**$241,000** [1] - 119:18
**$30,000** [1] - 43:8
**$50** [9] - 20:2, 56:19, 56:20, 57:5, 57:12, 57:14, 57:25, 59:19, 118:2
**$50,000** [4] - 8:11, 55:25, 95:24, 96:10
**$58,000** [2] - 43:10, 43:11
**$72,798** [1] - 14:5
**$775,264** [1] - 100:3

**'**

**'01** [6] - 93:9, 93:16, 94:25, 95:3, 95:23, 96:9
**'03** [1] - 106:13
**'04** [8] - 91:7, 93:10, 93:17, 94:25, 95:23, 96:9, 96:20, 106:13
**'05** [2] - 35:6, 100:2
**'06** [12] - 28:14, 39:11, 41:8, 43:15, 70:25, 71:7, 71:16, 71:17, 95:4, 98:23, 99:10

**1**

**1** [13] - 11:17, 11:18, 11:20, 12:2, 12:9, 56:6, 56:7, 56:8, 62:17, 100:17, 101:8, 114:15, 126:8
**10** [3] - 80:5, 80:6, 126:13
**100** [3] - 6:19, 50:10, 114:24
**10007** [1] - 2:8
**10017** [2] - 1:17, 2:15
**101** [1] - 126:14
**10:30** [1] - 1:11
**10:33** [1] - 109:6
**11** [7] - 4:8, 83:5, 83:6, 83:11, 126:8, 126:9, 126:13
**116** [1] - 126:14
**119** [1] - 126:15
**12** [4] - 101:6, 101:10, 114:25, 126:14
**120** [2] - 126:15, 126:16
**121** [1] - 126:16
**125** [4] - 67:9, 67:19, 68:6, 69:6
**12:41** [1] - 82:10
**13** [3] - 116:21, 116:22, 126:14
**14** [4] - 34:25, 119:3, 119:5, 126:15

**15** [3] - 120:15, 121:13, 126:15
**150** [1] - 48:24
**17** [1] - 126:10
**18** [2] - 7:7, 126:9
**18-month** [4] - 40:8, 40:23, 41:2, 42:15
**1:07-cv-06431-jsr** [1] - 1:6
**1:15** [1] - 83:3

**2**

**2** [13] - 11:22, 11:24, 12:6, 21:20, 22:7, 56:6, 56:8, 62:17, 99:25, 100:12, 117:5, 117:7, 126:9
**20** [11] - 35:10, 35:16, 36:6, 36:25, 37:6, 37:24, 38:6, 59:5, 59:12, 60:2, 100:12
**200** [1] - 48:25
**2000** [2] - 27:5, 89:8
**2001** [3] - 89:9, 89:24, 95:10
**2003** [2] - 56:5, 89:5
**2004** [8] - 6:12, 7:20, 7:23, 9:2, 21:6, 22:10, 56:7, 95:10
**2005** [57] - 4:12, 4:18, 5:9, 5:14, 5:20, 6:5, 6:9, 6:20, 7:12, 7:20, 7:23, 8:4, 8:23, 9:2, 9:9, 9:12, 11:23, 12:7, 15:21, 16:12, 17:15, 17:16, 18:2, 23:22, 23:24, 29:25, 30:10, 30:14, 31:17, 31:19, 32:24, 33:9, 33:17, 33:19, 34:3, 34:25, 35:4, 35:11, 38:10, 38:13, 48:21, 49:13, 50:4, 61:11, 67:25, 68:4, 69:17, 69:20, 70:6, 70:12, 71:25, 86:3, 86:4, 119:17, 119:21, 120:23
**2006** [50] - 6:3, 11:21, 12:4, 12:14, 12:15, 12:22, 12:25, 13:6, 17:17, 24:2, 27:8, 28:16, 35:10, 35:16, 36:6, 36:18, 36:25, 37:6, 37:24, 38:6, 38:23, 39:4, 40:6, 40:20, 40:25, 41:7, 41:14, 42:5, 42:18, 45:13, 50:11, 50:16, 50:22, 67:25, 69:17, 69:21, 70:12, 71:25, 72:2, 72:6, 76:24, 78:15, 78:22, 86:6, 86:23, 87:11, 98:7, 100:17, 119:25, 120:23
**2007** [5] - 66:24, 101:8, 101:9, 101:19, 109:6, 114:15
**2008** [4] - 1:10, 123:2, 124:12, 126:2
**21** [1] - 38:23
**222** [2] - 1:16, 2:14
**225** [1] - 2:6

**25** [8] - 4:8, 7:3, 7:4, 7:17, 59:9, 100:5, 100:6, 100:23
**2700** [1] - 2:7
**2:31** [1] - 122:24
**2:53** [1] - 101:19

**3**

**3** [18] - 1:10, 12:9, 18:5, 18:7, 18:11, 19:19, 56:4, 57:23, 58:2, 58:7, 58:13, 100:16, 100:18, 100:19, 117:10, 123:2, 126:2, 126:9
**30** [2] - 101:8, 101:19
**31** [2] - 89:24, 109:5
**34** [1] - 126:10

**4**

**4** [28] - 17:19, 17:21, 18:11, 19:19, 21:20, 21:21, 24:3, 25:16, 25:18, 26:8, 26:11, 27:4, 28:7, 28:10, 28:15, 28:21, 62:16, 63:6, 64:20, 65:14, 66:24, 89:24, 100:2, 115:25, 126:6, 126:10
**400,000** [1] - 93:25
**41st** [2] - 1:16, 2:14
**44** [1] - 126:11
**46** [1] - 98:5
**4896** [1] - 102:7

**5**

**5** [15] - 23:5, 24:12, 34:14, 34:16, 35:23, 56:14, 59:8, 60:5, 60:11, 61:14, 66:6, 66:9, 90:5, 91:8, 126:10
**50** [14] - 6:19, 49:25, 50:3, 50:5, 56:14, 56:22, 57:18, 58:8, 58:11, 59:9, 60:11, 60:13, 114:12, 118:7
**50,000** [1] - 55:19
**50-50** [1] - 42:9

**6**

**6** [3] - 44:3, 44:4, 126:11
**62** [1] - 126:11
**66** [1] - 126:12
**69** [1] - 126:12

**7**

**7** [4] - 61:23, 62:3, 67:3, 126:11
**75** [3] - 34:22, 59:9, 100:14
**79** [1] - 126:16

**8**

**8** [3] - 66:12, 66:13, 126:12

**80** [2] - 50:10, 126:13
**83** [1] - 126:13
**8:32** [1] - 114:15

**9**

**9** [3] - 69:22, 69:24, 126:12

**A**

**ability** [3] - 10:2, 68:18, 111:22
**able** [10] - 10:3, 10:17, 20:23, 54:19, 55:9, 70:21, 90:21, 92:6, 104:2, 110:9
**absence** [1] - 14:16
**acceptable** [1] - 89:2
**access** [5] - 10:18, 11:6, 15:3, 15:7, 15:16
**accident** [1] - 103:17
**accolades** [1] - 98:2
**accommodation** [1] - 75:13
**accompanying** [1] - 16:11
**account** [6] - 22:17, 58:3, 58:14, 72:9, 116:4
**accountant** [4] - 24:7, 43:6, 70:3, 119:22
**accounting** [7] - 9:6, 14:17, 32:5, 50:23, 66:15, 79:23, 119:11
**accounts** [3] - 4:10, 44:21, 58:10
**accrued** [1] - 39:3
**accruing** [1] - 42:21
**accumulated** [2] - 16:7, 84:21
**accurate** [3] - 34:5, 100:7, 119:23
**achieve** [1] - 106:24
**acknowledges** [1] - 21:23
**act** [1] - 48:7
**acting** [1] - 6:7
**action** [4] - 102:2, 102:24, 121:14, 125:16
**actions** [1] - 82:5
**active** [5] - 47:9, 48:5, 81:23, 94:10, 112:18
**activities** [9] - 6:9, 10:12, 15:20, 16:8, 45:24, 48:8, 48:11, 98:6, 98:22
**activity** [9] - 9:17, 9:21, 26:6, 26:8, 30:5, 37:13, 54:10, 69:16, 98:13
**acumen** [1] - 33:6, 88:14
**addendum** [2] - 18:2, 18:4
**additional** [1] - 85:17
**address** [6] - 15:24, 47:5, 69:15, 76:10, 96:12, 107:6
**addressed** [1] - 30:24
**addresses** [1] - 19:22

addressing [1] - 95:17
administer [1] - 3:10
administration [4] - 4:22, 5:3, 9:6, 47:9
administrative [4] - 13:4, 16:19, 62:7, 76:5
administrator [30] - 4:23, 10:5, 14:19, 14:24, 15:12, 24:24, 26:3, 26:5, 27:11, 27:12, 28:9, 32:15, 38:19, 62:9, 63:12, 63:22, 65:9, 65:11, 66:3, 71:11, 71:18, 71:20, 73:17, 74:10, 74:25, 75:11, 78:20, 88:21
Adrianna [1] - 87:6
advance [1] - 61:7
advised [2] - 71:10, 71:17
adviser [1] - 22:18
advising [1] - 72:11
Afternoon [1] - 83:2
agent [1] - 97:19
ago [4] - 15:18, 26:12, 57:24, 108:19
agree [3] - 26:17, 62:20, 63:7
Agreed [3] - 3:4, 3:8, 3:12
agreed [2] - 25:22, 37:10
agreement [57] - 6:16, 7:2, 7:10, 17:20, 18:6, 18:16, 19:25, 20:6, 20:7, 20:24, 21:7, 21:18, 21:21, 22:3, 22:12, 24:17, 25:23, 31:7, 31:9, 34:21, 35:18, 37:8, 37:19, 37:22, 40:23, 41:25, 48:23, 49:5, 52:24, 54:8, 55:10, 55:13, 55:24, 56:5, 56:20, 57:6, 57:9, 57:14, 59:20, 60:9, 60:10, 60:18, 60:19, 60:21, 61:9, 63:8, 70:6, 70:13, 70:17, 72:5, 72:25, 92:2, 92:4, 107:16, 115:5
agreements [5] - 18:11, 18:12, 18:24, 19:18, 29:14
ahold [2] - 33:13, 87:2
Aim [1] - 78:10
alerted [1] - 72:16
allegations [1] - 117:18
alleged [3] - 99:20, 117:13, 120:20
allow [1] - 53:2, 72:20, 111:5
allowed [2] - 72:21, 73:14
almost [1] - 92:12
amended [2] - 121:13, 121:14
amount [16] - 12:18, 33:4, 42:20, 42:22, 43:5, 43:21, 50:18, 54:15, 61:4, 71:3, 105:8, 109:16, 116:8,

117:13, 117:23
amounts [4] - 40:7, 43:13, 53:17, 84:20
Andrea [5] - 54:20, 54:24, 86:12, 87:5, 87:6
annuity [1] - 98:11
Answer [1] - 71:15
answer [13] - 7:8, 15:6, 15:16, 21:8, 37:15, 41:4, 47:17, 63:21, 71:14, 81:5, 113:19, 113:21, 113:22
answered [1] - 54:14
answering [1] - 52:12
anyway [1] - 73:6
appeal [1] - 109:19
appearance [1] - 66:23
Appearances [1] - 2:2
Appleby [4] - 10:6, 44:20, 44:25, 79:20
appointing [1] - 92:9
appreciate [1] - 120:10
appropriate [3] - 14:22, 15:15, 17:4
appropriately [1] - 107:7
appropriateness [1] - 15:13
approximate [1] - 50:18
approximation [1] - 48:15
April [14] - 18:2, 38:23, 39:11, 40:6, 40:20, 40:25, 41:7, 41:14, 42:4, 42:17, 70:25, 71:7, 101:8, 114:15
arbitration [2] - 113:24, 114:6
area [1] - 97:10
areas [2] - 4:21, 37:12
argument [3] - 102:19, 102:20, 105:12
arise [2] - 10:10, 30:23
arose [1] - 10:8, 10:15, 107:6
arrangement [1] - 9:5
arrested [1] - 113:25
arrogant [1] - 113:18
Arturo [2] - 67:12, 67:17
aside [6] - 5:13, 12:20, 13:20, 13:24, 26:24, 96:7
aspect [3] - 9:18, 10:8, 42:11
aspects [1] - 5:5
assert [1] - 29:10
asserted [3] - 29:4, 99:18, 99:22
Asset [7] - 1:4, 4:13, 67:7, 88:17, 89:18, 119:10, 119:13
assets [19] - 15:25, 16:13, 17:5, 21:25, 22:11, 22:15, 23:13, 49:9, 50:22, 51:6, 57:25, 58:21, 59:6, 59:15, 59:24, 61:4, 77:13, 112:16

assist [1] - 54:25
assistance [2] - 112:9, 112:14
assistant [2] - 54:20, 86:12
assisted [3] - 4:24, 109:18, 110:16
assisting [2] - 55:23, 112:12
associate [1] - 67:2
associated [4] - 4:12, 97:25
Association [1] - 88:9
Assuming [2] - 6:2, 17:23
attached [2] - 62:16, 64:10
attempt [7] - 15:21, 22:15, 45:17, 55:2, 74:20, 74:23, 81:16
attempted [1] - 114:2
attempts [2] - 16:4, 16:25
attended [1] - 69:4
attention [3] - 4:11, 25:15, 29:25
attentiveness [1] - 99:5
attorney [5] - 13:16, 21:11, 44:16, 109:18, 111:3
Attorneys [2] - 2:5, 2:13
attorneys [1] - 9:5
attract [1] - 45:18
attributable [1] - 13:10
audit [10] - 4:25, 23:24, 87:20, 87:21, 88:15, 88:16, 88:19, 88:23, 88:25, 89:2
auditing [1] - 87:20
auditor [2] - 79:19, 88:20
auditors [2] - 9:6, 79:24
August [5] - 76:24, 77:8, 77:16, 77:20, 77:25
Authority [2] - 44:24, 74:7
authority [2] - 73:4, 73:5
authorizations [1] - 122:11
authorize [2] - 121:18, 122:9
authorized [1] - 3:10
authorizing [1] - 122:16
available [3] - 52:23, 80:2, 115:9
award [2] - 103:7, 106:7
awards [1] - 98:3
aware [17] - 21:2, 26:23, 26:25, 30:6, 30:21, 31:17, 31:19, 31:23, 33:8, 33:10, 42:24, 61:17, 61:18, 66:20, 67:16, 76:21, 110:5

