# Exhibit E

George Szele & Joseph Porco
Principals and Managing Directors
Independent Asset Management, LLC
177 Broad Street, Suite 1051
Stamford, CT 06901
(203) 355-1160

January 24, 2006

Office of the Secretary
United States Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549-9303

## Comments

### Admin. Proc. File Nos. 3-11445, 3-11446, 3-11447, 3-11448, 3-11449, 3-11558, 3-11559 ("NYSE Fraud")
### FUND ADMINISTRATOR'S PROPOSED FAIR FUND DISTRIBUTION PLAN

### I.    Factual Background

Independent Asset Management, LLC ("IAM") is a trading manager, commodity pool operator, and commodity trading advisor. Established on February 16, 2001, IAM is the trading manager for The Independent Fund Limited ("IFL"), a Bermuda fund registered with the Bermuda Monetary Authority ("BMA").

In the months of January 2003 to March 2003, under the direction of IAM and with IFL investors' approval, IFL invested $4,500,000 in Sea Carriers Limited Partnership I ("Sea Carriers"). Furthermore, IAM introduced investors to Sea Carriers, which resulted in an additional $2,350,000 being invested in Sea Carriers. Therefore, IAM/IFL efforts represented approximately 34.5% of Sea Carriers assets (at peak assets under management) at the inception of Sea Carriers trading. By October of 2003, as investors redeemed from Sea Carriers, IAM/IFL efforts represented approximately 61% of Sea Carriers assets.

The expertise of Sea Carriers was trading baskets of stocks listed on the NYSE, by transmitting unconditional market orders to buy or sell though the NYSE's Super DOT system. Agreeing to have IFL and its other investor contacts make this asset allocation decision, IAM did not know that the fraudulent practices of NYSE Specialists primarily targeted the order flow of Sea Carriers. Subsequently, according to press reports on the criminal investigation by Federal prosecutors, certain Specialists had a "screw the DOT orders" mentality.

1

Independently of IAM and before IAM's involvement in this matter, a securities account was opened at Spear, Leeds & Kellogg by R. Allan Martin in the name of Empire Programs. Mr. Martin/Empire had a joint venture[1] with Sea Carriers, whereby Empire Programs provided trading capital, and Sea Carriers and its independent traders/contractors designed and executed the trading strategy.[2]

In naming Empire Programs as co-lead plaintiff in the class action lawsuit against the NYSE and its member firms, Federal Judge Robert Sweet determined that Empire Programs has the largest financial interest in the matter of the NYSE Fraud. As such, Empire is likely to be paid a larger sum of money than any other "Injured Customer" identified by the Fund Administrator.

In court papers filed during his bid to be named lead plaintiff, Mr. Martin asserted that he has no obligation to share or allocate with any other parties the settlement amounts to which Empire Programs may be entitled. Specifically, Mr. Martin, in his May 12, 2004 Declaration in connection with Empire's Lead Plaintiff Motion filed in U.S. District Court, stated, "Empire and Empire alone owns its claims herein. . ." (the "claims herein" being any disbursements of reimbursement of losses, prejudgment interest, and/or penalties). As a result of Mr. Martin's claims, Sea Carriers filed a lawsuit against Empire Programs in the U.S. District Court, Southern District of New York (Index No. 04-CV-7395). Among other things, Sea Carriers has petitioned Judge Sweet to block any payments to Empire Programs by the Fund Administrator.

The NYSE Fraud diminished Net Trading Profits generated by both the Empire Programs/Sea Carriers joint venture and the capital invested in Sea Carriers by IFL. As such, it adversely affected not only Empire Programs but also Sea Carriers, IAM and the other traders Sea Carriers had independently contracted. Sea Carriers and its independent traders were all compensated based solely upon performance. The NYSE Fraud diminished the actual performance and therefore the amount that Sea Carriers and its independent traders earned.

## II.    Summary of Comments

A.    The class of "Injured Customers" in the Fund Administrator's Distribution Plan should be changed to include certain injured persons other than account parties and Nominees identified by Clearing Members, and these additional injured persons ("Derivative Claimants") should be eligible to receive distributions of compensatory Disgorgement Amounts, with prejudgment interest.

---

[1] "Joint venture" is the term R. Allan Martin used to describe the arrangement between Empire Programs and Sea Carriers.

[2] The terms of the Empire Programs/Sea Carriers joint venture were straightforward. On a monthly basis, 20-25% of Net Trading Profits (trading profits less commissions and SEC fees) were paid out to traders that Sea Carriers independently contracted. Joint venture expenses (which included but were not limited to utility costs, office rent, and data costs) were then deducted from the remaining Net Trading Profits, if any. Any amount remaining was split 50% to Empire Programs, 50% to Sea Carriers.

