# Exhibit F

Case 1:07-cv-06431-JSR   Document 40-8   Filed 04/28/2008   Page 1 of 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
INDEPENDENT ASSET MANAGEMENT LLC,

        Plaintiff,

vs.

DANIEL ZANGER,

        Defendant.
------------------------------------------------------------ x

Case No. 1:07-cv-06431-JSR

ECF

## EXPERT REPORT OF RAYMOND L. ARONSON

I, Raymond Aronson, declare, pursuant to the provisions of 28 U.S.C. §1746, as follows:

I.  **QUALIFICATIONS AND ASSIGNMENT**

1. I received a juris doctor degree from New York University in 1962 and a Bachelor of Arts Degree with a concentration in non-western civilization and a minor in economics from the University of Rochester in 1959. I was admitted to the New York State Bar in 1973, and I remain admitted.

2. From 1965 through 1972, I worked as an associate director of rulings at the American Stock Exchange (the "AMEX"). My responsibilities included writing rules, handling inquiries from the public on the floor, and working on special projects for the Chairman of the AMEX. In 1968, I prepared a report on the nature of hedge funds and the identity of member organizations involved in them for the Executive Vice President for Legal and Regulatory Affairs of the AMEX, Norman Poser.

3. From 1972 through 1975, I was General Counsel and Director of Compliance of Edwards & Hanly, a 26 branch regional broker-dealer. At Edwards & Hanly, I ran the compliance department and assured that the firm complied with its regulatory management and investment responsibilities.

4. From 1975 through 2004, I was a senior counsel in the Legal and Compliance Departments at Bear Stearns & Co., Inc. ("Bear Stearns") where I became Senior Managing Director in 1994. From 1999 through 2003, I served as Director of Compliance for Bear Stearns Securities Corporation, Bear Stearns' clearing division.

5. While at Bear Stearns, I advised legal and business staff in all areas, including compliance, litigation, clearance, operations, securities lending, equities and

derivatives, prime brokerage, hedge funds, private client services, arbitrage, and corporate finance. I regularly testified in arbitrations and legal proceedings and consulted with senior officials of governmental and self-regulatory organizations regarding policy as well as rule changes and interpretations.

6. A copy of my Curriculum Vitae, which details my employment history, all my publications for the past 10 years, and selected presentations to regional and national gatherings is attached hereto as Exhibit A. A list of my expert testimony engagements for the past four years is attached hereto as Exhibit B.

7. I have been retained by Defendant Daniel Zanger ("Zanger") to rebut certain allegations in the Amended Complaint of Independent Asset Management LLC ("IAM") and Ola Holmstrom (the "Complaint"). In writing this expert report, I relied upon my own professional experience of over 35 years in the brokerage industry and documents I have examined including: all pleadings from the above entitled action; various correspondence involving IAM personnel; the Agreement between Daniel Zanger and Independent Asset Management, LLC, dated October 19, 2004 (the "Contract"); IAM's Corporate Authorization by Goldman Sachs dated September 9, 2005 (the "Corporate Authorization"); the Independent Fund Confidential ("IMF") Offering Memorandum, dated July 2006 (the "Offering Memorandum"); various financial statements from IAM and IMF; and the Agreement between Zanger and IAM dated October 19, 2004 (the "Agreement").

II. **SUMMARY OF OPINIONS**

8. Zanger's use of leverage and creation of margin calls as the fund manager of Class Z IAM Shares ("Class Z Shares") was typical for traders in the hedge fund industry, and did not violate any SEC, exchange, or broker rules or regulations.

9. The circumstances surrounding Zanger's employment at IAM illustrate that IAM should have, and likely did, expect that Zanger would employ a trading strategy involving the use of leverage.

10. Because it is generally difficult for hedge funds to attract investors, and when the Class Z Shares produced extraordinary profits, only one investor was obtained, even if the fund had not liquidated, it is very unlikely that the Class Z Shares would have attracted additional investment in late 2006 and thereafter.

11. Lastly, even after the Class Z shares liquidated, IAM could still have engaged several other Prime Brokers.

III. **OPINIONS**

    A. **Zanger's Use of Leverage Is Typical of Fund Managers And IAM Should Have Expected Zanger To Use Leverage**

12. Zanger's use of leverage as the fund manager for Class Z Shares is typical of traders in the hedge fund industry. Like many hedge funds, Class Z Shares were meant to profit solely from management and performance fees. Pursuant to the Offering Memorandum, IAM would receive fixed annual management fees of approximately 2% of assets under management in the Class Z shares, and annual performance fees of 20% of annual profits measured against a highwater mark. Under the Agreement, IAM was required to split its performance and management fees with Zanger. In order to justify such high fees, fund managers typically maximize profitability by using leverage.

