**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | |
|---|---|
| INDEPENDENT ASSET MANAGEMENT LLC ) and OLA HOLMSTROM, ) ) Plaintiffs, ) ) vs. ) ) DANIEL ZANGER, ) ) Defendant. ) ) ) ) ) ) | Case No. 1:07-cv-06431-JSR ECF |

------------------------------------------------------------ x

**DECLARATION DANIEL ZANGER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Daniel Zanger, declare, pursuant to the provisions of 28 U.S.C. §1746, as follows:

1. Except as otherwise indicated below, I have personal knowledge of the facts stated herein. I am over twenty-one years of age and am competent to testify as a witness in this case as to the matters set forth herein.

2. In mid-2004, George Szele ("Szele"), the director and part-owner of Independent Asset Management ("IAM") approached me to manage a class of shares on behalf of the Independent Fund Limited ("IFL") of which IAM was the fund manager. Szele indicated that he was well aware of my reputation a successful chart trader.

3. Szele represented to me that he could and would raise approximately $200 million for me to manage, and that we would split fees paid by investors in the fund. He never informed me that IAM had suffered significant financial difficulties in early 2004. Nor did he inform me that as a result of these financial difficulties, IAM had lost, or was in the process of losing, each of its investors. I first learned of these facts during the course of this litigation.

4. On October 19, 2004, I entered an agreement (the "<u>Agreement</u>") with IAM, whereby I agreed to manage Class Z shares of the IFL. The Agreement is attached hereto as Exhibit A.

5. Pursuant to the Agreement, I was required to invest at least $5 million in the fund. (Agreement ¶ 1). I was entitled to redemption of my investment at any time, but, if I withdrew any of my initial investment within the first year, I would be required to pay IAM a 2% withdrawal fee. (Agreement ¶¶ 1c, 4). I was also required to pay $100,000 to support IAM's working capital requirements. (Agreement ¶ 2II.)

6. The Agreement also provided that IAM and I would split the 2% management fees of assets under management I would receive 75% percent of, and IAM would receive 25% of, the 20% performance fees generated by the fund. (Agreement at ¶ 2i.)

7. I understood that if I breached the Agreement, IAM was required to notify me of the a breach in writing.

8. I did everything I could to make my relationship with IAM successful. In February 2005, I provided $100,000 of working capital to IAM in accordance with the Agreement. In early 2005, I invested $5 million in the fund.

9. Due solely to my trading activity, the fund profited $4 million during 2005, the first calendar year I managed it. This profit represented an increase in share value in excess of 84%.[1] A true and correct copy of the fund's trading records from August 31, 2005 through December 31, 2006 is attached hereto as Exhibit C.

10. In addition to meeting my responsibilities under the Agreement, on April 17, 2005, I signed an addendum agreement (the "Addendum Agreement"), under which I agreed to provide an additional $50,000 of working capital to IAM. A true and correct copy of the Addendum Agreement is attached hereto as Exhibit B. After signing the Addendum Agreement, I immediately paid $50,000 to IAM.

11. In June 2006, I provided an additional $50,000 to IAM to fund IAM's employment of a marketing firm, R Capital Advisors, LLC. ("R Capital"). I was later informed by IAM management that the venture with R Capital was a failure. My funds were never returned.

12. Throughout the Agreement, Szele continuously represented to me that he could and would attract investors to the fund. Despite these promises, only one additional investor ever invested in the fund—Ola Holmstrom, an owner and director of IAM who invested $450,000. Therefore, my initial investment of $5 million represented 95% of the total investment in the fund.

13. Attracting other investors was critical to the commercial success of the Agreement and was the only reason that I agreed to take part in the relationship. I could and would have retained all of my investment and any profits I made if I had not invested in the fund. Pursuant to the Agreement, management and performance fees would be

---

[1] In early 2006, I requested and IAM agreed that I could withdraw $4 million from the fund in order to pay my taxes. I did withdraw these funds.

paid to IAM from my investment and profits on a monthly basis. Thus, the only way for me to profit from the Agreement was if IAM attracted additional investors so that I could collect fees based on the funds invested by such additional investors and trading profits associated with such additional invested funds.

14. From April 2005, when I began managing the fund, through October 2006, my trading resulted in excess of 100 margin calls. 70 of these calls occurred in 2005. I met each of the margin calls on or before they became due.

