**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**INDEPENDENT ASSET**
**MANAGEMENT, LLC,**

                        **Plaintiff,**

    **- against -**

**DANIEL ZANGER,**

                        **Defendant.**

---

**1:07-CV-06431-JSR**

**ECF**

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION**
**TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Craig Stuart Lanza (CL-2452)
John Balestriere (JB- 3247)
**BALESTRIERE LANZA PLLC**
225 Broadway, Suite 2900
New York, NY 10007
Telephone:   (212) 374-5400
Facsimile:    (212) 208-2613
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................iii

PRELIMINARY STATEMENT..................................................................................... 1

ARGUMENT ................................................................................................................. 3

Zanger Breached the Agreement with IAM ............................................................... 3

    A.  The Evidence Adduced During Discovery Makes Clear that Zanger Breached the Agreement with IAM ................................................................................ 4

    B.  Plaintiff IAM Satisfied Its Obligations under the Agreement........................... 10

Zanger Breached His Fiduciary Duty to IAM .......................................................... 11

Zanger Has Failed to Produce Any Evidence Supporting His Motion for Partial Summary Judgment .................................................................................................. 13

    A.  Zanger's Creation of Margin Calls Violated GSEC's Prime Broker Agreement.......................................................................... 13

    B.  Issues of Fact Remain as to Whether Zanger Had to Invest $50 Million in IFL ................................................................................ 14

    C.  Zanger Had to Maintain Between $5 Million and $50 Million in IFL .............. 14

    D.  Unlike Zanger, IAM Never Breached the Agreement in Any Way.................. 15

CONCLUSION ........................................................................................................... 15

# TABLE OF AUTHORITIES

*Cal Distributor Inc. v. Cadbury Schweppes Americas Beverages, Inc.*, No. 06-CIV-0496-RMB, 2007 WL 54534, at \*9 (S.D.N.Y. Jan. 5, 2007)....................................................................... 11

*New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995)............................... 11

*Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992)............................................................ 11

*Two Guys from Harrison N.Y., Inc. v. S.F.R. Realty Assoc.*, 63 N.Y.2d 396, 403 (1984) ........ 13

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, Plaintiff Independent Asset Management, LLC ("Plaintiff" or "IAM"), by its attorneys, Balestriere Lanza PLLC, respectfully submits this reply memorandum in further support of its motion for partial summary judgment on all counts against Defendant Daniel Zanger ("Defendant" or "Zanger").

## PRELIMINARY STATEMENT

Under Rule 56 of the Federal Rules of Procedure, a party is entitled to summary judgment if there are no genuine issues of material fact. *See* FED. R. CIV. P. 56(a).  In this case, there is no disputing that Defendant Zanger breached the contract ("Agreement") with and his fiduciary obligation to Plaintiff IAM.  The evidence adduced during discovery proves that Zanger breached the Agreement in several ways and, as he grew impatient with the joint venture, he placed his own interests above those of the venture breaching his fiduciary obligation to IAM.

In October 2004, Plaintiff IAM and Defendant Zanger entered into a joint venture and signed an Agreement whereby Zanger agreed to trade in Class Z shares for the Independent Fund Limited ("IFL"), IAM's Bermuda-based hedge fund. (Lanza Decl. Ex. D, hereinafter "Agreement.")  In exchange, IAM was to serve as the Fund's trading manager, handling administrative duties and exercising its best efforts to promote the Fund. (*Id.*)  George Szele ("Szele") and Joseph Porco ("Porco"), IAM's sole members, also implemented several mechanisms to ensure that the venture would be a success, including insisting that Zanger adhere to a number of conditions and selecting a

reputable administrator and prime broker, Butterfield Fund Service ("BFS") and Goldman Sachs Execution & Clearing ("GSEC"), respectively.

