# EXHIBIT D

358

1
2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  --------------------------------x
   INDEPENDENT ASSET MANAGEMENT,
4  LLC, and OLA HOMSTROM,

5          Plaintiff,

6      v.         1:07-CV-06431-JSR

7  DANIEL ZANGER,

8          Defendant.
   --------------------------------x

9
              July 11, 2008
10             10:55 a.m.
11
12      Continued deposition of GEORGE B.
13  SZELE, pursuant to notice and agreement, held
14  at the offices of Jones Day, 222 East 41st
15  Street, New York, New York, before Maureen
16  McCormick, a Shorthand Reporter and Notary
17  Public of the State of New York.
18
19
20
21
22
23
24
25

---

359

1
2  APPEARANCES:

3

4  BALESTRIERE, PLLC
5      Attorneys for Plaintiffs
6      225 Broadway, Suite 2700
7      New York, New York 10007
8  BY: CRAIG STUART LANZA
9      WILLIAM HOLLEMAN

10

11  JONES DAY
12      Attorneys for Defendant
13      222 East 41st Street
14      New York, New York 10017
15  BY: MICHAEL D. SILBERFARB, ESQ.

16

17  PRESENT:

18  DAVID LEIMGRUBER

19

20

21

22

23

24

25

---

360

1
2              STIPULATIONS

3

4      IT IS HEREBY STIPULATED AND AGREED,
5  by and between counsel for the respective parties
6  hereto, that all objections, except as to form,
7  are reserved to the time of trial.
8      IT IS FURTHER STIPULATED AND AGREED
9  that the deposition may be signed and sworn to
10 before any officer authorized to administer an
11 oath.
12     IT IS FURTHER STIPULATED AND AGREED
13 that the sealing and filing of the deposition be
14 waived.
15
16
17
18
19
20
21
22
23
24
25

---

361

1                    G. Szele
2  GEORGE B. SZELE,
3      called as a witness, having been duly sworn,
4      testified as follows:
5  EXAMINATION
6  BY MR. SILBERFARB:
7      Q.   Mr. Szele, you've been deposed twice
8  before in this matter.
9          Since your second deposition, you've
10 been recalled to testify about certain matters
11 you weren't prepared for at your first two
12 depositions.
13         Have you done anything to prepare
14 between April 17 at your last deposition and
15 today?
16     A.   Yes.
17     Q.   Can you tell me what you've done?
18     A.   Going over IMs, gone over the specifics
19 of how you wanted the calculation on the damages,
20 and just in general looked over some of the
21 documents we've submitted.
22     Q.   How much time would you say you spent
23 on that?
24     A.   I don't know.  I just don't know.
25     Q.   Estimate?

G. Szele

1  the -- I was listing my -- my comments on his
2  violations.
3     Q.  Are these damages that are described in
4  the spreadsheet based on the violations you have
5  listed here?
6     A.  A portion of -- a portion of the 10
7  million that's listed in this Exhibit 13 does
8  include the overall effect of these violations on
9  the shutdown of Independent Fund and Independent
10  Asset Management.
11     Q.  But does it impact the loss of $9.1
12  million that you describe in the spreadsheet?
13     A.  Yes, I think in the sense that I have
14  to explain to people Dan's unacceptable actions
15  and what he -- you know, what he did.
16        In that sense, it does affect those
17  damages, because I have to explain to people why
18  he had all his margins calls, why he had all the
19  trading violations, why he took out the 5 million
20  that he was supposed to leave in for minimum for
21  five years, why he have improper wiring attempts,
22  why his volatility and drawdowns exceeded the
23  limits which he said he would stick to in his due
24  diligence documents, and I can go on and on, if

G. Szele

1  you want.
2     Q.  But you would just keep reading the
3  list right here?
4     A.  I would.
5     Q.  If you took out any of these violations
6  that you say that the $10 million, which we'll
7  get to later, is based on, partially this $9.1
8  million is based on, would that lower your
9  calculations?  If let's say --
10     A.  No, it would increase them.
11     Q.  Let's say under violations he didn't
12  make any improper wiring attempts.
13     A.  Okay.  I'm going to say this again.
14  Dan did many, many things wrong that in a due
15  diligence process I may have to explain to
16  potential investors.  Okay?
17        I don't know if you are aware of what
18  people have to go through when they're doing due
19  diligence, but it's very extensive at times.  I
20  would have to sit down in front of a $5 million
21  fund to fund and have to explain to them
22  everything about Dan, the audit, everything that
23  he did wrong, and I'd have to explain to them why
24  that happened, why didn't you have a different

