# EXHIBIT A

```
                                    1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
INDEPENDENT ASSET MANAGEMENT LLC
and OLA HOLMSTROM,

            Plaintiffs,

      v.              1:07-CV-06431-JSR

DANIEL ZANGER,

            Defendant.
-------------------------------x
                  March 3, 2008
                  10:30 a.m.


        Deposition of JOSEPH J. PORCO, taken by
defendant, pursuant to notice, at the offices of
Jones Day, 222 East 41st Street, New York, NY
10017, before Joseph B. Pirozzi, a Registered
Professional Reporter and Notary Public of the
State of New York.
```

```
                                    2
APPEARANCES:

BALESTRIERE, PLLC
   Attorneys for plaintiffs
   225 Broadway
   Suite 2700
   New York, NY 10007
BY:  CRAIG STUART LANZA
     WILLIAM HOLLEMAN


JONES DAY
   Attorneys for defendant
   222 East 41st Street
   New York, NY 10017
BY:  THOMAS H. SEAR
```

```
                                    3
                  STIPULATIONS

        IT IS HEREBY STIPULATED AND AGREED,
by and between counsel for the respective parties
hereto, that all objections, except as to form,
are reserved to the time of trial.
        IT IS FURTHER STIPULATED AND AGREED
that the deposition may be signed and sworn to
before any officer authorized to administer an
oath.
        IT IS FURTHER STIPULATED AND AGREED
that the sealing and filing of the deposition be
waived.
```

```
                                    4
                     Porco
JOSEPH J. PORCO
   called as a witness, having been duly sworn,
   testified as follows:
EXAMINATION
BY MR. SEAR:
        MR. SEAR:  Let's just note the time.
     It is about 25 of 11.  Counsel had informed
     me earlier that they were stuck in traffic
     and that accounts for a late start.
     Q.   Mr. Porco, directing your attention to
2005.  Were you associated with an entity called
Independent Asset Management?
     A.   Yes.
     Q.   And can we refer to that as IAM?
     A.   Sure.
     Q.   And what was your position with IAM in
2005?
     A.   Managing director.
     Q.   And what were your responsibilities?
     A.   I dealt with several different areas,
interacted with administration and the
administrator down in Bermuda, interacted with
counsel to the fund, assisted with compliance
issues, handled previous audit by the NFA, and
```

**77**

Porco

```
 2  continue to operate?
 3       A.   IAM was getting by and continuing to
 4  operate and we were continuing to try to market
 5  up until the point that we could no longer market
 6  Dan.
 7       Q.   I'm not asking you about marketing Dan.
 8  I'm asking you whether in August, September and
 9  October there were conversations between you and
10  George to the effect that IAM did not have enough
11  money to continue to operate?
12       A.   No, because we were going to continue
13  to raise assets either for Dan or from other
14  classes of shares.
15       Q.   To your knowledge, was Dan told in or
16  around August, September, October that IAM did
17  not have enough money to pay its bills?
18       A.   Not by me.
19       Q.   Did IAM have enough money to pay its
20  bills during the months of August, September and
21  October.
22       A.   IAM had been paying their bills.
23       Q.   I'm not asking you what they had been
24  doing, I'm asking you during the months of
25  August, September and October if IAM had enough
```

**78**

Porco

```
 2  even to pay its bills?
 3       A.   Yes, IAM had enough money to pay its
 4  bills.
 5       Q.   During those months it did pay those
 6  bills?
 7       A.   Things were lean but we were continuing
 8  to meet our obligations.
 9       Q.   In connection with liquidation of the
10  fund, how much money did AIM get paid?
11            (Telephone interruption)
12       A.   IAM didn't get paid in regards to Dan's
13  redemption.
14       Q.   In connection with the liquidation in
15  or around December of 2006, did IAM get any
16  money?
17       A.   IAM didn't get revenue -- Dan was given
18  back the money that was his. Some portion was
19  retained per the offering memorandum by the
20  administrator and there was no gain to IAM.
21       Q.   Was IAM paid a management fee for
22  December of 2006?
23       A.   I don't know what the cutoff dates
24  were, but the history of the management fees
25  which were paid are all in the Butterfield
```

**79**

Porco

```
 2  transcripts that show the monthly reportings, so
 3  it would show a list of when the last payment was
 4  made, it would be in there, and I believe you
 5  have that.
 6            MR. SEAR:  Has that been produced to
 7       us?
 8            MR. LANZA:  I believe so.  We don't
 9       have everything from Butterfield.
10            THE WITNESS:  You have all that stuff,
11       I think.
12            MR. SEAR:  I would either ask for the
13       production or I would ask for the Bates
14       numbers, please.
15            THE WITNESS:  I mean, it lays it all
16       right out.  Everything is very transparent.
17       I mean, that's one of the reasons why we set
18       up in Bermuda.  We worked with a group like
19       Butterfield Fund Service, had an auditor
20       like D&T, worked with Appleby Sperling and
21       had a legal team like Williams Mullen.
22       Everything was always very transparent.  The
23       accounting was always done correctly and
24       then reviewed by the auditors.
25            So whatever these figures are and you
```

**80**

Porco

```
 2       are looking for should all be available for
 3       you guys to see what was paid and when.
 4       Q.   Let me show you what we have marked as
 5  Zanger Exhibit 10.
 6            (Zanger Exhibit 10 was marked for
 7       identification)
 8       Q.   This is a letter to Mr. Steven Schulman
 9  who was and is counsel for Mr. Zanger and to Mr.
10  Lanza, your counsel.  Have you seen this letter
11  before?
12       A.   I don't know if this was forwarded just
13  to George or whether I received a cc on this.
14  But this would have come through our law firm.  I
15  think you sent it just to George.
16       Q.   Do you have any knowledge as to whether
17  or not this letter was responded to?
18       A.   Is this the lawyer that Dan had prior
19  to you, the guy that got in all the trouble and
20  he had to fire him?
21       Q.   That's not correct what you just said,
22  but he is the lawyer that was representing Dan
23  during this period of time.
24       A.   I'm not familiar with this letter.
25       Q.   You don't know whether there was a
```