UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                         )
INDEPENDENT ASSET MANAGEMENT LLC                         )   Case No. 1:07-cv-06431-JSR
and OLA HOLMSTROM,                                       )
                                                         )
                Plaintiffs,                              )
                                                         )   ECF
vs.                                                      )
                                                         )
DANIEL ZANGER,                                           )
                                                         )
                Defendant.                               )
                                                         )
-------------------------------------------------------- X

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE RAYMOND ARONSON FROM TESTIFYING TO UNDISPUTED FACTS AND DAMAGES AND FROM PROVIDING A LEGAL ANALYSIS**

Plaintiff Independent Asset Management ("IAM" or "Plaintiff") has filed a Motion in Limine to Preclude Raymond Aronson from Testifying to Undisputed Facts and Damages and From Providing a Legal Analysis (the "Motion"). Defendant, though its counsel, files the memorandum of law in opposition to that Motion.

**I. Relevant Facts**

In 1959, Raymond Aronson ("Aronson") received his Bachelor of Arts Degree in non-western civilization and a minor in economics from the University of Rochester. (Declaration of Raymond L. Aronson, dated July 28, 2008, at ¶ 3. (the "Aronson Declaration"). A copy of the Aronson Declaration has been filed herewith)). In 1962, Aronson received his law degree from New York University. (Id.) He was admitted to the New York Bar shortly thereafter, and remains admitted. (Id.)

Between 1965 and 1972, Aronson worked as an associate director of rulings at the American Stock Exchange (the "AMEX") (Id., at 4). His responsibilities at the AMEX included writing rules applicable to traders, handling inquiries from the public on the floor, and working on special projects for the Chairman. (Id.) In 1968, Aronson had his first encounter with the fledgling hedge fund industry when he was asked to prepare a report on the nature of hedge funds and the identity of member organizations involved in them to the Executive Vice President for Legal and Regulatory Affairs of the AMEX. (Id.)

From 1972 through 1975, Aronson acted as General Counsel and Director of Compliance of Edwards & Hanly, a 26 branch regional broker-dealer. (Id., at 5.) At Edwards & Hanly, Aronson ran the compliance department and assured that the firm complied with its regulatory, management and investment responsibilities. (Id.)

From 1975 through 2004, Aronson acted as senior counsel in the Legal and Compliance Departments at Bear Stearns & Co., Inc. ("Bear Stearns") where he became Senior Managing Director. From 1999 through 2003, he served as Director of Compliance for Bear Stearns Securities Corporation, Bear Stearns' Clearing division. (Id. at 6.)

During his 30 years at Bear Stearns, Mr. Aronson advised both legal and business staff in all areas, including compliance, litigation, clearance, operations, securities lending, equities, derivatives, prime brokerage, hedge funds, private client services, arbitrage, and corporate finance. (Id. at 7.) Aronson sat with Bear Stearns' Prime Brokerage Group and Clearing service group that serviced hedge funds. (Id.)

Specifically, Aronson served on Bear Stearns' committee responsible for determining whether Bear Stearns' brokerage would serve as the brokerage for applicant hedge funds (the "New Business Committee"). (Id. at 9) As a member of the New Business Committee, Aronson

was responsible for researching and analyzing the general reputation and performance history of both traders and trading managers affiliated with applicant funds. (Id.) In performing this duty, Aronson paid particular attention to among other factors, whether the fund's traders had violated applicable trading rules and regulations as well as whether the fund abused its leverage limits. Also, as a member of the New Business Committee, Aronson spoke with certain funds' investors and potential investors in order to determine the funds' long term viability for attracting and maintaining investors. (Id.) Aronson reported to business personnel regarding whether the fund would be capable of attracting additional investors in the long term. (Id.)

Moreover, Aronson served on Bear Stearns' committee to determine how to penalize existing hedge funds clients that violated rules and regulations (the "Regulatory Committee"). (Id., at 9) In this role Aronson had lead responsibility for determining: (1) whether Bear Stearns' brokerage should continue to represent its current hedge fund clients; and (2) whether and how to penalize existing hedge funds for violations of Bear Stearns' prime brokerage rules. (Id.) In making these determinations, Aronson analyzed the products the fund invested in, the quality of the fund's investors, as well as reputational issues such as excessive margin violations and volatility. (Id.) Aronson also advised senior management with regard to how much leverage the brokerage should allow each hedge fund to use. (Id.) In this role, Aronson directly supervised a Bear Stearns employee who reviewed whether serviced hedge funds had created excessive margin violations. (Id.) If that employee made a determination that a fund's margin violations were indeed excessive, he would report to Aronson, who would advise senior management regarding potentially limiting the hedge fund's leverage in order to pressure the violating fund to find a new prime broker. (Id.)

