**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

INDEPENDENT ASSET MANAGEMENT LLC ) Case No. 1:07-cv-06431-JSR
and OLA HOLMSTROM, )
)
       Plaintiffs, )
) ECF
vs. )
)
DANIEL ZANGER, )
)
       Defendant. )

------------------------------------------------------------ x

**DECLARATION OF RAYMOND L. ARONSON**
**IN SUPPORT OF MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE RAYMOND**
**ARONSON FROM TESTIFYING TO UNDISPUTED FACTS AND**
**DAMAGES AND FROM PROVIDING A LEGAL ANALYSIS**

I, Raymond L. Aronson, declare, pursuant to the provisions of 28 U.S.C. §1746, as follows:

1. Except as otherwise indicated below, I have personal knowledge of the facts stated herein. I am over twenty-one years of age and am competent to testify as a witness in this case as to the matters set forth herein.

2. I have been retained by Defendant in this matter to testify about four discrete topics about which his experience is clearly applicable. Specifically, I will testify that:

- Zanger's use of leverage and creation of margin calls as the fund manager of Class Z . . . Shares was typical for traders in the hedge fund industry, and there

are no negative consequences from the creation of margin calls when they are timely met. (Aronson Report, ¶.9).[1]

- The circumstances surrounding Zanger's employment at IAM illustrate that IAM should have, and likely did, expect that Zanger would employ a trading strategy involving the use of leverage. (Aronson Report, ¶ 10)

- Because it is generally difficult for hedge funds to attract investors, and when the Class Z Shares produced extraordinary profits, only one investor was obtained, even if the fund had not liquidated, it is very unlikely that the Class Z Shares would have attracted additional investment in late 2006 and thereafter. (Aronson Report, ¶ 10)

- Even after Class Z shares liquidated, IAM could still have engaged several other Prime Brokers. (Aronson Report, ¶ 11).

3. In 1959, I received my Bachelor of Arts Degree in non-western civilization and a minor in economics from the University of Rochester. In 1962, I received my law degree from New York University. I was admitted to the New York Bar shortly thereafter, and I remain admitted.

4. Between 1965 and 1972, I worked as an associate director of rulings at the American Stock Exchange (the "<u>AMEX</u>"). My responsibilities at the AMEX included writing rules applicable to traders, handling inquiries from the public on the floor, and working on special projects for the Chairman. In 1968, I had my first encounter with the fledgling hedge fund industry when I was asked to prepare a report on the nature of hedge funds and the identity of member organizations involved in them to the Executive Vice President for Legal and Regulatory Affairs of the AMEX.

5. From 1972 through 1975, I acted as General Counsel and Director of Compliance of Edwards & Hanly, a 26 branch regional broker-dealer. At Edwards &

---

[1] A true and correct copy of my expert report is attached hereto as Exhibit 1.

NYI-4083187v1

Hanly, I ran the compliance department and assured that the firm complied with its regulatory, management and investment responsibilities.

6. From 1975 through 2004, I acted as senior counsel in the Legal and Compliance Departments at Bear Stearns & Co., Inc. ("Bear Stearns") where I became Senior Managing Director. From 1999 through 2003, I served as Director of Compliance for Bear Stearns Securities Corporation, Bear Stearns' Clearing division.

7. During his 30 years at Bear Stearns, I advised both legal and business staff in all areas, including compliance, litigation, clearance, operations, securities lending, equities, derivatives, prime brokerage, hedge funds, private client services, arbitrage, and corporate finance. I sat with Bear Stearns' Prime Brokerage Group and Clearing service group that serviced hedge funds.

8. I served on Bear Stearns' committee responsible for determining whether Bear Stearns' brokerage would serve as the brokerage for applicant hedge funds (the "New Business Committee"). As a member of the New Business Committee, I was responsible for researching and analyzing the general reputation and performance history of both traders and trading managers affiliated with applicant funds. In performing this duty, I paid particular attention to among other factors, whether the fund's traders had violated applicable trading rules and regulations as well whether the fund abused its leverage limits. Also, as a member of the New Business Committee, I met with spoke with certain funds' investors and potential investors in order to determine the funds' long term viability for attracting and maintaining investors. I reported to business personnel regarding whether the fund would be capable of attracting additional investors in the long term.

9.      Moreover, I served on Bear Stearns' committee to determine how to penalize existing hedge funds clients that violated rules and regulations (the "Regulatory Committee").  In this role, I had lead responsibility for determining: (1) whether Bear Stearns' brokerage should continue to represent its current hedge fund clients; and (2) whether and how to penalize existing hedge funds for violations of Bear Stearns' prime brokerage rules.    In making these determinations, I analyzed the products the fund invested in, the quality of the fund's investors, as well as reputational issues such as excessive margin violations and volatility.  I also advised senior management with regard to how much leverage the brokerage should allow each hedge fund to use. In this role, I directly supervised a Bear Stearns employee who reviewed whether serviced hedge funds had created excessive margin violations.  If that employee made a determination that a fund's margin violations were indeed excessive, he would report to me, and I would advise senior management regarding potentially limiting the hedge fund's leverage in order to pressure the violating fund to find a new prime broker.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28 day of July, 2008.

>Respectfully submitted,
>
>/s/ Raymond L. Aronson
>Raymond L. Aronson

**CERTIFICATE OF SERVICE**

      Michael D. Silberfarb, an attorney admitted to the Bar of this Court, certifies under penalty of perjury that on July 28, 2008, he caused a true and correct copy of the attached Declaration of Raymond L. Aronson in Support of Memorandum of Law in Opposition to Plaintiff's Motion in Limine to be served via ECF filing on all counsel so registered.

Dated: New York, New York
         July 28, 2008

                                                  s/ Michael D. Silberfarb
                                                  Michael D. Silberfarb

NYI-4083187v1