## B

babies [2] - 105:15, 105:22
baby [1] - 105:23
background [4] - 87:16, 87:18, 112:11
backup [1] - 98:21

bad [3] - 115:14, 115:15, 115:19
balance [1] - 35:11
balances [1] - 14:20
Balestriere [1] - 2:4
banter [3] - 102:17, 105:18, 105:20
bar [1] - 81:14
base [1] - 59:24
based [6] - 39:21, 52:8, 54:19, 100:8, 110:2, 113:15
Basel [1] - 113:25
basic [2] - 5:3, 58:22
basis [6] - 9:22, 10:12, 10:17, 11:6, 117:18, 117:25
batch [1] - 103:16
Bates [6] - 53:7, 79:13, 102:7, 120:6, 120:11, 121:5
bear [1] - 46:19
became [1] - 31:23, 32:22, 33:10, 41:3, 47:23, 49:10, 71:4, 90:13, 98:13, 112:12, 113:18
become [4] - 48:9, 63:19, 82:2, 97:20
becomes [1] - 63:20
becoming [1] - 97:11
began [10] - 36:20, 68:3, 68:6, 72:2, 89:8, 89:9, 89:20, 90:24, 92:21, 113:14
begin [6] - 25:21, 40:9, 43:3, 108:4, 113:16
beginning [5] - 20:16, 42:24, 58:19, 60:25, 61:2
begun [1] - 73:8
behalf [7] - 16:5, 30:16, 31:21, 61:12, 88:16, 106:12, 110:6
behind [1] - 11:13
Behring [7] - 112:6, 112:21, 113:5, 113:12, 113:17, 113:19, 113:24
beneath [2] - 24:12, 35:22
benefit [1] - 104:6
Bermuda [8] - 4:23, 10:7, 44:24, 44:25, 61:25, 74:6, 79:18, 89:19
best [7] - 18:25, 36:25, 45:21, 86:21, 87:9, 101:2, 107:4
better [2] - 23:25, 55:14
Between [1] - 76:16
between [20] - 3:5, 16:20, 17:20, 18:21, 18:23, 19:2, 19:17, 20:8, 21:2, 26:3, 37:3, 57:8, 61:2, 61:9, 77:9, 91:21, 97:3, 101:15, 102:18, 105:20
beyond [6] - 18:23, 19:17, 20:25, 37:9, 84:16, 84:17
Beyond [1] - 19:15

**bills** [8] - 77:17, 77:20, 77:22, 78:2, 78:4, 78:6, 85:14, 98:21
**bit** [3] - 40:10, 99:3, 116:18
**bizarre** [1] - 33:7
**blood** [1] - 125:16
**blowup** [1] - 47:15
**Bma** [5] - 10:10, 32:17, 44:22, 44:23, 99:6
**board** [6] - 10:5, 27:20, 55:23, 63:20, 63:23, 72:13
**books** [1] - 113:5
**borrow** [1] - 7:24, 7:25, 8:4
**borrowed** [4] - 85:6, 85:8, 85:17, 93:12
**bottom** [1] - 35:6
**break** [5] - 8:20, 51:22, 65:17, 82:9, 120:3
**breakdown** [1] - 95:14
**breath** [1] - 75:3
**briefly** [1] - 69:3
**bring** [2] - 22:15, 39:8
**Broadway** [1] - 2:6
**broken** [1] - 15:9
**broker** [3] - 34:10, 34:11, 67:6
**brokerage** [1] - 22:16
**brother** [1] - 112:10
**brought** [3] - 22:19, 95:19, 107:14
**Brown** [1] - 22:21
**Bruce** [1] - 112:10
**Bs** [1] - 88:6
**build** [1] - 46:14
**bulk** [2] - 16:17, 92:21
**burden** [1] - 46:19
**business** [8] - 6:8, 33:7, 58:24, 59:15, 88:24, 98:6, 98:22, 103:11
**Butterfield** [10] - 27:21, 28:6, 32:8, 61:25, 62:8, 63:8, 78:25, 79:9, 79:19, 109:2

## C

**calculated** [5] - 100:8, 117:25, 118:16, 118:17, 118:21
**calculations** [1] - 118:12
**calculator** [1] - 118:10
**calendar** [1] - 23:21
**camaraderie** [1] - 60:25
**Candidly** [1] - 120:24
**cannon** [1] - 73:10
**cannot** [2] - 20:22, 28:25
**capital** [8] - 6:13, 7:19, 22:14, 58:23, 95:16, 95:19, 104:21, 116:11
**capitalization** [1] - 42:25
**card** [4] - 85:7, 85:10,

85:12, 85:13
**care** [3] - 86:17, 87:8, 98:11
**career** [2] - 97:19, 97:20
**carried** [2] - 16:18, 63:13
**Carrier's** [1] - 90:12
**Carriers** [29] - 90:17, 91:18, 91:21, 91:22, 92:5, 92:15, 92:17, 93:4, 94:10, 103:8, 103:18, 103:19, 103:24, 103:25, 104:2, 104:9, 104:10, 104:18, 104:21, 106:2, 106:3, 107:13, 107:23, 107:24, 107:25, 108:8, 109:15, 111:23
**Carriers'** [1] - 92:8
**carry** [1] - 54:10
**carrying** [1] - 25:3
**case** [5] - 6:6, 43:20, 94:15, 97:5, 112:5
**catch** [1] - 72:23
**catch-22** [1] - 55:7
**caught** [3] - 72:19, 90:17, 110:12
**caused** [2] - 31:14, 114:3
**causing** [1] - 90:21
**Caxton** [1] - 112:10
**cc** [1] - 80:13
**cc'd** [4] - 27:25, 28:3, 68:12, 69:3
**cease** [3] - 30:9, 98:23, 98:24
**ceased** [1] - 98:25
**certain** [6] - 13:13, 36:16, 93:24, 94:2, 94:20, 120:21
**certainly** [1] - 52:20
**Certainly** [1] - 87:17
**Certificate** [1] - 125:2
**certify** [2] - 125:10, 125:15
**cetera** [4] - 9:6, 14:23, 32:18, 105:17
**chain** [1] - 102:6
**Chairman** [1] - 110:7
**Change/reason** [1] - 123:6
**charge** [2] - 100:12, 116:14
**charges** [1] - 85:10
**Charter** [1] - 87:25
**check** [10] - 14:23, 34:24, 35:7, 35:9, 35:14, 36:7, 38:22, 38:24, 39:7, 51:20
**checks** [5] - 14:20, 34:18, 34:20, 39:9, 40:12
**chronological** [1] - 102:7
**circles** [1] - 112:23
**circumstance** [1] - 111:14
**circumstances** [3] - 95:21, 109:14, 110:23
**circumvent** [1] - 22:24
**circumvented** [2] - 72:12, 74:4
**claim** [5] - 53:3, 99:19,

99:22, 103:18, 103:19
**claimed** [2] - 38:2, 55:22
**Class** [17] - 5:11, 5:13, 6:23, 21:25, 22:11, 23:5, 24:3, 31:12, 31:21, 40:15, 40:19, 46:13, 56:12, 56:15, 62:17, 66:16, 67:23
**class** [18] - 41:24, 46:8, 46:11, 46:12, 46:15, 46:18, 47:4, 48:13, 82:4, 88:6, 91:24, 92:3, 94:8, 94:9, 94:10, 99:2, 99:17, 106:17
**classes** [3] - 5:17, 10:2, 77:14
**clause** [1] - 29:13
**clear** [12] - 5:23, 20:2, 26:18, 30:11, 31:13, 61:3, 61:9, 64:8, 71:5, 71:7, 73:15, 95:8
**clearly** [2] - 26:14, 52:10
**client** [1] - 52:17
**clients** [1] - 22:19
**collapsed** [1] - 46:15
**colleague** [1] - 108:15
**collected** [1] - 109:16
**collectively** [2] - 21:15, 55:21
**college** [2] - 87:18, 87:23
**column** [2] - 83:25, 84:4
**comfortable** [1] - 59:10
**coming** [10] - 7:14, 35:23, 40:13, 48:3, 61:3, 103:14, 103:23, 104:5, 104:6, 111:25
**Commencing** [1] - 56:9
**comment** [1] - 109:7
**committed** [1] - 110:19
**committing** [2] - 93:2, 106:20
**common** [1] - 59:22
**communicate** [2] - 37:11, 70:8
**communicated** [2] - 86:8, 110:6
**communicating** [1] - 26:6
**communications** [5] - 28:4, 28:20, 65:25, 74:15, 99:6
**community** [1] - 107:21
**company** [16] - 5:5, 39:8, 48:25, 53:20, 55:22, 74:2, 74:4, 81:23, 83:24, 84:16, 112:8, 112:13, 114:24, 116:3, 122:14
**comparison** [1] - 54:14
**complained** [1] - 107:2
**complains** [1] - 61:13
**complaint** [2] - 81:21, 121:14
**complaints** [2] - 107:3, 120:22
**complete** [1] - 54:24

**completely** [3] - 58:17, 74:4, 107:19
**compliance** [2] - 4:24, 64:24
**compliant** [1] - 44:22
**concern** [6] - 19:6, 24:18, 27:11, 27:13, 53:6, 103:5
**concerned** [1] - 24:11
**concerning** [7] - 46:23, 66:16, 81:6, 86:2, 86:6, 86:23, 87:11
**concerns** [3] - 64:17, 64:19, 107:6
**conclude** [1] - 71:13
**conditions** [3] - 21:18, 35:17, 37:2
**confidential** [1] - 45:13
**confirm** [1] - 63:4
**confirmation** [1] - 63:2
**confirming** [1] - 64:5
**Congressman** [3] - 109:9, 109:11, 110:4
**congressman** [2] - 109:13, 110:15
**Connecticut** [2] - 87:24, 88:2
**connection** [10] - 8:17, 12:23, 21:6, 31:20, 40:21, 68:22, 78:9, 78:14, 83:9, 83:17
**consent** [3] - 75:21, 75:25, 76:3
**consented** [2] - 75:19, 76:3
**consequence** [2] - 82:5, 106:6
**considered** [1] - 110:11
**consistent** [1] - 119:20
**consistently** [1] - 67:14
**constant** [2] - 9:22, 10:12
**constituents** [1] - 109:13
**contact** [1] - 17:12
**contacted** [2] - 31:3, 74:12
**contacts** [1] - 16:6
**continual** [2] - 16:3, 49:8
**continually** [3] - 15:25, 45:22, 76:19
**continue** [10] - 58:3, 58:14, 77:2, 77:11, 77:12, 85:19, 103:9, 107:12, 107:23, 107:24
**Continued** [4] - 52:2, 53:12, 83:13, 121:10
**continued** [2] - 71:9, 71:12
**continuing** [4] - 56:10, 77:3, 77:4, 78:7
**contract** [28] - 20:18, 25:6, 25:22, 26:14, 26:17, 26:19, 26:25, 29:3, 29:5, 29:11, 29:20, 30:3, 30:15, 36:9, 36:22, 37:3, 37:6, 37:12,

39:12, 41:25, 42:6, 42:7,
70:15, 73:3, 75:18, 75:20,
86:3, 86:7
  **contrary** [1] - 101:24
  **contrasting** [1] - 95:11
  **contribute** [3] - 6:12, 17:5,
60:4
  **contributed** [1] - 61:14
  **contribution** [2] - 6:15,
7:19
  **contributions** [1] - 116:11
  **control** [2] - 21:24, 22:22
  **conversation** [4] - 19:22,
52:5, 86:18, 115:11
  **Conversations**[1] - 76:14
  **conversations** [11] - 19:13,
20:14, 25:25, 57:7, 74:16,
76:11, 76:23, 77:9, 85:25,
86:5, 86:22
  **convey** [1] - 63:8
  **cooking** [1] - 113:5
  **copies** [2] - 24:7, 120:7
  **copy** [13] - 8:18, 12:3,
17:19, 18:6, 34:15, 50:25,
51:3, 51:5, 62:22, 62:23,
101:12, 101:18, 119:4
  **corporate** [1] - 114:7
  **Corporation**[1] - 97:16
  **correct** [17] - 11:5, 12:15,
23:21, 29:18, 33:8, 33:20,
34:24, 40:6, 45:25, 62:11,
62:20, 63:5, 64:10, 80:21,
100:5, 100:10, 100:23
  **Correct**[1] - 9:10
  **correctly** [1] - 79:23
  **correspond** [1] - 121:6
  **corresponded** [2] - 28:5,
65:8
  **correspondence** [12] -
19:2, 20:8, 20:10, 20:11,
26:2, 26:4, 30:7, 31:4, 53:23,
54:22, 72:2
  **cost** [2] - 46:19, 104:2
  **counsel** [22] - 3:5, 4:24,
10:5, 10:7, 21:5, 21:13,
32:17, 34:15, 44:13, 44:14,
51:10, 52:8, 66:24, 80:9,
80:10, 83:7, 99:6, 101:12,
101:24, 112:15, 119:4, 121:4
  **Counsel**[1] - 4:8
  **County**[1] - 125:6
  **couple** [3] - 11:12, 87:4,
91:13
  **course** [3] - 25:19, 38:7,
92:22
  **Court**[2] - 1:2, 67:10
  **cover** [1] - 72:6
  **covered** [3] - 13:11, 13:14,
13:17
  **covering** [1] - 72:17

  **covers** [1] - 35:3
  **Cox**[1] - 110:7
  **Cpa**[2] - 88:15, 119:13
  **Craig**[1] - 2:9
  **crazy** [1] - 73:21
  **create** [1] - 60:5
  **created** [2] - 32:13, 61:11
  **creates** [1] - 60:12
  **creation** [1] - 21:6
  **credit** [3] - 85:7, 85:10,
85:12
  **credits** [1] - 88:6
  **crime** [1] - 106:20
  **crook** [2] - 114:8
  **cross** [2] - 90:18, 110:13
  **cumbersome** [1] - 103:13
  **custodial** [1] - 72:9
  **Custodian**[1] - 34:10
  **custodian** [4] - 71:11,
72:19, 72:21, 74:24
  **cutoff** [1] - 78:23
  **cycle** [1] - 40:11

# D

  **D&t** [3] - 79:20, 87:21,
88:10
  **daily** [4] - 5:2, 10:17, 11:5,
16:21
  **damaged** [5] - 103:23,
103:24, 106:15, 110:20,
111:20
  **damages** [10] - 42:21,
84:16, 84:17, 104:12,
104:17, 106:12, 108:2,
110:3, 110:10, 114:2
  **damaging** [1] - 108:5
  **Dan**[169] - 5:10, 5:16, 6:23,
6:25, 7:5, 10:3, 10:4, 10:16,
10:18, 11:3, 11:12, 17:20,
18:12, 19:3, 19:17, 19:22,
19:23, 19:25, 20:8, 21:2,
21:7, 21:15, 22:10, 22:14,
23:24, 24:2, 24:5, 24:8,
24:13, 24:20, 25:9, 25:22,
26:3, 26:4, 26:6, 27:3, 27:11,
28:2, 28:5, 28:16, 28:20,
29:22, 30:3, 30:5, 30:8,
30:16, 31:3, 31:6, 31:18,
32:3, 32:11, 33:14, 34:20,
35:10, 35:16, 36:25, 39:12,
39:19, 40:13, 41:5, 41:6,
41:13, 41:17, 41:19, 41:21,
41:25, 42:3, 42:10, 42:17,
42:20, 42:23, 42:24, 43:14,
46:12, 47:15, 48:3, 49:4,
49:5, 51:7, 54:8, 54:12,
54:13, 54:20, 54:23, 55:13,
55:16, 55:18, 55:20, 55:22,
55:25, 56:3, 56:18, 56:21,