B.      Derivative Claimants should be eligible to receive distributions of penalties and consequential damages, whether Derivative Claimants receive compensatory Disgorgement Amounts or not.

C.      If the Plan is not changed to accommodate the two requests above, language in the Commission's final order should nevertheless:

1.      Maintain jurisdiction over this matter even after the Fund Administrator has made all distributions;

2.      Issue an express finding that the Specialist Firms' trading violations have injured persons besides account parties—specifically, third parties positioned to benefit (or lose) from transactions involving the Specialist Firms and the account parties;

3.      Make Injured Customers acknowledge, as a precondition to their receipt of distributions, their legal obligation to share distributions with third party beneficiaries of the transactions at issue; and

4.      Permit Derivative Claimants to seek further SEC review if such Injured Customers do not so share the distributions received.

## III.     Discussion

### A.     The class of "Injured Customers" should include certain injured persons other than account parties.

The class of "Injured Customers" should be broadened for three reasons. First, this interpretation is consistent with the stated goals of the Fair Fund. Second, some Injured Customers have expressed a subversive intention not to share distributions with other parties whom Violative Transactions affect. Third, the nature of the entity comprising an Injured Customer might give the partner of an Injured Customer a direct pro rata interest in distribution proceeds.

First, according to the Commission, Fair Fund distributions aspire to redress injuries arising "as a result of the Specialist Firms' trading violations."[3] The current Distribution Plan therefore limits the class of claimants to "the customers who were injured as a result of" Violative Transactions.[4] Without any stated legal justification, however, the Plan interprets "Injured Customers" to include only account parties identified by Clearing Members or Nominees.[5] This interpretation clashes with the Commission's stated intent, because Violative Transactions were the proximate cause of substantial economic injuries beyond those to account parties. The Plan acknowledges that "one transaction could

---

[3] Notice of Proposed Distribution Plan and Opportunity for Comment at 2.
[4] Fund Administrator's Proposed Fair Fund Distribution Plan at 4.
[5] Fund Administrator's Proposed Fair Fund Distribution Plan at 5.

3

represent a block of trades from more than one Injured Customer."[6]  Thus, if a Clearing Member identifies "multiple Injured Customers" for one transaction, the Fund Administrator allocates the Disgorgement Amount "to each Injured Customer pro rata."[7] If, however, a Violative Transaction caused an Injured Customer in turn to injure multiple Derivative Claimants, and a Derivative Claimant therefore loses investors, the Plan unreasonably fails to allocate compensatory distributions pro rata to each injured Derivative Claimant.  Such a failure unequally treats persons who are similarly situated.

Second, the Distribution Plan should not make it easy for Injured Customers to subvert the Commission's intent by withholding distributions from other parties whom Violative Transactions affect.  Perhaps the Fund Administrator has assumed that consequential injuries are matters to be resolved between an Injured Customer and a Derivative Claimant—not between them and the Commission.  As shown by the example of Empire, however, some Injured Customers have already decided, if possible, not to share their distributions with Derivative Claimants.  The statements by Empire do not directly affect IAM, because Empire has not been IAM's partner.  Moreover, IAM is confident that its own partner, Sea Carriers, will not similarly fail to share distributions with IAM.  Empire's statements, however, exemplify a problem that will only worsen if the Commission does not speak to the issue.  Indeed, the Plan's failure to address this issue has perhaps prevented even IAM's partner, Sea Carriers, from granting written assurances that distributions will be shared without litigation.

Third, the Plan fails to recognize that the nature of the entity comprising an Injured Customer might give the partner of an Injured Customer a direct pro rata interest in distribution proceeds.  The Uniform Partnership Act, for example, rebuttably presumes property purchased with partnership funds to be partnership property, notwithstanding the name in which title is held.[8]  The current Plan's simplistic method ignores such complexities, thereby fostering unfairness.

> B.    Derivative Claimants should be eligible to receive distributions of penalties and consequential damages.

By definition, a "penalty" punishes a person for the commission of a crime.[9]  Accordingly, the essential element of the penalties in this matter is the fact that they deprive the Specialists of certain monies—not the fact that Injured Customers receive them. Distributions of penalties will therefore penalize the Specialists just as much if Derivative Claimants receive them as if Injured Customers receive them.

---

[6] Fund Administrator's Proposed Fair Fund Distribution Plan at 5.