13. Leverage involves the use of borrowed funds to purchase positions in the stock market. For example, using leverage, a trader may purchase $20 million of securities with $10 million. Leverage increases both potential profitability and loss.

14.     A review of factors surrounding Zanger's engagement by IAM illustrates that IAM expected him to use leverage. The Agreement authorizes 4:1 leverage in connection with the purchase of securities. The Agreement further provides that, "it is understood by IAM that higher leverage is perhaps desirable and appropriate for DZ and IAM will make every effort to quickly allow higher leverage limits either through IFL or through IAM's BVI offshore fund." (Agreement ¶ 6). Moreover, the Offering Memorandum, provides: "[s]hares of each segregated account of the fund offered hereby are suitable only for sophisticated investors who are able to bear the possible loss of their entire investment in shares of the fund." (Offering Memorandum, p. 5). Class Z Shares thus involve the highest degree of risk, the possible loss of the entire investment. Such risk is usually associated with highly leveraged accounts. Thus, the documents surrounding Zanger's retention illustrate that he was expected to use significant leverage.

15.     IAM's expectation that Zanger would trade using significant leverage is confirmed by communications between Zanger and George Szele ("Szele"), IAM's director. For example, in an email to Zanger, Szele stated, "[s]o we would have Class Z shares which is Dan's money and which can take those investors that can withstand 20% drawdowns or more, like Dan can." (See Bates Number IAM 002879). A 20% drawdown would cause a significant increase in leverage ratio. For example, if an account has equity of $300K with total value of $900,000, a 20% drawdown would reduce the equity in the account to $100,000. This reduction would cause the leverage in his account to increase from a relatively conservative 3:1 ratio to a highly leveraged 9:1 ratio.

16. Dan's previous trading record further emphasizes that IAM expected him to trade with leverage. Prior to his engagement with IAM, Dan was well established as a chart trader. Chart trading is a style of trading that disregards fundamentals. Chart traders take positions based on directionality in stocks which may already be overpriced by any standard measure but continue to rise merely because they were already rising. Chart traders typically use significant leverage because leverage multiplies potential profits (and loss).

17. Between 1999 and 2000, through chart trading, Zanger turned an initial investment of $11,000 into $18 million. Anyone in the hedge fund industry would know that such gains could only be accomplished using leverage. It is common knowledge in the hedge fund industry that traders do not significantly modify their trading styles, and it would be unreasonable for IAM to expect Zanger to modify his trading style as the Class Z share fund manager. Thus, considering the entirety of the circumstances surrounding IAM's employment of Zanger, it is clear that IAM should have expected or did expect Zanger to trade in a leveraged fashion.

B. **Zanger's Creation of Various Margin Calls Were Common Practice In The Hedge Fund Industry**

18. Securities Regulations, market place rules, and prime brokerage firms set limits on the degree of leverage that any particular account may use. When the degree of leverage exceeds the limits set by these rules and regulations, a margin call occurs. When a margin call occurs, a trader must "meet" the margin call by bringing the account within the range of the leverage limits during a mandated period of time. Unless the trader fails to meet the margin call in the mandated time, a violation does not occur.

19. There are two classes of margin calls: initial margins and maintenance margins. Initial margin calls arise when an account exceeds a designated minimum leverage ratio at the time a security is initially purchased. Through appreciation, sale of securities, or infusion of additional equity, the account must meet that margin call (by bringing the leverage ratio to the required minimum) within a designated period of time. If the margin call is not met during this period of time, only then does a violation occur. Initial margin limits are established by Regulation T of the Federal Reserve Board. (See 12 C.F.R. § 220.12).

20. Maintenance margin requires account managers to maintain certain leverage ratio with regard to the securities already in their accounts. When the leverage ratio in an account rises above the set limit, a maintenance margin call occurs, and the fund must meet the call within a designated period of time (by bringing the leverage ratio to the required minimum through appreciation, sale of securities, or infusion of additional equity). If the call is not met in the prescribed period of time, a violation occurs. New York Stock Exchange Rule 431, and the prime broker established the maintenance margin requirements for Class Z shares.[1]

21. Creation of both initial (under regulation T of the Securities Exchange Act) and maintenance margin calls (including prime broker rules and Rule 431 of the New York Stock Exchange) are a normal occurrence in any actively traded account. Creating a margin call does not violate any rules or regulations, unless the account fails to

---

1. [1] Pattern day trading margin calls are specific a specific type of maintenance margin calls that apply to pattern day traders—of which Zanger was one. Pattern day trading margin calls occur in hedge fund trading on certain occasions. The only difference between pattern day trading calls and other maintenance margin calls is that these calls have to be met with cash payment rather than the sale of securities.

meet the margin call. It would be highly unusual for any trader in Zanger's position to manage an account without effecting transactions that resulted in margin calls. Thus, Zanger's creation of margin calls while managing Class Z shares was a completely normal occurrence.