15. George Szele was aware of my creation of margin calls. In an email dated December 1, 2005, Szele informed me that Arturo said "this sort of thing (day trading call) happens quite frequently with [Zanger] and others and she [was] not so concerned about that." In the same email, Szele informed me that I had had a "great month." A true and correct copy of this email is attached hereto as Exhibit I.

16. During my relationship with IAM, no representative of IAM ever informed me orally or in writing that the creation of margin calls that were met constituted a violation of the Agreement.

17. On the contrary, Szele encouraged me to continue trading in my usual manner.

18. For example, on November 4, 2005, in an instant message conversation, Szele told me, "you are considered a gunslinger in some ways – some people want and love that – we'll find them." A true and correct copy of the transcript from this instant message conversation is attached hereto as Exhibit E.

19. On January 3, 2006, despite the fact that my trading had resulted in 70 margin calls in 2005, Szele informed me via instant messenger that in 2005 I had had a

"great year." A true and correct copy of the transcript from this instant message conversation is attached hereto as Exhibit F.

20. In February 2006, Ola Holmstrom, an IAM director and owner invested approximately $450,000 in class Z shares.

21. In 2006, my trading resulted in several additional margin calls. Despite this, on September 17, 2006, Szele begged me to continue our relationship. He stated, "[l]et's hang in there and be patient – It's only a matter of time before people realize your/our added value, especially if you kick some beeehind [sic] between now and year end." A true and correct copy of this email is attached hereto as Exhibit G.

22. On September 26, 2006, Szele sent me another email stating, "please give this another 6 months, listen to me – do not give up." A true and correct copy of this email is attached hereto as Exhibit G.

23. In mid-October 2006, I was informed by Arturo that Class Z shares had an outstanding day trading call of $1.45 million and that the fund had to meet the call with cash. In order to meet the call, even though I had no obligation to do so, I immediately wired $1.45 million of my own funds into the fund. The next day, after the call was met, I asked the firm's administrator, Butterfield Financial Services ("BFS"), to wire the $1.45 million back to me. Before BFS returned the funds, it informed IAM that I asked to have the money returned to me. IAM instructed BFS to wire the funds back to me.

24. During my relationship with IAM directors, I exchanged in excess of 100 emails with IAM and had over 50 instant message conversations with either George Szele or Joseph Porco ("Porco"), both directors of IAM. Neither Porco nor Szele ever

informed me orally or in writing that I had violated or breached the Agreement as a result of the creation of margin calls that were met.[2]

25. I also was never told by anyone from IAM's prime broker, Goldman Sachs Exchange and Clearing ("GSEC"), that any of the margin calls I had met were violations of any rule or regulation of Goldman Sachs.

26. Moreover, I have reviewed over 100 emails between Gianina Arturo of GSEC and George Szele, and none of these emails indicate that any margin call that I met violated any GSEC rule or regulation.

27. During my relationship with IAM, no representative of IAM ever informed orally or in writing me that I violated or breached any provision of the Agreement. In fact:

- They never informed me that they believed I breached the Agreement because my trading resulted in 20% drawdowns to the fund.[3]

- They never informed me that they believed I breached the Agreement because the account did not have sufficient liquidity to avoid the creation of margin calls.

- They never informed me that they believed my withdrawal of funds from the account resulted in a breach.

- They never informed me that they believed I breached the Agreement because I did not place an initial investment of $50 million in the account.

- They never informed me that they believed I breached the Agreement for failing to maintain $5 million in the account for a period of five years.

---

[2] George Szele constantly gave me advice regarding the fund's positions.
[3] On the contrary, in an email dated May 23, 2005, Szele emailed me, and my accountant Jeff Robertson indicating that class Z1 shares (the shares in which the alleged drawdowns occurred) would be tailored to investors who could "withstand 20% drawdowns or more." A true and correct copy of this email is attached hereto as Exhibit J.

28. IAM stopped paying me my share of the monthly management fees after April 2006 despite the fact that I continued to abide by the Agreement through the end of 2006. I still have not received my share of management fees for May 2006 - December 2006.

29. In November 2006, my trading resulted in two day trading calls. As a result of these calls, GSEC placed the account on liquidation only basis.

30. In December 2006, I requested to withdraw my funds from the account because the relationship was not profitable for me. The fund's administrator redeemed the remaining funds I had in the account.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28 day of April, 2007.

                                                Respectfully submitted,

                                                /s/ Daniel Zanger
                                                Daniel Zanger