Despite the Fund's potential, Zanger soon became disillusioned in large part due to the consequences of Zanger's own actions. (Lanza Decl. Ex. G at 28-29, hereinafter "Instant Message Communications.")  Zanger placed his own self-interest ahead of that of the venture and acted in a manner wholly inconsistent with both the terms of the Agreement and his fiduciary duties to co-venturer IAM.  In late 2006, after inducing more than one-hundred margin calls (Lanza Decl. Ex. F at 51-52, hereinafter "Email Communications")—which Zanger concealed in violation of the Agreement—Zanger committed two day trading violations, in direct violation of NYSE Rule 431, GSEC's Prime Broker Agreement, and the Agreement with IAM (Email Communications at 53; Instant Message Communications at 59).  Ultimately, Zanger's actions, which culminated with the late 2006 day trading violations, forced both BFS and GSEC to shut down IFL, all but destroying what IAM had worked for over the previous several years. (Lanza Decl. Ex. H at 1-2, hereinafter "BFS Letter"; Email Communications at 46.)

Ultimately, there is no factual dispute regarding whether Defendant breached the Agreement and breached his fiduciary duty to IAM.  Defendant admits that he created 115 margin calls; the Agreement called for sufficient liquidity; a margin call itself can be prevented by maintaining sufficient liquidity; he intentionality refused to cover two day trading violations; and it was his responsibility to cover the margin calls (by stating that he covered the previous 115 margin calls).  The issue of whether Plaintiff's allegations as a matter of law amount to a cause of action has already been

addressed.  Defendant cannot here argue that he committed the aforementioned acts and expect to escape liability.  For these reasons, Plaintiff IAM respectfully requests that the Court grant Plaintiff's motion for partial summary judgment.

## ARGUMENT

### ZANGER BREACHED THE AGREEMENT WITH IAM

IAM has made abundantly clear that Zanger disregarded his contractual obligations and breached the Agreement in many ways.  Among other things, Zanger failed to maintain sufficient liquidity, to disclose positions to IAM, failing to comply with the Prime Broker Agreement, and to maintain between $5 million and $50 million for the duration of the Agreement. (Agreement at 2.)  Zanger refused to appreciate the extent of his obligations[1] and then proceeded to disregard the terms with which he had to comply.  Zanger's persistent failure—and sometimes outright refusal—to comply with the Agreement indicates that he acted with gross negligence and willful intent, and anything Zanger's Opposition either misconstrues or ignores the record.

Aside from distorting the facts of this case, Zanger attempts to obfuscate the issue by diverting attention away from his misconduct and highlighting isolated instances in which Zanger did not breach the Agreement. (Opp'n Pl.'s Mot. Summ. J. 10-11.)  As with much of Zanger's arguments, this is but a red herring: in the context of this summary judgment motion, it is irrelevant and immaterial, for example, that

---

[1] During his deposition, Zanger never seemed to have a grasp, and never seemed to even consider, the scope of his duties under the Agreement. He never attempted to ascertain what GSEC's rules and regulations were, and he openly admitted to being ignorant of the applicable laws, rules, and regulations with which he was obligated to comply. (Zanger Dep. 18.)

Zanger agreed to pay $50,000 to assist in IAM's marketing efforts.  Instead, the real focus should be Zanger's failure and outright refusal to comply with the Agreement. And considering only the material facts at hand, there is no genuine issue whether Zanger is liable to IAM for a breaching the Agreement.

**A.    The Evidence Adduced During Discovery Makes Clear that Zanger Breached the Agreement with IAM**

It is undisputed that Zanger breached the Agreement with IAM.   In its Opposition, Zanger muddies the water by mischaracterizing his contractual obligations and by selectively quoting and distorting the facts that prove his breaches.  Moreover, Zanger attempts to shift the attention away from his *contractual* performance to his *trading* performance, which, in some but not all respects, was satisfactory. Notwithstanding Zanger's misguidance, IAM has thoroughly demonstrated that Zanger breached the Agreement and is liable under IAM's first cause of action.

1.    <u>Zanger's Failure to Maintain Sufficient Liquidity</u>

IAM in its first memorandum of law proved that Zanger breached the Agreement by failing to maintain sufficient liquidity.  To reiterate, Zanger had an obligation to maintain sufficient liquidity and openly admitted that "if you have enough liquidity, you would not have a margin call." (Zanger Dep. 52:23-25.)  Zanger's more than 100 margin calls trading conclusively show that he failed to maintain sufficient liquidity. (Email Communications at 51, 52; Mot. Dismiss Am. Compl. 2, 7, 8.)

In his Opposition, Zanger fails to address IAM's arguments head on, instead re-characterizing the liquidity provision as one simply requiring notification (Opp'n 15).