G. Szele

1  protocol there, where, you know, Dan had to tell
2  you that he was violating these things, and then
3  I explained to them, well, it's in our agreement
4  that he was supposed to tell me everything, but I
5  can't make the guy tell me everything.
6        So all these things that I have to
7  potentially go through, explain why the fund
8  administrator is writing me a letter to either
9  get rid of Dan or they'll get rid of me -- if I
10  have to explain all these things in a due
11  diligence process, it hurts.  Okay?  I can't
12  tell -- I can't explain that in any other way.
13     Q.  We'll come back to this later.
14        Let's go down to where it says damages
15  down at the bottom.  Do you see that?
16     A.  Yes.
17     Q.  On Exhibit 45?
18     A.  Yes.
19     Q.  Says one year earning potential for G,
20  400,000.  What does that mean?
21     A.  Well, my last professional position at
22  Goldman Sachs I earned 400,000 in one year, so I
23  just took one year of what I could have earned
24  had I been doing maybe something else or, you

G. Szele

1  know, if I wasn't thwarted by Dan again in
2  various ways.
3        I just took one year of what I would
4  have earned typically at a Wall Street shop, and
5  that's 400,000.  Same thing.
6     Q.  Hold on, hold on.  I'm just asking
7  about that now.
8        When did you leave Goldman Sachs?
9     A.  2000.
10     Q.  Why?
11     A.  Mid 2000.
12     Q.  Why?
13     A.  Why?  Various reasons.
14     Q.  Was it your decision to leave or did
15  Goldman Sachs ask you to leave?
16     A.  Joint, joint decision.
17     Q.  Describe that.
18     A.  It was a joint mutual decision.
19     Q.  How did that come up?
20     A.  I don't recall how it came up.  We --
21  we came to a conclusion to jointly move on.
22     Q.  Who began the discussions about you
23  jointly moving on?
24     A.  I don't know who began it.

422

G. Szele

1  A.  Yes.

2  Q.  IAM's potentially liable to this other

3  investor?

4  A.  Or investors, right.

5  Q.  What other investors is it potentially

6  liable to? That's what I'm asking.

7  A.  I've already answered that. The

8  investor in '07 and Ola Homstrom.

9  Q.  And other than those two, is there

10  anyone else?

11  A.  I already said no. There were no other

12  investors.

13  Q.  Let's pretend Ola Homstrom is not

14  around, okay? Take him out of the equation.

15  A.  The only other investor was this 1.5

16  million investor in 2007 that came in when we

17  still had 5 million in the fund.

18  Q.  And how did -- and is there any --

19  other than what you've stated already, is there

20  any other basis for the potential liability IFL

21  would have to this other investor as a result of

22  Dan's actions?

23  A.  I don't know. I don't know. There

24  could be all sorts of potential liabilities

423

G. Szele

1  stemming from all that.

2  Q.  Has either Ola Homstrom or the 2007

3  investor sued IAM?

4  A.  No, they haven't sued us, but they have

5  questioned significantly why the fees were so

6  high, and we told them that fees were so high

7  because Dan pulled his money out, and they

8  weren't happy about that.

9      Therefore, they pulled out their

10  investment in IFL, causing us further damage

11  because of Dan as well.

12      If Dan doesn't pull out his 5 million,

13  that investor doesn't pull out his 1.5 million.

14  Damage begets damage begets damage begets damage.

15  It just rolls and rolls and rolls.

16  Q.  If this 2007 investor and Ola Homstrom

17  never sued IAM, will IAM ever have to pay them a

18  cent as a result of a liability caused by Dan's

19  alleged actions?

20      MR. LANZA: Objection as to form.

21  A.  Yeah, I -- maybe reword it or explain

22  to me what you're asking.