Aronson has been retained by Defendant in this matter to testify about four discrete topics about which his experience is clearly applicable. Specifically, Aronson will testify that:

- Zanger's use of leverage and creation of margin calls as the fund manager of Class Z . . . Shares was typical for traders in the hedge fund industry, and there are no negative consequences from the creation of margin calls when they are timely met. (Aronson Report, ¶.9).[1]

- The circumstances surrounding Zanger's employment at IAM illustrate that IAM should have, and likely did, expect that Zanger would employ a trading strategy involving the use of leverage. (Aronson Report, ¶ 10)

- Because it is generally difficult for hedge funds to attract investors, and when the Class Z Shares produced extraordinary profits, only one investor was obtained, even if the fund had not liquidated, it is very unlikely that the Class Z Shares would have attracted additional investment in late 2006 and thereafter. (Aronson Report, ¶ 10).

- Even after Class Z shares liquidated, IAM could still have engaged several other Prime Brokers. (Aronson Report, ¶ 11).

## II. Argument

Plaintiff's Motion asks this Court to preclude Aronson from testifying at trial. The Court should evaluate Aronson's expertise when he is offered at trial where Plaintiff will have an opportunity to cross examine him, and Aronson can detail his experience in person. However, to the extent the court wishes to evaluate Aronson's qualifications on this Motion, Aronson is clearly qualified to testify here.

A. <u>Aronson is Uniquely Qualified to Testify Regarding The Hedge Fund's Viability</u>:

Plaintiff argues that Aronson is unqualified to testify regarding hedge fund damages. Only one of the topics that Aronson will testify about could arguably be characterized as a damages topic. Specifically, Aronson will be offered to testify that by October 2006, as a result of its past performance, the Independent Fund Limited ("<u>IFL</u>"), a hedge fund, would be

---

[1] A copy of Aronson's expert report is attached to the Aronson Declaration as Exhibit 1.

incapable of attracting new investors. However, Aronson is uniquely qualified to testify regarding the topic. As detailed above, while on the New Business Committee at Bear Stearns, Aronson was primarily responsible for analyzing hedge funds' ability to attract and maintain investors based on prior performance. Hence, Aronson is clearly qualified to testify about this topic at trial.

B.  <u>Aronson Is Not Being Offered to Testify Regarding Undisputed Facts</u>:

Plaintiff also argues that Aronson is improperly being offered to testify regarding subjects that were already decided by this Court's June 16, 2008 order granting Defendant's partial summary judgment motion. This allegation rests upon confused, conflicting, and misleading assertions. Specifically, Plaintiff argues that Aronson's contention that margin calls are common practice in the hedge fund industry is an undisputed fact because the court held that margin calls per se are not a violation of the Prime Brokerage Agreement. Yet, in another motion in limine filed the same day, Plaintiff indicated that it plans to offer evidence that the *number* of margin calls created by Zanger was excessive. <u>See</u> Defendant's Memorandum of Law in Support of Plaintiff's Motion in Limine to Preclude Evidence Concerning Defendant's Non-IFL Margin Calls and to Draw an Adverse Inference From Defendant's Non-Production of Such Evidence, Docket Number 56, at 7 (arguing the amount of margin calls in Zanger's personal accounts is relevant to determine whether Zanger acted with care when managing IAM's account). Aronson's testimony regarding the commonality of margin calls in the hedge fund industry is thus highly relevant as a factual matter to contradict Plaintiff's apparent argument that even if margin calls per se do not create a violation, the creation of a significant number of margin calls was excessive and somehow wrongful.

Defendant also argues that Aronson's testimony that IAM should have expected Zanger to use high leverage when it entered the Agreement is an undisputed fact because "Aronson's report simply reiterates the Courts [SIC] binding decision that drawdowns of more than 20% will not by themselves constitute a breach." Whether drawdowns were allowed under the Agreement is simply not related to the apparent argument they are making that Zanger used too much leverage. Aronson's testimony is highly relevant to the disputed factual matter regarding whether IAM intended for Zanger to trade with a high degree of leverage when it entered its agreement with him.