56:24, 57:8, 57:24, 58:25,
59:14, 59:20, 60:7, 60:20,
61:2, 61:3, 61:13, 62:22,
62:24, 64:6, 64:7, 64:11,
64:12, 65:2, 65:13, 67:23,
70:2, 70:3, 70:5, 70:9, 70:14,
70:20, 70:21, 71:5, 71:10,
71:12, 71:17, 71:25, 72:6,
72:8, 72:16, 73:9, 73:12,
73:13, 73:15, 73:25, 74:3,
74:11, 74:16, 74:22, 75:7,
75:9, 77:6, 77:7, 77:13,
77:15, 78:17, 80:18, 80:22,
81:15, 81:17, 86:2, 86:13,
86:15, 86:19, 87:14, 91:23,
92:9, 94:16, 95:16, 96:15,
96:19, 96:22, 96:25, 99:17,
100:9, 103:23, 104:4,
107:15, 111:25
  **Dan's** [23] - 10:11, 11:8,
16:2, 16:5, 16:24, 17:3, 19:7,
23:22, 31:21, 33:6, 45:24,
46:11, 49:10, 57:5, 58:18,
60:4, 74:19, 78:12, 82:5,
97:3, 97:5, 98:25, 99:13
  **Daniel** [2] - 1:7, 67:2
  **darn** [1] - 108:3
  **database** [1] - 16:7
  **date** [25] - 5:23, 6:14, 7:22,
8:5, 8:8, 35:25, 36:5, 36:6,
36:7, 36:10, 36:20, 41:2,
45:12, 45:15, 46:4, 56:9,
62:15, 65:21, 82:7, 83:19,
84:2, 89:23, 91:4, 99:12
  **dated** [2] - 34:25, 35:9
  **dates** [7] - 8:6, 30:11,
32:25, 38:14, 47:18, 71:19,
78:23
  **David**[1] - 111:14
  **David-and-goliath-type** [1]
- 111:14
  **days** [5] - 33:15, 33:24,
33:25, 34:4, 88:25
  **deal** [5] - 23:4, 30:23,
68:14, 75:11, 89:16
  **dealing** [1] - 120:20
  **dealt** [2] - 4:21, 10:7
  **debt** [2] - 84:13, 84:21
  **December**[9] - 11:23, 41:7,
42:4, 46:2, 78:15, 78:22,
98:7, 98:23, 99:9
  **decide** [1] - 22:20
  **decision** [4] - 48:4, 52:16,
71:3, 92:18
  **declaring** [1] - 34:10
  **deep** [1] - 75:3
  **Defendant**[1] - 1:8
  **defendant** [3] - 1:15, 2:13,
67:2
  **Defendant's** [1] - 116:25

  **defendant's** [1] - 118:2
  **defined** [1] - 42:2
  **degree** [3] - 16:23, 21:9,
21:19
  **deliberately** [1] - 71:13
  **Deloitte** [2] - 88:10, 88:19
  **Deloitte's** [1] - 12:5
  **depleted** [1] - 84:24
  **depose** [1] - 26:21
  **deposed** [1] - 120:9
  **deposition** [4] - 3:9, 3:13,
125:12, 125:13
  **Deposition** [1] - 1:14
  **derivatively** [1] - 111:7
  **describe** [1] - 36:11
  **described** [2] - 23:10,
28:23
  **designations** [1] - 87:19
  **desire** [1] - 60:4
  **desperation** [1] - 115:25
  **despite** [1] - 114:4
  **destroyed** [1] - 107:25
  **detail** [2] - 15:24, 23:19
  **detailed** [1] - 14:18
  **deteriorate** [1] - 73:9
  **determine** [1] - 90:21
  **determined** [4] - 90:22,
110:19, 111:16, 114:6
  **develop** [1] - 53:22
  **development** [1] - 112:13
  **dialing** [1] - 87:7
  **dialogue** [1] - 20:13
  **died** [1] - 113:7
  **Dieter**[8] - 112:5, 112:6,
112:21, 113:4, 113:12,
113:17, 113:18, 113:24
  **different** [9] - 4:21, 16:20,
32:20, 36:15, 63:5, 92:11,
99:5, 107:18, 107:19
  **difficult** [3] - 49:10, 59:16,
98:15
  **diligence** [1] - 54:2
  **dipped** [1] - 85:13
  **Directing**[1] - 25:15
  **directing** [2] - 4:11, 29:25
  **directly** [6] - 28:6, 54:24,
62:25, 72:10, 72:14, 72:18
  **director** [14] - 4:19, 9:13,
9:15, 27:19, 27:20, 47:10,
47:11, 47:19, 47:23, 48:8,
48:9, 63:24, 76:4, 76:10
  **directors** [4] - 10:6, 27:21,
63:20, 72:13
  **disability** [1] - 97:8
  **disbursed** [1] - 105:5
  **disclose** [1] - 37:11
  **disclosed** [2] - 45:9, 45:10
  **disclosure** [2] - 105:19,
113:13

**disclosures** [3] - 37:17, 39:17, 51:14
**discover** [1] - 37:20
**discovered** [2] - 92:24, 113:20
**discuss** [1] - 81:17
**discussed** [1] - 120:7
**discussing** [1] - 55:21
**discussions** [1] - 58:5
**disengaged** [1] - 98:13
**disrupt** [1] - 69:19
**disrupted** [2] - 69:18, 69:20
**disruptive** [1] - 32:3
**distribute** [1] - 111:17
**distribution** [1] - 109:20
**District** [2] - 1:2, 1:2
**divorce** [1] - 60:23
**document** [34] - 8:13, 8:17, 15:11, 20:5, 20:21, 33:3, 44:15, 44:19, 44:21, 45:6, 45:9, 50:20, 50:24, 52:5, 52:13, 52:19, 53:5, 57:4, 57:15, 57:21, 61:11, 63:4, 83:4, 83:6, 83:8, 83:22, 92:6, 102:6, 111:9, 114:8, 118:24, 122:8, 122:9, 122:18
**documentation** [1] - 15:8
**documents** [15] - 15:5, 38:4, 45:5, 53:8, 54:11, 94:3, 120:6, 120:8, 120:12, 121:2, 121:3, 121:5, 121:7, 122:4, 122:5
**dollar** [1] - 84:20
**dollars** [8] - 48:18, 56:25, 104:3, 109:23, 109:25, 112:25, 116:3, 116:13
**domino** [1] - 32:13
**done** [15] - 10:9, 27:22, 32:19, 38:3, 38:11, 63:9, 64:25, 67:9, 79:23, 107:4, 107:9, 111:2, 111:21, 116:10, 118:25
**Dormant** [1] - 99:11
**dormant** [10] - 81:25, 82:2, 99:4, 99:9, 103:4, 103:5, 103:6, 103:10, 104:24, 105:12
**double** [1] - 88:5
**down** [16] - 4:23, 15:9, 22:21, 25:11, 33:14, 35:5, 35:22, 39:9, 45:23, 46:6, 52:21, 58:18, 93:2, 93:5, 104:25, 110:9
**draft** [1] - 21:21
**drafted** [4] - 21:12, 21:13, 21:14, 42:10
**dragged** [1] - 35:25
**draw** [1] - 115:10
**drawdown** [1] - 36:21
**drawdowns** [3] - 10:25,

36:17, 36:19
**drawing** [1] - 60:21
**drawn** [1] - 60:20
**drew** [1] - 16:15
**ducks** [1] - 106:10
**due** [4] - 32:16, 32:17, 49:2, 54:2
**duly** [2] - 4:3, 125:12
**during** [11] - 5:21, 6:20, 7:21, 30:16, 36:3, 49:3, 52:6, 77:20, 77:24, 80:23, 115:3
**During** [1] - 78:5
**duties** [1] - 9:11
**Dz** [2] - 21:23, 56:12

## E

**E-mail** [1] - 115:15
**e-mail** [20] - 19:3, 19:14, 19:16, 20:12, 20:20, 27:15, 27:17, 30:21, 61:24, 64:2, 67:5, 67:16, 67:24, 101:17, 101:18, 101:21, 102:6, 105:11, 109:6, 114:14
**e-mailing** [1] - 62:14
**e-mails** [23] - 19:8, 26:22, 27:10, 28:3, 30:12, 30:13, 57:7, 61:19, 62:6, 65:10, 68:11, 68:13, 68:15, 68:17, 68:20, 69:3, 101:6, 101:14, 102:18, 103:17, 108:14, 114:23, 120:19
**Early** [2] - 24:2, 38:11
**early** [8] - 17:16, 20:17, 27:4, 27:8, 28:16, 38:7, 97:23, 97:24
**earn** [1] - 117:21
**earned** [8] - 93:15, 94:24, 95:11, 95:24, 96:3, 96:8, 96:10, 117:22
**East** [2] - 1:16, 2:14
**educational** [2] - 87:15, 88:13
**effect** [5] - 20:13, 27:15, 32:13, 76:25, 77:10
**effort** [1] - 49:9
**eight** [1] - 22:19
**either** [4] - 21:13, 77:13, 79:12, 120:5
**elaborate** [1] - 23:17
**eligible** [2] - 14:22, 41:3
**elsewhere** [2] - 22:25, 113:4
**emphatic** [1] - 24:14
**employees** [2] - 9:7, 9:9
**end** [25] - 10:21, 11:6, 11:10, 12:7, 12:13, 17:16, 32:5, 43:15, 52:25, 54:18, 55:5, 65:2, 68:19, 86:10, 89:8, 93:3, 93:10, 93:16,

95:4, 95:23, 96:9, 110:18, 110:24, 111:4, 114:9
**ended** [1] - 113:24
**ending** [1] - 12:4
**endless** [1] - 16:6
**engage** [1] - 15:20
**engaged** [1] - 54:10
**English** [1] - 88:5
**enjoy** [1] - 108:6
**enlargement** [1] - 89:14
**entire** [3] - 46:16, 46:19, 93:6
**entirely** [1] - 74:16
**entirety** [1] - 34:22
**entities** [1] - 75:22
**entitled** [5] - 40:9, 52:13, 104:22, 105:7, 108:4
**entity** [7] - 4:12, 5:10, 41:23, 46:5, 92:5, 99:8, 105:25
**Equity** [1] - 97:16
**equity** [1] - 85:4
**Erisa** [1] - 90:8
**Errata** [1] - 123:4
**escalate** [2] - 68:3, 68:6
**essentially** [1] - 53:15
**established** [2] - 20:18, 104:12
**et** [4] - 9:6, 14:22, 32:18, 105:17
**Europe** [1] - 112:20
**European** [1] - 112:22
**Eventually** [2] - 28:12, 75:8
**eventually** [6] - 33:13, 75:6, 104:25, 105:2, 110:4, 110:8
**evolved** [1] - 44:18
**exact** [5] - 11:14, 17:23, 18:19, 27:24, 43:5
**exactly** [2] - 14:18, 55:11
**Examination** [6] - 4:5, 52:2, 53:12, 83:13, 121:10, 126:5
**examined** [1] - 9:23
**examples** [1] - 37:21
**exceed** [2] - 95:24, 96:3
**exceeded** [1] - 11:3
**Except** [1] - 118:8
**except** [2] - 3:6, 53:16
**excess** [1] - 96:10
**Exchange** [2] - 90:15, 104:13
**exchanged** [1] - 19:4
**exchanges** [5] - 67:6, 67:12, 67:16, 67:24, 69:6
**exclusively** [1] - 47:4
**Excuse** [1] - 17:25
**execution** [1] - 56:10
**Exhibit** [37] - 11:17, 11:18, 11:22, 11:24, 12:2, 12:6, 12:9, 17:19, 17:21, 18:5,

18:7, 34:14, 34:16, 44:3, 44:4, 56:4, 61:23, 62:3, 66:12, 66:13, 69:22, 69:24, 80:5, 80:6, 83:5, 83:6, 83:11, 99:25, 100:17, 101:6, 101:10, 116:21, 116:22, 119:3, 119:5, 120:15, 121:13
**Exhibits** [2] - 18:11, 19:19
**exist** [2] - 19:14, 19:16
**existence** [2] - 20:5, 120:19
**existing** [1] - 99:8
**exists** [1] - 46:5
**exit** [1] - 98:25
**expand** [1] - 10:2
**expense** [4] - 15:10, 15:15, 45:7, 45:8
**expenses** [15] - 12:10, 12:24, 13:4, 13:22, 14:2, 14:4, 14:7, 14:11, 14:16, 15:8, 46:16, 49:7, 50:9, 81:6, 115:21
**expensive** [1] - 116:3
**experience** [1] - 87:19
**expertise** [1] - 53:21
**expiration** [1] - 56:11
**expired** [1] - 41:3
**explain** [1] - 110:10
**explanation** [1] - 107:19
**exposure** [1] - 58:19
**extension** [1] - 119:8
**extensive** [1] - 16:3
**extent** [2] - 37:15, 86:17
**extremely** [2] - 24:11, 32:3

## F

**fact** [12] - 10:23, 24:14, 39:22, 52:21, 61:13, 72:15, 72:23, 101:14, 114:4, 114:19, 120:12, 121:7
**factual** [1] - 117:18
**failed** [3] - 37:11, 90:15, 90:16
**fair** [8] - 6:4, 23:16, 31:6, 36:23, 53:14, 106:13, 107:9, 122:8
**fairly** [1] - 97:25
**fall** [1] - 46:17
**familiar** [6] - 21:17, 48:5, 58:24, 62:5, 80:24, 112:11
**familiarity** [1] - 16:23
**family** [1] - 84:11
**far** [3] - 42:22, 64:15, 70:9
**fashion** [1] - 13:8
**fault** [1] - 106:21
**favor** [1] - 17:3
**fee** [43] - 7:5, 7:6, 12:13, 12:16, 12:21, 12:22, 13:15, 13:25, 14:21, 14:25, 32:7, 32:8, 34:22, 34:23, 35:4,

132

39:3, 39:4, 40:7, 40:22, 41:8, 41:9, 41:10, 41:11, 41:13, 41:16, 41:20, 42:8, 42:15, 42:17, 43:22, 78:21, 94:12, 94:14, 94:15, 100:3, 100:8, 100:13, 100:15, 100:20, 100:24, 105:7, 105:10

feed [1] - 115:17

fees [21] - 6:21, 7:18, 13:4, 13:10, 13:13, 13:14, 13:17, 26:12, 32:16, 32:17, 35:12, 42:4, 43:14, 43:17, 43:18, 70:11, 70:12, 70:25, 78:24, 117:14, 118:15