[7] Fund Administrator's Proposed Fair Fund Distribution Plan at 6.

[8] "Property is presumed to be partnership property if purchased with partnership assets, even if not acquired in the name of the partnership or of one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership."  Uniform Partnership Act § 204(c) (1997), posted at http://www.law.upenn.edu/bll/ulc/fnact99/1990s/upa97fa.htm (last visited Jan. 23, 2006).  The Uniform Partnership Act of 1997 has been adopted in every state except Louisiana.

[9] *See, e.g.,* Black's Law Dictionary: Pocket Edition, ed. Bryan A. Garner (West Group 1996) at 475.

4

Similarly, by definition, "consequential damages" arise not from the immediate act of the party, but in consequence of such act—such as if a person throws a log into the public streets and another falls upon it and becomes injured by the fall.[10]  Violative Transactions in the current matter triggered a chain of effects that resulted in numerous consequential damages.  Injuries to Derivative Claimants fall under the heading of "consequential damages," both because Injured Customers passed their losses on to Derivative Claimants and because Derivative Claimants suffered further financial harm as a result of their injured track record.

IAM's and IFL's clients and contacts included a pension fund, as well as other institutional and high net worth investors.  Because IAM is a young firm, performance is the most critical element to growth, in terms of raising funds under management.  Performance (growth) is critical both to survival and to maintaining strategic relationships with operations including, but not limited to, administration, accounting and auditing.[11]

The NYSE Fraud robbed IAM (the trading manager), IFL (the fund) and its contacts of performance.  The NYSE Fraud thereby materially damaged the ability of IAM and IFL to raise assets from 2003 through 2005.[12]  During this very period, the rest of the hedge fund/alternative investment sector experienced explosive and unprecedented growth.

Moreover, as investors began to withdraw their funds from IFL, and as assets under management declined, management fees were lost—management fees that were necessary for the principals of IAM personally to survive.  Therefore, besides diminishing the performance generated by Sea Carriers, the NYSE Fraud set off a wave of related events that drove IAM to the brink of financial ruin and in doing so caused IAM's principals and

---

[10] *See id.* at 163.

[11] Despite its relative youth, IAM quickly established a strong reputation, until the NYSE Fraud took this major asset away.  Before founding IAM, George Szele worked at Societe Generale, Goldman Sachs, and State Street Global Advisors.  Raising the capital to found IAM, setting up a premier team of administrators and accountants, setting up an office in Stamford, and securing the necessary regulatory registrations—all these accomplishments directly resulted from hard work and the reputation George had nurtured over ten years.  In building a fully scalable business, which could handle assets up to $1 billion, the principals of IAM negotiated and secured contracts with companies regarded by investors as "pillars in the institutional community," thereby ensuring investor confidence in proper administration, reporting and auditing for the fund.  IAM secured back office relationships with OSI (now part of Sungard), Forum Fund Services (now part of CitiGroup) and KPMG.  Each of these groups took IAM and the fund on with the expectation of significant growth of assets over two to three years.

[12] Specifically, as existing investors grew more and more discontent with performance, IAM began to lose credibility with its back office vendors and its administrator.  OSI/Sungard was the first to resign.  This event triggered concern among the remaining investors but also required IAM to spend time and effort to find a replacement administrator and in essence start over.  Next, IAM's offshore administrator, Forum Fund Services, resigned.  This event caused further concern with remaining investors and required IAM to spend the time and effort to find a replacement offshore administrator.  Remaining investors had concerns regarding performance and concerns regarding the resignations of IAM's strategic administrative partners.  Then KPMG suggested that it would be mutually practical, due to the fund's size and the cost to audit the fund, that the auditing relationship be terminated.  This event caused additional concern with the remaining investors and required IAM to spend the time and effort to find a replacement auditor.  Each required restart consumed significant resources.

their families to accumulate personal debt and to suffer credit damage, as well as professional and personal embarrassment.[13]

The Administrator has properly identified Sea Carriers as an Injured Customer. As Sea Carriers receives payments of Disgorgement Amounts and prejudgment interest from the Escrow Agent, it will pass on the appropriate share of such payments to IAM/IFL.[14] In addition to any such compensatory payments by Sea Carriers, however, IAM and its principals (George B. Szele and Joseph J. Porco) have suffered extraordinary consequential damages. They therefore seek reimbursement for such damages from the Fair Fund. The Proposed Distribution Plan assumes that the only victims of the NYSE Fraud are those persons or entities that opened an account, in their name, with a clearing member. This is not a valid assumption. Accordingly, the SEC should consider the special circumstances of those consequential victims, like IAM/IFL, whom the NYSE Fraud financially devastated, and should make special payments to those victims out of any funds left over, now estimated to be $50-70 million.