### C. It is Highly Unlikely That Funds of IAM Would Have Attracted Investors After October 2006

22. It is generally difficult for hedge funds to attract investors. Between February 2005 and February 2006, Class Z Shares appreciated by approximately 80%. Yet during this period, the fund was only able to attract one investor (other than Zanger).

23. When the value of Class Z Shares began to suffer losses in early to mid 2006, the fund became even less attractive to potential investors because the fund was substantially underperforming the market, in addition to being extremely volatile. Thus, once the Class Z Shares began to suffer losses, it became extremely unlikely that the fund would ever be able to attract additional investors.

### D. IAM Could Have Engaged Additional Brokerage Firms

24. Lastly, IAM could have engaged numerous other Prime Brokers after Class Z shares were liquidated in December 2006.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28 day of February, 2008.

                                           Respectfully submitted,

                                           /s/ Raymond L. Aronson
                                           Raymond L. Aronson

# EXHIBIT A



SUTTER SECURITIES

Curriculum Vitae

**Raymond L. Aronson**
Senior Managing Director

---

*Sutter Securities*
160 Riverside Blvd. Suite 33B
New York, NY 10069
Business: (212) 877-9781
Fax: (212) 877-9782
Mobile: (516) 330-5044
ray@suttersf.com

Mr. Aronson joined the Opinion and Testimony Group of Sutter Securities as a Senior Managing Director in September, 2004, working out of New York. He has provided consultation and testimony as an expert in a wide range of matters, including FINRA arbitrations and court proceedings.

Mr. Aronson has more than 35 years of legal and management experience in the securities industry, with in-depth knowledge of the interface between securities laws and self-regulatory organization rules and brokerage firm operations. He is expert in industry practices and standards, compliance, supervision, clearing, prime brokerage, stock loan, hedge fund issues, arbitrage, derivatives, complex trading questions, customer claims, member to member as well as employee disputes, and anti-money laundering procedures.

From 1975 through 2004, Mr. Aronson was senior counsel in the Legal and Compliance Departments at Bear Stearns & Co., Inc. where he became Senior Managing Director in 1994. Mr. Aronson also served as Director of Compliance for Bear Stearns Securities Corporation, the clearing division of Bear Stearns from 1999 through 2003.

While at Bear Stearns, Mr. Aronson advised legal and business staff in all areas,

including compliance, litigation, clearance, operations, securities lending, equities and derivatives, prime brokerage, hedge funds, private client services, arbitrage, and corporate finance. He has regularly testified in arbitrations and legal proceedings and has effectively consulted with senior officials of governmental and self-regulatory organizations regarding policy as well as rule changes and interpretations.

Prior to joining Bear Stearns, Mr. Aronson was Director of Compliance and General Counsel of Edwards & Hanly, a New York Exchange member organization. From 1965 to 1972, Mr. Aronson was a staff attorney at the American Stock Exchange, becoming Associate Director of Rulings in 1968. Mr. Aronson received an A.B. from the University of Rochester in 1959 and a J.D. from New York University School of Law in 1962.

### *Professional Affiliations*

- Arbitrator: FINRA (NASD, NYSE, and ASE)
- Securities Industry Association Clearing Firms Committee
- Securities Regulation Committee, Broker/Dealer Subcommittee, American Bar Association, Section of Corporation, Banking, and Business Law
- Panel Chairman, Securities Industry Association Compliance Seminars: Dealing with Regulators, Clearing Firm Liabilities, Prime Brokerage
- Panel Member, Securities Industry Association, Advertising, Sales and Marketing Materials Workshop
- Member, National Society of Compliance Professionals
- Compliance Director's Examination Committee, New York Stock Exchange (Formerly)
- Compliance Advisory Committee, New York Stock Exchange (Formerly)

Licenses

- Member, New York State Bar
- FINRA General Securities Principal
- Registered Options Principal
- Registered Series 3 Futures Representative

---

Sutter Securities  
160 Riverside Blvd. Suite 33B  
New York, NY 10069  
212-877-9781 · 212.877.9782 (Fax)  
Ray@Suttersf.com

Sutter Securities  
555 California Street, Suite 3330  
San Francisco, CA 94104  
415.352.6300

# Exhibit B

# RAYMOND L. ARONSON
## EXPERT TESTIMONY IN THE PAST FOUR YEARS
(January 2004 – February 2008)

TESTIMONY IN ARBITRATION

2007 – Expert testimony for respondent registered representative re claim for compensation (*Advanced Equities, Inc. v. Kappel*) NASD Arbitration, Chicago IL  Counsel: Iavarone Law Firm, P.C.