This both ignores the thrust of the provision and skirts the fact that Zanger acknowledged his duty to maintain sufficient liquidity. Even accepting this provision to require only that Zanger notify IAM of any illiquidity, the evidence adduced during discovery establishes that Zanger breached the Agreement by failing to notify IAM when IFL's account became illiquid no fewer than 115 times. (Email Communications at 51-53.) Indeed, neither IAM nor Zanger could produce any documents evidencing that Zanger *ever* notified IAM of any instances of illiquidity, and Szele confirmed the same during his depositions.

Accordingly, even under Zanger's construction of this provision, there is no issue that Zanger breached the Agreement at least 115 times: he neither maintained sufficient liquidity nor ever notified IAM of such illiquidity. And that Zanger did this at least 115 times evinces Zanger's gross negligence or willful misconduct.

2.    <u>Zanger's Failure to Disclose His Positions</u>

Zanger further breached the Agreement by continuously failing to disclose his positions at all times to IAM. (Agreement at 2.) To date, no evidence has been produced indicating that Zanger *ever* disclosed his positions to IAM. Instead, Zanger attempts to re-define the English language and revise his obligations *post hoc*, sidestepping all of IAM's arguments. (Opp'n 15-16.) In effect, Zanger posits that an obligation to "disclose" amounts to an obligation of transparency (Opp'n 15-16; Zanger Dep. 55),

which misconstrues the very meaning of "disclose"[2] and would moot this clause altogether.[3]

Sidestepping that he never voluntarily disclosed his positions to IAM, Zanger claims that he never failed to disclose his positions to IAM "*when requested*." (Opp'n 15.) This claim is not by any evidence whatsoever,[4] and it also misses the point, as his disclosure obligation was unconditional, not contingent on anything (Agreement at 2.) Zanger also points to the fact that Szele monitored IFL's, seemingly, to alleviate Zanger's own disclosure burdens. (Opp'n 16.)  Again, this is nothing more than a *post hoc* justification for Zanger's failure to comply with a simple, yet important, provision.

Zanger has openly admitted to having caused 115 margin calls, and it is well established that Zanger never informed either Szele or anyone else at IAM about his persistent margin problems.  As such, notwithstanding his importunate diversions, Zanger breached the Agreement by never disclosing his positions to IAM.

3.    <u>Zanger's Margin Calls</u>

The record is clear that Zanger induced 115 margin calls (Email Communications at 51-52), thereby violating the Prime Broker Agreement (Lanza Decl. Ex. E at 7,

---

[2] As mentioned in IAM's initial memorandum, disclose means "make known," which connotes an affirmative obligation, something which Zanger foolishly disputes. <u>Webster's Encyclopedic Unabridged Dictionary</u> (1996).

[3] Moreover, Zanger's conception of "disclose" would render moot the provision of the Agreement. Indeed, there exists another requiring Zanger to remain transparent, so

[4] Defendant states only that "there is no evidence" that Zanger failed to disclose positions when requested. (Opp'n 15.) Apparently, Zanger fails to realize that a failure to disclose positions in breach of the Agreement is consistent with a dearth of evidence. In fact, there is no evidence that Zanger *did* disclose positions, and that "there is no evidence" undercuts his position.

hereinafter "Prime Broker Agreement") and, derivatively, the Agreement with IAM (Agreement at 2). Zanger does not dispute that he caused 115 margin calls. Instead, he argues simply that this does not amount to a breach of the Agreement (Opp'n 11), but this argument fails for several reasons. In short, Zanger fails to address the clear and unambiguous language of the Prime Broker Agreement, mischaracterizes the relevance of GSEC's exercise of discretion, and exaggerates the importance of and ignores Zanger's non-production of communications with GSEC concerning margin calls, or anything else for that matter.

As explained in numerous papers, GSEC's agreement is clear on its face: "Customer agrees *at all times* to maintain adequate margins in the account so as *continually* to meet the original and maintenance margin requirements . . . ." (Prime Broker Agreement at 7 (emphasis added).) Notwithstanding the clarity, Zanger ignores this language and attempts to explain this provision into oblivion by either avoiding it altogether or by equating it to Regulation T and NYSE Rule 431. (Mot. Dismiss Am. Compl.) Absent any evidence to the contrary—and there is none—such a ploy is insufficient to defeat a motion for summary judgment on whether Zanger's 115 margin calls constituted a breach of the Agreement.