23  Q.  If Ola Homstrom and the 2007 investor

24  never bring a lawsuit against IAM, will IAM have

424

G. Szele

1  to pay them anything, be required to?

2  A.  I would assume not.

3  Q.  So this loss only really comes up if

4  they sue?

5  A.  It says potential liability.

6  Q.  You believe Dan should have to pay for

7  potential -- IAM for potential liability?

8  A.  Yeah, I do, because if there's a -- if

9  there's a suit there, why wouldn't he have to

10  cover it? It's because of him that it would be a

11  potential liability.

12  Q.  Let's go to the next line down, shut

13  down of IFL $500,000. What's that based on?

14  It's in your spreadsheet.

15  A.  Shut down. Yeah, I mean, we -- again,

16  we spent well over $500,000 in building the

17  Independent Fund, and Dan essentially shut it

18  down, so that's where that comes from, and we

19  spent well over half a million dollars to build

20  IAM over the years, and basically that was shut

21  down by him as well.

22  Q.  Do you have any evidence, documentary

23  or otherwise, that show that $500,000, how you

24  calculated it, where that $500,000 number came

425

G. Szele

1  from?

2  A.  I think if you looked at all the money

3  we spent over the years, expenses, you know,

4  marketing, building, the fund costs, everything,

5  if you combine everything, it's well over -- it's

6  over a million dollars to build the structures

7  and to maintain them and to, you know, just

8  operate.

9      MR. SILBERFARB: Once again, we would

10  ask for IAM's books. We don't have the

11  financial records, except for tax returns

12  that don't state any of these damages.

13  We are going to reserve all our rights,

14  if Mr. Szele tries to claim these damages,

15  because we don't have the evidentiary

16  support for them, despite the fact that --

17  THE WITNESS: Well, it's in the tax

18  returns, as well. The expenses are listed,

19  the debts listed, and I believe they

20  provided that.

21  MR. SILBERFARB: We'll go over that

22  later. We will reserve all rights. We

23  don't believe that all the information

24  that's been provided -- we would like a

426

1    G. Szele
2    backup and the best evidence from you guys.
3    MR. SILBERFARB: IFL we don't have the
4    tax returns for. We only have the tax
5    returns for IAM, so we want some backing for
6    why 500 was damage to IFL particularly.
7    MR. LANZA: 500,000.
8    MR. SILBERFARB: 500,000.
9    Q. Have those been produced?
10   A. Building -- I believe they have been.
11   I'm not sure in what form, but I think everything
12   that IAM extends out or spends in expenses is
13   related to the fund, as well as its office. You
14   know, everything -- IAM is a trading manager to
15   the fund, so basically IAM outlays the money.
16   You can just put a million under IAM
17   and strike the IFL. I just divided it because
18   they're both intertwined.
19   Q. So you're saying that the combined loss
20   to IAM is $1 million?
21   A. I'm saying the combined expenditure
22   over the years for both IFL and IAM extends over
23   million, yeah.
24   Q. Are there financial documents to show
25   this from IFL in particular?

427

1    G. Szele
2    A. Again, the expenses that will list
3    certain things, I think it's in the tax returns
4    as well, just a basic breakdown of these debts
5    and expenses --
6    Q. Does --
7    A. -- that pertains to IFL.
8    Q. Does IFL have tax returns?
9    A. IFL has audits, not tax returns.
10   Q. Have we received all the audits from
11   IFL?
12   A. I've provided the audits.
13   MR. SILBERFARB: We would appreciate
14   the Bates numbers. We have asked for it
15   several times.
16   MR. HOLLEMAN: You've gotten the
17   audits, at least one of the audits in one of
18   previous depositions.
19   MR. SILBERFARB: We have the audits for
20   '05 and '06. We don't believe we have the
21   previous audits.
22   MR. HOLLEMAN: You have '04, as well.
23   MR. SILBERFARB: If he's claiming money
24   for damages that are based on the building
25   up of the company from '01 to '04, we want