C. <u>Aronson Is Only Being Offered to Present Factual Opinions</u>

Additionally, Plaintiff agues that Aronson's opinions regarding the use of leverage in the hedge fund industry are based on "legal" opinions, not properly testified about by experts. In support of this argument, Plaintiff asserts that certain of Aronson's opinions are "phrased in terms of inadequately explored legal criteria" or that they merely "tell the jury what result to reach." Specifically, Plaintiff argues that Aronson's use of the phrases "expected" or "should have expected" in his expert report transform his factual testimony that IAM should have anticipated Zanger's trading strategy into a legal opinion. Not true. Aronson's testimony is directed at the factual issue of whether Zanger's trading strategy was contemplated by the parties when the Agreement was signed. This is a purely factual issue.

Moreover, Plaintiff argues that Aronson should not be permitted to testify regarding the "legal" issue of whether Zanger's creation of margin calls violated various rules and regulations. Aronson's testimony will go beyond the strict legality of that conduct and explain why and how creation of margin calls—even numerous margin calls—does not create any negative impact for a trading entity.

D.  <u>Aronson is Uniquely and Supremely Qualified to Testify About the Issues in this Case:</u>

Plaintiff argues that Aronson's testimony lacks sufficient basis in facts or data pursuant to Rule 702; however, Aronson's professional experience is directly relevant to the issues he will about which he will testify at trial.

First, Aronson plans to testify that based on Zanger's trading history and the circumstances surrounding Zanger's relationship with IAM, Szele, an experienced hedge fund trader, should have or did expected Zanger to utilize enough leverage to cause margin calls to occur.  Aronson bases this testimony on his over 30 years of experience in the hedge fund industry during which he interacted with thousands of investors, regulators, traders, brokers, and trading managers.  He also bases this opinion on his experience analyzing hedge fund volatility and creation of margin calls as a member of Bear Stearns' New Business and Regulatory Committees.

Second, Aronson expects to testify that the number of margin calls in the account were not excessive.  As part of Bear Stearns' Regulatory Committee, Aronson was directly responsible for determining whether and how to penalize hedge funds that used excessive margin or violated margin rules and regulations.  This experience makes Aronson uniquely qualified to testify regarding whether the creation of margin calls in IFL was excessive.

Third, Aronson will testify regarding IAM's ability to attract investors to the fund.  As discussed in detail above, while on the New Business Committee at Bear Stearns, Aronson was primarily responsible for analyzing hedge funds' ability to attract and maintain investors based on prior performance.  This experience is directly relevant to the testimony Aronson will offer.

Finally, Aronson expects to testify that in November 2006, IAM could have found another prime broker to service IFL shares had it attempted to do so. This testimony is based

upon Aronson's experience of analyzing hedge funds to determine whether Bear Stearns' brokerage should service these hedge funds. It is also based upon Aronson's over 30 years of working at, and interacting with various prime brokerages.

Aronson is clearly qualified to testify regarding the topics for which he is being offered.

E. <u>Aronson Will Not Testify Regarding Whether Zanger's Relationship with IAM Was a Joint Venture</u>:

Lastly, Plaintiff argues that Aronson cannot testify regarding whether plaintiff and Defendant entered into a joint venture because that is a legal matter. Aronson's report does not state that he will testify about this topic, and he does not plan to testify regarding this topic.

### III. Conclusion

For the reasons stated herein, Defendant respectfully requests that the Court grant this motion and any other relief it finds appropriate.

Dated: July 28, 2008                                Respectfully submitted,

*s/* Michael D. Silberfarb
Thomas H. Sear (TS-5570)
Michael D. Silberfarb (MS-9678)
Matthew E. Szwajkowski (MS-8362)
JONES DAY
222 East 41st Street
New York, NY 10017-6702
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
msilberfarb@jonesday.com

*Attorneys for Defendant Daniel Zanger*

**CERTIFICATE OF SERVICE**

      Michael D. Silberfarb, an attorney admitted to the Bar of this Court, certifies under penalty of perjury that on July 28, 2008, he caused a true and correct copy of the attached Memorandum of Law in Opposition to Plaintiff's Motion in Limine to be served via ECF filing on all counsel so registered.

Dated: New York, New York
         July 28, 2008

                                          s/ Michael D. Silberfarb
                                          Michael D. Silberfarb