Fees[4] - 117:6, 117:7, 117:9, 117:16

feet [1] - 35:25

felt [4] - 55:5, 63:12, 103:12, 112:16

few [5] - 15:23, 24:5, 33:15, 47:14, 54:14

figure [4] - 14:15, 43:5, 49:15, 119:22

figures [5] - 48:14, 48:16, 79:25, 94:2, 95:13

file [2] - 106:11, 119:9

filed [6] - 106:11, 107:3, 114:2, 121:19, 122:10, 122:16

filing [3] - 3:13, 81:20, 99:7

fill [2] - 54:12, 55:16

final [3] - 46:4, 122:11

finally [1] - 92:24

financial [5] - 12:3, 53:10, 100:2, 100:17, 120:6

financing [1] - 11:20

fine [2] - 8:21, 66:20

fines [4] - 109:17, 110:22, 110:23, 111:5

finish [1] - 27:7

finished [1] - 32:5

fire [2] - 80:20, 98:17

firm [5] - 45:2, 80:14, 81:9, 119:11, 119:14

firms [7] - 45:3, 90:16, 103:20, 109:17, 110:19, 113:3

first [19] - 24:16, 25:7, 29:8, 34:24, 35:21, 38:9, 39:4, 48:23, 56:8, 89:6, 90:2, 96:14, 96:25, 101:17, 102:12, 112:8, 115:23, 117:5, 118:9

First[2] - 116:24, 116:25

five [3] - 17:13, 69:2, 88:23

flared [1] - 74:12

flat [1] - 93:5

focusing [1] - 96:8

follow [2] - 10:11, 65:3

followed [2] - 11:2, 99:12

following [4] - 9:17, 9:20, 16:21, 65:7

follows [2] - 4:4, 24:5

force [1] - 73:23

forced [3] - 25:11, 25:12, 46:7

foresaw [1] - 61:7

form [3] - 3:6, 13:8, 65:14

formal [1] - 15:11

formed [1] - 95:16

forms [2] - 10:9, 99:7

forth [12] - 18:10, 19:4, 19:18, 57:4, 57:8, 81:7, 101:15, 110:7, 110:15, 112:14, 117:18, 125:12

forthcoming [1] - 103:8

forward [8] - 32:7, 54:2, 74:15, 95:18, 103:3, 105:4, 112:3, 112:13

forwarded [10] - 15:6, 21:10, 33:3, 43:7, 43:8, 54:11, 55:25, 62:25, 80:12, 117:4

four [2] - 17:13, 69:2

fraction [2] - 49:16, 69:11

frame [3] - 7:21, 8:12, 25:23

France[1] - 113:4

Francis[1] - 119:12

fraud [8] - 90:23, 92:21, 93:2, 104:12, 104:14, 108:9, 109:21, 110:20

frequent [3] - 9:22, 10:12, 10:13

frequently [3] - 9:23, 72:3, 86:20

friends [1] - 84:11

frightened [1] - 109:8

front [4] - 57:10, 65:20, 66:23, 120:2

fruition [1] - 104:7

Fuhrtz[2] - 62:2, 62:14

full [6] - 11:6, 15:7, 41:5, 49:8, 95:3, 105:19

fully [1] - 45:9

function [1] - 31:24

fund [145] - 4:24, 5:6, 5:11, 5:14, 5:17, 5:22, 6:5, 6:11, 7:14, 9:3, 9:15, 9:16, 9:25, 10:6, 13:14, 13:16, 14:19, 14:21, 14:24, 15:2, 15:10, 15:11, 15:22, 16:2, 16:4, 16:5, 16:12, 16:14, 16:20, 16:23, 19:5, 19:24, 20:3, 22:16, 23:10, 24:6, 24:10, 24:13, 25:11, 27:14, 27:20, 31:24, 40:4, 40:13, 41:23, 44:10, 45:23, 45:25, 46:5, 46:7, 46:16, 47:10, 47:21, 47:23, 48:6, 48:10, 48:11, 49:9, 49:13, 58:21, 58:23,

59:5, 59:6, 59:13, 59:18, 60:5, 60:8, 60:16, 61:15, 62:9, 63:21, 66:7, 66:10, 66:17, 69:18, 71:6, 71:8, 72:9, 72:12, 72:13, 72:18, 72:24, 73:20, 74:6, 74:20, 75:19, 75:21, 75:24, 76:2, 76:4, 76:9, 78:10, 81:24, 87:19, 89:11, 89:14, 89:15, 89:20, 90:2, 91:2, 91:12, 92:4, 92:6, 92:11, 92:12, 92:19, 92:20, 93:9, 95:14, 95:17, 95:20, 96:24, 97:5, 98:14, 99:4, 99:7, 100:13, 103:4, 103:5, 104:4, 104:8, 104:10, 104:23, 104:24, 104:25, 105:4, 105:5, 105:12, 106:4, 106:21, 106:22, 107:25, 108:11, 110:14, 113:10, 113:11, 113:17, 117:20, 117:21

Fund[12] - 5:8, 7:15, 11:21, 27:21, 44:10, 47:24, 76:8, 79:19, 89:19, 103:22, 104:19, 111:19

fund's [3] - 92:17, 106:14, 107:10

fund-to-fund [1] - 92:12

fundamentals [1] - 58:23

funded [5] - 89:15, 89:17, 89:20, 89:21, 90:2

funders [1] - 91:12

Funds[1] - 61:25

funds [15] - 5:18, 8:2, 25:8, 46:6, 47:11, 58:11, 59:16, 64:24, 68:18, 72:7, 75:10, 85:18, 86:11, 92:19, 97:11

furious [3] - 74:10, 74:11

future [1] - 95:20

Futures[1] - 88:9

---

## G

gain [1] - 78:20

gains [2] - 100:11, 100:14

general [1] - 9:19

generated [4] - 6:23, 7:13, 100:9, 117:24

gentleman [2] - 112:21, 112:24

George[114] - 6:16, 8:24, 9:13, 15:25, 16:6, 16:18, 18:17, 18:18, 19:2, 19:22, 20:8, 20:22, 21:8, 21:15, 23:17, 24:10, 25:17, 26:10, 26:21, 27:3, 27:12, 27:19, 29:2, 30:7, 30:19, 30:24, 37:12, 37:13, 37:18, 37:19, 39:7, 39:18, 39:21, 42:11, 43:23, 43:24, 44:15, 46:11, 46:21, 47:3, 47:23, 48:4,

49:7, 50:3, 50:15, 54:8, 55:12, 55:18, 55:21, 56:3, 57:8, 58:6, 60:20, 61:2, 61:12, 61:21, 62:15, 63:2, 63:3, 63:23, 63:24, 63:25, 64:5, 64:6, 64:12, 64:15, 64:20, 65:4, 65:12, 65:13, 66:2, 68:13, 69:4, 71:2, 71:11, 72:13, 74:11, 74:14, 76:3, 76:9, 76:10, 76:15, 76:16, 77:10, 80:13, 80:15, 81:8, 81:11, 82:7, 86:20, 86:25, 89:8, 95:6, 96:21, 96:25, 102:19, 105:20, 105:23, 109:6, 109:7, 112:20, 114:14, 115:2, 115:4, 115:6, 116:13, 118:17, 118:25, 121:20, 121:22, 122:6, 122:12

George's [7] - 24:18, 25:25, 66:19, 87:14, 108:15, 112:11, 118:22

Gia[3] - 33:12, 34:7, 71:23

Giovanna[1] - 67:12

given [16] - 8:18, 15:5, 19:10, 26:4, 36:4, 41:6, 43:6, 49:10, 49:17, 49:21, 51:19, 55:8, 71:25, 78:17, 108:3, 125:14

glance [1] - 118:9

Global[1] - 89:14

global [1] - 113:11

goals [2] - 95:17, 95:19

god [1] - 75:3

Goldman[26] - 10:18, 11:7, 11:11, 11:15, 26:5, 32:6, 32:12, 33:12, 34:8, 34:9, 66:16, 67:13, 67:17, 67:24, 68:7, 68:21, 68:22, 71:23, 72:10, 72:14, 73:3, 73:13, 73:19, 120:19, 120:22

goliath [1] - 111:14

graduate [4] - 87:17, 87:22, 88:3, 88:4

grand [3] - 49:25, 50:3, 50:6

granted [1] - 110:8

granting [1] - 42:9

grants [1] - 56:12

great [6] - 23:19, 24:17, 27:10, 43:20, 45:7

greater [6] - 15:24, 42:22, 54:5, 112:19, 115:7, 116:9

gross [1] - 116:8

group [4] - 18:17, 79:18, 114:16, 114:22

grow [1] - 58:21

guess [5] - 60:21, 60:22, 72:22, 88:14, 114:9

guidelines [2] - 22:2, 22:12

**guilty** [1] - 114:4
**guy** [5] - 25:4, 80:19, 81:9, 81:14, 105:15
**guys** [4] - 51:8, 80:3, 83:20, 111:18

# H

**hairs** [2] - 90:18, 110:13
**hand** [3] - 24:19, 25:3, 25:5
**handed** [1] - 51:8
**handful** [2] - 37:21, 39:16
**handle** [1] - 88:25
**handled** [8] - 4:25, 5:2, 63:11, 74:14, 75:14, 88:15, 88:16, 101:23
**handling** [3] - 48:8, 48:10, 87:20
**handwriting** [1] - 39:2
**happy** [1] - 61:6
**hard** [1] - 36:11
**head** [1] - 46:25
**health** [1] - 97:7
**hear** [1] - 109:14
**hearing** [1] - 81:13
**Heart** [2] - 87:25, 88:3
**heart** [1] - 36:22
**heated** [5] - 102:19, 102:20, 103:15, 105:18, 115:11
**hedge** [2] - 23:10, 58:23
**held** [1] - 32:19
**hell** [1] - 75:3
**help** [7] - 42:13, 52:9, 53:22, 54:6, 54:10, 55:9, 112:16
**helpful** [2] - 27:9, 53:10
**helping** [1] - 53:21
**hence** [2] - 59:18, 92:18
**Hence** [1] - 104:23
**Hereby** [1] - 3:4
**hereby** [1] - 125:10
**herein** [1] - 56:11
**hereinbefore** [1] - 125:12
**hereof** [1] - 56:10
**hereto** [1] - 3:6
**high** [3] - 17:2, 53:24, 91:13
**High** [1] - 87:17
**himself** [5] - 37:3, 72:18, 73:18, 73:20, 74:21
**hints** [1] - 26:10
**historically** [1] - 28:12
**history** [2] - 78:24, 107:15
**Holleman** [1] - 2:10
**Holmstrom** [8] - 1:4, 5:24, 6:2, 46:9, 46:10, 99:14, 99:16, 99:18
**home** [6] - 85:6, 85:9, 98:21, 105:15, 105:16, 105:22
**Honor** [1] - 67:4

**hopefully** [2] - 104:6, 104:11
**hoping** [1] - 17:3
**houses** [1] - 11:12
**hundreds** [3] - 48:17, 112:25
**hurt** [4] - 106:4, 107:11, 109:16, 111:7
**hurting** [1] - 115:19

# I

**Iam** [127] - 4:15, 4:17, 6:8, 6:20, 7:2, 7:11, 7:20, 8:4, 8:22, 9:2, 9:7, 9:9, 12:13, 12:15, 12:22, 13:6, 13:20, 13:23, 14:11, 14:13, 15:3, 15:22, 16:11, 16:13, 16:15, 17:20, 18:13, 18:17, 19:17, 21:2, 21:5, 21:23, 25:17, 26:10, 27:2, 27:20, 29:9, 29:20, 30:16, 33:20, 34:3, 35:18, 36:9, 37:3, 40:7, 40:9, 40:14, 40:16, 40:18, 40:21, 41:3, 41:8, 41:21, 41:23, 42:3, 49:5, 49:13, 49:17, 50:12, 50:22, 51:17, 53:14, 56:12, 61:13, 62:12, 62:20, 63:7, 63:18, 63:22, 67:18, 68:21, 70:11, 70:17, 70:19, 70:20, 76:7, 76:12, 76:25, 77:3, 77:10, 77:16, 77:19, 77:22, 77:25, 78:3, 78:12, 78:15, 78:17, 78:20, 78:21, 81:23, 81:24, 83:23, 84:8, 84:23, 88:22, 89:7, 89:12, 89:14, 91:21, 92:2, 93:9, 93:16, 94:4, 94:12, 94:17, 94:24, 95:3, 95:24, 96:9, 97:12, 98:22, 99:19, 99:23, 99:24, 100:2, 100:5, 100:23, 103:21, 105:10, 109:8, 111:6, 111:18, 115:3, 122:13
**Iam's** [2] - 6:10, 119:21
**idea** [1] - 102:16
**Identification** [15] - 11:19, 11:25, 17:22, 18:8, 34:17, 44:5, 62:4, 66:14, 69:25, 80:7, 83:12, 101:11, 116:23, 119:6, 120:16
**identified** [1] - 112:19
**identify** [1] - 69:23
**identity** [1] - 17:6
**Ifi** [10] - 6:8, 6:21, 12:4, 14:17, 21:24, 56:13, 67:6, 89:11, 91:9, 118:3
**Ifi's** [1] - 56:13
**ignored** [1] - 114:8
**imagine** [1] - 61:7
**immediately** [5] - 24:11, 33:12, 56:23, 57:2, 69:15

**impact** [2] - 27:13, 108:11
**implode** [2] - 71:6, 71:8
**imploded** [1] - 46:13
**implosion** [1] - 45:23
**importance** [1] - 104:23
**impossible** [1] - 107:13
**inappropriate** [1] - 101:24
**Inappropriately** [1] - 72:8
**incentive** [2] - 35:4, 35:11
**incidentally** [1] - 48:19
**include** [1] - 43:16
**included** [1] - 13:19
**includes** [1] - 43:17
**including** [1] - 113:3
**income** [9] - 24:6, 50:19, 51:6, 108:3, 115:7, 115:20, 116:2, 116:13, 116:17
**incomes** [1] - 110:15
**incorporation** [1] - 89:23
**increase** [4] - 15:21, 16:11, 16:13, 71:10
**increased** [1] - 16:14
**increasingly** [1] - 49:10
**Independent** [17] - 1:4, 4:13, 5:8, 7:15, 11:21, 44:10, 47:24, 67:7, 76:8, 88:17, 89:18, 89:19, 103:22, 104:19, 111:19, 119:9, 119:13
**Index** [1] - 126:3
**Indicates** [1] - 27:2
**individual** [2] - 103:2, 105:21
**individuals** [6] - 17:2, 17:7, 17:9, 17:11, 84:7, 91:13
**industry** [2] - 23:10, 59:23
**information** [14] - 11:7, 15:3, 15:4, 15:17, 46:23, 47:12, 53:21, 54:17, 55:8, 55:17, 117:13, 117:17, 118:15, 119:25
**Informed** [3] - 4:8, 120:5, 120:11
**Infurcia** [1] - 119:16
**initial** [4] - 51:13, 89:13, 89:22, 109:22
**instance** [2] - 13:15, 104:11
**instantaneous** [1] - 64:17
**instead** [1] - 103:4
**institutional** [7] - 53:24, 54:7, 59:2, 59:4, 59:10, 59:17, 59:25
**instructed** [1] - 71:21
**instruction** [2] - 24:21, 25:4
**instructions** [3] - 19:10, 62:12
**Insurance** [1] - 98:8
**insurance** [9] - 87:18, 97:6, 97:7, 97:8, 97:24, 98:8, 98:10, 98:20