    C.    If the Plan is not changed to accommodate the two requests above, and if Injured Customers do not so share the distributions received, language in the Commission's final order should empower Derivative Claimants to seek further SEC review.

Administrative burdens might prevent the Commission from granting our requests above. If so, certain provisions in the Commission's final order could, in the alternative, mitigate the kinds of problem that our requests anticipate. First, an express finding that the Specialist Firms' trading violations have injured persons besides account parties—specifically, third parties positioned to benefit (or lose) from Violative Transactions—

---

[13] Upon launching the company, IAM had borrowed money from family and friends. IAM has been unable to repay these obligations, which exceed $500,000. In an effort to keep the company going, the principals of IAM worked tirelessly to develop alternatives to generate income and were forced to dilute equity to raise capital to pay the rent and other expenses. IAM's principals have not received their full salaries for several years. Both principals have been forced to borrow additional funds to pay personal creditors and basic living expenses, and both have incurred tremendous personal debt. To date the company owes its principals/managing directors in excess of about $1,000,000. Even if IAM survives, the equity interest of its principals has been significantly diluted as a result of the sale of equity.

[14] The intimate partnership between IAM/IFL and Sea Carriers caused IAM/IFL to invest in Sea Carriers in human ways that increased the consequential damages arising after the Specialists injured Sea Carriers. In addition to IFL being an investor in Sea Carriers, IAM's principal, George Szele, also bought and sold baskets of stock for the Partnership. At the request of IFL's investors, George spent the majority of his time from 2003 to March 2005 in the Sea Carriers office. George traded approximately 200,000,000 shares of stock listed on the NYSE as a Sea Carriers trader or independent contractor in overseeing the interests of IAM/IFL clients. Some 20%-25% of the net trading results from his activity as a trader on behalf of IFL would have been payable at the end of each month and paid to the fund. The NYSE Fraud diminished his actual trading performance and as a direct result, diminished the share of the distribution of trading profits for the fund. Furthermore, as the NYSE Fraud became public knowledge, IAM allocated time and resources to assist Sea Carriers in its various legal activities to recover damages. IAM also felt it had a fiduciary duty to its clients and contacts to solicit the assistance of persons including, but not limited to, Connecticut Congressman Shays, particularly when the NYSE failed to turn the violation data over to the Administrator in a timely fashion (the NYSE had been named as a defendant in the class action lawsuit).

would facilitate efforts by Derivative Claimants to seek redress from Injured Parties. Second, making Injured Customers acknowledge, as a precondition to their receipt of distributions, their legal obligation to share distributions with third party beneficiaries would encourage Derivative Claimants and Injured Customers to resolve any dispute without litigation. Finally, by maintaining jurisdiction after the Fund Administrator has made all distributions, the Commission should make provisions for Derivative Claimants to seek further SEC review if Injured Customers do not so share the distributions received.

## IV.    Conclusion (Specific Actions Sought)

The NYSE Fraud has created a mess. Judging by the data released in the Proposed Plan (i.e., $157,624,364 in disgorgement amounts on over 2.6 million transactions identified by the NYSE's Self Regulatory Organization as "Violative Transactions"), the NYSE Fraud was a "skimming scheme," skimming (stealing) anywhere from a fraction of a cent per share to three cents, five cents, or twenty five cents or more per share.

Because the NYSE Fraud skimmed just pennies off the reported execution price ,some Injured Customers, unaware that they had been victimized in the first place, will be shocked to get a check from the escrow agent of the Fund Administrator. Certain of these victims may not even be aware that the NYSE Fraud took place. Some of the large Wall Street firms that routinely participate in what is known as "program trading" will not be surprised when they receive a check, but they will likely have no clue as to when specific violations occurred. Nor will the amount of check be material to their overall financial statements, as such program trading activity is a miniscule percentage of their overall business models.

One category of victims, however, was devastated by the NYSE Fraud. This category includes a small business (IAM) that focused all of its resources and assets in a trading strategy that fell smack in the crosshairs of the NYSE Fraud. The traded stocks included TXN, MOT, MER, C, EMC, GLW, GE, GS, JPM, JNJ, MWD, TYC, MRK, AOL, IBM, AIG, TER, VZ, PFE, LLY, ADI, GTE and others—the most liquid and largest capitalized stocks listed on the NYSE. According to the SEC, six particular stocks per Specialist firm accounted for the vast majority of Violative Transactions. The SEC listing included all the stocks listed above. The trading strategy transmitted all of its orders (unconditional market orders to buy or sell) through the NYSE's Super DOT system, the epicenter of the NYSE Fraud. Under the circumstances, a small business has little or no chance to survive.