2007 – Expert testimony for claimant broker dealer re securities firm operational practices (*Knight Equity Markets, LP v. vFinance et. al.*) NASD Arbitration, New York NY  Counsel: Dreier, LLP

2007 – Expert testimony for respondent broker dealer re securities firm clearing practices (*Riedel v CSC.*) NASD Arbitration, Boston MA  Counsel: AGC CSC

2007 – Expert testimony for claimant broker dealer re dispute over pricing of bonds (*ADP v. Commerce Capital Markets*) NASD Arbitration, New York NY Counsel: Blank Rome, LLP

2007 - Expert testimony for respondent broker dealer re employment dispute (*Rosenwein aka Louis R. Rose, et. al.v. Morgan Stanley Dean Witter Inc.*)  NASD Arbitration, New York NY  Counsel: Kirkland & Ellis LLP

2007 –Witness for respondent broker dealer re introducing broker customer claim (*Pinnacle v. Bear Stearns Security Corp*) NASD Arbitration, Washington DC   Counsel:  Covington & Burlington

2007 – Expert testimony for claimant individual re brokerage firm handling of customer claim (*Goldendale Investments, Ltd et. al. v. Jessum et. al.*)  NASD Arbitration, NY   Counsel: Kauffman, Feiner, Yamin, Gildin & Robbins LLP

2007 – Expert testimony for respondent broker dealer re securities firm clearing practices (*Deitchman et. al v. Bear Stearns Securities Corp et. al.*) NASD Arbitration, Boca Raton FL Counsel:  Bressler, Amery & Ross, PC

2007 – Expert testimony for respondent broker dealer re retail customer claim (*Tobin v. Janney*) NASD Arbitration, Boston MA  Counsel:  Nixon Peabody

2007 - Expert testimony for claimant (individual) re failure of bank-owned broker dealer to follow internal procedures.(*Bishop v McDonald*)   NASD Arbitration, Chicago IL   Counsel: Iavarone Law Firm

2006 – Expert testimony for respondent re securities firm operational practices (*Southwest Securities v. First Southwest Securities*) NASD Arbitration, Dallas TX  Counsel: Patton Boggs, LLP

2006 - Expert testimony for claimant re brokerage firm sales practice (*Serino v. Citigroup Global Markets, Inc*) NASD Arbitration, New York NY  Counsel: Simmons Cooper LLC.

2006 – Expert testimony for claimant re brokerage firm sales practice (*Roten v. Sander Morris Harris*) NASD Arbitration, Dallas TX  Counsel: Simmons Cooper LLC.

2006 – Expert testimony for claimant re brokerage firm sales practice (*Golden v. Fidelity*) NASD Arbitration, New York NY  Counsel: Simmons Cooper LLC.

2006 – Expert testimony for respondent re absence of clearing firm liability for introducing broker's sales practice (*Shah v. Wexford*) NASD Arbitration, Pittsburgh PA Counsel: Proskauer Rose LLP.

2005 – Expert testimony for claimant introducing brokerage firm re clearing firm operational practice (*Ehrenkrantz King Nussbaum Inc. v. Correspondent Services Corporation*) NASD Arbitration, New York NY  Counsel: McCarthy Fingar LLP.

2005 – Expert testimony for respondent re clearing firm operational practice (*Medical Assets LLC and David B. Arnold, Fiduciary v. Emmett A. Larkin Company*) NASD Arbitration, New York NY  Counsel: Dickstein Shapiro Morin & Oshinsky LLP.

2004 – Expert testimony for respondent re securities firm operational practice (*Miller v. Donaldson & Co. Inc*) NASD Arbitration, New York NY  Counsel: Proskauer Rose LLP.

2004 – Expert testimony for respondent re suitability of investments (*Smith v. Merrill Lynch*) NASD Arbitration, Raleigh NC  Counsel: Sutherland Asbill & Brennan LLP.

2004 – Expert testimony for respondent re clearing firm operational practices *(Pascual v. Prudential Securities, Inc.)* NASD Arbitration, New York NY) Counsel: Proskauer Rose LLP.

TESTIMONY BY DEPOSITION

2006 – Expert testimony for plaintiff re responsibility of bank with brokerage unit in handling of client's accounts (*Emery v. U.S. Bancorp*) Superior Court, WA (deposition in Chicago, IL) Counsel: Simmons Cooper LLC.

TESTIMONY IN MEDIATION

2005 – Expert testimony in mediation for claimant re suitability of investments (*Morrison v. McDonald*) NASD Arbitration/Mediation at Buckstein & Associates, Boca Raton FL Counsel: Simmons Cooper LLC.

TESTIMONY BY REPORT OR AFFIDAVIT

2006 – Expert testimony for plaintiff re analyst independence in investment bank, supervisory requirements, and procedures to cure or prevent conflicts of interest between various classes of clients (in re *Enron Corporation Securities*); US District Court, Southern Court, Houston TX Counsel:  Spencer & Associates PC