Beyond avoiding IAM's argument in its entirety, Zanger also miscasts the issue here as one of GSEC's discretion and communication, both of which are irrelevant. (Opp'n 11.) To be clear, this discretion is merely an issue of GSEC's ability to establish margin requirements above and beyond those set forth in Regulation T and NYSE Rule 431 and does not concern the propriety of a margin call. (Prime Broker Agreement at 7)

Alluding to GSEC's discretion neither upsets the plain language of the Prime Broker Agreement nor requires IAM to further demonstrate that Zanger breached the Agreement, so Zanger's argument here is inapposite.

Moreover, concerning GSEC communications, it is specious to assume that no breach occurred merely because IAM has been unable to locate any documents from GSEC confirming that a violation has, in fact, occurred. One, requiring a confirmatory memorandum from GSEC to prove a breach when the language of the Prime Broker Agreement is sufficiently clear is absurd. Two, practically all of the notifications of a margin call went directly to Zanger, not IAM. In discovery, despite repeated attempts, Zanger has been unable to produce any documentation concerning any margin calls—in IFL or any other fund—when it is clear that such documentation does, or at least *did*, exist. Therefore, any argument about a lack of concrete documentation on the matter should target Zanger's own poor recordkeeping.

Based on the foregoing, it is clear that Zanger breached the Agreement with IAM by virtue of causing 115 margin calls in the account for IFL.

4.    Zanger's Day Trading Violations

Zanger has acknowledged causing and refusing to cover two day trading calls—one on November 10, 2006, and another on November 30, 2006—and the record indicates that this was an obvious breach of the Agreement. (Email Communications at 22-53.) In his Opposition, Zanger attempts to circumvent liability by arguing that he had no reason to "sabotage" IFL (Opp'n 13), but this, too, is off point. One, it is comical to suggest that an individual's subjective motives can absolve liability altogether. Two,

despite his lack of sophistication, ascertaining Zanger's state of mind would be downright impossible, given his fickle and emotional nature. Three, Zanger has demonstrated over time a willingness to sacrifice short-term gains to get his way in the end, and the evidence indicates that this is exactly what Zanger was doing here. (Instant Message Communications at 28, 29, 59.)

In light of the foregoing, it is well established that Zanger breached the Agreement by causing and refusing to cover multiple day trading calls in IFL's account.

5.    <u>Zanger's Obligation to Maintain Between $5 million and $50 million in IFL</u>

There is no disputing that Zanger was obligated to maintain at least $5 million, and up to $50 million, in IFL throughout the duration of the Agreement with IAM. Zanger argues to the contrary, but his position must fail for three reasons. One, it makes no economic sense in the context of starting a hedge fund to permit a fund's primary investor to withdraw his money whenever he wants. IAM's Szele has plainly stated that he required a five year commitment from Zanger, not just as to the trading, but as to the money as well. Anything less than that would have made it impossible to generate working capital pending the solicitation of new investors.

Two, Zanger's construction—that he could withdraw his money at any time— amounts to an illusory obligation under the Agreement. During his deposition Zanger effectively expressed that he had no obligation to ever place money into the Fund, but this is contradicted by his later statements as well as the Agreement itself.

Three, the parties' course of conduct shows that Zanger, in fact, knew that he was obligated to have more than $5 million in IFL at all times. In early 2006, when

Zanger needed to withdraw money from the Fund in order to pay his income taxes, Szele remarked that such a withdrawal would take him below the $5 million mark. However, Zanger was quick to promise that he would get the level back to $5 million as quickly as possible, and that is exactly what he did.  Accordingly, there is no dispute that Zanger was required to maintain between $5 million and $50 million in IFL's account for the duration of the parties' Agreement.

**B.    Plaintiff IAM Satisfied Its Obligations under the Agreement**

There is no dispute that IAM complied with its obligations under the Agreement. However, in a weak attempt to evade the issue of his own misconduct, Zanger claims that IAM failed to pay approximately $57,000 in fees purportedly due to Zanger. (Opp'n 17.)   In fact, nothing could be further from the truth.   Throughout the entire relationship, IAM not only complied with the Agreement, but it also went above and beyond to placate Zanger time and time again.