428

1    G. Szele
2    those audits. They're very relevant here.
3    And again, we'll reserve all our rights
4    with regard to this.
5    MR. HOLLEMAN: Anything else that you
6    are --
7    MR. SILBERFARB: We'll talk about some
8    of the tax return issues later. We only got
9    partial tax returns, but we would like the
10   full documents. We don't feel that's crazy
11   to ask.
12   We also don't feel it's inappropriate
13   to ask for the backup of those tax returns,
14   but we'll talk about that later.
15   MR. LANZA: I'm unclear what you mean.
16   MR. SILBERFARB: We'll talk about it,
17   but it's referencing the accountant's letter
18   that there was backups that he sent back to
19   George, and we didn't receive any of that
20   for sure.
21   So in all those ways, these damages are
22   impossible for us to calculate.
23   Q. When you were calculating this million
24   dollars of loss to IAM and IFL combined, did you
25   use any documents to make these calculations?

429

1    G. Szele
2    A. Joe and I went over all the expenses
3    going back to when he started building this.
4    Q. How did you -- what did you -- so you
5    used this list that Joe had to calculate how much
6    you spent on IAM?
7    A. We have a ledger that he kept track of
8    expenses.
9    MR. SILBERFARB: We'd ask that you
10   produce the ledger, as well, and we'd ask
11   that you do it in a timely fashion, because
12   we only have a month until trial.
13   Again, we'll reserve all rights with
14   regard to this, because we can't question
15   him about those damages.
16   Q. Do you have a copy of this ledger, Mr.
17   Szele?
18   A. I'm pretty sure we have a copy of it,
19   yeah. I'll ask Joe to produce the ledger, if it
20   hasn't been produced.
21   MR. SILBERFARB: If not, we'd ask for
22   the Bates numbers again.
23   And these are the financial documents
24   we're talking about. We can't judge damages
25   without Mr. Szele providing those documents.

438

G. Szele

1  MR. LANZA: That's not all financial
2  documents.
3  MR. SILBERFARB: We want --
4  MR. LANZA: I mean, let's be clear. I
5  don't remember there ever being a request --
6  perhaps I'm wrong -- in which you requested
7  all financial documents.
8  When, you know, Joe Porco buys milk for
9  the refrigerator in 2003 and gets -- and
10  keeps hold of the receipt, surely you don't
11  want that. Do you?
12  MR. SILBERFARB: You know what? I have
13  it with me, but I can go back to our
14  document request, and we ask for all
15  financial documents.
16  MR. LANZA: All financial documents?
17  MR. SILBERFARB: Yes.
18  MR. LANZA: Well --
19  MR. SILBERFARB: That was our document
20  request. You didn't object to that
21  request.
22  MR. LANZA: I don't think any of us
23  have your document request.
24  MR. SILBERFARB: I don't have it right

439

G. Szele

1  now. I don't think we need to have this
2  argument on the record. It's pointless. Let's
3  keep going with that. Hopefully everything
4  will be produced to us today, and then that
5  will end this conversation.
6  MR. LANZA: Just for the record,
7  everything is not going to be produced
8  today. It will be produced timely, but
9  obviously, you know, today we can't provide
10  it between now and six o'clock.
11  MR. SILBERFARB: The other issue is
12  that we received a spreadsheet with damages
13  that really break down the damages a lot
14  more today, not before today, but today, and
15  that's why a lot of these documents become a
16  lot more relevant, and I think you will
17  acknowledge that.
18  Q. Shutdown of admin is the next line on
19  your spreadsheet. What does that refer to?
20  A. Shutdown of the administrator. The
21  administrator, which takes plenty of time to
22  build a relationship with administrators, is shut
23  down based on Dan's actions, and I didn't even

440

G. Szele

1  place an amount on it here.
2  Q. Why not?
3  A. I left it blank. I chose not to put
4  anything on there right now.
5  Q. Shut down of SLKGS?
6  A. Spear Leeds Kellogg, Goldman Sachs.
7  The account was shut down at Spear Leeds.
8  Relationship is closed down there because of,
9  again, Dan's action. Didn't put an amount on it
10  for now, basically chose to leave the lump sum of
11  the million, and then for the IFL and the IAM,
12  since the admin and the SLK can be relevant to
13  IFL.
14  Q. Minimum debt IAM, $800,000, what's that
15  based on?
16  A. Again is just the -- the seed capital
17  and debt that we incurred from -- from the --
18  over the series. That will be -- that will be on
19  the tax return as well, the debt.
20  Q. How did you calculate that?
21  A. From the -- from the tax stuff, from
22  the accountant.
23  Q. Let's go back to Exhibit 13. Says
24  IAM's unpaid debts. Page 3.