**intends** [1] - 58:3
**intent** [1] - 57:20
**intention** [1] - 58:18
**Interacted** [4] - 4:22, 4:23, 10:3, 10:4
**interest** [3] - 89:13, 104:5, 111:24
**interested** [6] - 55:23, 103:3, 112:2, 112:12, 125:17
**interfered** [1] - 86:15
**Interrogatories** [1] - 117:2
**Interrupted** [6] - 32:9, 32:10, 68:18, 69:15, 106:18, 106:19
**interruption** [2] - 68:25, 78:11
**Introduce** [1] - 16:25
**introducing** [1] - 22:18
**introduction** [2] - 23:14, 109:2
**Introductions** [1] - 22:24
**Invest** [4] - 5:10, 40:14, 40:16, 113:16
**Invested** [2] - 48:12, 96:24
**investing** [1] - 58:8
**investment** [20] - 6:4, 16:5, 19:7, 22:18, 23:13, 40:18, 40:19, 89:16, 90:10, 91:8, 91:22, 91:24, 96:7, 96:15, 104:3, 104:4, 106:18, 112:6, 112:7, 112:17
**investments** [3] - 91:9, 91:16, 92:17
**investor** [10] - 46:7, 46:10, 46:18, 47:13, 59:4, 59:10, 59:17, 99:15, 99:16, 106:21
**investors** [15] - 5:15, 5:22, 22:16, 40:5, 45:18, 53:24, 53:25, 84:17, 90:24, 91:14, 92:20, 105:5, 106:8, 106:12
**involved** [13] - 5:4, 9:14, 9:17, 9:18, 55:12, 55:15, 89:12, 97:12, 98:7, 103:25, 108:25, 112:2, 113:5
**involvements** [1] - 109:4
**irate** [1] - 67:14
**iron** [1] - 105:2
**Irons** [1] - 98:16
**Island** [1] - 45:4
**isolated** [1] - 103:14
**issue** [3] - 63:19, 63:20, 86:6
**issues** [6] - 4:25, 10:7, 10:15, 24:20, 53:10, 55:14, 73:8, 90:13
**Item** [3] - 25:15, 117:5, 117:16
**items** [2] - 81:7, 118:24
**itself** [5] - 9:16, 20:7, 40:16, 93:9, 107:24

## J

Jail [2] - 113:25, 114:5
January [9] - 35:10, 35:16, 36:6, 36:18, 36:24, 37:6, 37:24, 38:6, 39:11
Jeff [1] - 70:8
job [1] - 69:16
Joe [2] - 84:12, 96:22
Joes [1] - 85:15
John [5] - 102:2, 102:25, 108:13, 108:22
Jones [2] - 1:16, 2:12
Joseph [8] - 1:14, 1:17, 4:2, 124:8, 125:8, 125:11, 125:22, 126:6
Judge [1] - 66:24
July [2] - 34:25, 45:13
June [2] - 35:4, 35:6

## K

K-1 [2] - 50:17, 51:3
K-1's [8] - 49:18, 51:7, 51:15, 51:16, 51:20, 53:8, 93:18, 94:4
keep [2] - 103:10, 103:13
keeping [2] - 103:4, 104:24
kept [2] - 31:25, 106:10
kids [2] - 115:6, 115:17
kind [9] - 52:16, 55:6, 73:9, 94:12, 98:19, 99:19, 111:8, 115:15
knowing [1] - 95:19
knowledge [15] - 6:5, 33:6, 36:25, 46:22, 47:7, 59:23, 65:5, 65:23, 77:15, 80:16, 117:12, 117:15, 117:17, 118:14, 119:24
known [2] - 24:23, 112:22
Kovner [3] - 112:9, 113:6, 113:15
Kovner's [1] - 112:10
Kpmg [1] - 88:20

## L

lack [2] - 49:2, 90:21
language [2] - 19:25, 61:8
Lanza [13] - 2:9, 8:19, 17:10, 51:15, 51:18, 52:14, 53:6, 65:15, 66:25, 67:3, 67:11, 79:8, 80:10
lapse [1] - 10:14
large [8] - 24:7, 32:23, 61:4, 93:14, 105:8, 106:7, 109:16, 110:22
last [14] - 8:7, 8:9, 45:15, 79:3, 82:4, 83:19, 84:2, 97:3, 99:11, 102:5, 102:9, 108:16, 114:25, 119:15

Last [1] - 22:7
late [2] - 4:10, 91:6
launched [2] - 89:18, 112:8
law [3] - 44:25, 45:3, 80:14
lawyer [3] - 80:18, 80:22, 81:16
lays [1] - 79:15
lean [1] - 78:7
least [9] - 5:9, 34:4, 56:14, 57:5, 60:11, 68:17, 68:24, 69:2, 73:24
left [2] - 39:2, 86:11
legal [4] - 32:17, 79:21, 101:25, 104:17
length [1] - 113:6
lengthy [1] - 81:8
lent [2] - 84:8, 112:14
less [4] - 50:13, 50:14, 115:8, 115:9
letter [8] - 70:5, 70:10, 80:8, 80:10, 80:17, 80:24, 81:6, 110:7
letting [1] - 52:19
level [3] - 54:7, 87:20, 108:5
levels [1] - 73:21
liabilities [1] - 51:6
liaison [1] - 16:20
licensed [1] - 97:21
life [2] - 97:7, 97:8
limit [1] - 37:9
limitations [1] - 11:4
Limited [12] - 5:8, 7:15, 11:21, 44:10, 47:25, 61:25, 76:8, 89:19, 90:12, 103:22, 104:19, 111:19
limited [2] - 92:7, 104:20
limits [1] - 10:25
line [1] - 85:4
lines [1] - 43:9
lion's [3] - 6:22, 6:24, 40:12
liquidated [1] - 46:2
liquidation [2] - 78:9, 78:14
list [2] - 79:3, 84:19
listed [7] - 12:24, 13:5, 14:4, 33:2, 50:20, 100:3, 100:20
lists [2] - 83:23, 83:24
Llc [1] - 1:4
loan [5] - 8:9, 84:2, 85:15, 85:20, 95:15
loans [6] - 8:7, 83:23, 83:24, 84:10, 95:12, 96:7
London [1] - 113:4
long-term [1] - 98:11
look [21] - 21:11, 21:20, 35:9, 38:20, 38:22, 43:20, 49:4, 51:2, 56:4, 66:20, 67:5, 93:18, 99:25, 100:16,

101:13, 101:17, 106:16, 106:24, 108:13, 115:23, 121:15
Look [1] - 115:12
looked [9] - 8:17, 24:19, 38:17, 49:20, 49:21, 51:13, 52:6, 52:21, 84:3
Looking [1] - 12:9
looking [16] - 8:13, 13:12, 22:5, 52:11, 54:7, 72:5, 80:2, 81:15, 83:9, 83:18, 95:2, 106:22, 106:23, 111:8, 112:3, 122:18
loose [1] - 73:9
Lori [1] - 62:2
loss [2] - 119:17, 119:25
losses [1] - 104:18
lost [3] - 36:2, 112:4, 118:15
Lost [4] - 117:6, 117:7, 117:16, 118:19
low [1] - 118:7
Luncheon [1] - 82:10

## M

magnitude [2] - 8:4, 93:20
mail [21] - 19:3, 19:14, 19:16, 20:12, 20:20, 27:15, 27:17, 30:21, 61:24, 64:2, 67:5, 67:16, 67:24, 101:17, 101:18, 101:21, 102:6, 105:11, 109:6, 114:14, 115:15
mailing [1] - 62:14
mails [23] - 19:8, 26:22, 27:10, 28:3, 30:12, 30:13, 57:7, 61:19, 62:6, 65:10, 68:11, 68:13, 68:15, 68:17, 68:20, 69:3, 101:6, 101:14, 102:18, 103:17, 108:14, 114:23, 120:19
major [2] - 73:7, 88:5
majority [1] - 122:12
man [1] - 106:9
manage [2] - 56:12, 92:3
managed [2] - 22:17, 91:24
management [31] - 7:6, 12:16, 12:21, 13:25, 32:7, 34:22, 35:3, 35:11, 39:3, 40:7, 40:22, 41:8, 41:9, 41:11, 41:13, 41:16, 41:20, 41:24, 42:4, 42:7, 42:15, 42:17, 43:17, 43:22, 70:12, 70:25, 78:21, 78:24, 100:13, 105:7, 105:10
Management [9] - 1:4, 4:13, 67:7, 88:17, 89:18, 117:8, 117:16, 119:10, 119:14

manager [24] - 5:2, 6:8, 6:11, 7:16, 9:4, 41:22, 53:21, 54:4, 54:6, 55:7, 63:18, 63:19, 73:16, 75:2, 76:6, 76:7, 89:16, 90:13, 90:19, 91:22, 91:24, 92:9, 106:17, 107:14
manager's [1] - 106:18
managers [2] - 9:24
Managing [1] - 4:19
managing [5] - 6:23, 9:13, 27:19, 99:17, 106:17
mandate [2] - 37:12, 59:11
mandates [4] - 59:2, 59:3, 59:17, 59:25
mandatory [1] - 14:22
March [6] - 1:10, 101:8, 101:19, 109:5, 123:2, 126:2
margin [21] - 25:12, 31:18, 31:20, 31:23, 32:4, 32:11, 32:21, 33:2, 33:9, 33:17, 33:18, 33:21, 34:2, 67:14, 68:2, 68:23, 71:9, 72:6, 73:14, 86:16, 120:22
mark [1] - 83:4
marked [20] - 11:18, 11:24, 17:21, 18:7, 34:13, 34:16, 44:4, 62:3, 69:24, 80:4, 80:6, 83:5, 83:11, 101:10, 116:20, 116:22, 119:2, 119:5, 120:15, 121:12
market [10] - 54:6, 54:18, 66:13, 77:4, 77:5, 107:13, 107:23, 107:24, 116:15
marketing [10] - 16:17, 53:22, 55:2, 60:15, 77:7, 98:16, 98:18, 107:20, 114:22
marriage [2] - 60:22, 125:17
material [5] - 31:8, 31:10, 31:11, 39:25, 53:16
Material [2] - 40:3, 40:4
materially [1] - 31:13
materials [2] - 53:23
math [1] - 49:4
matter [10] - 18:24, 53:4, 53:18, 65:9, 66:23, 74:14, 76:9, 101:23, 104:16, 125:18
matters [1] - 120:23
Mccorvey [2] - 108:20, 108:22
Mcveigh [3] - 14:24, 21:11, 109:18
mean [21] - 9:18, 27:11, 28:11, 29:13, 39:19, 39:22, 42:25, 46:25, 59:22, 65:2, 69:8, 73:20, 76:20, 79:15, 79:17, 85:22, 104:14, 106:5, 108:12, 117:20, 118:23
meaning [2] - 23:7, 57:20

means [3] - 23:9, 23:11, 23:12
meet [2] - 78:8, 109:10
meeting [2] - 109:11, 110:8
meetings [1] - 16:3
member [1] - 104:20
memorandum [17] - 13:11, 13:13, 13:18, 14:3, 14:10, 14:14, 15:13, 44:9, 45:13, 62:24, 63:14, 64:24, 73:2, 78:19, 89:22, 89:25, 112:15
memory [1] - 96:13
mention [1] - 57:16
mentioned [4] - 53:18, 57:24, 67:23, 113:10
message [1] - 86:8
messages [1] - 86:11
met [6] - 31:20, 32:18, 33:9, 33:17, 33:19, 34:3
methodology [9] - 16:2, 16:24, 17:4, 53:22, 54:3, 54:4, 61:5, 106:18, 113:13
mid-2006 [1] - 53:15
middle [1] - 52:11
midway [1] - 38:13
might [5] - 42:13, 61:19, 71:13, 104:8, 104:9
million [42] - 20:3, 23:5, 24:3, 24:13, 25:16, 25:18, 26:8, 26:11, 27:4, 28:7, 28:10, 28:15, 28:21, 35:23, 56:14, 56:19, 56:20, 56:22, 57:5, 57:12, 57:14, 57:18, 57:25, 58:8, 59:7, 59:8, 59:19, 60:5, 61:14, 62:16, 63:6, 64:21, 65:14, 66:6, 66:9, 90:6, 91:8, 91:19, 118:2, 118:8
millions [3] - 56:25, 104:3, 112:25
mind [2] - 29:20, 51:21
mine [2] - 52:12, 116:10
minimum [1] - 37:10
minority [1] - 122:13
minute [1] - 51:21
missed [1] - 103:25
misspoke [1] - 17:25
model [1] - 92:25
moment [4] - 15:18, 17:10, 26:12, 57:24
Monetary [2] - 44:24, 74:6
Money [1] - 85:6
money [96] - 6:14, 8:3, 11:11, 19:23, 22:20, 24:10, 24:13, 24:15, 24:21, 24:22, 24:25, 25:5, 25:9, 32:12, 32:14, 35:24, 37:7, 37:9, 37:23, 37:25, 38:9, 40:14, 40:16, 40:19, 41:4, 42:20, 42:22, 43:2, 43:21, 49:12,

49:24, 51:7, 53:15, 53:17, 55:20, 56:21, 56:25, 59:2, 59:18, 60:7, 68:25, 70:14, 70:22, 70:23, 72:9, 72:10, 72:11, 72:14, 72:17, 72:20, 72:22, 72:24, 73:13, 73:19, 74:3, 74:5, 74:20, 74:22, 74:23, 76:13, 76:19, 76:21, 76:25, 77:11, 77:17, 77:19, 78:3, 78:10, 78:16, 78:18, 84:8, 85:8, 85:11, 85:17, 90:7, 93:12, 93:16, 95:22, 96:7, 96:24, 97:4, 98:18, 98:25, 105:9, 108:3, 108:6, 109:9, 112:19, 113:8, 113:11, 113:17, 114:17, 114:18, 115:25, 116:19
moneys [14] - 7:11, 7:20, 13:5, 13:21, 13:23, 40:21, 43:11, 43:13, 58:4, 60:5, 70:9, 70:18, 70:21, 115:9
month [6] - 27:22, 32:5, 38:16, 38:18, 68:19, 86:10
month-end [1] - 86:10
monthly [2] - 41:8, 79:2
months [10] - 7:7, 47:14, 77:20, 77:24, 78:5, 89:25, 108:18, 108:19, 114:25
morning [1] - 120:13
most [3] - 29:14, 40:10, 113:3
mother [3] - 85:16, 85:20, 85:21
mouth [1] - 98:19
move [6] - 22:25, 57:2, 57:3, 57:25, 58:4, 58:20
moving [2] - 68:25, 112:24
Mullen [5] - 13:16, 14:25, 44:13, 44:17, 79:21
must [1] - 103:16
mutual [1] - 23:19