Upon the request of IAM's principal, George Szele, Congressman Christopher Shays forwarded correspondence to the SEC regarding the Distribution Plan. In his letter to Chairman W.H. Donaldson, on September 22, 2004, Congressman Shays not only points his concern for smaller firms but also emphasizes the degree of financial hardship that the NYSE Fraud has forced smaller firms to endure.

> " ...I am particularly concerned because Sea Carriers, a small trading firm in Greenwich, Connecticut that expects to be a beneficiary of the SEC's settlement with the specialist firms, is on the verge of bankruptcy while

awaiting settled reimbursement. While I realize that some beneficiaries of the disbursement fund may be large firms that are financially able to be patient during the delay, this is not the case with a small firm such as Sea Carriers."

## A.    Summary of Comments on the Proposed Distribution Plan:

1.  IAM requests that the Administrator provide (in the form of a computer file) immediate access to all the Violative Transactions that have been identified to date as being allocated to Sea Carriers, including the detailed explanation for each transaction, which includes:

    > Prejudgment Interest Amount
    > Clearing member number
    > Clearing member name
    > Trade date
    > Security symbol
    > Firm mnemonics
    > Branch and sequence codes
    > Turn around code
    > Transaction type
    > Number of shares
    > Time of trade
    > Specialist Firm
    > Disgorgement Amount
    > Execution Price
    > CUSIP number
    > Principal/agency code

2.  IAM requests that, as new Violative Transactions are identified by the clearing members (i.e., Calyon or SLK), IAM be granted immediate access to the new trades being added.

3.  When making a distribution to Sea Carriers, the Administrator should include a detailed breakdown, per Violative Transaction, of the all the information listed in comment #1 above. With this information, Sea Carriers will be able to determine the exact amount owed to IAM and its clients. With this information, Sea Carriers will be able precisely to calculate the amount due to IFL for the trading activity performed by George Szele in his capacity as a trader for the Partnership.

4.  The delay in reimbursing damages caused by the NYSE Fraud has only exacerbated the financial devastation of IAM. The SEC and Fund Administrator should take all actions necessary immediately to reimburse damages to all the victims. Specifically, Goldman Sachs/Spear, Leeds & Kellogg should be given an order by the SEC to complete the entire required submission to the Fund

8

Administrator within 7 days or face a $100,000 per day fine until Fund Administrator's request for information is completely fulfilled. Goldman Sachs and SLK are named as defendants in the ongoing class action lawsuit. Furthermore, the SEC and Fund Administrator should streamline future interactions so as to permit the reimbursement of damages as soon as possible.

5. On the top of page 4 of his proposed Distribution Plan, the Administrator described a "retroactive surveillance" conducted by the NYSE to identify Violative Transactions. The Administrator also indicated that the surveillance used "certain time parameters." The particulars of such "retroactive surveillance" should be publicly disclosed in its entirety and without ambiguity as to methods/parameters, scope, etc. Public disclosure of this information, however, should not delay the distribution of funds to the NYSE Fraud victims.

**B.    Summary of comments on "the use to be made of any funds left over after the contemplated payments have been made" (currently estimated to be $50-70 million).**

The NYSE Fraud caused material consequential damages to IAM/IFL, as outlined herein. It caused investor withdrawals, strategic partners' resignations, and loss of income to principals, all of whom had to focus on recovering damages, thereby diverting limited resources away from core business activities, etc. These damages are over and above the calculated damages that the Administrator will be forwarding to Sea Carriers.

IAM therefore asks that the SEC consider IAM's special circumstances, its financial devastation by the NYSE Fraud, and conclude that IAM is entitled to additional compensation with respect to all the consequential damages suffered as a result of the NYSE Fraud. IAM seeks and claims it is entitled to a direct payment of $10 million to be paid from the estimated $50-70 million of funds left over.

**C.    Summary of further comments**

If the Plan is not changed to accommodate the requests above, and if Injured Customers do not so share the distributions received, language in the Commission's final order should empower Derivative Claimants to seek further SEC review.

Sincerely yours,

George Szele and Joseph Porco
Principals and Managing Directors
Independent Asset Management, LLC.