During the period in question, IAM was short on working capital and was unable to pay Zanger his portion of the fees. (Instant Message Communications at 55.) Zanger knew of IAM's financial condition, consented to IAM's deferring payment, and even went so far as to discuss giving IAM an additional $50,000 for short-term working capital purposes. (Instant Message Communications at 55.)  Shortly thereafter, Zanger breached the Agreement by committing two day trading violations, after which Zanger's other breaches came to light. (Email Communications at 47-52.)   And under New York law, a party is excused from performing when the other party has breached the Agreement. *See Marks v. New York University*, 61 F. Supp. 2d 81 (S.D.N.Y. 1999).

Therefore, given that Zanger had already breached the Agreement innumerable times, Zanger waived any claim to the management and performance fees and cannot point to IAM's non-payment to avoid liability for his own breaches.

## ZANGER BREACHED HIS FIDUCIARY DUTY TO IAM

IAM has both alleged and proven that Zanger breached his fiduciary, separate and apart from his breach of the Agreement. IAM proved in its first memorandum of law that the parties entered into a joint venture, that each owed the other a fiduciary duty as a result of that joint venture, and that Zanger breached his fiduciary duty to IAM by acting in a deleterious and self-interested manner. (Mem. 15-21.)

Zanger's Opposition does not squarely address IAM's argument, instead claiming that IAM is precluded from alleging both a breach of contract and a breach of fiduciary duty. (Opp'n 17-18.)  However, this argument ignores case after case in which a court has held that both such claims can coexist. *See, e.g., Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992).  Admittedly, "where a party is merely seeking to enforce its bargain, a tort claim will not lie," but a party "may be liable . . . when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." *New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995) (citations omitted); *see also Cal Distributor Inc. v. Cadbury Schweppes Americas Beverages, Inc.*, No. 06-CIV-0496-RMB, 2007 WL 54534, at *9 (S.D.N.Y. Jan. 5, 2007) ("A cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand.")

Here, although IAM's fiduciary duty claim is related to its contract claim, both the nature of the duty and the facts supporting its breach are distinct from IAM's

contractual allegations.  Whereas Zanger's duties under the Agreement are limited to express provisions requiring Zanger to do or refrain from doing something, the Agreement itself contemplated a joint venture in more general terms (Agreement at 1), and the parties' numerous discussions prior to and following signing the Agreement confirm the same.

In addition to the disparate nature of the contractual and fiduciary duties, the facts supporting each claim are distinct.  Indeed, numerous facts exist to support IAM's breach of fiduciary claim which would are wholly unavailing in connection with IAM's breach of contract claim.  For example, it is apparent that Zanger exercised far more care in connection with his own trading accounts—including Westwood Capital Partners, LLP, Zanger's domestic hedge fund—than he did with IFL.[5]  Also, he evinced a total disregard for others while saying and doing anything he could to protect his own skin. (Instant Message Communications at 43.)  Moreover, after he had been entrusted with the reins to IFL, Zanger did many things not covered by the Agreement which all but made it impossible for IAM to market IFL to potential new investors. (Instant Message Communications at 28, 43, 50, 55, 57.)

In its breach of fiduciary duty claim, IAM is not "merely seeking to enforce its bargain;" rather, IAM seeks redress for Zanger's impenitent decision to place his own self-interest ahead of the joint venture, which effectively shut down IAM and IFL.

---

[5] Zanger admitted in his deposition that he likely caused margin calls in his other accounts but openly speculated that it was almost certainly far fewer than he caused in IFL's account, indicating that Zanger clearly treated IFL with much less care than his other trading accounts. (Zanger Dep. 54.)

## ZANGER HAS FAILED TO PRODUCE ANY EVIDENCE
## SUPPORTING HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

On April 28, 2008, Defendant Zanger moved for partial summary judgment on several issues of fact, but this cross-motion must be denied because Zanger has not presented any evidence supporting his claims.