441

G. Szele

1  A. Yeah.
2  Q. The bottom.
3  In connection with defendant's actions
4  IAM incurred approximately $690,595 in debts
5  which were rendered unable to be repaid due to
6  IFL being shut down by the prime broker and the
7  fund administrator.
8  A. Right. That was --
9  Q. Do you see that?
10  A. I do.
11  Q. Stop. Let me ask my question.
12  A. Yes.
13  Q. Is that number -- why is that 690,000
14  worth of unpaid debts on Exhibit 13, and now it's
15  $800,000 of unpaid debts on Exhibit 45?
16  A. That's because it keeps increasing.
17  Q. What are IAM's debts right now?
18  A. Everything that we're getting under
19  debt more and more on a whole basis, on an entire
20  basis per the accountant. I think my accountant
21  said that you're up to -- you're up over 800 in
22  debt from the new one that's coming out now or,
23  you know, the return that he'll be working on
24  now, so there's even more -- even -- you know,

442

G. Szele

1   it's starting to compound with more debt
2   accumulating from -- and I have to look at why
3   he's -- you know, I have to look at the
4   accountant, why he's saying that.
5   Q.   What year is this $800,000 based on?
6   What years was this debt?
7   A.   I think it's based on -- I think it's
8   based on -- I'm just not sure what exact point
9   it's based on.
10  Q.   From '01 to '05?
11  A.   I don't know. Some of it is based on
12  earlier years.
13  Q.   Is it --
14  A.   The point is that we can't pay anything
15  back, because Mr. Zanger has shut us down.
16  That's why it's in there.
17  Q.   Is this debt based on IAM's total debt
18  throughout the period of IAM's existence?
19  A.   Yes. Everything that's minimum to IAM
20  refers to IAM's existence in building and, you
21  know, seed capital that we had.
22  Q.   You believe Dan should pay off all of
23  IAM's debts for its entire existence, despite the
24  fact Dan only worked there for two years, or had
25

443

G. Szele

1   the agreement with IAM for two years?
2   A.   I think Day should pay off much more
3   than that, because he shut down something that
4   could have created a lot more revenue for us.
5   Q.   Is there any other basis, other than
6   this -- how did you calculate this $800,000?
7   A.   I just said, it's through the
8   accountant, through his -- his numbers, the debt
9   numbers on the returns.
10  Q.   The accountant says right now you have
11  $800,000 in debt.
12  A.   It's around there. I round things off.
13  Q.   When did you speak to the accountant?
14  A.   When did I speak to the accountant? I
15  speak to him on and off.
16  Q.   When did he tell you there was $800,000
17  of debt?
18  A.   I don't know exactly. I have to check.
19  It's on -- I think I saw it on one of the return
20  sheets on the accountant's sheets.
21  Q.   Is that number a precise number?
22  A.   It's approximate.
23  MR. SILBERFARB:   We'd ask if there is
24  an accounting sheet that we haven't seen,
25

444

G. Szele

1   that it be produced. It's an approximate
2   number, $800,000.
3   THE WITNESS:   Approximate -- it's an
4   approximate number.
5   Q.   Round up or down?
6   A.   It's an approximate number. I don't
7   know. I don't know if I rounded up or down.
8   Q.   So you could have rounded up? It could
9   be less than that?
10  A.   Maybe could be 10,000 less, could be
11  10,000 more. I don't know. I have to check.
12  Again, you want the exact number -- in fact,
13  we'll produce the accountant's papers that, you
14  know, if we haven't already produced it -- I
15  think we have. It's already detailed that.
16  Q.   Minimal poten -- I think that's a
17  spelling --
18  A.   Minimum potential on George's trading.
19  Q.   We'll just accept that as being what
20  it's supposed to say. It says $1 million.
21  What's that based upon?
22  A.   That's based on -- that was just based
23  on a hundred percent gain, and now I'm at a 200
24  percent gain since February '05, but that was
25