# N

name [9] - 17:6, 18:18, 44:16, 54:21, 62:2, 86:12, 87:5, 108:16, 119:15
named [1] - 34:7
names [1] - 17:9
National [1] - 88:9
national [1] - 98:3
naturally [1] - 46:15
nature [1] - 13:18
need [9] - 17:8, 24:9, 61:7, 115:7, 115:9, 115:12, 116:16, 116:19
needed [4] - 10:9, 115:18, 115:20
needs [2] - 99:8, 116:16
net [4] - 17:2, 53:24, 91:13,

119:17
never [2] - 72:3, 89:15
New [10] - 1:2, 1:16, 1:19, 2:8, 2:15, 90:14, 104:13, 125:4, 125:6, 125:10
new [1] - 103:14
next [3] - 35:9, 81:19, 117:16
Nfa [4] - 4:25, 87:21, 88:7, 88:23
nightmare [1] - 75:11
nilly [1] - 74:5
nobody [1] - 107:2
nondisclosure [1] - 10:15
nondisclosures [1] - 39:24
none [1] - 5:17
Notary [2] - 1:18, 125:9
note [4] - 4:7, 35:6, 38:25, 120:4
noted [2] - 28:12, 122:24
notes [2] - 8:15, 83:16
notice [5] - 1:15, 29:12, 29:21, 30:2, 30:25
notices [1] - 29:5, 30:4, 30:15
notified [6] - 33:11, 33:12, 33:13, 74:9, 74:25
notify [1] - 37:13
notifying [3] - 73:15, 73:16
November [1] - 34:3
number [12] - 21:21, 32:20, 36:15, 39:23, 56:6, 56:8, 57:23, 58:2, 69:3, 98:2, 99:5, 102:7
numbers [8] - 53:8, 53:11, 79:14, 118:7, 118:9, 120:6, 120:11, 121:5
numerous [6] - 16:3, 18:20, 31:18, 31:20, 39:16, 87:18
Ny [3] - 1:16, 2:8, 2:15

# O

Oak [1] - 87:25
oath [2] - 3:11, 75:6
object [4] - 64:16, 64:22, 65:5, 65:15
objected [3] - 26:11, 27:3, 64:20
objecting [1] - 27:12
objection [2] - 25:17, 28:21
objections [1] - 3:6
obligation [7] - 23:2, 41:5, 56:19, 57:5, 60:6, 60:7, 60:13
obligations [3] - 18:12, 78:8, 85:19
obtain [1] - 6:20
obviously [2] - 102:18, 103:16

occasion [6] - 54:24, 71:20, 86:9, 86:13, 86:25, 87:7
occasions [2] - 32:2, 36:10
occur [2] - 25:13, 92:22
occurred [13] - 25:10, 28:11, 33:11, 38:21, 39:19, 74:10, 75:18, 84:15, 84:18, 90:14, 104:15, 110:5, 110:10
occurring [1] - 32:2
October [10] - 21:6, 47:16, 56:5, 66:24, 76:12, 76:24, 77:9, 77:16, 77:21, 77:25
off-the-record [1] - 52:5
offered [1] - 55:20
offering [17] - 13:11, 13:13, 13:18, 14:3, 14:13, 15:13, 44:9, 45:13, 48:22, 62:24, 63:14, 64:24, 73:2, 78:19, 89:22, 89:25, 112:15
office [1] - 88:24
officer [1] - 3:10
officers [1] - 88:23
offices [1] - 1:15
offset [1] - 116:16
offshore [3] - 58:19, 74:3, 91:14
Ola [2] - 1:4, 46:10
old [1] - 98:4
once [4] - 46:12, 58:19, 69:18, 73:14
one [35] - 8:7, 17:23, 17:25, 19:20, 25:3, 25:24, 26:9, 27:15, 31:24, 45:3, 54:23, 60:21, 61:7, 61:19, 71:20, 72:6, 73:7, 79:17, 83:6, 86:9, 86:13, 86:24, 87:7, 95:18, 95:25, 96:4, 96:11, 103:7, 105:16, 106:22, 106:25, 107:2, 113:19, 114:23, 115:6
One [1] - 59:3
one-page [1] - 83:6
ones [4] - 68:24, 69:14, 69:15, 105:23
onset [2] - 20:16, 59:19
operate [4] - 76:13, 77:2, 77:4, 77:11
operated [1] - 16:21
operating [2] - 19:5, 115:5
operation [7] - 9:18, 10:8, 43:2, 46:17, 48:24, 49:6, 92:8
operational [3] - 5:3, 14:9, 43:3
operations [4] - 5:2, 16:22, 48:6, 69:20
opportunities [1] - 9:25
opportunity [4] - 16:4, 16:25, 36:3, 107:18
opposed [1] - 52:18
option [2] - 102:2, 102:24

**order** [8] - 8:4, 15:9, 59:9, 59:24, 60:15, 93:20, 102:7, 116:14
**organization** [1] - 69:5
**original** [1] - 18:6, 44:15
**otherwise** [4] - 97:11, 108:2, 108:6, 117:24
**out-sourced** [1] - 9:5
**outcome** [2] - 112:3, 125:18
**outlined** [1] - 6:16
**outrageous** [1] - 74:7
**outsourcing** [1] - 41:24
**overall** [1] - 92:14
**overseas** [1] - 112:8
**overseeing** [1] - 9:14
**owe** [2] - 42:3, 42:7
**owed** [8] - 41:19, 41:20, 41:21, 42:20, 43:14, 70:14, 70:15, 70:21
**own** [10] - 23:2, 40:19, 51:10, 56:24, 56:25, 59:17, 72:7, 85:13, 92:5, 116:4
**owner** [2] - 122:13
**oxley** [1] - 109:21

**P**

**package** [1] - 89:16
**page** [21] - 12:9, 12:24, 21:20, 22:6, 22:7, 56:5, 56:7, 67:3, 83:6, 89:24, 100:2, 100:16, 100:18, 100:19, 102:5, 102:8, 115:23, 117:5, 117:10, 121:25, 122:20
**Page** [4] - 56:8, 117:7, 126:5, 126:7
**Page/line** [1] - 123:6
**pages** [1] - 54:13
**paid** [42] - 13:5, 13:23, 14:12, 31:25, 32:16, 38:9, 40:10, 40:21, 41:8, 41:9, 41:10, 41:12, 41:13, 41:17, 42:17, 43:14, 49:5, 49:6, 49:13, 49:24, 50:3, 50:11, 50:15, 51:7, 63:6, 70:9, 70:15, 70:20, 70:21, 70:22, 74:22, 78:10, 78:12, 78:21, 78:25, 80:3, 100:5, 100:23, 109:20, 115:22, 115:25
**Paid** [2] - 13:7, 13:8
**paper** [5] - 26:9, 26:13, 26:16, 26:24, 26:25
**paperwork** [1] - 43:7
**paragraph** [5] - 21:20, 56:6, 56:8, 102:4, 115:24
**Paragraph** [1] - 21:21
**part** [16] - 11:3, 19:12, 24:18, 25:17, 40:10, 44:12, 58:5, 60:6, 70:10, 89:15,

101:21, 103:7, 104:5, 108:25, 116:4
**participate** [2] - 103:21, 104:8
**participation** [1] - 93:11
**particular** [2] - 54:4, 122:18
**parties** [8] - 3:5, 16:20, 18:21, 18:23, 22:21, 103:14, 105:19, 125:16
**Partnership** [1] - 90:12
**partnership** [2] - 92:7, 104:20
**party** [4] - 21:13, 22:19, 23:13, 114:22
**pass** [2] - 13:20, 24:25
**pass-throughs** [1] - 13:20
**passed** [6] - 6:24, 13:9, 13:21, 13:23, 89:2, 113:7
**past** [1] - 23:25
**Pause** [1] - 42:12
**pay** [23] - 24:15, 25:5, 37:25, 41:5, 49:2, 55:19, 70:11, 70:22, 70:23, 70:24, 77:17, 77:19, 78:2, 78:3, 78:5, 85:14, 85:19, 98:21, 109:23, 109:24, 110:22, 116:3
**payable** [2] - 13:15, 35:10
**paying** [2] - 77:22, 116:14
**payment** [7] - 12:12, 73:11, 75:6, 75:8, 75:16, 79:3, 119:10
**payments** [3] - 12:23, 34:20, 40:7
**penalty** [1] - 111:15
**pension** [4] - 90:9, 90:25, 97:9, 97:24
**people** [5] - 93:2, 93:7, 106:5, 110:21, 110:24
**people's** [2] - 22:14, 103:8
**Pepco** [1] - 97:21
**per** [16] - 7:2, 13:11, 13:17, 14:3, 14:10, 14:13, 15:13, 34:21, 37:8, 37:19, 41:25, 49:5, 63:6, 70:14, 78:19, 115:5
**percent** [11] - 7:3, 7:4, 7:17, 34:22, 59:5, 59:12, 60:2, 100:6, 100:14, 100:24
**perform** [2] - 114:20, 118:11
**performance** [32] - 6:21, 7:4, 7:17, 12:13, 12:21, 13:25, 19:7, 32:7, 34:23, 36:3, 39:4, 41:10, 41:11, 43:18, 70:11, 90:22, 90:24, 92:14, 92:18, 93:4, 100:3, 100:13, 100:14, 100:20, 100:24, 103:25, 106:19, 106:23, 106:24, 106:25,

118:15, 119:21
**Performance** [1] - 117:9
**performed** [1] - 55:3
**performing** [1] - 49:4
**period** [21] - 7:5, 12:17, 28:5, 36:4, 40:8, 45:20, 49:3, 57:3, 67:21, 67:22, 68:8, 80:23, 84:19, 90:12, 90:20, 92:16, 93:6, 93:23, 97:2, 112:18, 112:20
**person** [5] - 47:2, 47:7, 48:12, 49:23, 119:12
**person's** [1] - 107:15
**personal** [8] - 58:2, 58:10, 58:14, 85:15, 85:19, 102:18, 108:4, 116:2
**personally** [7] - 69:8, 73:20, 74:2, 74:24, 84:22, 86:2, 122:17
**pertained** [1] - 68:25
**pertaining** [1] - 109:15
**Phoenix** [3] - 97:15, 97:23, 98:3
**phone** [6] - 19:8, 19:21, 24:9, 25:24, 86:8, 115:11
**phrase** [1] - 57:18
**phrased** [1] - 96:17
**pick** [1] - 71:16
**piece** [4] - 26:9, 26:16, 26:24, 26:25
**pierce** [1] - 114:7
**Pirozzi** [3] - 1:17, 125:8, 125:22
**pitch** [1] - 107:20
**place** [5] - 23:12, 68:9, 69:17, 92:19, 118:2
**placed** [5] - 21:25, 22:11, 23:5, 23:7, 91:18
**placement** [1] - 23:15
**Placement** [2] - 23:9, 23:12
**Plaintiff's** [1] - 116:25
**plaintiff's** [1] - 66:25
**Plaintiffs** [1] - 1:5
**plaintiffs** [1] - 2:5
**plan** [3] - 60:22, 90:8, 90:9
**Planning** [1] - 97:16
**plans** [1] - 95:20
**pleased** [1] - 61:6
**Pllc** [1] - 2:4
**plop** [1] - 56:22
**plus** [2] - 39:4, 114:24
**Pm** [4] - 82:10, 83:3, 101:19, 122:24
**pocket** [1] - 14:12
**Point** [1] - 57:23
**point** [34] - 5:9, 5:18, 9:16, 19:23, 20:20, 21:3, 22:6, 26:9, 26:15, 28:6, 28:24, 28:25, 32:22, 33:22, 41:15, 42:8, 42:23, 43:4, 47:10,

47:20, 48:6, 58:2, 71:4, 72:19, 74:15, 77:5, 88:20, 96:23, 104:7, 104:17, 105:6, 113:16, 115:18, 116:15
**pointed** [1] - 113:14
**pointing** [2] - 30:8, 117:23
**Porco** [7] - 1:14, 4:2, 4:11, 101:7, 124:8, 125:11, 126:6
**portion** [12] - 12:12, 12:16, 12:20, 12:21, 42:3, 44:21, 70:24, 78:18, 84:8, 109:20, 111:15, 111:20
**position** [6] - 4:17, 36:8, 55:7, 70:5, 70:16
**positive** [3] - 90:22, 90:24, 112:3
**potential** [1] - 9:24
**potentially** [1] - 103:6
**power** [1] - 122:12
**praises** [1] - 106:8
**precisely** [1] - 65:16
**precision** [1] - 90:25
**premarked** [6] - 11:16, 17:18, 44:2, 61:22, 66:11, 101:6
**premier** [1] - 45:3
**prepared** [4] - 44:11, 44:12, 52:8, 113:15
**preparing** [1] - 45:6
**prerequisite** [1] - 59:14
**present** [1] - 16:4
**prestigious** [1] - 113:3
**pretty** [2] - 98:12, 115:19
**prevail** [1] - 111:23
**previous** [2] - 4:25, 16:8
**Previously** [1] - 5:18
**previously** [2] - 96:16, 120:12
**primarily** [1] - 88:22
**Primarily** [1] - 84:11
**prime** [2] - 34:11, 67:6
**principals** [1] - 122:3
**private** [1] - 105:20
**privilege** [1] - 52:22
**privileged** [2] - 52:20, 74:17
**pro** [1] - 104:22
**problem** [4] - 30:22, 31:4, 31:5, 32:23
**problems** [3] - 11:3, 32:13, 106:3
**procedurally** [3] - 25:2, 63:10, 107:7
**procedure** [1] - 30:23
**proceeds** [1] - 116:8
**process** [5] - 28:11, 32:4, 75:9, 86:10, 104:17
**processed** [1] - 39:7
**produced** [5] - 51:5, 79:6, 120:12, 121:2, 121:8

production [1] - 79:13
professional [3] - 112:7, 112:17
Professional [2] - 1:18, 125:9
profits [2] - 84:9, 100:9
program [1] - 97:20
prohibit [3] - 26:15, 26:18, 26:19
prohibited [1] - 72:25
pronounced [1] - 87:6
proper [3] - 75:9, 75:15, 101:25
properly [2] - 55:4, 64:25
proportionately [1] - 116:9
provide [3] - 29:11, 29:21, 121:4
provided [5] - 13:13, 29:4, 29:6, 56:11, 83:7
providing [1] - 37:18
prudent [4] - 25:2, 63:10, 106:9, 107:7
psych [1] - 88:5
Public [2] - 1:18, 125:9
pull [1] - 74:5
pulled [1] - 37:25
purchased [1] - 5:14
purports [4] - 11:20, 11:22, 61:23, 66:15
purpose [2] - 59:19, 64:23
purposes [1] - 43:3
pursuant [3] - 1:15, 6:21, 52:23
pursue [2] - 106:10, 109:25
pursued [1] - 106:9
put [25] - 19:23, 20:2, 21:15, 23:3, 35:24, 37:7, 39:22, 43:2, 43:12, 56:19, 56:21, 57:5, 59:18, 59:20, 60:7, 60:11, 60:13, 65:20, 74:3, 87:4, 90:7, 90:8, 107:20, 113:25
putting [4] - 13:24, 26:24, 96:6, 113:11
Putting [3] - 5:13, 12:20, 13:20