**A.    Zanger's Creation of Margin Calls Violated GSEC's Prime Broker Agreement**

Zanger first argues that his 115 covered margin calls did not violate any GSEC rule or regulation (Opp'n 19).  As discussed above, this argument ignores the plain language of GSEC's Prime Broker Agreement.  Zanger misrepresents the Prime Broker Agreement to mean simply that "GSEC has the discretion to set forth restrictions on IAM's trading" (Opp'n 20), but that is not what the Prime Broker Agreement requires. Rather, the Prime Broker Agreement (a) mandates that Zanger continually maintain sufficient margin levels and (b) allows that GSEC may promulgate its own margin requirements above and beyond what is already established by Regulation T and NYSE Rule 431. (Prime Broker Agreement at 7.)  As the language is clear, the Court should not succumb to Zanger's attempt to dilute the Prime Broker Agreement.  To do otherwise would render that language meaningless. *See generally Two Guys from Harrison N.Y., Inc. v. S.F.R. Realty Assoc.*, 63 N.Y.2d 396, 403 (1984) (explaining that courts seek "to avoid an interpretation that would leave contractual clauses meaningless").

**B.    Issues of Fact Remain as to Whether Zanger Had to Invest $50 Million in IFL**

Zanger then argues that he was not obligated to invest $50 million, but this, too, is unsupported by any credible evidence.[6]  During their first discussions, it was Zanger who seduced IAM with the promise of placing $50 million into the Fund, not the other way around. (Szele Dep. 8:10-12.)  In fact, IAM has never signed any other agreement with a provision concerning the amount of money to be invested, so it difficult to accept that IAM independently inserted the figure here. (*Id.*)

**C.    Zanger Had to Maintain Between $5 Million and $50 Million in IFL**

Zanger disputes that was required to maintain between $5 million and $50 million in IFL throughout the entire duration of the Agreement (Opp'n 21), but this assertion misconstrues certain provisions of the Agreement and makes absolutely no economic sense in the context of start a new class of shares in a hedge fund.  As discussed above, Zanger's view of the contract is unacceptable, because it purports to create an entirely illusory obligation on Zanger's part, and Zanger has openly admitted that he was bound by the Agreement he signed with IAM in 2004. (Zanger Dep. 23.) Accordingly, it is clear that Zanger was required to maintain between $5 million and $50 million in IFL at all times.

---

[6] During his deposition, Zanger claimed that the $50 million was Szele's idea (Zanger Dep. 40), but this was also the same Zanger who could not recall whether he had a compliance officer (*id.* at 48), did not know the substance of any rules or regulations with which he had to comply (*id.* at 48), and contradicted himself on many other issues.

**D.**     **Unlike Zanger, IAM Never Breached the Agreement in Any Way**

Zanger in his cross-motion accuses IAM of failing to pay Zanger his share of the management and performance fees (Opp'n 23), but this accusation is unsupported by the evidence.  Rather, it is but one more attempt on Zanger's part to divert the Court's attention from the real issues of the case, Zanger's breach of the contract with and fiduciary duty to IAM.  As explained above, IAM fully performed its obligations under the Agreement; Zanger not once complained of any non-payment, and it is just too convenient that Zanger *now* raises the subject when his own liability is at issue.

At one point in time, IAM was short on working capital.  Zanger agreed to defer receiving payment and even discussed paying money into IAM to cover short-term working capital needs.  Soon thereafter, however, Zanger breached the Agreement by committing two day trading violations, at which point in time IAM learned of Zanger's numerous, previously undisclosed breaches.  As it is well established that a party waives his right to bargained-for compensation when he breaches an agreement, Zanger in this case waived his right to the alleged $57,000 he claims he is still owed and cannot point to IAM's non-payment as a means of escaping liability.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff IAM respectfully requests that the Court grant its motion for partial summary judgment on IAM's claims against Zanger.

Dated: New York, New York                    Respectfully submitted,
      May 9, 2008


                                              _s/ Craig Stuart Lanza_
                                              Craig Stuart Lanza (CL-2452)
                                              John Balestriere (JB- 3247)
                                              **BALESTRIERE LANZA PLLC**
                                              225 Broadway, Suite 2900
                                              New York, NY 10007
                                              Telephone:    (212) 374-5400
                                              Facsimile:    (212) 208-2613
                                              _Attorneys for Plaintiff_