445

G. Szele

1   based on a hundred percent gain and the fees we
2   would have earned off a 20 percent performance
3   fee, if we just had brought in 5 million into
4   that trading strategy.
5   Q.   I'm confused. Explain that again. How
6   did you calculate this precisely?
7   A.   Based on a hundred percent return on 5
8   million, take it 20 percent performance fee.
9   That's how it basically comes up.
10  Q.   Where does the 5 million come from?
11  A.   The 5 million is an amount we could
12  have traded on Dan's money or we could have
13  raised on our own to trade also that we could
14  have raised money on our own or we could have
15  done it with Dan's 5 million if he wanted to
16  hedge his own portfolio, which he thought he
17  wanted to do, which he was starting to do with
18  the hundred K, he started to do with a hundred K,
19  so he was obviously wanting to have me trading
20  more and more of his capital to hedge.
21  Q.   Is this money based on performance fees
22  and --
23  A.   Yes.
24  Q.   -- and management fees?
25

490

G. Szele

1
2   Q.   Is he a partner in IAM?
3   A.   He was not.
4   Q.   What did he get back? What did he get
5   back?
6   A.   He was a lender. He would have
7   probably participated in fees of upside sharing
8   of some sort.
9   Q.   You see up in Column 1, cash says
10  $172,964?
11  A.   Yeah, I see that.
12  Q.   The year before, IAM had $15,134 in
13  cash. Can you explain why there was such a jump?
14  A.   I cannot. You have to ask the
15  accountant.
16  Q.   And then if you go down back to
17  Schedule M 2, distributions for that year,
18  $65,373 to you and Mr. Porco; is that correct?
19  A.   I think that's probably distributed to
20  Joseph and I.
21  Q.   What percentage of the distributions
22  from the partnership would you get as compared to
23  Mr. Porco?
24  A.   I think it was pretty much 50-50.
25  Q.   Capital contributed that year in

491

G. Szele

1
2   partners contributed $31,884, is that correct,
3   No. 2, Schedule M 2?
4   A.   That's what it says, yes.
5   Q.   And the net income or the income loss
6   was $132,070 for that year?
7   A.   Looks like it.
8   Q.   Let's go to 2005, next page. The cash
9   Line No. 1 on Schedule L -- again, this is the
10  Form 1065 for 2005. It's Bates numbered 006510,
11  IAM Bates number.
12        The cash goes down from -- on hand goes
13  down from 172,964 to 45,956. Is there any reason
14  that that happened, in your mind?
15  A.   I don't know why. You have to ask the
16  accountant.
17  Q.   The debt went up from $822,562 to
18  $872,987 in that year; is that correct?
19  A.   Looks like it.
20  Q.   And do you know why that went up
21  $50,000?
22  A.   I do not. Question for the accountant.
23  Q.   This is a year that Zanger gave
24  $100,000 of working capital to IAM, correct,
25  2005?

492

G. Szele

1
2   A.   Actually he gave 100,000 in '04.
3   Q.   Okay.
4   A.   End of '04.
5   Q.   Can we go back to '04 for a second
6   then? Do you know where that would be reflected
7   on this document?
8   A.   I do not. Could be in that mortgage
9   Section 19.
10  Q.   Go back to '05. Says guaranteed
11  payments other than health insurance under No. 3
12  and M 1, $149,900. Do you know what that's for?
13  A.   I do not.
14  Q.   Did you take out any money for yourself
15  and Mr. Porco during 2005?
16  A.   I do not recall.
17  Q.   Could that $149,900 be salaries to you
18  and Mr. Porco during that year?
19  A.   I don't know. It could be.
20  Q.   Do you have any reason to believe
21  that's not what that says?
22  A.   Again, I don't know what that is. It's
23  a question for the accountant.
24  Q.   And that year, the income loss No. 9
25  was $91,480, correct?