**Q**

quarter [1] - 39:4
questionnaire [1] - 54:25
questions [12] - 54:2, 54:3, 54:13, 54:14, 54:15, 65:16, 81:5, 81:6, 113:21, 113:22, 122:22
Quite [1] - 15:23
quite [3] - 13:2, 13:12, 92:23
quote [1] - 41:23

**R**

raise [8] - 15:25, 49:9, 59:6, 59:7, 59:24, 77:13, 112:16, 113:8
raised [4] - 21:25, 22:11, 22:14, 23:11
raising [3] - 28:21, 58:23, 59:2
Rakoff [1] - 66:24
rata [1] - 104:22
rather [2] - 48:7, 103:9
Rca [8] - 18:17, 18:24, 19:17, 53:18, 55:3, 55:13, 55:19, 114:16
reach [2] - 86:9, 87:3
reached [2] - 54:8, 55:24
read [8] - 66:22, 69:3, 71:15, 102:12, 117:3, 118:4
Read [1] - 71:14
reading [3] - 27:25, 61:20, 105:11
reads [1] - 56:9
real [1] - 10:20
reality [1] - 105:19
realize [1] - 104:2
really [6] - 49:8, 55:15, 67:4, 72:3, 111:19, 111:20, 116:13, 116:17
reason [1] - 72:21
reasonable [1] - 111:12
reasons [3] - 79:17, 95:18, 99:6
receipt [1] - 56:13
receive [9] - 7:20, 12:16, 12:23, 48:21, 62:16, 88:6, 103:7, 110:12, 111:20
Received [1] - 98:2
received [16] - 7:5, 8:8, 8:10, 12:22, 13:21, 34:21, 40:7, 62:15, 64:5, 64:7, 64:9, 65:3, 80:13, 94:12, 104:11, 108:7
receiving [3] - 64:2, 110:14
Recess [3] - 51:25, 120:14, 121:9
recess [1] - 82:10
recollect [2] - 21:3, 27:16
recollection [10] - 24:4, 25:7, 43:10, 45:21, 52:10, 86:21, 87:10, 93:21, 101:2, 122:15
reconstruct [1] - 102:17
record [10] - 5:25, 6:3, 20:4, 34:6, 51:24, 52:5, 102:13, 120:4, 120:18, 125:14
records [5] - 6:15, 10:18, 38:20, 43:19, 43:25
recovery [1] - 104:9
redeem [3] - 65:14, 90:25,

91:3
redeemed [5] - 82:4, 91:2, 91:6, 99:3, 106:5
redemption [31] - 25:13, 28:13, 46:4, 46:7, 62:21, 62:23, 63:7, 63:12, 63:15, 64:7, 64:18, 65:3, 65:5, 66:2, 66:5, 66:8, 73:18, 73:22, 73:23, 73:24, 75:9, 75:15, 75:17, 75:25, 78:13, 82:3, 97:3, 99:11, 99:13
refer [6] - 4:15, 34:6, 84:6, 84:13, 102:13, 114:12
reference [3] - 57:12, 57:13, 70:4, 84:5, 84:12, 102:23, 108:20, 109:5, 112:4, 114:11, 118:16, 118:19, 119:17
referenced [2] - 57:19, 71:4
references [3] - 58:2, 58:9, 115:10
referencing [2] - 22:13, 116:17
referrals [1] - 98:19
referred [4] - 5:6, 34:12, 53:9, 88:7
Referring [1] - 43:13
referring [14] - 5:7, 18:15, 43:11, 58:10, 88:8, 88:12, 94:19, 102:15, 108:14, 114:10, 114:18, 116:6, 116:7, 120:25
refers [3] - 20:5, 57:23, 117:8
reflect [4] - 6:3, 13:23, 20:9, 23:2
reflected [3] - 25:20, 25:21, 25:24
reflecting [1] - 19:2
refresh [1] - 43:10
refreshed [1] - 52:10
refuse [1] - 32:12
regard [4] - 42:21, 56:5, 74:19, 75:10
regarding [5] - 30:5, 54:22, 65:9, 66:2, 113:13
regardless [1] - 63:17
regards [6] - 5:3, 21:9, 36:13, 43:22, 54:9, 78:12
registered [1] - 97:15
Registered [2] - 1:17, 125:8
regular [1] - 115:20
regulate [2] - 90:15, 90:17
regulated [1] - 74:6
regulations [1] - 120:21
reimbursable [1] - 14:13
reimbursed [1] - 104:18
reimbursement [3] - 14:2, 14:10, 15:10
related [1] - 125:15

relationship [15] - 20:17, 20:18, 22:17, 38:8, 60:24, 67:23, 73:8, 91:20, 91:21, 91:23, 92:13, 98:14, 107:17, 109:2
relationships [3] - 16:8, 17:14, 98:17
relative [2] - 23:23, 85:18
released [3] - 15:14, 39:10, 75:8
relevant [2] - 37:16, 37:17
relief [1] - 110:2
remain [2] - 99:8, 107:5
remainderment [5] - 6:25, 93:12, 94:6, 94:18, 95:9
remained [1] - 99:2
remaining [2] - 21:24
remains [1] - 84:21
remember [8] - 27:25, 61:20, 81:13, 81:18, 87:6, 108:18, 111:3
Remember [1] - 96:21
remembering [1] - 42:11
remnant [1] - 42:20
rep [1] - 97:15
repeatedly [1] - 69:20
repercussions [1] - 84:18
Rephrase [1] - 29:17
rephrasing [1] - 27:10
report [2] - 66:15, 68:13
Reporter [2] - 1:18, 125:9
reporting [1] - 86:10
reportings [1] - 79:2
represent [2] - 14:8, 51:4
representative [1] - 34:8
represented [1] - 21:5
representing [1] - 80:22
reputation [4] - 106:4, 106:14, 107:10, 108:11
Request [1] - 126:16
request [1] - 24:22, 24:23, 62:16, 62:23, 64:7, 64:10, 73:18, 73:19, 73:24, 75:15, 121:4
requested [2] - 87:21, 121:23
require [1] - 67:5
required [2] - 60:15, 99:5
requirement [1] - 97:19
researched [1] - 9:24
reserved [1] - 3:7
resign [1] - 47:22
respect [2] - 39:13, 99:19
respective [1] - 3:5
respond [1] - 10:4
responded [3] - 80:17, 81:8, 81:11
Response [1] - 116:25
response [7] - 10:14, 19:9,

63:25, 64:4, 81:2, 81:9,
109:22
  **responsibilities** [6] - 4:20,
9:12, 9:15, 16:18, 66:19,
75:23
  **responsibility** [2] - 6:10,
25:2
  **rests** [1] - 122:12
  **result** [4] - 93:3, 108:9,
110:17, 110:18
  **retain** [1] - 25:5
  **retained** [3] - 7:2, 78:19,
100:6
  **return** [2] - 84:8, 119:9
  **returns** [7] - 49:17, 93:19,
94:5, 95:2, 96:12, 104:3,
104:4
  **reveal** [1] - 121:2
  **Revenue** [1] - 118:20
  **revenue** [19] - 7:13, 7:14,
13:7, 16:15, 16:16, 40:13,
49:3, 50:14, 78:17, 84:22,
94:24, 95:10, 95:11, 95:12,
95:24, 96:4, 96:8, 96:10,
105:3
  **revenues** [10] - 6:20, 6:22,
6:24, 7:12, 15:22, 16:11,
16:13, 48:20, 93:15
  **reverse** [1] - 102:6
  **review** [5] - 15:12, 17:2,
39:9, 64:23, 120:25
  **reviewed** [2] - 21:9, 79:24
  **revision** [1] - 45:16
  **Richard** [5] - 112:9, 112:10,
112:15, 113:6, 113:7
  **ridiculous** [3] - 101:22,
102:14, 109:7
  **risky** [1] - 72:23
  **robust** [1] - 36:3
  **role** [12] - 16:19, 66:19,
69:4, 69:10, 70:7, 86:24,
87:13, 88:22, 103:11,
108:24, 118:22
  **row** [1] - 106:10
  **Rpr** [1] - 125:22
  **rule** [2] - 75:10, 106:9
  **rules** [6] - 63:14, 67:8,
67:19, 68:8, 68:22, 120:21
  **running** [2] - 89:10, 115:16

## S

  **Sachs** [12] - 10:19, 11:8,
34:8, 34:9, 66:16, 67:13,
67:17, 67:25, 68:7, 68:21,
120:19, 120:22
  **Sachs's** [1] - 68:22
  **Sacred** [2] - 87:25, 88:3
  **salaries** [4] - 49:8, 76:20,
93:14, 115:5

  **salary** [2] - 48:24, 49:2
  **Sarbanes** [1] - 109:21
  **Sarbanes-oxley** [1] -
109:21
  **sat** [1] - 75:2
  **savings** [2] - 84:24
  **Savings** [1] - 85:2
  **saw** [2] - 61:19, 68:24
  **scam** [1] - 114:19
  **scammed** [1] - 114:12
  **scenario** [2] - 24:20, 103:4
  **school** [2] - 87:17, 87:22
  **Schulman** [2] - 80:8, 81:14
  **Sea** [31] - 90:12, 90:17,
91:18, 91:21, 91:22, 92:5,
92:7, 92:15, 92:17, 93:4,
94:10, 103:8, 103:18,
103:19, 103:24, 103:25,
104:2, 104:9, 104:10,
104:17, 104:21, 106:2,
106:3, 107:13, 107:23,
107:24, 107:25, 108:8,
109:15, 111:22
  **sealing** [1] - 3:13
  **Sear** [27] - 2:16, 4:6, 4:7,
8:16, 8:20, 34:15, 51:12,
51:16, 51:23, 52:3, 52:4,
53:3, 53:7, 53:13, 65:18,
71:14, 79:6, 79:12, 82:9,
83:4, 83:14, 101:12, 119:4,
120:3, 120:17, 121:11, 126:6
  **Sears** [1] - 122:22
  **Sec** [7] - 90:14, 104:13,
109:16, 109:19, 109:22,
110:9, 110:18
  **second** [5] - 57:16, 94:9,
102:5, 102:8, 111:5
  **section** [4] - 42:14, 66:22,
111:9, 117:19
  **securities** [1] - 97:10
  **see** [32] - 10:23, 12:10,
14:5, 22:4, 31:25, 35:5,
38:20, 40:11, 45:14, 51:20,
52:19, 53:2, 56:6, 56:16,
62:14, 62:17, 68:20, 69:7,
69:14, 80:3, 83:18, 100:2,
100:20, 102:3, 116:4, 117:5,
117:9, 118:19, 121:24,
122:19, 122:21
  **seed** [6] - 83:23, 84:5,
93:11, 95:11, 95:14, 96:7
  **seeing** [1] - 62:6
  **seek** [1] - 112:17
  **seem** [2] - 118:7, 118:9
  **segregated** [1] - 44:21
  **selecting** [1] - 92:11
  **sell** [1] - 98:20
  **selling** [1] - 98:8
  **send** [1] - 73:18
  **senior** [2] - 9:13, 39:8

  **sense** [3] - 48:7, 48:9, 72:4
  **sent** [19] - 19:8, 24:7,
27:17, 28:2, 30:3, 30:5,
30:16, 30:18, 30:25, 32:6,
39:7, 64:6, 64:11, 64:12,
70:2, 72:13, 80:15, 83:20,
101:18
  **sentence** [5] - 22:7, 22:25,
23:4, 23:8, 56:9
  **sentences** [1] - 102:12
  **separate** [5] - 24:20, 47:4,
75:22, 75:23, 107:22
  **September** [9] - 47:16,
71:16, 71:17, 76:12, 76:24,
77:8, 77:16, 77:20, 77:25
  **series** [6] - 14:20, 54:2,
54:11, 62:17, 101:6, 101:14
  **served** [2] - 121:18, 122:9
  **Service** [1] - 79:19
  **service** [1] - 31:12
  **services** [3] - 9:3, 61:24
  **Services** [3] - 27:21, 61:25,
62:8
  **Session** [1] - 83:2
  **Set** [1] - 116:25
  **set** [7] - 9:4, 18:10, 19:18,
37:9, 79:17, 117:18, 125:12
  **sets** [1] - 57:4
  **seven** [1] - 22:19
  **several** [4] - 4:21, 32:2,
48:17, 86:9
  **Several** [2] - 89:25, 97:18
  **share** [4] - 6:22, 6:24,
40:12, 104:22
  **shared** [3] - 94:15, 94:16
  **shareholder** [1] - 61:24
  **shares** [27] - 5:11, 5:13,
5:17, 10:2, 31:12, 31:22,
40:15, 40:19, 41:25, 46:8,
46:11, 46:12, 46:18, 47:5,
56:12, 56:15, 66:16, 77:14,
82:4, 91:25, 92:3, 94:9, 99:2,
99:17, 105:6, 106:17
  **Shays** [4] - 109:9, 109:12,
110:5, 110:15
  **shell** [1] - 46:5
  **short** [1] - 113:23
  **shortly** [8] - 35:23, 46:13,
89:24, 92:20, 99:13, 113:20
  **Shortly** [1] - 82:3
  **show** [15] - 11:16, 17:18,
18:5, 34:13, 44:2, 61:22,
66:11, 69:22, 79:2, 79:3,
80:4, 101:5, 116:20, 119:2,
121:12
  **showed** [1] - 18:2
  **shows** [1] - 23:24
  **shut** [4] - 25:11, 45:23,
58:18, 104:24
  **shutting** [1] - 46:6

  **side** [1] - 47:10
  **sign** [1] - 122:5
  **signature** [2] - 122:2,
122:19
  **signatures** [1] - 121:23
  **signed** [7] - 3:9, 17:24,
35:7, 35:14, 38:23, 122:5,
122:7
  **signing** [2] - 122:17, 122:21
  **similar** [1] - 91:23
  **simple** [3] - 29:16, 38:21,
108:10
  **simply** [1] - 70:8
  **singing** [1] - 106:8
  **sit** [4] - 39:9, 42:16, 94:23,
110:9
  **sitting** [1] - 26:13
  **situation** [7] - 7:25, 42:25,
75:12, 76:18, 95:15, 105:17,
115:8
  **size** [2] - 90:3, 111:13
  **slightly** [1] - 93:5
  **slow** [1] - 98:19
  **slowly** [1] - 90:24
  **small** [10] - 6:25, 12:18,
42:19, 42:22, 43:5, 46:17,
53:17, 71:3, 89:3
  **so-called** [2] - 5:11, 34:11
  **software** [2] - 116:3, 116:14
  **sole** [2] - 6:10, 7:13
  **someone** [3] - 33:5, 63:16,
106:20
  **sometime** [3] - 91:6, 92:23,
96:19
  **somewhere** [5] - 50:8,
50:10, 91:17, 91:19, 106:25
  **sorry** [2] - 7:8, 118:8
  **sort** [4] - 52:24, 92:12,
99:18, 103:3
  **source** [2] - 7:21, 58:11
  **sourced** [1] - 9:5
  **sources** [1] - 91:19
  **Southern** [2] - 1:2, 87:24
  **space** [2] - 115:14, 115:15
  **speaking** [1] - 43:21
  **speaks** [1] - 42:14
  **specialist** [6] - 61:24,
90:16, 90:23, 103:20, 109:17
  **specialists** [2] - 90:17,
92:21
  **specific** [5] - 10:24, 18:20,
30:21, 35:25, 54:16
  **specifically** [4] - 42:14,
65:24, 67:7, 111:8
  **specifics** [3] - 65:21, 66:4,
71:2
  **spectacularly** [1] - 23:22
  **spent** [1] - 85:11
  **Sperling** [4] - 10:6, 44:20,