493

G. Szele

1
2   A.   That's what it says there, yeah.
3   Q.   So again, for the -- IAM took a loss in
4   '05, correct, big loss, $91,480?
5   A.   Income loss is negative 91,480.
6   Q.   Let's turn on to the next page, 2006.
7   A.   Just for the record, you were asking
8   where we got that 800,000 number from down here.
9   That's where I think we got that 800,000 number
10  from.
11  Q.   Okay.
12  A.   Okay?
13  Q.   So as of the end 2004 -- let's go back
14  to the 2004 one. It's Bates numbered IAM 0065.
15  Says -- can't really read that. It's page No. 8
16  of 10?
17  A.   Yeah.
18  Q.   That says $822,562 in Column 19 under
19  debts owed by IAM, correct?
20  A.   822,562, end of year, yeah.
21  Q.   So before Dan Zanger even got involved
22  with IAM, IAM already had debts in excess of
23  $800,000, correct?
24  A.   I don't think that's correct, because I
25  think the hundred thousand is in that 822 of

494

G. Szele

1  Dan's money that he put in.
2  Q.  So even assuming that, which I won't
3  concede here, even assuming that that hundred
4  thousand is in there, IAM going into its
5  agreement with Dan Zanger already had debt of
6  $722,562?
7  A.  We'd have to check with the accountant,
8  but that's possible.
9  Q.  IAM did have at least significant debt
10 at that point?
11 A.  If you say so.
12 Q.  Let's turn to 2006. The next one, I
13 think it's IAM 006511. It's the Form 1065 for
14 2006.
15 A.  Yes.
16 Q.  See at top it says cash 14,250, No. 1?
17 A.  Which page are you on?
18 Q.  On Page 10 of 10.
19 A.  Okay. I see that.
20 Q.  So that cash on hand went down from
21 45,956 to 14,250, between 2005 and 2006?
22 A.  It looks like it, yes.
23 Q.  Is there any reason that that went down
24 that you know of?
25

495

G. Szele

1  A.  No, I do not.
2  MR. SILBERFARB: You guys mind if we
3  take a five-minute break?
4  MR. LANZA: Sure.
5  (Recess taken.)
6  Q.  Now we are looking at 2006. You go
7  down to No. 3 in Schedule M 1, says guarantied
8  payments, 164,150. Do you see that?
9  A.  Yes.
10 Q.  And do you know what that stands for?
11 A.  I do not. I'm assuming it's probably
12 some -- some draw.
13 Q.  Some salary to you and Mr. Porco?
14 A.  Some draw, yeah.
15 Q.  And then if you look at income loss,
16 right, No. 59, says 107,414, but there's no
17 negative. This year you made money, 2006?
18 A.  Okay.
19 Q.  Is that true?
20 A.  Looks like it.
21 Q.  Is there any reason to believe it's not
22 true?
23 A.  I do not.
24 Q.  At the end of that year, despite the

496

G. Szele

1  fact that IAM made money, it had less cash on
2  hand than it did the year before, correct?
3  A.  If you say so. Again, I'm not an
4  accountant. I can't give you details on this
5  stuff.
6  Q.  Look at No. 19 on Schedule L. IAM's
7  debt was now $864,899 the end of that year?
8  A.  Okay.
9  Q.  That went down $8,000 from the previous
10 year; is that correct?
11 A.  Looks like it.
12 Q.  Yes or no?
13 A.  It looks like it went from 872,987 to
14 864,890.
15 Q.  Do you know why the debt went down that
16 year?
17 A.  I do not.
18 Q.  What year did Dan Zanger put $50,000 of
19 additional working capital under the addendum
20 agreement into IAM?
21 A.  I believe it was '05.
22 Q.  Let's turn back to '05 for one second
23 here, and that $50,000 is probably reflected in
24 the fact that IAM's loans or money owed went

497

G. Szele

1  from 822,000 approximately to 872,000,
2  approximately. That's probably that $50,000
3  there, correct?
4  A.  Could be.
5  Q.  What else could it be?
6  A.  I don't know.
7  Q.  But --
8  A.  It could be that, though.
9  Q.  Did you think that's it, in your
10 opinion? I know you're not an accountant.
11 A.  Could be, yeah, it could be that.
12 Q.  Good chance?
13 A.  Yeah, it's a good chance that that's
14 probably it.
15 Q.  When did Dan provide IAM with the
16 $50,000 for RCA Capital or RC -- how is that?
17 A.  RCA?
18 Q.  RCA?
19 A.  When did Dan provide that? That was
20 '06.
21 Q.  '06? Do you see that reflected in the
22 '06 statement anywhere? That's Page 10 of 10.
23 A.  I don't know where that would be
24 reflected.