44:25, 79:20
**spouse** [3] - 85:7, 85:8, 85:10
**ss** [1] - 125:5
**staggering** [1] - 33:4
**stake** [1] - 92:7
**stalled** [1] - 81:16
**stand** [1] - 114:21
**standard** [2] - 29:13, 30:23
**start** [6] - 4:10, 36:23, 40:9, 46:17, 89:6, 105:17
**start-up** [1] - 46:17
**started** [4] - 24:17, 96:14, 96:19, 96:25
**State**[4] - 1:19, 87:24, 125:4, 125:10
**state** [5] - 42:7, 69:13, 81:25, 101:21, 114:23
**statement** [11] - 11:21, 11:23, 12:3, 13:19, 34:5, 100:2, 100:17, 101:22, 102:14, 102:15, 120:17
**states** [2] - 67:3, 89:23
**States**[1] - 1:2
**stating** [1] - 119:8
**stay** [4] - 36:16, 36:18, 93:8, 103:6
**step** [2] - 110:2
**Steven**[1] - 80:8
**stick** [1] - 30:14
**still** [7] - 7:25, 47:19, 94:9, 99:4, 105:7, 111:10, 111:15
**stipulate** [1] - 55:10
**Stipulated**[3] - 3:4, 3:8, 3:12
**Stipulations** [1] - 3:2
**Stock** [2] - 90:15, 104:13
**stood** [1] - 70:8
**stopped** [5] - 73:6, 73:12, 74:19, 74:21, 74:24
**story** [2] - 107:19, 113:23
**strategy** [1] - 16:5
**stream** [1] - 84:22
**street** [1] - 22:22
**Street**[3] - 1:16, 2:14, 93:2
**strike** [2] - 66:21, 107:17
**struck** [1] - 107:16
**Stuart**[1] - 2:9
**stuck** [1] - 4:9
**stuff** [3] - 11:10, 51:7, 79:10
**subject** [2] - 53:4, 116:10
**submit** [2] - 15:11, 49:16
**Subscribed** [1] - 124:10
**subscribed** [1] - 91:12
**subscription** [9] - 46:21, 47:3, 72:12, 90:2, 90:4, 90:5, 92:6, 96:15, 97:4
**subscriptions** [1] - 91:16
**subsequent** [1] - 48:25

**Subsequent**[1] - 40:20
**substance** [2] - 65:14, 87:10
**substantially** [1] - 68:3
**substantive** [1] - 115:13
**subtract** [1] - 49:6
**successful** [2] - 23:22, 60:16
**sue** [1] - 110:25
**sued** [1] - 106:25
**suggesting** [1] - 31:15
**suggestion** [1] - 118:2
**suit** [1] - 114:2
**Suite**[1] - 2:7
**summary** [2] - 12:5, 70:3
**summons** [1] - 121:13
**Supplement**[1] - 116:24
**supplemental** [1] - 51:13
**supporting** [1] - 20:13
**supposed** [8] - 29:11, 29:21, 35:24, 36:16, 37:17, 56:18, 114:20, 117:21
**surprise** [2] - 95:21, 113:2
**sweep** [1] - 11:11
**swept** [1] - 11:11
**Switzerland**[1] - 112:21
**sworn** [4] - 3:9, 4:3, 124:10, 125:13
**Szele**[16] - 6:17, 8:24, 8:25, 9:8, 9:21, 10:11, 10:17, 11:6, 15:20, 19:3, 62:15, 101:8, 101:15, 101:18, 115:2, 120:9

## T

**talent** [1] - 9:23
**talks** [1] - 64:9
**tax** [6] - 49:17, 93:19, 94:5, 95:2, 96:12, 119:9
**taxes** [4] - 24:15, 25:5, 37:25, 116:10
**team** [5] - 62:7, 79:21, 81:15, 113:15, 114:6
**Telephone**[1] - 78:11
**temporarily** [1] - 97:4
**Ten**[1] - 69:13
**tensions** [1] - 74:12
**term** [1] - 98:11
**termination** [1] - 56:11
**terms** [18] - 7:9, 16:10, 18:19, 21:17, 22:2, 22:12, 31:11, 35:17, 37:2, 52:9, 53:9, 65:7, 65:20, 71:6, 93:3, 93:15, 95:24, 110:13
**testified** [2] - 4:4, 120:18
**testifying** [1] - 121:7
**testimony** [11] - 8:18, 52:7, 52:9, 60:12, 73:11, 75:5, 75:24, 83:10, 83:17, 88:14, 125:14

**themselves** [2] - 17:5, 54:9
**thereafter** [5] - 45:17, 46:14, 89:24, 92:20, 113:20
**they've** [1] - 110:25
**third** [2] - 38:22, 115:24
**Third**[1] - 114:22
**Thirdparty** [1] - 114:22
**Thomas**[1] - 2:16
**thousands** [2] - 30:12, 48:18
**three** [3] - 34:18, 40:12, 88:24
**throughout** [2] - 57:20, 67:25
**throughs** [1] - 13:20
**thrown** [1] - 114:5
**tight** [1] - 95:16
**timing** [1] - 27:24
**today** [7] - 52:7, 62:16, 64:9, 81:23, 83:16, 83:17, 120:7
**together** [3] - 21:16, 43:12, 55:24
**Tom**[5] - 14:24, 17:10, 21:10, 22:21, 109:18
**tomorrow** [1] - 120:13
**took** [8] - 21:11, 62:11, 65:17, 68:9, 69:17, 73:18, 75:2, 115:25
**top** [2] - 117:9, 117:10
**total** [1] - 91:17
**totally** [2] - 72:25, 86:22
**Touche**[2] - 88:10, 88:19
**tough** [1] - 107:12
**Tpm**[2] - 114:11, 114:21
**track** [2] - 33:14, 116:15
**trade** [2] - 100:9, 116:4
**traded** [2] - 94:11, 104:21
**trader** [2] - 31:12, 37:15
**trades** [3] - 11:8, 11:9, 11:14
**trading** [53] - 5:2, 5:5, 6:7, 6:11, 7:15, 9:4, 9:17, 9:20, 10:11, 10:18, 11:7, 16:2, 16:24, 23:22, 25:11, 26:6, 26:7, 30:5, 31:21, 32:21, 33:6, 37:13, 37:14, 40:3, 41:22, 49:11, 54:3, 54:4, 56:23, 56:24, 58:3, 58:14, 61:4, 63:18, 63:19, 73:16, 75:2, 76:6, 76:7, 86:23, 87:12, 87:14, 90:13, 90:19, 92:8, 93:13, 94:6, 94:13, 94:18, 95:9, 98:25, 106:19, 113:13
**Trading**[1] - 118:20
**traffic** [1] - 4:9
**trailed** [1] - 11:13
**tranche** [1] - 38:9
**tranches** [2] - 24:6, 59:8

**transcript** [1] - 66:23
**transcripts** [1] - 79:2
**transfer** [5] - 56:13, 62:19, 68:18, 86:11, 86:15
**transferred** [1] - 103:16
**transfers** [1] - 32:6
**transparent** [3] - 79:16, 79:22, 107:5
**transpired** [1] - 115:15
**travel** [1] - 16:3
**traveling** [1] - 112:20
**tremendously** [1] - 108:5
**trial** [1] - 3:7
**tried** [8] - 22:15, 33:13, 54:12, 72:8, 72:17, 73:5, 74:5, 87:4
**trouble** [2] - 80:19, 81:14
**true** [1] - 125:13
**trust** [1] - 119:23
**try** [5] - 16:25, 73:19, 73:23, 77:4, 87:2
**trying** [11] - 15:25, 19:9, 21:4, 46:14, 55:16, 65:22, 71:6, 71:8, 72:24, 86:8, 98:20
**turn** [2] - 89:17, 111:17
**turned** [1] - 113:2
**twisting** [2] - 101:22, 102:14
**two** [14] - 18:11, 18:23, 23:18, 24:20, 25:14, 51:21, 75:22, 75:23, 88:6, 102:12, 105:15, 105:21, 105:23, 115:6
**two-minute** [1] - 51:21
**type** [6] - 30:22, 54:2, 97:6, 98:10, 107:16, 111:14
**typically** [1] - 59:3, 59:11

## U

**ultimate** [1] - 65:2
**ultimately** [4] - 36:13, 52:18, 63:21, 91:2
**Ultimately**[1] - 90:11
**unable** [1] - 49:2
**unclear** [1] - 96:18
**under** [4] - 22:2, 22:12, 66:18, 75:6
**underlying** [1] - 15:8
**understandings** [7] - 18:13, 18:20, 18:23, 19:4, 19:18, 19:20, 61:3
**understood** [2] - 18:25, 59:14
**undertaking** [1] - 89:3
**unencumbered** [1] - 103:14
**Unfortunately**[1] - 54:13
**unit** [3] - 83:23, 84:5, 93:11
**United**[1] - 1:2

University[2] - 87:24, 87:25
  unless [1] - 121:22
  unlike [2] - 92:9, 110:23
  unpaid [1] - 84:13
  untypical [1] - 33:5
  unusual [1] - 111:4
  up [26] - 9:4, 16:21, 24:8, 32:19, 38:17, 41:7, 43:14, 46:17, 49:20, 49:21, 56:14, 56:20, 60:11, 60:20, 60:21, 77:5, 79:18, 84:25, 89:9, 93:9, 93:16, 95:4, 95:23, 101:8, 113:16, 113:24
  Usd[1] - 56:14
  utilized [1] - 11:12

**V**

various [3] - 32:25, 37:13, 81:6
  vehicle [1] - 23:13
  veil [1] - 114:7
  vendor's [1] - 84:13
  vendors [3] - 31:25, 84:20, 115:21
  venture [5] - 92:10, 95:16, 103:11, 103:23, 113:8
  versus [2] - 36:13, 95:14
  via [1] - 18:17
  victims [1] - 109:21
  viewed [2] - 72:22, 111:6
  vindicated [1] - 106:7
  violate [3] - 36:21, 37:2, 37:5
  violated [12] - 24:17, 31:7, 31:9, 35:17, 36:9, 36:12, 36:13, 36:14, 36:15, 37:22, 39:12, 70:5
  violating [2] - 25:6, 75:18
  violation [16] - 29:4, 29:10, 29:19, 29:22, 30:2, 30:15, 31:2, 31:14, 35:21, 67:8, 67:18, 68:8, 68:22, 70:13, 70:17, 75:19
  violations [10] - 25:12, 30:5, 30:6, 32:22, 33:4, 37:14, 68:2, 86:3, 86:7, 120:20
  visible [1] - 11:9
  volume [2] - 91:15, 112:19
  volunteering [1] - 56:3

**W**

waived [2] - 3:14, 52:22
  waiver [1] - 53:4
  Wall[1] - 93:2
  ways [2] - 36:16, 37:5
  Wednesday[1] - 120:10
  well-being [1] - 40:4

whatsoever [1] - 14:25
  whole [2] - 59:18, 65:9
  wife [1] - 85:11
  William[1] - 2:10
  Williams[5] - 13:15, 14:25, 44:12, 44:17, 79:21
  willing [1] - 109:14
  willy [1] - 74:5
  willy-nilly [1] - 74:5
  wire [12] - 32:8, 32:10, 32:12, 32:18, 72:8, 72:17, 72:20, 72:24, 73:19, 74:20, 74:23, 75:14
  wired [2] - 6:14, 73:13
  wiring [2] - 72:10, 72:11
  withdraw [8] - 22:10, 24:2, 24:21, 24:22, 24:25, 25:18, 27:13, 27:14
  withdrawal [4] - 24:16, 26:11, 28:22, 38:20
  withdrawals [1] - 24:4
  withdrawing [2] - 25:8, 27:4
  withdrawn [4] - 12:14, 28:16, 31:18, 96:16
  withdrew [2] - 25:9, 37:9
  withhold [2] - 70:18, 70:20
  Witness[3] - 79:10, 79:15, 126:5
  witness [10] - 4:3, 8:17, 52:6, 83:8, 83:9, 120:18, 121:6, 122:23, 125:11, 125:14
  woman [2] - 34:7, 67:12
  word [2] - 23:7, 98:19
  word-of-mouth [1] - 98:19
  words [3] - 22:23, 48:20, 88:18
  works [1] - 67:13
  world [3] - 26:10, 26:24, 27:2
  worth [3] - 17:2, 53:25, 91:13
  writing [3] - 25:24, 64:21, 109:19
  written [9] - 28:20, 29:5, 29:11, 29:21, 30:2, 30:4, 30:7, 30:15, 30:25
  wrongdoing [1] - 99:20

**Y**

year [18] - 5:21, 12:4, 12:7, 12:13, 12:15, 12:17, 12:22, 12:25, 13:6, 23:21, 30:17, 48:23, 50:13, 50:20, 71:24, 89:4, 91:5, 95:25
  year-end [2] - 12:7, 12:13
  years [7] - 16:7, 23:25, 48:25, 96:4, 96:11, 97:18,

105:2
  York[10] - 1:2, 1:16, 1:19, 2:8, 2:15, 90:15, 104:13, 125:4, 125:6, 125:10
  yourself [4] - 8:23, 8:25, 48:20, 72:20
  yourselves [3] - 15:5, 24:8, 111:10

**Z**

Zanger[57] - 1:7, 5:10, 5:14, 5:20, 6:5, 6:12, 7:19, 11:17, 11:18, 11:20, 11:22, 11:24, 12:2, 12:6, 12:9, 17:19, 17:21, 18:5, 18:7, 18:11, 19:3, 19:19, 34:14, 34:16, 35:10, 44:3, 44:4, 56:4, 61:23, 62:3, 66:12, 66:13, 67:2, 69:22, 69:24, 70:12, 73:25, 80:5, 80:6, 80:9, 83:6, 83:11, 86:2, 86:6, 91:10, 99:25, 100:17, 101:6, 101:10, 116:21, 116:22, 119:3, 119:5, 120:15, 120:21, 121:13, 126:7