462

G. Szele

1    message.

2    Q.  When did the funds -- when did Dan

3    start trading in the funds?

4    A.  He got the money in by the end of

5    February and early March.

6    Q.  So there's a month difference in there?

7    In that month he could have lost that 35 percent,

8    right.

9    A.  No, January and February is what we

10   missed out on.  The first two months is what we

11   missed out on.  His money was in by the end of

12   February, early March so --

13   Q.  The date of the IM --

14   A.  February 4 of '05.  Okay?

15   Q.  So between February 4 of '05 and

16   February 28, '05, Dan potentially could have lost

17   that 35 percent?

18   A.  Some -- some money was in -- already

19   in -- I think, 2 million.  I gotta get the exact

20   dates, but some money was in by early February,

21   and some money was in by early March, so we --

22   you can put March in there, but I think he was up

23   in March as well, so I think it's irrelevant.  We

24   looked at that.

463

G. Szele

1    We looked at what we would have -- we

2    looked at what we would have earned if he had his

3    money in there from January 1 and a 38 percent

4    approximate difference.  I mean, we have the

5    numbers, but you can look into it more, if you

6    want.

7    Q.  Just so I know, on this document we're

8    looking at in Exhibit 8, it says, "Y-T-D

9    portfolio change percent," right in that column,

10   on Page No. 6?

11   A.  Okay.  What I can tell you for sure is

12   that any P&L number on the Goldman spreadsheet

13   report is not taking out any fees for anything.

14   That's for sure.

15   Q.  Again, all I'm asking you is this:

16   What percentage year to date was the portfolio

17   for IFL up at the end of -- for the year to date

18   at the end of December '05?

19   A.  Looks like 84.38 gross.  That's gross

20   number.

21   Q.  That's a gross number?

22   A.  Right.  That in my opinion is

23   definitely a gross number, because Goldman Sachs

24   does not take out fees, and they're just

464

G. Szele

1    calculating P&L.

2    MR. SILBERFARB:  Why don't we take

3    lunch right now.

4    (Discussion off the record.)

5    Q.  There are a couple of other things that

6    you didn't talk about in your spreadsheet.  I'm

7    wondering from Exhibit 13, which was your

8    original damages calculations -- I'm just

9    wondering if those are included in the

10   spreadsheet, and I'll just go through them pretty

11   quick.

12   First one is information technology

13   costs.  In connection with -- it's on Page 3.

14   In connection with the management of

15   IFL, IAM incurred approximately $20,000 cost in

16   implementing the information technology necessary

17   to operate a hedge fund.  Because defendant's

18   action shut down IFL, IAM was unable to realize

19   the value of information technology investment.

20   A.  Yes.

21   Q.  Is that included in the spreadsheet?

22   A.  No.

23   Q.  It's not?  It's not included in the

24   money IAM spent to start its company, the

465

G. Szele

1    $500,000?

2    A.  If you want to include it, you can

3    include it.  Network synergy, it's based on --

4    it's based on our -- the technology of running

5    the computers, the softwares, the trading

6    analysis.

7    It's basically software and technology

8    support type stuff, so it's possible you could

9    put that into the -- into the IAM expenses.

10   Q.  Do you have any -- do you have any

11   documents to back that $20,000 up, that that's

12   how much you spent?

13   A.  It's a very minimum estimate over the

14   years of what we spent with this company network

15   synergy and CQG.

16   I do have expenses on net synergy and

17   CQG.  I mean --

18   Q.  Do we have those?

19   A.  I provided a list of -- I'm pretty sure

20   I provided a list of these costs.  If they're

21   not, will be on this ledger of expenses that my

22   partner would have.

23   Q.  So they're included in the 500,000 or a

24   million dollars that IAM and IFL have expended,